UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ART-OPTIC, LTD.,                                        :
                                                       :
                        Plaintiff,                     :        08 CV 0327 (MGC) (KNF)
                                                       :
            v.                                         :
                                                       :
SAMUEL TOMASHOVER,                                     :
MERYL TOMASHOVER and                                   :
NEWLIGHT EYEWEAR, LLC,                                 :
                                                       :
                        Defendants.                    :
-------------------------------------------------------------X


# MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFF'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER,
## PRELIMINARY INJUNCTION AND RELATED RELIEF


Shira Y. Rosenfeld (SR 5392)
SHIBOLETH, YISRAELI, ROBERTS, ZISMAN, LLP
One Penn Plaza, Suite 2527
New York, New York, 10119
T: (212) 244-4111
F: (212) 563-7108

*Attorney for Plaintiff*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT...................................................................1

FACTUAL BACKGROUND...................................................................3

    I.      Prior Business History...................................................................4

    II.    Defendants Manufacture, Market and Sell Counterfeit Ronit Furst Eyewear and Cases...................................................................5

    III.   Defendants' Manufacture, Market and Sell Counterfeit Ronit Furst Eyewear......7

    IV.   S. Tomashover Improperly Applies to Trademark the "Ronit Furst" Name.........9

    V.    Art-Optic Obtains an Injunction in Israel Against the Tomashovers in September 2007...................................................................9

    VI.   Defendants Continue to Manufacture Market and Sell Counterfeit Ronit Furst Eyewear and Cases...................................................................10

    VII.  Defendants are Threatening Art-Optic's Current Distributor and Representatives...................................................................10

ARGUMENT...................................................................11

POINT I

PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION...................................................................11

    A.    Grounds for a Temporary Restraining Order...........................................11

    B.    Grounds for a Preliminary Injunction.................................................12

POINT II

PLAINTIFF WILL SUFFER IMMEDIATE AND IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.............12

POINT III

PLAINTIFF HAS A LIKELIHOOD OF SUCCESS ON EACH OF ITS CAUSES OF ACTION...................................................................13

A.    Plaintiff's First Cause of Action – Copyright Infringement..........................14

     1.    Art-Optic Owns Valid Copyrights.................................................14

     2.    Defendants' Actions Constitute Copying.......................................14

         a.     Actual Copying..............................................................14

     3.    Improper Appropriation...........................................................15

B.    Plaintiff's Second Cause of Action - Trademark Infringement.....................16

     1.    Art-Optic's "Ronit Furst" Trademark is Entitled to Protection.............17

     2.    Defendants' Use of Art-Optic's 'RONIT FURST' Mark is Likely to Cause Confusion as to the Origin or Sponsorship of Defendants' Goods.................................................................19

         a.     The Strength of the Plaintiff's Trademark.............................19

         b.     The Similarity Between the Two Trademarks........................20

         c.     The Proximity of the Products in the Marketplace..................20

         d.     Likelihood of "Bridging the Gap".....................................21

         e.     Actual Confusion..........................................................21

         f.     Defendants' Bad Faith....................................................22

         g.     Quality of Defendants' Product.........................................23

         h.     Sophistication of the Relevant Consumer Group....................23

C.    Plaintiff's Third Cause of Action - Common Law Trademark Infringement......24

D.    Plaintiff's Fourth Cause of Action - Trade Dress Infringement....................24

     1.    Plaintiff's Eyewear Trade Dress is Inherently Distinctive and Nonfunctional or Has Acquired Secondary Meaning..................25

     2.    Defendants' Use of Art-Optic's Trade Dress is Likely to Cause Confusion as to the Origin or Sponsorship of

Defendants' Goods....................................................................26

    a.    The Strength of the Plaintiff's Trade Dress..........................26

    b.    The Similarity Between the Two Trade Dresses....................26

    c.    The Proximity of the Products in the Marketplace..................26

    d.    Likelihood of "Bridging the Gap"...................................27

    e.    Actual Confusion.....................................................27

    f.    Defendants' Bad Faith...............................................27

    g.    Quality of Defendants' Product......................................27

    h.    Sophistication of the Relevant Consumer Group....................27

E.    Plaintiff's Fifth Cause of Action - Common Law Trade Dress Infringement......27

F.    Plaintiff's Sixth Cause of Action – False Advertising...............................28

G.    Plaintiff's Seventh Cause of Action -  New York False Advertising...............29

H.    Plaintiff's Eighth Cause of Action - Unfair Competition by Misappropriation...30

I.    Plaintiff's Ninth Cause of Action – Tortious Interference with Prospective Economic Advantage ......................................................30

POINT IV

PLAINTIFF HAS PRESENTED SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS TO MAKE THEM A FAIR GROUND FOR LITIGATION AND A BALANCE OF HARDSHIPS TIPPING DECIDEDLY IN PLAINTIFF'S FAVOR....31

POINT V

DEFENDANTS' INFRINGING COPIES AND REPRODUCTION EQUIPMENT MUST BE SEIZED, IMPOUNDED AND DESTROYED................................................32

POINT VI

PLAINTIFF IS ENTITLED TO AN ASSET RESTRAINING ORDER AND EXPEDITED DISCOVERY ORDER ...............................................................34

A.    Asset Restraining Order................................................................34

B.    Expedited Discovery Order..............................................................35

CONCLUSION.........................................................................................36

## TABLE OF AUTHORITIES

Cases:

*Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976) .............................. 25

*AIM Intern. Trading LLC v. Valcucine SpA.,* 188 F. Supp. 2d 384 (S.D.N.Y. 2002) ................. 11

*Cartier, a Div. of Richemont North America, Inc. v. Samo's Sons, Inc.,* 2005 WL 2560382 (S.D.N.Y., Oct. 11, 2005) ........................................................................... 22

*Cartier Intern. B.V. v. Ben-Menachem,* 2008 WL 64005 (S.D.N.Y., Jan. 3, 2008) ..................... 34

*Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132 (2d Cir. 1998) .......... 14

*Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 652 F. Supp. 1105 (S.D.N.Y. 1987). ..................................................................................................... 18

*Century Home Entertainment, Inc. v. Laser Beat, Inc.* 859 F. Supp. 636 (E.D.N.Y. 1994) ........................................................................................................ 33

*Courtenay Communications Corp. v. Hall,* 334 F.3d 210 (2d Cir. 2003) .............................. 16-17

*Edward B. Beharry & Co., Ltd. v. Bedessee Imports Inc.,* 2006 WL 3095827 (E.D.N.Y., Oct. 31, 2006) .......................................................................................... 34

*Eliya, Inc. v. Kohl's Dept. Stores,* 2006 WL 2645196 (S.D.N.Y., Sept. 13, 2006) ..................... 25

*Fonar Corp. v. Domenick,* 105 F.3d 99 (2d Cir. 1997) .............................................................. 14

*Freedom Calls Foundation v. Bukstel,* 2006 WL 845509 (E.D.N.Y., Mar. 3, 2006)................... 21

*Fruit-Ices Corp. v. Coolbrands Intern., Inc.,* 335 F. Supp. 2d 412 (S.D.N.Y. 2004)............. 12, 23

*Fun-Damental Too, Ltd. v. Gemmy Industries Corp.,* 111 F.3d 993 (2d Cir. 1997) ........ 24, 25, 26

*Gaste v. Kaiserman,* 863 F.2d 1061 (2d Cir. 1988).................................................................... 14

*Ideal Toy Corp. v. Chinese Arts & Crafts Inc.,* 530 F.Supp. 375 (S.D.N.Y. 1981)................ 27-28

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,* 348 F.Supp.2d 165 (S.D.N.Y. 2004) ...................................................................................................... 28

*Merit Diamond Corp.,* 376 F. Supp. 2d 517 (S.D.N.Y. 2005)...................................................... 15

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94 (2d Cir. 2002) ...... 12

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987)................................ 19

*Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133 (2d Cir. 1999) .. 23

*Neutrik AG v. Switchcraft, Inc.*, 2001 WL 286722 (S.D.N.Y. Mar. 23, 2001) *aff'd*, 31 Fed.
Appx. 718 (Fed. Cir. 2002) ..................................................................................................... 27

*Norbrook Laboratories Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463
(N.D.N.Y. 2003) ........................................................................................................................ 13

*North Face Apparel Corp. v. TC Fashions, Inc.*, 2006 WL 838993
(S.D.N.Y. Mar. 30, 2006) .................................................................................................. 34-35

*Novo Nordisk A/S*, 997 F.Supp. 470 (S.D.N.Y.,1998)................................................................ 29

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209 (2d Cir. 2003) ....................................... 17

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 WL 896952 (E.D.N.Y., Mar. 26, 2004) ..... 24

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ......................................... 19

*Price v. Fox Entertainment Group, Inc.*, 2007 WL 241389 (S.D.N.Y. Jan. 27, 2007) ................ 14

*Princeton Graphics Operating, L.P. v. NEC Home Elecs. (U.S.A.), Inc.*, 732 F.Supp.
1258 (S.D.N.Y.1990) ................................................................................................................ 29

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994) ....................................................................... 30

*Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 115 S.Ct. 1300 (1995) ................... 25

*Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997)............................ 15

*Roy Export Co. Establishment v. Columbia Broad. Sys.*, 672 F.2d 1095 (2d Cir. 1982) ............. 30

*Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 162 (2d Cir. 2007) .......................... 13

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473
(S.D.N.Y. 1990)........................................................................................................................ 35

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S. Ct. 2753 (1992)..... 16, 17, 18, 24, 25

*U2 Home Entertainment, Inc. v. Bowery Music City, Inc.*, 2003 WL 22889738
(S.D.N.Y. Dec. 8, 2003)........................................................................................................... 33

*Virgin Enterprises Ltd. v. Nawab,* 335 F.3d 141 (2d Cir. 2003) ............................................ 12, 17

<u>Statutes:</u>

15 U.S.C. § 1052(c) ................................................................................................ 17

15 U.S.C. § 1125 .................................................................................................... 18

15 U.S.C. §§ 1116(a) ......................................................................................... 11, 12

15 U.S.C. §1125(a)(1)(A) ........................................................................................ 15

15 U.S.C. §1125(a) .................................................................................... 2, 12, 17, 24

15 U.S.C. § 1125(b) ................................................................................................. 2

15 U.S.C. § 1125(a)(1)(B) ........................................................................................ 28

17 U.S.C. § 101 ................................................................................................... 2, 12

17 U.S.C. § 410(c) .................................................................................................. 14

17 U.S.C. § 502 ..................................................................................................... 12

17 U.S.C. § 503 ............................................................................................ 1, 32, 36

Fed. R. Civ. P. 65 ............................................................................................. 12, 33

Fed. R. Civ. P. 65(f) ............................................................................................... 33

N.Y. Gen. Bus. Law § 350 ............................................................................... 2, 11, 29

TMEP § 1206 ........................................................................................................ 18

TMEP § 813 .......................................................................................................... 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ART-OPTIC, LTD.,                           :

                Plaintiff,                      :            08 CV 0327 (MGC) (KNF)

            v.                                 :

SAMUEL TOMASHOVER,                         :
MERYL TOMASHOVER and                       :
NEWLIGHT EYEWEAR, LLC,                     :

             Defendants.                  :

------------------------------------------------------------X

## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFF'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER,
## <u>PRELIMINARY INJUNCTION AND RELATED RELIEF</u>

    Plaintiff Art-Optic, Ltd. ("Art-Optic") submits this Memorandum of Law in support of its

motion for a temporary restraining order, preliminary injunction, seizure, impoundment and

destruction of Defendants' infringing copies and reproduction equipment pursuant to 17 U.S.C. §

503, expedited discovery order and asset restraining order.

### <u>PRELIMINARY STATEMENT</u>

    Since 2002, Art-Optic, a company based in Israel, has produced and sold the Ronit Furst

brand of hand-painted eyewear and cases in New York and throughout the United States, Europe,

Israel and South Africa, where it has built up a brand and reputation for selling its unique hand-

painted eyewear. Art-Optic has expended substantial resources to work with the artist Ronit

Furst ("Furst") to design, manufacture, market and sell its eyewear. All of the designs are

created by Furst and they, along with the design and creation of the marketing materials, belong

to Art-Optic.

Since the beginning of 2007, Art-Optic has been deliberately and maliciously harmed by Samuel Tomashover ("S. Tomashover") and Meryl Tomashover (collectively "Tomashovers") who blatantly and willfully have been producing, manufacturing and marketing counterfeit "Ronit Furst" eyewear and cases. In addition, in April 2007, S. Tomashover has applied to trademark "Ronit Furst," Furst's personal name, in their disturbing and unyielding quest to destroy Art-Optic's goodwill. The Tomashovers, New York residents, who incorporated Newlight Eyewear, L.L.C. ("Newlight") (collectively "Defendants") in New York in June 2007, have not stopped there; they have deliberately sought out Art-Optic's exclusive distributor, Brintech, and its representatives in New York and throughout the United States, and have threatened to sue and destroy them. The representatives have either stopped selling Ronit Furst eyewear or refuse to sell the brand in the optical stores that already carry the counterfeit products out of fear for their safety.

The Defendants' egregious counterfeiting and marketing of Art-Optic's Ronit Furst eyewear and cases has damaged and continues to damage Art-Optic's business every day. They must be stopped.

Thus, Art-Optic asserts the following causes of action: 1) Copyright Infringement pursuant to the Copyright Act of 1976; 17 U.S.C. § 101, *et seq.*; 2) False Designations of Origin, False Representations and False Advertising, Section 43 of the Lanham Act; 15 U.S.C. § 1125(a); 3) Common Law Trademark Infringement; 4) False Designations of Origin, False Representations and False Advertising, Section 43 of the Lanham Act; 15 U.S.C. § 1125(a) – Trade Dress; 5) Common Law Trade Dress Infringement; 6) False Designations of Origin, False Representations and False Advertising, Section 43 of the Lanham Act; 15 U.S.C. § 1125(b) - False Advertising; 7) False Advertising - N.Y. Gen. Bus. Law §350; 8) Unfair Competition by

Misappropriation; and 9) Tortious Interference with Prospective Economic Advantage.  Art-Optic immediately seeks a temporary restraining order and preliminary injunction, including seizure, impoundment and destruction of all counterfeit products and manufacturing equipment used to make the counterfeit products to cease the daily injury inflicted by Defendants upon Art-Optic's business, reputation and goodwill.

## FACTUAL BACKGROUND

Art-Optic was founded in Israel in 2002 by Ehud Bibring ("Bibring"), who has managed its daily business affairs from its inception, and is owned by his mother Lea Bibring. (Affidavit of Ehud Bibring ("Bibring Aff.") ¶¶ 2, 3.)  Art-Optic exclusively manufactures and sells the "Ronit Furst" brand of unique hand-painted eyewear designed and created by Bibring's wife, the artist Ronit Furst ("Furst"), with a distinctively designed case accompanying each pair of eyeglasses sold. (*Id.* at ¶¶ 2-3, 5.)  Since 2002, Art-Optic, has grown from a small local business to a well-known international eyeglasses company who sell Ronit Furst hand-painted eyewear in optical stores in New York, throughout the United States, Europe, Israel and South Africa. (*Id.* at ¶ 4.)  Because of the high artistic beauty and the unique and distinctive design as well as personal attention given to apply each design on each frame, the "Ronit Furst" brand has earned a reputation as distinctive, high quality eyeglasses through Israel, Europe and the United States. (*Id* at ¶ 7.)

The eyeglasses produced by Art-Optic are unique and distinctive as each frame is designed with hand-painted colorful designs created by Furst, the artist behind each design on the eyewear. (*Id* at ¶ 5.)  Each design is then hand-painted onto clear plastic eyeglass frames by a select small group of artists who train for months to learn the various designs and apply these designs under the direct supervision of Furst. (*Id.*)  Each design has an identifying index number

which is handwritten by an artist on the inside of the right temple of each frame. After applying a special coating process that affixes the paint to the surface of the frame, each frame is then screen printed with Ronit Furst's personal signature on the left temple and left lens of each frame. (Bibring Aff. ¶ 5.)

Designing, creating, marketing and distributing the eyeglasses took and still takes intensive research, a great deal of labor, and a large capital investment into Art-Optic. (*Id* at ¶ 6.)

All designs and marketing material are proprietary and owned outright by Art-Optic, including all intellectual property rights. (*Id* at ¶ 6, Ex. 1.) The designs of three of these frames and case are registered with the U.S. Copyright Office. (*Id* at ¶ 6, Ex. 2.) Art-Optic has filed for copyrights on the remaining twenty-three frames. (*Id.*)

I.    **Prior Business History**

In 2004, Art-Optic, the Tomashovers and David Goldwasser, a relative of the Tomashovers, entered into an exclusive Sales and Distribution Agreement ("Agreement"). (*Id.* at ¶¶ 8-9, Ex. 3.) The term of the Agreement was thirteen months, from December 1, 2004 until December 31, 2005, and contained a non-competition clause which extended to December 31, 2007. (*Id.* at ¶ 9, Ex. 3.) The Agreement provided that the Tomashovers had the exclusive right to purchase and sell the Ronit Furst Brand of Eyewear in the United States with the exception of two customers, one of which was a small distributor in the Rochester, New York area, and the other being an optical shop in Manhattan. (*Id.* at ¶¶ 8, 9.) As part of the Agreement, and to assist with the sales of the Ronit Furst brand of eyewear, Art-Optic supplied the Tomashovers with marketing material, including posters, wallpapers, brochures and colorful shelving designed by Art-Optic. (*Id.* at ¶ 3.) With the approval of all parties, Goldwasser subsequently withdrew from the Agreement in February 2005. (*Id.* at ¶ 9.)

During the term of the Agreement, the Tomashovers repeatedly breached the terms by not ordering the required quantities as per the term of the Agreement, failing to pay for products supplied to them by Art-Optic, and not returning damaged frames after Art-Optic replaced them. (Bibring Aff. ¶¶ 10, 11.) The Agreement was not renewed after December 31, 2005; however, Art-Optic reluctantly allowed the Tomashovers to continue selling the Ronit Furst brand of eyewear in the United States on a non-exclusive basis as Art-Optic had no other distributor in the Untied States. (*Id.* at ¶ 12.) In April 2006, the Tomashovers attempted to enter into a new agreement with Art-Optic, however they continually demanded terms which were unfavorable to Art-Optic and failed to remedy their existing breaches of the Agreement. (*Id.* at ¶ 13.) Thus, Art-Optic sought a new distributor. (*Id.* at ¶ 15.) The Tomashovers could not accept that the relationship was over and shouted obscenities at Bibring and threatened to harm Art-Optic if it sought a new importer. (*Id.* at ¶ 15, 16.) As a result, Art-Optic, through its counsel in Israel, sent a letter dated December 5, 2006 informing the Tomashovers that they were no longer authorized to sell the Ronit Furst brand of eyewear and they could not hold themselves out to the public as representatives of Art-Optic, Ronit Furst or as promoters and sellers of the Ronit Furst brand of eyewear. (*Id.* at ¶ 16.)

## II.    Defendants Manufacture, Market and Sell Counterfeit Ronit Furst Eyewear and Cases

In February 2007, Bibring learned from Cathy Shue ("Shue"), an owner of an optical store in Monterey, California, that the Tomashovers sold her frames which they claimed to be original Ronit Furst frames. (*Id.* at ¶¶ 17-20, Ex. 4, Affidavit of Cathy Shue) On March 16, 2007, Shue sent the frames sold to her by the Tomashovers to Bibring. (*Id.* at ¶ 22, Ex. 5) The frames were counterfeit and Bibring replaced Shue's frames with originals at no cost. (*Id.*) On the authentic Ronit Furst eyewear, the color reference is written by hand on the bottom of the

right temple of each frame. On the frames sent by Shue, the color reference was screen printed on the upper inside right temple of each frame. (Bibring Aff. ¶ 22, Ex. 5.)

The Tomashovers, knowing that they would no longer receive goods from Art-Optic due to the termination of our agreement, actively took the time to seek out a supplier to create counterfeit Ronit Furst frames. (*Id.* at ¶ 23.) They produced exact replicas of Art-Optic's frame shapes, a production process that within the optical industry takes at least 4-5 months. (*Id.*) They had learned of Art-Optic's technique and method of producing the eyeglasses frames from Bibring who explained the process to S. Tomashover in the regular course of business during the term of the Agreement. (*Id.*)

The Tomashovers used Art-Optic's trade secrets and confidential information to train their manufacturer to mirror Art-Optic's technique, albeit not perfect. (*Id.*) Their manufacturer continues to produce precise copies of Ronit Furst's frame designs, including printing her name on the left temple of the eyeglasses frames as well as upon the left lens, thereby infringing on Art-Optic's intellectual property. (*Id.*)

Finally, the Tomashovers marketed and sold their counterfeit frames as original Ronit Furst frames. (*Id.*) Innocent customers were duped into purchasing these frames, unaware of the differences between the frames. (*Id.*)

The Tomashovers' behavior reflects a deliberate attempt to create and build their business on Art-Optic's business, goodwill and reputation. (*Id.* at ¶ 24.) Their deliberate use of a separate manufacturer and training their workers how to create the designs and apply them to the frames in the exact same manner as Art-Optic shows that this was a well thought-out scheme plotted by the Tomashovers.

6

In addition, the Tomashovers also began to produce eyeglass cases that were the same unique shape and design as the glasses cases manufactured by Art-Optic to hold the Ronit Furst glasses. (Bibring Aff. ¶ 6, Ex. 1.) The Tomashovers also continued to use the Art-Optic marketing materials after the term of the Agreement ended as part of their deliberate scheme to hold themselves out as authorized sellers of the Furst Brand Eyewear to optical stores in New York and throughout the United States. (Bibring Aff. ¶¶ 20, 21; Affidavit of Avri Beeri ("Beeri Aff.") ¶ 5.)

On June 8, 2007, the Tomashovers incorporated "Newlight Eyewear L.L.C." in New York with their home address as the address of the company. (Declaration of Shira Y. Rosenfeld ("Rosenfeld Dec.") ¶ 2, Ex. 1.) Thus, the Tomashovers have established a limited liability company to front their counterfeiting operation.

III.    **Defendants' Manufacture, Market and Sell Counterfeit Ronit Furst Eyewear**

The Tomashovers have flooded the marketplace in the United States with counterfeits of Art-Optic exclusive and uniquely individual products thereby damaging Art-Optic's business, goodwill and reputation in the U.S. marketplace. (Bibring Aff. ¶ 25.) The Tomashovers' sale of counterfeit eyewear has not been limited to individual stores like Shue's. (*Id.* at ¶¶ 26, 32, Ex. 7, Affidavit of Ruth Domber of 10/10 Optics.) They have attended conventions in New York, Chicago and Las Vegas where they have claimed to represent Ronit Furst eyewear. (Bibring Aff. ¶ 26, Ex. 7; Beeri Aff. ¶ 9, Ex. 4) Through these conventions, the Tomashovers sold unknown amounts of counterfeits throughout the world. (*Id.*) In fact, Bibring learned that they plan to attend a convention in Atlanta in February 2008 in furtherance of their counterfeiting scheme. (Bibring Aff. ¶ 26.)

In October 2007 at the Vision Expo West eyeglasses convention in Las Vegas, Defendants sold identically designed counterfeit Ronit Furst frames in a booth less than 50 feet from Art-Optic's booth which was selling original Ronit Furst frames. (Bibring Aff. ¶ 27; Beeri Aff. ¶¶ 5, 6; Ex. 2.) This convention appearance caused Art-Optic and Avri Beeri ("Beeri") of Brintech, Art-Optic's official distributor as of May 2007, significant damage to the outstanding reputation of the Ronit Furst brand of eyewear, a great deal of embarrassment and thousands of dollars in lost sales because customers avoided our booth when they saw identical frames being sold several feet from us. (Bibring Aff. ¶¶ 27, 32; Beeri Aff. ¶ 6, Ex. 2) Because of this, Art-Optic was not able to sell many frames at the convention. (*Id.*)

While in Las Vegas, Bibring and Beeri saw 30 counterfeit frames advertised with a photograph of Ronit Furst at Davante, a prestigious boutique optical store in The Forum Shops located at the Caesar's Palace Hotel. (Bibring Aff. ¶ 28, Ex. 6; Beeri Aff. ¶ 8, Ex. 3.)

In October 2007, Bibring also traveled to New York and visited Bella Vista Optics, located at 1291 Lexington Avenue, New York, New York, and A.R. Trapp Opticians, located at 488 Madison Avenue, New York, New York, where he saw over 40 different pieces of counterfeit Ronit Furst eyewear supplied by Defendants. ( Bibring Aff. at ¶ 29.) Bibring purchased a counterfeit version of frame number 1174 color 9 from A.R. Trapp Opticians and noticed that Defendants realized their error in creating their counterfeit frames. (*Id.*) In an effort to conceal their error and have their frames look more like original Ronit Furst frames, Defendants have since scratched out the color reference which was printed on the frame and replaced it with a hand-painted color reference utilizing a color similar to Art-Optic's. (*Id.*)

**IV.    S. Tomashover Improperly Applies to Trademark the "Ronit Furst" Name**

On or about April 30, 2007, S. Tomashover applied for a trademark registration for the mark RONIT FURST (Serial No. 77169467).  (Bibring Aff. ¶ 30; Rosenfeld Dec. ¶ 3, Ex. 2.) According to the application posted on the United States Patent and Trademark Office website, S. Tomashover listed himself as the owner. (*Id.*)  Neither Ronit Furst, Art-Optic or Bibring gave S. Tomashover the right to use the mark RONIT FURST.  (Bibring Aff. ¶ 30.)  S. Tomashover also falsely claimed that his first use in commerce occurred "at least as early as 11/01/2004," prior to his entry into the Agreement with Art-Optic, who first used the mark in commerce since January 2002. (Bibring Aff. ¶¶ 4, 30; Rosenfeld Dec. Ex. 2.)  This is false because Art-Optic has been manufacturing and marketing Ronit Furst frames since 2002. (*Id.*)   Furthermore, S. Tomashover's application to trademark of Furst's name was also in direct violation of paragraph 8.1 of the Agreement: "It is hereby specifically acknowledged by the buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product." (Bibring Aff. ¶ 30.)

**V.    Art-Optic Obtains an Injunction in Israel
        Against the Tomashovers in September 2007**

In April 2007, Art-Optic sued the Tomashovers in Tel Aviv District Court in the State of Israel (Civil File 1661/07).  (Bibring Aff. at ¶ 32, Exs. 4, 7.)  On September 20, 2007, the District Court issued a temporary injunction barring the defendants from "making and/or marketing and/or selling spectacle frames that constitute an imitation of the decorated frames made by the [plaintiff] with the inscription Ronit First [sic] . . ." (*Id.* at ¶ 32, Ex. 8.)  In addition, a judgment was entered against the Tomashovers in the amount of 20,000 NIS (New Israeli Shekels) for attorney's fees. (*Id.*)

9

## VI.  Defendants Continue to Manufacture, Market and Sell Counterfeit Ronit Furst Eyewear and Cases

Despite the temporary injunction and judgment, Defendants continue to: (1) manufacture eyewear that is deliberately produced to look exactly like Art-Optic's Ronit Furst eyewear and cases; (2) hold themselves out as authentic Ronit Furst eyewear dealers; and (3) palm off their counterfeit eyewear and cases as Ronit Furst eyewear and cases to the public. (Bibring Aff. ¶ 32; Beeri Aff. ¶¶ 5-8, Ex. 3.)  Defendants' blatant and deliberate scheme to infringe Art-Optic's unique Ronit Furst line of hand-painted eyewear and cases has caused serious business losses. (Bibring Aff. ¶¶ 25, 31, 33; Beeri Aff. ¶¶ 9,10, 12-14.)

## VII.  Defendants are Threatening Art-Optic's Current Distributor and Representatives

Defendants have also engaged in a campaign to identify Brintech's representatives in New York and throughout the United States. (Beeri Aff. ¶ 11.)  Once identified, S. Tomashover has verbally threatened and intimidated Brintech and its representatives in the United States and in New York that he will sue and bankrupt them.  (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.)  The representatives are frightened and most have decided no longer to distribute Ronit Furst Frames because they do not want to deal with Defendants' threatening and abusive behavior.  (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.)  Moreover, the Defendants spread false rumors about Art-Optic's business practices thereby further damaging Art-Optic's reputation.  (Bibring Aff. ¶ 25; Beeri Aff. ¶ 11.)

Art-Optic's agreement with Brintech has called for Brintech to order an additional 2,000 eyeglasses by January 31, 2008.  (Bibring Aff. ¶ 31; Beeri Aff. ¶ 14.)  As of November 2007, Beeri has already informed Bibring that he will not be able to purchase this amount because he is finding it extremely difficult to find representatives to sell the frames because of Defendants' reprehensible behavior.  (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.)

The Defendants' blatant and deliberate scheme to infringe Art-Optic's unique Furst Brand Eyewear is defrauding the public and is undoubtedly damaging Art-Optic's business and sales. The Defendants are clearly embarking on a program to expand their counterfeiting business, divert business away from Art-Optic and earn money off of the hard-earned reputation built up over years by Ronit Furst and Art-Optic. (Bibring Aff. ¶ 33.) By threatening and intimidating Beeri's representatives in the United States, Defendants have ensured that no one wants to work with Art-Optic and it is losing sales of the glasses while Defendants enjoy the sale of their counterfeit products. (*Id.*) It is imperative that the temporary restraining order and preliminary injunction be granted to stop Art-Optic's continued losses and to help restore our business, goodwill and reputation which are being tarnished by Defendants. This instant motion seeks to immediately halt the Defendants' continuous infringing acts. (*Id.*)

## ARGUMENT

### POINT I

### PLAINTIFF IS ENTITLED TO A
### TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff is entitled to a temporary restraining order and preliminary injunction pursuant to Fed. R. Civ. P. Rule 65 and a preliminary injunction pursuant to 17 U.S.C. § 502 and 15 U.S.C. § 1116(a) to prevent Defendants from causing continuing harm to Art-Optic, in violation of its rights, and tending to render a judgment ineffectual.

**A.     Grounds for a Temporary Restraining Order**

A temporary restraining order is specifically provided for in Fed. R. Civ. P. Rule 65. A temporary restraining order will issue in this Circuit upon a showing of the likelihood – not mere possibility – of imminent "irreparable harm." *AIM Intern. Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002).

11

**B.    Grounds for a Preliminary Injunction**

Preliminary injunctions are specifically authorized by Fed. R. Civ. P. 65 and by 17 U.S.C. § 502, which applies to plaintiff's first claim, copyright infringement pursuant to Copyright Act of 1976; 17 U.S.C. § 101, *et seq.*, and 15 U.S.C. §§ 1116(a), which apply to plaintiff's second, fourth and sixth claims based on trademark infringement, trade dress Infringement and false advertising pursuant to False Designations of Origin, False Representations and False Advertising, Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) and (b).

In the Second Circuit, a preliminary injunction is proper where a plaintiff establishes "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002).

**POINT II**

**PLAINTIFF WILL SUFFER
IMMEDIATE AND IRREPARABLE HARM WITHOUT
A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

In copyright infringement cases, irreparable harm is presumed where a plaintiff makes out a *prima facie* case of copyright infringement. *Id.* In actions for trademark infringement and trade dress infringement, a likelihood of confusion is generally sufficient to demonstrate irreparable harm. *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (trademark infringement); *Fruit-Ices Corp. v. Coolbrands Intern., Inc.*, 335 F. Supp. 2d 412, 418 (S.D.N.Y. 2005) (trade dress infringement). With respect to a claim for false advertising, irreparable harm is presumed when plaintiff is an obvious competitor with respect to the

misrepresented product. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 162 (2d Cir. 2007). Irreparable harm is shown in an unfair competition claim if there is a "potential loss of an industry leader's present market and loss of the advantage of being the pioneer in the field and the market leader." *Norbrook Laboratories Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 492-93 (N.D.N.Y. 2003).

Art-Optic clearly meets these presumptions of irreparable harm as demonstrated in Point III, *infra*. There is no question that Art-Optic will continue to suffering immediate and irreparable harm in the absence of a temporary restraining order because every day that Defendants produce, market and sell their counterfeit eyewear, represent themselves as authentic distributors of Ronit Furst eyewear and threaten Art-Optic's distributor and representatives, it damages Art-Optic's business, reputation and goodwill. Defendants' actions blatantly violate the temporary injunction obtained by Art-Optic in Israel in September 2007, which expressly enjoined the Tomashovers from manufacturing and selling counterfeit Ronit Furst frames. (Bibring Aff. ¶ 32, Ex. 8.) Moreover, Defendants plan to attend an eyewear convention in Atlanta, Georgia in February 2008 in furtherance of their counterfeiting scheme (*Id.* at ¶ 26.) Because Defendants' egregious acts will cause Art-Optic to suffer immediate and irreparable harm, it follows that Art-Optic will suffer irreparable harm in the absence of an issuance of a preliminary injunction as well.

## POINT III

### PLAINTIFF HAS A LIKELIHOOD OF
### SUCCESS ON EACH OF ITS CAUSES OF ACTION

It is clear that Art-Optic is likely to succeed on each of its causes of action against the Defendant and will raise sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in favor of Art-Optic.

A.    **Plaintiff's First Cause of Action – Copyright Infringement**

To prevail on a claim of copyright infringement, a plaintiff must prove two elements: "ownership of a valid copyright and the copying of constituent elements of the work that are original. *Fonar Corp. v. Domenick,* 105 F.3d 99, 103 (2d Cir. 1997)

1.    **Art-Optic Owns Valid Copyrights.**

A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright. 17 U.S.C. § 410(c); *Price v. Fox Entertainment Group, Inc.*, 2007 WL 241389, *5 (S.D.N.Y. Jan. 27, 2007)

Art-Optic has obtained certificates of registration for three of its eyewear designs and one of its cases. (Bibring Aff. ¶ 6, Ex. 2.)  Thus, Art-Optic has provided prima facie evidence of its ownership of those copyrighted materials.  Furthermore, Art-Optic has applied to register its remaining 23 frames. (Bibring Aff. ¶ 6.)

2.    **Defendants' Actions Constitute Copying.**

The second element, copying, is comprised of two requirements: actual copying and improper or unlawful appropriation.  *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)

a.    **Actual Copying**

Actual copying may be established either by direct evidence of copying or by indirect evidence, including "access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Id.*  The Second Circuit has stated that "[a]ccess means that an alleged infringer had a 'reasonable possibility' - not simply a 'bare possibility' - of hearing [or seeing] the prior work." *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir. 1988). Furthermore, a finding of probative similarity "requires only the fact that the infringing work

14

copies something from the copyrighted work." *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997).

Here, Defendants' counterfeiting of Ronit Furst eyewear clearly satisfies "actual copying" under a direct evidence analysis. Defendants willfully created counterfeit frames and cases that are identical to Art-Optic's Ronit Furst eyewear. (Bibring Aff. ¶¶ 22-24, Ex. 5; Beeri Aff. ¶ 7.) Defendants made an active effort to replicate every detail of Ronit Furst eyewear, by creating identically shaped clear plastic eyeglasses frames, copying the designs and color schemes and printing Ronit Furst's personal signature on the left temple and left lens of each frame. (*Id.*) Defendants also copied the unique shape and design of the cases. (*Id.*) Thus, even using indirect evidence and a probative similarity analysis, the "actual copying" prong is satisfied as well, because the authentic and counterfeit frames and cases are identical. It is also indisputable that the Tomashovers, as the previous exclusive distributor of authentic Ronit Furst eyewear, were given the copyrighted eyewear and cases to sell and thus had direct access prior to producing their counterfeit eyewear and case. (Bibrin g Aff. ¶ 23.)   Art-Optic has clearly established actual copying.

### 3.     **Improper Appropriation**

Once actual copying has been established, as is the case here, the next step must focus on the second element of copying, the "improper appropriation" requirement. Improper appropriation is established by demonstrating "substantial similarity" between the protected elements of the copyrighted work and the alleged infringing copy. *Merit Diamond Corp.*, 376 F. Supp. 2d 517, 525 (S.D.N.Y. 2005).

Applying the 'substantial similarity' analysis to the context of the matter at hand, Defendants' counterfeit eyewear and case is not merely substantially similar to the Ronit Furst

eyewear and case, but are virtually exact copies, clearly giving rise to improper appropriation on the part of the Defendants.  (Bibring Aff. ¶ 22-24, Ex. 5; Beeri Aff. ¶ 7.)

**B.**    **Plaintiff's Second Cause of Action - Trademark Infringement**

15 U.S.C. §1125(a)(1)(A), Section 43(a)(1)(A) of the Lanham Act provides, in relevant part:

> **§ 1125. False designations of origin, false descriptions, and dilution forbidden**
>
> (a) Civil action
>
> **(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The United States Supreme Court in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68, 112 S. Ct. 2753, 2757 (1992), stated that unregistered marks are entitled to protection under Lanham Act, Section 43(a):

> The Lanham Act was intended to make "actionable the deceptive and misleading use of marks" and "to protect persons engaged in ... commerce against unfair competition." § 45, 15 U.S.C. § 1127. Section 43(a) "prohibits a broader range of practices than does § 32," which applies to registered marks, *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 858, 102 S.Ct. 2182, 2190-2191, 72 L.Ed.2d 606 (1982), but it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a). See *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 299, n. 9 (CA3 1986); *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 215-216 (CA2 1985).

(footnote omitted); *see also Courtenay Communications Corp. v. Hall*, 334 F.3d 210, 214 (2d

Cir. 2003) ("Although CCC has not registered its mark, an unregistered mark is entitled to Lanham Act protection if it would qualify for registration.")

In *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003), the Second Circuit set forth the test to assert a claim for trademark infringement under 15 U.S.C. 1125(a). In *Virgin Enterprises Ltd. v. Nawab,* the Second Circuit stated:

> a claim of trademark infringement, whether brought under 15 U.S.C. § 1114(1) (for infringement of a registered mark) or 15 U.S.C. § 1125(a) (for infringement of rights in a mark acquired by use), is analyzed under the familiar two-prong test described in *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072 (2d Cir.1993). *See Time, Inc. v. Petersen Publ'g Co. L.L.C.,* 173 F.3d 113, 117 (2d Cir.1999) (noting that *Gruner* test is applicable to claims brought under § 1114(1) and § 1125(a)). The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods. *Gruner,* 991 F.2d at 1074.

## 1.    Art-Optic's "Ronit Furst" Trademark is Entitled to Protection.

To determine a mark's eligibility, it is first necessary to classify it as either (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Two Pesos, Inc.*, 505 U.S. at 768-69 (1992). While an individual's proper name is inherently considered descriptive in the Second Circuit, it can qualify for trademark protection if the name has attained "secondary meaning." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 217 (2d Cir. 2003). Furthermore, a personal name rendered in a distinctive lettering style may be considered strong even without a showing of secondary meaning. *Id.* (citation omitted).

As of the date of this action, Art-Optic has not yet registered the trademark "RONIT FURST" and is, in fact, unable to do so because S. Tomashover has improperly applied for trademark protection of the mark RONIT FURST claiming himself as owner of the mark. (Bibring Aff. ¶ 30; Rosenfeld Dec. ¶ 3, Ex. 2). S. Tomashover's application for trademark protection of Furst's name is a violation of Trademark Act Section 2(c), 15 U.S.C. § 1052(c);

TMEP §§ 813 and 1206 because S. Tomashover did not receive signed, written consent from Furst to apply to trademark her name. (Rosenfeld Aff. ¶ 3, Ex. 2)  Furthermore, S. Tomashover falsely claimed that his first use in commerce occurred "at least as early as 11/01/2004," prior to his entry into the Agreement with Art-Optic, who first used the mark in commerce since January 2002. (Bibring Aff. ¶¶ 4, 30.)  S. Tomashover's application to trademark Furst's name was also in direct violation of  paragraph 8.1 of the Agreement: "It is hereby specifically acknowledged by the buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product." (*Id.*)    Thus, the application must be rejected or withdrawn, which is one type of relief that Art-Optic is requesting in its Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, before Art-Optic can apply for a trademark.   Nevertheless, Art-Optic is entitled to trademark protection for their use of the mark under 15 U.S.C. § 1125.

Attaining "secondary meaning" means that despite its merely descriptive nature, a mark becomes distinctive of the goods in the minds of consumers. *Two Pesos*, 505 U.S. at 768-69. These factors include (1) advertising expenditures, (2) consumer studies linking the name to a source, (3) sales success, (4) unsolicited media coverage of the product, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 652  F.  Supp.  1105,  1108 (S.D.N.Y.  1987).    In  *Centaur Communications, Ltd.*, the Court stated, "[i]n assessing the existence of secondary meaning no 'single factor is determinative,' and every element need not be proved. Each case, therefore, must be resolved by reference to the relevant factual calculus." *Id., citation omitted.*

Art-Optic has continuously been using the name "RONIT FURST," the artist's personal name, on each pair of its eyeglasses designs sold in New York and throughout the United States,

and in Europe, Israel and South Africa, as well as on all of its marketing materials, since 2002. (Bibring Aff. ¶ 4.) Art-Optic has spent considerable funds advertising Ronit Furst eyewear and the public has come to identify the brand with the original designs created by the artist Ronit Furst. (Bibring Aff. ¶ 7.) Such advertising efforts and public association have been significant in generating significant sales of Ronit Furst eyewear. (Bibring Aff. ¶ 7.) Furthermore, Defendants have blatantly plagiarized the "Ronit Furst" trademark by emblazoning it on the left temple and left lens of all of its counterfeit eyewear. (Bibring Aff. ¶¶ 22-24, Ex. 5.) Ms. Furst's name – "RONIT FURST" has acquired secondary meaning and is inextricably associated in the minds of consumers with the unique hand-painted eyewear produced by Ronit Furst. (Bibring Aff. ¶ 7.)

2. **Defendants' Use of Art-Optic's 'RONIT FURST' Mark is Likely to Cause Confusion as to the Origin or Sponsorship of Defendants' Goods**

The Second Circuit applies the test established in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) to evaluate whether there is a likelihood of confusion. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256 (2d Cir. 1987). A nonexhaustive list of eight factors, articulated by Judge Friendly in *Polaroid, supra*, 287 F.2d at 495, helps guide this inquiry: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will "bridge the gap" between the two markets; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the purchasers. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256 (2d Cir. 1987)

a. **The Strength of the Plaintiff's Trademark**

Each frame produced by Art-Optic is screen printed with Ronit Furst's personal signature in block letters "RONIT FURST" on the left temple and left lens of each frame (Bibring Aff. ¶

5, Ex. 1.) Furthermore, all of the marketing materials used by Art-Optic to sell the Ronit Furst

brand of eyewear prominently contain the "Ronit Furst" mark. (Bibring Aff. ¶ 6; Beeri Aff. ¶ 2,

Ex. 1) Thus, eyewear bearing the Ronit Furst name written distinctively in her personal

handwriting is highly recognized and respected as a symbol of the unique hand-painted designs

on eyewear created by her. (Bibring Aff. ¶ 7.) Therefore, the Ronit Furst Trademark has

undoubtedly acquired the requisite strength to satisfy this particular "*Polaroid*" factor.

### b.    The Similarity Between the Two Trademarks

When comparing the RONIT FURST mark on the authentic eyewear and Defendants'

counterfeit eyewear, it is obvious that Defendants deliberately copied the RONIT FURST mark

by replicating Furst's handwritten signature and placing it on the left temple and lens of each

frame. (Bibring Aff. ¶¶ 5, 22-23, Exs. 1, 5.)

### c.    The Proximity of the Products in the Marketplace

Both Art-Optic and Defendants operate within the same industry – design, production

and sale of eyeglasses frames – and their respective products, Ronit Furst authentic eyewear and

the counterfeit eyewear, are designed to appeal to the same consumer base, in fact the same exact

customers seeking to purchase Ronit Furst frames. (Bibring Aff. ¶¶ 3-7, 17-23, 27-30; Exs. 1, 3-

5, 7; Beeri Aff. ¶¶ 4-12, Exs. 1-3.) For instance, Defendants sold their counterfeit Ronit Furst

frames using Ronit Furst publicity materials to Cathy Shue, an owner of an optical store in

Monterey, California. (Bibring Aff. ¶¶ 17-22, Exs. 4-5.) Art-Optic's representatives have also

attended conventions in New York, Chicago and Las Vegas where they have claimed to

represent Ronit Furst eyewear. (Bibring Aff. ¶¶ 26-27; Beeri Aff. ¶¶ 4-5, Ex. 2.) Specifically, in

October 2007, Defendants had a booth at the Vision Expo West eyeglasses convention in Las

Vegas, where they sold identically designed counterfeit Ronit Furst frames in a booth less than

50 feet from Art-Optic's booth which was selling original frames. (Bibring Aff. ¶ 27; Beeri Aff. ¶ 5, Ex. 2.) At the same time, Bibring and Beeri saw 30 counterfeit frames advertised with a photograph of Ronit Furst at Davante, a prestigious optical store in Las Vegas (Bibring Aff. ¶ 28; Ex. 6;Beeri Aff. ¶ 8, Ex. 3.) The proximity of the products in the marketplace is not only close, but in fact overlapping.

        d.      **Likelihood of "Bridging the Gap"**

For the purposes of "*Polaroid*" test analysis, "bridging the gap" refers to whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, "bridge the gap." *Freedom Calls Foundation v. Bukstel*, 2006 WL 845509, *10 (E.D.N.Y., Mar. 3, 2006) However, there is no bridge to gap when the parties are competing in the same market, making this factor irrelevant in the likelihood of confusion analysis. *Id.* ("More broadly, it is clear that Plaintiff is not just likely to enter Defendant's 'business'-it is a foregone conclusion because this is the exact same space that Plaintiff occupied before Defendant created his infringing website.")

There is no bridge to gap in the case at bar and it is thus a foregone conclusion that Defendants are trying to occupy exactly the same position in the market by trying to palm off their counterfeit eyewear as Ronit Furst eyewear.

        e.      **Actual Confusion**

The very nature of the infringing counterfeit eyewear – that they are exact replicas of the Ronit Furst brand of eyewear – means that consumers cannot tell the difference between one or the other and are duped into purchasing the counterfeit frames, unaware of the differences. (Bibring Aff. ¶ 23.) At the Vision Expo West in Las Vegas in December 2007, where both Art-Optic and Defendants had booths less than 50 feet away from each other, numerous distributors

and optical stores approached Beeri and asked why Art-Optic and Defendants were both selling the same frames. (Bibring Aff. ¶ 27; Beeri Aff. ¶ 6.)

> ### f.    **Defendants' Bad Faith**

In *Cartier, a Div. of Richemont North America, Inc. v. Samo's Sons, Inc.*, 2005 WL 2560382, *9 (S.D.N.Y., Oct. 11, 2005), the Court set forth the standard in determining bad faith:

> The question is whether Defendants "adopted the marks with the intention of capitalizing on Cartier's reputation and goodwill, as well as any customer confusion as to the source of the products." *Four Star,* 348 F.Supp.2d at 248; *see also Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 482-83 (2d Cir.1996). Defendants' Watch appears similar to the Tank Francaise, and Defendants, as jewelry sellers, must (should) have "had knowledge of plaintiffs' design and did not innocently choose a confusingly similar design." *Four Star,* 348 F.Supp.2d at 248.

Defendants' bad faith is intrinsic in every action they have taken. Defendants actively took time to seek out a supplier to create counterfeit frames. (Bibring Aff. ¶¶ 23, 24.) They also made exact replicas of Art-Optic's frame shapes, a production process that within the optical industry takes at least 4-5 months, based on Art-Optic's technique and method. (*Id.*) They also used Art-Optic's trade secrets and their knowledge of confidential information to train their manufacturer to mirror Art-Optic's technique. (Bibring Aff. ¶¶ 23, 24.) Their manufacturer continues to produce precise copies of Ronit Furst's frame designs, including printing her name, the RONIT FURST mark, on the left temple of the eyeglass frames as well as upon the left lens, thereby infringing on Art-Optic's intellectual property. (*Id.*, Ex. 5) Finally, Defendants marketed and sold their counterfeit frames as original Ronit Furst frames, by selling to stores and attending conventions. (Bibring Aff. ¶¶ 17-20, 22, 26-29, Exs. 4, 6-7; Beeri Aff. ¶¶ 5-9, Ex. 3.) Moreover, S. Tomashover applied to register the RONIT FURST mark, falsifying the date of first use in commerce to a date before the Agreement, and in violation of the Agreement not to use the RONIT FURST mark. (Bibring Aff. ¶ 30.) Finally, despite an injunction entered against

the Tomashovers in Israel prohibiting them from manufacturing and marketing the counterfeit frames, they continue to do so. (Bibring Aff. ¶ 32.) It is clear that Defendants infringed the RONIT FURST mark in bad faith.

### g.     Quality of Defendants' Product

This "*Polaroid*" factor is met where there is little difference between the quality of the parties' product because products of equal quality may tend to create confusion as to source because of that very similarity of quality. *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999). Here, Defendants' counterfeit eyewear is close enough in quality to Art-Optic's authentic eyewear, because both frames are hand painted with Ronit Furst designs on clear plastic frames using the same process, thereby adequately satisfying this factor. (Bibring Aff. ¶¶ 6, 22-24, Exs. 1, 5)

### h.     Sophistication of the Relevant Consumer Group

When analyzing likelihood of confusion, "[t]he sophistication of purchasers, as measured by the care likely used by consumers when purchasing a particular product, is a factor to be taken into account." *Fruit-Ices Corp.*, 335 F. Supp. 2d at 428.

Here, there are two main types of consumers — optical shop distributors and owners and their customers. Although optical shop distributors and owners may personally examine the quality of the frames closely, the counterfeits are so well done that even those who have previously sold the original products could be fooled into believing that the counterfeits are original. (Bibring Aff. ¶¶ 6, 22-24, 27, Exs. 1-5; Beeri Aff. ¶ 6.) In fact, at the trade show in Las Vegas, Art-Optic was approached by distributors and consumers and asked why they were selling the same product as Defendants whose booth was 50 feet away. (Bibring Aff. ¶ 27; Beeri Aff. ¶ 6.) If optical shop distributors and owners, who are the most sophisticated consumer

group here, are confused then consumers, who do not have their knowledge of eyewear and purchase frames less often, are obviously confused as well.

It is clear that all of the *Polaroid* factors weigh in favor of Art-Optic. Thus, Art-Optic has demonstrated that there is not only a likelihood of confusion, but actual confusion between its eyewear and Defendants' counterfeit eyewear.

**C.**    **Plaintiff's Third Cause of Action - Common Law Trademark Infringement**

The same analysis is used for common law trademark infringement as is used under federal law. *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 WL 896952, *7 (E.D.N.Y., Mar. 26, 2004). As set forth in Section III. B, Art-Optic established its likelihood of success on the merits of its trademark infringement claim under the Lanham Act, *supra*, and thus has established its likelihood of success on the merits on its common law trademark infringement cause of action.

**D.**    **Plaintiff's Fourth Cause of Action - Trade Dress Infringement**

Trade dress of a product is the total image and overall appearance of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques. *Two Pesos, Inc.*, 505 U.S. at 765, 112 S. Ct. at 2755 (1992). To establish a claim of trade dress infringement under Section § 43(a) 15 U.S.C. § 1525(a), "plaintiff must first demonstrate that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning." *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 999 (2d Cir. 1997) (citing *Two Pesos,* 505 U.S. at 769, 112 S. Ct. at 2757-58). If a trade dress is inherently distinctive, then it must be nonfunctional. *Fun-Damental Too, Ltd.*, 111 F.3d at 999. Second, plaintiff must demonstrate that there is a likelihood of confusion between defendant's and plaintiff's trade dress. *Id.*

1.   **Plaintiff's Eyewear Trade Dress is Inherently Distinctive and Nonfunctional or Has Acquired Secondary Meaning.**

An inherently distinctive trade dress is one whose "intrinsic nature serves to identify a particular source of a product," although it may not yet have widespread identification among consumers. *Fun-Damental Too, Ltd.*, 111 F.3d at 999 (*citing Two Pesos, Inc.*, 505 U.S. at 769, 771, 112 S.Ct. at 2757-59). The inherent distinctiveness of trade dress is evaluated by applying the trademark classifications set forth by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). *Fun-Damental Too, Ltd.*, 111 F.3d at 999-1000. Within this framework, trade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful. *Id.* at 1000. Suggestive and arbitrary or fanciful trade dress is deemed to be inherently distinctive and thus always satisfies the first prong of the test for protection. *Two Pesos,* 505 U.S. at 768, 112 S. Ct. at 2757.

The designs, including the shapes, color, color combinations and graphics on Ronit Furst eyewear and case, as well as the cases they come in, are inherently distinctive and original and are known as designs created by the artist Ronit Furst. (Bibring Aff. ¶¶ 3-6, Ex. 1.)

The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 164, 115 S. Ct. 1300, 1304 (1995).

The designs, i.e. trade dress, of Ronit Furst eyewear and cases are nonfunctional because they are purely a decorative element of the eyewear and case.

The overall design of a product has acquired secondary meaning if the general public associates the product's design with a particular source of origin. *Eliya, Inc. v. Kohl's Dept. Stores*, 2006 WL 2645196, *2 (S.D.N.Y., Sept. 13, 2006)

Ronit Furst's eyewear and cases have nonetheless obtained secondary meaning because the public links the fanciful and unique design of Ronit Furst eyewear with Art-Optic's Ronit Furst brand of eyewear, thereby satisfying the test for trade dress infringement. (Bibring Aff. ¶¶ 3-6, Ex. 1.)

### 2. Defendants' Use of Art-Optic's Trade Dress is Likely to Cause Confusion as to the Origin or Sponsorship of Defendants' Goods

As in trademark infringement actions, a court evaluates the issue of likelihood of confusion relating to trade dress by analyzing the eight *Polaroid* factors. *Fun-Damental Too, Ltd.*, 111 F.3d at 1002-1003.

#### a. The Strength of the Plaintiff's Trade Dress

Consumers identify Ronit Furst frames through the unique colorful designs she designed and hand-painted on the eyeglasses frames as well as the uniquely designed case that accompany each frame. (Bibring Aff. ¶¶ 3-6, Ex. 1.) Therefore, Art-Optic's trade dress has undoubtedly acquired the requisite strength to satisfy this *Polaroid* factor.

#### b. The Similarity Between the Two Trade Dresses

Defendants' counterfeit eyewear and cases are not only similar to Art-Optic's authentic Ronit Furst brand of eyewear and cases; they are virtually exact copies. (Bibring Aff. ¶¶ 6, 22-24, Exs. 1, 5)

#### c. The Proximity of the Products in the Marketplace

As stated in Section III 2. c., *supra*, both Art-Optic and Defendants operate within the same industry – design, production and sale of eyewear – and their respective products are designed to appeal to the same consumer base.

**d.    Likelihood of "Bridging the Gap"**

As stated in Section III 2. d., *supra*, there is no bridging the gap because Defendants' counterfeit eyewear obviously occupies the same market as Art-Optic's genuine eyewear.

**e.    Actual Confusion**

As stated in Section III 2. e., *supra*, the counterfeit eyewear are exact replicas of the Ronit Furst brand of eyewear, which means that consumers cannot tell the difference between one or the other. Thus, there is actual confusion between the Ronit Furst brand of eyewear and the counterfeit eyewear.

**f.    Defendants' Bad Faith**

Art-Optic has demonstrated Defendants' bad faith as stated in Section III 2. f, *supra.*

**g.    Quality of Defendants' Product**

As stated in Section III 2. g., *supra,,* Defendants' counterfeit eyewear is similar enough in quality to the Furst Brand Eyewear, to create confusion among these purchasing eyeglasses, thereby adequately satisfying this factor.

**h.    Sophistication of the Relevant Consumer Group**

This factor, Sophistication of the Relevant Consumer Group, weighs in favor of Art-Optic as shown in Section III 2. h, *supra.*

**E.    Plaintiff's Fifth Cause of Action - Common Law Trade Dress Infringement**

The standard for proving a trade dress infringement claim under New York common law is similar to the standard for proving a Lanham Act trade dress claim. *Neutrik AG v. Switchcraft, Inc.*, 2001 WL 286722 *1 n. 2 (S.D.N.Y., Mar. 23, 2001), *aff'd*, 31 Fed. Appx. 718 (Fed. Cir. 2002). The only difference is that, under New York common law, there is no requirement to show "secondary meaning" for distinctive designs. *Id.*; *Ideal Toy Corp. v. Chinese Arts & Crafts*

*Inc.*, 530 F. Supp. 375, 377 (S.D.N.Y. 1981) ("Under New York law . . . an injunction may issue against a confusingly similar trade dress, even if no secondary meaning is shown.")

As set forth in this Memorandum in Section III. C., *supra*, Art-Optic established its likelihood of success on the merits of its trade dress infringement claim under the Lanham Act, *supra*, and thus has established its likelihood of success on the merits on its common law trade dress infringement cause of action.

**F.    Plaintiff's Sixth Cause of Action – False Advertising**

Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C.A. § 1125(a)(1)(B) provides, in relevant part as follows:

**§ 1125. False designations of origin, false descriptions, and dilution forbidden**

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-- . . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

To establish a false advertising claim under Section 43(a) of the Lanham Act, a plaintiff must prove the following elements: (1) the defendant has made a false or misleading statement; (2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; (3) the deception is material in that is it likely to influence purchasing decisions; (4) there is a likelihood of injury to plaintiff, such as declining sales or loss of good will; and (5) the goods traveled in interstate commerce." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F. Supp. 2d 165, 178 (S.D.N.Y. 2004).

Defendants' representations of themselves to optical store owners and at conventions as authentic Ronit Furst eyewear representatives using Ronit Furst marketing materials and selling authentic Ronit Furst eyewear constitute false and misleading statements. (Bibring Aff. ¶¶ 17-20, 22, 26-29, Exs. 4, 6-7; Beeri Aff. ¶¶ 5-9, Ex. 3.) Defendants' false and misleading statements have actually deceived consumers into thinking that they were purchasing authentic Ronit Furst eyewear, when they were actually not, and undoubtedly have the capacity to deceive a substantial portion of consumers into thinking the same. (Bibring Aff. ¶¶ 6, 22-24, 27, Exs. 1-5; Beeri Aff. ¶ 6.) The deception is material and likely to influence purchasing decisions because optical store owners and consumers are duped into thinking that they are purchasing authentic Ronit Furst eyewear when they are not. (*Id.*) Defendants' false and misleading statements have injured Art-Optic and will definitely continue to do so. (Bibring Aff. ¶¶ 6, 22-25, 27, 31-33, Exs. 1-5; Beeri Aff. ¶¶ 6, 9-10, 12-14.)

**G.    Plaintiff's Seventh Cause of Action - New York False Advertising**

Section 350 of the New York State General Business Law expressly prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 350. The Court's analysis under the New York General Business Law is the same as under the Lanham Act. *Novo Nordisk A/S,* 997 F. Supp. 470, 472 (S.D.N.Y., 1998); *Princeton Graphics Operating, L.P. v. NEC Home Elecs. (U.S.A.), Inc.,* 732 F. Supp. 1258, 1267 (S.D.N.Y.1990) ("the standards for a violation under Section 350-d [of the New York General Business Law] are substantially the same as under section 43(a) [of the Lanham Act]"). Thus, because Art-Optic has established a likelihood of success on the merits of its Lanham Act false advertising claim in Section III. F., *supra*, it has also established a likelihood of success on the merits of its New York false advertising claim.

**H.    Plaintiff's Eighth Cause of Action - Unfair Competition by Misappropriation**

An unfair competition claim involving misappropriation concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property. *Roy Export Co. Establishment v. Columbia Broad. Sys.*, 672 F.2d 1095, 1105 (2d Cir.1982) Here, the Defendants utilized the existing intellectual property of Art-Optic which they had direct access to when the Agreement between the parties was signed in 2004. (Bibring Aff. ¶ 23.)    The Defendants created exact replicas of the Ronit Furst designs by copying the hand-painted designs created by Ronit Furst, applying the designs on identically shaped eyeglasses, applying the trademark RONIT FURST, which is Ronit Furst's personal name, on the left lens and left temple of every pair of counterfeit eyewear they manufactured, and copying the unique shape and design of the cases.   (Bibring Aff. ¶¶ 22-24, Ex. 5; Beeri Aff. ¶ 7.)   They then sold their counterfeit eyewear claiming that they were authentic Ronit Furst representatives selling authentic Ronit Furst eyewear. (Bibring Aff. ¶¶ 17-20, 22, 26-29, Exs. 4, 6-7; Beeri Aff. ¶¶ 5-9, Exs. 3-4.) Art-Optic has certainly proven that they are likely to succeed on their cause of action unfair competition by appropriation.

**I.    Plaintiff's Ninth Cause of Action –**
**Tortious Interference with Prospective Economic Advantage**

In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

Defendants' conduct encompasses these elements and therefore a valid claim exists. After learning of Art-Optic's new distributorship relationship with Brintech, S. Tomashover has

engaged in a campaign to identify Brintech's representatives in New York and throughout the United States. (Beeri Aff. ¶ 11.) S. Tomashover has then proceeded to verbally harass plaintiff's representatives, including threatening to sue and bankrupt Brintech and its representatives if they continued to sell Ronit Furst eyewear. (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.) Defendants' actions themselves demonstrate that they have acted with the sole purpose of harming Art-Optic and used dishonest, unfair or improper means.

Art-Optic has undoubtedly been harmed by Defendants' behavior. As a result, Brintech's distributors do not want to sell the original frames as a result of S. Tomashover's threats. (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.) Moreover, the Defendants spread false rumors about Art-Optic's business practices thereby further damaging Art-Optic's reputation. (Bibring Aff. ¶ 25; Beeri Aff. ¶ 11.) Moreover, Art-Optic's agreement calls for Brintech to order 2,000 eyeglass frames by January 31, 2008. (Bibring Aff. ¶ 31; Beeri Aff. ¶ 14.) However, as of the end of November 2007, Beeri already informed Bibring that he will not be able to purchase that amount because he is finding it extremely difficult to find representatives to sell the frames because of Defendants' belligerent behavior toward representatives. (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.) Defendants' conduct has therefore severely limited Art-Optic's ability to do business in the United States thereby causing enormous economic damages.

## POINT IV

### PLAINTIFF HAS PRESENTED SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS TO MAKE THEM A FAIR GROUND FOR LITIGATION AND A BALANCE OF HARDSHIPS TIPPING DECIDEDLY IN PLAINTIFF'S FAVOR.

Art-Optic has presented sufficiently serious questions going to the merits to make them a fair ground for litigation, with the balance of the hardships tipping decidedly in favor of Art-Optic. The counterfeit eyewear and case are virtually identical copies of the Ronit Furst eyewear

and cases. (Bibring Aff. ¶¶ 5, 22-23, Exs. 1, 5.) Defendants' are representing to optical store business owners and distributors that they are authentic Ronit Furst eyewear representatives using Ronit Furst marketing materials. (Bibring Aff. ¶¶ 17-20, 22, 26-29, Exs. 4, 6-7; Beeri Aff. ¶¶ 5-9, Ex. 3.) They are undoubtedly confusing the authentic and counterfeit eyewear. (Bibring Aff. ¶¶ 6, 22-24, 27, Exs. 1-5; Beeri Aff. ¶ 6.) Art-Optic is losing sales by this confusion and S. Tomashover is threatening Brintech representatives to the point that Art-Optic is incurring serious business losses. (Bibring Aff. ¶¶ 6, 22-25, 27, 31-33, Exs. 1-5; Beeri Aff. ¶¶ 6, 9-10, 12-14.) Having its intellectual property misappropriated and wrongfully passed off as belonging to another entity has caused, and will continue to cause, great hardship to Art-Optic. The balance of hardships unquestionably tips in Art-Optic's favor. Not a scintilla of hardship should be accorded to counterfeiters who are engaged in a campaign to run Art-Optic out of business by continuing to produced fake eyewear, threatening Art-Optic's representatives and applying to trademark the RONIT FURST mark, notwithstanding a preliminary injunction issued against them in Israel.

**POINT V**

**DEFENDANTS' INFRINGING COPIES
AND REPRODUCTION EQUIPMENT
MUST BE SEIZED, IMPOUNDED AND DESTROYED**

17 U.S.C. § 503 provides:

> **§ 503. Remedies for infringement: Impounding and disposition of infringing articles**
>
> **(a)** At any time while an action under this title is pending, the court may order the impounding, on such terms as it may deem reasonable, of all copies or phonorecords claimed to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced.

(b) As part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies or phonorecords found to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced.

Impoundment of items that allegedly infringe plaintiff's rights under the Copyright Act is warranted if plaintiff establishes a *prima facie* case of copyright infringement, and therefore demonstrates a likelihood of success on the merits. *U2 Home Entertainment, Inc. v. Bowery Music City, Inc.*, 2003 WL 22889738, *1 (S.D.N.Y., Dec. 8, 2003).

In *Century Home Entertainment, Inc. v. Laser Beat, Inc.*, 859 F.Supp. 636, 638-639 (E.D.N.Y. 1994), the court in granting an order of seizure explained as follows:

Furthermore, Plaintiff need not show that a particular Defendant would not adhere to a TRO but rather only that someone like the Defendant would be likely to hide or destroy the evidence of his infringing activity. *In re Vuitton et Fils S.A.*, 606 F.2d 1 (2d Cir.1979); *First Technology Safety Systems, Inc. v. Depinet*, 29 USPQ 2d 1269, 11 F.3d 641 (6th Cir.1993) (holding that an applicant for an order of seizure bears the burden of "showing that the adverse party has a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history").

Procedurally, Fed. R. Civ. P. Rule 65, which provides for preliminary injunctions and temporary restraining orders, expressly states that this section also applies to copyright impoundment proceedings. Fed. R. Civ. P. Rule 65(f).

As shown in Section III A., B., *supra*, Art-Optic has established a *prima facie* case for infringement and a likelihood of success on the merits. Seizure, impoundment and destruction of Defendants' infringing copies and manufacturing equipment to make those infringing copies is desperately needed to stop Defendants from manufacturing and selling Ronit Furst counterfeit eyewear, which is irrefutably damaging Art-Optic's business, goodwill and reputation. Moreover, these measures will stop Defendants who have blatantly disregarded the temporary

injunction in Israel in September 2007, which enjoined them from making and marketing counterfeit Ronit Furst frames. (Bibring Aff. ¶ 32.) Furthermore, seizure orders are par for the course in counterfeiting cases. *Cartier Intern. B.V. v. Ben-Menachem*, 2008 WL 64005, *1 (S.D.N.Y., Jan. 3, 2008) ("The Plaintiffs commenced this action on May 23, 2006, and on that date, a temporary restraining order, seizure order, and order for expedited discovery, asset restraint and to show cause for a preliminary injunction was issued and was executed on May 24, 2006.")

## POINT VI

### PLAINTIFF IS ENTITLED TO AN
### ASSET RESTRAINING ORDER AND EXPEDITED DISCOVERY ORDER

In counterfeiting cases, asset restraining orders and expedited discovery orders are routinely granted as part of the relief sought with the temporary restraining order. *Cartier Intern. B.V.*, 2008 WL 64005 at *1; *Edward B. Beharry & Co., Ltd. v. Bedessee Imports Inc.*, 2006 WL 3095827, *1 (E.D.N.Y., Oct. 31, 2006); *North Face Apparel Corp. v. TC Fashions, Inc.*, 2006 WL 838993, *1 (S.D.N.Y., Mar. 30, 2006). Furthermore, these orders are kept in place after the Court issues a preliminary injunction. *Id.*

### A.    Asset Restraining Order

In *North Face Apparel Corp.*, the Court set forth the standard to impose an asset restraining order in a counterfeiting case:

> District courts have the "authority to freeze those assets which could [be] used to satisfy an equitable award of profits." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995) (citing *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.,* 970 F.2d 552, 558-59 (9th Cir.1992)); *see also* 15 U.S.C. § 1117(a) (as remedy for violation of 15 U.S.C. § 1125(a) (false designation of origin) "the plaintiff shall be entitled, ... subject to the principles of equity, to recover [among other things] defendant's profits"); McCarthy on Trademarks and Unfair Competition § 30:40 (4th ed.) (*purpose of freezing assets is to preserve "security for plaintiff's future recovery on an accounting of the counterfeiter's profits.*").

*North Face Apparel Corp.*, 2006 WL 838993 at *3 (*emphasis added*.)    It is clear that Defendants' assets must be frozen to preserve security for Art-Optic's future recovery on an accounting of the "counterfeiter's profits."

**B.    Expedited Discovery Order**

In *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990), this Court has set forth the following requirements for granting expedited discovery in a counterfeiting case:

> (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

Art-Optic in Points II and III of this memorandum have more than satisfied the first two factors requiring a showing of irreparable injury and some probability of success on the merits. As for the third factor, immediate discovery of Defendants' records of manufacture and sale of their counterfeit products, including the name of the manufacturers, suppliers and purchasers, and the opportunity to take the Tomashovers' depositions, will allow Art-Optic to discover the totality of the counterfeiting operation and shut it down to stop the daily bleeding of business forever lost and damage to goodwill and reputation. As for the fourth factor, without expedited discovery, if Art-Optic does not discover who is supplying the materials, manufacturing the counterfeit products and purchasing them, it will not be long before counterfeit frames and cases are produced again. Thus, Art-Optic meets all four factors, and expedited discovery should be granted.

## CONCLUSION

For all the reasons set forth herein, plaintiff's motion for a temporary restraining order, preliminary injunction, seizure, impoundment and destruction of Defendants' infringing copies and reproduction equipment pursuant to 17 U.S.C. § 503, expedited discovery order and asset restraining order should be granted in its entirety.

Dated: New York, New York
      January 16, 2008

Respectfully submitted,

SHIBOLETH, YISRAELI, ROBERTS & ZISMAN, L.L.P.

By: _____
Shira Y. Rosenfeld (SR 5392)
1 Penn Plaza, Suite 2527
New York, New York 10119
Tel: 212-244-4111
Fax: 212-563-7108

*Attorneys for Plaintiff*

# Cases

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 3095827 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

C
Edward B. **Beharry** & Co., Ltd. v. Bedessee
Imports Inc.
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
EDWARD B. **BEHARRY** & CO., LTD., Plaintiff,
v.
BEDESSEE IMPORTS INC.; Bedessee Imports
Ltd; Verman Bedessee; John Doe 1-10, John Doe
Entities 1-10, Defendants.
**No. 06-CV-5707 (JBW).**

Oct. 31, 2006.

Matthew Clifford Wagner, Ossining, NY, for
Plaintiff.

MEMORANDUM & ORDER

JACK B. WEINSTEIN, Senior United States
District Judge.
   *1 On October 23, 2006, Edward B. **Beharry**
& Co., LTD filed a complaint alleging trademark
infringement, trademark counterfeiting, false
designation of origin, false advertising, trademark
dilution and unfair competition by defendants
Bedesse Imports Inc., Bedessee Imports LTD,
Verman Bedessee, John Does 1-10 and John Doe
entities 1-10 in violation of 15 U.S.C. §§ 1114 and
1125(a). At the same time, plaintiff applied, *ex
parte,* for a temporary restraining order, seizure
order, expedited discovery order, and order to show
cause for a preliminary injunction. The court
granted the plaintiff's *ex parte* motion in part.
Plaintiff seeks to convert the temporary restraining
order into a preliminary injunction. After a full
evidentiary hearing on October 27, 2006 and
default by defendants, plaintiff's motion is granted.

*Facts*

   Sworn credible, as well as documentary,
evidence established the following:

   1. Plaintiff manufactures and sells curry
powder under its registered INDI trademark. The
INDI brand curry powder is sold in distinctive
packaging which contains the INDI mark and
distinctive designs. Plaintiff only manufactures its
INDI brand curry in Guyana and its packaging and
labels state that the INDI brand curry
powder is "Manufactured by: Edward B. **Beharry**
& Company Ltd., 191 Charlotte Street
Georegetown, Guyana ..." Cheong Decl. ¶¶ 13,
27(b).

   2. Through a private investigator, plaintiff
purchased curry sold by the defendants from
defendants' warehouse in Brooklyn, NY. Cole Decl.
¶¶ 5, 14, and various local stores. The packages
of curry plaintiff purchased from the defendants and
their retail vendors copies the plaintiff's INDI mark
and distinctive packaging. Narine Decl. ¶ 26, Exs.
C, D. The defendants' curry powder also falsely
states on its packaging that it is "
MANUFACTURED BY: EDWARD B.
**BEHARRY** & Co., LTD. New York, N.Y. 10003."
Narine Decl. ¶ 24(a), Ex. D.

*Law*

   "To obtain a preliminary injunction, a plaintiff
must establish '(1) the likelihood of irreparable
injury in the absence of such an injunction, and
either (a) likelihood of success on the merits or (b)
sufficiently serious questions going to the merits to
make them a fair ground for litigation plus a
balance of hardships tipping decidedly' in its favor."
*Malletier v. Burlington Coat Factory Warehouse*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 3095827 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*Corp.*, 426 F.3d 532, 537 (2d Cir.2005) (quoting *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir2000)).

In order to prevail on its trademark infringement claims under 15 U.S.C. § 1114(1)(a) and its claims of false designation of origins under 15 U.S.C. § 1125(a) plaintiff must establish "(1) that it has a valid trademark entitled to protection under the Act, and (2) defendant[s'] actions are likely to cause confusion." *Arrow Fastener v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995).

A certificate of registration with the Patent and Trademark Office is prima facie evidence that a mark is valid and entitled to protection, the registrant owns the mark and it has exclusive right to use the mark in commerce. *See Lane Capital Management, Inc. v. Lane Capital Management Inc.*, 192 F.3d 337, 345 (2d Cir.1999); *see*15 U.S.C. § 1115(a). The right of a registrant to use a registered mark in commerce for the goods with which such mark has been in continuous use for five consecutive years from the date of registration and is still in use in commerce is uncontestable. *See*15 U.S.C. § 1065. To the extent that the right to use the registered mark has become uncontestable, the registration is conclusive evidence of the validity and registration of the mark, the registrant's ownership of the mark and the registrant's exclusive right to use the mark in commerce. *See*15 U.S.C. § 1115(b).

*2 "Where a protected mark is implicated ... [plaintiff] may simply show a 'likelihood of confusion' in order to establish both a 'likelihood of success on the merits and irreparable harm.' " *Cartier v. Symbolix, Inc.*, 386 F.Supp.2d 354, 358 (S.D.N.Y.2005). Confusion for purposes of plaintiff's claims under 15 U.S.C. §§ 1114(1)(a) and 1125(a) "is shown where there is a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or ... simply confused, as to the source of the goods in question ... " *1-800 Contacts, Inc. v. WhenU.com*, 309 F.Supp.2d 467 (S.D.N.Y.2003).

In trademark infringement cases, likelihood of confusion is a factual determination made by

applying the eight-factor test set forth in *Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961)."[C]ourts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the 'totality of factors that could cause confusion among perspective purchasers." *Malletier*, 426 F.3d at 537. "However, ... in cases where counterfeit marks are involved, it is not ' necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Lorillard Tobacco Company v. Jamelis Grocery, Inc.*, 378 F.Supp.2d 448 (S.D.N.Y.2005); *see Danone Asia Pte. v. Happy dragon Wholesale Inc.*, 2006 WL 845573 at *5 (E.D.N.Y 2006) ("counterfeits, by their very nature, cause confusion.")

### *Application of Law to Facts*

Plaintiff's INDI trademark, registration number 1,171,508, is valid. The INDI mark is registered with the Patent and Trademark Office, Pl.'s Ex. 9, and plaintiff has continuously utilized the INDI mark for more than five years. Cheong Decl. ¶ 8. Conclusive evidence has established that the trademark is valid, incontestable and entitled to protection. The remaining issue is whether defendants' activities are likely to cause confusion.

Prospective purchasers of plaintiff's INDI curry powder would be confused by defendants' counterfeit product. The two products "create the same overall impression such that a consumer who has seen [plaintiff's] trade dress, would upon *later* seeing [defendants'] trade dress alone, be confused." *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 1004 (2d Cir.1997). The products have similar coloration, make use of elephant symbols of the same general character on the exterior of the packaging, and both packages contain the phrase "special madras curry powder" in similar script. When displayed side by side a clever consumer might be able to distinguish between the two products, but the average consumer would not be able to make such a distinction. Given

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

**Not Reported in F.Supp.2d, 2006 WL 3095827 (E.D.N.Y.)**
**(Cite as: Not Reported in F.Supp.2d)**

the fact that it is serial viewing that is at issue in the market context and not side by side comparison, it is apparent that the counterfeit product does and will cause consumer confusion.

*3 The plaintiff has demonstrated that it has a valid mark that is entitled to protection and has shown that there is a likelihood of confusion between its product and that sold by the defendants. It has "established both the likelihood of success on the merits and irreparable harm."*Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d at 537. Given that the defendants' product is used unfairly by the defendants offering an inferior product for a reduced price, irreparable harm is clearly established.

While the defendants have defaulted, the court held a full evidentiary hearing to protect the defendants, even in their absence. The court finds that the material in defendants' counterfeit product is inferior to that in the plaintiff's authentic product and is sold at a reduced price. This constitutes a severe interference with the sales of plaintiff's product and illegal use of the INDI trademark. Plaintiff has established a basis for full recovery.

### Conclusion

Plaintiff's motion for a preliminary injunction is granted. A separate detached order has been signed.

### Reporters Privilege

A representative of the press was present when the evidentiary hearing was held. Plaintiff sought an order preventing publication of this court's conclusion before the defendants' offending product was seized. The motion was not granted since the relief sought would be in derogation of the freedom of the press. The Marshall's service is requested to expedite seizure in order to prevent defendants from spiriting away its product.

SO ORDERED.

E.D.N.Y.,2006.
Edward B. Beharry & Co., Ltd. v. Bedessee Imports Inc.
Not Reported in F.Supp.2d, 2006 WL 3095827 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

# EXHIBIT 2

Westlaw.

Slip Copy

Page 1

Slip Copy, 2008 WL 64005 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Cartier Intern. B.V. v. Ben-Menachem
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
CARTIER INTERNATIONAL B.V.; Richemont
International, S.A.; Alfred Dunhill Ltd.; Lange
Uhren GmbH; and Montblanc-Simplo, GmgH,
Plaintiffs,
v.
Ilan BEN-MENACHEM; David Ben-Menachem;
King Replica; Davids Luxury; Replica Kingdom
a/k/a Swiss Kingdom; Branded Luxury d/b/a/ BS
Gifts; Vertexo, Inc.; Aviv Ben-Menachem; Chana
Ben-Menachem; Travel Derech Tslecha; Avilan
Marketing LLC; John Does 2-10; Jane Does 2-10;
and XYZ Companies 3-10, Defendants.
**No. 06 Civ. 3917.**

Jan. 3, 2008.

Greenberg Traurig, LLP, by: Harley Lewin, Esq.,
Scott Gelin, Esq., New York, NY, for Plaintiffs.

*OPINION*

SWEET, District Judge.
  *1 For the reasons set forth below, the
Plaintiffs' motion for summary judgment, which is
unopposed, is granted.

**Prior Proceedings**

  The Plaintiffs commenced this action on May
23, 2006, and on that date, a temporary restraining
order, seizure order, and order for expedited
discovery, asset restraint and to show cause for a
preliminary injunction was issued and was executed
on May 24, 2006 (the "May 23 Order" or the "Order
").

  On June 5, 2006, the Plaintiffs moved for
contempt arising out of the facts set forth below. A
hearing of the contempt motion and a trial of the
underlying action were set for April 24, 2007.

  Following an evidentiary hearing unopposed by
Defendants on June 15, 2006, this Court entered a
Preliminary Injunction against Defendants (the "
June 15 Order") which required, *inter alia,* that:
  Defendants shall deliver to Plaintiffs' attorneys,
within two (2) days from the date of this Order, all
of the documents, records, things and other items
seized by Plaintiffs' representatives during their
execution of the Order....

  The Plaintiffs sought discovery and, after
efforts described below, the Plaintiffs requested
removal of the action from the trial calendar and
filed the instant motion for summary judgment,
which was marked submitted on June 6, 2007.

**The Facts**

  The facts with respect to discovery in this
action, the products of the Plaintiffs, and their
efforts to enforce their copyrights, as well as the
conduct of the Defendants, are set forth in the
Plaintiffs' Local Rule 56.1 Statement, which is
unopposed. See *Gubitosi v. Kapica,* 154 F.3d 30, 31
(2d Cir.1998) (accepting as true facts set forth in
unopposed Local Civil Rule 56.1 statement).

  The Plaintiffs have been engaged for many
years in the business of manufacturing and
distributing various types of high-quality luxury
products, including, *inter alia,* watches, watch
buckles, bracelets, scarves, handbags, lighters, pens,
belts, belt buckles, letter openers, and eyewear
under a number of trademarks and trade names ("
Plaintiffs' Products"). Plaintiffs own the entire right,
title and interest in and to Plaintiffs' federally
registered trademarks (the "Plaintiffs' Marks"),

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

**Slip Copy, 2008 WL 64005 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

most of which are incontestable.

Plaintiffs have used and are currently using the registered Plaintiffs' Marks in commerce in the United States and throughout the world in connection with their sale of Plaintiffs' Products. Over the years, Plaintiffs have enjoyed extraordinary success by designing, developing, and marketing an extensive line of luxury goods, which are known for their unique shapes, styles, and overall appearances.

Plaintiffs manufacture, merchandise, and market all of Plaintiffs' Products with a concern for design, artistry, workmanship, and material quality, as well as their projected image, goodwill and long-term growth. Plaintiffs have earned a reputation for high-quality luxury products. The Plaintiffs' policy is that only high-quality goods be produced under Plaintiffs' Marks and they maintain quality control over the manufacture, sale, and servicing of Plaintiffs' Products throughout the United States and the world.

*2 Each year, Plaintiffs spend millions of dollars in advertising, promoting, and developing Plaintiffs' Marks throughout the world. As a result, products bearing Plaintiffs' Marks are closely associated with Plaintiffs' reputation in the eyes of the public, customers, and the luxury goods industry. Plaintiffs' Marks have come to symbolize Plaintiffs' enormous goodwill and are invaluable assets of Plaintiffs.

Investigations commenced in July 2005 by Plaintiffs' representatives revealed that Defendants have imported, exported, distributed, advertised, offered for sale, and sold counterfeit watches bearing Plaintiffs' Marks, including A. Lange & Sohne, Cartier, Lanieres, Baignoire, Tortue, Tankissime, Panthere, Pasha de Cartier, 21 Chronoscaph, Santos de Cartier, Divan, Dunhill, Vacheron Constantin, Jaeger-Lecoultre, IWC, Montblanc, Piaget, Luminor, and Panerai (the " Counterfeit Products") through, among other locations, approximately fifteen websites (the " Websites"), including but not limited to those located at: kingreplica.com, swisskingdom.com, vertexo.com, davidluxury.com, davidsluxury.com,

replicakingdom.com, and watches-boutique.com.

Defendants Ilan Ben-Menachem ("Ilan"), Aviv BenMenachem ("Aviv"), David Ben-Menachem (" David"), and Chana Ben-Menachem ("Chana") operated the Websites, and operated the following Defendant counterfeiting entities (the "Defendant Businesses"): King Replica, Davids Luxury, Replica Kingdom a/k/a Swiss Kingdom, Branded Luxury d/b/a BS Gifts, Vertexo, Inc., Avilan Marketing LLC, and Travel Derech Tslecha (" Travel").

The Defendants operated the Websites and Defendant Businesses and sold and distributed the Counterfeit Products from their home at 939 East 13th Street, Brooklyn, New York, 11230 (the " Premises"), as well as other locations. The Defendants had been operating their Websites since at least May 2004 and through their Websites and Defendant Businesses, advertised, offered for sale, and sold counterfeit watches bearing copies of Plaintiffs' Marks and designed to look exactly like genuine Plaintiffs' Products. Plaintiffs did not in any way authorize or consent to the Defendants' sale of the Counterfeit Products.

The Websites displayed photographs of watches bearing exact duplicates of Plaintiffs' Marks and designed to look like genuine Plaintiffs' Products.

The "Contact Us" page of the Website located at kingreplica.com (the "King Replica Website") listed for customer service the telephone number: 206-333-0050. An investigator for Plaintiffs called this telephone number and received a message that he had reached Branded Luxury customer service.

A database search for the King Replica Website revealed fifteen domain names listed on the same server, including the following watch-related websites: replicakingdom.com, davidsluxury.com, davidluxury.com, and watches-boutique.com.

A WhoIs database search for replicakingdom.com listed the following contact information: Ilan Ben-Menachem, 939 East 13th Street, Brooklyn, NY, 11230, Tel: 917-370-3154,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 3

**Slip Copy, 2008 WL 64005 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

Email: apogee91@gmail.com. A domain name system report for replicakingdom.com confirmed that the host master email address was apogee91 @gmail.com.

*3 A WhoIs database search for vertexo.com listed the following contact information: Vertexo Web Designs, Ilan Ben-Menachem, 939 East 13th Street, Brooklyn, NY, 11230, Tel: 917-370-3154, Email: ilanbm@hotmail.com.

Domain name system reports for davidsluxury.com indicated that the host master email address for the site was ilan@vertexo.com.

On August 10, 2005, an investigator for Plaintiffs accessed the King Replica Website and ordered a watch bearing Plaintiffs' Cartier Marks for $246.00. On August 11, 2005, Plaintiffs' investigator received an email from "David Angelino" at sales@kingreplica.com inquiring whether he wanted the male Cartier Tank watch. Plaintiffs' investigator responded, requesting a male Cartier Tank watch. On August 23, 2005, Plaintiffs' investigator received a package with an EMS/China Posting Tracking sticker on it bearing a return address in Chinese (the "Package").

The Package contained a white box bearing the mark Cartier. Inside the white box was a red leather box bearing the mark Cartier. The box contained one men's silver watch in the Cartier Tank design and bearing the mark Cartier on the watch face, watch back, and wristband clasp (the contents of the Package are collectively referred to herein as the " Counterfeit Watch").

Upon inspection, Plaintiffs' representative confirmed that the Counterfeit Watch is not a genuine Plaintiffs' watch but rather an inferior counterfeit replication. On August 23, 2005, Plaintiffs' investigator noted a credit card charge of $246.00, the price paid for the Counterfeit Watch, charged by BS Gifts, Tel: 718-701-3323.

An internet search for telephone number 718-701-3323 revealed that it is listed as the contact number on Defendants' Website davidsluxury.com.

Defendants' Website davidsluxury.com additionally lists an address of "PMB 122 28262 Chardon Rd., Willoughby Hills, Oh, 44092."

On March 23, 2006, another Plaintiffs' investigator sent an email to sales @kingreplica.com inquiring about purchasing a watch bearing the Cartier mark with a money order. Later that same day, Plaintiffs' investigator received a reply email from "David Angelino" stating that she could send a money order to: Branded Luxury, 130 Church Street # 361, New York, NY, 10007. This reply email listed the Defendants' Website swisskingdom.com under the electronic signature for David Angelino. On March 27, 2006, Plaintiffs' investigator sent a money order in the amount of $315.00 to 130 Church Street # 361, New York, NY, 10007, to purchase a watch bearing the Cartier marks. On March 31, Plaintiffs' investigator received an email from sales@kingreplica.com by " David Moreno" stating that the money order was received and the order was being processed. On April 10, 2006, Plaintiffs' investigator received a package which contained a white cardboard sleeve with the Cartier mark printed on it, as well as a red box bearing the Cartier mark. Inside this package, Plaintiffs' investigator found a watch, silver in color, in the Cartier Tank design (the "Second Counterfeit Watch") and bearing the Cartier marks on the face, watch back and wristband.

*4 Plaintiffs' investigator marked the Second Counterfeit Watch as evidence for identification and photographed it. Upon inspection, Plaintiffs' representative confirmed that the Second Counterfeit Watch is not a genuine Plaintiffs' watch but rather an inferior counterfeit replication.

Pursuant to the May 23 Order, on May 24, 2006, Plaintiffs' investigators and attorneys, accompanied by a police officer, arrived at the Premises to conduct a seizure. They were met at the front door of the Premises by a woman who stated that no one else was present, and that she did not know anything about a counterfeit watch operation.

After gaining entry to the house, Plaintiffs' representatives discovered that a young man, two teenage girls, and a preteen boy, all apparently

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2008 WL 64005 (S.D.N.Y.)
**(Cite as: Slip Copy)**

residents of the house, and a housekeeper were inside. The young man refused to identify himself, but picture identification discovered later that he was Defendant Aviv Ben-Menachem. Plaintiffs' attorney advised Aviv to call his attorney, as well as Defendants Ilan, Chana, and David. Aviv replied that he could not reach any of them.

Throughout Plaintiffs' execution of the Order, Aviv behaved in an aggressive and threatening manner towards Plaintiffs' representatives. At the urging of Plaintiffs' representatives, Aviv called 9-1-1, leading to the arrival of five additional uniformed police officers at the Premises. These officers confirmed that Aviv must cooperate with Plaintiffs' representatives in their execution of the Order. Aviv proceeded to follow Plaintiffs' representatives around the house, attempting to hide evidence, and generally disrupting the seizure and execution of the Order.

Plaintiffs' representatives collected several watches and watch boxes bearing Plaintiffs' Marks, one entire banker's box and separate file folder of documents relating to Defendants' counterfeit watch business, and two computer towers and a laptop computer likely used in Defendants' counterfeit watch business. Among the documents collected by Plaintiffs' representatives were documents that demonstrated: (a) that Defendants were selling large quantities of replica watches on the Websites; (b) that Defendants were corresponding with entities and individuals in Hong Kong and China to import and distribute Counterfeit Products; (c) that Defendants had set up off-shore accounts and foreign corporations, including in Panama; (d) that Defendant Ilan Ben-Menachem reported an income of $800,000 in 2005; and (e) that Defendants were selling several hundred thousand dollars of counterfeit watches, including the Counterfeit Products, monthly. Plaintiffs' representatives photographed and placed evidence tags on watches bearing Plaintiffs' Marks presumed to be Counterfeit Products.

When one of Plaintiffs' investigators was nearly finished with boxing and tagging as evidence watches bearing Plaintiffs' Marks and documents relating to Defendants' counterfeit watch business,

he was alone on the first floor of the house. Plaintiffs' investigator had in his possession at this time a banker's box and file folder of documents, a laptop, two computer towers, and an evidence bag containing ten watches bearing Plaintiffs' Marks and several watch boxes. He was then confronted by Aviv and an unidentified man seen earlier outside the Premises. Aviv and the unidentified man approached Plaintiffs' investigator, pushed him, and tried to hit him. The unidentified man grabbed the folder of documents and ran from the room. Plaintiffs' investigator clutched the box of documents firmly as Aviv and the unidentified man, who had returned to the room, tried to push Plaintiffs' investigator to the ground, and tried to wrest the box of documents from his hands. Aviv and the unidentified man succeeded in ripping the box of documents, sending documents flying, and gathered the ripped box and documents and ran out the front door.

**\*5** The police officer accompanying Plaintiffs' representatives had taken possession of a lockbox located in the Travel Derech Tslecha office in the basement of the house. Defendant Chana Ben-Menachem arrived at the house and began to attack the police officer holding the lockbox. Chana then tried to grab the evidence bag described above. Plaintiffs' representatives and the police officers tried to prevent Chana from taking the bag. The laptop computer and evidence bag were then placed on the coffee table just inside the front door on the first floor.

Chana then handed one of Plaintiffs' attorneys a cordless phone and informed him that her attorney, Asher White, was on the line and wished to confer. Plaintiffs' attorney began to speak with White about the Plaintiffs' execution of the Order.

While the police officers (totaling approximately ten, uniformed and undercover) were speaking with Plaintiffs' representatives on the front porch and Plaintiffs' attorney was speaking with Defendants' attorney, Chana locked the front door of the house and drew the blinds. She refused to open the door when the police officers knocked. When uniformed police officers regained entry to the house, Plaintiffs' representatives noticed that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5

Slip Copy, 2008 WL 64005 (S.D.N.Y.)
**(Cite as: Slip Copy)**

evidence bag and the laptop computer, which had all been on the coffee table just inside the doorway, were missing. Plaintiffs' representatives were not able to recover from the house the documents, laptop computer, or the evidence bag of watches bearing Plaintiffs' Marks described above, or the lockbox described above, and were forced to leave the Premises without this evidence.

Pursuant to the May 23 Order, on May 24, 2006, Plaintiffs' investigators and attorney, accompanied by a police officer, also entered the premises of 1367 Coney Island Avenue, Brooklyn, NY, 11230, to conduct a seizure. This location had been used by Defendants as an office to operate their counterfeit watch business. At 1367 Coney Island Avenue, Plaintiffs' representatives seized approximately one folder of business records relating to Defendants' counterfeit watch business, as well as a postal scale, shipping labels, and envelopes. Documents seized at 1367 Coney Island Avenue corroborate the documents gathered by Plaintiffs' representatives at the Premises but absconded with by Defendants.

Documents seized at 1367 Coney Island Avenue included evidence of:

(a) a wire transfer on March 30, 2006, in the amount of $36,250.00 from Defendant Avilan Marketing LLC into an off-shore account in the name of Defendant Chana Ben-Menachem;

(b) a merchant application to Credicorp Bank on behalf of Luxury Goods; Inc., identified on the application as a corporation existing in Panama City, Panama, to provide credit card processing for the website bagsnstyle.com. The merchant application estimates a monthly sales volume on the website of $600,000. This application was faxed to Credicorp Bank from Defendant Travel Derech Tslecha.

Starting on May 24, 2006, the day Plaintiffs' representatives attempted to execute the May 23 Order at the Premises, Plaintiffs' attorneys were in contact with Defendants' then-counsel, Asher White ("White"), concerning Defendants' physical attacks on Plaintiffs' investigators and Defendants' absconding with and hiding of the Counterfeit Products and other evidence gathered by Plaintiffs' representatives.

*6 On May 30, 2006, White asked Plaintiffs' counsel to forgo filing a Motion for Contempt and represented to Plaintiffs' counsel that Defendants would return all documents and things hidden by Defendants during the execution of the May 23 Order. On May 31, 2006, White informed Plaintiffs' counsel that Defendants had provided to him what Defendants represented were all of the documents and things collected by Plaintiffs' representatives during the execution of the Order. White confirmed that these items included the evidence bag of Counterfeit Products collected by Plaintiffs' representatives. Later on May 31, 2006, Plaintiffs' messenger retrieved the items described above from White's office and delivered them to Plaintiffs' counsel.

The items retrieved from White's office consisted of a banker's box, approximately one-eighth full of documents, two computer towers, and a laptop computer. The banker's box appeared to be the same box used by Plaintiffs' representatives to gather documents during the execution of the Order. The box had writing on the top identifying where in the Premises the collected documents were found. The box also appeared to be ripped and bent in a way that comports with the struggle over the box between Plaintiffs' investigator and Aviv and the unknown man.

The documents retrieved from White's office, however, did not include the folder of documents collected by Plaintiffs' representatives during the execution of the Order and taken back by Defendants. The documents also did not include the following documents which Plaintiffs' representatives had collected during the execution of the Order: (a) documents evidencing Defendants' sales of large quantities of Counterfeit Product on the various Defendants' Websites; (b) documents evidencing Defendants' partnership with entities and individuals in Hong Kong and China to import and distribute counterfeit watches; (c) documents evidencing Defendants' establishment of several off-shore bank accounts and foreign corporations, including in Panama; (d) documents evidencing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 6

**Slip Copy, 2008 WL 64005 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

Defendants' wire transfers of large sums out of the United States; (e) Defendant Ilan Ben-Menachem's tax return; and (f) documents evidencing involvement of Chana and Travel in the counterfeit watch operation.

The documents provided by White included documents that Plaintiffs' representatives had not originally collected which had nothing to do with Defendants' counterfeit watch business.

White did not provide to Plaintiffs' counsel any of the watches or watch boxes bearing Plaintiffs' Marks that had been collected by Plaintiffs' representatives and put into an evidence bag during the execution of the Order.

Additionally, a large number of files, including those in folders bearing the name "Cartier" and other of Plaintiffs' brands, had been deleted from the laptop provided by White.

After Plaintiffs' counsel reviewed the items retrieved from White, he telephoned White and told him of the missing documents and items. White confirmed that those items comprised everything that had been provided to him by Defendants.

*7 On November 1, 2006, Defendants Aviv, Ilan, Avilan Marketing LLC, Branded Luxury, Davids Luxury, King Replica, Replica Kingdom, and Vertexo, Inc. filed an opposition to Plaintiffs' Motion for Contempt.

Aviv admitted in his sworn declaration to taking items from Plaintiffs' representatives during the execution of the Order. He also admitted to disposing of the watches and watch boxes bearing Plaintiffs' Marks collected by Plaintiffs' representatives despite the fact that he had been served by the Order and was already represented by counsel.

Ilan and Aviv, King Replica, Davids Luxury, Branded Luxury d/b/a BS Gifts, Avilan Marketing LLC, and Vertexo, Inc. admitted in interrogatory responses to disposing of the Counterfeit Products described above and that they refused to comply with the Order and deliberately prevented Plaintiffs

from executing the Order by (a) physically attacking Plaintiffs' representatives, (b) barring access to the Premises, (c) concealing the Counterfeit Products, and (d) forcibly taking back documents and items that had been identified and collected by Plaintiffs pursuant to the Order.

Aviv admitted he knew that the Counterfeit Products collected by Plaintiffs' representatives during execution of the Order "were replica watches " and that he and Ilan were in the watch business selling replica watches.

Following the entry of the June 15 Order, on July 25, 2006, former counsel for Aviv, Ilan, Avilan Marketing LLC, Branded Luxury d/b/a BS Gifts, Davids Luxury, King Replica, Replica Kingdom a/k/a Swiss Kingdom, and Vertexo, Inc. filed a letter representing to the Court that these Defendants had produced all documents requested by Plaintiffs within the possession custody or control of these Defendants.

On June 29 and August 7, 2006, Defendants produced only approximately 200 pages of documents, collectively, while Plaintiffs collected approximately eight times that amount during their execution of the May 23 Order. These documents produced by Defendants do not include those collected by Plaintiffs' representatives during the execution of the Order which were taken back by Defendants.

The June 15 Order additionally required that:

Defendants shall deliver to Plaintiffs' attorneys, within ten (10) days from the date of this Order, copies of all accountant's reports, bank statements, tax returns, certificates of deposit, notes, bonds, checking accounts, trust accounts, money market or GNMA accounts, savings accounts or other financial institution records or documentation showing investments or deposits, and documents indicating title to any real or personal property in each of the Defendants' actual or constructive possession or control.

Defendants have not provided to Plaintiffs any information about overseas accounts in the names

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2008 WL 64005 (S.D.N.Y.)
(Cite as: Slip Copy)

of David and Chana or any information about funds transferred into those accounts.

On December 12, 2006, Plaintiffs served counsel for Ilan, Aviv, King Replica, Replica Kingdom a/k/a Swiss Kingdom, Davids Luxury, Branded Luxury d/b/a BS Gifts, Avilan Marketing LLC, and Vertexo, Inc. with Plaintiffs' First Requests for the Production of Documents and Things and Plaintiffs' First Set of Interrogatories (" Plaintiffs' Interrogatories"), returnable January 2, 2007. In response to Plaintiffs' Interrogatories, Defendants Ilan, Aviv, King Replica, Davids Luxury, Branded Luxury d/b/a BS Gifts, Avilan Marketing LLC, and Vertexo, Inc. maintained that Plaintiffs' representatives had been given all documents, electronic or otherwise, relating to the Counterfeit Products. The response to Plaintiffs' Interrogatories admits that watches were acquired from a source in China.

*8 David has admitted that funds were wired to China from the Travel account to purchase merchandise at the request of Aviv and Ilan.

Aviv and Ilan, along with their companies, admitted to attempting to start overseas businesses and to having foreign contacts, including contacts with companies in the United Kingdom, Hong Kong, the Philippines, and Panama.

Though Aviv and Ilan, and the Defendant Businesses (excluding Defendant Travel Derech Tslecha), including Defendant Avilan Marketing, deny forming foreign entities and opening foreign accounts, financial records obtained by Plaintiffs' subpoenas show that Defendant Avilan Marketing transferred over $200,000 to overseas accounts maintained by David and Chana. Defendants have refused to provide any information about these accounts.

The response to Plaintiffs' Interrogatories admits that "Bagsnstyle.com" operated on servers of Defendants. Though "LaPeree.com," "LaPeree Distribution Center," and "LaPeree Malls" are mentioned on Defendants' website replicakingdom.com, the response to Plaintiffs' Interrogatories denies knowledge of any such entities.

On or about March 1, 2007, Plaintiffs' counsel served Notices of Deposition of David, Chana, Aviv, and Ilan on the respective Defendant's counsels for March 15, 16, 19, and 20. From the time of the hearing on Plaintiffs' Motion for Contempt on January 25, 2007, through the deposition dates, until the close of discovery on March 22, 2007, Plaintiffs' counsel made numerous calls to each Defendant's counsel in an attempt to schedule these depositions.

Former counsel for Ilan, Aviv, King Replica, Replica Kingdom, Swiss Kingdom, Davids Luxury, Branded Luxury d/b/a BS GIFTS, Avilan Marketing LLC, and Vertexo, Inc. informed Plaintiffs' counsel that his clients would not appear at the depositions.

Counsel for David and Chana and Travel also informed Plaintiffs' counsel that his clients would not appear at the depositions.

White filed a Motion to be Relieved as Counsel, citing his clients' non-communication, on February 27, 2007. The Court granted this motion on March 26, 2007.

David has admitted that he and Chana, his wife, "set up the account" and gave approximately $150,000 to their sons, Ilan and Aviv, to start the counterfeiting operations. Financial records obtained by Plaintiffs' subpoenas confirm that David and Chana maintain overseas accounts and received large transfers from Defendant Avilan Marketing LLC.

Records obtained by Plaintiffs' subpoena to Central Bancard LLC shows two different merchant accounts opened by David and Chana. Account number 204026 with Central Bancard LLC was for Defendant Branded Luxury (the "Branded Luxury Merchant Account"). The application for the Branded Luxury Merchant Account indicated that Defendant Branded Luxury is a sole proprietorship wholly-owned by David Ben-Menachem. This application provided Travel Derech Tslecha as a merchant reference and "Hanna" as the contact person.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 64005 (S.D.N.Y.)
**(Cite as: Slip Copy)**

**\*9** The Branded Luxury Merchant Account application described the merchandise being sold as "watches" and shows that the online store is located at www.kingreplica.com. The application indicated that proceeds from the Branded Luxury Merchant Account were to be transferred into a Washington Mutual Bank account ending in digits-516. A sales report for the Branded Luxury Merchant Account provided by Central Bancard LLC shows $124,280 in credit card sales over a period of approximately four months for kingreplica.com.

The Washington Mutual Bank account is in the name of Defendants Branded Luxury, David, and Chana (the "Branded Luxury Checking Account"). Statements for the Branded Luxury Checking Account show monthly deposits of tens of thousands of dollars from the Branded Luxury Merchant Account. The Branded Luxury Checking Account was also used to make monthly payments to "Google Ad Words". These payments indicate that Defendants paid Google, the internet search engine, to feature Defendants' Websites prominently in paid advertisement search results when Google users entered search requests related to replica watches.

The Branded Luxury Checking Account was used by David and Chana to pay their own personal expenses and David and Chana also transferred funds from the Branded Luxury Checking Account into their many other accounts, including overseas accounts.

Defendants used the Branded Luxury Checking Account to transfer funds into and out of accounts in the name of Travel, as well as among their personal accounts. David signed checks for payments from the Branded Luxury Checking Account, and Chana endorsed them to make deposits into an account in the name of Travel.

The two computer towers seized by Plaintiffs' representatives during execution of the May 23 Order contain document folders containing document files related to counterfeit watches, intermingled with David's academic papers. These documents include: a copy of defendant David's New York driver's license next to a copy of a

cancelled check from the Branded Luxury Checking Account; a memorandum from David to Central Bancard LLC entitled "How I Will Avoid Chargebacks in the Future"; and a compilation of standard correspondence to buyers of counterfeit watches. Some of these form letters are from Aviv at the 1367 Coney Island Avenue address, others from "B. Luxury" at 130 Church Street, others from "David Angelino" and others from "David Moreno".

Ilan and Vertexo, Inc. have previously been sued for trademark counterfeiting relating to their Website bagnstyle.com in another judicial district of this Circuit. *See Louis Vuitton Malletier S.A. et al. v. Ben-Menachem et al.,* No. CV 05-4844 (E.D.N.Y. filed Oct. 14, 2005).

Ilan and Branded Luxury, LaPeree Distribution Center, as well as Websites davidsluxury.com, replicakingdom.com, kingreplica.com, and swisskingdom.com were sued for trademark counterfeiting in another judicial district of this Circuit. *See Rolex Match U.S.A., Inc. v.. Ben-Menachem et al.,* No. 06 Civ. 6687 (E.D.N.Y. filed Dec. 20, 2006).

**The Summary Judgment Standard**

**\*10** In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Weinstock v. Columbia Univ .,* 224 F.3d 33, 41 (2d Cir.2000).

The moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.,* 398 U .S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, *Celotex,* 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

genuine issue for trial,"Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial."*Celotex,* 477 U.S. at 322.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion."*Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985) . However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If there is not, summary judgment is proper. *See id.* at 249-50.

It is the law of this Circuit that "even when a nonmoving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial" and that summary judgment is appropriate as a matter of law. *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001); *see also Vt. Teddy Bear,* 373 F.3d 241, 244 (2d Cir.2004); *Mattel, Inc. v. Pitt,* 229 F.Supp.2d 315, 320 (S.D.N.Y.2002). In determining whether the moving party has met its burden, the court must be satisfied that the citation to evidence in the record supports the assertion. *Vt. Teddy Bear,* 373 F.2d at 244 (citing *Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003)).

### Defendants are Liable for Trademark Counterfeiting and Infringement

A plaintiff will prevail on its claims of trademark counterfeiting and infringement under 15 U.S.C. § 1114(1)(a) of the Lanham Act if it establishes that (1) it possesses a valid mark entitled to Lanham Act protection, and (2) defendant used a similar mark in commerce in a manner likely to cause confusion among the relevant consuming public. *See Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,* 378 F.Supp.2d 448, 454 (S.D.N.Y.2005). The Lanham Act imposes liability

upon on a person who sells, offers for sale, advertises or distributes goods using a counterfeit of a registered trademark, 15 U.S.C. § 1114(1)(a), regardless of "whether or not the person against whom relief is sought knew such mark was so registered,"15 U.S.C. § 1116(d)(B)(i).

*11 Plaintiffs have established their ownership and registration with the United States Patent and Trademark Office of the Plaintiffs' Marks. These registrations are *prima facie* evidence of the validity of the trademarks Plaintiffs seek to protect, as well as the exclusive rights of Plaintiffs to use the Plaintiffs' Marks in commerce and in connection with the goods or services specified in the registration certificates. *See*15 U.S.C. § 1057(b). Other than filing Answers generally denying the allegations in Plaintiffs' Complaint, Defendants have submitted no evidence on this motion that Plaintiffs' trademarks are not valid.

In the course of this action, Plaintiffs have identified nineteen different registered trademarks which Defendants have counterfeited: A. LANGE & SOHNE, BAIGNOIRE, CARTIER, DIVAN, DUNHILL, IWC, JAEGER-LECOULTRE, LANIERES, LUMINOR, MONTBLANC, PANERAI, PANTHERE, PASHA DE CARTIER, PIAGET, SANTOS DE CARTIER, TANKISSIME, TORTUE, VACHERON CONSTANTIN, and 21 CHRONOSCAPH.

The Plaintiffs have also established that Defendants were importing, distributing, advertising, offering for sale, and selling counterfeit reproductions of Plaintiffs' Marks likely to cause consumer confusion. To determine the likelihood of confusion, courts in this Circuit apply the eight-factor test of *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495-96 (2d Cir.1961). In cases involving counterfeit marks, however, this Court has found it unnecessary to perform a *Polaroid* examination because "counterfeit marks are inherently confusing." *Lorillard,* 378 F.Supp.2d at 455 (citing *Philip Morris USA Inc. v. Felizardo,* No. 03 Civ. 5891(HB), 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004); *Gucci America, Inc. v. Duty Free Apparel, Ltd.,* 286 F.Supp.2d 284, 287 (S.D.N.Y.2003) (noting that "confusing the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 64005 (S.D.N.Y.)
**(Cite as: Slip Copy)**

customer is the whole purpose of creating counterfeit goods")). As found above, while executing the May 23 Order, Plaintiffs' representatives found watches bearing copies of Plaintiffs' Marks at Defendants' home, as well as documentary evidence of Defendants' operation of a complex, lucrative business selling Counterfeit Products. Defendants have not disputed that these watches were Counterfeit Products or that they were in the business of selling counterfeit watches. Defendants Aviv and Ilan have admitted to knowingly distributing and selling the Counterfeit Products for themselves and the business entities King Replica, Davids Luxury, Replica Kingdom a/k/a Swiss Kingdom, Branded Luxury d/b/a BS Gifts, Vertexo, Inc., and Avilan Marketing LLC.

David and Chana and Travel Derech Tslecha continue to deny knowledge of the counterfeiting business operating from their home, although they admit that they were actively involved. Their denials, however, are not credible and are not supported by any evidentiary submission. David and Chana admit that they set up accounts to transact the business of the counterfeiting operation and gave approximately $150,000 to their sons to start the counterfeiting operation. Numerous transfers were made from counterfeiting bank accounts into personal accounts of David and Chana, as well as the account of Travel Derech Tslecha. Given the admission that various Defendant business entities and their financial accounts were opened in David and Chana's names, and that the large counterfeit watch import, distribution, and sales business operated from their home, David's declaration that he did not know what the funds were being used for lacks credibility.

**\*12** David and Chana were: (1) the owners and residents of the home in which counterfeit operations occurred openly; (2) direct financial beneficiaries of the counterfeiting operations, in part through deposits into their off-shore accounts; and (3) are the parents of admitted counterfeiters Ilan and Aviv. Documents relating to Counterfeit Products and Defendants' Websites, including a document authored by David, were found in David's computer folders, David and Chana jointly owned a bank account with admitted counterfeiting entity

Defendant Branded Luxury, withdrawals from bank accounts of admitted counterfeiting entities were deposited into the purported business account of Travel, Branded Luxury is a sole proprietorship of David, and transfers of funds overseas from the Travel account were made at the behest of Ilan and Aviv.

Since a seller bears strict liability for violations of the Lanham Act, even an "innocent" individual who sells goods bearing an infringing mark is liable for trademark infringement-intent is not required. *See Procter & Gamble Co. v. Quality King Distribs., Inc.,* 123 F.Supp.2d 108, 112 (E.D.N.Y.2000) ("[T]he registrant need not prove intent in order to succeed on the issue of liability" under the Lanham Act).

Even if David and Chana and Travel were not directly involved in the sale of the Counterfeit Products, they remain liable for contributory trademark infringement because they chose to be willfully blind to the counterfeiting business operated by two of their sons from the Ben-Menachem home, also the location of the Travel office, which involved David's computer and Defendants' bank accounts.

It is well established that "liability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another."*Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 853 (1982); *see also, Grant Airmass Corp. v. Gaymar Indus., Inc.,* 645 F.Supp. 1507, 1511 (S.D.N.Y.1986) ( "[L]iability under the Lanham Act has been construed to extend beyond those who actually misrepresent goods or directly place such goods in commerce"); *Carter Int'l B.V. v. Liu,* No. 02 Civ. 7926(TPG), 2003 WL 1900852, at \*3 (S.D.N.Y. Apr. 17, 2003) (finding an indirect actor liable for trademark counterfeiting when the party knew or had reason to know it was engaging in trademark infringement). This Court has recognized "that one may be held liable as a contributory infringer, not withstanding the fact that one does nothing to assist an infringing party." *Power Test Petroleum Distribs. v. Manhattan & Queens Fuel Corp.,* 556 F.Supp. 392, 395 (S.D.N.Y.1982) (citation omitted). A contributor

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 11

**Slip Copy, 2008 WL 64005 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

who knew or had reason to know of the Lanham Act violations or was "willfully blind" to the violations is liable for trademark infringement.*Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264-65 (9th Cir.1996).

Even if the denials of David and Chana were to be accepted as plausible, the facts establish that David and Chana and Travel were "willfully blind" to the activities and not only failed to investigate, but also assisted their co-Defendants' sales of the Counterfeit Products. Accordingly, David and Chana and Travel are at the very least liable for contributory trademark infringement.

**\*13** When, as here, a plaintiff has satisfied all statutory proof requirements and absent a dispute of material facts, that plaintiff is entitled to a grant of summary judgment. *See, e.g., Lorillard Tobacco Co.,* 378 F.Supp.2d at 456;*Felizardo,* 2004 WL 1375277, at *5;*Fendi S.a.S. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd.,* 642 F.Supp. 1143, 1145 (S.D.N.Y.1986). Defendants have not put forth any evidence to dispute the facts material to Plaintiffs' Lanham Act claims, thus creating no justifiable issues as to liability on these claims. *See Felizardo,* 2004 WL 1375277, at *3.

Due to the clear weight of the evidence of Defendants' importing, distributing, advertising, offering for sale, and sale of Counterfeit Products, the Plaintiffs' summary judgment motion on their claims of trademark counterfeiting and infringement is granted.

### Defendants are Liable for Federal Unfair Competition and State and Common Law Claims

The Lanham Act extends liability to any person who uses in commerce in connection with goods or services any mark or false designation of origin likely to cause confusion or otherwise "deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. "15 U.S.C. § 1125(a)(1). The stated intent of the

Lanham Act is to protect persons engaged in commerce against unfair competition. *See*15 U.S.C. § 1127. When a plaintiff presents a successful claim of federal trademark infringement, it is not necessary to present further proof to succeed on a claim of federal unfair competition. *See Russian Kurier, Inc. v. Russian Am. Kurier, Inc.,* 899 F.Supp. 1204, 1208 (S.D.N.Y.1995).*See also Lorillard,* 378 F.Supp.2d at 454 (citing *Arrow Fastener Co ., Inc. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir.1995)). Because Plaintiffs have presented a successful claim of federal trademark infringement, Defendants are also found liable for federal unfair competition under Section 1125(a).

The same acts that constitute trademark counterfeiting and unfair competition under federal laws give rise to Plaintiffs' claims of common law trademark infringement and unfair competition, as well as unfair competition under New York law. Unfair competition under New York law additionally requires evidence of bad faith. *See Felizardo,* 2004 WL 1375277, at *6. However, "a presumption of bad faith attaches to the use of a counterfeit mark."*Id.; see also Lorillard,* 378 F.Supp.2d at 456. Defendants' sale of the Counterfeit Products serves to establish bad faith under New York law, and therefore summary judgment is appropriate as to these claims. Defendants are also liable for trademark infringement, trade name infringement, and unfair competition under New York state and common law. *See Russian Kurier, Inc.,* 899 F.Supp. at 1208.

### Defendants Are Liable for Statutory Damages

**\*14** Because "counterfeiters' records are frequently non-existent, inadequate or deceptively kept ..., making proving actual damages in these cases difficult, if not impossible,"*Lorillard,* 378 F.Supp.2d at 458 (citations omitted), the Lanham Act permits a statutory damage award in lieu of an award of actual damages resulting from the use of counterfeit marks. The Act permits an award "not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                     Page 12

Slip Copy, 2008 WL 64005 (S.D.N.Y.)
**(Cite as: Slip Copy)**

considers just."15 U.S.C. 1117(c). If the court finds that the use of the counterfeit mark was willful, the court may award damages in an amount "not more than $1,000,000 per counterfeit mark per type of goods sold, offered for sale, or distributed."*Id.*

Plaintiffs have shown that for a period of approximately four months, a merchant account in the name of Defendant Branded Luxury, opened by David, processed $124,280 in credit card sales. Since the initiation of the instant action, Plaintiffs have diligently attempted to discover the full extent of Defendants' counterfeiting activities. For several months, Defendants refused to provide any information, claiming that they had produced all documents in their possession to Plaintiffs' counsel. After Plaintiffs were forced to subpoena voluminous records from financial institutions, it became apparent that the documents provided by Defendants are incomplete and thus there is no way to determine actual damages. Statutory damages are therefore appropriate in this case.

Courts have wide discretion in setting an amount of statutory damages. *See Silhouette Int'l Schmied Ag v. Vachik Chakhbazian,* No. 04 Civ. 3613, 2004 WL 2211660, at *2 (S.D.N.Y. Oct. 4, 2004); *see also Philip Morris USA Inc. v. Marlboro Express,* No. 03 Civ. 1161, 2005 WL 2076921, at *6 (E.D.N.Y. Aug. 26, 2005). In awarding statutory damages, courts consider a variety of factors, including whether a defendant's conduct was willful, lost revenue and harm to the plaintiff, the value of the plaintiff's marks, the defendant's cooperation in providing information on the value of the infringing material, and the deterrent effect on the defendant and others. *Duty Free Apparel, Ltd.,* 315 F.Supp.2d 511, 520. Conduct can be found to be willful "whether the defendant had knowledge that his conduct represented infringement or perhaps recklessly disregarded the possibility."*Lorillard,* 378 F.Supp.2d at 457 in. 13 (citing *Felizardo,* 2004 WL 1375277 at *7). A defendant's knowledge can be "actual or constructive." *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.,* 807 F.2d 1110, 1115 (2d Cir.1986) . Knowledge, therefore, "need not be proven directly but may be inferred from the defendant's conduct."*N.A.S. Import, Corp. v. Chenson Enters.,*

*Inc.,* 968 F.2d 250, 252 (2d Cir.1992) (*citing Fallaci v. New Gazette Literary Corp.,* 568 F.Supp. 1172, 1173 (S.D.N.Y.1983)).

**\*15** Plaintiffs seek enhanced statutory damages in light of the evidence that Defendants' conduct was "willful" under Section 1117(c). However, the Court concludes that standard statutory damages in the amount of $50,000 for each of Plaintiffs' nineteen Marks counterfeited by Defendants will be sufficient to meet the goals of the statute, including compensating the Plaintiffs and deterring future violations. *Cf. Lorillard,* 378 F.Supp.2d at 457 (finding standard statutory damages would provide " sufficient redress and deterrence" despite likelihood that plaintiffs could prove willfulness, and noting the court's "doubts as to whether enhanced damages would be recoverable"; *Malletier v. Whenu.Com, Inc.,* No. 05 Civ. 1325(LAK), Slip Op., 2007 WL 257717, at * 6 (S.D .N.Y. Jan. 26, 2007) (awarding a total of $1,100,000 for infringement of 11 marks and discussing cases awarding less than the per-mark maximum).

### Defendants Are Liable for Costs and Attorneys' Fees

Having prevailed on its claims for willful infringement and unfair competition, Plaintiffs are entitled to an award of costs and reasonable attorney's fees. 15 U.S.C. § 1117(a); *see also Silhouette,* 2004 WL 221660, at *3 (citing *Rolex Watch U.S.A., Inc. v. Brown,* No. 01 Civ. 9155(AJP), 2002 WL 1226863, at *3 (S.D.N.Y. June 5, 2002)).

### Defendants Are Permanently Enjoined

Section 34(a) of the Lanham Act provides courts with the power to grant injunctive relief to prevent the violation of a trademark owner's rights. 15 U.S.C. § 1116(a); *see Lorillard,* 378 F.Supp.2d at 459. Plaintiffs have shown that they are entitled to a permanent injunction based on: (1) actual success on the merits, and (2) irreparable harm. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2008 WL 64005 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Plaintiffs have established that Defendants have violated the Lanham Act by engaging in the counterfeiting activities described in the Complaint and, therefore, the Plaintiffs are granted entry of a permanent injunction.

### Conclusion

Summary judgment against Defendants is granted for importing, distributing, advertising, selling, and offering for sale the Counterfeit Products, and permanently enjoining Defendants' counterfeiting and infringing activities as set forth in the Complaint, and awarding Plaintiffs statutory damages against Defendants in the amount of $950,000, as well as costs and attorneys' fees. Plaintiffs will submit judgment on notice, as well as a supporting affidavit with respect to attorneys' fees.

It is so ordered.

S.D.N.Y.,2008.
Cartier Intern. B.V. v. Ben-Menachem
Slip Copy, 2008 WL 64005 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Cartier, a Div. of Richemont North America, Inc. v.
Samo's Sons, Inc.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
CARTIER, A DIVISION OF RICHEMONT
NORTH AMERICA, INC.; and Cartier
International, B.V., Plaintiffs,
v.
SAMO'S SONS, INC.; Freddie Samuel; Gabriel
Efraim Jewelry Inc.; Gabriel Musheyev; Sardell
Jewelry, Inc.; Eli Sardar; L & M Jewelry Creations,
Inc.; David Rappaport; Awad II, Inc.; Italiano Gold
Mounting and John Does 2-5, Defendants.
**No. 04Civ.2268RMBDFE.**

Oct. 11, 2005.

*DECISION AND ORDER*

BERMAN, J.

I. Introduction

   *1 On or about September 14, 2004, Cartier
and Cartier International, B.V. (together, "Cartier"
or "Plaintiffs") filed an amended complaint ("
Amended Complaint") against Sardell Jewelry, Inc.
and Eli Sardar (together, "Defendants") asserting
trade dress and trademark infringement in violation
of Sections 32 and 43(a) of the Lanham Act, 15
U.S.C. §§ 1114, 1125(a), and Section 349 of the
New York General Business Law, N.Y. Gen. B.L. §
349. (Amended Complaint ¶¶ 60, 61, 69, 70.) [FN1]
Plaintiffs allege that Defendants "without
Cartier's authorization, have advertised, offered for
sale, sold and distributed imitations of Cartier's
watches and jewelry, ... infringing the rights of
Cartier."(*Id.* ¶ 53.)

   FN1. By consent judgment in favor of
   Plaintiffs, the Amended Complaint was
   dismissed as to defendants (i) Samo's Sons,
   Freddie Samuel, Gabriel Efraim Jewelry,
   Inc., Gabriel Musheyev, Awad II, Inc .,
   and Italiano Gold Mounting, on April 5,
   2005, and (ii) L & M Jewelry Creations,
   Inc. and David Rappaport, on June 27,
   2005.

   On or about May 6, 2005, Plaintiffs filed a
motion for summary judgment pursuant to Rule 56
of the Federal Rules of Civil Procedure, arguing
that Defendants "copied one of its famous and
successful watch designs-the Tank Francaise-and
sold 'knockoff' or 'look-alike' watches."(*See*
Plaintiffs' Memorandum of Law in Support of
Motion for Summary Judgment, dated May 6, 2005 (
"Plaintiffs' Memorandum"), at 1.) On or about June
9, 2005, Defendants opposed the motion and
cross-moved for summary judgment, arguing that "
the most prominent features of the Cartier watch are
functional," and that the evidence is "inadequate to
show that the design of the Cartier watch is ...
distinctive."(*See* Defendants' Memorandum of Law
in Opposition to Plaintiffs' Motion for Summary
Judgment and in Support of Defendants' Cross
Motion for Summary Judgment, dated June 8, 2005 (
"Defendants' Opposition"), at 2-3.) [FN2]On or
about June 24, 2005, Plaintiffs filed their reply. (*See*
Plaintiffs' Reply Memorandum of Law in Further
Support of Motion for Summary Judgment, dated
June 24, 2005 ("Plaintiffs' Reply").) For the reasons
stated below, Plaintiffs' motion for summary
judgment is granted in part and denied in part, and
Defendants' motion for summary judgment is
granted in part and denied in part.

   FN2. The parties have waived oral
   argument.
   By letter dated March 15, 2005, Plaintiffs
   stated that they "would prefer to have liability
   determined by summary judgment."(Letter from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs to the Court, dated March 15, 2005, at 2.) By letter dated May 24, 2005, Defendants " request[ed permission] ... to submit a cross-motion for summary judgment."(*See* Letter from Defendants to the Court, dated May 24, 2005.)

## II. Background

Plaintiffs have been a "world famous watch manufacturer and jeweler" since 1847, and manufacture and distribute the Tank Francaise family of luxury watches ("Tank Francaise"). (Plaintiffs' Memorandum at 1-2.) Plaintiffs own Trademark Registration No. 2,322,769 for the Tank Francaise case design, issued on February 29, 2000. (Amended Complaint ¶ 29.) Defendant Sardell Jewelery, Inc. is a New York corporation which " generally sells at wholesale to jewelry stores, although it has on occasion sold to retail customers." (Plaintiffs' Memorandum at 4; Plaintiffs' Statement of Material Facts Pursuant to Local Civil Rule 56.1, dated May 6, 2005 ("Plaintiffs' 56.1 Stmt.") ¶ 3.) Defendant Eli Sardar is president of Sardell Jewelry, Inc. and "is responsible for and makes the final decision as to buying."(Plaintiffs' 56.1 Stmt. ¶ 4.) On or about February 13, 2004, Defendants sold a watch ("Defendants' Watch") to an investigator hired by Plaintiffs for $1,000. (*Id.* ¶¶ 5-7.)

\*2 Plaintiffs claim that Defendants' Watch is "a close imitation" of the trade dress for the Tank Francaise. (*Id.* ¶ 9; Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1, dated June 2, 2005 ("Defendants' 56.1 Stmt.") ¶ a.) Defendants argue that, other than producing a " square watch [ ] with Roman numerals on the dial", "the remaining features of Plaintiff's 'Tank Francaise" watch ... are not copied or imitated by the watch sold by the defendants."(Defendants' 56.1 Stmt. ¶¶ A, F.)

Both watches are alike in that they each have (1) square watch faces that feature Roman numerals, each of which "inclines to conform to the angle-direction of the watch hands at such time as the hands are juxtaposed to that numeral," (Plaintiffs' 56.1 Stmt. ¶ 10(c)), (2) a "metal chain

bracelet ... [which] consists of alternating H-shaped and rectangular links,"(*id.* ¶ 10(f)), (3) "relatively thick concave vertical frames (or brancards), both formed of the case metal .... [which] are elongated beyond the bottom and top of the watch case, and end in inwardly angled corners,"(*id.* ¶ 10(a)), and (4) "chapter ring[s] or minute guide[s] located between the center of the dial and the numerals."(*Id.* ¶ 10(a); (*see also* photograph of Defendants' Watch, attached as Exhibit B to Declaration of Hanice Tavares, dated May 2005 ("Tavares Decl." )); photograph of the Tank Francaise, attached as Ex. FF to Declaration of Milton Springut, dated May 6, 2005 ("Springut Decl.").) Certain models of the Tank Francaise include a square window showing the date in place of the Roman numeral " six," and this is also true of Defendants' Watch. The face of Defendants' Watch is marked "GENEVE" on the upper portion and "QUARTZ" on the bottom portion, while the Tank Francaise reads "CARTIER " on the upper portion of the watch face and the bottom portion is blank. (*See* Tavares Decl. Ex. B; Springut Decl. Ex. FF.)

## III. Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material issue of fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *seeCelotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)."The court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor."*Koch v. Multiplan, Inc.,* No. 99 Civ. 11277, 2001 U.S. Dist. LEXIS 2142, at \*6 (S.D.N.Y. Feb. 16, 2001); *Melwani v. Jain,* No. 02 Civ. 1124, 2004 U.S. Dist. LEXIS 7590, at \*12 (S.D.N.Y. Apr. 29, 2004). The Court must reserve any genuine issue of material fact for a jury. *See ResQNet.com, Inc. v. Lansa, Inc.,* 382 F.Supp.2d 424, 436 (S.D.N.Y.2005).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*3 When cross-motions for summary judgment are made, the standard is the same as that for individual motions. See *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir.2001); *AFP Imaging Corp. v. Philips Medezin Systeme Unternehmensbereich der Philips GMBH,* No. 92 Civ. 6211, 1994 U.S. Dist LEXIS 16504, *2 (S.D.N.Y. Nov. 17, 1994). The court must consider each motion independently of the other. *Morales,* 249 F.3d at 121.

### IV. Analysis

Section 43(a) of the Lanham Act prohibits a person from using "any word, term, name symbol or device, or any combination thereof" that is "likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods."15 U.S.C. § 1125(a) .Section 32 of the Lanham Act requires that the mark in question has been registered. 15 U.S.C. § 1114(1).[FN3] In order to prevail in an action for trade dress and trademark infringement pursuant to Sections 32 and 43(a) of the Lanham Act, plaintiff must show "(1) that the mark is distinctive as to the source of the good, and (2) that there is a likelihood of confusion between its good and defendant's." *Yurman Design, Inc. v. Paj, Inc.,* 262 F.3d 101, 115-16 (2d Cir.2001).[FN4] Even if plaintiff can show distinctiveness and a likelihood of confusion, " a defendant may avoid liability under [the Lanham Act] if he or she is able to demonstrate that the allegedly similar trade dress feature is 'functional.' " *Villeroy & Boch Keramische Werke K.G. v. THC Sys., Inc.,* 999 F.2d 619, 620 (2d Cir.1993). "A product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1006 (2d Cir.1995).

FN3. The elements of trademark infringement, pursuant to Section 32 of the Lanham Act, are the same as trade dress infringement, pursuant to Section 43 of the Lanham Act; in the case of trademark infringement, the mark in question must be registered. See *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 155 (2d Cir.2002).

FN4."A mark has acquired distinctiveness . .. if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." ' *Wal-Mart Stores, Inc. v. Samara Bros.,* 529 U.S. 205, 211 (2000) (citing *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851, n. 11 (1982)).

### (1) *Distinctiveness of the Tank Francaise Mark*

Plaintiffs argue that "Cartier has achieved secondary meaning in the Tank Francaise design at issue" because, among other things, "a consumer survey ... shows 60% recognition among the relevant consuming public," (i.e., fine watch owners or those very likely to buy), and there has been " extensive media commentary and recognition." (Plaintiffs' Memorandum at 14-15.) Defendants respond that "even if plaintiff's product were well recognized by the public," no secondary meaning exists because Plaintiffs cannot show that "from observing the product, the observer knows that it is the product of a particular manufacturer." (Defendants' Opposition at 4 .) Defendants also contend that the consumer survey on which Plaintiffs rely "is flawed and would likely be inadmissible at trial because it did not test the perceptions of an ordinary observer."(*Id.* at 10.)

"Distinctiveness may be proven by showing the intrinsic nature of the mark serves to identify a particular source or that 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself." ' *Cartier, Inc. v. Four Star Jewelry Creations, Inc.,* 348 F.Supp.2d 217, 240 (S.D.N.Y.2004) (citing *Yurman,* 262 F.3d at 115.) Courts consider "advertising expenditures, consumer studies, sales, competitors' attempts to plagiarize the mark, and the length and exclusivity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

of the mark's use" in determining whether a mark has acquired a secondary meaning. *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.,* 228 F.Supp.2d 399, 405 (S.D.N.Y.1983) (quoting *Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 393 (2d Cir.1995)).

### Advertising Expenditures

*\*4* Plaintiffs provide substantial evidence that " Cartier has engaged in extensive advertising and other promotion of its products, including the Tank Francaise" by, among other things, "plac[ing] print advertising in magazines, newspapers, and billboards, both nationally and regionally, as well as 'co-op' advertising with its authorized dealers." (Plaintiffs' Memorandum at 4; *see* Springut Decl. Exs. AA-DD, FF.) Plaintiffs show that "media spending for the Tank Francaise has averaged in excess of $1 Million per year," and that advertisements have appeared in national publications such as *Vogue, Town and Country, Architectural Digest, The New Yorker, The New York Times, Washington Post, Los Angeles Times,* and *The Chicago Tribune.*(*Id.;see* Springut Decl. Ex. X.) These extensive efforts to advertise and promote Plaintiffs' products weigh in favor of a finding that the Tank Francaise has acquired a secondary meaning. *SeeFour Star,* 348 F.Supp.2d at 241-42;*Citigroup v. Citi Holding Co.,* 171 F.Supp.2d 333, 346 (plaintiff's marks, "through extensive advertising and promotion over the decades, garnered extraordinary acquired distinctiveness.")

### Consumer Studies

Plaintiffs retained an expert, Dr. Sidney Lirtzman, president of Fairfield Consulting Associates, Inc. (a consumer consulting company), to conduct a survey to assess whether the Tank Francaise has acquired a secondary meaning. (*See* Declaration and Expert report of Dr. Sidney I. Lirtzman, dated March 8, 2005 ("Lirtzman Expert Report").) Dr. Lirtzman interviewed 149 customers

at Tourneau watch stores in Manhattan, Long Island, and Los Angeles who "reported owning a fine watch valued at $2,500 or more" or "were very likely to buy a fine watch in the next year." (Lirtzman Expert Report at 8.) The survey found that "sixty-one percent of the respondents associated the design of the Tank Francaise watch with a single company."(*Id.*) Defendants argue that the Lirtzman Expert Report is "flawed" because it " did not test the perceptions of an ordinary observer." (Defendants' Opposition at 10 .) Plaintiffs respond that "it is sufficient to demonstrate secondary meaning in the limited market for such watches." (Plaintiffs' Reply at 2.)

The Lirtzman Expert Report shows that a majority of consumers who "reported owning a fine watch valued at $2,500 or more" or "were very likely to buy a fine watch in the next year" identify the Tank Francaise with one source. "The Plaintiff is not required to establish that *all* consumers relate the product to its producer; it need only show that a substantial segment of the relevant consumer group makes this connection."*Coach Leatherware Co. v. Ann Taylor, Inc.,* 933 F.2d 162, 168 (2d Cir.1991) (emphasis in original); *Four Star,* 348 F.Supp.2d at 242 ("[V]alid market research does not require a secondary meaning survey to be conducted in a vacuum."). Because the findings in the Lirtzman Expert Report show that the Tank Francaise has acquired secondary meaning among fine watch owners or those likely to purchase a fine watch in the next year, it supports a ruling in Plaintiffs' favor. *SeeDeere & Co. v. MTD Holdings Inc.,* No. 00 Civ. 5936, 2004 U.S. Dist. LEXIS 2550, at \* \*32-33 (Feb. 19, 2004); *Schering Corp. v. Pfizer, Inc.,* No. 98 Civ. 7000, 2000 U.S. Dist. LEXIS 7071, at \* \*24-25 (May 24, 2000).

### Sales

*\*5* Plaintiffs present evidence that Cartier watches are sold in the United States in 33 Cartier boutiques and by approximately 225 authorized dealers. (Plaintiffs' Memorandum at 5; Springut Decl. Exs. Z, AA.) As of 2002, Cartier had sold approximately 93,750 Tank Francaise watches for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

more than $266 million. (Plaintiffs' Memorandum at 5; Springut Decl. Ex. Y.) This evidence of sales success also favors a finding that the Tank Francaise has achieved secondary meaning. *See Four Star,* 348 F.Supp.2d at 242;*see also Deere & Co.,* 2004 U.S. Dist. LEXIS at *33.

*Competitors' Attempts to Plagiarize the Mark*

Plaintiffs present evidence that "numerous merchants of 'knockoff' or 'look-alike' merchandise make comparison ... to Cartier through use of such terms as 'Cartier-style' or even the specific Cartier models, e.g., 'Tank Francaise.' " (Plaintiffs' Memorandum at 9; Springut Decl. Exs. LL, NN-PP.) "Secondary meaning may be supported by intentional copying, particularly when the purpose is 'to benefit from the good will of the prior user through confusion.' " *Four Star,* 348 F.Supp.2d at 243 (citing *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.,* 312 F.Supp.2d 195, 208-09 (D.Conn.2004)). The intentional copying identified by Plaintiffs is evidence that the Tank Francaise has acquired a secondary meaning. *See Centaur Commc'ns Ltd. v. A/S/M Commc'ns, Inc.,* 830 F.2d 1217, 1224 (2d Cir.1987); *N.Y. State Soc'y of CPAs v. Eric Louis Assocs.,* 79 F.Supp.2d 331, 340 (S.D.N.Y.1999).

*Length and Exclusivity of Use*

The Tank Francaise was first marketed in 1996 and was an "instant hit," and the design has been used continuously for over nine years. (Plaintiffs' Memorandum at 5.) This length of time supports a finding that the Tank Francaise has acquired secondary meaning. *See Four Star,* 348 F.Supp.2d at 243 (evidence of secondary meaning exists where product design had been used for eight years); *Dana Braun, Inc. v. SML Sport Ltd.,* 2003 U.S. Dist. LEXIS 21349, * *39-40 (S.D.N.Y.2003) (evidence of secondary meaning exists where product design had been used for five years); *Landscape Forms, Inc. v. Columbia Cascade Co.,* 117 F.Supp.2d 360, 367 (S.D.N.Y.2000) (evidence of secondary

meaning exists where product design had been used for eleven years).

Plaintiffs also provide substantial evidence that Cartier has protected the Tank Francaise mark. Plaintiffs "enforce[ ] a 'zero tolerance' policy with respect to infringements," and, among other things, employ an investigator dedicated to discovering possible infringements in Manhattan, send many " ' cease and desist' letters, which consist of alerting alleged infringers of Cartier's rights and various claims of infringement," and "[o]ccasionally, these efforts also include filing of litigation."(Plaintiffs' Memorandum at 11.) These measures also support a finding that the Tank Francaise has acquired a secondary meaning. *See Dana Braun,* 2003 U.S. Dist. LEXIS at * *39-40.

*6 Examining these factors in their totality, the Court concludes that the Tank Francaise is distinctive and has acquired a secondary meaning. *See Four Star,* 348 F.Supp.2d at 244;*see also, Centaur Commc'ns,* 830 F.2d at 1222;*Deere & Co,* 2004 U.S. Dist. LEXIS at * *33-34; *EnergyBrands, Inc. v. Beverage Mktg. USA, Inc.,* No. 02 Civ. 3227, 2002 U.S. Dist. LEXIS 7763, at *3 (S.D.N.Y. May 1, 2002).

*(2) Likelihood of Confusion*

Plaintiffs argue that Defendants' Watch caused " confusion as to sponsorship, initial interest (pre-sale) confusion and post-sale confusion." (Plaintiffs' Memorandum at 18.) Defendants respond that no such confusion existed because " potential purchasers of fine watches costing thousands of dollars are highly sophisticated and will not be fooled into believing that the source of a watch is other than Cartier simply because its design is similar."(Defendants' Opposition at 10.)

Courts consider the following factors in determining whether a likelihood of confusion exists: "(1) the strength of plaintiffs' mark; (2) the degree of similarity between plaintiffs' and defendant's marks; (3) the proximity of the products; (4) the likelihood that either owner will

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

bridge the gap, using the mark on products closer to the other's area of commerce; (5) the sophistication of the buyers and the quality of defendants' product; (6) actual confusion; and (7) good or bad faith." *Four Star,* 348 F.Supp.2d at 244 (citing *Polaroid Corp. v. Polaroid Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961)); *see also* *TCPIP Holding Co. Inc. v. Haar Commc'n, Inc.,* 244 F.3d 88, 100 (2d Cir.2001). No one factor is determinative and a court "should focus on the ultimate question of whether consumers are likely to be confused ." *Tactica Int'l v. Atl. Horizon Int'l,* 154 F.Supp.2d 586, 602 (S.D.N.Y.2001); *see also* *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 199 (2d Cir.2001).

### (1) *Strength of Plaintiffs' Mark*

A plaintiff's mark is strong when it has a " tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *1-800-Contacts, Inc. v. WhenU. com,* 309 F.Supp.2d 467, 495 (S.D.N.Y.2003). The Tank Francaise mark is strong and has acquired a secondary meaning. *See* *supra* pp. 4-7."The same type of evidence may support a claim concerning the strength of a mark and a claim concerning secondary meaning." *PAJ, Inc. v. Barron's Gold Mfg. Corp.,* No. 02 Civ. 1465, 2002 U.S. Dist. LEXIS 14227, at *6 (S.D.N.Y. Aug. 2, 2002).

### (2) *Similarity of the Marks*

"The comparison of marks is an inquiry designed to determine the general impression conveyed to the purchasing public by the respective marks." *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 77 (2d Cir.1988) (citation omitted). Courts " must appraise the overall impression created by ... the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Friesland Brands,* 228 F.Supp.2d at 405.

*7     The Court has carefully examined

Defendants' Watch and the Tank Francaise "side by side." Both watches have (same sized) square watch faces that feature Roman numerals, each of which " inclines to conform to the angle-direction of the watch hands at such time as the hands are juxtaposed to the watch case, and end in inwardly angled corners," and "chapter ring[s] or minute guide[s] located between the center of the dial and the numerals."(Plaintiffs' 56.1 Stmt. ¶ 10; *see also* Tavares Decl. Ex. B; Springut Decl. Ex. FF.) Certain models of the Tank Francaise include a square window showing the date in place of the Roman numeral "six," and this is also true of Defendants' Watch. (*See* *id.*)Defendants' Watch is yellow gold colored (either 14 karat gold or gold-plated), and the Tank Francaise is also manufactured in yellow gold. (*See* *id.*)The face of Defendants' Watch is marked "GENEVE" on the upper portion and "QUARTZ" on the bottom portion, while the Tank Francaise reads "CARTIER " on the upper portion of the watch face and the bottom portion is blank. (*See* *id.*)[FN5]Defendants' Watch appears to be of inferior quality to the Tank Francaise; it did not feel heavy and the case and bracelet were scratched. (*See* Defendants' Watch, submitted with Letter from Plaintiffs to the Court, dated October 6, 2005.)

> FN5. In addition, Defendants' Watch and the Tank Francaise are both luxury watches. Defendants' Watch was sold for $1,000, and the Tank Francaise sells for, at a minimum, several thousand dollars. (*See* Tavares Decl. Ex. C; Springut Decl. Ex. F at 420-21.)

Because Defendants' Watch so closely resembles the Tank Francaise, there is a likelihood of confusion. *See* *Four Star,* 348 F.Supp.2d at 245 (" watches will often be viewed in isolation in display cases, in catalogs and on wearer's wrists. In these multifarious contexts, the court finds that even consumers who are familiar with Cartier's designs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

would be unlikely to notice small but nonetheless significant differences between ... [a Cartier watch] and a copy.")

(3) *Proximity of the Products*

This factor "addresses whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Hasbro,* 858 F.2d at 77. "Both Cartier's and defendants' products are what might be termed luxury watches ... The products are similar and are designed for the same purpose. The proximity of the watches is therefore sufficiently close to create a likelihood of confusion."*Four Star,* 348 F.Supp.2d at 246; (*see* Tavares Decl. Ex. C.)

(4) *Likelihood of 'Bridging the Gap'*

" 'Bridging the gap' refers to the probability of defendants entering plaintiffs' business or of the average customer's perception that defendants would enter plaintiffs' market."*Four Star,* 348 F.Supp.2d at 246 (citing *Malletier v. Dooney & Bourke, Inc.,* 340 F.Supp.2d 415, 432 (S.D.N.Y.2004)). Where, as here, the goods compete in the same market (i.e., the luxury watch market), "there is no gap to be bridged," and so this factor is inapplicable.*Four Star,* 348 F.Supp.2d at 246;*see*Friesland Brands, 228 F.Supp.2d at 407.

(5) *Sophistication of Buyers and Quality of Defendants' Product*

**\*8** "Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in a conclusion concerning the source or sponsorship of the product."*Bristol Myers Squibb, Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1046 (2d Cir.1992). In certain contexts, the sophistication of the buyer "might not be determinative," *Tough Travelers v. Outbound*

*Prods.,* 989 F.Supp. 203, 216-17 (N.D.N.Y.1997), because "it is sophisticated ... buyers who pay the most attention" to certain aspects of a luxury product. *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986) (explaining that sophisticated jeans purchasers were more likely to be confused by jeans with similar stitching on the back pockets).

Plaintiffs argue that, although the purchasers of luxury watches are sophisticated, "actionable confusion includes not only traditional point-of-sale confusion, but also other forms of confusion, including post-sale, initial interest, and sponsorship confusion, for all of which the supposed sophistication of the customer is less important." (Plaintiffs' Reply at 4.) Defendants respond that sophisticated purchasers "will not be fooled into believing that the source of a watch is other than Cartier simply because its design is similar." (Defendants' Opposition at 10.)

Actionable confusion can occur in several contexts, including where "(1) prospective purchasers believe that the senior user sponsored or otherwise approved of the junior user's trademark; (2) potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though consumers are not actually confused at the time of purchase; and (3) customers are confused as to the source of the junior user's product when this product is observed in the post-sale context."*Jordache Enters., Inc. v. Levi Strauss & Co.,* 841 F.Supp. 506, 514-15 (S.D.N.Y.1993) (citations omitted).

There is no evidence "tending to show that initial or post-sale confusion exists because of, rather than in spite of, the sophistication of the luxury watch consumer," or that consumers assume that a relationship exists between Plaintiffs and Defendants. *Four Star,* 348 F.Supp. at 247;*see also Tough Travelers,* 989 F.Supp. at 216-17 ("in absence of some evidence that a relationship between the parties exists, to assume that consumers are likely to suppose the existence of such a relationship is overly speculative").

Courts must also consider "whether the senior

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."*Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 965 (2d Cir.1996); *see also Star Indus. v. Bacardi & Co.,* 412 F.3d 373, 389 (2d Cir.2005). An inferior product may cause injury to a superior product because "people may think that the senior and junior products came from the same source ... or products of equal quality may tend to create confusion as to source because of this very similarity."*1-800-Contacts,* 309 F.Supp.2d at 502 (citing *Hormel Foods Corp. v. Jim Henson Prods.,* 73 F.3d 497, 505 (2d Cir.1996)). As noted, there is evidence that Defendants' Watch is of inferior quality to the Tank Francaise. (*See* Declaration and Expert Report of Leon Adams, dated March 10, 2005 at 4 ("I am surprised at the extremely poor quality of the watch given the large price tag [$1,000]. Most of the metal appears to be gold plated, not 14 karat gold (as stamped on the back of the watch case), and the plating is beginning to wear off in places.")."Where the allegedly infringing product is inferior, the quality factor weighs in favor of Plaintiff."*Calvin Klein Jeanswear Co. v. Tunnel Trading,* No. 98 Civ. 5408, 2001 U.S. Dist. LEXIS, at *31 (S.D.N.Y. Nov. 16, 2001); *see Forschner Group v. Arrow Trading Co.,* 124 F.3d 402, 405 (2d Cir.1997); *Fun-Damental Too v. Gemmy Indus. Corp.,* 111 F.3d 993, 1004 (2d Cir.1996); *Cartier v. Aaron Faber, Inc.,* No. 05 Civ. 6615, 2005 U.S. Dist. LEXIS 22251, at * *11-12 (S.D.N.Y. Sept. 30, 2005).

*(6) Actual Confusion*

**\*9** "The Lanham Act does not require evidence of actual confusion as a prerequisite to recovery." *Four Star,* 348 F.Supp.2d at 247. Plaintiffs do not present any specific evidence of actual confusion. ( *See* Plaintiffs' Memorandum at 22.)

*(7) Good or Bad Faith*

The question is whether Defendants "adopted the marks with the intention of capitalizing on

Cartier's reputation and goodwill, as well as any customer confusion as to the source of the products. "*Four Star,* 348 F.Supp.2d at 248;*see also Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 482-83 (2d Cir.1996). Defendants' Watch appears similar to the Tank Francaise, and Defendants, as jewelry sellers, must (should) have "had knowledge of plaintiffs' design and did not innocently choose a confusingly similar design."*Four Star,* 348 F.Supp.2d at 248. In *Four Star,* defendant told plaintiff's private investigator that "defendants' watches were exactly the same as Cartier watches ... [and] compared defendants' watches to advertisements of plaintiffs' watches and pointed out similar features."*Id.* The court held that "[t]he foregoing all suggests a showing of bad faith."*Id.* In the instant case, Defendants promoted their watch as an "exact copy" of the Tank Francaise. (*See* Tavares Decl. ¶ 4 (Defendants' salesman told Plaintiffs' investigator that "these are exactly like Cartiers."); *see also* Tavares Decl. Ex. A); *Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 745 (2d Cir.1998); *We Media v. Ge,* 218 F.Supp.2d 463, 478 (S.D.N.Y.2002) (bad faith occurs where second-comer "intentionally copies a trademark or trade dress").

Taken together, these factors establish that there is a likelihood that consumers would confuse Defendants' Watch with the Tank Francaise. *See Four Star,* 348 F.Supp.2d at 249;*see also Virgin Enters. v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003); *Fun-Damental Too,* 111 F.3d at 1005.

*Non-Functionality*

Defendants argue that "the most prominent features of the Cartier watch are functional and for that reason cannot be included in the collocation of features which could arguably make the Cartier watch distinctive"-namely, "the roman numerals and the artful way in which they are placed" and " both watches appear to be square."(Defendants' Opposition at 2.) Plaintiffs respond that Defendants have improperly "select[ed] two out of the many trade dress elements claimed by Cartier, labeling them the 'most prominent' and then attacking them

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 9

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

individually as 'functional.' ' (Plaintiffs' Reply at 2-3.)

"[A] product is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."*Yurman,* 262 F.3d at 116. Where aesthetic features are in question, "the dress is functional if the right to use it exclusively 'would put competitors at a significant non-reputation-related disadvantage.' " *Four Star,* 348 F.Supp.2d at 249 (citing *Fruit-Ices Corp. v. Coolbrands, Int'l Inc.,* 335 F.Supp.2d 412 (S.D.N.Y.2004)).

*10 The trade dress of the Tank Francaise is not functional. *SeeFour Star* 348 F.Supp.2d at 225 ( "the watch designs at issue are purely ornamental and do not play a functional, essential, or cost-saving role in the manufacture of the watches." ). It is improper to "break [Plaintiffs'] trade dress into its individual elements and then attack[ ] certain of those elements as functional" because Plaintiffs "claim[ ] as [their] mark the particular combination and arrangement of design elements that identify its [watches] and distinguish them from other [watches]."*Le Sportsac, Inc. v. K Mart Corp.,* 654 F.2d 71, 76 (2d Cir.1985). And, "the fact that a design feature performs a function does not make it essential to the performance of that function; ... the true test of functionality is not whether the feature in question performs a function, but whether the feature is dictated by the functions to be performed." *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.,* 834 F.2d 1142, 1148 (2d Cir.1987) (internal citation omitted). None of the distinctive features of the Tank Francaise are essential to the function of the watch, nor do they render the Tank Francaise cheaper or easier to manufacture. *SeeFour Star,* 348 F.Supp.2d at 225;*Stormy Clime, Ltd. v. Progroup, Inc.,* 809 F.2d 971, 975 (2d Cir.1987) (a design feature is functional if it "affect[s] the cost or quality of an article ... [or] which permits the article to be manufactured at a lower cost.") (citations omitted).

Because the Tank Francaise has acquired a secondary meaning, there is a likelihood of confusion between the Tank Francaise and Defendants' Watch. Moreover, the Tank Francaise's

trade dress is not functional. Plaintiffs succeed on their Lanham Act trade dress and trademark infringement claims. *SeeFour Star,* 348 F.Supp.2d at 249;*Centaur Commc'ns,* 830 F.2d at 1229.

*Defendant Eli Sardar*

Defendants admit that "Eli Sardar is responsible for and makes the final decision as to buying."(Plaintiffs' 56.1 Stmt. ¶ 5; Defendants' 56.1 Stmt. ¶ (a)); *seeCarrel v. Shubert Org., Inc.,* 104 F.Supp.2d 236, 271 (S.D.N.Y.2000). A showing that an officer "authorized and approved the acts of unfair competition which are the basis of [the] ... corporation's liability ... is sufficient participation in the wrongful acts to make [the officer] individually liable."*Bambu Sales, Inc. v. Sultana Crackers, Inc.,* 683 F.Supp. 899, 913-14 (E.D.N.Y.1988) (citing *Donsco v. Casper, Inc.,* 587 F.2d 602, 606 (3d Cir.1978).

*Section 349 of New York General Business Law*

Plaintiffs argue that "claims for trade dress infringement under the laws of the State of New York are similar to those under the Lanham Act," and should be "considered together." (Plaintiffs' Memorandum at 13.) Although Defendants do not respond, "most ... trade dress infringement claims are deemed to fall outside the ambit of Section 349." *Perkins Sch. for the Blind v. Maxi-Aids, Inc.,* 274 F.Supp.2d 319, 327 (E.D.N.Y.2003).

*11 To prevail on a Section 349 claim, Plaintiffs must provide proof of "consumer injury or harm to the public interest" or evidence of " potential danger to the public health or safety." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 277 F.Supp.2d 269, 273 (S.D.N.Y.2003)."Mere evidence of general consumer confusion is insufficient."*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* No. 01 Civ. 5981, 2004 U.S. Dist. LEXIS 19239, at * *29-30 (S.D.N.Y.2004). Plaintiffs fail to provide sufficient evidence of consumer injury or harm to the public interest. *See*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* No. 01 Civ. 5981, 2004 U.S. Dist. LEXIS 19239, at *30 (S.D.N.Y. Sept. 28, 2004) ("Harm to a business from a competitor, however, does not constitute the kind of detriment to the public interest required by the statutes."); *digiGAN, Inc. v. iValidate, Inc.,* No. 02 Civ. 420, 2004 U.S. Dist. LEXIS 1324, *20 (S.D.N.Y. Feb. 3, 2004) (finding that Section 349 had not been violated where "there are no factual allegations ... that suggest a broad impact on consumers."). Trade dress infringement claims "are not cognizable under [this] statute unless there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution."*Nat'l Distillers Prods Co., LLC v. Refreshment Brands, Inc.,* 198 F.Supp.2d 474, 486-87 (S.D.N.Y.2002).

V. Conclusion and Order

For the reasons stated herein, Plaintiffs' motion for summary judgment is granted in part and denied in part and Defendants' motion for summary judgment is granted in part and denied in part.

The parties are requested to appear at a settlement/status conference with the Court on October 28, 2005 at 9:45 a.m., in Courtroom 706 of the Thurgood Marshall Courthouse, 40 Centre Street, New York, New York. The parties are directed to engage in good faith settlement negotiations prior to the conference.

S.D.N.Y.,2005.
Cartier, a Div. of Richemont North America, Inc. v. Samo's Sons, Inc.
Not Reported in F.Supp.2d, 2005 WL 2560382 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4



Not Reported in F.Supp.2d                                                                                           Page 1

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
(Cite as: Not Reported in F.Supp.2d)

C
Eliya, Inc. v. Kohl's Dept. Stores
S.D.N.Y.,2006.

United States District Court,S.D. New York.
ELIYA, INC., Plaintiff,
v.
KOHL'S DEPARTMENT STORES, Defendant.
No. 06 Civ 195(GEL).

Sept. 13, 2006.

Tedd S. Levine, Baldinger & Levine, LLC,
Mineola, NY, for Plaintiff.
Albert Robin, Cowan, Liebowitz & Latman, P.C.,
New York, NY, and W. Mack Webner and Leigh
Ann Lindquist, Sugrue Mion, PLLC, Washington,
D.C., for Defendant.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.
*1 Plaintiff Eliya, Inc. ("Eliya"), a designer and
manufacturer of shoes, brings this action against
defendant Kohl's Department Stores ("Kohl's"), a
well-known retailer, alleging that Kohl's copied one
of Eliya's shoe designs and is currently selling the
copied shoe at its retail stores in violation of various
common law and statutory prohibitions. Kohl's now
moves to dismiss the complaint pursuant to
Fed.R.Civ.P. 12(b)(6), and for attorney's fees
pursuant to 28 U.S.C. § 1927. For the reasons
below, Kohl's motion will be granted in part and
denied in part.

**BACKGROUND**

For purposes of this motion to dismiss, the
Court assumes as true the facts asserted in plaintiff's
Amended Complaint. In 2004, Eliya created an
original shoe design, consisting of patterned
stitching on the front and sides of the shoe, a strap
with visible stitching, and a sole with a pattern of
spots that wraps around the shoe and extends up the
back, sides, and front. (Am.Compl.¶ 8.) Eliya gave
this design the creative title SHOE, and copyrighted
the design drawing with the United States Copyright
Office. (Am.Compl.Ex.A.) Based on the SHOE
design, Eliya fashioned a line of shoes that it has
been promoting and selling since on or about
August 15, 2004, under brand label BERNE MEV.

In October 2005, Eliya became aware that
Kohl's was manufacturing and selling a line of shoes
using a design that is substantially similar to the
SHOE design. On October 21, 2005, Eliya sent
Kohl's a letter demanding that it immediately cease
and desist from selling the similarly-designed
Kohl's shoe. Kohl's refused this demand, and Eliya
commenced the instant action. Eliya asserts seven
causes of action against Kohl's-false designation
and unfair competition under the Lanham Act, 15
U.S.C. § 1125(a); common law trademark
infringement; common law unfair competition;
dilution under N.Y. Gen. Bus. Law § 360-*l;*
deceptive business practices under N.Y. Gen. Bus.
Law § 349; copyright infringement under 17 U.S.C.
§ 501; and common law copyright infringement.

**DISCUSSION**

I. *Motion to Dismiss Standard of Review*

On a motion to dismiss under Federal Rule of
Civil Procedure 12(b)(6), the Court must accept "as
true the facts alleged in the complaint,"*Jackson
Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d
697, 699-700 (2d Cir.1994), and may grant the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
(Cite as: Not Reported in F.Supp.2d)

motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,"*Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir.1998) (citations omitted). The question for the Court "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim."*Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (internal quotation marks and citations omitted). All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [the claims] as a matter of law. "*In re Independent Energy Holdings PLC,* 154 F.Supp.2d 741, 747 (S.D.N.Y.2001).

*2 As noted above, Eliya asserts seven causes of action against Kohl's. Each cause of action will be addressed in turn.

II. *Count One: False Designation of Origin and Unfair Competition*

Eliya asserts that Kohl's manufacture and sale of a shoe similar to that of SHOE violates the Lanham Act, 15 U.S.C. § 1125(a).Section 1125(a) prohibits the unauthorized use of "any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of [the unauthorized user's] goods, services, or commercial activities by another person."While the text of the statute prohibits only the use of a "word, term, name, symbol, or device, or any combination thereof,"§ 1125(a)'s proscriptions apply with equal force to the trade dress of a product, which is defined as the product's "total image ... includ[ing] features such as size, shape, color or color combinations, texture, or graphics."*Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 967 (2d Cir.1995), *quoting LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 75 (2d Cir.1985) (alterations in original); *see also* Restatement (Third) of Unfair Competition § 16 cmt. a ("The term 'trade dress' is often used to describe the overall appearance or image of goods ... as offered for sale in the marketplace.").

Trade dress itself is divided into two categories-product design trade dress and product packaging trade dress. As the names suggest, product design trade dress refers to the design of the product itself, while product packaging trade dress refers to a product's packaging as it appears in the marketplace. While the line between packaging and design may be difficult to draw in some cases, [FN1] the distinction is generally clear.

> FN1. For example, the Supreme Court has suggested that a Coca-Cola bottle may be packaging "for those consumers who drink the Coke and then discard the bottle," but may be product design "for those consumers who are bottle collectors," or may be "part of the product itself for those consumers who buy Coke in the classic glass bottle, rather than a can, because they think it more stylish to drink from the former."*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 215 (2000).

To state a claim for false designation under § 1125(a) based on trade dress, a plaintiff must establish (1) that its trade dress "is distinctive as to the source of the good," (2) "that there is a likelihood of confusion between [the plaintiff's] good and the defendant's," and (3) that the trade dress is not functional. *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 115-16 (2d Cir.2001). In a claim based on product packaging trade dress, the distinctiveness requirement can be met in one of two ways-either by establishing that the dress is inherently distinctive because it clearly identifies the source of the product, or by establishing that the dress has acquired secondary meaning because, in the mind of the general public, the "primary significance" of the dress is to identify the source of the product.*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 215 (2000). However, when a plaintiff's claim is based on product design trade dress, distinctiveness can only be established by a showing of secondary meaning.*Id.* In other words, the overall design of a product is protected under the Lanham Act only if the general public associates the product's design with a particular source of origin.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
(Cite as: Not Reported in F.Supp.2d)

*3 The third requirement-that the trade dress not be functional-serves to protect competition by refusing to grant trademark protection to essential or merely aesthetic features of a product. *Yurman*, 262 F.3d at 116. A product feature is functional, and is therefore not protected as trade dress under § 1125(a), if the feature is " essential to the use or purpose of the article," if "it affects the cost or quality of the article,"*id.,* or if its primary purpose is aesthetic, *Knitwaves, Inc. v.. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1008-09 (2d Cir.1995). The requirement that a protectable feature or design be nonfunctional overlaps with and supports the requirements relating to source identification and consumer confusion. If a feature or design only serves to make a product "more useful" or "more appealing," then it does not serve to identify the source of the product, and it is not protected trade dress under the Lanham Act. *Yurman,* 262 F.3d at 115 (noting the oft-cited example of a cocktail shaker shaped like a penguin where the penguin design did not identify the source of the shaker but merely made the shaker more appealing and was therefore not protectable).

Eliya sufficiently alleges a claim of trade dress infringement under the Lanham Act. The trade dress described by Eliya is the SHOE design itself. Accordingly, Eliya must allege (1) that the SHOE design has acquired secondary meaning in the general public, (2) that there is a likelihood of confusion between Eliya's shoes based on the SHOE design and the shoes sold by Kohl's, and (3) that the SHOE design features that comprise its trade dress are not functional.

With respect to the first element, Eliya alleges that the trade dress of the SHOE design includes: a rectangular label attached to the inner portion towards the back of the shoe, an imbedded rectangular label on the sole of the shoe, two elongated stitched patterns of like size on the top front portion of the shoe, two elongated stitched patterns of like size on the sides of the shoe, a strap which incorporates visible stitching, curved-shaped stitching on the front portion of the shoe, a border that [w]raps around and extends up the back, the sides, and front of the shoe, and a spotted design of circles all through the border, extending up the

back, the sides, the front, and the sole of the shoe.

(Am Compl. ¶ 10.) Additionally, Eliya alleges that the SHOE design has "acquired distinctiveness through secondary meaning such that consumers are likely to associate the source of such products with Plaintiff"*(id.),* that the trade dress "has acquired enormous value and recognition in the United States, " and that it is "well known to the consuming public ... as identifying and distinguishing Plaintiff as the exclusive and unique source of the products that are used in connection with such trade dress" (Am.Compl.¶ 11).

With respect to the second element, likelihood of confusion, Eliya alleges that "consumers are likely to associate the source of [products with the SHOE design] with Plaintiff" (Am.Compl.¶ 10), that "Kohl's use of [the] features on its products is likely to cause confusion in the marketplace as to the source of such goods"*(id.),* and that "Kohl's is using the ... trade dress of Plaintiff's SHOE product line such that there is a likelihood of confusion between the trade dress of the Kohl's shoes and the trade dress of Plaintiff's SHOE product line" (Am.Compl.¶ 13).[FN2]

> FN2. To determine whether, as a factual matter, there exists a likelihood of confusion, the Court must use the test set out in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.1961). However, an application of the so-called *Polaroid* factors on this motion to dismiss would be inappropriate because it would involve premature factfinding. *See Hearts on Fire Co., LLC v.. L C Int'l Corp.,* No. 04 Civ. 2536, 2004 WL 1724932, at *4 (S.D.N.Y. July 30, 2004). There is no requirement that a plaintiff address the *Polaroid* factors in its pleading; such a requirement would be inconsistent with the "notice pleading" philosophy of the Federal Rules of Civil Procedure. *Cf. Swierkiewicz v. Sorema N. A .,* 534 U.S. 506 (2002).

*4 With respect to the third element,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 4

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
(Cite as: Not Reported in F.Supp.2d)

functionality, Eliya asserts ·that the design features that make up the described trade dress are " non-functional." (Am.Compl.¶ 10.)

These allegations are sufficient to support a claim under § 1125(a). Eliya describes the SHOE design and alleges that the design serves as a source identifier to the general public. Eliya alleges that Kohl's has copied its SHOE design, and that Kohl's imitation causes consumer confusion regarding the source of Kohl's products. Lastly, Eliya alleges that the design elements it describes are not functional. Accordingly, Eliya has successfully asserted a trade dress claim under § 1125(a).

Kohl's arguments to the contrary do not compel a different conclusion. First, Kohl's argues that the features of the SHOE design that Eliya alleges to be its trade dress are functional. Second, Kohl's argues that Eliya's shoes based on the SHOE design have not been on the market long enough to acquire secondary meaning. Third, Kohl's argues that Eliya has not sufficiently pleaded the specific elements of the SHOE design that comprise its trade dress. For the reasons below, each of these arguments is without merit.

Whether the trade dress described by Eliya is functional for purposes of the Lanham Act is essentially a fact question. Kohl's asserts that " [s]ome of the features ... are clearly functional (strap, stitching, sole) and Eliya alleges no facts to offset the prima facie functionality of the claimed features."(Def.Mem.19.) This argument fails for two reasons. First, Eliya does not claim that any one particular feature of the SHOE design is protectable trade dress. Rather, Eliya lists a number of features that, taken together, comprise the overall image of the SHOE design. It is this overall image that allegedly comprises Eliya's trade dress. Kohl's claim that the strap is functional as a separate feature does not as a matter of law defeat Eliya's assertion that the overall SHOE design, which incorporates not just the strap but also the sole, the stitching, and the labels, is non-functional, and therefore protectable as trade dress for purposes of the Lanham Act. Second, Kohl's is simply incorrect that the strap, stitching, or sole are functional features under the Lanham Act. Indeed, every shoe needs some form

of stitching and some form of sole, and many shoes have some form of strap. However, Eliya does not assert that its trade dress is the mere fact that the SHOE design incorporates a strap, stitching, or a sole. Rather, Eliya asserts that the particular *design* of the stitching, the sole, and the strap on its SHOE design comprise the design's overall image and are protectable as trade dress. Accordingly, Eliya sufficiently alleges that the overall image of the SHOE design serves to identify the source of Eliya's shoes fashioned after the SHOE design.

Kohl's argument that the SHOE design has not been on the market for a sufficient amount of time to acquire secondary meaning is similarly without merit. In support of this argument, Kohl's relies on 15 U.S.C. § 1052(f), which states that exclusive use of a trademark for five years provides prima facie evidence that the mark is distinctive for purposes of registration. However, nothing in the statute suggests that a trademark or trade dress may not become distinctive for purposes of the Lanham Act in less than five years. To the contrary, to provide that five years creates a rebuttable presumption of distinctiveness implies that distinctiveness can be proved, instead of presumed, before that time. Indeed, due to the "mass exposure achievable with today's communications media," public demand for a particular product and concomitant secondary meaning can be "rapidly achieved." *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1130 (Fed.Cir.1993). If a product with a particular trade dress becomes popular in a short period of time, the trade dress may become distinctive through secondary meaning in a matter of months. *See id.* (finding that popular shoe design had acquired secondary meaning in five months). Here, Eliya alleges that its products based on the SHOE design are well known and that the public identifies the design as being affiliated exclusively with Eliya. Whether this is so is to be determined later in this litigation, but Elitya has sufficiently alleged that its trade dress is distinctive.

**\*5** Lastly, Eliya has pleaded the specific elements of its trade dress with sufficient particularity. Kohl's argues, based on *Landscape Forms, Inc. v. Columbia Cascade Co.,* that Eliya has not "articulat[ed] ... the specific elements which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
**(Cite as: Not Reported in F.Supp.2d)**

comprise its distinct dress,"113 F.3d 373, 381 (2d Cir.1997), and that therefore Kohl's is "left with only speculation as to what Eliya claims Kohl's has infringed" (Def.Mem.20). In fact, however, Eliya clearly articulates the specific features of the SHOE design that comprise its trade dress-the stitching patterns on the front and side of the shoe and the strap, the design of the strap itself, the labels, and the pattern on the wrap-around sole. (Am.Compl.¶ 10.) Kohl's does not explain how Eliya's description could be more detailed or what additional information Kohl's would need to avoid " speculation." The Federal Rules require only notice pleading, and Eliya's description of its trade dress is sufficient to provide Kohl's with sufficient notice regarding the features of the SHOE design that Eliya alleges Kohl's has infringed.

III.  *Count  Two:  Common  Law  Trademark Infringement*

Eliya's second cause of action is entitled " Common  Law  Trademark  Infringement." (Am.Compl. p. 6.) Kohl's correctly observes that Eliya does not assert the existence of any *trade mark.*Rather, Eliya's claims are based on its trade *dress.*Accordingly, Kohl's argues that Eliya has failed to state a claim because it does not identify a particular trademark upon which Kohl's has infringed. (Def.Mem.17.) This argument proves too much.

As Kohl's concedes in its reply papers, Eliya's claim of common law trademark infringement is based on the allegation that "it is harmed by the copying of the shoe design ... (its trade dress which it now claims is also its trademark)." (Def.Reply.8.) Kohl's own statement illustrates that Kohl's comprehends the substance of Eliya's claim. As Kohl's itself understands, Eliya's use of the term " trademark" refers to its trade dress, the same trade dress at issue in Count One of the Amended Complaint. This (perhaps sloppy) use of language is understandable,  given  courts'  well-established practice of including trade dress in the Lanham Act's definition of trademark. *See Yurman,* 262 F.3d at 114. Therefore, Eliya's use of the word "

trademark" to refer to its trade dress will not result in the dismissal of the second cause of action of the complaint.

Kohl's next argues that Eliya's claim of common law trademark infringement is preempted by federal copyright law. Kohl's asserts, confusingly, that a shoe could be protected by copyright if it were not a useful article, but that in this case Eliya's shoes are not protected by copyright, and so since the second cause of action would not support a copyright claim, it is preempted by  federal  copyright  law.  (Def.Mem.17.) Apparently, Kohl's argues that failure to state a copyright claim results in the preemption of any non-copyright state law claims. Not surprisingly, no support is provided for this proposition. This lack of support is not surprising because contrary to Kohl's argument, federal copyright law does not preempt claims of common law trade dress infringement. *See, e.g., U-Neek, Inc. v. Wal-Mart Stores,  Inc.,*  147  F.Supp.2d  158,  174 (S.D.N.Y.2001).

*6 Finally, with respect to the sufficiency of Eliya's allegations, under New York law a common law claim of trade dress infringement is evaluated " in the same manner as a trade dress claim under the Lanham Act."*U-Neek,* 147 F.Supp.2d at 178. Accordingly, because Eliya has stated a claim for relief under the Lanham Act, it has stated a claim for relief under New York common law.

IV. *Count Three: Common Law Unfair Competition*

Kohl's conclusorily asserts in its Notice of Motion that Eliya's third cause of action for common law unfair competition is preempted by federal copyright law. However, Kohl's does not support this contention or address Eliya's common law unfair competition claim in its initial moving papers. Despite Kohl's failure to support its assertion of preemption, Eliya addresses the issue in its responsive briefing, and Kohl's belatedly supports its claim of preemption in its reply. Accordingly, because both parties have addressed the issue, the Court will evaluate Kohl's argument to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
(Cite as: Not Reported in F.Supp.2d)

dismiss Eliya's third cause of action despite Kohl's initial abandonment.

Kohl's argues that Eliya's unfair competition claim is preempted by federal copyright law because Eliya's allegation of unfair competition is based on the mere copying of the SHOE design. However, a state law cause of action is not preempted by federal copyright law if the state law cause of action requires an extra element "instead of or in addition to the acts of reproduction, performance, distribution or display" of copyrighted material. *Samara Bros., Inc. v. Wal-Mart Stores, Inc.,* 165 F.3d 120, 130 (2d Cir.), *rev'd on other grounds,*529 U.S. 205 (2000). A claim of unfair competition under the New York common law is " almost indistinguishable" from a claim under the Lanham Act, which Eliya asserts in Count One. *Tri-Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 363 (S.D.N.Y.1998). As discussed above, both claims require a showing of a likelihood of confusion, an element in addition to reproduction, performance, distribution, or display. Accordingly, Eliya's common law unfair competition claim is not preempted.

### V. *Count Four: N.Y. Gen. Bus. Law § 360-l*

To state a claim under § 360-*l* a plaintiff must show (1) that its product has distinctive trade dress, and (2) that the defendant's appropriation of that trade dress results in a likelihood of dilution. *See New York Stock Exch., Inc. v. New York, New York Hotel, LLC,* 293 F.3d 550, 557 (2d Cir.2002); *see also Landscape Forms,* 113 F.3d at 369 (stating that § 360-*l* applies with equal force to trademarks and trade dress). For trade dress to be distinctive, it must "possess a distinctive quality capable of dilution."*Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1030 (2d Cir.1989). Such distinctiveness may be achieved through secondary meaning, such that the mark "has become so associated in the mind of the public with that entity ... or its product that it identifies the goods sold by that entity and distinguishes them from goods sold by others."*Id., quoting Allied Maintenance Corp. v. Allied Mech. Trades, Inc.,* 42

N.Y.2d 538, 545 (1977). However, a trademark's distinctiveness "in a limited geographical or commercial area does not endow it with a secondary meaning for the public generally."Mead, 875 F.2d at 1030.

*7 Eliya has alleged facts sufficient to state a claim under § 360-*l*.As discussed above, Eliya alleges that its trade dress "has acquired enormous value and recognition in the United States" (Am.Compl.¶ 10), and that it is "well known to the consuming public ... as identifying and distinguishing Plaintiff as the exclusive and unique source of the products that are used in connection with such trade dress" (Am.Compl.¶ 11). These assertions are sufficient to allege the nationwide distinctiveness required under § 360-*l*. *Cf. SMJ Group, Inc. v. 417 Lafayette Restaurant LLC,* No. 06 Civ. 1774, 2006 WL 2516519, at *4 (S.D.N.Y. Aug. 30, 2006) (dismissing plaintiff's claim under § 360-*l* because asserted distinctiveness of trademark was limited to plaintiff's customers in the New York metro area). Additionally, Eliya has alleged that Kohl's use of its trade dress is likely to cause " injury to [its] public image and reputation" and dilute "the distinctive quality of its trade dress." (Am.Compl.¶ 30.) Accordingly, Eliya has stated a claim under § 360-*l*.

Kohl's essentially concedes that this cause of action is well pleaded. Instead, Kohl's once again argues that the cause of action is preempted by federal copyright law, again providing no authority for this contention. Indeed, the argument Kohl's advances against Eliya's dilution claim rivals the incomprehensibility of its preemption argument with respect to Eliya's common law trademark claim. Here, Kohl's argues that "the dilution statute of New York is preempted in this case because the alleged trade dress is either capable of or not capable of Copyright protection."(Def.Mem.17.) Kohl's is correct to the extent that any item necessarily falls into one of two categories-those that are capable of copyright protection and those that are not. However, this unremarkable fact does nothing to support Kohl's claim that New York's statutory cause of action for trade dress dilution is preempted by federal copyright law.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
**(Cite as: Not Reported in F.Supp.2d)**

As discussed above, a cause of action is not preempted by copyright law if the state law cause of action requires an extra element "instead of or in addition to the acts of reproduction, performance, distribution or display."*Samara Bros.,* 165 F.3d at 130. With respect to a claim under § 360-*l,* a plaintiff must establish a likelihood of dilution, an element which is not essential to a federal copyright claim. Accordingly, Eliya's fourth cause of action is not preempted.

## VI. *Count Five: N.Y. Gen. Bus. Law § 349*

To state a claim under § 349 a plaintiff must allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result."*Maurizio v. Goldsmith,* 230 F.3d 518, 521 (2d Cir.2000).

However, § 349"is, at its core, a consumer protection device,"*Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir.1995), not a tool to resolve disputes between competitors. Therefore, for the statute to apply, a plaintiff must establish a "direct harm to consumers" that is greater than the "general consumer confusion" commonly found in trademark actions. *See Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.,* No. 96 Civ. 5150, 1997 WL 137443, at *3 (S.D.N.Y. Mar. 24, 1997). The "gravamen" of the claim must be an alleged injury to consumers or the general public. *See Schnabolk,* 65 F.3d at 264. Courts in this district have explained that the sort of harm necessary to establish consumer injury includes harms such as "potential danger to the public health or safety."*Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 277 F.Supp.2d 269, 273 (S.D.N.Y.2003) (collecting cases).

**\*8** Eliya fails to allege sufficient public injury to state a claim under § 349. Rather, Eliya alleges that the consumer injury that underpins this cause of action is the confusion, mistake, and deception that exists in any case of alleged trade dress infringement. (Pl. Mem. 20; *see also* Am. Comp. ¶ ¶ 18, 36, 37.) Where the only alleged harm is that

which is generally associated with violations of intellectual property law, courts in this district have found that plaintiffs cannot state a claim under § 349 . *See, e.g., SMJ Group,* 2006 WL 2516519, at *5; *U-Neek,* 147 F.Supp.2d at 176. Accordingly, Eliya's fifth cause of action will be dismissed.

## VII. *Count Six: Copyright Infringement*

To state a claim of copyright infringement a plaintiff must establish (1) the ownership of a valid copyright, and (2) unauthorized copying of the copyrighted work. *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,* 338 F.3d 127, 131 (2d Cir.2003). Unauthorized copying can be established by showing either a substantial similarity between the copyrighted work and the defendant's work or by showing that the defendant's copying was "improper" or "unlawful." *Id.*

In this action Eliya contends, and Kohl's concedes for purposes of this motion, that Eliya has a valid copyright in a work entitled SHOE. The certificate of registration for SHOE is attached as an exhibit to the Amended Complaint, and it contains a two dimensional rendition of the SHOE design from a side view. Many of the elements Eliya asserts as the SHOE design's trade dress are visible in the drawing, including the strap and the spotted design around the border of the shoe at the sole. (Am.Compl.Ex.A.) Also attached to the complaint are an image of a pair of Eliya's shoes based on the SHOE design (Am.Compl.Ex.B) and an image of a pair of Kohl's allegedly similar shoes (Am.Compl.Ex. C). Eliya alleges that by creating and selling the shoes illustrated in Exhibit C to the Amended Complaint, Kohl's has copied its copyrighted SHOE design.

Strictly speaking, however, Kohl's has not copied Eliya's copyrighted work. Eliya has a copyright in the SHOE design, which is a two-dimensional representation of the side view of a shoe. Eliya does not allege that Kohl's has copied this two-dimensional picture; rather, Eliya alleges that Kohl's has created a functional three-dimensional shoe. However, Eliya has no

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
(Cite as: Not Reported in F.Supp.2d)

copyright in an actual shoe, only a two-dimensional representation of one.[FN3]

> FN3. This distinction brings to mind Magritte's famous painting of a pipe: Kohl's contends that what Eliya submitted to the copyright office *n'est pas une chaussure,* but is merely a depiction of one.

This conclusion is compelled by the certificate of registration for SHOE provided by Eliya. After indicating that the title of the work is SHOE, the certificate states that the nature of the work is an " Etching." Elsewhere on the certificate, the author is asked to check a box to describe the nature of the work. The choices provided are three-dimensional sculpture, two-dimensional artwork, reproduction of a work of art, map, photograph, jewelry design, technical drawing, text, or architectural work. Eliya checked the box for two-dimensional artwork for SHOE. Accordingly, Eliya's copyright is for a two-dimensional etching.

*9 However, the fact that Eliya copyrighted a two-dimensional etching while Kohl's created a three-dimensional shoe does not necessarily doom Eliya's infringement claim. A two-dimensional design can be infringed if it is reproduced as part of a three-dimensional object, such as an item of apparel. For example, in *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* the plaintiff copyrighted designs for two sweaters-one with a "puffy leaf" pattern, and the other depicting a squirrel and leaves. 71 F.3d at 999. The Court of Appeals held that the defendant had infringed the plaintiff's copyrighted designs by reproducing the leaves and squirrels on its own line of sweaters. *Id.* at 1000-05. Relying on this holding, Eliya argues that because Kohl's allegedly copied aspects of the SHOE design and incorporated them into its own line of shoes, Kohl's has essentially taken Eliya's two-dimensional work and copied it onto a three-dimensional item. (Pl.Mem.23.)

Eliya stretches the holding of *Knitwaves* too far. Copyright law does not allow a third party to reproduce a work of visual art on a sweater and then defend its actions by claiming that the artist only

has a copyright on the visual art itself, not on a sweater. *Knitwaves* illustrates this common sense conclusion. However, that is not what happened here. Eliya does not allege that Kohl's reproduced the etching of the SHOE design on the surface of an infringing line of shoes. Rather, Eliya alleges that Kohl's created an actual three-dimensional shoe that is similar to the one depicted in the SHOE etching. This was not the situation faced by the Court of Appeals in *Knitwaves,* which prevented the defendant from reproducing the plaintiff's squirrels and leaves on the surface of its sweaters. The Court did not prevent the defendant from creating an actual squirrel or an actual leaf that resembled those depicted in the plaintiff's designs.

However, the difficulty in extending Eliya's copyright in the SHOE etching to cover Kohl's creation of a functional shoe has less to do with an increase in dimension than it does with copyright law's refusal to protect useful articles. Any work that has "an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information"-such as a shoe-is not granted the protection of copyright. *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.,* 413 F.3d 324, 327 (2d Cir.2005), *quoting*17 U.S.C. § 101. This limitation is based on the well-accepted "notion that functional items are not eligible for the relatively longterm protections of copyright."*Id.* at 328.Accordingly, an etching of a shoe, which has no utilitarian function and is simply an artistic rendering of a physical object, can be copyrighted, while an actual shoe cannot be. As a necessary consequence, ownership of a copyright in a pictorial representation of a useful article does not vest the owner of the picture with a derivative copyright in the useful article itself. If such roundabout copyrighting were permitted, copyright law's exclusion of useful articles would be eviscerated, because any useful article could be copyrighted by merely obtaining a copyright for a two-dimensional representation of the article.

*10 Eliya recognizes this fact, both in its memorandum in opposition to Kohl's motion (see Pl. Mem. 23) and in its registration of SHOE as a copyrightable etching instead of as an noncopyrightable shoe. However, Eliya argues that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 9

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
(Cite as: Not Reported in F.Supp.2d)

while it does not have a copyright in SHOE as a shoe, it does have a copyright in specific individual design elements incorporated into the SHOE design, and that Kohl's infringed its copyright by copying those design elements. (Pl.Mem.23.) Specifically, Eliya alleges that its copyright in SHOE includes the following "separate design elements"-

two elongated stitched-patters of like size on the top front portion of the SHOE design, two elongated stitched-patterns of like size on the sides of the SHOE design, a strap with visible stitching, curved-shaped stitching on the front portion of the SHOE design, a border that [w]raps around and extends up the back, the sides and front of the SHOE design, a spotted design of circles all through the border and extending up the back, sides and front of the SHOE design, and a spotted design of circles all through the sole of the SHOE design.

(Am.Compl.¶ 8)-and that Kohl's copied these specific design elements when it created its own line of shoes (Am.Compl.¶ 9).

Eliya is correct that "while 'useful articles,' taken *as a whole,* are not eligible for copyright protection, the individual design elements comprising these items may, viewed *separately,* meet the Copyright Act's requirements."*Chosun,* 413 F.3d at 328. The classic example of this rule is provided by *Mazer v. Stein,* in which the Supreme Court held that the artistic design on the base of a lamp could be copyrighted because the design was separable from the lamp's useful function. 347 U.S. 201 (1954). The lamp's ability to illuminate a room would not be affected by the removal of the design on the base, and therefore the design was copyrightable. Here, Eliya contends that the copyrighted etching of the SHOE design contains certain separable design elements, and that Kohl's has infringed upon Eliya's copyright in SHOE by incorporating those design elements into its similar line of shoes.

The line between protectable separable design elements and unprotectable inseparable functional elements is not always clear. See *Brandir Int'l, Inc. v. Cascade Pacific Lumber Co.,* 834 F.2d 1142, 1143 (2d Cir.1987) ("the line Congress attempted to draw between copyrightable art and

noncopyrightable design" is not clear); *Kieselstein-Cord v. Accessories By Pearl, Inc.,* 632 F.2d 989, 992-93 (2d Cir.1980) ("[N]one of the authorities-the *Mazer* opinion, the old regulations, or the statute-offer any ready answer to the line-drawing problem."(internal quotation marks omitted)); *see also Chosun,* 413 F.3d at 327 (noting that District Court stated that "our circuit's tests for physical and conceptual separability were too inconsistent to afford meaningful guidance"). However, the Court of Appeals has attempted to provide guidance in determining whether a particular design element of a useful article is separable, and therefore copyrightable.

**11 Separability comes in two flavors-physical separability and conceptual separability. *See Chosun,* 413 F.3d at 328 ("if a useful article incorporates a design element that is phyiscally or conceptually separable from the underlying product, the element is eligible for copyright protection"). A feature of a useful article is physically separable if, like an artistic base of a lamp, the feature could actually be physically separated from the useful article and be "capable of existing independently as a work of art."*Norris Industries, Inc. v. Int'l Tel. & Tel. Corp.,* 696 F .2d 918, 923 (11th Cir.1983)." [W]hen a component of a useful article can actually be removed from the original item and separately sold, without adversely impacting the article's functionality, that physically separable design element may be copyrighted."*Chosun,* 413 F.3d at 329.

Our Court of Appeals recognizes a second form of separability-conceptual separability. *But see OddzOn Prods., Inc. v. Oman,* 591 F.2d 346, 350 (D.C.Cir.1991) (refusing to "enter the 'conceptual separability' fray"). Unlike physical separability, the doctrine of conceptual separability is somewhat amorphous. In attempting to fashion a workable test for determining the line between conceptually separable and inseparable features, the Court of Appeals admitted that " 'there is no line, but merely a spectrum of forms and shapes responsive in varying degrees to utilitarian concerns.' " *Brandir,* 834 F.2d at 1145,*quoting* Robert C. Denicola, *Applied Art and Industrial Design: A Suggested Approach to Copyright in Useful Articles,* 67 Minn.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 10

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
(Cite as: Not Reported in F.Supp.2d)

L.Rev. 707, 741 (1983). Despite recognizing this lack of clarity, the Court of Appeals went on to adopt the following test for conceptual separability, which it asserted would "not be too difficult to administer in practice." *Brandir,* 834 F.2d at 1145.

[I]f design elements reflect a merger of aesthetic and functional considerations, the artistic aspects of a work cannot be said to be conceptually separable from the utilitarian elements. Conversely, where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences, conceptual separability exists.

*Id.* Accordingly, while a belt buckle is a useful article, an artistic design on a belt buckle is conceptually separable if the design "reflect[s] purely aesthetic choices, independent of the buckle['s] function." *Id.; see also Kieselstein,* 632 F.2d 989. However, the design of a bike rack is not conceptually separable if "the form of the rack is influenced in significant measure by utilitarian concerns."*Brandir,* 834 F.2d at 1147.

The design elements described by Eliya are neither physically nor conceptually separable. First, none of the elements described by Eliya could be physically separated from an actual pair of shoes without affecting the shoes' functionality. Removing the strap, stitching, or sole of a shoe would, to some degree, adversely impact a wearer's ability to locomote by foot, either because the shoe would fall off (without a strap), fall apart (without stitching), or provide no protection against the ground (without a sole). Nor could any of the design elements, once removed, be separately sold or exist as an independent work of art. Even assuming that some portion of the stitching or the border on the SHOE design could be removed from an actual shoe without affecting the shoe's functionality, removed stitching is simply a length of thread, and a removed border is merely a formless band of spotted rubber. Neither feature is a separate work of copyrightable art.

**\*12** Nor are the design features conceptually separable. Unlike a fanciful design on the base of a lamp, or the ornamentation on a belt buckle, the features of the SHOE design described by Eliya are not purely aesthetic. Of course, the precise design of the sole, the strap, the border, or the stitching is, to some extent, influenced by artistic considerations. People do not simply wear shoes to protect their feet while walking. Rather, people often wear shoes, at least in part, as an expression of fashion or of their personal taste. With this consideration in mind, the SHOE design clearly reflects various aesthetic decisions that were made to create a desirable, attractive, and marketable shoe.

However, the mere act of aesthetic decisionmaking does not render the result of that decisionmaking conceptually separable. Rather, for a design element to be conceptually separable, it must be the result of aesthetic decisionmaking that is *independent* of functional considerations. The design elements of SHOE described in the complaint are not sufficiently independent of a shoe's functional purpose to satisfy this standard. Stitching, straps, borders, and soles all serve a functional purpose on a shoe, and "functional components of useful articles, no matter how artistically designed, have generally been denied copyright protection unless they are physically separable from the useful article."*Norris Indus.,* 696 F.2d at 924.

For example, in *SCOA Indus., Inc. v. Famolare, Inc.,* the plaintiffs sought copyright protection for two design elements of a shoe-troughs in the sole of the shoe and wavy lines on the side. 192 U.S.P.Q. 216, 218 (S.D.N.Y.1976). The District Court held that these features were not copyrightable, reasoning that they "have no existence as works of art" and that "[a] shoe sole is an object whose intrinsic function is utilitarian."*Id.* Accordingly, the *SCOA Indus.* Court concluded that "the troughs, waves, and lines which appear on the shoe sole ... do not exist independently as works of art."*Id.*

This Court agrees. The design features of SHOE do not represent independent artistic expression, as would an image displayed on the shoe's surface, *see Knitwaves,* 71 F.3d at 1000-05 (image on sweater), or a jewelry-like appendage attached to the strap, *see Kieselstein,* 632 F.2d 989 (design on belt buckle). Rather, the features reflect

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
**(Cite as: Not Reported in F.Supp.2d)**

the designer's decisions regarding how best to implement a shoe's functional purposes-how to, in an aesthetically pleasing manner, keep the shoe attached to the wearer's feet, hold the material of the shoe together, cushion the wearer's feet, and provide traction on various surfaces. Some of these decisions may reflect more concern for form than for function. However, the blending of form and function in the SHOE design results in the exclusion of its design elements from copyright protection.

It should be noted that this conclusion is not contrary to the Court's conclusion above that, with respect to Eliya's trade dress claims, the features asserted to comprise Eliya's trade dress were not functional. Functionality is defined differently under the law of copyright and the law of trade dress. With respect to copyright, a blending of function and appearance lands a feature on the functional side of the line, rendering it inseparable and ineligible for copyright protection. However, with respect to trade dress, a useful feature can also be a source identifier, and a feature is functional only if it is "essential" to the design of a product. *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 1002 (2d Cir.1997) (concluding that a "useful" box design was not functional because "two alternative" designs could have served a similar function). Accordingly, a feature might not be functional under the Lanham Act even though it serves some functional purpose.

**VIII.** *Count Seven: Common Law Copyright Infringement*

**\*13** Eliya's claim of common law copyright infringement must be dismissed because it is preempted by federal copyright law. *See Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 740 (1989) (stating that the Copyright Act's "express objective" is to create a "national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation"); *see also* 17 U.S.C. § 301(a) (stating that all rights in "the general scope of copyright ... are governed exclusively by" the Copyright Act).

Eliya argues that despite the preemptive power of federal copyright law, its common law cause of action should survive because it is "pleaded in the alternative." (Pl.Mem.24.) However, pleading a claim in the alternative does not resuscitate an otherwise unviable claim. Regardless of whether Eliya's statutory copyright claim has merit, its common law copyright claim asserts rights in "the general scope of copyright" and therefore, win or lose, those rights are "governed exclusively by" the Copyright Act. 17 U.S.C. § 301(a). Accordingly, Eliya's common law copyright claim will be dismissed.

**IX.** *Kohl's Request for Attorneys' Fees*

Under 28 U.S.C. § 1927, attorneys' fees are awarded only upon a showing that a party acted in bad faith and that the party's claims are completely without merit. *Jones v. Hirschfeld,* 348 F.Supp.2d 50, 62 (S.D.N.Y.2004). Here, Kohl's asserts that the claims brought by Eliya are "clearly not available" and can only be attributed to "vexatiousness." (Def.Mem.22.) However, more than half of Eliya's claims have survived this motion to dismiss. Additionally, aside from the conclusory assertion that Eliya's claims are meritless, Kohl's presents no evidence that Eliya or its attorneys have acted in bad faith. Accordingly, the request for attorney's fees is denied.

**CONCLUSION**

Kohl's motion to dismiss is granted with respect to Count Five, Count Six, and Count Seven of the Amended Complaint. The motion is denied with respect to Count One, Count Two, Count Three, and Count Four. Kohl's request for attorneys' fees is denied. The Clerk of the Court is respectfully directed to close the motion (Doc.5, 13) for all statistical purposes.

SO ORDERED.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12

Not Reported in F.Supp.2d, 2006 WL 2645196 (S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82 U.S.P.Q.2d 1088
**(Cite as: Not Reported in F.Supp.2d)**


S.D.N.Y.,2006.
Eliya, Inc. v. Kohl's Dept. Stores
Not Reported in F.Supp.2d, 2006 WL 2645196
(S.D.N.Y.), 2006 Copr.L.Dec. P 29,274, 82
U.S.P.Q.2d 1088

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Freedom Calls Foundation v. Bukstel
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.ON
LINE Publication ONLY
United States District Court,E.D. New York.
FREEDOM CALLS FOUNDATION, a New York
corporation, Plaintiff,
v.
Edward BUKSTEL, Defendant.
Edward Bukstel, Counterplaintiff/Third-Party
Plaintiff,
v.
Freedom Calls Foundation, a New York
corporation, Counterdefendant,
andJohn B. Harlow II, Kate Green, Warren
Sherman, Daniel Kurtz and J.J. Leitner, Third-Party
Defendants.
**No. 05CV5460(SJ)(VVP).**

March 3, 2006.

Holland & Knight LLP, New York, NY, By:
Christelette Angelika Hoey, Tamara F. Carmichael,
for Plaintiff.
Edward Bukstel, Blue Bell, PA, Defendant pro se.

*MEMORANDUM & ORDER*

JOHNSON, Senior District Judge:
   *1 Presently before the Court is
Plaintiff-Counterdefendant Freedom Calls' ("
Plaintiff") motion for a preliminary injunction,
pursuant to Rule 65 of the Federal Rules of Civil
Procedure,          to          restrain
Defendant-Counterplaintiff-Third-Party    Plaintiff
Edward Bukstel ("Defendant"),[FN1] a former
officer, employee and director of Plaintiff, from
engaging in ongoing acts of unfair competition and
cybersquatting in violation of the Lanham Act, 15
U.S.C. § 1051 *et seq.*, as well as related and
independent violations of New York state statutory

and common law. Plaintiff also moves this Court for
leave to file an amended complaint, pursuant to
Rule 15(a) of the Federal Rules of Civil Procedure.

> FN1. Defendant was also the named
> plaintiff in *Bukstel v. Harlow et al.,* Docket
> No. 05 CV 5996, which was pending in the
> United States District Court for the Eastern
> District of Pennsylvania ("Pennsylvania
> Federal Court"). In that case, Defendant
> alleged that Plaintiff and its current
> directors are liable for retaliatory
> termination,     fraud,     embezzlement,
> negligence, breach of contract, defamation,
> and breach of fiduciary responsibilities. *See*
> Complaint, *Bukstel v. Harlow et al.,*
> Docket No. 05 CV 5996 (E.D.Pa. Nov. 15,
> 2005). On February 2, 2006, the
> Pennsylvania Federal Court entered an
> order of dismissal for the *Bukstel v.
> Harlow et al.* action, upon Defendant's
> request.

   Also before this Court is Defendant's motion
for a temporary restraining order ("TRO"),
preliminary injunction, and appointment of a
receiver. Defendant seeks to enjoin and restrain
Plaintiff's directors from (1) using the business
e-mail account assigned to Defendant while he was
affiliated with Plaintiff to distribute misleading and
fraudulent tax documentation to Plaintiff's donors
and patrons and (2) falsifying tax returns,
perpetuating fraud, and misappropriating assets
from Plaintiff.

*BACKGROUND*

   Plaintiff, a New York not-for-profit corporation,
[FN2] was formed in 2003 to carry out the charitable
mission of building a communications network

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

which enables men and women on active duty in the United States Armed Forces to communicate free of charge from their base camps with their families at home. (Am.Compl.¶¶ 1, 5.) Plaintiff was founded by Defendant and Plaintiff's current Executive Director, John Harlow ("Harlow"). (Am.Compl.¶ 9.) Both Defendant and Harlow served on Plaintiff's initial board of directors. (Harlow Decl.¶ 4.)

> FN2. Plaintiff has also been recognized by the Internal Revenue Service as a tax-exempt organization, as described in Section 501(c)(3) of the Internal Revenue Code. (Am.Compl.¶ 1.)

From September 2003 until the present, Plaintiff used the marks FREEDOM CALLS and FREEDOM CALLS FOUNDATION (collectively, the "Marks") when communicating with the public about its charitable services. (Am.Compl.¶ 6, 7.) Plaintiff has received national and international publicity for the work it does and has also received recognition from the United States Department of Defense, United States Army, and the United States Defense Security Service. (Harlow Decl.FN3 ¶ 10, Ex. F, G.) As a result of this continuous usage, Plaintiff alleges that it has all common law rights in and to the Marks. (Am.Compl.¶ 7.)

> FN3. All citations to "Harlow Decl." refer to Harlow's Declaration in support of Plaintiff's Motion for a Preliminary Injunction and for Leave to File an Amended Complaint, unless otherwise noted.

In addition to using the Marks, Plaintiff also secured the "freedomcalls.org" domain (the "Plaintiff Domain") and subsequently built Plaintiff's website using the uniform resource locator (the "URL") *www.freedomcalls.org*. (Am.Compl. ¶ 11.) On or about October 28, 2005, Plaintiff submitted applications to the United States Patent and Trademark Office ("USPTO") to register the Marks as trademarks. (Am.Compl.¶ 6.)

Since its formation, Plaintiff has maintained a list of corporations, state agencies, schools, colleges, telemedicine agencies, and other entities with videoconferencing capabilities that have provided conferencing venues for military families, as well as a list of family-readiness group personnel that is responsible for executing the scheduled events and conferences (collectively, the "Supporters"). (Harlow Decl. ¶ 11; Hr'g Tr.FN4 16:6-11.) Contact information for the Supporters is maintained in a database called Operation Hometown Link. (Hr'g Tr. 15:1-12.) Additionally, Plaintiff maintains contact information for those who have used or expressed a desire to use Plaintiff's services to communicate with deployed friends and families (the "Clients"). (Harlow Decl. ¶ 11.) Contact information for the Clients is kept on various spreadsheets, which are updated with family-contact and military-contact information each time an event is held. (Hr'g Tr. 16:14-19.) Plaintiff refers to the lists containing contact information for both Supporters and Clients as the "Supporter & Client List." (Harlow Decl. ¶ 12.) Plaintiff alleges that the Supporter & Client List is a trade secret and that the names and the contact information contained therein are not disclosed on the Internet or in any public documents. (*Id.*)

> FN4. All citations to "Hr'g Tr." refer to the evidentiary hearing held before this Court on January 12, 2006 for Plaintiff's Motion for Preliminary Injunction and for Leave to File an Amended Complaint and Defendant's Motion for a Temporary Restraining Order, Preliminary Injunction and Appointment of a Receiver, unless otherwise provided.

**\*2** While employed with Plaintiff, Defendant's assigned email address was *ebukstel@freedomcalls.org*. (Am.Compl.¶ 17.) On August 11, 2005, while still employed with Plaintiff, Bukstel registered the domain name "freedomcalls.us" (the "Bukstel Domain") with Go Daddy Software, Inc. (Harlow Decl., Ex. H.) Soon thereafter, Defendant used the Bukstel Domain to create a website (the "Bukstel Website") using the URL *www.freedomcalls.us* (the "Bukstel URL").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

(Am.Compl.¶ 15.) Defendant also used the Bukstel Domain to establish a new e-mail address, *ebukstel@freedomcalls.us* (the "Bukstel E-mail"). (Am.Compl.¶ 16.) [FN5]

> FN5. Defendant's pleadings also reveal that he established and uses a Yahoo! Instant Message account with the name " freedomcallsbukstel ." (Def.'s Mot. TRO Prelim. Injunc. at 5.) Although there is no evidence of the frequency with which Defendant uses this instant message account, the evidence before the Court confirms that the it was used on December 17, 2005 to correspond with an individual that appears to be a Supporter or Client regarding whether satellite service connecting the United States to Iraq would lapse. (*Id.*)

The Bukstel Website's front page included a banner at the top that read "Freedom Calls Volunteers." (Hr'g, Pl.'s Ex. 9. at 1.) [FN6] Below the banner, there were links entitled "Home Page," " About Us," "Contact Us," "Volunteers," and " Contribute." (Hr'g, Pl.'s Ex. 9. at 1.) A short description of the services offered by Plaintiff appeared below the aforementioned links.(*Id.*) Thereafter, the Bukstel Website provided several pictures of Supporters and Clients at various events sponsored by Plaintiff. (*Id.* at 1-4.)

> FN6. On or about January 17, 2006, the content of the Bukstel Website was altered significantly. Based on this Court's review of the Bukstel Website, all hyperlinks, pictures, text, and logos relating to, or suggesting affiliation with, Plaintiff have been removed. On that date, only a white background, a red line, and a ribbon colored with the United States Flag, reminiscent of the "Support Our Troops" ribbons, Go Daddy Software, Inc. logos, a 2006 copyright, and a non-working "Home Page" hyperlink were visible on the face of the website. To be sure, the fact that Defendant, at least in part, has removed

potentially infringing content from Bukstel Website does not render an award of preliminary relief moot because he has not provided the Court or Plaintiff with a consent injunction or other enforceable assurance that the alleged infringement will not be repeated. *SeeColumbia Pictures Indus. v. Miramax Films Corp.,* 11 F.Supp.2d 1179, 1183 (stating that where defendants' posters and film trailers allegedly infringed plaintiffs' copyrights, " the withdrawal of the complained of advertising does not render this action moot " on motion for preliminary injunction); *Upjohn Co. v. Am. Home Prods. Corp.,* 598 F.Supp. 550, 554-55 (S.D.N.Y.1984) ( "Before a suit for injunctive relief can be dismissed as moot, the offending conduct must have ceased and the court must find that there is no reasonable expectation that it will resume.") (citations omitted). Defendant has not even provided Plaintiff with reasonable assurance that the infringing website will not recur. *Cf. American Express Travel Related Servs. Co., Inc. v. Mastercard Int'l Inc.,* 776 F.Supp. 787, 790 (S.D.N.Y.1991) (finding injunction moot once defendant ceased showing infringed television commercial and had already filmed a noninfringing replacement); *Greilsheimer v. Ferber Chan & Essner,* No. 98 CV 2553, 1998 U.S. Dist. LEXIS 13445, *1, *2-*3 (S.D.N.Y. Aug. 27, 1998) (injunction against trademark infringement not necessary where defendants had not only agreed to stop using plaintiff's name on firm's sign and stationery, but had already ordered new, noninfringing sign and stationery).

When a user clicks on the "About Us" link, a more detailed program description of Plaintiff appeared, along with additional pictures of Supporters and Clients at Plaintiff-sponsored events. (*Id.* at 5-7.) The program description included on the Bukstel Website was substantially the same as that which appears on Plaintiff's official website. (*Id.* at 5; *see* Pl.'s Hr'g Ex. 6, 2-3.) The "

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Contact Us" link takes website users to language that instructed "Freedom Calls Volunteers" to " schedule a video connection or volunteer locations for connecting troops and families" by providing contact information. (*Id.* at 8.) The Bukstel Website also provided *info @freedomcalls.us* as a point of contact. (*Id.*)

Harlow learned about the Bukstel Website from an individual who contacted him sometime after August 2005. (Hr'g Tr. 37:22-23.) Under the impression that the Bukstel Website belonged to Plaintiff, the individual commented to Harlow about the change in the quality of the website's look and feel. (*Id.* at 37:24-25; 38:1-2.) After receiving information about the existence of the Bukstel Website, Harlow conducted a "WHOIS" search in order to determine the identity of the Bukstel Website registrant. (Hr'g Tr. at 38:2-4.) Harlow's search revealed that Defendant registered the Bukstel Domain on August 11, 2005. (*Id.* at 38:5-7.) Soon thereafter, Harlow contacted Defendant via phone and via e-mail to request that Defendant disable the Bukstel Website. (*Id.* at 39:25, 40:1.) These requests were apparently refused or ignored by Defendant.

By and through its counsel, Plaintiff issued " cease and desist" letters to Defendant, on August 29, 2005 and again on October 31, 2005, requesting that Defendant disable the Bukstel Website. (Harlow Supp. Decl.[FN7] ¶ 2-3; Am. Compl. ¶ 30.) Although the content of the Bukstel Website has changed since these demand letters were issued, Defendant has not fully complied with these demand letters, as the Bukstel URL is still functional. (*See* Am. Compl. ¶ 30.)

FN7. All citations to "Harlow Supp. Decl." refer to Harlow's Supplemental Declaration in Reply to Defendant's Opposition to, and in further support of, Plaintiff's Motion for a Preliminary Injunction and for Leave to File an Amended Complaint, unless otherwise noted.

*3 On or about November 8, 2005, Plaintiff

terminated Defendant, apparently because of the acrimony between Defendant and members of Plaintiff's board of directors. (Am. Compl. ¶ 14; Def.'s Resp. Mem. Def.'s PI Mot.[FN8] at 4.) In the days immediately following Defendant's termination, Plaintiff, via Harlow, monitored Defendant's "freedomcalls.org" account in order to field inquiries from Supporters and Clients that attempted to contact Defendant with inquiries related to Plaintiff. (Harlow Opp'n Decl.[FN9] ¶ 8.) As a general practice, Harlow responded to Defendant's e-mails by sending reply messages from Harlow's e-mail account, rather than from Defendant's *ebukstel @freedomcalls.org* account, and explaining that Defendant was no longer affiliated with Plaintiff. (*Id.* at ¶ 9.) However, in the first or second day following Defendant's termination, Harlow responded to e-mails directly from Defendant's "freedomcalls.org" account. (Hr'g Tr. 49:13-16.) On November 11, 2005, Harlow responded to an e-mail from a donor (and a friend of Defendant) that requested a copy of Plaintiff's annual tax return. Without explaining that Defendant was no longer associated with Plaintiff, Harlow provided the donor with the requested tax documentation. (*Id.* at ¶ 10.) Since that time, Harlow avers that he has not used the *ebukstel@freedomcalls.org* e-mail address to respond to e-mails sent to that account. (Hr'g Tr. 50:20-22.)

FN8. All citations to "Def.'s Resp. Mem. Def.'s PI Mot." refer to Defendant's Response Memorandum of Law for Plaintiff's Response in Opposition to Defendant's Motion for TRO, Preliminary Injunction, and Appointment of a Receiver, unless otherwise noted.

FN9. All citations to "Harlow Opp'n Decl." refer to Harlow's Declaration in Opposition to Defendant's Motion for a Temporary Restraining Order, Preliminary Injunction, and Appointment of a Receiver, unless otherwise noted.

After his termination, Defendant used the Bukstel Email to contact Supporters and Clients. On

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

November 23, 2005, and again on December 6, 2005, Defendant sent e-mails from the Bukstel E-mail to Supporters and Clients stating that Plaintiff had canceled or threatened to cancel various video teleconferences. (Am.Compl.¶ 20.) These e-mails also contained statements that Harlow mistreated troops and their families and embezzled money from Plaintiff's bank accounts. (Am.Compl.¶ 21.) On January 13, 2006 message, Defendant used the Bukstel E-mail to send a message that accused Harlow of providing perjurious testimony at the January 12 evidentiary hearing. (Pl.'s 1/18/2006 Ltr., Ex. A.) Plaintiff asserts that these statements are false and that Defendant has made "numerous" other false statements on the Bukstel Website and during the process of contacting and/or soliciting Supporters and Clients. (Am.Compl.¶ 22.)

Plaintiff filed the complaint in the instant action on November 18, 2005, alleging 13 causes of action.[FN10] Defendant answered this complaint and also alleged several counterclaims against Plaintiff and third-party claims against various board members and attorneys for Plaintiffs.[FN11] On December 8, 2005, Plaintiff moved this Court for a preliminary injunction, and Defendant cross-moved for similar relief. Defendant also moved for appointment of a temporary receiver and a motion to disqualify Holland & Knight LLP as Plaintiff's counsel. On January 11, 2006, the Court held an evidentiary hearing on these motions.

> FN10. Plaintiff's 13 causes of action, as provided in the Amended Complaint, are violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (Count I), federal unfair competition, 15 U.S.C. § 1125(a) (Count II), common law unfair competition (Count III), violations of New York Unfair Competition Law, N.Y. Gen. Bus. § 360-1 (Count IV), unjust enrichment (Count V), common law trademark infringement (Count VI), breach of fiduciary duty (Count VII), trade secret misappropriation (Count VIII), tortious interference with business relations (Count IX), defamation

(Count X), trade libel (Count XI), fraud (Count XII), and prima facie business tort (Count XIII).

> FN11. Defendant's counterclaims and third-party claims, as provided in Defendant's Answer, Affirmative Defenses, and Counterclaims, include retaliatory termination, fraud; embezzlement, negligence, breach of contract, defamation, and breach of fiduciary responsibility.

### *JURISDICTION*

*4 This Court has jurisdiction over Plaintiff's Lanham Act unfair competition and cyber-squatting claims, pursuant to 15 U.S.C. § 1121(a) ( "The district ... courts of the United States shall have original jurisdiction ... of all actions arising under [the Lanham] Act[.]") The Court has jurisdiction over Plaintiff's and Defendant's state law claims, pursuant to 28 U.S.C. § 1367 ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction[.]"). Under New York's choice of law rules, New York law properly applies to this case because the relevant transactions appear to have occurred in New York. *See Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989) (noting that a federal court adjudicating a supplemental state law claim applies the choice of law rules of the forum state); *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 (2d Cir.1997) (stating that New York applies the law of the state having the most significant contacts to the underlying transaction).

### *DISCUSSION*

### I. *PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

A. Standard for Preliminary Injunction

A party seeking a preliminary injunction must show (1) immediate irreparable injury and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly towards the movant. *SeeFed. Express Corp. v. Fed. Expresso, Inc.,* 201 F.3d 168, 173 (2d Cir.2000). Irreparable injury under the Lanham Act is presumed if a plaintiff is able to show likelihood of confusion, but must be proved independently absent a showing of likely confusion. *Seeid.* at 174.The movant must show that injury is "neither remote or speculative, but actual and imminent."*Rodriguez by Rodriguez v. DeBuono,* 175 F.3d 227, 233-34 (2d Cir.1999). Because monetary loss may be estimated and compensated, such harm is not considered irreparable harm, *Brenntag Int'l Chems., Inc. v. Bank of India,* 175 F.3d 245, 249 (2d Cir.1999), unless the movant can show the monetary loss cannot be compensated, for example, because it will probably result in bankruptcy, *Borey v. Nat. Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991).

B. Application of the Preliminary Injunction Standard

1. *Likelihood of Success on the Merits*

As previously noted, Plaintiff brings thirteen causes of action against Defendant, six of which serve as the basis for Plaintiff's preliminary injunction request. Each of these six claims will be examined in turn to determine Plaintiff's likelihood of success on the merits.

a. *Unfair Competition in Violation of the Lanham Act (Count Two)*

Plaintiff alleges that Defendant's use of the Marks in the Bukstel Domain, Website, URL, and E-mail constitute unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) , because it falsely designates Defendant's unauthorized products and/or services as originating, being sponsored by, or having a connection with Plaintiff. (Am.Compl.¶ 40.) Defendant contends that his use of the Marks does not violate the Lanham Act because the Bukstel Domain, URL, Website, and Email were created in good faith and are not "in commerce" as contemplated by the Lanham Act. (Def.'s Opp'n Mot.[FN12] at 2.) Moreover, Defendant states that Plaintiff waived its right to challenge use of the Marks by bringing an action against him four months after discovering existence of the Bukstel Website. (Def.'s Opp'n Mot. at 1.) Defendant further argues that Plaintiff has "unclean hands" with respect to the Lanham Act unfair competition claim because Plaintiff has also engaged in various acts of trademark and copyright infringement. (Def.'s Opp'n Mot. at 2.)

> FN12. All citations to "Def.'s Opp'n Mot." refer to Defendant's Memorandum of Law Opposing Plaintiff's Order to Show Cause, unless otherwise noted.

*5 Section 43(a) of the Lanham Act creates a federal private cause of action for injunctive relief and damages against a person who *"uses in commerce* any word, term, name, symbol, or device" or "any false designation of origin" that is "likely to cause confusion" as to the origin of a product. 15 U.S.C. § 1125(a) (emphasis added). Section 43(a) protects registered marks, but also protects certain unregistered trademarks from infringement and even offers a degree of protection from unfair competition for "unregistrable marks," such as generic words that have acquired significant secondary meaning. *Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997).

Before turning to the substantive Lanham Act analysis, the Court will first address Defendant's contention that the Lanham Act is not applicable here because the Bukstel Website does not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

participate "in commerce." (Def.'s Opp'n Mot. at 2.) Presumably, Defendant's argument is based on the fact that neither goods nor services are actively sold or advertised on the Bukstel Website. The Court finds this argument to be without merit. The "use in commerce" requirement is a jurisdictional predicate of the Lanham Act and, therefore, is broad and has sweeping reach. *Planned Parenthood Fed'n. of Am., Inc. v. Bucci,* No. 97 CV 0629, 1997 WL 133313, *1, *3 (S.D.N.Y. Mar. 24, 1997). In this case, Defendant's actions have potentially affected Plaintiff's ability to offer and to provide its telecommunications services, which were undoubtedly "in commerce." *SeePlanned Parenthood Fed'n. of Am., Inc.,* 1997 WL 133313, at *3. Thus, even if Defendant's activities (including the operation of the Bukstel Website) were not in interstate commerce for Lanham Act purposes, the potential effect of those activities on *Plaintiff's* commercial activities place Defendant within the reach of the Lanham Act. *Seeid.*Moreover, the presence of the Bukstel Website on the Internet, where it is capable of being accessed by national and international users, is sufficient to bring Defendant's use of the Marks within the reach of the Lanham Act. *Seeid.*

(1) Validity of the Marks at Issue

The Court now turns to the issue of whether FREEDOM CALLS AND FREEDOM CALLS FOUNDATION, although unregistered marks, are protected by the legal ambit of the Lanham Act. In the United States Court of Appeals for the Second Circuit (the "Second Circuit"), it is established that an unregistered mark is entitled to Lanham Act protection if it would qualify for registration. *See Thompson Med. Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 215-16 (2d Cir.1985). To qualify for protection, and thus registration, a mark must either be (1) "inherently distinctive" or (2) distinctive by virtue of acquired secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Thus, Plaintiff will prevail on the merits of its unregistered trademark infringement claim if it can show that "it has a valid trademark entitled to protection and that

the defendant's use of it is likely to cause confusion. "*Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir.1995).

*6 Marks are classified, in ascending order of strength, as "(1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful."*Star Indus. v. Bacardi & Co.,* 412 F.3d 373, 384-385 (2d Cir.2005). Generic marks are those consisting of words identifying the relevant category of goods or services.*Id.* at 385.They are not at all distinctive and thus are not protectable under any circumstances. *Id.* Descriptive marks are those consisting of words identifying qualities of the product or services. *Id.* They are not inherently distinctive, but are protectable provided they have acquired secondary meaning, which is sometimes referred to as "acquired distinctiveness." *Id.* Suggestive marks and arbitrary or fanciful marks are each inherently distinctive. *Id.* Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product through the use of imagination, thought and perception. *Id* . Finally, arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion. *Id.*

While Plaintiff states that the Marks are suggestive or fanciful mark in the context of its "likelihood of confusion analysis," discussed *infra,* Plaintiff also engages in a discussion of the Marks' acquired secondary meaning, which is only relevant when a mark is found to be descriptive. *See* Pl.'s Mem. Law. Supp. Mot. Prelim. Injunc. at 10. The Court finds that the Marks are, most likely, suggestive. Both FREEDOM CALLS and FREEDOM CALLS FOUNDATION suggest, through the use of imagination and thought, the qualities of the products and services offered by Plaintiff. Specifically, the word "Calls" in the Marks suggests the ability of Plaintiff's clients to communicate telephonically with one another. Also, the word "Freedom" evokes the idea that the "Calls" are in some way in support of or related to patriotism, the United States Armed forces, or other government-related ideas, entities, or persons.

At a minimum, the Court finds that the Marks are descriptive. Therefore, if the Marks have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

secondary meaning, then they are protectable under the Lanham Act. Under Second Circuit precedent, the following factors are relevant in determining secondary meaning: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use. *Centaur Comdc'n v. A/S/M Commc'n,* 830 F.2d 1217, 1222 (2d Cir.1987).

With respect to the first factor, advertising expenditures, Plaintiff avers that it has expended over $100,000 in order to promote its services. (Harlow Decl. ¶ 8.) Although this amount is relatively modest, it is apparent that Plaintiff has achieved at least a modicum of advertising success, which the Court finds compelling. *SeeCentaur Commc'n,* 830 F.2d at 1222 (citing *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir.1987) (noting that the test of secondary meaning is not the size of the expenditures used to create [a mark] but its effectiveness)). Plaintiff has used its advertising expenditures to sponsor events, attend events, promote its services, produce posters and other signage, and maintain its website. (Hr'g Tr. 89:7-9, 18-21 .) Additionally, Plaintiff's advertising reach extends beyond the reach of its own financial outlays, as the organization receives donations of advertising and marketing resources. (Hr'g Tr. 89:11-18 .) Moreover, Plaintiff has consistently directed its marketing efforts toward the target customer group, that is, families of deployed military personnel and branches of the United States Military. *SeeCentaur Commc'n,* 830 F.2d at 1222 (finding modest advertising expenditures weighed in favor of secondary meaning because plaintiff invested efforts in publicizing its connection to the mark by, *inter alia,* sending brochures to the relevant consumer group (top American advertising agencies) and by sending its senior director from Europe to the United States to meet with advertising agencies). Plaintiff currently serves approximately 25% of the Marines deployed to Iraq and serves anywhere from 1200 to 2000 soldiers daily in its technology facilities. (Hr'g Tr. 18:1-4.) Therefore, the Court finds that Plaintiff's advertising expenditures likely weigh in favor of the Marks' secondary meaning.

*7 The second factor, the availability of consumer studies linking the mark to a source, has no bearing on the present controversy since neither party submitted evidence with respect to consumer studies linking the Mark to the source.

Turning to the third factor in the secondary meaning inquiry, unsolicited media coverage, Plaintiff has adduced evidence of the fact that it has been profiled in various national and international media outlets and has been recognized by various governmental agencies. (Harlow Decl., Ex. F and G.) For example, the "Press" page on Plaintiff's website at *www.freedomcalls.org* lists more than 100 instances, with some as recent as February 20, 2006, where Plaintiff has received press coverage as a result of its video- or tele-conferences. Therefore, the Court finds that this factor likely weighs in favor of the Marks' secondary meaning.

The fourth factor in the secondary meaning inquiry is Plaintiff's sales success as a result of its use of the Marks. Although no exact number of users is available, it is clear based on the amount of unsolicited media coverage received to date that Plaintiff's services have been well-received by the target audience, that is, military personnel and their families. However, given that more specific information relating to this factor is unavailable, the Court makes no finding as to Plaintiff's sales success as a result of its use of the Marks.

The Court now considers what is, in this case, a significant factor in the secondary meaning analysis-Defendant's attempts to plagiarize the Marks. As evidence of Defendant's attempts to plagiarize the Marks, Plaintiff cites Defendant's use of the Bukstel Domain and E-mail. Defendant counters this allegation by stating that the Bukstel Domain was created to assuage clients and military personnel that were complaining about the outdated material contained on Plaintiff's official website. (D's Opp'n Mot. at 2.) In *Centaur Communications,* the court compared Centaur's MARKETING WEEK to A/S/M's mark and found striking similarities, leading the court to conclude that the mark had been copied in an effort to take advantage of Centaur's consumer recognition and goodwill. 830 F.2d at 1224. Similarly, the differences

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

between the Bukstel Domain (freedomcalls.us) and the Plaintiff Domain (freedomcalls.org) is merely the URL extension. Further, the Bukstel E-mail ( *ebukstel @freedomcalls.us* ) is strikingly similar to the email Defendant used while affiliated with Plaintiff (ebukstel@freedomcalls.org). Notwithstanding Defendant's allegations of his benign motive, the Court finds that Defendant likely plagiarized, with knowledge, Plaintiff's Marks.

Finally, the Court considers the length and exclusivity of Plaintiff's use of the Marks. Plaintiff avers that it has used the Marks since its inception in September 2003, and that such use has been exclusive. (Pl.'s Mem. Law. Supp. Mot. Prelim. Injunc. at 6.) There is no evidence of a break in service that would suggest that this exclusive use has been disrupted. Furthermore, there is compelling evidence that Plaintiff fervently protected itself against potentially infringing uses of the Marks, contrary to Defendant's assertion. Specifically, Plaintiff, via Harlow, requested that Defendant stop using the Busktel Website soon after learning of its existence. Plaintiff, through counsel, also sent two cease and desist letters to Defendant, requesting that he discontinue use of the Bukstel Website. In contrast, Defendant does not present any credible evidence that Plaintiff's use of the Marks is not exclusive. Therefore, the Court finds that Plaintiff's use of the Marks is most likely exclusive.

**\*8** Based on the foregoing, the Court finds that the Marks have likely acquired secondary meaning and therefore are likely to be entitled to the protections afforded by the Lanham Act.

(2) Likelihood of Confusion

Having determined that FREEDOM CALLS and FREEDOM CALLS FOUNDATION will likely be deemed valid marks and thus entitled to legal protection, the Court must now consider whether there is a likelihood of confusion in the instant case. In order to be confused, Plaintiff must show that the public believed that it "sponsored or otherwise approved" the use of the Marks in the Bukstel

Domain, URL, Website, and E-mail. *Pfizer Inc. v. Astra Pharm. Prods.,* 858 F.Supp. 1305, 1323 (S.D.N.Y.1994).

In determining likelihood of confusion, this Court will utilize the nonexclusive list of factors set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961), *cert. denied,*368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), commonly referred to as the *Polaroid* factors: (1) strength of plaintiff's mark; (2) degree of similarity between plaintiff's and defendant's marks; (3) competitive proximity of the goods or services under the marks; (4) likelihood that plaintiff will "bridge the gap" and offer products or services such as defendant's products or services; (5) actual confusion between the products or services; (6) good faith on the defendant's part; (7) quality of defendant's product; and (8) sophistication of buyers of plaintiff's and defendant's goods or services. The foregoing list of factors does not exhaust the possibilities-the court may still have to take other variables into account. *W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993). Moreover, "no single *Polaroid* factor is determinative."*Id.* Rather, "the proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists."*Id.*

Furthermore, if the evidence shows that the defendant intentionally copied the plaintiff's mark, likelihood of confusion will be presumed as a matter of law.*New York State Soc. of Certified Pub. Accountants v. Eric Louis Assocs.,* 79 F.Supp.2d 331, 340 (S.D.N.Y.1999) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 258 (2d Cir.1987)).

Plaintiff alleges that three aspects of Defendant's conduct cause a likelihood of confusion: (1) Defendant's use of each of the Marks, particularly on the Bukstel Website; (2) registration and use of the Bukstel Domain; and (3) creation and use of the Bukstel E-mail. The Court finds that each of Defendant's allegedly unlawful acts provides compelling evidence of intentional plagiarism; therefore, a presumption of confusion exists. As has been made clear through pleadings and hearing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

testimony, Defendant was one of Plaintiff's co-founders, served as a member of the board of directors, and as an officer and employee of the organization. Therefore, it is highly unlikely that Defendant was unaware that Plaintiff used the Marks to identify itself. *See New York State Soc. of Certified Pub. Accountants.,* 79 F.Supp.2d at 340 (S.D.N.Y.1999). Defendant operated with full knowledge of the current use of the Marks when he placed the FREEDOM CALLS FOUNDATION logo on the Bukstel Website and included the FREEDOM CALLS mark in the Bukstel Domain, URL, and E-mail. Therefore, it is likely that Defendant developed the Bukstel Domain, URL, Email, and Website with a clear intent to copy the Plaintiff's Marks. Defendant has not provided sufficient evidence to rebut this presumption and, as a result, the presumption remains intact.

**\*9** This presumption of confusion is further confirmed by this Court's application of the *Polaroid* factors to the case at bar. The first factor, strength of the mark, likely weighs in Plaintiff's favor. Defendant stated that the primary reason he created the Bukstel Domain, URL, and Website was to provide an updated website for individuals that were familiar with Plaintiff, but that were displeased with Plaintiff's website maintenance. It is therefore clear that it was precisely the recognizability of the Marks that led Defendant to create the "freedomcalls.us" domain name. *See New York State Soc. of Certified Pub. Accountants,* 79 F.Supp.2d at 341 (noting that the recognizability of the Society's mark led defendant to adopt the infringing "nysscpa.com" domain name).

Similarly, the fact that. the Busktel URL and Domain are nearly identical to Plaintiff's FREEDOM CALLS mark, provides-with respect to the second *Polaroid* factor-strong support for the conclusion that Defendant's use of the Plaintiff's Marks was likely to confuse consumers. Plaintiff's FREEDOM CALLS mark and Defendant's " freedomcalls.us" domain name are nearly identical. The only distinctions are the latter's lack of capitalization, the lack of a space between words, and the "us" that is necessary to designate a domain name. *Planned Parenthood,* 1997 WL 133313, at \*8 . In addition to the distinctions noted above, the one

additional distinction between the FREEDOM CALLS FOUNDATION mark and "freedomcalls.us " domain is the word "foundation." Finally, the degree of similarity between Defendant's " freedomcalls.us" domain and Plaintiff's " freedomcalls.org" domain is even stronger. *Id.*

Turning to the third factor, competitive proximity, the parties' respective web sites are both located on the World Wide Web, and the "sites compete for the same audience-namely, Internet users who are searching for a web site that uses [P]laintiff's mark as its address." *Planned Parenthood,* 1997 WL 133313, at \*8. Also, if Defendant were to reactivate the Bukstel Website, Plaintiff's and Defendant's websites would be in direct competition with each other. Those persons seeking Plaintiff's site with the intention of learning about its mission and services and who would be diverted to Defendant's site by means of the " freedomcalls.us" domain name may, indeed, end up using Defendant's services rather than Plaintiff's. Although it was not clear from the Bukstel Website, prior to its deactivation, whether or not Defendant has developed its own tele- or video-conferencing infrastructure, it did appear that potential clients or volunteers could provide their contact information in order to "schedule a video connection" or " volunteer [a] location for connecting troops and families." *See* Pl.'s Hr'g Ex. 9 at 8. On this page, there was no link to information regarding Plaintiff; instead, an e-mail containing the freedomcalls.us domain name appeared. Persons diverted to Defendant's website were and have the potential to be not only be confused, but totally unaware that they are providing personal information to a service provider that is different from the one they initially sought out. Therefore, this Court finds that the third *Polaroid* factor tips in favor of Plaintiff.

**\*10** The fourth factor looks to whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, "bridge the gap." *Centaur Commc'n,* 830 F.2d at 1227. In the sense that the two sites are competing for the same users, that is, those looking for a web site that uses Plaintiff's Marks as its address, there is no gap to bridge. More broadly, it is clear that Plaintiff is not just likely to enter Defendant's "business"-it is a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

foregone conclusion because this is the exact same space that Plaintiff occupied before Defendant created his infringing website. This factor, therefore, carries no weight in the likelihood of confusion analysis.

The Court now turns to Plaintiff's evidence of actual confusion, the fifth *Polaroid* factor. Plaintiff has adduced compelling evidence that its Supporters and Clients are actually confused by Defendant's use of the Marks. Specifically, Harlow received a call from certain Supporters in Kentucky that were concerned about the content of an e-mail message they received from Defendant, which was sent using the Bukstel E-mail. (Harlow Decl. ¶ 18.) This message was sent by Defendant on November 23, 2005, after Defendant's termination. In sum and substance, this e-mail accused Harlow of cancelling scheduled video-conferences and threatening to discontinue services to certain geographic areas, making · denigrating comments about troops and families, and embezzling cash from Plaintiff. (Harlow Decl., Ex. J at 1.) Because the FREEDOM CALLS mark appeared in the e-mail address used by Defendant, the Supporters believed that Bukstel was still affiliated with Plaintiff and therefore was authorized to send the e-mail. (Harlow Decl. ¶ 18.) As a result, Harlow had to provide clarifying information to these Supporters. (Harlow Decl. ¶ 18.) Therefore, this Court finds that the fifth Polaroid factor likely tips in favor of Plaintiff.

The sixth factor concerns whether Defendant adopted Plaintiff's Marks in good faith. This factor looks to whether Defendant adopted its mark with the intention of capitalizing on Plaintiff's reputation and goodwill. *New York State Soc. of Certified Pub. Accountants,* 79 F.Supp.2d at 348 (citing *Lang v. Ret. Living Publ'g Co., Inc.,* 949 F.2d 576, 583 (2d Cir.1991)) (internal quotations omitted). Further, Defendant's awareness of Plaintiff's use of a given mark to identify itself can give rise to an inference of bad faith, and this inference can be bolstered by the further finding that Defendant proffered no credible innocent explanation for the adoption of Plaintiff's Marks. *Id.* (citing *Centaur Commc'n,* 830 F.2d at 1228) (internal quotations omitted). The Court's earlier determination that Defendant

intentionally copied the Marks is an indicator of bad faith. *See New York State Soc. of Certified Pub. Accountants,* 79 F.Supp.2d at 348. Furthermore, after receiving two cease and desist letters from Plaintiff's counsel, Defendant did not seek the advice of counsel. Rather, Defendant misconstrued demands made by Plaintiff's counsel in the August 29, 2005 cease and desist letter as "legal advice" [FN13] and consequently added a reference to Plaintiff's *www.freedomcalls.org* website to the Bukstel Website. (Def.'s Opp'n Mot. at 23.) Even if Defendant innocently relied on statements made by Plaintiff's counsel, this reliance was misplaced and is most likely insufficient to mitigate the inference of bad faith in this case.

> FN13. The August 29, 2005 letter from Plaintiff's counsel states that Defendant's " [www.freedomcalls.us] website, which does not make reference to the [Plaintiff's] primary website, [  ] will only cause confusion for donors and others interested in the [Plaintiff's] work, and will interfere with the pursuit of the [Plaintiff's] mission." (Hr'g, Pl.'s Ex. 11.)

*11 Finally, Defendant has offered no credible innocent explanation of his adoption of Plaintiff's mark. As discussed above, Defendant adopted Plaintiff's Marks because he wanted Supporters and Clients to have a website that they found suitable. Based on the evidence before the Court, it is clear that Defendant had knowledge of the fact that using the Marks in the Bukstel URL, Website, Domain, and E-mail would allow him to capitalize off of the goodwill attached to Plaintiff's Marks. Therefore, this Court finds that Defendant most likely did not adopt Plaintiff's mark in good faith.

The Court now considers the seventh *Polaroid* factor, the quality of Defendant's product. As previously noted, the extent to which Defendant offers services is unclear. However, if Defendant does offer services, then the services will almost certainly be inferior because he does not have the resources to provide the level of service provided by Plaintiff. The Court therefore finds that the seventh factor also likely weighs in favor of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 12

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

finding of a likelihood of confusion.

Coming finally to the eighth factor, the sophistication of the consumers of the parties' respective services, a finding that the consumers are sophisticated "usually militates against a finding of a likelihood of confusion."*Centaur Commc'n,* 830 F.2d at 1228. However, when there is a high degree of similarity between the parties' services and marks, "the sophistication of the buyers cannot be relied on to prevent confusion."*Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 143 (2d Cir.1999) (citations omitted).

In this case, the users of the products and services offered by Plaintiff vary in their level of sophistication. Clearly, there are high-ranking government officials and technology service providers that are intimately familiar with Plaintiff, its mission, and presumably its website. However, the similarity between the parties' websites, e-mails, URLs, and domain names suggest that the sophistication of these consumers cannot be relied on to prevent confusion.*Id.* As for the "unsophisticated" consumer, there are also countless military personnel and military family members that may be unfamiliar with Plaintiff and may venture to the Internet to learn more about its products and services. These are the unsuspecting individuals that may come across the Bukstel Website and mistake it for one authorized by Plaintiff. As Harlow testified at the evidentiary hearing before this Court, the call notifying him of the Bukstel Website came from someone familiar with the organization. Although this unidentified caller was capable of observing the change in the website's presentation quality, the caller was unable to ascertain in the first instance that the Bukstel Website was not-sanctioned by Plaintiff. Therefore, the Court finds that the sophistication of Plaintiff's Supporters and Clients is unlikely to save Defendant from a finding of a likelihood of confusion.

**\*12** Of the eight *Polaroid* factors, seven weigh in favor Plaintiff. One-the likelihood that Plaintiff will "bridge the gap"-is of no help to Defendant. Balancing the *Polaroid* factors and considering the presumption of confusion, the Court finds that the that Plaintiff has demonstrated that there is a

significant likelihood of confusion among Plaintiff's current and prospective Supporters and Clients if Defendant were to continue to use Plaintiff's Marks.

As a defense to the Lanham Act unfair competition claim, Defendant asserts that the Bukstel Website was created in good faith. (Def.'s Opp'n Mot. at 2.) However, a "good faith defense is no defense" to a Lanham Act claim for unfair competition. *Gucci America, Inc. v. Action Activewear, Inc.,* 759 F.Supp. 1060, 1065 (S.D.N.Y.1991). Therefore, this argument is of no avail to Defendant.

Having also found that Plaintiff's Marks have acquired secondary meaning, the Court holds that Plaintiff is likely to succeed on its unfair competition claim under § 43(a) of the Lanham Act.

*b. Cyber-Squatting in Violation of the Lanham Act (Count I)*

Plaintiff also alleges that Defendant violated the Anti-Cybersquatting Consumer Protection Act (the "ACCPA"), 15 U.S.C. § 1125(d)(1)(A), when he registered the domain "freedomcalls .us" and used that domain in the Bukstel URL. The ACCPA provides, in pertinent part, that a person shall be liable in a civil action by the owner of a mark if, without regard to the goods or services of the parties, that person:

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section and

(ii) registers, traffics in, or uses a domain name that-

\* \* \*

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark[.]

15 U.S.C. § 1125(d)(1)(A).

To succeed on a claim under the ACCPA, Plaintiff must prove that: (1) Defendant had a bad faith intent to profit from use of the Marks; (2) the Marks are either distinctive or famous; and (3)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 13

Defendant's domain name is identical or confusingly similar to Plaintiff's domain name. *See Sporty's Farm LLC v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 497-99 (2d Cir.2000).

The Court has already determined that both the FREEDOM CALLS and FREEDOM CALLS FOUNDATION marks are distinctive because they are, at the very least, descriptive marks. Therefore, Plaintiff has, most likely, proven the second factor of the ACCPA inquiry.

The Court must now consider whether the domain name "freedomcalls.us" is identical or confusingly similar to Plaintiff's Marks. When evaluating whether a domain name is confusingly similar to a mark, a district court disregards the top-level domain name (e.g. ".com", ".org", ".net" etc.).*Omega S.A. v. Omega Engineering, Inc.,* 228 F.Supp.2d 112, 126, n. 36 (D.Conn.2002) (citing *Sporty's Farm,* 202 F.3d at 497-98). Under the ACCPA, "whether a domain name is confusingly similar to a trademark is to be evaluated 'without regard to the goods or services of the parties." ' *Id.* (quoting 15 U.S.C. § 1125(d)(1)(A)). As discussed above, FREEDOM CALLS, as used by Plaintiff, and "freedomcalls" as used by Defendant differ by only the spaces between the words and capitalization. In addition to these minor distinctions, FREEDOM CALLS FOUNDATION, as used by Plaintiff, and "freedomcalls" as used by Defendant differ by only one word. The Court therefore concludes that Defendant's " freedomcalls.us" domain is confusingly similar to Plaintiff's Marks.

**\*13** Finally, the Court· turns to the issue of whether Defendant acted with a bad faith intent to profit from Plaintiff's Marks when he registered the domain name "freedomcalls.us." The ACCPA lists nine factors to assist courts in determining whether a person has a bad faith intent to profit from the use of a mark.[FN14]15 U.S.C. § 1125(d)(1)(B)(i). The Court is not limited, however, to considering just the listed factors in making a determination of whether the statutory criteria for bad faith have been met. *Sporty's,* 202 F.3d at 498. Rather, the factors are indicia that may be considered along with other facts. *Id.*

FN14. The nine factors enumerated in the ACCPA are: (1) the trademark or other intellectual property rights of the person, if any, in the domain name; (2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (7) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 14

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

meaning of subsection (c)(1) of section 43. 15 U.S.C. § 1125(d)(1)(B)(i)(I)–(IX).

After considering the facts of the case, the Court finds that Defendant did, most likely, have a bad faith intent to capitalize on the reputation and goodwill of Plaintiff when he registered the Bukstel Domain. First, Defendant did not have any cognizable intellectual property or trademark rights in freedomcalls.us at the time of its registration. *See* 15 U.S.C. § 1125(d)(1)(B)(I). In contrast, Plaintiff had a protectable intellectual property interest in the Marks and their use because it has exclusively and continuously used the Marks and the " freedomcalls.org" domain since September 2003. As a board member at the time he registered the Bukstel Domain, Defendant was fully aware of these facts.

The second and third ACCPA factors also likely weigh in favor of Plaintiff. With respect to the second factor, that is, the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person, it is clear that the Bukstel Domain name does not consist of the legal name of Defendant. The third factor, prior use of the domain name in connection with the bona fide offering of any goods or services, also cuts against Defendant because he did not create and use the site until well after Plaintiff established and used the Marks and the "freedomcalls.org" domain.

As to the fourth factor, the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name, Defendant contends that his use of the Marks in the Bukstel Website is non-commercial. As of the date of this opinion, the Bukstel Website contains absolutely no text, much less the offering of products or services that give rise to commercial activity. However, as the Court previously noted, the prior version of the Website seemed to suggest that visitors could schedule video- and tele-conferences by using the site, thus giving rise to an inference of commercial activity. At best, this factor is neutral as to Plaintiff and Defendant.

The fifth ACCPA factor, the person's intent to

divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, also likely tips in favor of Plaintiff. As previously noted, Defendant admitted that he created the Bukstel Domain Website to provide a space that would be more suitable to complaining Supporters and Clients. This statement makes clear that Defendant intended to divert Supporters and Clients from Plaintiff's website to his own. Moreover, this diversion has the potential to harm the goodwill represented by Plaintiff's Marks because it creates a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Bukstel Domain and Website. Although the Bukstel Website, at the time this action was brought, did not contain any text or other materials that were necessarily "tarnishing" or "disparaging," 15 U.S.C. § 1125(d)(1)(B)(V), and it is unclear whether Defendant realized any "commercial gain," *id.,* the Court does not naively believe, given the acrimony between Plaintiff's board of directors and Defendant, that there is no possibility that either situation could occur in the very near future. In light of these considerations, the Court finds that Defendant, most likely, created the Bukstel Domain and Website with a bad faith intent to divert users from Plaintiff's website to his own.

*14 Based on the foregoing, this Court finds that Plaintiff has produced sufficient evidence that it is likely to succeed on its ACCPA claim.

c. New York General Business Law (Count Four)

Plaintiff alleges that Defendant's use of the Marks injured Plaintiff's business reputation and subjected the Marks to dilution, in violation of New York General Business Law § 360-1. To succeed on this claim, Plaintiff must show (1) that the trademark is truly distinctive or has acquired secondary meaning and (2) a likelihood of dilution either as a result of blurring or tarnishment. *Strange Music, Inc. v. Strange Music, Inc.,* 326 F.Supp.2d 481, 496 (S.D.N.Y.2004).

"Dilution by 'blurring' may occur where the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product."*Tommy Hilfiger Licensing Inc. v. Nature Labs LLC,* 221 F.Supp.2d 410, 421 (S.D.N.Y.2002) (citation omitted). It typically involves "the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products."*Id.* at 421-22 (citation omitted). Blurring under New York law is assessed by a six factor test: (1) similarity of the marks, (2) similarity of the products covered; (3) sophistication of consumers; (4) predatory intent; (5) renown of the senior mark; and (6) renown of the junior mark. *Katz v. Mordiri,* 283 F.Supp.2d 883, 901 (S.D.N.Y.2003). Although a likelihood of confusion is not necessary to find dilution, and indeed may be inconsistent with such a finding, [FN15] many of the factors relevant to likelihood of confusion are also relevant to likelihood of dilution. *Tommy Hilfiger Licensing,* 221 F.Supp.2d at 422.

> FN15."The state of mind required for confusion and dilution are distinct and inconsistent. Confused consumers believe that the actor's use of the mark indicates a connection with the trademark owner, and thus for those consumers, the actor's use does not dilute the distinctiveness of the mark."*Tommy Hilfiger Licensing,* 221 F.Supp.2d at 422 (citation omitted).

Here, the Court has already determined that the Marks have secondary meaning. Further, the Court also finds that there is a likelihood of dilution as a result of blurring because each of the blurring factors have been discussed both in the context of the *Polaroid* analysis and in the ACCPA analysis and both have been resolved in Plaintiff's favor. Therefore, the Court finds that Plaintiff is likely to succeed on its New York law claim for injury to business reputation or dilution.

*d. Misappropriation of Trade Secrets (Count VIII)*

Plaintiff alleges that Defendant misappropriated a trade secret when he "possessed, used, and exploited the Supporter & Client List and the information contained therein" by using it to obtain the e-mail addresses of Plaintiff's Supporters and Clients and, thereafter, e-mailing those individuals. (Am.Compl. ¶ 67.) To date, Plaintiff has presented evidence that Defendant contacted Supporters and Clients, from the Bukstel E-mail, on November 23, 2005, December 6, 2005, and January 13, 2006. (Harlow Decl., Ex. J; Pl.'s 1/18/2006 Ltr., Ex. A.) In the November 23, 2005 e-mail, Defendant contacts more than 20 individuals regarding the allegedly unlawful acts of Harlow. (Harlow Decl., Ex. J.) Specifically, this message included accusations that Harlow threatened to cancel various scheduled videoand/or tele-conferences, embezzled monies from Plaintiff, made derogatory statements about military personnel, and held less-than-successful fundraisers. (*Id.*) The December 6, 2005 e-mail made similar accusations. (*Id.*) The January 13, 2006 message, sent to two individuals, accused Harlow of providing perjurious testimony at the January 12 evidentiary hearing. (Pl.'s 1/18/2006 Ltr., Ex. A.)

*15 At the evidentiary hearing, Harlow testified that the identities of the Supporters and Clients are only revealed to "[p]eople associated with [Plaintiff] internally and external parties ... on a need-to-know basis" and thus are trade secrets. (Hr'g Tr. 75:20-21.) Defendant counters on the ground that third-parties had access to the list of Supporters and Clients. (Def.'s Opp'n Mot. at 5.) For this proposition, Defendant avers that Supporters and Clients often referred third-parties to Plaintiff, which demonstrates that the Supporter & Client List is not a trade secret. (*Id.*) Defendant also argues that, because Plaintiff's website lists locations and contact persons that have volunteered or supplied equipment to Plaintiff, Plaintiff has made the contents of the Supporter & Client List public and therefore cannot claim that the list is a trade secret. (Def.'s Opp'n Mot. at 5.)

Under New York law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 16

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

advantage over competitors who do not know or use it."*North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir.1999) (citations and internal quotation marks omitted). In determining whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.*Id.* (citation omitted).

"A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable."*North Atlantic Instruments, Inc.,* 188 F.3d at 44 (citations and internal quotation marks omitted)."The question of whether or not a customer list is a trade secret is generally a question of fact."*Id.*

Based on the *North Atlantic Instruments* factors, this Court finds that Plaintiff's likelihood of success on its misappropriation claim is considerable because the personal information contained in the Supporter & Client List likely constitutes a trade secret. Four of the six factors weigh in favor of such a conclusion. With respect to the first factor, the contact information contained in the Supporter & Client List, that is, the telephone numbers, e-mail addresses, and other personal information for families, soldiers, and others, is not known outside of the business, which weighs in favor of a trade secret determination. (Hr'g. Tr. 73:16-18.) Although Plaintiff provides a list of Supporter and Client *entities* that can be found on the public website, the personal contact information for *individuals* at these Supporter and Client organizations is not disclosed. *Cf.Leo Silfen, Inc. v. Maurice C. Cream et al.,* 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (N.Y.1972)

(holding that preliminary injunction should not issue because, *inter alia,* plaintiff's customers were readily ascertainable as likely prospects).

**\*16** When considering the fourth factor, it is clear that Supporter and Client contact information is critical to Plaintiff's business, as it allows Plaintiff to solicit support to carry out its mission. Moreover, consideration of the fifth factor reveals that Plaintiff has expended a great deal of resources in developing its network of Supporters and Clients, as evidenced by the products of its efforts. Plaintiff has had to develop a reputation with both military officials and families in order to acquire the video- and tele-conferencing equipment, locations, and participants needed for its activities. Finally, with respect to the sixth factor, it would be rather difficult for one to acquire or duplicate Plaintiff's efforts because the personal contact information for individuals within the Supporter & Client List is not publicly available.

The remaining two *North Atlantic Instruments* factors, although not weighing in favor of a trade secret finding, do not require the opposite result. For the second factor, Plaintiff affirmed that contact information for Supporters and Clients were only distributed on a "need to know" basis, therefore, information was readily available to those involved in Plaintiff's business. (Hr'g Tr. 88:15-20.) However, Plaintiff did not require that employees sign confidentiality agreements, which cuts against a trade secret finding. With respect to the third factor, it is unclear whether Plaintiff used security measures to guard its Supporter & Client List; however, it *is* clear that the contents were not widely published and dissemination of such information was bridled. Of course, Defendant's contacts may have been the product of "casual memory," *Leo Silfen, Inc.,* 328 N.Y.S.2d 423, 278 N.E.2d at 639, which cuts against a trade secret finding; however, such a finding in this case would not exempt Defendant's actions from potential liability.

In light of the fact that the November 23, 2005, December 6, 2005, and January 13, 2005 e-mail messages were sent from the Busktel E-mail, which the Court has established is likely to cause

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

confusion about Defendant's affiliation with Plaintiff, and the *North Atlantic* factors considered above, the Court considers its finding that Plaintiff will likely succeed on its trade secret claim to be valid.

### e. Breach of Fiduciary Duty (Count VII)

Plaintiff also alleges that Defendant breached his fiduciary duties while serving as an officer, director, and employee of Plaintiff by engaging in conduct that was not in Plaintiff's best interests. Specifically, Plaintiff asserts that Defendant breached his fiduciary duties by registering and using the Bukstel Website; using information from the Supporter & Client List; diverting business relationships from Plaintiff; and defaming Plaintiff and members of the Board. (Am.Compl.¶ 60.)

Generally, shareholders, officers, and employees of a corporation have a "duty to deal fairly, in good faith, and with loyalty to the corporation and other shareholders."*Am. Fed. Group, Ltd. v. Rotherberg,* No. 91 CV 7860, 2003 WL 22349673, *1, *10 (S.D.N.Y. Oct.14, 2003). New York law codifies these common law fiduciary duties for non-profit organizations and provides that "directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions."N.Y. NOT-FOR-PROFIT CORP. § 717(a).

**\*17** An employee's fiduciary duty may continue after termination of the employment relationship. *Am. Fed. Group, Ltd.,* 2003 WL 22349673, at *13. Such a continuing duty may, in appropriate circumstances, include the specific duty not to divert business in which a former employer has the requisite "tangible expectancy," and the duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment. *Am. Fed. Group, Ltd.,* 2003 WL 22349673, at *13 (citations omitted).

In this case, Plaintiff is likely to succeed on its breach of fiduciary duty claim as it relates to Defendant's ongoing actions. Although Defendant has a right to "compete with his former employer as to matters for which he has been employed,"*AGA Aktiebolag v. ABA Optical Corp.,* 441 F.Supp. 747, 754 (E.D.N.Y.1977), he is "not free to exploit the same trade if the opportunity was facilitated by acts of preparation and disloyalty during his employment " and before his termination and "by the breach of his obligation to use his best efforts in the interest of his employer,"*id.*At the very least, by (1) registering and using the Bukstel Website prior to his termination, thus potentially diverting website users from Plaintiff's website to his own and (2) using the contact information obtained from the Supporter & Client List while still employed by Plaintiff to disseminate, post-termination, information about Plaintiff's alleged operational difficulties and the alleged unlawful activities of Plaintiff's directors, Defendant has at the very least challenged Plaintiff's efforts to carry out its mission. Indeed, Plaintiff has had to engage in "damage control" with its Supporters and Clients as a result of Defendant. (Pl.'s Mem. Law. Supp. Mot. Prelim. Injunc. at 18.) Therefore, Defendant has demonstrated a lack of good faith and fair dealing.

### e. Defamation (Count X)

Plaintiff alleges that Defendant is liable for defamation *per se* because he conducted an " ongoing campaign" of distributing "knowingly false, fraudulent, libelous, and defamatory statements" about Plaintiff and Harlow to Supporters and Clients. (Am.Compl.¶ 82.) In order to succeed on this claim, Plaintiff must show the following elements: (1) a false statement, (2) published without privilege or authorization to a third party, (3) constituting fault as judged by, at a minimum, a negligence standard, and (4) that such publishing either caused special harm or constituted defamation *per se.Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 7 (N.Y.App.Div.1999). Under New York law, truth is a complete defense to a defamation claim. *Diaz v. Espada,* 8 A.D.3d 49, 778 N.Y.S.2d 38, 40 (N.Y.App.Div.2004).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 18

Whether a statement is susceptible of a defamatory construction is a question of law. *Van-Go Transp. Co. v. New York City Bd. of Educ.,* 971 F.Supp. 90, 98 (E.D.N.Y.1997) (citations omitted). In making this determination, the court is not to seek out a defamatory meaning:

*18 The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction.

*Id.*

Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties. *Id.* Because a statement impugning the plaintiff's business reputation is the libel *per se* form of defamation, special damages need not be pled. *Id.*

In this case, the Court finds that Plaintiff is likely to succeed on its defamation claim because Defendant issued statements that likely constitute libel *per se.* In order to analyze the defamation claim, the Court will consider each of the challenged e-mail communications in turn.

(1) November 23, 2005 E-mail

On November 23, 2005, Defendant sent an e-mail to a distribution list containing approximately 22 e-mail addresses. Defendant stated that "Harlow decided to cancel a[n] xMas party for families" and that during the previous year "Harlow threatened to cancel family connections and denigrated the Oregon National Guard." (Harlow Decl ., Ex. J.) Defendant also states that Harlow has "used the emotions of families and military folks to wield leverage in an unconscionable manner," has made "denigrating comments" and engaged in denigrating "treatment of [ ] troops and families." (*Id.*) In this same message, Defendant also asserts that Harlow

canceled other family connections and that Harlow deemed a fund-raising event a failure because it raised less than $1,000 in donations. (*Id.*) Finally, Defendant says that his vision has been "perverted by Harlow." (*Id.*) Defendant closes the November 23, 2005 message by signing off as "Founder" of Plaintiff. (*Id.*)

Taken as a whole, this e-mail is defamatory because it impugns Plaintiff's business. Specifically, the cancellation allegations create a perception among Plaintiff's Supporters and Clients that Plaintiff is either unwilling or unable to provide its promised services. Further, the e-mail imputes fraud and other misconduct to Plaintiff's directors. Plaintiff has not, to date, produced credible evidence going to the truth of these allegations. Additionally, Defendant published this message to third-parties without Plaintiff's authorization, without an investigation into the accuracy of the statements, and (seemingly) with an intent to inflict harm on Plaintiff and its directors. Therefore, it is reasonable for this Court to find that Defendant most likely acted maliciously. *See World Wrestling Fed'n Entm't, Inc. v. Bozell,* 142 F.Supp.2d 514, 528 (S.D.N.Y.2001) (defining common law malice as acting with "spite, ill will, hatred, or the intent to inflict harm"). Finally, as discussed above, the statements contained in the November 23, 2005 e-mail constitute libel *per se* because they relate to Plaintiff's business reputation. Based on this analysis, Plaintiff is likely to succeed on its defamation claim as to this e-mail.

(2) December 6, 2005 E-mail

*19 On December 6, 2005, Defendant sent an e-mail containing additional allegations about Plaintiff and its directors to two individuals, both of whom appear to be Supporters. (Harlow Decl., Ex. J.) In addition to referencing cancelled family connections, similar to the November 23 e-mail, Defendant distributed a memorandum of understanding (the "MOU") sent by Harlow, on behalf of Plaintiff, to another non-profit organization. Defendant admonished the contents of the MOU, stating that it "request[ed] 90% of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 19

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Operation America's donation in exchange for [Plaintiff's] services."(*Id.*) Defendant goes on to say the following:

Just as I thought the taking of Cash out of the Freedom Calls Bank account and the auditors declining to certify the foundations financials was questionable. I cannot believe these latest actions. [sic]

(*Id.*)

The Court's analysis with respect to the November 23 e-mail applies with equal force here. Therefore, the Court finds that Plaintiff is likely to succeed on its defamation claim as to the December 6, 2005 message.

(3) January 13, 2006 E-mail

Finally, on January 13, 2006, one day after Defendant appeared before this Court for an evidentiary hearing on the pending preliminary injunction motions, Defendant again contacted the same two Supporters that were the recipients of the December 6, 2005 e-mail. In this communication, Defendant informed the e-mail recipients that " Harlow lied his way through court and told the Judge that troops didn't mind that he said KIA's would help them (military families) wake up and smell the coffee."(Pl.'s 1/18/2006 Ltr to Court, Ex. A.) In this message, Defendant also forwarded an e-mail sent from Harlow to Defendant and to three other mail recipients regarding contributions and operations. (*Id.*) The message from Harlow was sent on March 10, 2005 and, *inter alia,* informed its recipients that Defendant would be focusing on marketing rather than operations and provided detailed information on corporate contributions and new technology installations. (Pl.'s 1/18/2006 Ltr to Court, Ex. A.) Defendant stated that the "e-mail is what one can expect to receive from [Harlow] as a board member" and further alleges that the contents of the e-mail are not true and that Harlow "does not care about military families" and will "lie as he did in [ ] court."(*Id.*)

The analysis for the November 23, 2005 and December 6, 2005 e-mails applies with equal force here. Therefore, the Court finds that Plaintiff is likely to succeed on its defamation claim as to the January 13, 2006 message. Moreover, given the recency of Defendant's communications, the Court finds that there is a risk that Defendant's defamatory communications will occur on an ongoing basis.

Plaintiff also brings a separate defamation cause of action based on trade libel. This form of defamation relates to the disparagement of a business' goods or services. *World Wrestling Fed'n Entm't, Inc.,* 142 F.Supp.2d at 532. To state a claim for trade libel, the plaintiff must allege that a defendant (1) made false, defamatory statements, (2) to a third party, (3) with malice, and (4) that it suffered special damages. *Id.* To the extent the claim alleges an injury to the business's reputation and not the product, it is the libel *per se* form of defamation and special damages need not be shown. *Aequitron Med. v. Dyro,* 999 F.Supp. 294, 297 (E.D.N.Y.1998). Given the similarities between the libel *per se* and trade libel elements of proof, the defamation analysis for reputational injury provided above applies with equal force to Plaintiff's trade libel claim. Therefore the Court finds that Plaintiff is likely to succeed on its trade libel claim.

*f. Tortious Interference with Business Relations (Count IX)*

**\*20** In this count of the Complaint, Plaintiff alleges that Defendant unlawfully interfered and continues to interfere with Plaintiff's business relationships with Supporters and Clients by (1) using the Supporters & Client List and other trade secrets and (2) defaming Plaintiff's goodwill, reputation, and operations during his solicitations to Plaintiff's Supporters and Clients. (Am.Compl.¶ 75.) These allegations give rise to two separate causes of action: tortious interference with *prospective* business relations and tortious interference with *existing* contractual relations.

(1) Tortious Interference with Prospective Business

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 20

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Relations

To establish a claim for tortious interference with prospective business relations, a plaintiff must prove: (1) there was a business relationship with a third party; (2) defendants knew of that relationship and intentionally interfered with it; (3) defendants either acted "solely out of malice" or used " wrongful means;" and, (4) defendants' interference caused injury to the relationship with the third-party. *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir.2003).

With respect to the first factor provided in *Carvel*, the Court finds that Plaintiff did have business relationships with the parties to whom Defendant sent the challenged e-mails. Based on the Court's review of these e-mails, Defendant contacted Supporters and Clients that have a vested interest in the mission and the products and services offered by Plaintiff. With respect to the second factor, Defendant, as a former board member, officer, and employee of Plaintiff, had knowledge of these business relationships. Indeed, Defendant used his knowledge of Plaintiff's relationships with certain Supporters and Clients to determine his target audience and to craft the text of the November 23, 2005, December 6, 2005, and January 13, 2006 e-mails. Defendant also likely interfered with Plaintiff's business by establishing a confusingly similar website...

For the third factor, there is a distinction between generic instances of interference and those special (although more frequently encountered) instances in which the plaintiff and defendant are market competitors. *Carvel Corp.*, 350 F.3d at 18 (citation omitted). If the plaintiff claims that a *non-competitor* interfered with its prospective economic relations, then the defendant should be liable where its interference was merely "improper." *Id.* (emphasis added and citation omitted). The factors in determining whether interference is improper include the nature of the defendant's conduct, the defendant's motive, the interests of both parties, the social interests in competition and the sanctity of contract, the degree to which the defendant's conduct caused the interference, and the relationship between the parties.*Carvel Corp.*, 350

F.3d at 18 (citation omitted). In further defining the "nature of defendant's conduct" factor, the commentary to the Restatement (Second) of Torts, § 767, lists several different examples of improper conduct. *Id.* Of particular relevance to this case is the specific suggestion that a defendant's conduct is improper when it is in "violation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods."*Id.*

**\*21** In contrast, if the plaintiff claims that a *competitor* interfered with its prospective economic relations, then the liability should only attach where the defendant employed wrongful means. *Id.* at 19.In this context, wrongful means include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract. *Id.*

Here, an analysis as to whether Defendant is a " competitor" or not would be academic, as his communication with Plaintiff's Supporters and Clients are tortious under both the "improper conduct" and the less stringent "wrongful means" standard. After considering the guidance provided by the Second Circuit in *Carvel*, this Court determines that Defendant's conduct is improper because Defendant violated recognized ethical codes for a particular area, that is, non-profit organizations. As established in Section I.B.(1)(d), Defendant owed duties of good faith and fair dealing to Plaintiff as both a current and former director; these duties were debunked by Defendant. Even if Defendant were truly concerned about the management of Plaintiff, distribution of such information using a confusingly similar e-mail address (the Bukstel E-mail), post-termination, and establishment of a confusingly similar website (the Busktel Website) demonstrate that Defendant's course of action was not the most prudent. Further, Defendant's actions are, most likely, wrongful because he misrepresented the operational and financial viability of Plaintiff in the November 23, 2005, and December 6, 2005 e-mails.

Finally, Plaintiff alleges that Defendant has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

injured its prospective business relationships because of the denigrating e-mails that have been sent to Supporters and Clients. Although Plaintiff has averred that it has had to engage in "damage control" by explaining and/or responding to comments made by Defendant, Compl. ¶ 77, which is sufficient for pleading purposes, Plaintiff has produced insufficient evidence of injury. To date, Plaintiff has not demonstrated that any Supporters or Clients have withdrawn their support, in part or in full. To the extent that Defendant ever offered services similar to Plaintiff's on the Bukstel Website, Plaintiff has not shown a loss of sales or business as a result of Defendant's actions. At present, there is only one allegation that even remotely constitute "injury"-that Plaintiff has had to answer "certain calls from Supporters in Kentucky who were concerned about the content of [Defendant's] e-mail."(Harlow Decl. ¶ 18.) Accordingly, Harlow has had to explain to the callers that Defendant no longer works for Plaintiff and is no longer authorized to send e-mails on behalf of Plaintiff. (*Id.*) Although inconvenient, it appears to this Court that Plaintiff has managed, thus far, to mitigate any injury that could have been caused by Defendant's actions. *See, e.g.,Unique Sports Generation, Inc. v. LGH-III, LLC,* 03 CV 8324, 2005 U.S. Dist. LEXIS 22133, *1 (S.D.N.Y. Sept. 30, 2005) (noting that allegations of lost sales and loss of one customer sufficient to show injury); *Highland Capital Mgmt., L.P. v. Schneider,* No. 02 CV 8098, 2005 U.S. Dist. LEXIS 14912, *1, *74 (S.D.N.Y. July 26, 2005) ("[The] interference must be direct interference with a third party, that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.")

(2) Tortious Interference with Existing Contractual Relations

**\*22** To prove tortious interference with existing contractual relations, Plaintiff must show that a defendant intentionally procured a third-party's breach of an existing contract with Plaintiff. *SeeAtla-Medine v. Crompton Corp.,* No. 00 Civ. 5901, 2001 U.S. Dist. LEXIS 1621, *1, *7

(S.D.N.Y. Feb. 21, 2001) (citations omitted). Plaintiff has not met this burden, as it has produced no evidence that parties to existing contracts have breached their obligations as a result of Defendant's allegedly unlawful conduct. Therefore, Plaintiff is not likely to succeed on this claim.

Given the evidence currently available for its review, the Court finds that Plaintiff is not likely to succeed on its claim for tortious interference with prospective business relations. However, there are, arguably, sufficient questions going to the merits to make this claim a fair ground for litigation, especially given that Plaintiff can rebut the Court's finding on the injury prong with a showing of contrary proof.

*2. Immediate Irreparable Injury*

In considering Plaintiff's request for a preliminary injunction based on its Lanham Act unfair competition claim, the requirement of irreparable harm is unnecessary because a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm. *SeeHasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988). Here, the Court has established that a likelihood of confusion exists; thus, irreparable harm has also been established. Therefore, a preliminary injunction shall issue with respect to this claim.

Following other district courts of the Second Circuit, this Court also finds that irreparable harm may be presumed for the Lanham Act cyber-squatting claim because Plaintiff has shown a likelihood of success on the merits. *See1-800 Contacts, Inc. v. WhenU.com,* 309 F.Supp.2d 467, 506-7 (S.D.N.Y.2003), *rev'd on other grounds,*414 F.3d 400, 2005 (2d Cir.2005).

In light of the analytical similarities between the Lanham Act unfair competition claim and the New York state law dilution claim, and the fact that there is a presumption of irreparable harm in favor of Plaintiff from the Lanham Act claim unfair competition claim, the Court finds that Plaintiff has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 22

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

established irreparable harm with respect to the analogous state law claim.

The activities that Plaintiff challenges in its breach of fiduciary duty claim, namely, registering and using the Bukstel Website; using information from the Supporter & Client List; diverting business relationships from Plaintiff; and defaming Plaintiff and members of the Board, are each addressed separately herein. Therefore, the Court shall not engage in an independent analysis of harm for this claim.

As to Plaintiff's defamation claim, "for almost a century the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases."*Metropolitan Opera Ass'n v. Local 100, Hotel Emples. & Restaurant Emples. Int'l Union,* 239 F.3d 172, 177 (2d Cir.2001). Even when such extraordinary circumstances are present, the Second Circuit has recognized that "current First Amendment principles may prohibit granting an injunction" because "prior restraints [on expression] are the most serious and the least tolerable infringement on First Amendment rights."*Metropolitan Opera Ass'n,* 239 F.2d at 176-7 (citations omitted). Courts are therefore reticent to grant injunctions based on defamation because "prior restraint [in] the form of a court-issued injunction [increases] the risk of infringing on speech protected under the First Amendment."*Id.* at 176 (citations omitted). In this case, the fact that Defendants false statements about Plaintiff's business and about its directors may injure Plaintiff does not alone constitute a sufficient ground for issuance of an injunction because Plaintiff has an adequate remedy at law. *SeeBynog v. SL Green Realty Corp.,* No. 05 CV 0305, 2005 U.S. Dist. LEXIS 34617, *1, *10 (S.D.N.Y. Dec. 22, 2005) (citations omitted).

**\*23** For Plaintiff's claim for misappropriation of trade secrets, irreparable harm is presumed where a trade secret has been misappropriated, even in the absence of an employment agreement. *Johnson Controls, Inc. v. A.P.T. Critical Sys.,* 323 F.Supp.2d 525, 533 (S.D.N.Y.2004). Therefore, a preliminary injunction shall issue with respect to this claim.

As to the claim of tortious interference with existing contractual relations, the Court declines to issue a preliminary injunction at this juncture because Plaintiff has not established a likelihood of success. For tortious interference with prospective business relations, Plaintiff has presented sufficient questions going to the merits of this count and the balance of hardships tips in Plaintiff's favor. However, the paucity of evidence regarding Plaintiff's actual loss vitiates a finding of irreparable harm and therefore a preliminary injunction shall not issue.

### 3. Unclean Hands

In response to Plaintiff's preliminary injunction motion, Defendant asserts the affirmative defense of unclean hands and accordingly alleges that Plaintiff acted in bad faith by committing its own Lanham Act violations. (Def.'s Opp'n Mot. at 3.) Specifically, Defendant alleges that Plaintiff modified and placed articles copyrighted by news publications on Plaintiff's website, to the detriment of Defendant. (Hr'g Tr. 124-128.) For example, Defendant contends that Harlow took an article that was originally printed in the *Akron Beacon Journal* and that identified Defendant as a "founder" of Plaintiff, changed Defendant's description to " co-founder," and then placed the modified article on Plaintiff's website. (Hr'g Tr. 125-127.) Defendant also testified that Harlow admitted that such modifications took place. Defendant asserts that such changes occurred in order that Plaintiff minimize his involvement in Plaintiff's founding.

Because a court sitting in equity is a vehicle for affirmatively enforcing the requirements of conscience and good faith, a party who comes into equity must come with clean hands if relief is to be granted. *Gidatex v. Campaniello Imports, Ltd.,* 82 F.Supp.2d 126, 130 (S.D.N.Y.1999) (citations and internal quotation marks omitted). The defendant who invokes the doctrine of unclean hands has the burden of proof. *Id.* Typically, courts that have denied injunctive relief due to plaintiff's unclean hands have found plaintiff guilty of truly unconscionable and brazen behavior. *Id.* at 131;*see,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 23

*e.g.,Goldstein v. Delgratia Mining Corp.*, 176 F.R.D. 454, 458 (S.D.N.Y.1997) (stating that unclean hands defense successful where plaintiff made multiple misrepresentations to court regarding law and facts); *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F.Supp. 969, 970 (S.D.N.Y.1992), *aff'd by summary order,*983 F.2d 1048 (2d Cir.1992) (finding that defendant's unclean hands barred laches defense in trademark dispute where defendant's president fabricated testimony to create impression that he detrimentally relied on plaintiff's acquiescence). However, the alleged unconscionable behavior must be *related to the matter at issue* to the detriment of the party opposing the motion for injunctive relief. *Id.* (citations and internal quotation marks omitted).

*24 The Court finds that Defendant has not met his burden of proof with respect to the unclean hands defense. First, even if Defendant's allegations regarding Plaintiff's alleged copyright infringement were true, they do not rise to the level of bad faith or unconscionability contemplated by the unclean hands defense. Plaintiff's alleged unlawful actions do not involve fabrications under oath or misrepresentations to the Court.[FN16]Moreover, Defendant's allegations of bad faith are not sufficiently related to Plaintiff's unfair competition claim to justify an unclean hands defense. First, Defendant does not allege that Plaintiff's alleged inequitable conduct relates to Plaintiff's development and use of the FREEDOM CALLS and FREEDOM CALLS FOUNDATION marks. The claim asserted by Plaintiff is that of an owner with the exclusive right to use its marks. Rather, Defendant's allegations relate to Plaintiff's allegedly unlawful modification of copyrighted material belonging to other businesses. Consequently, even if Plaintiff has unclean hands, Defendant cannot prove that Plaintiff tainted its hands in its use of the Marks or in bringing this suit to enforce its rights against Defendant. *SeeGidatex*, 82 F.Supp.2d at 132.

FN16. On January 18, 2006, Defendant filed an Order to Show Cause Contempt of Court and Perjury (the "Contempt Motion" ), alleging that Harlow fabricated testimony regarding his technology

certifications during the evidentiary hearing held before this Court. Defendant subsequently filed a Supplement to Contempt of Court Motion for Perjury, which alleged that Harlow also fabricated the date on which he became an employee of Plaintiff. Although the Court has not issued its opinion on the Contempt Motion and its supplement, the Court notes that Defendant's allegations, even if true, do not undermine the credibility of the evidence produced by Plaintiff in support of its motion for a preliminary injunction. In contrast to the fabricated testimony presented to the *Aris-Isotoner Gloves, Inc.* court and the misrepresentations made to the *Goldstein* court, any untruths related to Harlow's technological expertise and the start date of his employment will have no impact on the procedural posture and substantive merits of Plaintiff's case. Therefore, the outstanding nature of the Contempt Motion and its supplement do not affect this Court's finding that Defendant has failed to meet his burden with respect to the unclean hands defense.

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is hereby granted in part and denied in part.

II. *DEFENDANT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION*

Defendant moves for a temporary restraining order ("TRO") and preliminary injunction based on his counterclaims against Plaintiff and third-party claims against Harlow and Kate Green ("Green"), a director, Secretary, and Treasurer for Plaintiff. Specifically, Defendant asks this Court to (1) restrain Plaintiff, Harlow and Green from making cash withdrawals from Plaintiff's account and utilizing the *ebukstel@freedomcalls.org* e-mail account and (2) require Plaintiff to turn over to Defendant (a) all e-mails sent to and from the *ebukstel@freedomcalls.org* e-mail account since

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 24

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

November 8, 2005; (b) all e-mails received and sent from the *jharlow@freedomcalls.org* e-mail account since October 4, 2005; and (c) evidence of cash withdrawals from Plaintiff's bank account from 2004 to December 2005. Defendant's TRO and preliminary injunction requests are based on allegations that (1) Harlow and Greene are subject to liability for embezzlement, misappropriation, filing fraudulent tax returns, and breach of fiduciary duty and (2) Harlow is liable for defamation for improperly using the *ebukstel@freedomcalls.org* e-mail account to distribute the fraudulent tax documents.

A. Standard for Granting a Temporary Restraining Order and Preliminary Injunction

The standards for issuing a TRO is the same as that governing the granting of preliminary injunctive relief. *Harris v. Diaz,* No. 04 CV 9124, 2004 U.S. Dist. LEXIS 25256, *1, *8 (S.D.N.Y. Dec.13, 2004) (citations omitted). The standard for granting preliminary injunctive relief, discussed *supra* in Section I, applies with equal force here.

B. Application of the TRO and Preliminary Injunction Standard

1. *Likelihood of Success on the Merits*

*25 Defendant contends that Harlow and Green conspired to file, and knowingly filed, a 2004 tax return with the Internal Revenue Service on behalf of Plaintiff that contained fraudulent statements and material omissions, in violation of 26 U.S.C. § 7206(1). (Def.'s TRO Mot.[FN17] ¶¶ 1, 21, 22.) Defendant also contends that Harlow and Green untimely filed Plaintiff's 2004 tax return with the Charities Bureau of the New York Attorney General's Office. (*Id.* at ¶ 12.)Defendant further alleges that Harlow and Green conspired to embezzle money from Plaintiff, engaged in acts of self-dealing, and withheld documentation from

Defendant while he served on Plaintiff's board of directors, in breach of their fiduciary duties. (*Id.* ¶ 23, 32.)

> FN17. Citations to "Def.'s TRO Mot." refer to Defendant's Motion for Temporary Restraining Order and Preliminary Injunction, unless otherwise noted.

Defendant also contends that Plaintiff, Harlow, and Green are liable for defamation because they used the *ebukstel@freedomcalls.org* account after his termination to respond to e-mail messages and to disseminate the allegedly fraudulent tax returns after his termination. (Def.'s TRO Mot. at ¶ 14.) Defendant also avers that "Harlow is misleading the public by sending out misleading information from his e-mail account at [ ] *jharlow @freedomcalls.org.* "(*Id.* at ¶ 26.)

a. *Misappropriation, Embezzlement, and Breach of Fiduciary Duty*

To meet Article III's constitutional requirements for standing, a plaintiff must allege an actual or threatened injury to himself that is fairly traceable to the allegedly unlawful conduct of the defendant. *Lamar Adver. of Penn., LLC v. Town of Orchard Park,* 356 F.3d 365, 373 (2d Cir.2004) (citations and internal quotation marks omitted). Furthermore, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.*

The Court finds that Defendant does not have Article III standing to bring the misappropriation, embezzlement, and breach of fiduciary duty claims described herein because he has not sufficiently pled injury. Defendant has not demonstrated how the allegedly unlawful actions of Harlow and Green have resulted in any actual or threatened injury to Defendant. Although Defendant's allegations, if true, would almost certainly give rise to reputational damage with respect to Plaintiff, Harlow, and Green, no such injury can accrue to Defendant when he is no longer affiliated with Plaintiff.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 25

Therefore, Defendant is not likely to succeed on the merits of these claims. Moreover, without standing, there are insufficient questions regarding the merits of Defendant's claims to make them a fair ground for litigation.

Moreover, New York law provides that directors and officers may only bring an action against another director or officer for certain violations of duties if the director making the allegations occupies his office *at the time the action is brought.SeeN.Y.* NOT-FOR-PROFIT CORP. § 720(b)(1) ("[A]n action may be brought for the relief ... in the right of the corporation, by ... [a] director or officer of the corporation[.]"); *Tenney v. Rosenthal,* 6 N.Y.2d 204, 189 N.Y.S.2d 158, 160 N.E.2d 463, 468 (N.Y.1959) ("[T]he action, *properly commenced by the plaintiff when he was a director,* may not be defeated, either on the theory of abatement or of lack of capacity to sue, by effecting the plaintiff's ouster as director.") (emphasis added). When Defendant filed his counterclaims in this action on December 14, 2005, he was no longer affiliated with Plaintiff and thus cannot bring an action based on Harlow and Green's alleged misappropriation, embezzlement, and breach of fiduciary duty claims. Additionally, because Defendant was not a member, holder or owner of the corporation at the time the action was brought, he is also unable to bring these claims under the auspices of a member's derivative action. *See*N.Y. NOT-FOR-PROFIT CORP. § 720(b)(3) (" [A]n action may be brought for the relief ... in the right of the corporation, by ... one or more of the members thereof.").

*b. Defamation*

**\*26** After analyzing the elements of a claim for defamation, as set out in Section I.B.(1)(e) above, the Court finds that Defendant is not likely to succeed on his defamation claim. Defendant has not alleged that Plaintiff has made any false statement *about him.*As discussed above, an aggrieved party must prove the existence of a false and defamatory statement *concerning the aggrieved party* to create liability for defamation. *See*Restatement (Second)

of Torts § 558, 564 cmt. a (1977). Although Harlow admitted using the *enbukstel@freedocmcalls.org* account to send tax returns to a donor on November 11, 2005, there is no indication that the e-mail contained a false statement *about Defendant.*Even if true, Defendant's allegations about the falsity of the tax returns, without a statement regarding Defendant, are insufficient to support a defamation claim based on Harlow's use of Defendant's former e-mail account.

Defendant has also failed to show that the message sent by Harlow on November 9, 2005, from the *ebukstel@freedomcalls.org* account contained false statements about him. The e-mail stated that "the board of directors of the foundation took action ... to terminate [Defendant's] employment" and that "[Defendant] no longer has authority to act on the [Plaintiff's] behalf."(Def.'s Resp. Mem. Def.'s PI Mot. at 6.) Defendant does not challenge the fact that he was, in fact, terminated. He does, however, challenge the effective date of his termination by stating that it is the date on which he received notice (November 10, 2005), not the date on which the board actually decided to terminate him (November 8, 2005). (Def.'s Resp. Mem. Def.'s PI Mot. at 4.) Notwithstanding the date on which Defendant received notice, there is nothing in the record that indicates that Defendant was not in fact terminated at a November 8, 2005 board meeting, thus undermining any allegations of falsity as to this statement. Although the date on which an employee receives official notice of termination is relevant in certain circumstances, such as when a claim for wrongful termination accrues, *see, e.g.,Delaware State Coll. v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), this date has no significance in determining the viability of a defamation claim.

In light of the absence of a showing that Plaintiff used the account for defamatory purposes, the Court also finds that Defendant has no legitimate challenge to Plaintiff's ongoing monitoring of the *ebukstel@freedomcalls.org* e-mail. Through the enactment of the Electronic Communications Protection Act (the "ECPA"), Congress "update[d] and clarif[ied] Federal privacy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 26

protections and standards in light of dramatic changes in new computer and telecommunications technologies."Sen. Rep. No. 99-541, at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3555. The ECPA is divided into Title I, which governs unauthorized interception of electronic communications, 18 U.S.C. §§ 2510-2522, and Title II, which governs unauthorized access to stored communications, 18 U.S.C. §§ 2701-2711. Defendant's challenge to continued monitoring of his former business e-mail account, although not expressly alleged, potentially implicates both Title I and Title II.

*27 Title I of the ECPA creates liability for the interception of communications. 18 U.S.C. § 2511(1) (emphasis added). ECPA defines the term " intercept" as "the aural or other acquisition of the contents of any electronic ... communication through the use of any electronic, mechanical, or other device."18 U.S.C. § 2510(4) (emphasis added). As in the case of electronic storage, the ECPA creates an exception for business that allows an

"officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service."

18 U.S.C. § 2511(2).

Title II of the ECPA also creates civil liability for unlawful access to stored communications. 18 U.S.C. § 2701(a). However, Title II excepts from its broad reaching provisions seizures of e-mail authorized "by the person or entity providing a wire or electronic communications service."18 U.S.C. § 2701(c)(1).

In this case, Plaintiff meets both of the employer exceptions provided in the electronic storage and interception provisions of the ECPA. To the extent that prior e-mails sent to Defendant's *ebukstel@freedomcalls.org* e-mail account are

stored on Plaintiff's computer system, Plaintiff has the right to search these stored e-mails as the need arises because Plaintiff provided Defendant with the ability to send and receive electronic communications. See*Fraser v. Nationwide Mut. Ins. Co.,* 352 F.3d 107 (3d Cir.2003) (holding that because the employee's e-mail was stored on the employer's system, the search of e-mails falls within the 18 U.S.C. § 2701(c) exception); *Bohach v. Reno,* 932 F.Supp. 1232 (D.Nev.1996) (holding that police department was allowed to retrieve electronic communications because it was the provider). Further, Plaintiff has the right to "intercept," that is, receive and review future e-mails sent to the *ebukstel@freedomcalls.org* account, so long as it does so in the normal course of business, because Plaintiff is an employer and monitoring is necessary to ensure that current and prospective Supporter and Client email messages are answered in a timely fashion.

Based on the foregoing, the Court finds that Defendant is not likely to succeed on his claim for defamation and there are insufficient questions going to the merits to make this claim a fair ground for litigation.

*c. Filing of Fraudulent Tax Returns*

Defendant also alleges that Harlow and Green are liable for filing fraudulent tax returns on behalf of Plaintiff, in violation of 26 U.S.C. § 7206(1). Section 7206(1) of Title 26 provides in relevant part:

Any person who [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony.

*28 26 U.S.C. § 7206(1).

The Court finds that Defendant has no standing to bring this claim. Generally, a private citizen has no authority to initiate a federal criminal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

prosecution. See *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). Furthermore, criminal statutes do not create private rights of action, unless Congress so provides. *Cok v. Cosentino,* 876 F.2d 1, 2 (1st Cir.1989). At present, there is no private right of action available to Defendant under 26 U.S.C. § 7206. *Johnson v. Cullen,* 925 F.Supp. 244, 251 (D.Del.1996). Therefore, Defendant is not likely to succeed on this claim and there are insufficient questions going to the merits to make this claim a fair ground for litigation.

### 2. *Irreparable Harm*

The Court finds that Defendant has not shown that he will suffer irreparable harm if a TRO or a preliminary injunction does not issue. As previously discussed, Defendant does not have standing to bring the embezzlement, misappropriation, and breach of fiduciary duty claims. Moreover, the defamation claims are meritless because, with respect to the November 11, 2005 email, any false statements made were not made regarding Defendant and, with respect to the November 9, 2005 e-mail, Defendant has not shown that the proffered statements were in fact false. Finally, Defendant has failed to show that he has standing to bring a claim for fraudulent tax documentation under 26 U.S.C. § 7206(1).

Based on the foregoing, Defendant's motion for a TRO and preliminary injunction is hereby denied.

### III.    *DEFENDANT'S    MOTION    FOR APPOINTMENT OF A TEMPORARY RECEIVER*

In addition to a TRO and preliminary injunction, Defendant also moves this court to appoint a temporary receiver for Plaintiff. Defendant bases this request on his desire to "clear his name from defamatory distribution of fraudulent tax return documents to donors in a public charity." (Def.'s Mot. Prelim. Injunc. at 18.) Defendant also contends that a receiver is needed to "ensure that

corporate assets are not squandered and there will be monies available to attempt to affect remediation if at all possible."(*Id.*)

A district court may appoint a receiver to manage a defendant's assets during litigation. *Rosen v. Siegel,* 106 F.3d 28, 33 (2d Cir.1997) (citations omitted). The appointment of a receiver is considered to be an extraordinary remedy, and should be employed cautiously and granted only when clearly necessary to protect the movant's interests in the property. *Id.* (citations omitted)

Because Defendant has not demonstrated that he has standing to bring any of his claims, Defendant has no cognizable interest in Plaintiff's assets that justifies appointment of a receiver in this action. Defendant's desire to "clear his name" and to protect corporate assets from "squandering" when he is no longer affiliated with Plaintiff cannot serve as a basis for Defendant's requested relief.

### IV.    *MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT*

**\*29** Plaintiff has also filed a motion for leave to file an amended complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Plaintiff has not filed any amendments prior to this request. It is well settled that "leave to file an amended complaint shall be freely given when justice so requires,"Fed.R.Civ.P. 15(a), and "should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility."*Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001).

The Court hereby finds that Plaintiff's request to amend its complaint is not made in bad faith and that Defendant will suffer no prejudice as a result of the amendment, as Defendant has been on notice of the proposed amended complaint since December 8, 2005. Since that date, Defendant has filed numerous pleadings that address the allegations contained in the amended complaint and has also appeared at an evidentiary hearing regarding the allegations contained therein. Therefore, Plaintiff's request to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

file an amended complaint is hereby granted.

### CONCLUSION

For the reasons stated herein, Plaintiff's motion for a preliminary injunction on the grounds of unfair competition under the Lanham Act, cyber-squatting under the Lanham Act, dilution, and misappropriation of trade secrets is hereby GRANTED. Plaintiff's motion for a preliminary injunction on the grounds of defamation and tortious interference with existing contractual and prospective business relations is hereby DENIED. Defendant's motion for a TRO and preliminary injunction is hereby DENIED. Defendant's motion for appointment of a temporary receiver is hereby DENIED. Plaintiff's motion for leave to file an amended complaint is hereby GRANTED.

IT IS FURTHER ORDERED that a preliminary injunction shall issue, as follows:

A. Bukstel, directly or indirectly, during the pendency of this case and until such time as permanent injunctive relief is entered, if at all, is enjoined from: (1) distributing, marketing, selling, advertising, using or rendering services bearing the Marks, or any colorable imitation thereof; (2) using the Marks, or any colorable imitation thereof, alone or in combination with other words or designs, in connection with any product or service; (3) infringing Plaintiff's proprietary rights in the Marks, including but not limited to its rights at common law with respect thereto; (4) unfairly competing with Plaintiff in any manner whatsoever; (5) diluting the distinctiveness of Plaintiff's proprietary rights in the Marks; (6) continuing to operate any website(s) or to use any e-mail or instant message account that include as part of the domain or other identifying name "freedomcalls" or any colorable imitation thereof; (7) destroying, altering, hiding, transferring or advising or in any way participating (actively or passively) in the destruction, alteration, hiding or transfer of any and all documents, agreements, website development documents, books of accounts, journals, check registers, bank account statements, computer programs, e-mail computer diskettes, discs or software (and/or the information contained thereon), together with and including all other records of any kind or character whatsoever that reflect the operations of Defendant in which the Marks are or have been reflected; and (8) using, retaining, copying, distributing, or causing to be used, retained, copied, or distributed all or any part of the Supporter & Client List, or any other trade secret of Plaintiff.

**\*30** B. Defendant is directed to file with the Court and serve Plaintiff within fifteen (15) business days after the date of entry of this Order, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction.

SO ORDERED.

E.D.N.Y.,2006.
Freedom Calls Foundation v. Bukstel
Not Reported in F.Supp.2d, 2006 WL 845509 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 286722 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Neutrik AG v. Switchcraft, Inc.
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
NEUTRIK AG, a Stock Company of Liechtenstein,
and Neutrik USA, Inc ., a New Jersey Corporation,
Plaintiffs,
v. . .
SWITCHCRAFT, INC., an Illinois Corporation,
Defendant.
**No. 99 CIV. 11931(JSM).**

March 23, 2001.

Gerald Kiel, Reed Smith, LLP, New York, for
plaintiffs.
John Brennan, Davis & Gilbert, New York, Edward
O'Toole, Marshall, O'Toole, Gerstein, Murray &
Borun, Chicago, IL, for defendant.

*OPINION and ORDER*

MARTIN, District J.
    *1 Neutrik AG and Neutrik USA, Inc.
(collectively "Neutrik") bring this action against
Switchcraft, Inc. ("Switchcraft") for patent
infringement, trademark infringement and unfair
competition, and trade dress infringement based on
Switchcraft's sale of an electrical socket designed
for use with a plug manufactured by Neutrik.[FN1]
The Court previously denied Neutrik's motion for a
preliminary injunction. Switchcraft now moves for a
declaration of non-infringement of Neutrik's patent
and for summary judgment on Neutrik's remaining
claims. Neutrik cross-moves for a continuance in
order to obtain discovery pursuant to Fed.R.Civ.P.
56(f). For the reasons set forth below, Switchcraft's
motion for a declaration of non-infringement and
for summary judgment is granted, and Neutrik's
cross-motion for further discovery is denied.

FN1. Plaintiff has abandoned its trademark
dilution claims.

I. BACKGROUND

    Neutrik manufactures a patented electrical
plug-and-socket combination designed for use with
professional high power audio equipment. The
technology used in this electrical connector
combination is the subject of U.S. Patent No.
5,205,749 (the " '749 patent"), which features a
novel socket design that reduces electrical current
overload. Since approximately 1989, Neutrik has
sold its connectors under the "SPEAKON®"
trademark. Seeking to offer a competitive product,
Switchcraft designed a socket that could be used
with Neutrik's plug. In 1999, Switchcraft began
marketing its sockets under the "HPC" (High Power
Connector) trademark and advertising the sockets'
compatibility with Neutrik's plugs.

    Neutrik claims in this action that the
technology used in the HPC socket infringes its '749
patent, that Switchcraft's socket trade dress is
confusingly similar to Neutrik's trade dress, and that
Switchcraft's advertising infringes Neutrik's
SPEAKON® trademark. A thorough description of
the parties' competing products and the underlying
technology is set forth in the Court's previous
opinion in which it denied Neutrik's motion for a
preliminary injunction, *see Neutrik AG v.
Switchcraft*, No. 99 Civ. 11931, 2000 WL 1024669
(S.D.N.Y. July 25, 2000), and the Court will
assume the reader's familiarity with the relevant
facts.

II. DISCUSSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 286722 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

### A. Declaration of Non-Infringement

In its prior opinion denying Neutrik's motion for a preliminary injunction, the Court carefully considered the claims of the parties and found, on the record before it, that Switchcraft's socket did not infringe Neutrik's patent. Nothing submitted on this motion suggests that a different conclusion is warranted, and therefore Switchcraft's motion for a declaration of non-infringement is granted for the reasons set forth in the Court's prior opinion.

### B. Trade Dress Infringement

Neutrik alleges that Switchcraft has unlawfully infringed its socket trade dress in violation of state and federal law. *See* 15 U.S.C. § 1125(a).[FN2] The sockets in question are approximately one inch long and one and one-quarter inch wide. Both products feature a black outer shell that houses the cylindrical socket into which the plug is inserted. The outer shells of the sockets are also cylindrical, and each features a rectangular base. The cylindrical end of the shell is attached to the audio unit, and the rectangular end, which is screwed into an equipment panel, receives the plug. In the center of the rectangular base is a raised circular rim. The plug is inserted into the hollow space between the circular outer rim and the socket housed within.

> FN2. In general, Neutrik's state law claims for trademark and trade dress infringement involve an analysis similar to that under the Lanham Act. *See 20th Century Wear, Inc. v. Sanmark-Stardust Inc.,* 815 F.2d 8, 11 (2d Cir.1987); *American Marietta Co. v. Krigsman,* 275 F.2d 287, 289 (2d Cir.1960); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 369 N.E.2d 1162, 1165 (1977). Although a state claim for trade dress infringement does not require proof of secondary meaning, *see Perfect Fit Indus. v. Acme*

*Quilting Co.,* 618 F.2d 950, 952 (2d Cir.1980), the requirement of non-functionality remains. *See Morex S.P.A. v. Design Institute Am ., Inc.,* 779 F.2d 799, 801 (2d Cir.1985).

**\*2** Neutrik alleges that the shells feature the following common design elements: (1) black color; (2) rectangular base; (3) raised outer circular rim; (4) placement of lettering that designates the manufacturer on the bottom end of the rectangular base; (5) small triangular impression on the top of the base that points downward; and (6) rounded corners on the rectangular base.

In order to protect unregistered trade dress that consists of a product's design, as opposed to its packaging, a plaintiff must as a threshold matter show: (1) that the design is non-functional,[FN3] *see* 15 U.S.C. § 1125(a)(3), and (2) that secondary meaning is present. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 216, 120 S.Ct. 1339, 1346 (2000). Determinations of functionality and secondary meaning typically entail a rigorous evidentiary analysis. In addition to these preliminary requirements, a plaintiff must also demonstrate a likelihood of consumer confusion between the two products. *See Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1005 (2d Cir.1995).

> FN3. The 1999 amendments to the Lanham Act place the burden on the plaintiff to establish the non-functionality of an unregistered trade dress, *see Best Cellars Inc. v. Grape Finds at Dupont, Inc.,* 90 F.Supp.2d 431, 451 n. 10 (S.D.N.Y.2000), although the Second Circuit previously placed that burden on the defendant, *see LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 75 (2d Cir.1985).

The test of functionality is whether a product feature "is essential to the use or purpose of the article or [ ] affects the cost or quality of the article." *Id.* at 1006 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10 (1982))."[T]he case for protection weakens the more clearly the arrangement of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 286722 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

allegedly distinctive features serves the purpose of the product ..."*Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 80 (2d Cir.1990) (quoting *Stormy Clime,* 809 F.2d at 977). Functional trade dress receives no protection because to find otherwise would effectively grant a monopoly over the product design to the original manufacturer. *See Fun-Damental Too, Ltd. v. Gemmy Indus.,* 111 F.3d 993, 1002 (2d Cir.1997). Thus, one factor in establishing the non-functionality of a trade dress is a demonstration that feasible, or cost-effective, alternatives to the design exist. *See Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 977 (2d Cir.1987).

Neutrik's evidence of non-functionality consists of its own conclusory statements; it submits no evidence that the outer shells of sockets made for use with its plug can be designed in a different style in a cost-effective manner. The only alternative that Neutrik suggests to its design is that the raised circular rim need not be raised, and that its outer portion need not be circular. However, Switchcraft submits evidence that the rim is raised in order to ensure that it is flush with the equipment panel when the socket is rear-mounted,[FN4] and that the circular shape is necessitated by the fact that the original equipment manufacturer cuts round holes into the equipment panels. (Cooper Reply Decl. ¶ ¶ 22-26.) Switchcraft also submits evidence that the other elements of the design comprise either standard industry practice (black color and orientation triangle indicating where to insert the plug) or are dictated by the design of the audio equipment or the plug. (Cooper Reply Decl.) For example, the rectangular size of the base allows for several sockets to be placed in close proximity in horizontal rows on the equipment panel as provided by the original manufacturer, and replacement parts must of necessity be the same shape.[FN5](Cooper Reply Decl. ¶¶ 11-15.) Thus, Neutrik has not only failed to carry its burden of showing feasible alternatives, but it has failed to rebut Switchcraft's evidence of functionality.

FN4. While Neutrik argues that it is not functionally necessary that the socket be flush with the panel wall, were it not so,

consumers might conclude that the socket does not fit properly. The appearance of properly conjoined component parts, although not technically necessary to proper functioning, can nevertheless be crucial to consumer confidence in the product.

FN5. The only obviously ornamental aspect of the design is the placement of the manufacturer's name on the bottom end of the rectangular base. Although the name could conceivably be put on the side of the socket, this feature alone is of relatively minor importance in relation to the overall design, particularly where the name specifically identifies Switchcraft's socket as its own.

*3 Similarly, Neutrik's evidence of secondary meaning is lacking. In order to establish secondary meaning, Neutrik must show that "the primary significance of [the product's features] is to identify the source of the product rather than the product itself."*Mana Prods ., Inc. v. Columbia Cosmetics Mfg.,* 65 F.3d 1063, 1070 (2d Cir.1995) (quoting *Inwood,* 456 U.S. at 851 n. 11, 102 S.Ct. at 2187 n. 11). Factors to be considered are: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."*Centaur Communications, Ltd v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1222 (2d Cir.1987).

As proof of secondary meaning, Neutrik points to its sales volume of $2 million in 1999, its advertising budget of $500,000 in the past ten years, and an article appearing in Gig magazine.[FN6]While evidence of sales volume and advertising are factors in finding secondary meaning, they are alone insufficient without some additional showing of consumer recognition, such as surveys or affidavits from consumers. *See Mana,* 65 F.3d at 1071;*Mattel, Inc. v. Azrak-Hamway Int'l,* 724 F.2d 357, 361 n. 2 (2d Cir.1983); *Black & Decker Corp. v. Dunsford,* 944 F.Supp. 220, 226-28 (S.D.N.Y.1996). This is particularly important here, where the sockets

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 286722 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

appear to be standard audio equipment gadgets with no outwardly distinctive features. There is no evidence on this record that consumers purchase Neutrik's sockets because they recognize them to be manufactured by Neutrik, rather than for the simple reason that they work with Neutrik's plug.

> FN6. The magazine article actually focuses on Neutrik's plug, rather than on its socket. (*See* Ballerini Decl. Ex. T.)

Because Neutrik has failed to raise a question of fact as to whether its socket design is non-functional or has acquired secondary meaning, it is unnecessary to examine likelihood of confusion, and Switchcraft's motion for summary judgment on the trade dress claims is granted.

### C. Trademark Infringement and Unfair Competition

Neutrik also brings federal and state claims for trademark infringement and unfair competition based on Switchcraft's advertisements for its HPC sockets, which proclaim the sockets' compatibility with Neutrik's plugs. *See* 15 U.S.C. §§ 1114(1), 1125(a). Neutrik claims that the advertisements suggest that Neutrik sponsors or is affiliated with the Switchcraft socket, and thus confuse consumers about the source of the HPC product.

Advertisers are permitted to mention another's trademark for the purpose of describing an aspect of their own product or to indicate that their product is a legitimate copy of another's. *See* 15 U.S .C. § 1115(b)(4); *Mattel,* 724 F.2d at 361. Such use constitutes a "fair use" so long as it is truthful and does not confuse consumers about the source of the advertiser's product. *See Car-Freshener Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 269-70 (2d Cir.1995); *Weight Watchers Int'l v. Stouffer Corp.,* 744 F.Supp. 1259, 1277 (S.D.N.Y.1990); *Cumberland Packing Corp. v. Monsanto Co.,* 32 F.Supp.2d 561, 580-81 (E.D.N.Y.1999). Indeed, claiming that one's product is compatible with or a substitution for another's product is a common

method of advertisement that encourages competition.

**\*4** The advertisements submitted in support of Neutrik's claims consist of a Product Bulletin and a Letter Notice to distributors. The Product Bulletin states that the HPC connector is "[c]ompletely compatible with Neutrik® SpeakOn® cable connectors,""[m]ates with Neutrik® SpeakOn® cord plugs," and "[r]etrofits Neutrik's® SpeakOn® Panel Connector."(Ballerini Decl. Ex. P.) The Letter Notice, dated November 5, 1998, states that the HPC connectors are a "direct replacement to the Neutrik® SpeakOn® connector series," that the connector "[m]ates with SpeakOn® NL4FC and NL4FC-8 cord plugs," and that the connector was " [r]ated at 20A when mated with SpeakOn® cord plugs."(Ballerini Decl. Ex. Q.)

These publications do not reasonably suggest that Neutrik is affiliated with Switchcraft's HPC socket. On the contrary, Switchcraft has been very careful *not* to confuse consumers about the source of the competing products. First, the ads appear in Switchcraft publications that advertise Switchcraft products. Second, the ads very plainly state that the Switchcraft socket is made to work *with* the Neutrik products, thus differentiating the sources of the two products. Third, the Product Bulletin always precedes any mention of "SPEAKON®)" with the name "Neutrik®." Fourth, the Letter Notice, which was sent only to distributors, notes that an upcoming cord plug will mate "with both our panel mount and Neutrik®'s" and alerts the reader that although Neutrik is claiming that the HPC connectors infringe on Neutrik's patent, Switchcraft will "vigorously" defend against such claims. On the whole, these publications are highly unlikely to lead a reader to conclude that Neutrik manufactures the Switchcraft product or is otherwise associated with its HPC connector series. Because Neutrik submits no other evidence of a likelihood of confusion about the source of the HPC socket, it has failed to raise a material question of fact on this claim and Switchcraft's motion for summary judgment is granted.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2001 WL 286722 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

### D. Motion for Further Discovery

Finally, Neutrik has filed a cross-motion seeking a continuance in order to obtain additional discovery, which would include several depositions of Switchcraft personnel and responses to its outstanding document requests.Rule 56(f) of the Federal Rules of Civil Procedure provides that:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In order to justify additional discovery, a party must demonstrate how the information sought will raise a genuine issue of material fact. *See Sage Realty Corp. v. Insurance Co.,* 34 F.3d 124, 128 (2d Cir.1994).

**\*5** Resolution of Neutrik's patent and trademark infringement claims requires examination of materials already in evidence, and therefore requests relating to these claims will not produce any information relevant to the decision here. For example, analysis of the literal claim language, the sockets themselves, and the '749's prosecution history is dispositive of Neutrik's patent claims. It is evident that Switchcraft designed around Neutrik's patent, and therefore evidence of intentional copying of Neutrik's socket or the designer's views on how closely the Switchcraft socket resembles the Kissling patent will add little to the analysis.

Neutrik also seeks information about the design of Switchcraft's socket shell, for example, the extent to which it was based on functional considerations or was intentionally copied. However, Neutrik has failed to meet its own burden of demonstrating the non-functionality and secondary meaning *of its own product,* information that is readily available to it. While evidence of intentional copying by Switchcraft might increase the likelihood that secondary meaning exists, absent evidence of non-functionality and additional evidence of

secondary meaning, Neutrik would remain unable to raise an issue of fact on its trade dress claims.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion for a declaration of non-infringement of Plaintiff's patent and for summary judgment on Plaintiff's federal and state trademark claims is granted, and Plaintiff's cross-motion to obtain further discovery is denied.

SO ORDERED.

S.D.N.Y.,2001.
Neutrik AG v. Switchcraft, Inc.
Not Reported in F.Supp.2d, 2001 WL 286722 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

Not Reported in F.Supp.2d                                                Page 1

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

**H**
Pfizer, Inc. v. Y2K Shipping & Trading, Inc.
E.D.N.Y.,2004.

United States District Court,E.D. New York.
PFIZER, INC., Plaintiff,
v.
Y2K SHIPPING & TRADING, INC. and Rajkumar
Jaisinghani Defendants.
**No. 00 CV 5304(SJ).**

March 26, 2004.

Hale and Dorr LLP, New York, NY, By: Nels T.
Lippert, Dyan Finguerra-DuCharme, for Plaintiff.
Adiel Bassrey, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

JOHNSON, Senior J.
   *1 Pfizer, Inc. ("Plaintiff") brings this action
against Y2K Shipping & Trading, Inc. and
Rajkumar Jaisinghani ("Jaisinghani") (collectively, "
Defendants"), alleging infringement of its registered
VIAGRA trademark and unfair competition in
violation of the Lanham Trademark Act ("Lanham
Act"), 15 U.S.C. §§ 1051-1127, and of trademark
infringement, unfair competition, injury to business
reputation, dilution and unfair trade practices under
New York state law. Presently before the Court are
Plaintiff's motions for summary judgment pursuant
to Rule 56(c) of the Federal Rules of Civil
Procedure and for sanctions against Defendants'
attorney pursuant to Rules. 11 and 56(g) of the
Federal Rules of Civil Procedure. For the reasons
stated herein, Plaintiff's motions are granted and a
permanent injunction is issued against Defendants.
A final determination with respect to Plaintiff's
claims to monetary relief will be deferred until the
Court receives written submissions from the parties
with respect to damages, profits, attorney's fees, and
costs.

BACKGROUND [FN1]

   FN1. The facts discussed herein are
   admitted unless otherwise stated.

   Plaintiff, one of the world's leading
pharmaceutical companies, develops and markets
drugs which are sold under Pfizer brand names.
(Affidavit of Janice Lipsky, September 15, 2000 ["
Lipsky Aff. I"] ¶ 4.) It owns Trademark
Registration Number 2,162,548 for its brand of
sildenafil citrate known as VIAGRA. (Id.¶ 8, Ex.
3.) Plaintiff has made substantial investments in
advertising and promoting the VIAGRA product
within the United States and abroad. (Id.¶¶ 7,
9-10, Ex. 2.)

   In 1998, Pfizer introduced VIAGRA, the first
oral therapy approved by the Food and Drug
Administration ("FDA") for erectile dysfunction.
(Plaintiff's Statement of Uncontroverted Facts ["
Pl.'s Statement"] ¶ 3.) On June 2, 1998, the Patent
and Trademark Office registered the VIAGRA
trademark on the Principal Register. (Id. ¶ 5 .)
Since it was first introduced in 1998, VIAGRA has
received extensive media coverage. (Id.¶¶
6-7.)Pfizer has spent millions of dollars in
advertising, promoting, and maintaining a website
that offers information about VIAGRA. (Id.¶ 8,
12-13.)VIAGRA has generated millions of dollars
in sales revenue since its introduction. (Id.¶ 10.)

   In 1999, Defendant Jaisinghani created the
TRIAGRA mark and formed the corporation Y2K
Shipping and Trading to market the TRIAGRA
product. (Id.¶ 19.)Defendant Jaisinghani was
influenced by the VIAGRA trademark when he
created the mark TRIAGRA, and was well-aware of
the notoriety associated with the VIAGRA mark.
(Id. ¶¶ 18; 20.) [FN2]Defendants began using the
TRIAGRA mark in commerce in 2000, when they
began to sell, promote, and advertise TRIAGRA as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
**(Cite as: Not Reported in F.Supp.2d)**

an effective treatment for erectile dysfunction in national newspapers, magazines, on the radio and on their website. (Id.¶¶ 21-24.)Defendants' promotional materials stated that TRIAGRA was composed of "herbs for erectile dysfunction," and claimed "clinically proven efficacy" and a 100 percent success rate. (Id.¶¶ 25-27.)Representations in the product literature and advertisements suggested that TRIAGRA was FDA approved.(Id.¶ 30.)Defendants' total sales of TRIAGRA amounted to $57,485.11.(Id.¶ 33.)

> FN2. In an Affidavit, Defendant Jaisinghani stated that "[w]hen choosing a name for my herbal capsule, I was thinking about the group of users ... of Viagra and the name came to me as 'TRY HERBAL,' then I said, 'TRY AGRARIAN' or ' AGRICULTURAL: TRYAGRI or ' TRYAGRAN.' Then some of the group who were with me made it 'TRIAGRA .' It was coincidental and in good faith."(Aff. Rajkumar Jaisinghani, Sept. 28, 2000 [" Jaisinghani Aff. I"] ¶ 4.) On July 18, 2002, Defendants filed a response to Plaintiff's motion for summary judgment claiming that "[s]ince the building of the Taj Mahal in Agra in 1641 ... the saying in India was 'come visit Agra' and see the biggest erections ever made by man for a woman. After the appearance of Viagra, Indian humor made the above saying come VIA-AGRA etc."("Defs.' Answer to Pl.'s Mtn. for Summ. Judg. & Defs.' Counter-Mtn. to Vacate the Prelim. Inj. and to Grant Defs. Dmgs. for Interruption of Defs.' Sales" ["Defs.' Opp. to Sum. Judg ."] at 16.) On February 13, 2004, Defendants submitted a Motion to Dismiss, which this Court denied on February 27, 2004, claiming that they "coined the word TRIAGRA after the Indian city AGRA where the ayurvedic formula originated. The impact of the Triagra name on the strength of the Viagra was almost zero." (Def.'s Mtn. to Dismiss at 1.)

Local Civil Rule 56.1 provides, in relevant part:
(a) Upon any motion for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

(b) The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

(c) All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

(d) Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

While Plaintiff has served a properly supported statement of material facts as required by Rule 56.1(a), Defendants did not submit a statement of disputed material facts pursuant to Local Rule 56.1(b) with their Opposition to Plaintiff's Summary Judgment Motion.

A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules, and may opt to " conduct an assiduous review of the record" where one of the parties has failed to file a Rule 56.1 Statement. *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001). This Court chooses not to exercise this discretion. Plaintiff's Rule 56.1 Statement is amply supported by evidence in the record that would be admissible under Fed. R. Civ. Proc. Rule 56(e), as required by Local Rule 56.1(d). Thus, Plaintiff's statement of material facts has not been properly controverted and is deemed admitted. Local Rule 56.1(c); *see Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998); *Dusanenko v. Maloney,* 726 F.2d 82, 84 (2d Cir.1984) (citing former Local Rule 3(g)). Defendants' dubious and contradictory assertions as to the origins of the " TRIAGRA" mark, set forth in their Opposition to Plaintiff's Summary Judgment Motion and their Motion to Dismiss, are hereby disregarded.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
**(Cite as: Not Reported in F.Supp.2d)**

**\*2** On September 1, 2000, Plaintiff filed this lawsuit against Defendants, alleging seven causes of action: trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114; unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); violations of §§ 349 and 360-1 of the New York General Business Law; and unfair competition and trademark infringement at common law.[FN3]On September 5, 2000, the Court issued a Temporary Retraining Order enjoining Defendants from selling and promoting any product under the TRIAGRA name. On June 13, 2001, the Court issued a Preliminary Injunction against Defendants. On July 18, 2002, Plaintiff filed a motion for summary judgment on all of its claims,[FN4] and on September 10, 2002, Plaintiff filed a motion for sanctions against Defendants.

> FN3. Subject matter jurisdiction over the federal claims is proper under 15 U.S.C. § 1121(a) and 1125(a), and 28 U.S.C. §§ 1331 and 1338(a). The state causes of action are properly before the court under 28 U.S.C. §§ 1338(b) and 1367(a), and the doctrine of pendent jurisdiction. Venue is proper pursuant to 28 U.S.C. § 1391(b).

> FN4. Plaintiff's original complaint listed a claim for federal dilution under § 43 of the Lanham Act, 15 U.S.C. § 1125. Plaintiff withdrew that claim from its summary judgment motion in light of *Moseley v. V. Secret Catalogue,* 537 U.S. 418 (2003). (See Pl.'s Feb. 9, 2004 Letter.)

### DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and answers on file, together with affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The Court need only determine if there is a genuine issue to be tried, rather than resolve disputed issues

of fact. See*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See*Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). The court must view all facts, inferences and ambiguities in the light most favorable to the non-movant. See*Matsushita Elec. Indus. Co. v.. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)."If reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate.*Anderson,* 477 U.S. at 250.

Once the moving party meets its burden, the non-movant must respond with "significantly probative" supporting evidence demonstrating a material dispute of fact. *Id.* at 249.Summary judgment should be granted where the non-movant's evidence is merely colorable, conclusory, speculative, or not significantly probative. *See Parker v. Chrysler Corp.,* 929 F.Supp. 162, 165 (S.D.N.Y.1996).

### I. Federal Trademark Infringement and Unfair Competition

The Lanham Act was enacted to provide " national protection of trademarks in order to secure to the owner of the mark the good will of his business and to protect the ability of consumers to distinguish among competing producers."*Park 'N Fly. Inc. v. Dollar Park and Fly,* 469 U.S. 189, 198 (1985).

Counts One and Two of the Complaint allege that Defendants' use of the TRIAGRA mark constitutes infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114, and unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). To prevail on its trademark infringement and unfair competition claims, Plaintiff must prove (1) that it owns a protectable trademark, and (2) there is a likelihood of consumer confusion. *Time. Inc. v. Petersen Publ'g Co., L.L.C.,* 173 F.3d 113, 117 (2d Cir.1999) (citations omitted). The undisputed evidence shows that Plaintiff owns a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

Page 4

protectable trademark as a matter of law. Plaintiff's ownership of a registered mark is *prima facie* evidence of the mark's validity, and of Plaintiff's exclusive right to use the mark in commerce in connection with the goods identified in the certificate of registration. 15 U.S.C. §§ 1057(b) (1997), 1115(a) (1998).

*3 Plaintiff also satisfies the likelihood of consumer confusion prong for its trademark infringement and consumer confusion claims. To determine whether a likelihood of confusion exists, a court must determine whether an "ordinarily prudent purchaser" in the marketplace is likely to be confused as to the origin or sponsorship of the goods. *Lois Sportswear, USA, Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986). The inquiry into likelihood of confusion is guided by the following factors: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the owner will bridge the gap; (5) evidence of actual confusion; (6) defendant's good faith in adopting the mark; (7) the quality of defendant's product; and (8) the sophistication of the consumers. *SeePolaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961). The first three factors are considered the most important; however, no one factor is determinative and the list is not exhaustive. *SeeMobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 256-58 (2d Cir.1987)."Summary judgment is appropriate where the undisputed evidence would lead only to one conclusion under the Polaroid test."*The Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 960 (2d Cir.1996).

*Strength of Plaintiff's Mark*

"The strength of the mark refers to its distinctiveness, or its tendency to identify the goods as emanating from a particular source, even when the source is unknown to the consumer."*Tri-Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 354 (S.D.N.Y.1998). Four categories of marks are used to gauge the extent to which a mark deserves protection. A generic mark, which includes "the

common distinctive name of an article or substance, "15 U.S.C. § 1064(c), is never entitled to trademark protection. A descriptive mark, which describes a product's qualities, ingredients or characteristics, is entitled to protection only upon proof that it has acquired "secondary meaning"-and identity that consumers associate with a single source of goods or services. *Gruner + Jahr,* 991 F.2d 1072, 1076 (2d Cir.1993). Suggestive marks "suggest ... the product, though it may take imagination to grasp the nature of the product," and are eligible for protection without proof of secondary meaning. *Id.* Finally, arbitrary or fanciful marks "will almost always be seen as strong marks,"*Sports Auth.,* 89 F.3d at 961, and "bear little or no relationship to the kind of product represented."*Gruner,* 991 F.2d at 1075.[FN5]They are protectable without proof of secondary meaning and "with ease of establishing infringement." *W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993) (quotation omitted).

FN5."An arbitrary term is one that has a dictionary meaning-though not describing the product-like IVORY for soap. A fanciful mark is a name that is made-up to identify the trademark owner's product like EXXON for oil products and KODAK for photography products."*Id.* at 1075-76 (citing J. Thomas McCarthy, *Trademarks and Unfair Competition,* §§ 11:2, 11:3, 11:4A (2d ed.1984)).

This Court may consider the incontestability of Plaintiff's trademark as an indicator of its strength. *SeeGruner,* 991 F .2d at 1078. Plaintiff has widely used the VIAGRA mark in commerce to sell its drug, and the mark has received extensive national and international media coverage, even prior to receiving FDA approval in 1998. "VIAGRA" is not a generic name for a drug for erectile dysfunction, nor does it describe or suggest such a drug. Although Defendants contest that the term is fanciful, their assertions are unsupported, and Defendants have not submitted a "Rule 56.1 Statement" to controvert Plaintiff's assertion that the term VIAGRA is fanciful. Accordingly, the uncontroverted evidence establishes that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

VIAGRA mark is strong and is therefore entitled to the greatest degree of protection under the Lanham Act.

*Similarity*

*4 To determine the similarity between two marks, courts analyze the similarity in pronunciation and appearance of each and the manner in which they are presented to consumers. See *Am. Auto. Ass'n v. AAA Auto. Club of Queens, Inc.,* No. 97 CV 1180 SJ, 1999 WL 97918, at *5 (E.D.N.Y. Feb. 8, 1999); *Consol. Cigar Corp. v. Monte Cristi de Tabacos,* 58 F.Supp.2d 188, 198 (S.D.N.Y.1999)."The question is not merely how many points of similarity the marks share, but whether they create the same general overall impression."*Id.*;*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1046 (2d Cir.1992). Even if the marks contain a slight distinction-a difference between one or two letters, for example-consumers will likely believe that the products emanate from the same source or are somehow affiliated. *Consol. Cigar,* 58 F.Supp.2d at 198.

The two marks at issue in this case, VIAGRA and TRIAGRA, are quite similar. The two terms differ only in the substitution of "TR" for the "V" in VIAGRA. Both marks feature the sounds "I" and " AGRA." Visually, the dominant features in both marks are the "I-A-G-R-A" letters. Consumers have come to identify the name VIAGRA with Plaintiff's brand of sildenafil citrate. The similarity in sound and spelling of 'TRIAGRA" is likely to lead consumers to believe that Defendants' product is affiliated with that of Plaintiff. See *Lois Sportswear, USA, Inc. v. Levi Strauss & Co .,* 799 F.2d 867, 873-74 (2d Cir.1986); *Consol. Cigar,* 58 F.Supp.2d at 198.

*Proximity of the Products and Bridging the Gap*

Under the proximity factor, the Court must consider whether the products compete with each other. " 'To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion.'Thus the court may consider whether the products differ in content, geographic distribution, market position, and audience appeal."*W.W.W. Pharm.,* 984 F.2d at 573 (citations omitted); *Am. Auto. Ass'n,* 1999 WL 97918, at *6. However, Plaintiff need not prove that the parties' marks are in direct competition in order to establish likelihood of confusion. See *Mobil Oil,* 812 F.2d at 257;*Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 689 F.2d 1127, 1134 (2d Cir.1982) (finding that a court must determine likelihood of confusion "as to the source of the products, rather than as to the products themselves") (citation omitted). In addition, "competitive proximity must be measured with reference to the first two *Polaroid* factors."*Mobil Oil,* 812 F.2d at 258.

Defendants used the phrase "erectile dysfunction" in their advertisements and promotional materials in order to compete directly with the strong mark VIAGRA. Here, as in *Mobil Oil,* Plaintiff's "ubiquitous presence throughout the .. . industry ... increases the likelihood that a consumer will confuse" the sources of the products offered. The identical therapeutic claim of Defendants' and Plaintiff's products demonstrates that the products are closely related. Furthermore, TRIAGRA and VIAGRA also overlap in geographic distribution area, as both products are advertised, distributed, and used in the United States. (Defs.' Opp. to Sum. Judg. at 3-5.) Defendants thus fail to offer adequate evidence to support a finding that the parties' services are not in close proximity.

*5 The Court must also consider "the likelihood ... or the average customer's perception of the likelihood" that Plaintiff will 'bridge the gap' by entering the Defendant's market." *Sports Auth .,* 89 F.3d at 963;*Tri-Star,* 14 F.Supp.2d at 356. Defendants argue that the markets are different because Defendants offer an herbal formulation, whereas Plaintiff offers a chemical formulation. As discussed above, however, the evidence demonstrates that Plaintiff and Defendants compete in the same market and target the same consumers,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

since both parties offer products that purportedly treat erectile dysfunction in men. Where the products are competitive, "there is no gap to bridge and the likelihood of confusion is greater."*Id.;see also Am. Auto. Ass'n,* 1999 WL 97918, at \*6. In the absence of any other evidence establishing a difference in the parties' intended markets, the Court finds that both the third and fourth factors weigh in Plaintiff's favor.

### Junior User's Bad Faith

The Court also considers "whether the defendant adopted the mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product ."*Sports Auth.,* 89 F.3d at 964. Good faith may be found where the defendant "has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel."*W.W.W. Pharm.,* 984 F.2d at 575. Bad faith, on the other hand, is established where there is evidence of actual knowledge of the senior user's mark and the marks are so similar "that it seems clear that deliberate copying has occurred." *Paddington Corp. v. Attiki Imps. & Distrib., Inc.,* 996 F.2d 577, 586 (2d Cir.1993); *Am. Auto. Ass'n,* 1999 WL 97918, at \*7. Once the plaintiff shows awareness and similarity, the burden shifts to the defendant to show that adoption of the junior mark was done in good faith. *Id.*

Not only is Defendant's mark confusingly similar to that of Plaintiff, but its chosen name mirrors that of Plaintiff's product in both spelling and sound. Defendant Jaisinghani admitted that he was aware of the notoriety associated with VIAGRA before he created TRIAGRA. (Jaisinghani Aff. ¶ 4.) Indeed, the idea that Jaisinghani would have chosen the name "TRIAGRA" for a product purported to treat erectile dysfunction if VIAGRA did not exist is implausible.

Defendants fail to rebut the presumption of bad faith through a showing of good faith. The TRIAGRA mark does not reflect the product's characteristics, and Defendants produced no

evidence of a trademark search report or an opinion of counsel. Thus, the uncontroverted evidence supports the finding that Defendant acted with the intent to capitalize on the reputation of Plaintiff's mark.

### Actual Confusion

Evidence of actual confusion, while not necessary to demonstrate a likelihood of confusion for the purpose of obtaining injunctive relief, is a prerequisite to the recovery of damages. *SeeAm. Auto. Ass'n,* 1999 WL 97918, at \*7 (citing *Arrow Fastener Co.,* 59 F.3d 384, 397 (2d Cir.1995)). Because "actual consumer confusion is not easily established through direct evidence or even through use of consumer surveys or market research," the court may draw a "powerful inference" of actual confusion from the fact that Defendants intentionally engaged in a deceptive commercial practice. *Id.;see also Resource Dev., Inc. v. Statue of Liberty-Ellis Island Found., Inc.,* 926 F.2d 134, 140 (2d Cir.1991); *Getty Petroleum Corp. v. Island Transp. Corp.,* 878 F.2d 650, 656 (2d Cir.1989); *PPX Enters., Inc. v. Audiofidelity Enters ., Inc.,* 818 F.2d 266, 272-73 (2d Cir.1987). A deceptive commercial practice can be inferred from a competitor's expenditure of "substantial funds in an effort to deceive customers and influence their purchasing decisions."*Resource Dev., Inc.,* 926 F.2d at 140. Upon a proper showing that a defendant has engaged in deliberate conduct of an " egregious nature," the burden shifts to that defendant to demonstrate the absence of consumer confusion. *Id.;Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 298 (2d Cir.1992).

\*6 This Court finds that Plaintiff has adequately demonstrated that Defendants have engaged in deliberate conduct of an egregious nature, and that Defendants have failed to satisfy their burden of demonstrating an absence of consumer confusion. Although Defendants' advertisements and promotional materials presented TRIAGRA as an herbal remedy for erectile dysfunction, they failed to sufficiently contrast their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

product with VIAGRA. In fact, Plaintiff's evidence demonstrates that Defendants set out to intentionally deceive purchasers by representing, through the purportedly similar nature of TRIAGRA and VIAGRA, that their product was affiliated with Plaintiff and its VIAGRA product. Furthermore, Defendants submitted no evidence that they conducted well-founded tests and scientific analyses of their product, or that they conducted a comprehensive consumer survey that might have satisfied their burden of demonstrating lack of actual consumer confusion.[FN6]*See L & F Prods., A Div. of Sterling Winthrop, Inc. v. Proctor & Gamble Co., 845 F.Supp. 984, 1003 (S.D.N.Y.1994).

> FN6. Defendants misrepresent the affidavit submitted by Arthur A. Silverstein (" Silverstein"), Senior Corporate Trademark Counsel for Plaintiff, in which he states that "Pfizer has no record of any customer complaints relating to confusion between the VIAGRA® mark and TRIAGRA mark. "(Defs.' Opp. to Sum. Judg. at 2.) Silverstein's affidavit is not an admission that confusion is unlikely; rather, it simply states that Plaintiff received no consumer complaints of confusion between the VIAGRA and TRIAGRA marks. As Plaintiff highlights, this statement is hardly surprising, since Defendants were enjoined by this Court from marketing TRIAGRA within months of its introduction. (Pl.'s Reply Mem. of L. ["Pl.'s Reply"] at 3.) Additionally, the affidavits of Min Chien Chang, Mike Carmi, and Edward J. Silvestry, Jr.-even if deemed admissible or accorded significant evidentiary weight-are insufficient to overcome Defendants' burden to demonstrate the absence of consumer confusion. (See Defs.' Opp. to Sum. Judg. at 3-5.) This Court finds Chang's affidavit to be inadmissible under Kuhmo Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999); Carmi's and Silvestri's affidavits are accorded little evidentiary weight, since both were familiar with VIAGRA before taking TRIAGRA.

*Quality of Defendants' Product*

The Court must consider whether the senior user's reputation could be jeopardized or tarnished by virtue of the fact that the junior user's product is of inferior quality. See *Arrow,* 59 F.3d at 398; *Am. Auto. Ass'n,* 1999 WL 97918, at *8; *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.,* 964 F.Supp. 733, 748 (S.D.N.Y.1997). Even if the junior user's product is of high quality, a senior user may sue to protect its reputation. *Mobil Oil,* 818 F.2d at 259-60.

In this case, the unknown quality and effectiveness of Defendants' product could jeopardize VIAGRA's reputation. Defendants promote TRIAGRA as having "clinically proven efficacy," and they advertise their product as FDA-approved. (Jaisinghani Dep. I, Ex. 5.) However, Defendants submitted no evidence to support these claims. The evidence supports this Court's finding at the preliminary injunction stage: " confusion will likely result in the denial of effective medical treatment to many people suffering from erectile dysfunction and cause irreparable harm to Pfizer's reputation."(Prelim. Inj. Tr. at 4:3-6.) Because the quality and efficacy of TRIAGRA are unknown, Plaintiff's reputation as a well-known pharmaceutical company and the VIAGRA mark are jeopardized by consumers' potential association of VIAGRA with TRIAGRA.

*Sophistication of Customers*

In determining whether there is a likelihood of confusion, courts consider "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods ." *W.W.W. Pharm. Co.,* 984 F.2d at 575. In this case, the purchasers of both TRIAGRA and VIAGRA are presumably men suffering from erectile dysfunction. However, there is a significant difference between the two products: whereas VIAGRA is only available by a doctor's prescription, TRIAGRA requires no prescription and is sold over the internet directly by Defendants.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

*7 The Court estimates that physicians have sufficient expertise to differentiate between the two products. Therefore, because an individual can acquire VIAGRA only through a doctor's prescription, the "ordinary purchaser" standard does not apply to an analysis of VIAGRA purchasers' sophistication. *See Am. Auto. Ass'n,* 1999 WL 97918, at *8. On the other hand, the "ordinary purchaser" standard would apply to an analysis of the sophistication of TRIAGRA purchasers, since they may lack expertise in the medical field and are likely to rely on a mark indicating a reliable source, instead of conducting background research. Thus, the Court finds that this factor weighs partially in favor of Plaintiff.

*Combining the Factors*

Considering all of the *Polaroid* factors, as applied to the uncontroverted facts, the Court concludes that a reasonable trier of fact would find that there is a likelihood of confusion. Seven of the eight criteria weigh strongly in Plaintiff's favor, and this overwhelmingly supports Plaintiff's motion for summary judgment on its federal trademark infringement and unfair competition claims.

II. New York Common Law Trademark Infringement and Unfair Competition

The same analysis is used for common law trademark infringement and unfair competition cases as is used under federal law. *See Safeway Stores, Inc. v. Safeway Props., Inc.,* 307 F.2d 495, 498 n. 1 (2d Cir.1962); *McDonald's Corp. v. McBagels, Inc.,* 649 F.Supp. 1268, 1279-80 (S.D.N.Y.1986). Since Plaintiff has established infringement and unfair competition claims under the Lanham Act, it has necessarily also done so under common law. *See Baker v. Parris,* 777 F.Supp. 299, 304 (S.D.N.Y.1991); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir.1995).

III. False Advertising

Section 43(a) of the Lanham Act prohibits false or misleading representation of fact in commercial advertising that misrepresents "the nature, characteristics, qualities, or geographic origin of his or her or another person's goods."15 U.S.C. § 1125(a)(1)(B). To establish a false advertising claim under § 43(a), a plaintiff must show that "an advertisement is either literally false or that the advertisement, though literally true, is likely to mislead and confuse customers."*McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir.1991); *Nat'l Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 855 (2d Cir.1997). In addition to proving falsity, "the plaintiff must also show that the defendants misrepresented an ' inherent quality or characteristic' of the product." *Id.;S.C. Johnson & Son. Inc. v. Clorox Co.,* 241 F.3d 232, 238 (2d Cir.2001) (internal quotations and citations omitted).

To prove that an advertising claim is literally false, a plaintiff must show not only that the tests supporting the challenged claim are unpersuasive, but also that such tests are "not sufficiently reliable to permit one to conclude with reasonable certainty that they established" the claim made. *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb, Co.,* 938 F.2d 1544, 1549 (2d Cir.1991); *Procter & Gamble Co. v. Chesebrough-Pond's Inc.,* 747 F.2d 114, 119 (2d Cir.1984). Where the plaintiff shows the advertising claim to be literally false, "the court may enjoin the use of the claim 'without reference to the advertisement's impact on the buying public." ' *Alpo Petfoods, Inc. v. Ralston Purina Co.,* 720 F.Supp. 194, 213 (D.D.C.1989), *aff'd in part,rev'd in part on other grounds,*286 U.S.App. D.C. 192, 913 F.2d 958 (D.C.Cir.1990) (citations omitted). Additionally, the plaintiff must demonstrate that it will suffer irreparable harm absent the injunction. *S.C. Johnson,* 241 F.3d at 238.

*8 In this case, Plaintiff has demonstrated that Defendants' commercial advertisements and promotional materials contain literally false statements concerning an inherent quality or characteristic of their TRIAGRA product. Defendants admit that they have no evidence to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

support their representations in product literature and advertisements suggesting that TRIAGRA is FDA-approved. Additionally, Defendants' advertising and promotional materials contain other literally false misrepresentations. For instance, their product literature and website claim that TRIAGRA has passed clinical trials and has "clinically proven efficacy." (See Jaisinghani Dep. I, Ex. 5.) Yet the record is void of any evidence substantiating this claim.[FN7]In fact, Defendants responded to Plaintiff's request for all documents "concerning clinical trials involving Defendants' Triagra product or its efficacy in overcoming erectile difficulties" by stating that they "are not in possession of any responsive documents and are of the opinion that no such documents exist."(Finguerra Aff., Ex. I, J) Since Defendants admit that no tests or documents exist to support their claims, their statements are literally false as a matter of law. As such, Plaintiff is entitled to summary judgment on its false advertising claim.

> FN7. During Jaisinghani's deposition, Defendants contended that two unauthenticated "certificates" from a " licensing authority" in India supported their claims. (Jaisinghani Dep. II, Exs. 30, 31.) Neither document, however, substantiates Defendants' claim that "in a study conducted on 250 patients, TRIAGRA's success rate was 100 percent." (Jaisinghani Dep. I, Exs. 8, 14.) Neither document discusses any clinical studies, and Defendants acknowledge that Exhibits 30 and 31 are the only documents in their possession concerning clinical trials. (Jaisinghani Dep. II at 33:21 to 34:11.)

In opposition to Plaintiff's motion for summary judgment, Defendants conceded "that they exaggerated [in TRIAGRA advertisements], but this was done to built [sic] up confidence for therapeutic purposes ..." (Defs.' Opp. to Sum. Judg. at 16.) " Exaggerating" claims in commercial advertising, especially concerning clinical trials and product effectiveness, is prohibited by the Lanham Act. Defendants' statements do not constitute a valid defense of puffery, because they are not expressions of opinion, but rather specific statements of fact

upon which a consumer would rely. *See,e.g.,Ferrer v. Maychick,* 69 F.Supp.2d 495, 502 (S.D.N.Y.1999); *Radio Today, Inc. v. Westwood One, Inc.,* 684 F.Supp. 68, 74 (S.D.N.Y.1988).

IV. Dilution under N.Y. Gen. Bus. Laws §§ 349 & 360-1[FN8]

> FN8. Defendants contend that in light of *Moseley v. V. Secret Catalogue,* 537 U.S. 418 (2003), Plaintiff's motion for summary judgment on its federal and state law claims should be denied. (Defs .' Response to the Supp. Briefing by Pfizer Dated February 9, 2004 Following the U.S. Supreme Court's Moseley Decision of March 2003 ["Defs.' Response to Feb. 9 Letter"] at A); (Defs'. Mtn. to Dismiss at B); (Reply to Plaintiff's Response to " Motion to Dismiss .") The Supreme Court held in *Moseley* that a trademark holder must show actual dilution to prevail on a dilution claim under the Federal Trademark Dilution Act, 35 U.S.C. § 43(c).

As Plaintiffs indicate, summary judgment remains appropriate on Plaintiff's state dilution claim under N.Y. Gen. Bus. Law § 360-1 (McKinney 1996 & Supp.2004). (Pl.'s Feb. 9, 2004 Letter at 1.) Since the *Moseley* decision in March 2003, the majority of New York federal district courts reviewing N.Y. Gen. Bus. Law § 360-1 have ruled that *Moseley* has not changed the prevailing state test for dilution, which focuses on the " likelihood" of dilution rather than "actual" dilution. *See,e.g.,Katz v. Modiri,* 283 F.Supp.2d 883, 900 (S.D.N.Y.2003); *Mastercard Int'l Inc. v. Nader 2000 Primary Comm., Inc., et. al.,* 00 Civ. 6068(GBD), 2004 U.S. Dist. LEXIS 3644 (S.D.N.Y., March 8, 2004); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.,* 01 Civ. 11295, 2003 WL 21056809, at *13-14 (S.D.N.Y. May 8, 2003); *Brennan's Inc. v. Brennan's Rest., LLC,* 02 Civ. 9858(RLC), 2003 WL 1338681, at *6-7 (S.D.N.Y. March 18, 2003). This Court agrees with this analysis, and finds that, since Plaintiff has withdrawn its federal dilution claim from its motion for summary judgment, *Moseley* is irrelevant with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 10

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

respect to state claims at this juncture.

Plaintiff also brings a claim under New York's anti-dilution statute, Section 360-1 of the General Business Law, which provides that:
Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y.G.B.L. § 360-1 (McKinney 2003).

To establish a dilution claim under New York law, Plaintiff must establish: (1) ownership of a distinctive mark, and (2) likelihood of dilution. *See Hormel Foods Corp. v. Jim Henson Prods.,* 73 F.3d 497, 506 (2d Cir.1996); *Katz,* 283 F.Supp.2d at 900; *Mastercard,* 2004 U.S. Dist. LEXIS 3644. Likelihood of confusion is not necessary to prevail on a state law dilution claim. *Fed. Express Corp. v. Fed. Espresso, Inc.,* 201 F.3d 168, 175 (2d Cir.2000). This Court has already determined that the VIAGRA mark is distinctive. The Court must now decide whether there is a likelihood of dilution.

"Dilution under New York law can involve either blurring or tarnishment."*N.Y. Stock Exch. v. N.Y., N.Y. Hotel, LLC,* 293 F.3d 550, 557-58 (2d Cir.2002) (citations omitted). Here, Plaintiff asserts the likelihood of dilution by blurring. (Pl.'s Feb. 9, 2004 Letter at 2.) Blurring occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product."*Deere & Co. v. MTD Prod., Inc.,* 41 F.3d 39, 43 (2d Cir.1994) (emphasis omitted). The likelihood of blurring is generally assessed by a six-factor test: (1) similarity of the marks, (2) similarity of the products covered, (3) sophistication of the consumers, (4) predatory intent, (5) renown of the senior mark, and (6) renown of the junior mark. *Deere,* 41 F.3d at 43-44, n. 8;*accordSports Auth.,* 89 F.3d at 966.

*9 The Court has already discussed these six factors in relation to the federal trademark infringement and unfair competition claims. Based on the foregoing analysis, the Court finds that Defendants' TRIAGRA mark is likely to blur Plaintiff's famous VIAGRA mark, and that Plaintiff is therefore entitled to summary judgment on its state dilution claim.

V. Defendants' Affirmative Defenses

Defendants also raise the affirmative defenses of estoppel, the doctrine of laches and free speech under the First Amendment. (Defs.' Opp. to Sum. Judg. at 6.) However, Defendants make no arguments in support of these claims. Thus, the Court will not consider these claims.

VI. Entitlement to Equitable and Monetary Relief

A. Permanent Injunction

This Court denies Defendants' motion to vacate the preliminary injunction and denies Defendants' request for damages to compensate them for interruption of their sales for the same reasons that it grants summary judgment in Plaintiff's favor. (Defs.' Opp. to Sum. Judg. at 24.) Moreover, this Court finds that the uncontroverted material facts support the entry of a permanent injunction pursuant to 15 U.S.C. § 1116(a). Plaintiff will be irreparably harmed, and the reputation associated with its VIAGRA product will be irreparably damaged, if Defendants are allowed to market, promote, and sell a product under the TRIAGRA designation.

B. Relief Under the Lanham Act

1. Damages

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
**(Cite as: Not Reported in F.Supp.2d)**

Under Section 35(a) of the Lanham Act, a Plaintiff may be awarded damages to compensate for: "(1) lost sales or revenue; (2) sales at lower prices; (3) harm to market reputation; or (4) expenditures to prevent, correct, or mitigate consumer confusion."Restatement (Third) of Unfair Competition § 36(2) (2004); *Int'l Star Class Yacht Racing Ass'n (ISCYRA) v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 753 (2d Cir.1996). However, recovery of damages requires proof that some customers were actually confused or deceived, or " that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion."*Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.,* 145 F .3d 481, 46 U.S.P.Q.2d 1577 (2d Cir.1998); *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.,* 926 F.2d 134 (2d Cir.1991); *W.W.W.,* 984 F.2d at 567, n. 6;*ISCYRA,* 80 F.3d 749 .

The Court finds that Defendants' conduct fails to give rise to a presumption of actual confusion or deception, and that Defendants' actions were not sufficiently intentionally deceptive as to warrant compensatory damages.[FN9] Furthermore, Plaintiff has not proven actual confusion or deception through circumstantial evidence, and has failed to demonstrate that Defendants' actions are so intentionally deceptive as to give rise to a rebuttable presumption of consumer confusion.

> FN9.*Cf.Getty Petroleum Corp. v. Island Trans. Corp.,* 878 F .2d 650 (2d Cir.1989), in which the Second Circuit found that where defendant sold non-GETTY gasoline from pumps marked "GETTY," the product could not be meaningfully inspected by the consumer and the jury could use its common sense to determine that consumers "were certainly deceived by and unaware of the substitution."

**2. Profits**

Section 35(a) of the Lanham Act also provides for a plaintiff's recovery of defendant's profits. "

While damages directly measure the plaintiff's loss, *defendant's* profits measure the defendant's gain." *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1540 (2d Cir.) (emphasis in original), *cert. denied,*506 U.S. 991 (1992). Profits may be awarded in cases of trademark infringement or unfair competition: (1) as a measure of plaintiff's damages; (2) if the defendant has been unjustly enriched; or (3) if necessary to deter a willful infringer from doing so again. *Id.* at 1537.A finding of defendant's "willful deceptiveness is a prerequisite for awarding profits" under any of these three grounds. *George Basch Co.,* 968 F.2d at 1539-40;*seealsoISCYRA,* 80 F.3d at 753. The Court holds that an accounting of profits is warranted, based on the strong and uncontroverted evidence of Defendant's willful deception and the likelihood that Defendant benefitted from its association with the VIAGRA mark. *SeeAm. Auto. Ass'n,* 1999 WL 97918, at *10.

**\*10** Plaintiff mistakenly argues that it is entitled to $57,485.11, which represents the total amount of sales-not profits-for the TRIAGRA product. (Pl.'s Mtn. for Sum. Judg. at 22.; *see* Finguerra Aff. Ex. K.) Defendant, in a written submission, must now document all profits earned. 15 U.S.C. § 1117(a); *Monsanto Co. v. Haskel Trading, Inc.,* 13 F.Supp.2d 349, 362 (E.D.N.Y.1998). The Court refers this issue to the Magistrate for a calculation of Plaintiff's profits award.

**C. Relief Under Common Law**

**1. Punitive Damages**

Under New York law, a plaintiff may obtain punitive damages where the defendant's conduct constitutes " 'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree."*Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 371 (2d Cir.1988) (quoting *Borkowski v. Borkowski,* 355 N.E.2d 287, 287 (N.Y.1976)). Contributory infringement that is "done knowingly,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 12

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

intentionally and with a callous disregard for the rights of [a plaintiff] in its trademark" satisfies the standard for the requisite degree of moral culpability. *Getty,* 878 F.2d at 657.

Some New York cases, however, have stated that in certain circumstances there must be fraud aimed at the public before punitive damages may be awarded. *See,e.g.,James v. Powell,* 225 N.E.2d 741, 747 (N.Y.1967); *Walker v. Sheldon,* 179 N.E.2d 497, 488-99 (N.Y.1961).*ButseeBorkowski,* 355 N.E.2d at 287 (finding that fraud on public not always essential, so long as conduct at issue was sufficiently "gross, wanton, or willful or ... morally culpable"). Thus, Defendants may have committed a wrongful act but their conduct may not have been so "gross and wanton" as to bring it into the class of malfeasances for which punitive damages may be afforded. *James,* 225 N.E.2d at 747 .

The Court does not have sufficient information to make a determination with respect to Plaintiff's entitlement to punitive damages at this time. This issue is referred to the Magistrate (1) to determine whether Plaintiff is entitled to punitive damages, and (2) if so, to calculate the appropriate damage award.

2. Attorney's Fees and Costs

Plaintiff contends that attorney's fees and costs are also appropriate under New York law. (Pl.'s Mtn. for Sum. Judg. at 23.) If attorney's fees are awarded in connection with a New York punitive damage recovery, Plaintiff should receive fees reasonable for the time spent proving only its state law punitive damages claim. *SeeGetty Petroleum Corp. v. Island Transp. Corp.,* 862 F.2d 10, 17 (2d Cir.1988)."In determining the amount of time reasonably spent by [Plaintiff] to prove state law punitive damages, the Court may include that portion of time spent proving [Plaintiff's] federal law punitive damages claim that would have had to be spent proving its state law punitive damages claim, *i.e.,* the time saved in proving the state law claim because of the proof on the federal law claim."

*Id.*

**\*11** The Court does not have sufficient information to make a determination with respect to Plaintiff's entitlement to attorney's fees and costs at this time. This issue is referred to the Magistrate (1) to determine whether Plaintiff is entitled to attorney's fees and costs under New York law, and (2) if so, to calculate the appropriate fees and costs.

VIII. Plaintiff's Motion for Rule 11(c) sanctions

In a separate motion, Plaintiff contends that sanctions against Defendants are appropriate because Defendants' counsel submitted on two separate occasions the false affidavit of Ana-Maria Santi, M.D. ("Santi"), without making the required factual determination that would have disclosed that Santi was not a licensed physician. (Pl.'s Mem. of L. in Supp. of Pfizer's Mtn. for Sanctions ["Pl.'s Mtn. for Sanctions"], Sept. 10, 2002.) The Santi Affidavit, dated October 23, 2000, purports to describe certain observations of an operating room attending physician over a two year period. (Defs.' Opp. to Sum. Judg. at 15.) However, Santi's medical license was suspended for a portion of the two year period and revoked for the remainder of that period. Thus, Santi could not have been an attending physician in an operating room. (See Pl.'s Mtn. for Sanctions.)

Defendants responded to Plaintiff's motion by claiming that "[n]either the Defendants nor their attorneys knew about Dr. Santi's license suspension and her affidavit has been submitted in good faith." (Defs.' Comments on Pl.'s Mtn. of Sept. 10, 2002, ' An Answer' ["Defs.' Opp to Pl.'s Mtn. for Sanctions "], Oct. 23, 2002 at 1.) However, in a letter to the Court dated October 22, 2002, Defendants continued to rely on the Santi Affidavit. (Id. at 6.)

The Court hereby sanctions Defendants' counsel pursuant to Fed. R. Civ. Proc. 11(c) for submitting the Santi Affidavit. A basic inquiry into the status of Santi's license would have revealed that the facts alleged in her Affidavit were false.[FN10] Additionally, Defendants' counsel failed to take

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 13

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
(Cite as: Not Reported in F.Supp.2d)

advantage of the "safe harbor" provision of Rule 11(c)(1)(A) by withdrawing the Santi Affidavit after notification by Plaintiff that it was false. *See In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 (2d Cir.2003).[FN11]

> FN10.Rule 11(b) provides, in pertinent part, that:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,(3) the allegations and other factual contentions have evidentiary support ...

Additionally, the Model Rules of Professional Conduct provide that an attorney must not "offer evidence that the lawyer knows to be false."Model Rules of Prof'l Conduct R. 3.3(a)(4), *citedin Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 2002 WL 59434, at *6 (S.D.N.Y. Jan. 16, 2002). Regardless of whether or not Defendants' counsel actually knew that the Santi Affidavit was false, he violated his obligation under these rules to investigate the Affidavit's validity. *See Margo v. Weiss*, 213 F.3d 55, 64-65 (2d Cir.2000).

> FN11. Plaintiff also argues that Defendants' submission of the Santi Affidavit-which focuses on VIAGRA's safety-violated the Court's November 9, 2001 order, which decisively ruled that VIAGRA's "safety" is not an issue in this case. (Pfizer's Reply in Support of Mtn. for Sanctions Pursuant to Rule 11 and 56(g) of the Fed. R. Civ. Proc. ["Pl.'s Reply in Support of Sanctions"], Nov. 1, 2002 at 1; Ex. A at 4:9-13.) This is yet another example of Defendants' counsel's disregard for this Court and the Rules of Professional Conduct. This Court hereby strikes the Santi Affidavit as irrelevant to any claims pending in this action.

A Rule 11 sanction "shall be limited to what is sufficient to deter repetition of such conduct...." Fed.R.Civ.P. 11(c)(2). This Court finds that an adequate sanction for violation of Rule 11 consists of notification of the Disciplinary Committee of the New York State Bar Association of Defendants' counsel's misconduct.

## CONCLUSION

For the foregoing reasons, Plaintiff's motions for summary judgment and Rule 11 sanctions are GRANTED.

With respect to the permanent injunction, IT IS HEREBY ORDERED:

A. That Defendants and their agents, officers, employees, representatives, and all other persons acting in concert or in participation with any of them, and any licensees, successors or assigns be PERMANENTLY ENJOINED AND RESTRAINED from engaging in any of the following acts:

*12 (i) Using on or in connection with the production, manufacture, advertising, promotion, displaying for sale, offering for sale, sale, or distribution (all including on the Internet) of any article of merchandise, or for any purpose whatsoever, the VIAGRA mark, or any colorable imitation thereof, or any mark confusingly similar to or dilutive of the VIAGRA mark, including but not limited to the name TRIAGRA;

(ii) Representing by any means whatsoever, directly or indirectly, or doing any other acts or things calculated or likely to cause confusion, mistake, or to deceive purchasers into believing that any of Defendants' products originated with or are the products of Pfizer or that there is any affiliation or connection between Pfizer and its products and Defendants or their products, and from otherwise competing unfairly with Pfizer;

(iii) Making any false and misleading representations of material fact in advertising and promotional material;

(iv) Using any mark or designation in a manner so as to cause the dilution of the distinctive quality of the Pfizer VIAGRA trademark, including, but not limited to, by using the designation TRIAGRA;

(v) Applying for registration of any mark that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 14

Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592
**(Cite as: Not Reported in F.Supp.2d)**

incorporates the VIAGRA trademark owned by Pfizer, or any colorable imitation thereof; and

(vi) Aiding, assisting or abetting any party in doing any act under Subparagraphs (i) through (v) above;

B. That Defendants deliver to Plaintiff for destruction all the products and marketing, promotional and advertising materials related to TRIAGRA, and that Defendants be ordered to deactivate all websites that bear any corporate mark or design with TRIAGRA or any mark confusingly similar to or dilutive of the VIAGRA trademark;

C. That Defendants be ordered to file with the Court and to serve on counsel for Plaintiff within thirty (30) days an Affidavit setting forth in detail the manner and form in which Defendants have complied with this order.


SO ORDERED.

E.D.N.Y.,2004.
Pfizer, Inc. v. Y2K Shipping & Trading, Inc.
Not Reported in F.Supp.2d, 2004 WL 896952 (E.D.N.Y.), 70 U.S.P.Q.2d 1592

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Westlaw.

Slip Copy

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**

▷
Price v. Fox Entertainment Group, Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
David PRICE and Ernando Ashoka Thomas,
Plaintiffs,
v.
FOX ENTERTAINMENT GROUP, INC., Fox
Filmed Entertainment, Twentieth Century Fox,
Twentieth Century Fox Home Entertainment, Inc.,
Red Hour Films, and Rawson Thurber, Defendants.
Gregory James GAUGEL and YNOT Visions, A
Partnership, Intervening-Plaintiffs,
v.
David PRICE and Ernando Ashoka Thomas,
Plaintiffs,
FOX ENTERTAINMENT GROUP, INC.,
Twentieth Century Fox Film Corporation,
Twentieth Century Fox Home Entertainment, LLC,
Fox Filmed Entertainment, Twentieth Century Fox,
Twentieth Century Fox Home Entertainment, Inc.,
Red Hour Films, and Rawson Thurber, Defendants.
**No. 05 Civ.5259 SAS.**

Jan. 26, 2007.

Guy Robert Cohen, Neal Howard Klausner, Shirin
Keen, Davis & Gilbert LLP, New York, NY, for
Plaintiffs.
Robert H. Rotstein, Lisa E. Stone, Gregory R. Jones
, McDermott, Will & Emery, LLP, Los Angeles,
CA, Christine A. Pepe, Morgan, Lewis & Bockius
LLP, New York, NY, for Defendants.
Leslie Haim Ben-Zvi, Queller, Fisher, Dienst,
Serrins, Washor & Kool, New York, NY, for
Intervening-Plaintiffs.

*OPINION AND ORDER*

SCHEINDLIN, J.
*1 This litigation involves two movies about a

dodgeball competition in which a team of misfits or
underdogs are pitted against a stronger team of
bullies. Plaintiffs allege that defendants infringed
the copyright of their 2001 screenplay *Dodgeball:
The Movie* through production and distribution of
*Dodgeball: A True Underdog Story,* a movie
released by defendants in June 2004. Following
discovery, defendants moved for summary
judgment.[FN1]For the reasons discussed below, the
motion is denied.

> FN1. Both plaintiffs and defendants
> subsequently filed objections to certain
> evidence submitted in connection with this
> motion. The Court's rulings on those
> objections are set forth in a separate order.
> Plaintiffs also made two distinct summary
> judgment motions. The Court will address
> those motions in separate opinions.

I. BACKGROUND

A. Facts [FN2]

> FN2. The facts summarized in this section
> are undisputed.

Defendant Rawson Thurber graduated from the
Peter Stark Producing Program at the University of
Southern California ("Stark") in 1999 .[FN3]While at
Stark, from 1998 to 1999, Thurber worked as a
summer intern and a floater at the William Morris
Agency ("WMA").[FN4] During this period, Thurber
worked with Shaun Redick, who was then an
assistant to an agent, and Gregory McKnight, a
literary agent and Stark graduate.[FN5]Thurber left
WMA in April 1999, and began working as an
assistant to screenwriter John August in June 1999.
[FN6]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 2

FN3.*See* Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def.56.1") ¶ 3.

FN4.*See id.* ¶ 4.

FN5.*See* Plaintiffs' Corrected Counter-Statement Pursuant to Local Rule 56.1 ("Pl.56.1") ¶¶ 240, 280.

FN6.*See* Def. 56.1 ¶¶ 5-6.

Beginning in January through late February or early March 2001, plaintiffs Ernando Ashoka Thomas and his co-author, David Price, wrote a screenplay about dodgeball entitled *Dodgeball: The Movie.*[FN7]Thomas registered the screenplay with the Writers Guild of America on March 28, 2001. [FN8] The screenplay was never sold or produced.[FN9]

FN7.*See id.* ¶¶ 23-24.Co-authorship is disputed among plaintiffs and intervening-plaintiffs and is the subject of a separate motion for summary judgment. For the purposes of this motion, I assume, without deciding, that plaintiffs Thomas and Price are the authors of *Dodgeball: The Movie.*

FN8.*See* Pl. 56.1 ¶ 261.

FN9.*See* Def. 56.1 ¶ 27.

On March 20, 2001, Thomas and intervening-plaintiff Gregory James Gaugel ("James") held a screening of a low-budget independent film they had produced entitled *Raw Fish,* which Redick, then an agent-in-training in WMA's Independent Film division, attended.[FN10] Sometime between March 21 and April 3, 2001, Redick met with Thomas and James at WMA to discuss *Raw Fish.*[FN11]At that meeting, Thomas and James gave Redick a copy of the dodgeball screenplay. [FN12]

FN10.*See id.* ¶¶ 25-26, 32.

FN11. The precise date of the meeting is disputed. *See id.* ¶ 34; Pl. 56.1 ¶ 264.

FN12.*See* Def. 56.1 ¶ 35.

By April 26, 2001, Thurber had completed his first full-length draft of his screenplay, then-titled *Underdogs.*[FN13]On May 25, 2001, Thurber registered *Underdogs* with the Writers Guild of America.[FN14]In 2001, Thurber sent his script to three agents, one of whom was McKnight, but Thurber retained one of the other agents.[FN15]In 2003, however, due in part to the success of another project, Thurber retained McKnight as his agent, and McKnight remains his agent today.[FN16]

FN13.*See id.* ¶ 14.

FN14.*See id.* ¶ 15.

FN15.*See* Pl. 56.1 ¶¶ 297, 299.

FN16.*See id.* ¶¶ 301-303.

Defendant Red Hour Films, a film production company, decided to develop *Underdogs* into a motion picture.[FN17]In June 2003, the Fox defendants acquired the rights to *Underdogs* and hired Thurber to direct the movie.[FN18] The movie, re-titled as *Dodgeball: A True Underdog Story,* was released in theaters worldwide on June 18, 2004. [FN19]

FN17.*See* Def. 56.1 ¶¶ 16-17.

FN18.*See id.* ¶ 18.

FN19.*See id.* ¶¶ 19-20.

B. Procedural History

On June 2, 2005, plaintiffs filed a complaint alleging copyright infringement under the Copyright Act of 1976.[FN20]On May 9, 2006, the Court granted leave to intervene to James and YNOT Visions, A Partnership ("YNOT") (collectively, "

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**

intervening-plaintiffs"). On May 15, 2006, intervening-plaintiffs filed their complaint alleging copyright infringement against defendants and asserting cross-claims against each plaintiff alleging, *inter alia,* breach of partnership agreement, breach of contract, misappropriation and conversion. On June 14, 2006, plaintiffs answered intervening-plaintiffs' cross-claims and plaintiffs asserted their own cross-claim against intervening-plaintiffs, seeking declaratory judgment that neither James nor YNOT has any ownership or other interest in the *Dodgeball: The Movie* screenplay.

> FN20.*See*17 U.S.C. § 101*et seq.*

**\*2** Following discovery, defendants moved for summary judgment against plaintiffs and intervening-plaintiffs. In addition, plaintiffs moved for summary judgment on their cross-claim for declaratory judgment against the intervening-plaintiffs and dismissing the intervening-plaintiffs' complaint.[FN21] Plaintiffs also moved for summary judgment on defendants' affirmative defenses of laches, estoppel, consent, waiver and unclean hands.[FN22]

> FN21. In an Opinion and Order issued simultaneously with this Opinion, this motion was granted. *See Price v. Fox,* No. 05 Civ. 5259,-WL-(S.D.N.Y. Jan. 26, 2007).

> FN22. In an Opinion and Order issued simultaneously with this Opinion, this motion was granted in part and denied in part. *See Price v. Fox,* No. 05 Civ. 5259,-WL-(S.D.N.Y. Jan. 26, 2007).

## C. The Works

Because the determination of substantial similarity in a copyright case "requires a detailed examination of the works themselves," I have examined plaintiffs' screenplay *Dodgeball: The Movie* and defendants' movie *Dodgeball: A True*

*Underdog Story* .[FN23]A brief description of both works follows.

> FN23.*Williams v. Crichton,* 84 F.3d 581, 583 (2d Cir.1996).

## 1. Dodgeball: The Movie

*Dodgeball: The Movie* is a story about a young man, Matt, who grew up and lives in a dodgeball-obsessed Ohio town. Growing up, Matt and his two friends were bullied by an older kid named Mitch, whose longtime girlfriend, Jessica, a cheerleader, is secretly the object of Matt's affection. Over the years, Matt and his team of two childhood friends, Gordo and Jimmy, have tried but failed to beat Mitch's team at dodgeball. Gordo is obese and eats constantly, and has a peculiar obsession with his own bowel movements. Jimmy is shallow and is obsessed with women and sex. Jimmy works for his mother, Shirley, who owns a lesbian bar.

In the beginning of the story, Matt decides to get a full dodgeball team together to beat Mitch in the annual national championship and win Jessica over. Jimmy learns that Shirley's bar is sitting on a fault line and that she needs to come up with $20,000 for an insurance policy. After trying in vain to recruit strong, athletic men for the team, Matt, Gordo and Jimmy settle on T, a nervous bartender at Shirley's bar who is the adopted brother and former dodgeball target of Mitch; Wana, an energetic patron of Shirley's bar with quick feet; and Charles, an alcoholic homeless man who can dodge beer bottles.

Matt and his newly assembled team lose their first match and decide to practice against "easier" teams. However, Matt's team is slaughtered by each of these stereotypically weaker teams, including teams of pregnant women, "Old Timers," and disabled people. Matt loses hope and tells the team to give up. Shortly thereafter, Matt is approached by an older man in a wheelchair. The man is Greg Maiwang, a Chinese-American former dodgeball champion, whose legs stopped working after he lost

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**

a match. Greg offers to guide the team and Matt accepts. Greg's training methods were unorthodox, including chasing the players in his wheelchair pulled by vicious dogs and feeding them a slimy green liquid. Greg is assisted by Samantha, Greg's younger attractive adoptive sister.

Matt's team grows stronger, and in a series of rematches against the teams that beat them before, Matt's team begins winning. Inspired by the team, Greg tries to walk again and miraculously gets out of the wheelchair and takes a few steps, but then trips and falls on his head and dies. Matt is devastated and blames himself for Greg's death. Samantha gives Matt Greg's book of dodgeball secrets that he was going to give him before he died.

\*3 The team then travels to Chicago for the championship tournament, which is being covered by two sports announcers who narrate the action. Matt's team, renamed "Maiwang" after Greg, beats a series of teams, including a team of oddly spiritual young men led by a white boy with dread locks and a team of metermaids, and advances to the finals, which is to be held the next day. Mitch's team also advances to the finals.

That evening, Team Maiwang has a dinner celebration, which quickly gets out of hand. Early the next morning, Matt takes a walk on the dodgeball field to reflect, where Greg's ghost appears in the fog and reassures Matt that he was born to play dodgeball and that Greg does not blame Matt for his death. Matt returns to the hotel where he finds everyone in bad shape from the night before. Jimmy is still with the attractive blonde woman with whom he left the bar the night before, who is being paid by Mitch to keep Jimmy away from the finals. The team heads to the field and Jimmy arrives just in time to play.

Matt's team is moving slowly, and loses the first game. However, after a pep talk from Matt and some green liquid from Samantha, the team comes back to win the second game. The final game comes down to Matt against Mitch and two of his teammates. In an amazing move Matt knocks all three of Mitch's remaining players out and wins the match and the $30,000 prize. Jessica dumps Mitch

and runs to Matt to kiss him, but Matt rebuffs her. Everyone celebrates at Shirley's bar, which is saved from demolition. Matt and Samantha kiss and then join the celebration.

### 2. Dodgeball: A True Underdog Story

*Dodgeball: A True Underdog Story* (the " Motion Picture") is a story about a conflict between two gym owners, Peter LaFleur and White Goodman. Peter is an underachiever who owns and operates the rundown Average Joe's Gym. Average Joe's employees and members include: Owen, a simpleton looking for love; Dwight, an African-American; Gordon, a timid fan of obscure sports who is married to a mail-order bride who hates him; Justin, a high school cheerleading squad reject who has a crush on the head cheerleader; and Steve, who dresses and talks like a pirate. White, a hyperbolic man who was once obese but is now a fitness fanatic, owns and operates the local branch of the successful corporate Globo Gym he founded.

Peter learns from Kate Veatch, a lawyer for White's bank, that White has purchased the mortgage on Average Joe's and that White will foreclose unless Peter can come up with $50,000 in 30 days. Peter and the group brainstorm ways to raise the money to save the gym. From one of Gordon's obscure sports magazines, the group learns about a dodgeball competition in Las Vegas that awards a grand prize of $50,000, but only Justin knows how to play. Justin brings in an old instructional video he watched in high school gym class featuring the former dodgeball star, Patches O'Houlihan, to teach the team how to play.

\*4 In order to qualify for entry in the tournament, the team has to win the regional championship. At regionals, the team loses to a team of girl scouts, but qualifies anyway because one of the girl scouts tested positive for steroids. After the match, Patches O'Houlihan, the former dodgeball champion from the video, now much older and in a wheelchair, approaches Peter and offers to coach the team and Peter accepts. Patches' training methods are unconventional, including

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**

throwing wrenches at the players to practice dodging. Kate, a former softball player with a strong arm, joins Peter's team after being fired by White and rejecting White's advances. Rumors begin to fly that Kate is a lesbian.

White also fields a team of bodybuilders from Globo Gym and an unattractive female Russian dodgeball champion, called the "Purple Cobras." They get a spot in the competition through one of White's connections.

At the tournament in Las Vegas, Peter's team, the "Average Joes," win several matches and advance to the finals, where they must face the Purple Cobras. The televised tournament is covered by two sports commentators who provide comic relief between the dodgeball action scenes. The night before the final match, Patches is killed when a "Luck of the Irish" sign falls on him in a casino. Peter loses hope. Later that night, White offers Peter a $100,000 bribe in exchange for title to Average Joe's Gym and Peter's promise not to play in the finals, which Peter accepts. The next day, Peter is sitting in an airport bar where he meets Lance Armstrong, the Tour de France cycling champion and cancer survivor, who shames Peter into returning to the tournament to play with his team.

At the finals, the match comes down to a sudden death confrontation between Peter and White. Peter takes out the scarf that Patches had given him before he died and asks Patches for guidance. Patches' face appears on the scarf and gives Peter a pep talk. Peter then takes the scarf and blindfolds himself. Peter dodges White's ball blindfolded and then hits White with his ball to win the match.

As the Average Joes are celebrating, White reveals to the team that Peter sold him the gym. Peter then reveals that he took the $100,000 bribe and bet it on Average Joes with 50 to 1 odds to win the championship. Peter has won $5 million, enough to buy a controlling interest in Globo Gym, which now owns Average Joe's Gym, and Peter fires White on the spot. As everyone is celebrating, Kate kisses a woman, leading Peter to believe that

Kate is a lesbian, but Kate then kisses Peter and reveals that she is bisexual. The ending shows Peter in a commercial for the new and improved Average Joe's Gym, which White, once again obese, is watching from his couch while stuffing his face and grumbling.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[FN24] An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' "[FN25] A fact is material when it " 'might affect the outcome of the suit under the governing law.' "[FN26]

> FN24. Fed.R.Civ.P. 56(c).
>
> FN25. *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir.2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir.1998)).
>
> FN26. *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

**\*5** The movant has the burden of demonstrating that no genuine issue of material fact exists.[FN27] In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does " 'not rely on conclusory allegations or unsubstantiated speculation.' "[FN28] To do so, it must do more than show that there is a " 'metaphysical doubt as to the material facts.' "[FN29] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**

favorable to the non-moving party and draw all justifiable inferences in that party's favor.[FN30]

> FN27.*See, e.g., Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)).

> FN28.*Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2002)).

> FN29.*McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

> FN30.*See id.*

**B. Copyright Infringement**

To prevail on a claim of copyright infringement, a plaintiff must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."[FN31]A certificate of registration made before or within five years of publication of a work is prima facie evidence of the first element.[FN32]To satisfy the second element of an infringement claim, "a plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an ' improper or unlawful appropriation." ' [FN33]

> FN31.*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991).

> FN32.*See*17 U.S.C. § 410(c).

> FN33.*Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir.2003) (quoting *Castle-Rock Entm't, Inc. v. Carol Publ'g Group, Inc .,* 150 F.3d 132, 137 (2d Cir.1998)).

Because direct evidence is seldom available to prove "actual copying," a plaintiff may fulfill this requirement with indirect evidence, "including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony."[FN34]"There is an inverse relationship between access and probative similarity such that ' the stronger the proof of similarity, the less the proof of access is required." ' [FN35] "It is only after actual copying is established that one claiming infringement then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears 'substantial similarity' to protected expression in the earlier work ." [FN36]

> FN34.*Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139-40 (2d Cir.1992) (quotation marks and citations omitted).

> FN35.*Jorgensen,* 351 F.3d at 56 (quoting 3 *Nimmer on Copyright* § 13.03[D], at 13-77).

> FN36.*Castle Rock Entm't,* 150 F.3d at 137 (quotations omitted).

1. Actual Copying

a. Probative Similarity [FN37]

> FN37. The Second Circuit cautions that " ' probative,' rather than 'substantial' similarity is the correct term in referring to the plaintiff's initial burden of proving actual copying by indirect evidence."*Id.* (quotation marks and citations omitted).

In determining whether two works are similar enough to prove actual copying, courts ask " whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."[FN38]The Second Circuit has noted that this is "a task generally performed after detailed examination of the works themselves." [FN39] A court must examine the alleged similarities "

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Slip Copy, 2007 WL 241389 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting."[FN40]

> FN38.*Warner Bros. v. American Broad. Cos.,* 654 F.2d 204, 208 (2d Cir.1981) (citing *Ideal Toy Corp. v. Fab-Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir.1966)).

> FN39.*Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48-49 (2d Cir.1986) (citing *Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F .2d 49 (2d Cir.1936)).

> FN40.*Williams,* 84 F.3d at 588.

**b. Access**

A plaintiff has the burden of proffering " significant, affirmative and probative evidence" establishing access.[FN41]"Access means that an alleged infringer had a 'reasonable possibility'-not simply a 'bare possibility'-of hearing [or seeing] the prior work." [FN42]Although a plaintiff's theory of access may be attenuated, it "cannot be based on mere 'speculation or conjecture." ' [FN43]

> FN41.*Jorgensen,* 351 F.3d at 51.

> FN42.*Id.* (quoting *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir.1988)).

> FN43.*Id. Accord Gaste,* 863 F.2d at 1067 ( "Although [plaintiff's] theory of access relies on a somewhat attenuated chain of events extending over a long period of time and distance, we cannot say as a matter of law that the jury could not reasonably conclude that [defendant] had access to the song through [the third party]. ").

Access to a copyrighted work may be inferred from the fact that a work was widely disseminated at the time of copying.[FN44]Wide dissemination is established where "the allegedly infringed work has had considerable commercial success or is readily available on the market."[FN45]If the infringed work has not been widely disseminated, a plaintiff can prove access by showing "a particular chain of events or link by which the alleged infringer might have gained access to the work."[FN46]Given the " inverse relationship between access and probative similarity,"[FN47] in certain limited situations a plaintiff need not prove access at all, because the similarities between the two works are so "striking" that they alone serve "both to justify an inference of copying and to prove improper appropriation."[FN48]

> FN44.*See Boisson v. Banian, Ltd.,* 273 F.3d 262, 270 (2d Cir.2001) (citations omitted).

> FN45.*Silberstein v. Fox Entm't Group, Inc.,* No. 02 Civ. 1131, 2004 WL 1620895, at *7 (S.D.N.Y. July 19, 2004).

> FN46.*Mowry v. Viacom Int'l, Inc.,* No. 03 Civ. 3090, 2005 WL 1793773, at *4 (S.D.N.Y. July 29, 2005).

> FN47.*Jorgensen,* 351 F.3d at 56 (quoting 3 *Nimmer on Copyright* § 13.03[D], at 13-77).

> FN48.*Arnstein v. Porter,* 154 F.2d 464, 468-69 (2d Cir.1946).*Accord Jorgensen,* 351 F.3d at 56;*Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997).

*6 In the Second Circuit, a plaintiff must generally prove that the creators themselves, and not merely an affiliated corporation, had access to the work that was allegedly copied.[FN49]However, " [a] court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer." [FN50] "An intermediary will fall within this category, for example, if she supervises or works in the same department as the infringer or contributes ideas to him."[FN51]"A copyright infringement plaintiff need not prove that the infringer actually saw the work in question; it is enough to prove that the infringer (or his intermediary) had the mere

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**

opportunity to see the work...,"[FN52]

> FN49.*See Jorgensen,* 351 F.3d at 53 (" Bare corporate receipt of [plaintiff's] work, without any allegation of a nexus between the recipients and the alleged infringers, is insufficient to raise a triable issue of access. ").

> FN50.*Id.* (quoting ·*Towler v. Sayles,* 76 F.3d 579, 583 (4th Cir.1996)).*Accord Gaste,* 863 F.2d at 1067 ("Access through third parties connected to both a plaintiff and a defendant may be sufficient to prove a defendant's access to a plaintiff's work.").

> FN51.*Jorgensen,* 351 F.3d at 53 (quoting *Towler,* 76 F.3d at 583).

> FN52.*Id.* (quoting ·*Bouchat v. Baltimore Ravens, Inc.,* 241 F.3d 350, 354-55 (4th Cir.2001)).

## 2. Actionable Infringement

After establishing that copying has occurred, a court must examine whether the "copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred."[FN53]In undertaking this analysis, courts should be aware that

> FN53.*Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70, 75 (2d Cir.1997) ("At first glance, it might seem odd to pursue an inquiry as to 'substantial similarity' even after copying as a·factual matter has been established. However, the superficial anomaly reflects only a lack of appreciation of the difference between factual copying and actionable copying. The former (probative similarity) requires only the fact that the infringing work copies something from the copyrighted work; the latter (substantial similarity) requires that the copying is quantitatively

and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred.").

*dissimilarity* between some aspects of the works will not automatically relieve the infringer of liability, for 'no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated.'It is only when the similarities between the protected elements of plaintiff's work and the allegedly infringing work are of 'small import quantitatively or qualitatively' that the defendant will be found innocent of infringement. [FN54]

> FN54.*Williams,* 84 F.3d at 588 (citation omitted) (quoting *Rogers v. Koons,* 960 F.2d 301, 308 (2d Cir.1992)).

The quantitative component of substantial similarity "concerns the amount of the copyrighted work that is copied, which must be more than 'de minimis.' ' [FN55] Thus, a plaintiff must establish that the similarities between the two works amount to more than "random similarities" that "are of little importance in the works ." [FN56]Substantial similarity will be found if " 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the works'] aesthetic appeal as the same." ' [FN57] "The qualitative component concerns the copying of expression, rather than ideas, facts, works in the public domain, or any other non-protectable elements." [FN58]In addition, "scenes a faire," which have been described as "elements that follow naturally from a work's theme rather than from an author's creativity," are not entitled to copyright protection. [FN59]

> FN55.*Castle Rock Entm't,* 150 F.3d at 138 (quotation marks and citations omitted).

> FN56.*Hogan v. DC Comics,* 48 F.Supp.2d 298, 313 (S.D.N.Y.1999) (citing *Williams,* 84 F.3d at 590).

> FN57.*Boisson,* 273 F.3d at 272 (quoting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 9

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**

*Folio Impressions, Inc. v. Byer Cal.,* 937
F.2d 759, 765 (2d Cir.1991)).

FN58.*Castle Rock Entm't,* 150 F.3d at 138.

FN59.*MyWebGrocer, LLC v. Hometown
Info., Inc.,* 375 F.3d 190, 194 (2d Cir.2004)
.*See generally Hogan,* 48 F.Supp.2d at 309
(citing 3 *Nimmer on Copyright* §
13.03[B][4] ); *see also Williams,* 84 F.3d
at 589 (in a story about a dinosaur zoo, "
electrified fences, automated tours,
dinosaur nurseries, and uniformed workers"
are scenes a faire); *Walker,* 784 F.2d at 50
(in a depiction of policemen in the South
Bronx, "drunks, prostitutes, vermin and
derelict cars" are scenes a faire).

"Substantial similarity is customarily an
extremely close question of fact."FN60However,
courts have granted summary judgment for
defendants when each similar element between two
works was held non-protectable as a matter of law.
FN61

FN60.*Hoehling v. Universal City Studios,
Inc.,* 618 F.2d 972, 977 (2d Cir.1980).

FN61.*See id.*

III. DISCUSSION

A. Valid Copyright

It is undisputed that Thomas owns a valid
copyright in the screenplay *Dodgeball: The Movie*
(the "Thomas Work").FN62 Therefore, plaintiffs
have the burden of proof at trial only as to the
second prong of a copyright infringement
claim-copying constituent elements of the work that
are original. Plaintiffs offer no direct evidence of
actual copying. Rather, both parties focus their
arguments on indirect evidence related to probative
similarity and the reasonable possibility of access.

FN62. As mentioned above, there is a
dispute over who among Price, James and
YNOT shares ownership with Thomas,
which is the subject of a separate summary
judgment motion by plaintiffs against the
intervening-plaintiffs. However, that
dispute does not affect the undisputed fact
that the Thomas Work is subject to
copyright protection for purposes of this
motion.

B. Actual Copying

1. Degree of Similarity

*7 After examining both works and reading the
evidence in the light most favorable to plaintiffs, I
conclude that a jury could reasonably find that the
two works contain similarities that are probative of
copying. Both works are superficial fast-moving
comedies that spoof underdog sports films. Each
work tells the story of a group of misfits led by the
main character who forms an underdog dodgeball
team, pitted against a stronger rival team of bullies
led by the main character's nemesis. In each work,
the underdog team decides to enter a national
dodgeball tournament that awards prize money,
which the team needs to save a business in distress:
in the Thomas Work, a bar owned by the mother of
one of the players; in the Motion Picture, a gym
owned by one of the players and frequented by the
rest.

The progression of the teams in each work is
similar. In the beginning of both works, the team is
uncoordinated, made up of very poor dodgeball
players and loses to stereotypically inferior teams:
in the Thomas Work, the team loses to pregnant
women, old men and disabled people; in the Motion
Picture, the team loses to a troop of girl scouts. In
each work, a former dodgeball champion comes
along unsolicited to coach the team. Notably, both
coaches are wheelchair-bound and use unorthodox
training methods. For example, in both the Thomas
Work and an earlier Thurber draft of the Motion
Picture, the coach gives the players a slimy green

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Page 10

power drink as part of their training.[FN63] The underdog team in both works begins to excel and as a token of the success, the main character in both works receives a gift from the coach: in the Thomas Work, Matt receives Greg's book of family dodgeball secrets; in the Motion Picture, Peter receives Patches' scarf. Moreover, in each work, the coach dies in a freak accident in the middle of the competition, causing the main character to lose hope and want to give up. However, in each work the coach reappears as a ghost and speaks to the main character to provide words of wisdom and advice on how to win.

> FN63. Consideration of earlier drafts of the allegedly infringing work is proper. *See Mowry,* 2005 WL 1793773, at *10 n. 15 (permitting review of prior drafts for the purpose of establishing actual copying).

Moreover, several characters that appear either in the Motion Picture or in Thurber's earlier drafts share the name and certain characteristics of characters in the Thomas Work. For example, as detailed above, the coach characters are quite similar. Numerous parallels also exist between the character of Gordo in the Thomas Work and Gordon in the Motion Picture. Not only are their names almost identical,[FN64] but they share certain characteristics as well. Gordo and Gordon are both overweight and they both have a flaw that they must overcome to help the team win the semifinal match: Gordo must overcome his fear of using other people's toilet paper in order to make it in time to the match; Gordon must take control of his anger and channel it to dodgeball during the match when he is the last man standing on the team. In both works, Gordo and Gordon do overcome the flaws and save the day at the semifinals in a very similar manner, by miraculously nearly single-handedly eliminating almost every player on the opposing team. Still other character parallels are present. Both works have a character named Kate who plays dodgeball: in the Thomas Work, Kate is a lesbian on the metermaids team; in the Motion Picture, Kate is the bisexual player on the Average Joes. In both works, a young boy named Timmy appears in a short scene as one of the coach's mentees. There

are also a few characters that appear in early Thurber drafts that share names with characters in the Thomas Work, such as Dick and Sam (short for Samantha in the Thomas Work).

> FN64. Indeed, at one point in the Motion Picture, one of the characters actually refers to Gordon as "Gordo."

*8 In sum, I find that there are sufficient similarities to raise an issue of material fact as to the issue of actual copying. The degree of similarity between these works is clearly an issue for the trier of fact.

2. Access

It is undisputed that the Thomas Work was not widely disseminated .[FN65] Thus, in order to establish access, plaintiffs must demonstrate a "a particular chain of events or link by which the alleged infringer might have gained access to the work."[FN66] Because "[t]here is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required,"[FN67] the jury's determination of the degree of similarity between the works will inform the requisite level of " reasonable possibility of access" that plaintiffs must show in order to establish actual copying. Nevertheless, given the Court's own analysis of the similarities and all of the additional evidence, I find that genuine issues of material fact exist such that a jury could reasonably conclude that defendants had a reasonable possibility of access to the Thomas Work through a "particular chain of events or link." [FN68]

> FN65. *See* Def. 56.1 ¶ 28; Plaintiffs' Corrected Response to Defendants' Statement of Undisputed Facts (" Pl.Opp.56.1") ¶ 28.

> FN66. *Mowry,* 2005 WL 1793773, at *4.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**

FN67.*Jorgensen,* 351 F.3d at 56 (quoting 3 *Nimmer on Copyright* § 13.03[D], at 13-77).

FN68.*Mowry,* 2005 WL 1793773, at *4.

Plaintiffs offer several theories based on the evidence from which a jury could reasonably infer that Thurber had a reasonable possibility of access to the Thomas Work. For example, plaintiffs assert that the evidence shows that Thurber's first full draft of the screenplay was created with "unusual speed" -within one month after the alleged date of access. [FN69]"Unusual speed in the creation of a defendant's work may constitute evidence that the defendant had access to and used plaintiff's work...." [FN70] There is evidence that Thurber wrote approximately 90% of his 150-page first full-length draft after the alleged date of access, following months of writer's block and frustration. The probative value of this evidence is enhanced by evidence that a number of the similarities discussed above begin to appear in Thurber's drafts in April-after the alleged access date.[FN71]Indeed, almost all of the characters who have the same names as characters in the Thomas Work, namely Gordon, Kate, Timmy, and Dick, appear for the first time in April drafts. Moreover, one of the most notable similarities between the two works, namely that the coach is in a wheelchair, also does not materialize until an April draft. Coincidence (even an "eerie" coincidence) [FN72] cannot explain away this evidence as a matter of law in this case; it is a question of fact for the jury.

FN69. Plaintiffs' Corrected Memorandum of Law in Opposition to Defendants' Summary Judgment Motion (" Pl.Opp.Mem."), at 16-17.

FN70.*Herzog v. Castle Rock Ent't,* 193 F.3d 1241, 1256 (11th Cir.1999).

FN71. Defendants argue that material written before Thurber allegedly had access to the Thomas Work should not be considered in assessing the similarity of the works. However, the precise date of

access as well as what material was in existence at what time are disputed facts and cannot be used to support defendants' motion as all inferences must be drawn in favor of the non-moving party.

FN72. Declaration of Shirin Keen (counsel for plaintiffs) ("Keen Decl."), Ex. 3 at 184 (Thurber's own description of some similarities between the works, found in his December 7, 2004 email to John August).

Moreover, plaintiffs raise a genuine issue of material fact as to whether there is a reasonable possibility that Thurber had access through a third party intermediary such as Redick or McKnight. Redick undisputedly received the Thomas Work between March 21 and April 3, 2001. Based on the evidence, a jury could find that it is reasonably possible that Redick gave a copy of the Thomas Work to Thurber: Redick worked at WMA at the same time as Thurber; they were "business friends"; [FN73] and given the nature of the industry, they were likely to keep in touch in order to maintain networking connections.

FN73. Pl. 56.1 ¶ 401.

*9 With respect to McKnight, a jury could find that there was a reasonable possibility that McKnight had access to the Thomas Work and that McKnight may have given it to Thurber. Redick testified that the sharing of scripts with literary agents (of whom McKnight is one) is common practice at WMA [FN74] and a jury could find that it is reasonably possible that Redick did so in this case, especially given the evidence that on March 30, 2001, McKnight requested copies of *Raw Fish* -Redick's project with Thomas.[FN75]In turn, a jury could find that there is a reasonable possibility that McKnight passed it on to Thurber based on evidence of McKnight and Thurber's prior and continuing relationship, namely that Thurber worked for McKnight while employed at WMA; that McKnight was one of only three agents to whom Thurber sent his screenplay; that McKnight later became Thurber's agent and remains his agent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 12

**Slip Copy, 2007 WL 241389 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

today; and that they both attended Stark and were likely to keep in touch to maintain networking contacts. The jury could also weigh the fact that one of the characters in the Motion Picture, a sports announcer, is named Cotton McKnight in finding that McKnight and Thurber had a more substantial relationship than they claim. Although Thurber and McKnight testified that they had no communications between 1999 and 2003,[FN76] given plaintiffs' evidence to the contrary,[FN77] issues of credibility arise that must be decided by the jury.

> FN74.*See id.* ¶¶ 282-284.*See, e.g., Jorgensen,* 351 F.3d at 55 (evidence that a Sony department "occasionally shares ... material with 'affiliated' songwriters" could support a finding of access if it could be shown that defendants were "affiliated" ).

> FN75.*See* Pl. 56.1 ¶ 278.

> FN76. McKnight did state that he bumped into Thurber at the 2002 or 2003 Sundance Film Festival and that he called Thurber at some point to tell him he read and liked the dodgeball script. *See* Pl. 56.1 ¶¶ 377, 381, 384.

> FN77.*See, e.g.,* Keen Decl. Ex. 3 at 174 (email from McKnight's assistant to McKnight, dated February 6, 2002, relaying a message that "Thurber returned your call."); *id.* at 178 (email from McKnight's assistant to Zach Galifianakis, dated August 26, 2002, regarding a possible meeting between Galifianakis and Thurber, including a statement that " Rawson Thurber would like to meet with you").

It bears repeating that plaintiffs need not prove that Thurber actually had access to the Thomas Work. Rather, plaintiffs burden is to show a *reasonable possibility* of access on the part of Thurber or his intermediary.[FN78]Reviewing the evidence in the light most favorable to plaintiffs, I

find that a reasonable jury could conclude that there is a reasonable possibility that Thurber had access to the Thomas Work given the evidence of the speed at which he wrote his screenplay, the timing of the appearances of certain similarities between the two works, and the relationships he had with WMA employees who either actually had access or had a reasonable possibility of access to the Thomas Work.

> FN78.*Jorgensen,* 351 F.3d at 53 (quoting *Bouchat,* 241 F.3d at 354-55).

C. Actionable Infringement

After examining each work's "total concept and feel, theme, characters, plot, sequence, pace, and setting,"[FN79] I cannot find as a matter of law that each and every similar element between the two works is non-protectable. A jury could reasonably conclude that " 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the works'] aesthetic appeal as the same." ' [FN80]

> FN79.*Williams,* 84 F.3d at 588.

> FN80.*Boisson,* 273 F.3d at 272 (quoting *Folio Impressions,* 937 F.2d at 765).

The jury will have to decide whether the similarities between the two works at issue here are substantial, and therefore actionable. This will require differentiation between similarities that constitute original artistic expressions and those that flow from non-protectable ideas, from scenes a faire, or from conventions of underdog sports stories and Hollywood films, or whether the similarities can be found in the prior art, such as *Happy Gilmore* or *Men with Brooms.*These questions are quintessentially fact-based disputes and cannot be decided as a matter of law.

IV. CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 241389 (S.D.N.Y.)
**(Cite as: Slip Copy)**


    **\*10** For the reasons set forth above, defendants' motion for summary judgment is denied in its entirety. The Clerk of the Court is directed to close this motion [No. 57 on the Docket Sheet]. A conference is scheduled in this matter for February 2, 2007 at 4 p.m.
    SO ORDERED:


S.D.N.Y.,2007.
Price v. Fox Entertainment Group, Inc.
Slip Copy, 2007 WL 241389 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

Westlaw.

Not Reported in F.Supp.2d                                    Page 1

Not Reported in F.Supp.2d, 2006 WL 838993 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**c**
North Face Apparel Corp. v. TC Fashions, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
    United States District Court,S.D. New York.
    THE NORTH FACE APPAREL CORP., a
    Delaware corporation; PRL USA Holdings, Inc., a
        Delaware corporation; and Polo Ralph Lauren
    Corporation, a Delaware corporation, Plaintiffs,
                    v.
TC FASHIONS, INC., d/b/a SDT USA d/b/a EB
    Garments d/b/a Cheers Enterprises d/b/a Great
    Champion Trading d/b/a J & C International d/b/a
    Combi Fashions d/b/a Jr & Pepper d/b/a Garment
Closeout.com, a New York corporation; SDT USA,
    Inc. a/k/a Sung Dong Trading Company, a New
    York corporation; Margaret Scott, an individual;
        Christine Yuen a/k/a Suek Peng Yoon, an
    individual; Yvonne Chan, an individual; Todd
    Turner, an individual; Wing Yee MA a/k/a Anna
    MA, an individual; Hiu Man Lee, an individual;
    Ling Ling Lee, an individual; Robert Holt, an
    individual; Waitex International Co. Ltd ., d/b/a
    Fashion USA a New York Corporation; Emmy
    Fashions, Inc., a corporation; Great Value, Inc., a
    New York corporation; EB Garments, Inc., a New
York corporation; John Does 9-30 and XYZ Corps.
                5-30, Defendants.
            **No. 05 Civ. 9083(RMB).**

                March 30, 2006.

                *DECISION & ORDER*

BERMAN, J.

I. Background

    *1 On or about October 24, 2005, The North
Face Apparel Corp. ("North Face"), and PRL USA
Holdings, Inc. and Polo Ralph Lauren Corp. ("PRL

USA") (collectively, "Plaintiffs") filed under seal a
complaint ("Complaint") alleging that Defendants
TC Fashions, Inc. ("TC Fashions" or "TC"), EB
Garments, Inc. ("EB Garments"), SDT USA, Inc. ("
SDT USA" or "SDT"), "JOHN DOES 1-5 and
XYZ CORPS. 1-15"'used, reproduced and/or
copied Plaintiffs' [trademarks] in connection with
their manufacturing, distributing, exporting,
importing, advertising, marketing, selling and/or
offering to sell counterfeit copies of Plaintiffs'
Products" in violation of Sections 32(1) and 43(a)
and (c) of the Lanham Act, 15 U.S.C. §§ 1114(1)
and 1125(a) & (c).[FN1] (Complaint ¶ 28.) At the
same time, Plaintiffs applied, *ex parte,* for a
temporary restraining order, seizure order, asset
restraining order, expedited discovery order, and
order to show cause for preliminary injunction
pursuant to 15 U.S.C. § 1116(d) (*"Ex Parte
Application"*). (*See* Plaintiff's Memorandum of
Law, dated October 24, 2005.)

> FN1. Plaintiffs also assert common law
> trademark and unfair competition claims,
> as well as claims under New York General
> Business Law §§ 360(I) and 349.
> (Complaint ¶¶ 53-70.) By order dated
> December 27, 2005, the Court unsealed
> the record in this case. (Memorandum
> Endorsement, dated December 27, 2005 ("
> Sealing is vacated in the interest of public
> disclosure (and in the absence of
> authorities presented by the parties).")

    On October 25, 2005, the Court granted
Plaintiffs' *Ex Parte* Application pursuant to 15
U.S.C. § 1116(d). (Order Granting Plaintiffs' *Ex
Parte* Application for Temporary Restraining
Order, Seizure Order, Asset Restraining Order,
Expedited Discovery Order, and Order to Show
Cause for Preliminary Injunction, dated October 25,
2005 ("TRO").) [FN2] Among other things, the TRO
authorized the seizure of allegedly counterfeit
products located at "499 7th Avenue, 6th Floor, in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 838993 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

New York, New York, 10018,""Waitex Warehouse, 1800 Lower Road, Linden, New Jersey 07036," and "2001 Tonnelle Avenue, North Bergen, New Jersey 07047."(TRO at 5.)

> FN2. After several extensions, the Court ordered, on January 18, 2006, that "the terms of the TRO shall remain in place in full until such time as the Court rules on Plaintiffs' request for a preliminary injunction."(Order Extending Temporary Restraining Order, dated January 18, 2006.)

Plaintiffs executed the TRO on October 27 and 28, 2005, (Declaration of David Saenz, dated November 7, 2005 ("Saenz Decl.") ¶ 2; Declaration of W.K. Wong, dated November 4, 2005 ("Wong Decl.") ¶ 8), recovering "more than twenty eight thousand counterfeit POLO RALPH LAUREN shirts and seven thousand counterfeit THE NORTH FACE jackets stored [by TC Fashions] at Waitex's warehouse in Linden, New Jersey."(Supplemental Declaration of G. Roxanne Elings, dated November 7, 2005 ("Elings Supp. Decl.") ¶ 16; Reply Memorandum of Law in Support of Asset Restrain and Order to Show Cause for Preliminary Injunction, dated November 7, 2005 ("Pl.Reply"), at 2; *see also* Declaration of Christine Yuen, dated November 4, 2005 ("Yuen Decl.") ¶¶ 11 ("The North Face goods seized at the Waitex warehouse, were not sold, they had just only been purchased, [and] were obviously fake."), 12 ("I am advised that goods impounded at the Waitex warehouse were counterfeit Polo items.").)

On or about November 4, 2005, Plaintiffs filed an amended complaint ("Amended Complaint") identifying several previously anonymous defendants, including, among others, Christine Yuen ("Yuen") and Waitex International Co. Ltd. (" Waitex"). (Amended Complaint ¶¶ 8, 15.) Plaintiffs allege that Yuen "is the owner of TC [and] actively manages and participates in TC's counterfeiting business" and "Waitex stores counterfeit goods on behalf of TC and SDT, and assists in re-labeling and re-packaging such counterfeit goods."(*Id.*)

**\*2** Also, on or about November 4, 2005, Defendants TC Fashions, Great Value, Inc. ("Great Value"), EB Garments, and Yuen, the sole shareholder of those corporations (collectively, "TC Defendants"), and Waitex submitted a response to Plaintiffs' *ex parte* seizure and application for a preliminary injunction. (*See* Defendants' Memorandum of Law in Response to Plaintiffs' *Ex Parte* Seizure and Request for a Preliminary Injunction, dated November 4, 2005 ("Def.Mem." ).) Plaintiffs filed a reply on or about November 7, 2005. (*See* Pl. Reply.) On or about November 30, 2005, Waitex filed a sur-reply, (*see* Waitex's Sur-Reply Memorandum of Law, dated November 30, 2005 ("Waitex Sur-Reply")), and Yuen submitted a Sur-Reply Declaration, dated November 30, 2005 ("Yuen Sur-Reply Decl."). Plaintiffs filed a "sur-sur reply" on or about December 7, 2005. (*See* Plaintiffs' Sur-Sur Reply Memorandum of Law in support of Order to Show Cause for Preliminary Injunction, dated December 7, 2005 ("Pl. Sur-Sur Reply").)

Plaintiffs seek to convert the TRO into a preliminary injunction. (Pl. Reply at 3-8.) TC Defendants state that they are "consenting to the preliminary injunction" but also seek to have certain restraints on their assets "modified." (Def. Mem. at 2 (emphasis in original).) SDT has not appeared in this action. Waitex opposes any preliminary injunction against it, seeks to have restraints on its assets removed, and seeks a protective order concerning information contained in documents and computers seized by Plaintiffs. (*Id.* at 6-9, 11-13.)

II. Legal Standard

"To obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor." *Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 537 (2d Cir.2005) (quoting *Federal Express Corp. v. Federal Espresso, Inc.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2006 WL 838993 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

201 F.3d 168, 173 (2d Cir.2000))."In trademark disputes, 'a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm." ' *Malletier,* 426 F.3d at 537 (quoting *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988)); *see alsoIn re Vuitton et fils S.A.,* 606 F.2d 1, 4 (2d Cir.1979) (purpose of counterfeit goods "is to confuse the buying public into believing it is buying the true article").

III. Analysis

A. *TC Defendants*

1. Preliminary Injunction

As noted, TC Defendants consent to a preliminary injunction. (*See* Def. Mem. at 2, 5.) The parties are directed to meet and confer forthwith and jointly to submit to the Court a proposed preliminary injunction for the Court's endorsement on or before April 6, 2006.[FN3]

> FN3. The proposed preliminary injunction may well contain "detailed provisions allowing any defendant to seek relief from the asset freeze if the defendant present[s] documentary proof that particular assets [are] not the proceeds of counterfeiting activities."*SeeCartier Int'l B.V. v. Liu,* No. 02 Civ. 7936, 2003 WL 1900852, at *1 (S.D.N.Y. Apr. 17, 2003).

2. Restrained Assets

**\*3** TC Defendants assert that they "have had more than a million dollars in their bank accounts restrained," and that these restraints should be "modified" because only a portion of that money is derived from the sale of garments bearing Plaintiffs'

trademarks.[FN4](*See* Def. Mem. at 11.) While the TC Defendants collectively initially argued that "a restraint of $175,000 should be more than adequate, " (Def. Mem. at 11; *see also* Yuen Decl. ¶ 13 ("I am prepared to deposit an appropriate sum of money-which I believe to be $175,000 about 50% more than the sales of the North Face goods")), Yuen later explained that gross profits from the sale of garments bearing Plaintiffs' trademarks totaled $235,724 .40. (Yuen Sur-Reply Decl. ¶ 6.) TC Defendants argue that Plaintiffs have miscalculated TC's profits because "the plaintiffs' version of the accounting for gross profit includes [among other things] alleged profits from the sale of merchandise that was in fact confiscated by the plaintiffs" and does not take into account costs "such as warehousing, credit card and factor commissions, as well as sales commissions."(*See* Yuen Sur-Reply Decl. ¶ 3.) TC Defendants also assert that "one of the bank accounts restrained by the plaintiffs contain funds that were the direct proceeds of sales of commonly-held securities that were purchased in the year 2000 and sold in September [2005]. None of the funds contained in that account have any connection to the sale of goods at issue in this action."(Yuen Sur-Reply Decl. ¶ 7; *id.*Ex. G.)

> FN4. Plaintiffs initially indicated that they " are aware that the banks have restrained only about $254,000 of TC Fashions' monies and $168,000 of SDT USA's monies," (Pl. Reply at 9 (citing Elings Supp. Decl. ¶ 14)), but later explained that they have restrained "approximately $1,000,000." (Supplemental Declaration of G. Roxanne Elings, dated December 7, 2005 ("Elings 2d Supp. Decl.") ¶ 4.)

Plaintiffs argue that TC's profits from the sale of counterfeit garments bearing Plaintiffs' trademarks for 2004 and 2005 alone totaled over $1.3 million. (Elings 2d Supp. Decl. ¶¶ 3-4 & Ex. B .) [FN5] Plaintiffs assert that "on the day of Plaintiffs' execution of the TRO alone, TC Fashions had more than twenty eight thousand counterfeit POLO RALPH LAUREN shirts and seven thousand counterfeit THE NORTH FACE jackets stored a Waitex's warehouse in Linden, New Jersey."(Pl.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 838993 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Reply at 9 (citing Elings' Supp. Decl. ¶ 16).) Plaintiffs also have submitted evidence suggesting that Yuen used bank accounts located in Hong Kong for her business. (Elings Supp. Decl. Ex. L; *see* Elings 2d Supp. Decl. ¶ 5 ("Without a full accounting by TC Fashions Defendants to this Court, Plaintiffs submit that TC Fashions Defendants have not made a sufficient showing to have any funds restrained by the TRO released.").)

> FN5. Plaintiffs initially argued that "TC Fashions' annual revenues from the sale of counterfeit goods total approximately eight million dollars," (Pl. Reply at 9), although the spreadsheet Plaintiffs submitted appears to show annual revenues totaling $6.8 million. (*See* Elings Supp. Decl. Ex. K.)

District courts have the "authority to freeze those assets which could [be] used to satisfy an equitable award of profits."*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995) (citing *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.,* 970 F.2d 552, 558-59 (9th Cir.1992)); *see also*15 U.S.C. § 1117(a) (as remedy for violation of 15 U.S.C. § 1125(a) (false designation of origin) "the plaintiff shall be entitled, ... subject to the principles of equity, to recover [among other things] defendant's profits"); McCarthy on Trademarks and Unfair Competition § 30:40 (4th ed.) (purpose of freezing assets is to preserve " security for plaintiff's future recovery on an accounting of the counterfeiter's profits."). The Court may "exempt any particular assets from the freeze on the ground that they [are] not linked to the profits of allegedly illegal activity."*Levi Strauss & Co.,* 51 F.3d at 987. The burden is on the party seeking relief to "present documentary proof that particular assets [are] not the proceeds of counterfeiting activities."*SeeCartier Int'l B.V. v. Liu,* No. 02 Civ. 7936, 2003 WL 1900852, at *1 (S.D.N .Y. Apr. 17, 2003).

*4 On the instant record, it is not clear whether any particular portion of TC Defendants' frozen assets are "not the proceeds of counterfeiting activities."[FN6]*SeeLiu,* 2003 WL 1900852, at *1.

Yuen has submitted spreadsheets indicating that, after certain adjustments, TC's gross profits (apparently in 2004 and 2005) were $220,278.60 from the sale of PRL USA goods and $15,445.80 from the sale of North Face goods. (Yuen Sur-Reply Decl. Exs. A & F.) Yuen's spreadsheets indicate that TC's profits from the sale of North Face goods arose solely from commissions TC made from selling North Face goods on behalf of SDT. (Yuen Sur-Reply Decl. Ex. F ("Commission Received from SDT USA on North Face Sales"; " Good[s] owned by SDT USA, Inc. not TC Fashions, Inc. TC Fashions, Inc. only receive[d] commissions on Goods Sold.").)

> FN6. TC Defendants have not established, for example, that certain frozen assets are derived from proceeds from the sale of securities and not the sale of counterfeit garments. Although TC Defendants have submitted evidence showing that Great Value received money from the sale of securities, (*see* Yuen Sur-Reply Decl. Ex. G (broker statements)), they have not submitted any documentary evidence showing that these proceeds were transferred to a bank account that is currently frozen pursuant to the TRO.

Plaintiffs, on the other hand, have submitted spreadsheets indicating that TC's gross profits in 2004 and 2005 were $977,779.60 from the sale of PRL USA goods and $346,180 from the sale of North Face goods. (Elings 2d Supp. Decl. Ex. B.) Plaintiffs support their profit calculation for the sale of PRL USA goods with packing lists and sales slips. (*Id.*) The evidence of TC's sales of North Face goods, however, appears to indicate that at least a portion of revenue from sales was being collected by SDT and not TC. (*Id.*)And, there appears to be some question as to whether SDT and TC are separate entities. (*See* Letter Agreement between CIT Commercial Services and TC, dated September 2005, Elings 2d Supp. Decl. Ex. A ("It is understood and agreed that the Agreement covers all of your sales, including but not limited to sales of your inventory made by you under your name and under all of your trade names ... including, but

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5

Not Reported in F.Supp.2d, 2006 WL 838993 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

not limited to the following: S.D.T. USA").

Final resolution of these issues requires further evidentiary submissions and possibly witness testimony. The parties are directed to meet and confer forthwith in an effort to reach their own agreement and to submit a joint letter to the Court by April 6, 2006 indicating whether they have been successful. If they are unable to reach agreement, the Court may refer the matter to Magistrate Judge Kevin Nathaniel Fox for a hearing.[FN7]

> FN7. The evidence in the record warrants a continuation of the existing asset freeze without prejudice to the parties' submissions to Judge Fox.

B. *SDT*

SDT has not appeared in this action and "has submitted no papers in opposition to Plaintiffs' requested preliminary injunction."(Pl. Reply at 3.) And, the evidence in the record to the effect that SDT manufactured and/or supplied TC with many of the counterfeit garments at issue is uncontradicted and sufficient to support a preliminary injunction. (*See, e.g.,* Elings Supp. Decl. Exs. A, B & G; Yuen Decl. Ex. A); *seeGucci Am., Inc. v. Duty Free Apparel, Ltd.,* 286 F.Supp.2d 284, 287 (S.D.N.Y.2003) ("For both Lanham Act claims, [*i.e.,*15 U.S.C. §§ 1114(1) and 1125(a) ] Gucci must demonstrate (1) that it has a valid mark that is entitled to protection under the Act and (2) that Defendants' actions are likely to cause confusion as to the origin of the mark."); *see also Malletier,* 426 F.3d at 537;*In re Vuitton,* 606 F.2d at 4;*Gucci Am., Inc. v. Accents,* 955 F.Supp. 279, 282-83 (S.D.N.Y.1997) (converting TRO into preliminary injunction upon finding "overwhelming proof of the counterfeit nature of the seized goods, the need for continuation of the original orders and of preliminary injunctive relief against defendants to prevent irreparable harm to plaintiffs, [and] the likelihood that plaintiffs will prevail on the merits of at least the present injunctive portions of their underlying claims").

*5 However, the docket does not indicate that SDT was served with a summons and complaint. The Court will convert the TRO into a preliminary injunction against SDT at such time as Plaintiffs present evidence that SDT was, in fact, properly served. Plaintiffs should submit a proposed preliminary injunction along with proof of service by April 6, 2006.

C. *Waitex*

1. Preliminary Injunction

Plaintiffs argue that they "have shown a strong likelihood" that Waitex is "directly liable" and " contributorily liable" for "TC Fashions' counterfeiting activities" because Waitex "took an active role in opening boxes, cutting labels and sewing new labels on, and repacking goods for pickup" and because "Waitex had intimate knowledge of [the] suspicious nature of TC Fashions' business, as well as general expertise in the apparel industry, and cannot credibly claim that it should not have known that TC Fashions was transacting in counterfeit apparel."(Pl. Sur-Sur Reply at 1-4; *see* Pl. Reply at 7 (citing Saenz Decl. ¶ 5 ("I observed Waitex employees opening all of the boxes that come to its warehouse on behalf of TC Fashions, cutting out the labels on the apparel in those boxes, sewing on new labels and repackaging the goods in unmarked boxes for pickup.")); Elings Supp. Decl. Ex. G.)

Waitex argues, among other things, that it "was never ... notified prior to this litigation" that TC Fashions engaged in counterfeiting and "Waitex has terminated warehouse services with TC Fashions since this litigation evidencing TC Fashions counterfeiting activities."(Waitex's Sur-Reply at 7 (citing Sur-Reply Declaration of W.K. Wong, dated November 30, 2005 ("Wong Sur-Reply Decl.") ¶ 2 ("prior to this ... suit, Waitex had never received notice that TC Fashions was engaged in counterfeiting" and that "[s]hortly after the raids on the warehouses, Waitex ... terminated warehouse

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 838993 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

distribution services with TC Fashions....")) .) Waitex also asserts that "Waitex has never sewn Plaintiff [s'] labels for TC Fashions," (Waitex Sur-Reply at 2 (citing Declaration of Kevin Liu, dated November 30, 2005 ("Liu Decl.") ¶ 2 ("TC Fashions has never requested Waitex to sew Plaintiffs' labels and Waitex has never sewn Plaintiffs' labels on behalf of TC Fashions. In fact, since 2002, no sewing services were provided to TC Fashions in any capacity."); Wong Sur-Reply Decl. ¶ 5 ("Waitex has never sewn or cut any of plaintiffs' labels for TC Fashions. Waitex did 'cut' labels for TC Fashions on occasion, ... but never for plaintiffs' labels. Since 2002, Waitex has not done any sewing of any labels for TC Fashions. Since January 2005, Waitex has not cut any labels for TC Fashions.")), and that on the dates on which its warehouses were searched by Plaintiffs, "Waitex employees were cutting out and sewing in labels for [another] Waitex warehouse customer, XES-NY, and sewing in XES-NY's owned J.A.C. brand label." (Waitex Sur-Reply at 2 (citing Liu Decl. ¶¶ 5-6; Wong Sur-Reply Decl. ¶¶ 3-5).) Further, Waitex argues that it houses thousands of legitimate PRL USA garments and "there is no way for Waitex, a public warehouse, to ensure that all of these goods are authentic while continuing to provide its services to clients, without disrupting its normal and logistically precise supply chain management services, to verify the authenticity of each garment." (Waitex Sur-Reply at 10 (citing Wong Sur-Reply Decl. ¶ 9; Wong Decl. ¶ 6 ("It is impossible for Waitex to investigate or have knowledge of whether each client's products are authentic, whether the client is authorized, whether brands are private brands or licensed brands, and the like. Nor can Waitex police the voluminous in and out flow of millions of garments.").) Waitex requests that if " the Court does not deny the preliminary injunction, the Court should allow a hearing in light of the bitterly disputed facts between the parties." (Waitex's Sur-Reply at 5 (citing *Forts v. Ward,* 566 F.2d 849, 851-52 (2d Cir.1977)).)

*6 "On a motion for preliminary injunction, where essential facts are in dispute, there must be a hearing ... and appropriate findings of fact must be made."*Fengler v. Numismatic Americana, Inc.,* 832 F.2d 745, 747 (2d Cir.1987) (internal quotations

omitted). Waitex's involvement with TC's counterfeiting operation is disputed and requires a hearing, unless the parties are able to resolve these issues on their own. *SeeFengler,* 832 F.2d at 747.[FN8] As with all other open issues in this case, the parties are directed to meet and confer forthwith in an effort to reach an agreement. The parties (jointly) shall inform the Court by April 6, 2006 as to whether they have been successful. If they have not, the Court may refer the matter to Judge Fox for a hearing.

> FN8. The Court notes that a proposed preliminary injunction enjoining Waitex from dealing with any goods bearing Plaintiffs' trademarks appears, at this stage, overly broad. *SeePatsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 220 (2d Cir.2003) ("Injunctive relief should be narrowly tailored to fit specific legal violations. Accordingly, an injunction should not impose unnecessary burdens on lawful activity.") (citation and quotation omitted).

## 2. Restrained Assets

Waitex argues that "Plaintiffs are not entitled to restrain any of Waitex's assets" because "Waitex is a robust and financially secure company that is not going to cut and run."(Def. Mem. at 11.) Plaintiffs respond that they have "sent a letter to HSBC instructing the bank to release the account."(Pl. Reply at 8.) As Plaintiffs have consented to release Waitex's assets, this issue is moot.

## D. *Seized Property*

Waitex asserts that Plaintiffs seized documents and computers containing "information not relating to TC Fashions, Inc., SDT USA, Inc., Great Value Inc., and/or EB Garments Inc. or the marks at issue herein" and "proprietary information regarding Waitex's data, operations, information technology, and procedures. Should this information be shared

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 7

Not Reported in F.Supp.2d, 2006 WL 838993 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

with others in the industry, we could lose our competitive advantage in the field."(Wong Decl. ¶ 17.) Waitex also asserts that "both Waitex's and its clients' information and trade secrets are at risk" because, through the seized computers, "plaintiffs have access to the pricing information of competitors, clients' brands, clients' range and type of products, as well as the customer lists of each and every Waitex client."(Wong Decl. ¶ 18.) Waitex requests that "all information, documents and computer information retained by plaintiffs ... be treated as confidential-attorneys eyes only."(Def. Mem. at 12-13.) TC Defendants allege that Plaintiffs have failed to return within five business days certain of their documents and computers that were seized, as directed under the TRO. (Def. Mem. at 3; *see* TRO at 6 ("merchandise, records or other items seized shall be impounded in the custody or control of Plaintiffs ... pending further order of this Court [and] any such records seized ... shall be copied and the copies returned to Defendants within five (5) business days of the date this Order is executed.").) Plaintiffs do not respond to these issues.

Information from documents or computers seized from Waitex and retained by Plaintiffs shall be treated as confidential until further notice. The parties are directed to meet and confer forthwith and to submit a proposed protective order for the Court's endorsement on or before April 6, 2006. Also, to the extent Plaintiffs have failed to return computers or copies of seized documents to TC Defendants, they are directed to do so forthwith. ( *See* TRO at 6.) [FN9]

FN9. Waitex also complains that Plaintiffs did not properly notify Waitex that it was a defendant in this action at the time Plaintiffs searched the warehouses and that Plaintiffs exceeded the scope of the TRO by seizing Waitex's property and causing damage to property belonging to clients other than TC or SDT. (*See* Def. Mem. at 7; Wong Decl. ¶¶ 11, 14.) If the parties are unable to resolve these issues themselves, Waitex may bring these complaints as counterclaims. *See* 15 U.S.C.

§ 1116(d)(11) ("A person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made....");  *Reebok Int'l Ltd. v. Su Youn Pak,* No. 87 Civ. 2727, 1989 WL 76225, at * (S.D.N.Y. June 30, 1989); *see also Accents,* 955 F.Supp. at 282 ("such responses to Fourth Amendment violations as suppression of unlawfully-seized evidence may well be available to victims of unlawfully-obtained seizure orders under the Trademark Counterfeiting Act, even if the goods prove in fact to be counterfeit.").

IV. Conclusion and Order

*7 Plaintiffs' application to convert the TRO into a preliminary injunction against TC Defendants is granted. The Court will grant Plaintiffs' application to convert the TRO into a preliminary injunction against SDT USA at such time as Plaintiffs submit proof of service of process upon SDT USA. The existing TRO shall remain in effect until such time as the preliminary injunction is entered by the Clerk of the Court. Plaintiffs' application for a preliminary injunction as to Waitex is deferred and the TRO shall remain in effect against Waitex pending either an agreement between the parties or an evidentiary hearing.

The parties are directed to meet and confer in good faith on all open issues forthwith and to submit for the Court's endorsement on or before April 6, 2006: (i) a proposed order of preliminary injunction; (ii) a proposed protective order; and (iii) any other settlements. The parties also are directed to submit a joint letter by April 6, 2006 informing the Court as to whether they have reached agreement on unresolved issues.

S.D.N.Y.,2006.
North Face Apparel Corp. v. TC Fashions, Inc.
Not Reported in F.Supp.2d, 2006 WL 838993 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22889738 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
U2 Home Entertainment, Inc. v. Bowery Music
City, Inc.
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
U2 HOME ENTERTAINMENT, INC., Plaintiff,
v.
BOWERY MUSIC CITY, INC. and John Does I
through V, d/b/a Bowery Music City and d/b/a
Grand Import Inc, Defendants.
**No. 03 Civ. 8909(RJH).**

Dec. 8, 2003.

**Background:** Alleged infringers moved to
vacate order of seizure issued in copyright
infringement action upon plaintiff's ex parte
application filed pursuant to Copyright Act.

**Holdings:** The District Court, Holwell, J., held
that:

(1) plaintiff established prima facie case of
copyright infringement, supporting seizure and
impoundment of alleged infringing items, and

(2) alleged infringers were not entitled to have
seizure order vacated.

Ordered accordingly.

West Headnotes

**[1] Copyrights and Intellectual Property 99⟜
71**

99 Copyrights and Intellectual Property
  99I Copyrights
    99I(J) Infringement
      99I(J)2 Remedies

        99k71 k. Seizure and Forfeiture. Most
Cited Cases
Plaintiff established prima facie case of copyright
infringement, supporting seizure and impoundment
of alleged infringing items under Copyright Act,
when plaintiff offered evidence that it owned
exclusive United States distribution rights to many,
if not all, of copyrighted titles of Chinese-language
motion pictures and television programs seized
from alleged infringers, and plaintiff claimed in its
pleadings that alleged infringers offered those titles
for distribution or sale in violation of plaintiff's
rights. 17 U.S.C.A. §§ 106, 503(a).

**[2] Copyrights and Intellectual Property 99⟜
71**

99 Copyrights and Intellectual Property
  99I Copyrights
    99I(J) Infringement
      99I(J)2 Remedies
        99k71 k. Seizure and Forfeiture. Most
Cited Cases
Alleged infringers of plaintiff's exclusive United
States distribution rights to many, if not all, of
copyrighted titles of Chinese-language motion
pictures and television programs seized from
alleged infringers were not entitled to have seizure
order vacated, inasmuch as plaintiff established
prima facie case of copyright infringement,
triggering presumption of irreparable harm, and any
countervailing hardship or injury to alleged
infringers arising from seizure did not outweigh that
presumptive harm in light of pre-seizure bond
posted by plaintiff, which provided adequate
protection for alleged infringers if seizure proved,
after trial on the merits, to have been improper. 17
U.S.C.A. §§ 106, 503(a); Fed.Rules Civ.Proc.Rule
65(b, f), 28 U.S.C.A.

DECISION AND ORDER

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2003 WL 22889738 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

HOLWELL, J.
　　**\*1** Counsel for the parties in the above-captioned action appeared before this Court on December 5, 2003, to be heard on the matter of the Order of Seizure and Order to Show Cause issued on November 13, 2003, upon the *ex parte* application of Plaintiff pursuant to Section 503(a) of the Copyright Act, U.S.C. Title 17, and Fed.R.Civ.P. 65(b) and (f). In its memorandum of law in support of its application and in its complaint, plaintiff states that it holds exclusive importation, reproduction, and distribution rights to certain Chinese-language motion pictures and television programs in the United States, and alleges that defendant violated one or more of these rights protected by Section 106 of the Copyright Act.

　　[1] Under section 503(a) of the Copyright Act, a court in which an action for copyright infringement is pending may order the seizure and impoundment of "all copies ... claimed to have been made or used in violation of the copyright owner's exclusive rights" and of all devices by means of which such copies may be reproduced. Impoundment of items that allegedly infringe plaintiff's rights under the Copyright Act, 17 U.S.C. § 106, is appropriate if plaintiff establishes a *prima facie* case of copyright infringement, and therefore demonstrates a likelihood of success on the merits. A *prima facie* case of copyright infringement can be established by offering evidence of ownership of valid copyrights, and alleging that defendant violated an exclusive right conferred by that ownership.

　　This Court finds that plaintiff has made a sufficient showing to establish a *prima facie* case of copyright infringement. Plaintiff has offered evidence that it owns exclusive U.S. distribution rights to many if not all of the copyrighted titles seized from defendants on November 15, 2003. To its complaint plaintiff attached a list of works to which it claims exclusive U.S. rights and which it states are currently registered in the U.S. Copyright office, for which there · are applications for copyrights pending, or which are protected under international copyright conventions. In reply to defendant's affirmation and supplemental

affirmation in opposition to plaintiff's application, in which defendant claims that plaintiff failed to provide sufficient information showing rights to the seized titles, plaintiff provided defendant with copies of documents allegedly establishing its ownership of rights to most if not all of the works seized on November 15. Plaintiff has claimed in its pleadings that defendant has offered these titles for distribution or sale in violation of these rights. Defendant has not produced any factual evidence contesting plaintiff's claims of rights in the seized works.

　　[2]Rule 65(b) of the Federal Rules of Civil Procedure provides that a temporary restraining order may be granted without notice to the adverse party or that party's attorney "only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required...."Rule 65(f) expressly makes this provision applicable to copyright impoundment proceedings. Where, as here, a *prima facie* case of copyright infringement is made out, irreparable harm is normally presumed. *Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.,* 312 F.3d 94 (2d Cir.2002) (citing cases). The Court finds that any countervailing hardship or injury to defendant arising from the seizure would not outweigh the presumptive harm to plaintiff in this case, since the bond posted by plaintiff prior to the seizure provides adequate protection for defendant should it be determined after a trial on the merits that the seizure was improper.

　　**\*2** Based on the record before it, the Court denies defendant's request to vacate the order of seizure without prejudice to defendant's right to submit further evidence in support of an application to lift the order in part or in whole. The order is hereby confirmed and will be extended so long as the interests of justice require. The parties are directed to meet and confer pursuant to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22889738 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Fed.R.Civ.P. 26(f) and to submit a joint pretrial
report no later than January 5, 2004.

    SO ORDERED.

S.D.N.Y.,2003.
U2 Home Entertainment, Inc. v. Bowery Music
City, Inc.
Not Reported in F.Supp.2d, 2003 WL 22889738
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.