UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ART-OPTIC, LTD.,                               :

                Plaintiff,               :

          v.                                  :                    **AFFIDAVIT OF**
                                               :                    **EHUD BIBRING**
SAMUEL TOMASHOVER,                             :                    **08CV0327(MGC)(KNF)**
MERYL TOMASHOVER, and                          :
NEWLIGHT EYEWEAR, LLC,                         :
                                               :
             Defendants.              :
-------------------------------------------------------------X

CITY OF KIRYAT ONO      )
                        )      ss.:
STATE OF ISRAEL         )

      EHUD BIBRING makes the following statements under penalty of perjury:

      1.     I am the founder of plaintiff Art-Optic, Ltd. ("Art-Optic"). I make this affidavit in support of Art-Optic's motion for a temporary restraining order and preliminary injunction. I make this affidavit based on my personal knowledge and review of the relevant documents.

### I.    Art-Optic and its "Ronit Furst" Brand of Eyewear

      2.     Art-Optic is a private family-owned company formed on January 14, 2002 and located in the State of Israel. Art-Optic is owned by my mother, Mrs. Lea Bibring.

      3.     Art-Optic was formed to manufacture and distribute eyeglass frames individually designed and hand-painted by my wife, Ronit Furst, under the "Ronit Furst" brand name and trademark. Creating designs for eyeglass frames was always a dream of hers. Together with my family we created a company that could create her works on clear plastic eyeglass frames.

4.      I manage the daily business affairs of Art-Optic in Israel and distribute the goods in Israel, Europe and the United States. I have built up the company from a small local business to a well-known international eyeglasses company.

5.      The eyeglasses produced by Art-Optic are unique and distinctive as each frame is designed with hand-painted colorful designs created by Ronit Furst, the artist behind each design on the eyewear. Each design is then hand-painted onto clear plastic eyeglass frames by a select small group of artists who train for months to learn the various designs and apply these designs under the direct supervision of Ronit Furst. Each design has an identifying index number which is handwritten by an artist on the inside of the right temple of each frame. After applying a special coating process that affixes the paint to the surface of the frame, each frame is then screen printed with Ronit Furst's personal signature on the left temple and left lens of each frame.

6.      Designing, creating, marketing and distributing the eyeglasses took and still takes intensive research, a great deal of labor, and a large capital investment into Art-Optic. All designs and marketing material are proprietary and owned outright by Art-Optic, including all intellectual property rights. (Photographs of twenty-six frames and one case are annexed hereto as Exhibit 1.) The designs of three of these frames and case are registered with the U.S. Copyright Office. (The Certificates of Copyright Registration are annexed hereto as Exhibit 2.) We have filed for copyrights on the remaining twenty-three frames. When we receive our Certificates of Copyright Registration, we will amend the complaint accordingly.

7.      Because of the high artistic beauty and the unique and distinctive design and special personal attention given to apply the design on each frame, Ronit Furst earned a reputation of designing high quality eyeglasses throughout Israel, Europe and the United States.

These special designs are identifiable throughout the world as the distinctive Ronit Furst eyeglasses.

## II.    Prior Business History with the Tomashovers

8.    My business association with Samuel and Meryl Tomashover ("Tomashovers") began in 2004 when I was approached by David Goldwasser ("Goldwasser"), one of my distributors in Israel. In 2004, I had existing business relationships with an individual optical store in New York City and with a small distributor in Rochester, New York. My exposure in the United States was limited to these two customers. Goldwasser told me that he had relatives in the United States who were experienced in marketing but were, at the time, unemployed. He proposed that Art-Optic, the Tomashovers and he sign an exclusive distribution agreement for the marketing and sales of Ronit Furst glasses solely in the United States.

9.    Wanting to expand the business, we negotiated and signed the distribution agreement for a period of thirteen months, beginning on December 1, 2004 and ending on December 31, 2005 ("Agreement"). (The Agreement is annexed hereto as Exhibit 3.) Although the Agreement did have an exclusivity clause, it allowed for me to continue working with the two clients in New York State. In February 2005, Goldwasser withdrew from the partnership with the Tomashovers and from the Agreement. With everyone's consent, I continued to work only with the Tomashovers to market and sell the Ronit Furst eyeglasses frames. I saw this as a great opportunity to expand the business and earn more exposure for our brand.

10.    While Goldwasser was a party of the Agreement, everything went well. However, once he withdrew from the Agreement, the Tomashovers began reducing the quantities ordered from us thereby acting less like an importer and more like a sales representative, which contradicted the Agreement's terms. Furthermore, they repeatedly breached the Agreement by

not paying for products that were supplied to them and by not returning damaged frames to us after we replaced them.

11.      Throughout 2005, and later in 2006, we had numerous disagreements with the Tomashovers about all aspects of our Agreement, including payment terms, prices and ordering methods.  Whenever any disagreement arose, which occurred often, the Tomashovers resorted to verbally attacking me personally either via e-mail or over the phone.  Samuel Tomashover repeatedly tried to intimidate me so that I would do exactly what he wanted me to do.  The disagreements stemmed from numerous issues including the fact that the Tomashovers only placed orders for a small amount of eyeglasses.  Instead of ordering enough stock at once so that he could supply the eyeglasses to the stores immediately, he would only order enough for each order received from the optical stores.  They also rarely paid for these orders on time; according to the Agreement with the Defendants, they were required to pay 30% of the cost of the frames with the placement of each order and to pay the remaining balance when the order was shipped. However, they failed to do so.  Regardless, we fulfilled the orders in order not to hold up any sale because I was worried that by doing so I would be harming my brand name and reputation in the U.S. market.

12.      It was clear based on the terms of the Agreement between us that the exclusivity would not extend beyond December 2005, which I confirmed with Samuel Tomashover by telephone and e-mail at that time.  In fact, neither of us was interested in signing an extension of the Agreement on the same terms.  I certainly found it very difficult to work with them because of the constant breaches of the Agreement by the Tomashovers.  However, because I had no other importer in the United States, I had no other choice but to continue to work with them. Furthermore, there were outstanding orders that needed to be fulfilled and I did not want to leave

my US clients without a contact person in case any service issues arose with frames that had already been supplied to them. Thus, we continued to work together but without a new agreement.

13.    In April 2006, the Tomashovers began demanding a new agreement. They wanted a ten-year exclusivity deal, without any minimum order requirements, unacceptable credit terms, and other extreme demands which I could not meet. They wanted all of this and yet they had failed to pay me for orders which I had already fulfilled during the term of the Agreement. Furthermore, I was unhappy with the fact that they did not procure a large number of orders for new frames, which according to the Agreement they were supposed to do. They kept placing small individual orders and wanted to keep working with me this way. This was not the best way to expand my business, which was the only reason I had entered into a business relationship with the Tomashovers in the first place.

14.    In order to remedy the Tomashovers' outstanding balance, I negotiated an agreement with the Tomashovers that they would pay off their outstanding balance in eight payments throughout 2006. Although they agreed to these terms, they did not make the payments as planned.

15.    Although the exclusivity clause ended, the Tomashovers did not accept that we would work with other importers. They would often shout obscenities at me whenever he suspected that I was trying to sell the Ronit Furst frames without him. It was obvious to both parties that I was allowed to pursue other importers since it was clearly written as such in the Agreement. However, the Tomashovers threatened that they would harm my business if I attempted to seek another importer.

16.     In September 2006, I began negotiating a distribution agreement with a new party because it became impossible to work with the Tomashovers. I informed them that I was negotiating with a new distributor and I repeated to them that they were not my exclusive distributor. However, I offered them the opportunity to become a sales representative once I found a new distributor. After hearing this, Samuel Tomashover began threatening me over the phone and shouting obscenities at me. At this point, I was extremely nervous about working with them. As a result, I decided that regardless of the outcome of my negotiations with the new distributor, I would stop working with the Tomashovers. As a result of this decision, I had my attorney send the Tomashovers a letter dated December 5, 2006 stating that they are no longer my representatives in the United States, thereby terminating my business relationship with them.

### III.   The Tomashovers Manufacture, Market and Sell Counterfeit Ronit Furst Eyewear

17.     In February 2007 I learned that the Tomashovers were selling frames which they claimed to be original Ronit Furst frames from Cathy Shue, an owner of an optical store in Monterey, California. (Ms. Shue's affidavit describing her experiences with the Tomashovers was originally submitted in connection with the Court proceedings in Israel, described herein and is annexed hereto as Exhibit 4.)

18.     I had been in contact with Ms. Shue since 2006 when she first contacted me because she was interested in distributing Ronit Furst frames in California. Although a distribution agreement never materialized, we had since remained in touch. The Tomashovers contacted Ms. Shue in February 2007 asking her whether they could hold a special sale of Ronit Furst frames in her store. Around the same time, I had contacted Ms. Shue to see if we could revive our negotiations for a distribution agreement in California. During our conversation, she mentioned that it was a coincidence that I contacted her and she proceeded to tell me about the

"special sale" which the Tomashovers wished to hold in her store. Not knowing anything about what the Tomashovers were up to, but knowing full well that they were no longer distributors of the original Ronit Furst frames, I told her to go through with the sale and to send to me what the Tomashovers sold to her. I told her I would provide her with replacement frames.

19.    It did not make sense to me that the Tomashovers would hold such a sale since they only had a limited number of original Ronit Furst frames which we delivered to them. In fact, our last shipment to them was on October 3, 2006 and consisted only of 514 frames out of a total of 667 frames which they ordered back in September 2006. I knew that the majority of the frames ordered in September 2006 came from orders placed with them at the Vision Expo West convention. It also did not make sense to me that the Tomashovers were planning to fly from New York, where they lived, to California to sell eyeglass frames only to one store because these sales tend to procure a sale of only 10-20 frames per store.

20.    According to what Ms. Shue described to me, the Tomashovers showed up with samples of frames and publicity materials created by Ronit Furst and represented themselves as agents of Ronit Furst designer eyewear. The Tomashovers then sold 13 frames to Ms. Shue, 12 of which were counterfeit Ronit Furst eyewear.

21.    This sale took place more than three months after they received the December 5, 2006 letter from my attorneys which formally terminated our business relationship. The Tomashovers had and have no right to represent themselves as Ronit Furst's agents, nor are they authorized to manufacture similar goods.

22.    On March 16, 2007, Ms. Shue sent me the frames sold to her by the Tomashovers. (Photographs of Defendants' infringing eyewear are annexed hereto as Exhibit 5.) She was able to identify that these frames were counterfeits as the Tomashovers erred in producing the frames.

7

On the original Ronit Furst eyewear which we produce, we *write by hand* the color reference on the bottom of the right temple of each frame. The Tomashovers manufactured their counterfeits with the same color reference *screen printed* on the upper inside right temple of each frame. I realized this as well and recognized their frames as counterfeits. I sent to Ms. Shue original frames as replacements for those sent to me for no additional charge. Although I lost money by replacing the frames at no cost, I felt that it was more important to maintain the quality and name of my company intact and remove any counterfeit copies from the market.

23.    It is obvious that the Tomashovers, knowing that they would no longer receive goods from us due to the termination of our agreement, actively took the time to seek out a supplier to create counterfeit Ronit Furst frames. They also made exact replicas of our frame shapes, a production process that within the optical industry takes at least 4-5 months. They had learned of our technique and our method of producing the eyeglasses frames as I explained the process to Samuel Tomashover in the regular course of business during the term of the Agreement. They had used our trade secrets and their knowledge of our confidential information to train their manufacturer to mirror our technique, albeit not perfectly. Their manufacturer continues to produce precise copies of Ronit Furst's frame designs, including printing her name on the left temple of the eyeglasses frames as well as upon the left lens, thereby infringing on Art-Optic's intellectual property. Finally, the Tomashovers marketed and sold their counterfeit frames as original Ronit Furst frames. Innocent customers were duped into purchasing these frames, unaware of the differences between the frames.

24.    The Tomashovers' behavior reflects a deliberate attempt to create and build their business on Art-Optic's business, goodwill and reputation. They in no way acted innocently. I made it clear to them in writing that our business relationship was over and we stopped sending

glasses frames to them on October 3, 2006. Their deliberate use of a separate manufacturer and training their workers how to create the designs and apply them to the frames in the exact same manner as Art-Optic shows that this was a well thought-out scheme plotted by the Tomashovers.

### IV.   Defendants' Actions Are Irreparably Harming Art-Optic

25.    The Tomashovers have spread lies about our company and have flooded the marketplace in the United States with counterfeits of our exclusive and uniquely individual products thereby damaging our business, goodwill and reputation in the US marketplace.

26.    The Tomashovers' lies have not been limited to individual stores like the incident with Ms. Shue. They have attended conventions in New York, Chicago and Las Vegas where they have claimed to represent Ronit Furst eyewear. Through these conventions, the Tomashovers sold unknown amounts of counterfeits throughout the world. In fact, I learned that they plan to attend a convention in Atlanta in February 2008 in furtherance of their counterfeiting scheme.

27.    In October 2007, I saw their booth at the Vision Expo West eyeglasses convention in Las Vegas, where they sold identically designed counterfeit Ronit Furst frames in a booth less than 50 feet from our booth which was selling original Ronit Furst frames. This convention appearance caused us and Avri Beeri ("Beeri"), our official distributor, significant damage to the outstanding reputation of the Ronit Furst brand of eyewear, a great deal of embarrassment and thousands of dollars in lost sales because customers avoided our booth when they saw identical frames being sold several feet from us. Because of this, I was not able to sell many frames at the convention.

28.    While I was in Las Vegas, I saw 18 counterfeit frames advertised with our brochure and a photograph of Ronit Furst at Davante, a prestigious boutique optical store in The

9

Forum Shops located at the Caesar's Palace Hotel. (A photograph of the display at Davante, which I took with Avri Beeri, is annexed hereto as Exhibit 6.)

29.    In October 2007, while in New York, I visited Bella Vista Optics, located at 1291 Lexington Avenue, New York, New York, and A.R. Trapp Opticians, located at 488 Madison Avenue, New York, New York, where I saw over 40 different pieces of counterfeit Ronit Furst eyewear supplied by Defendants. I purchased a counterfeit version of frame number 1174 color 9 from A.R. Trapp Opticians and noticed that Defendants realized their error in creating their counterfeit frames referenced in paragraph 21 above. In an effort to conceal their error and have their frames look more like original Ronit Furst frames, they scratched out the color reference which was printed on the frame and replaced it with a hand-painted color reference utilizing a similar color to ours.

30.    It has also come to my attention that Samuel Tomashover applied for trademark protection of our logo which consists of Ronit Furst's personal name and signature written in her unique style which is screen printed on each pair of glasses. The trademark application cites Samuel Tomashover as the owner of the trademark. This is an absolutely reprehensible action taken by the Defendants. Neither Ronit Furst, Art-Optic nor I have given him or anyone else the right to use the name "Ronit Furst." He has no rights in Ronit Furst's name. He also claims in the trademark application that the first use in commerce of the name as occurring prior to our distribution agreement. This is absolutely false because Art-Optic has been manufacturing and marketing Ronit Furst frames since January 2002.

31.    We have also had serious business losses because of the Defendants. We negotiated an agreement in May 2007 with a new distributor, Beeri, based in North Carolina, to distribute the Ronit Furst frames in the United States. The Defendants, specifically Samuel

Tomashover, are attempting to prevent Beeri's representatives from selling our frames in the United States. Tomashover has repeatedly threatened to sue all distributors and representatives and bankrupt them. He has also approached Beeri's representatives and has verbally harassed, threatened, and attempted to intimidate them and anybody who has expressed interest in distributing or selling the Ronit Furst frames. The distributors do not want to sell the original frames as a result of Samuel Tomashover's threats. The Defendants have therefore effectively limited the US sales of Ronit Furst frames. My agreement with Beeri has called for him to order an additional 2,000 eyeglasses frames by January 31, 2008. However, as of the end of November, Beeri has already informed me that he will not be able to purchase this amount because he is finding it extremely difficult to find representatives to sell the frames because of the Defendants' belligerent behavior towards the representatives. In fact, Beeri has found only three representatives that will sell the frames. Beeri's representative on the West Coast has told him that she will only begin to find more sales representatives once the legal problems end.

## V.    The Injunction Against Defendants in Israel

32.    In 2007, Art-Optic commenced a lawsuit against the Tomashovers in Tel Aviv District Court in the State of Israel (Civil File 1661/07). (Affidavits from some of the optical store owners who were contacted by defendants are annexed hereto as Exhibit 4 (Ms. Shue's affidavit), and the Affidavit of Ruth Domber of 10/10 Optics in New York is annexed hereto as Exhibit 7.) On September 20, 2007 the Tel Aviv District Court issued a temporary injunction barring the Tomashovers from manufacturing, marketing and selling counterfeit frames and entered a judgment against the Defendants for 20,000 NIS (New Israeli Shekels). (A certified translation of the judgment is annexed hereto as Exhibit 8.) However, the Defendants are

choosing to ignore the ruling against them and continue to manufacture, market, and sell counterfeit eyeglasses frames and cases.

## CONCLUSION

33.    The Defendants are clearly embarking on a program to expand their counterfeiting business, divert business away from Art-Optic and earn money off of the hard-earned reputation built up over years by Ronit Furst and Art-Optic. By physically threatening and intimidating Beeri's representatives in the United States, Defendants have ensured that no one wants to work with us and I am losing sales of the glasses while Defendants enjoy the sale of their counterfeit products. They took advantage of our business relationship, stole the core of my business, and are now doing everything they can to run me out of business. They need to be stopped immediately.

34.    It is imperative that the temporary restraining order and preliminary injunction be granted to stop our continued losses and to help restore our business, goodwill and reputation which are being tarnished by Defendants.

Dated: Kiryat Ono, Israel
December ___, 2007 January 9th, 2008

EMBASSY OF THE UNITED
STATES OF AMERICA AT |SS
TEL-AVIV ISRAEL

_____
EHUD BIBRING

Sworn to before me
Jan. 9, 2008.

_____
Notary Public

ELISA B. GREENE
CONSUL
THE UNITED STATES

MY COMMISSION EXPIRES: INDEFINITE

12



**Front**

**Left Side with logo**



**Back**

Model Number 3766
Color 20

**Right Side**







**Front**

**Left Side with logo**



**Back**

**Right Side**

Model Number 3766
Color 05







## Front





## Left Side with logo



## Back



Model Number 3765
Color 14

## Right Side











**Front**

**Left Side with logo**



**Back**

Model Number 2321
Color 01

**Right Side**







**Front**



**Left Side**



**Back**

Model Number 2319
Color TZ

**Right Side with logo**







**Front**



**Left Side with logo**



**Back**



Model Number 2319
Color 8

**Right Side**







**Front**



**Left Side with logo**



**Back**

**Right Side**

Model Number 2319
Color 07









## Front

## Left Side with logo







## Back

## Right Side

**Model Number 2319**
**Color 6B**







**Front**



**Left Side with logo**



**Back**

**Model Number 2147
Color 21**



**Right Side**



**Front**

**Left Side with logo**



**Back**

**Right Side**

Model Number 2147
Color 05A








**Front**



**Left Side with logo**



**Back**

Model Number 1680
Color 14A

**Right Side**





**Front**



**Left Side with logo**



**Back**

Model Number 2147
Color 1A





**Right Side**

## Front



## Left Side with logo

## Back

Model Number 1763
Color 35

## Right Side







**Front**

**Left Side with logo**

**Back**

**Right Side**

Model Number 1763
Color 19







## Front



## Left Side with logo



## Back



**Model Number 1680**
**Color 2A**

## Right Side





**Front**



**Left Side with logo**



**Back**

**Model Number 1556**
**Color 02**

**Right Side**







**Front**



**Left Side with logo**



**Back**



Model Number 1174
Color 13

**Right Side**





**Front**



**Left Side with logo**



**Back**

Model Number 1174
Color 3

**Right Side**









**Front**

**Left Side with logo**




**Back**



Model Number 1174
Color 25

**Right Side**





Front



Left Side with logo

Back

Model Number
1174 Color 16

Right Side







Front



Left Side with logo

Back

Model Number
1540 Color 5

Right Side







Front



Left Side with logo

Back

Model Number
1540 Color 9

Right Side







Front

Back



Model Number
1762 Color 9





Left Side with logo

Right Side







Front

Back



Model Number
2319 Color 6

Left Side with logo

Right Side







Front

Back



Left Side with logo

Right Side

Model Number
2321 Color 10







Front

Back



Left Side with logo

Model Number
2321 Color 17

Right Side







Front of Glasses Case



Side and back of Glasses Case



Inside of Glasses Case

EXHIBIT 2

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

**VA 1-624-141**

**Effective date of registration:**

December 14, 2007

## Title

**Title of Work:** Model No. 2321 Color 17

**Nature of Work:** Designs to be painted on Eyeglasses

## Completion/Publication

**Year of Completion:** 2002

**Date of 1st Publication:** January 1, 2002     **Nation of 1st Publication:** Israel

## Author

■  **Author:** Art-Optic, Ltd.

**Author Created:** 2-Dimensional artwork

**Work made for hire:** Yes

**Domiciled in:** Israel

**Year Born:** 2002

**Anonymous:** No     **Pseudonymous:** No

## Copyright claimant

**Copyright Claimant:** Art-Optic, Ltd.

Hazamir Street 61, Kiryat Ono 55507, Israel

## Limitation of copyright claim

**Material excluded from this claim:** Plastic pre-fabricated clear eyeglasses frames

**Previously registered:** No

**New material included in claim:** Designs hand painted on to the eyeglasses frames

## Certification

**Name:** Sagie Kleinlerer, Esq., authorized agent of Art-Optic, Ltd.

**Date:** December 11, 2007

Correspondence: Yes

IPN#:

**Registration #:**   VA0001624141

**Service Request #:**   1-27944541

Shiboleth, Yisraeli, Roberts & Zisman LLP
Sagie Kleinlerer, Esq.
One Penn Plaza, Ste. 2527
New York, NY 10119

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, United States Code,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

## VA 1-624-139

**Effective date of
registration:**

December 14, 2007

## Title

**Title of Work:** Model No. 2321 Color 10

**Nature of Work:** Designs to be painted on Eyeglasses

## Completion/Publication

**Year of Completion:** 2002

**Date of 1st Publication:** January 1, 2002      **Nation of 1st Publication:** Israel

## Author

- **Author:** Art-Optic, Ltd

**Author Created:** 2-Dimensional artwork

**Work made for hire:** Yes

**Citizen of:** Israel      **Domiciled in:** Israel

**Year Born:** 2002

**Anonymous:** No      **Pseudonymous:** No

## Copyright claimant

**Copyright Claimant:** Art-Optic, Ltd.

Hazamir Street 61, Kiryat Ono 55507, Israel

## Limitation of copyright claim

**Material excluded from this claim:** Plastic pre-fabricated clear eyeglasses frames.

**Previously registered:** No

**New material included in claim:** Designs hand painted on to the eyeglasses frames

## Certification

**Name:** Sagie Kleinlerer, Esq., authorized agent of Art-Optic, Ltd.

**Correspondence:** Yes

IPN#:

Registration #:    VA0001624139

Service Request #:   1-27858703

Shiboleth, Yisraeli, Roberts & Zisman LLP
Sagie Kleinlerer, Esq.
One Penn Plaza, Ste. 2527
New York, NY 10119

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, United States Code,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

## VA 1-624-140

**Effective date of
registration:**

December 14, 2007

## Title

**Title of Work:** Model No. 1174 Color 16

**Nature of Work:** Designs to be painted on Eyeglasses

## Completion / Publication

**Year of Completion:** 2002

**Date of 1st Publication:** January 1, 2002          **Nation of 1st Publication:** Israel

## Author

- **Author:** Art-Optic, Ltd.

   **Author Created:** 2-Dimensional artwork

   **Work made for hire:** Yes

   **Citizen of:** Israel          **Domiciled in:** Israel

   **Year Born:** 2002

   **Anonymous:** No          **Pseudonymous:** No

## Copyright claimant

**Copyright Claimant:** Art-Optic, Ltd.

   Hazamir Street 61, Kiryat Ono, 55507, Israel

## Limitation of copyright claim

**Material excluded from this claim:** Plastic pre-fabricated clear eyeglasses frames

**Previously registered:** No

**New material included in claim:** Designs hand painted on to the eyeglasses frames

## Certification

**Name:** Sagie Kleinlerer, Esq., authorized agent of Art-Optic, Ltd.

**Date:** December 11, 2007

Correspondence: Yes

IPN#:

Registration #:   VA0001624140

Service Request #:   1-27945074

Shiboleth, Yisraeli, Roberts & Zisman LLP
Sagie Kleinlerer, Esq.
One Penn Plaza, Ste 2527
New York, NY 10119

# EXHIBIT 3

## SALES AND DISTRIBUTION AGREEMENT

This sales and distribution agreement is made and entered into as of the 1st day of October 2004,

By and between Mrs Lea Bibring and/or Art Optic Ltd- a company registered in Israel,business No.513191148, It's address:61 Hazamir Street, Kiryat-Ono 55507, Israel (henceforth:The Producer)

And: Mr.David Goldwasser, Mr & Mrs Samuel & Meryl Tomashover -In person and/or as company (when and if such a company will be established in future), It's address: Mr.Goldwasser-

8 Haoranim Street,Kfar Maas,Israel., Mr.&Mrs.Tomashover- 444 east 75th Street,suite#17C,NY,New York 10021, U.S.A (henceforth: The Buyer)

WHEREAS, The producer produces hand painted frames for glasses of any kind and adjoining cases for those frames, under the trade name RONIT FURST (henceforth : The Product),

WHEREAS, The producer wishes to export the product and sell it in the U.S.A, and for that purpose is prepared to grant sole distribution rights for the U.S.A only,

WHEREAS, The Buyer wishes to buy the product and has the will as the ability and the means to cause such distribution, and wishes to undertake the distribution of the product in the U.S.A,

Therefore the parties have jointly decided on the following agreement :

1. The above declarations made by the parties are an integral part of this agreement.          S.T

2. In exchange of the commitments undertaken by the buyer,as set out hereinafter,the producer agrees to grant him sole distribution rights for the U.S.A Subject to the terms and conditions laid out in this agreement,for as long as the agreement will stay in force,the producer will not sell the product in the U.S.A except through the buyer.          S.T

Despite the above said, it is herby agreed that the Producer is allowed to sell directly, not through the Buyer, in the U.S.A to 2 customers only:

Mr. Morley of Advance Optical, 37 Goodway Drive, Rochester, NY 14623.
Mrs.Ruth Domber of 10/10 Optics, 168 Fifth Avenue New York,N.Y 10010.

It is herby acknowledged by the parties to this agreement that these two customers are working with the Producer for over 18 months- prior to this agreement.And it is herby understood by the Buyer that customer no.1 is a small distributor in the Rochester NY area, and that customer no.2 is an Optical shop in NY.

**3.** The agreement shall commence on December 1,2004 and will stay in force till December 31 2005, provided that the buyer has fulfilled its minimum purchase orders in accordance with section 4 bellow,and all of he's other commitments and obligations as set forth in this agreement.

**4.** The Buyer undertakes to purchase from the producer the minimum sales forecasts as set here forth :

Sales for the period from December 1,2004 till June 30,2005- Minimum **65,000 US\$** Ex-Works.

(in words: sixty five thousand US dollars).

I.E in quantity- a minimum of 2600 Frames.

Buyer hereby represents and confirms that it would not have received the state of sole distribution rights had he not agreed to its undertaking in this section 4.

---

**5.** The 2 sides to this agreement hereby proclaim that their basic intention is to continue their business connection for the satisfactory of both sides, further to 2005, by binding of a long term contract that shall be made and signed towards the end of 2005.

However, should the producer, for reasons that the Buyer has no control over, wish to appoint a different distributor for the U.S.A- for the period after 1.January 2006, he will have to purchase back all the (first quality) frames that the Buyer still has in his stock- prior to the termination of this agreement , at ex-works cost price- not including freight costs.

Furthermore, it is herby agreed that the Buyer will have first refusal rights,prior to any distribution contract- between the Producer and a different distributor for the Product in the U.S.A.

**6. Prices, Terms and Delivery:**

**6.1** The agreed **price** for each frame (including an Optical Case) is **25.00 US\$**.This is an **EX-WORKS** price and does not include Shipping , export documentation and insurance costs.

**6.2 Terms of payment** : By bank Swift transfer, **30%** at the time of placing the order and the remaining **70%** upon receipt of notice that the order is ready for dispatch.

The Buyer undertakes to Insure the goods shipped to him, and shall pay the Producer in full –

In accordance with the payment terms above specified, including should any damage and /or total-loss occur after the goods have been delivered by the Producer to the shipper.

**5.3 Delivery**: For orders of up to 1000 (one thousand) Frames – a maximum of up to Three months- from placement of order and payment of 30% advance payment. Larger quantities will be delivered according to specific understanding between the parties.

6. Purchase orders by the Buyer shall be in writing (by e-mail or by Fax messages) and are subject to acceptance by the Producer in writing.

It is hereby clarified that once the Producer accepts the order, the Buyer is obliged to purchase the ordered frames as listed in the order. Furthermore, the Buyer undertakes not to return and/or exchange any frame. Without derogating from the above said, the producer agrees to exchange any frame found to be **production Defective**- within a period of **12 months** from it's delivery to the Buyer. The Buyer will return such frames , and these will be exchanged by the Producer at no further cost to the Buyer.

Under no curcumstances will the Buyer deduct payment for frames said to be defective. Those-

As specified above- will be exchanged for new ones.

S.T   **7. Non-Competition**

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing- hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

S.T   **8.1** It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

S.T   **8.2** The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",

"ART OPTIC", "RONIT FURST".

**8.3** It is stressed and agreed, that unless otherwise determined by the Producer in writing, the Product will be soled and distributed in the U.S.A only under the trade name – "RONIT FURST".

S.T   **9. Notices**

Any notice provided pursuant to this agreement shall be in writing and sent by registered mail, curier, facsimile or e-mail. All notices and other communications shall be deemed to have been one business day after the date personally delivered, by hand, facsimile or e-mail, or 10 business days after mailing by registered mail (return receipt requested).

Said regestered mail are to be sent to the address set forth in the headings of this agreement.

S.T   **10. Governing Law**

This agreement shall be governed and interpreted solely in accordance with the laws of Israel.

Any and all disputes arising between the parties out of or in connection of this agreement, its

interpretation, performance or breach, shall be referred to a binding arbitration before a single

arbitrator to be appointed by mutual agreement between the parties and , in the absence of such agreement, within fourteen (14) days from any of the parties first demand, and the arbitrator will be appointed at the request of either party by the chairman of the Israeli bar. The arbitration will be held in Tel-Aviv, Israel. The arbitration shall be conducted in accordance with the provisions of the Israeli Arbitration Law, 1968. the arbitrator shall not be bound by any rules of evidence or procedure, but shall be bound by the substantive of Israeli law. Any award or decision rendered shall be made by means of written opinion explaining the arbitrator's reasons for the award or decision, shall be final and binding upon the parties hereto, and shall be given in 60 days from the appointment of the arbitrator.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date first herein written and each party acknowledges having received one counterpart.

**PRODUCER:**

Lea Bibring and/or Art Optic Ltd

Tomashover.

**BUYER:**

David Goldwasser, Samuel Tomashover,

Meryl

# EXHIBIT 4




COGU E.

# **AFFIDAVIT**

I, the undersigned, Cathy Shue, having been duly warned that I must state the truth, or else be subject to penalties under the law, make the following statement in writing:

1.   I am the owner and manager of the store "INSIGHT EYEWEAR" on 187 El Dorado St., Monterey , CA 93940.

2.   In recent years I have purchased hand painted eyeglass frames, designed by and branded Ronit Furst, from Sammy and Meryl Tomashover of Newlight eyewear from New-York ("the Tomashovers").

3.   Sometime during September 2006 I contacted the company Art-Optic Ltd. in Israel which I knew manufactured the Ronit Furst frames ( "the company") by E-mail in order to clarify several matters in connection with the frames it produces. In reply to my queries I received a reply from Mr.Ehud Bibring who introduced himself as sales manager of the company ("Ehud").
Thus a contact was established between Ehud and myself by E-mail and by telephone.

4.   Towards the end of February 2007, after a few months of not being in contact, Ehud called me to find out if I was interested in selling/distributing Ronit Furst frames in California. I informed him that on March the 10th I was expecting a visit by the Tomashovers in my store for the purpose of conducting a special sale of " Ronit Furst" designer frames for the store's select customers. I also mentioned that the Tomashovers had told me that

they planned on putting the frames on view at the forthcoming Exhibition in New-York.

5.    Ehud Expressed great surprise and concern at this news and said that the Tomashovers are no longer his official representatives in the U.S. and that to the best of his knowledge they did not have enough frames to justify a "special sale" nor to take part in the exhibition in New-York.

Therefore, Ehud asked me to "keep an eye" on what they were up to and to see what sort of frames the Tomashovers would put out on exhibition.

6.    On 03/10/07 a special sale did indeed take place in my store. The Tomashovers arrived at the store with a selection of frames which looked exactly like the Ronit Furst colorful hand painted frames, including the Ronit Furst stamped signature on the outside left temple of each frame. However, I did notice something significant about the frames they presented: in contrary to the Ronit Furst frames I had in stock up until that time where the color code number was always PAINTED ON BY HAND at the bottom of the inside right temple, In the frames they presented in the "special sale" the color code number was PRINTED and situated on the upper inside right temple.

7.    Furthermore, they mentioned a distributor in SOUTH AMERICA who they are in connection with who will be able to fill our order promptly. They also stated they will be doing a booth at MIDO (the biggest optical trade show in the world held each May in Milan, Italy) and plan to also be at SILMO (again a world known Optical trade show) in France in October, all that in addition to the New-York show. This was contradictory to what Ehud told me about his relations with the Tomashover, and the above information led me to believe that the Tomashovers are having copies made, possibly in South America.

2

To claify this I ordered a few frames from the Tomashovers.

On March 12th I wrote an E-mail to Ehud informing him of the above.

8.  On March the 16th , just 6 days after the "special sale" I received the frames I ordered. They were counterfeits of the Ronit Furst frames but I could see that the color code number was PRINTED and not HAND PAINTED like in the original frames.

All of the frames had the Ronit Furst signature stamped on the outside left temple-exactly like in the original frames.

Attached is a copy of the invoice with the list of frames ordered during the sale and supplied by the Tomashovers, "attachment A".

9.  As per Ehud's request, I sent to Israel the frames supplied to me by the Tomashovers. A photo of the frames I sent is attached, marked, "attachment B".

10. I declare this to be my name and signature,  and my above statement to be the truth.

Cathy Shue                                                              8920א

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of ___Monterey_____ } ss.

On ___4/9/07___, before me, ___NANCY L. SILVA___,
<span style="font-size:small">Date</span>                    Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared ___CATHY SHVE___,
<span style="font-size:small">Name(s) of Signer(s)</span>

---

NANCY L. SILVA
Commission # 1543771
Notary Public - California
Monterey County
My Comm. Expires Jan 13, 2009

Place Notary Seal Above

☑ personally known to me

☑ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

_Nancy L. Silva_
Signature of Notary Public

---

## OPTIONAL

Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document**

Title or Type of Document: ___Affidavit___

Document Date: ___4-9-07___          Number of Pages: _____

Signer(s) Other Than Named Above: ___N/A___

### Capacity(ies) Claimed by Signer(s)

Signer's Name: _____
- ☐ Individual
- ☐ Corporate Officer — Title(s): _____
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

| RIGHT THUMBPRINT OF SIGNER |
| Top of thumb here |

Signer Is Representing: _____

Signer's Name: _____
- ☐ Individual
- ☐ Corporate Officer — Title(s): _____
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

| RIGHT THUMBPRINT OF SIGNER |
| Top of thumb here |

Signer Is Representing: _____

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402     Item No. 5907     Reorder: Call Toll-Free 1-800-876-6827



**NEWLIGHT EYEWEAR**

444 EAST 75TH STREET
SUITE 17C
NY, NY 10021
917-859-5212/212-288-5827

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/12/2007 | 1014 |

**Bill To**

INSIGHT EYEWEAR
CATHY SHUE
187 EL DORADO STREET
MONTEREY, CA 93940

**Ship To**

INSIGHT EYEWEAR
CATHY SHUE
187 EL DORADO STREET
MONTEREY, CA 93940

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| | | | 3/12/2007 | PRIORITY | | |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| 1 | 1540-09 | CATS EYE SEMI-RIMLESS-GIFT DIANE | 0.00 | 0.00 |
| 1 | 1540-09  06 | CATS EYE SEMI--GIFT VALERIE | 0.00 | 0.00 |
| 1 | 2321-17 | LARGE PROGRESSIVE/SUNGLASS-SOLD PT STILL | 73.00 | 73.00 |
| 1 | 2147-16 | PROGRESSIVE/SUNGLASS-SOLD PT MAYER | 73.00 | 73.00 |
| 1 | 1556-21S | SEMI-RIMLESS-DIGRANZIA | 73.00 | 73.00 |
| 1 | 2321-2a | large frame progressive/sunglass-SOLD PT WORKMAN | 73.00 | 73.00 |
| 1 | 2147-19 | PROGRESSIVE/SUNGLASS-PT VINCENT | 73.00 | 73.00 |
| 1 | 2148-03  REAL | FUNKY SEMIRIMLESS | 73.00 | 73.00 |
| 1 | 2148-14A | FUNKY HALF EYE | 73.00 | 73.00 |
| 1 | 2321-10 | LARGE PROGRESSIVE/SUNGLASS | 73.00 | 73.00 |
| 1 | 2321-17 | LARGE PROGRESSIVE/SUNGLASS | 73.00 | 73.00 |
| 1 | 2321-21 | LARGE FRAME PROGRESSIVE/SUNGLASS | 73.00 | 73.00 |
| 1 | 1174-13 | GEOMETRIC | 73.00 | 73.00 |
| 1 | 2705-16 | FULL -BACKORDER | 0.00 | 0.00 |
| 1 | 2705-T/Z | FULL RIM ROUND | 0.00 | 0.00 |
| 1 | shipping/handling | us postal service | 19.95 | 19.95 |

*This is only authentic one!*

*13 need*

*The invoice I paid for this stuff*

*Thanks*

| **Total** | **$822.95** |
|-----------|-------------|

**ת צ ה י ר**

אני החי"מ איתמר פירסט בעל ת.ז. שמספרה 52253291, מרחי מכבי 10 אבן יהודה, לאחר שהוזהרתי כי עלי להצהיר את האמת, שאם לא כן אהיה צפוי לעונשים הקבועים בחוק, מצהיר בזאת בכתב, כדלקמן :

1.    שמי וכתובתי הם כני"ל.

2.    תצהיר זה מוגש על ידי בתמיכה לבקשה למתן צו מניעה במעמד צד א׳ ובתמיכה לבקשה להמצאה מחוץ לתחום השיפוט.

3.    הנני מכיר היטב את מסגרות המשקפיים אותן מייצרת ומעצבת הגבי רונית פירסט ("המשקפיים") שכן הגבי פירסט שהיא בת דודתי, נעזרה בי בתהליך יצור מסגרות המשקפיים. כמהנדס חומרים סייעתי לרונית בהליך ייצור המשקפיים ונתתי לה מענה לבעיות שונות שהתעוררו בעת צביעת המסגרות השונות. כן נשלחתי עי"י רונית ומטעמה פעמים מספר לתערוכות מקצועיות באיטליה לצורך ייצור המשקפיים.

4.    בתאריך 12.03.07 יצאתי עם משפחתי לחופשה משפחתית בארה"ב.

בתאריך 20.03.07 טיילנו בעיר אלכסנדריה בוורגיניה. באותו היום טיילנו אני ואשתי ברחובות העיר וחיפשנו משקפי שמש מסוג "אוקלי". במסגרת חיפושנו סיירנו בחנויות המשקפיים בעיר.

5.    חנות המשקפיים הראשונה שפגשנו בדרכנו היתה סגורה אולם בחלון הראווה הבחנתי במשקפיים של "רונית פירסט" המוכרים לי היטב כמי שעסק בייצורם. היות והחנות היתה סגורה המשכנו בחיפושינו.

6.    חנות המשקפיים הבאה שפגשנו היתה פתוחה ונכנסנו לחנות. שם החנות הוא "BRAHM POWELL" מייד כשנכנסנו לחנות הבחנתי במסגרות המיוצרות עי"י רונית פירסט. המסגרות היו מוצגות על מעמד גדול ומרשים שהכיל כ- 40 מסגרות שונות.

מצ"ב עותק הצילום שצולם על ידי בו מופיע המעמד והמסגרות מסומן כ**נספח א'** לתצהירי.

7. פניתי למוכרת שעמדה בחנות ואשר הציגה עצמה מנהלת החנות והזדהתה בשם בריג'יט מרשאל ואמרתי לה כי אני בן הדוד של הגב' רונית פירסט, המעצבת והיצרנית של מסגרות המשקפיים.

8. מנהלת החנות הציגה בפני עלון פרסומי של המותג "רונית פירסט" בו מופיעה תמונתה של רונית בת דודתי ודגמים רבים של משקפיים אשר ידוע לי מידיעה אישית כי רונית מעצבת ומייצרת.

9. התעניינתי וחקרתי את המוכרת בדבר היקף המכירות של המשקפיים וזו ענתה לי כי מחזור המכירות משביעה רצון וכי מסגרות המשקפיים נמכרות בסכום של כ-225 $ למסגרת. המוכרת אף אמרה כי המשקפיים נמכרות לה ע"י שני בני זוג אשר הודיעו לה כי הם מפסיקים לייצר את המשקפיים בישראל ומתחילים לייצר אותם במקום אחר.

10. לאחר שהמוכרת אמרה לי כי בני הזוג החליטו להתחיל לייצר המשקפיים במקום שונה הדבר הדליק אצלי נורה אדומה, שכן לא נראה לי סביר כי רונית בת דודתי תעתיק את מפעלה מישראל. על כן בדקתי את המסגרות ביתר תשומת לב.

11. רק לאחר בדיקה מדוקדקת זו, אני שמכיר את המסגרות היטב כמי שהיה מעורב בייצורן, ראיתי כי המסגרות הנמכרות בחנות **לא יוצרו ע"י רונית פירסט** אלא הן חיקוי מדויק של המסגרות המיוצרות על ידה. נדהמתי לגלות כי על המסגרות המזוייפות מוטבע המותג "רונית פירסט".

אני מצהיר בוודאות כי המסגרות שראיתי הן מזוייפות, וזאת לפי סימנים מוטמנים, של היצרן, ואולם אין סיכוי כי לקוח יוכל להבחין בשוני.

12. בסיום שיחה זו לקחתי כרטיס ביקור ממנהלת החנות ועזבתי את המקום. מצ"ב עותק כרטיס הביקור מצורף כ**נספח ב'** לתצהירי.

13.   מייד כשעזבתי את המקום פניתי לרונית ודיווחתי לה כי בארה"ב נמכרות מסגרות
      המחקות את המסגרות אותן היא מייצרת.

14.   זה שמי, זו חתימתי ותוכן תצהירי - אמת.

_(חתימה)_

איתמר פירסט


א י ש ו ר


הנני מאשר בזה כי ביום 26.03.2007 הופיע בפני עו"ד נחמי מייזליש במשרדי שברחוב
שד' דוד המלך 12 ת"א, מר איתמר פירסט שזיהה עצמו על-ידי ת.ז. שמספרה 52253291,
ולאחר שהזהרתיו כי עליו להצהיר את האמת בלבד וכי יהיה צפוי לעונשים הקבועים
בחוק אם לא יעשה כן, אישר את נכונות הצהרתו דלעיל וחתם עליה.

_(חותמת וחתימה)_
נחמי מייזליש, עו"ד

8904א

# EXHIBIT 5



EXHIBIT 6











# EXHIBIT 7

## AFFIDAVIT

I, the undersigned, Ruth H. Domber, having been duly sworn, deposes and says under the penalties for perjury as follows:

1.  I am one of the owners of the optical store DBA **10/10 Optics** at 168 Fifth Avenue at 22nd street, New York, N.Y 10010. (We are relocating this business to 50 Madsion Avenue as this time), and have been so for the last 12 years.

2.  Since 2003 I have been purchasing from the firm **Art Optic Ltd** (the Company) hand painted eyeglass frames designed by RONIT FURST. My contact with the above company is handled through Mr.Ehud Bibring ("Ehud").

3.  I had been introduced to SAMMY TOMASHOVER and his wife MERYL as the United States representative of The Company. I am also aware that the relationship between The Company and The Tomashover's had been terminated.

4.  On 3/22/07 Ehud contacted me and told me that he suspects that the Tomashover's are imitating the frames his company produces and he further suspects that the Tomashover's sell these imitation frames to various stores in the U.S. Ehud added that according to his information the Tomashover's are participating in the then forthcoming VISION EXPO optical trade show held in New York. He requested that I visit Tomashover's stand and check out the situation.

5.  I complied with Ehud's request and on Sunday March the 25th I went to the exhibition.

6.  I immediately recognized Tomashover's stand because not only was the booth on the first row of the exhibition, it was immediately identifiable

by the the outstanding colorful posters and background paperwork well known to me from the Ronit Furst stand a year ago- in the Vision Expo 2006. I also saw the red Ronit Furst brochures, which I received about a year ago from Ehud and Ronit Furst business cards which were being distributed at the booth. To my amazement, I noticed on display hundreds of eyeglasses frames which appeared to be an exact replica of the Ronit Furst frames, including the Ronit Furst signature stamped on the outside left temple of each frame. This surprised me since I was aware that the Tomashover's were no longer authorized to represent the brand.

7.      Upon my arrival to the stand I noticed that Meryl Tomashover recognized me-she signaled hastily to her husband to come quickly. I tried to enter into conversation with Mr.Tomashover, but he raised his voice at me and asked me to leave the stand. I left the stand and took pictures of the stand from a distance (they are attached as part of this affidavit).

8.      I went on my way looking at various exhibitor stands when after a few minutes I was surprisingly approached by Mr. Tomashover, who told me that we can do business together and that he can supply me with Ronit Furst frames directly provided I refrain from telling Ehud what I saw.

9.      When I refused the offer Tomashover turned to being aggressive: he threatened me, badmouthed Ehud, and shouted at me in front of passers by that I was a spy for Ehud. I left the place and later called Ehud and told him of the above.

Sworn before me this _6th_ of April _2007_

_____

Ruth H. Domber

8921N

Vivene Dixon
Notary Public, State of New York
No. 01D16146902
Qualified in Queens County
Commission Expires May 30, 2010

2

# EXHIBIT 8

Form No. 312/2007

## CERTIFICATION OF TRANSLATION

I the undersigned Advocate

**Reuven Ben-Ari**

Notary at 14, Massaryk blvd. Tel-Aviv Israel hereby declare that I am well acquainted with the Hebrew and English languages and that the document attached to this certification and marked "**A**" is a correct translation into English of the original document drawn up in the Hebrew language, which has been produced to me, and a copy of which is also attached herewith and marked "**B**".

In witness whereof I certify the correctness of the said translation by my signature and seal.

This 10th October 2007
Notary's fee 1,698.- NIS. including V.A.T

Notary's Seal and Signature



מס' רץ 312/2007

## אישור תרגום

אני החי"מ עו"ד **ראובן בן-ארי**
נוטריון ב- שד' מסריק 14, תל-אביב מצהיר בזה, כי אני שולט היטב בשפות העברית והאנגלית וכי המסמך המצורף לאישור זה והמסומן "**A**" הוא תרגום מדייק לאנגלית של המסמך מקורי הערוך בשפה העברית שהוצג לפני ואשר העתק צילומי שלו מצורף גם הוא לאישורי זה ומסומן "**B**"

ולראיה אני מאשר את דיוק התרגום האמור בחתימת ידי ובחותמי.

היום 10.10.07
שכרי בסך .- 1698 ש"ח כולל מ.ע.מ. נדרש.

חותם הנוטריון והתרגום



## APOSTILLE
### (Convention de la Haye du 5 October 1961)

1. **STATE OF ISRAEL**
This public document

2. Has been signed by
Reuven Ben-Ari
Advocate ..................................

3. acting in capacity of Notary.

4. bears the seal/stamp of the above Notary

### Certified

5. at the Magistrates' Court, Tel-Aviv-Yafo

6. Date ..................................

7. By an official appointed by Minister of
Justice under the Notaries Law, 1976.

8. Serial number ?57062

9. Seal/Stamp ..................................

10. Signature ..................................

.1 מדינת ישראל
מסמך ציבורי זה

.2 נחתם בידי
ע"ד.......... אובן בן-ארי

.3 המכהן בתור נוטריון.

.4 נושא את החותם/החותמת של הנוטריון הנ"ל

### אושר

.5 בבית המשפט השלום תל-אביב-יפו

.6 ביום ..................................

.7 על ידי מי שמונה בידי שר המשפטים לפי
חוק הנוטריונים, תשל"ו-1976.

.8 מס' סידורי ..................................

.9 החותם/החותמת ..................................

.10 חתימה ..................................

## State of Israel

## The Courts of Law

At the Tel-Aviv – Jaffa District Court                  Civil motion        009267/07

                                                        Principal Case   A  001661/07

Before His Honor Judge Yehuda Zaft  - Vice President

In the matter of        ART – Optic Ltd.

Represented by Counsel, advocate  Uriel Ganiar        <u>The Petitioner</u>

        V e r s u s

    1.    Samuel Tomshover

    2.    Merill Tomshover

Represented by Counsel, advocate Arie Lahav-Levy        <u>The Respondents</u>

## <u>Ruling</u>

### <u>Background</u>

On October 1, 2004 the Petitioner, engaged in the production and marketing of spectacle frames made of plastic, decorated by handwork ("the decorated frames") made a distribution agreement with the respondents whereby the respondents were to serve as sole distributors of the decorated frames in the USA in the period between December 1, 2004 and December 31, 2005 ((hereinafter: the distribution agreement).

A dispute about the distribution of the decorated framers erupted between the petitioner and the respondents and from 2006 onward the petitioner ceased to provide the respondents with decorated frames.

According to the petitioner, the respondents are engaged in the USA in the marketing of spectacle frames that constitute an imitation of the decorated frames.



In civil file 1661/07 the petitioner sought a declaratory ruling banning the respondents from producing or marketing frames that are similar to or competing with the decorated frames over a period of two years from September 30, 2006 – the final date on which the petitioner supplied the respondents with decorated spectacles. The petitioner also applied for a ruling banning the respondents from making and/or selling frames bearing the name "Ronit Furst", "Op-Art", or "Art Optic", or purporting to be frames manufactured by the petitioner and/or designed by Ronit Furst and/or being passed off as distributors and/or representatives of the petitioner.

In the petition before me, the petitioner requests a temporary injunction banning the respondents from manufacturing and/or marketing and/or distributing and/or selling spectacle frames painted by hand, and also from making and/or selling and/or displaying anywhere in the world spectacle frames bearing the name "Ronit Furst", "Op-Art", or "Art Optic" or frames purporting to be made or designed by the petitioner.

### Discussion

A.    The petitioner bases its right to the sought relief on the provisions of clause 7 of the distribution agreement, which bans the respondents from engaging in production and/or marketing of hand-painted spectacle frames resembling the decorated frames and/or competing with them during the currency of the agreement for a period of two years thereafter. Clause 7 of the distribution agreement (Appendix B) stipulates:

*During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, whether directly or indirectly, whether for consideration or not, in manufacturing,*

*marketing, selling, promoting or distributing hand painted frames for glasses of any kind (made of plastic or metal) worldwide that resemble and/or compete with the product".*

According to the petitioner, the period of restricted competition is to be counted from December 31, 2006 because according to the respondents' version they served till then as sole agents of the petitioner.

Owing to the grant of a two years sole distribution rights in the USA to the respondents it is possible that their restriction of business constitutes no disproportionate impairment of their right of conducting business. Even in this case, however, the restriction period expressly established in the agreement should not be extended. Since it is established that the distribution agreement is to be valid till December 31, 2005 (clause 3 of the agreement), the restriction period is to be counted for two years starting on that date.

Moreover, the delivery of decorated frames to the respondents in the period after December 31, 2005 took place in conditions different from those established in the distribution agreement and during that period the respondents were denied the exclusivity of distribution in the USA (article 10 of the affidavit by Ehud Bibering of April 26, 2007).

B.    The petitioner is applying for a temporary injunction banning the respondents from competing with it for an indefinite period whereas it was entitled at most to prevent the respondents from marketing competing glasses with decorated frames till December 31, 2007. Therefore, I see no justification for accepting this request, which was intended to prevent the respondents from competing with the petitioner.



C.    It follows from the affidavit by Ehud Bibering that on March 10, 2007 the respondents displayed in the optical store in Monterey spectacle frames similar to the decorated frames (article 10.1 of the affidavit). This statement was given on the basis of the version of Kathy Show, owner of the Monterey store, who even handed over to the petitioner frames purchased by her from the respondents.

Samuel Tomshover testified as follows (p. 3 of the protocol of September 20, 2007:

*Q.    About the deposition by Kathy Show, did you appear in her place and sell her frames?*

*A.    Yes.*

The testimony of Samuel Tomshover supports the version of Kathy Shaw, as given to Ehud. Bibering.

Comparison between the frames sold to Kathy Shaw by the respondents and the decorated frames (Exhibit 2) reveals that the frames sold by the respondents to Kathy Shaw comprise decorative elements and model signs identical to those existing in the decorated frames, among other things they contained the *Ronit Furst* sign, which characterizes the decorated frames. Therefore it appears prima facie that there is a misleading similareity between the frames sold by the respondents to Kathy Shaw and the decorated frames.

D.    The respondents agreed in their reply to obtain a temporary injunction banning them from distributing    forged frames (clause 90 of the respondents' reply of July 22, 2007), and on these grounds I think it

would be justified to hand down a temporary injunction banning the respondents from further marketing of frames that constitute a forgery of the decorated ones.

## Conclusion

A temporary injunction is hereby granted, banning the respondents and/or any person on their behalf from making and/or marketing and/or selling spectacle frames that constitute an immitation of the decorated frames made by the petitioner with the inscription "Ronit Furst", "Op-Art", or "Art Optic" as shown in Appendix A of the Petition.

The validity of this temporary injunction is conditional upon the deposition of a personal undertaking pursuant to Regulation 365(B) of the Civil Procedure Regulations, 5744-1984.

In view of the respondents' consent to the said order I see no need for making the temporary injunction conditional upon the deposition of a guarantee.

The respondents shall jointly and severally pay the petitioner the costs of the petition and attorney fee in the sum of NIS 20,000.

The court secretariat shall issue a copy of this ruling to the counsel of the parties by fax.
*Issued on October 9, 2007, in Chambers.*

*( - )*

*Judge Yehuda Zaft, Vice President*





"IN MY CREATIVE PERSUIT I TRY TO HIGHLIGHT
OUR INDIVIDUALISM BY CREATING EYEWEAR
THAT IS FUN, COLORFULL, ARTISTIC, AND UNIQUE"

Ronit Fürst

HAND
PAINTED
FRAMES



RoniT FürST

www.ronitfurst.com



נ"ב

1



בתי המשפט

בבית המשפט המחוזי בתל אביב-יפו          בשא 009267/07
                                        בתיק עיקרי : א 001661/07

בפני :   כבוד השופט יהודה זפט - סגן נשיא

בעניין :      ארט-אופטיק בע"מ

                ע"י ב א כח עוה"ד    אוריאל גנייהר          המבקשת

                          נ ג ד

              1.   סמואל טומשובר
              2.   מריל טומשובר
                ע"י ב א כח עוה"ד    אריה לתב-לוי          המשיבים


## החלטה

### רקע

ביום 1.10.04 התקשרה חמבקשת המייצרת ומשווקת מסגרות משקפיים מפלסטיק מצויירות
בעבודת יד (לחלן : "המסגרות המצויירות"), עם המשיבים בחסכם הפצה, לפיו ישמשו המשיבים
כמפיצים בלעדיים של המסגרות המצויירות בארה"ב מיום 1.12.04 ועד 31.12.05 (לחלן : "הסכם
החפצה").

בין החמבקשת למשיבים התגלע סכסוך בקשר להפצת המסגרות המצויירות ובשנת 2006 חדלה
חמבקשת לספק למשיבים מסגרות מצויירות.

לטענת המבקשת, המשיבים משווקים בארה"ב מסגרות משקפיים המהווח חיקוי של המסגרות
המצויירות.

בת.א 1661/07 תבעה חמבקשת להצחיר כי המשיבים מנועים מלייצר או לשווק מסגרות משקפיים
חדומות או מתחרות במסגרות המצויירות במשך תקופה של שנתיים החל מיום 30.9.06 חוא
המועד האחרון בן סיפקה המבקשת למשיבים מסגרות משקפיים מצויירות. כן תבעה חמבקשת לאסור על
המשיבים לייצר ו/או למכור מסגרות תנושאות את השם "רונית פירסט", "אופ-ארט" או "ארט
אופטיק" או חמותחזות להיות מסגרות המיוצרות על ידי המבקשת ו/או מעוצבות על ידי רונית
פירסט ו/או להציג עצמם כמפיצים ו/או נציגים של המבקשת.

2



בתי המשפט

בשא 009267/07
בתיק עיקרי: א 001661/07

בבית המשפט המחוזי בתל אביב-יפו

בפני:    כבוד השופט יהודה זפט - סגן נשיא

בבקשה שלפני עותרת המבקשת לצו מניעה זמני שיאסור על המשיבים לייצר ו/או לשווק ו/או
להפיץ ו/או למכור מסגרות משקפיים צבועות בעבודת יד, וכן לאסור על המשיבים לייצר ו/או
למכור ו/או להציג בכל מקום בעולם מסגרות משקפיים הנושאות את השם "רונית פירסט", "אופ-
ארט", או "ארט אופטיקיי" או מסגרות המתחזות להיות מיוצרות או מעוצבות עייי המבקשת.

<u>דיון</u>

א.  המבקשת מבססת את זכותה לסעד הנתבע על הוראות סעיף 7 להסכם ההפצה לפיו נאסר
על המשיבים לחוות מעורבים בייצור ו/או שיווק של מסגרות משקפיים צבועות ביד
הדומות למסגרות המצויירות ו/או מתחרות בהן במהלך תוקפו של ההסכם ולתקופה של
שנתיים לאחר מכן.

סעיף 7 להסכם ההפצה (נספח ב), קובע:

"During the term of this agreement and for a period of 2 years
thereafter, the Buyer shall not be involved in any way, wether
directly or indirectly, wether for consideration or not, in
manufacturing, marketing, selling, promoting, or distributing-
hand painted frames for glasses of any kind (made of Plastic
or metal) Worldwide that resemble and/or compete with the
product."

לטענת המבקשת, יש למנות את תקופת הגבלת התחרות מיום 31.12.06 משום שעל פי
גרסת המשיבים עד לאותו המועד המשיכו חמשיבים לשמש כנציגים בלעדיים של
המבקשת.

3



בתי המשפט

בבית המשפט המחוזי בתל אביב-יפו          בש"א 009267/07
                                          בתיק עיקרי: א 001661/07

בפני :    כבוד השופט יהודה זפט – סגן נשיא

אפשר שנוכח מתן זכות ההפצה הבלעדית בארה"ב למשיבים אין בהגבלת העיסוק של
המשיבים למשך שנתיים משום פגיעה לא מידתית בחופש העיסוק של המשיבים. ברם
אפילו כך אין להוסיף על תקופת החגבלה שנקבעה בהסכם במפורש. משנקבע כי תוקפו
של הסכם ההפצה יהיה עד ליום 31.12.05 (סעיף 3 להסכם) יש למנות את תקופת ההגבלה
לשנתיים החל ממועד זה.
לכך יש להוסיף כי אפשר ההפקת המסגרות המצויירות למשיבים בתקופה שלאחר ה – 31.12.05
היינה בתנאים שונים מאלה שנקבעו בהסכם ההפצה ובתקופה זו אף נכללה מהמשיבים
בלעדיות ההפצה בארה"ב (סעיף 10 לתצהירו של אהוד ביברינג מיום 26.4.07).

ב.   המבקשת עותרת לצו מניעת זמני שיאסור על המשיבים להתחרות בה לתקופה בלתי
מוגבלת מקום שלכל היותר זכאית היא למנוע מהמשיבים לשווק מסגרות משקפיים
המתחרות במסגרות המצויירות עד ליום 31.12.07. לפיכך, איני רואה לנכון להיעתר
לבקשה שנועדה למנוע מהמשיבים להתחרות במבקשת.

ג.   מתצהירו של אהוד ביברינג עולה כי ביום 10.3.07 הציגו המשיבים בחנות מוצרי אופטיקה
במונטריי מסגרת משקפיים הדומות למסגרות המצויירות (סעיף 10.1 לתצהיר).
הצחנה זו ניתנה תוך הסתמכות על גרסתה של קטי שו בעלת החנות במונטריי אשר אף
העבירה למבקשת מסגרות משקפיים שרכשה מהמשיבים.

בחקירתו העיד  סמואל טומשובר (ע' 3 לפרוטוקול מיום 20.9.07) :

"ש. באשר לתצהירה של קטי שו – האם הופעת אצלה ומכרת לח
מסגרות?
ת. כן."

עדותו של סמואל טומשובר תומכת בגרסתה של קטי שו אשר נמסרה לאהוד ביברינג.



4



בתי המשפט

בשא 009267/07
בתיק עיקרי: א 001661/07

בבית המשפט המחוזי בתל אביב-יפו

בפני:    כבוד השופט יהודה זפט - סגן נשיא

מהשוואה בין מסגרות המשקפיים שנמכרו לקטי שו על ידי המשיבים לבין המסגרות
המצויירות (מוצג 2), נמצא כי מסגרות המשקפיים שנמכרו על ידי המשיבים לקטי שו
כוללות רכיבי קישוט וסימני דגם וזהים לאלה הקיימים במסגרות המצויירות ובין חיתר
כוללים חם את חסימן "ronit furst" המאפיין את חמסגרות המצויירות. לפיכך, נראה
לכאורה שקיים דמיון מטעה בין מסגרות המשקפיים שנמכרו על ידי חמשיבים לקטי שו
לבין חמסגרות המצויירות.

ד.   בתשובתם הסכימו המשיבים שיינתן צו כנגדם צו מניעה זמני שיאסור עליהם להפיץ מסגרות
מזוייפות (סעיף 90 לתשובת המשיבים מיום 22.7.07), ומשכך אני סבור שנכון יהיה ליתן
צו מניעה זמני שימנע מהמשיבים להמשיך ולשווק מסגרות המהוות חיקוי למסגרות
המצויירות.

<u>סוף דבר</u>

ניתן בזה צו מניעה זמני האוסר על המשיבים ו/או מי מהם ו/או מי מטעמם לייצר ו/או לשווק
ו/או למכור מסגרות למשקפיים חמהוות חיקוי של מסגרות המשקפיים חמצויירות של
המבקשת הנושאות את חשם "רונית פירסט", "אופ-ארט" או "ארט אופטיק" כמופיע בנספח
א לבקשה.

תוקף הצו חזמני מותנה בהפקדת התחייבות עצמית לפי הוראות ותקנה 365 (ב) לתקנות סדר
הדין האזרחי, חתשמ"ד – 1984.

נוכח הסכמת המשיבים לצו האמור איני רואה צורך להתנות את תוקף הצו חזמני בהפקדת
ערבות.

5



בתי המשפט

בבית המשפט המחוזי בתל אביב-יפו          בשא  07/009267
בתיק עיקרי: א  07/001661

בפני:    כבוד השופט יהודה זפט - סגן נשיא

המשיבים ביחד ולחוד ישלמו למבקשת את הוצאות הבקשה, ושכ"ט עו"ד בסך 20,000ש.

<u>מזכירות בית המשפט תמציא עותק מהחלטה זו לבאי כח הצדדים בפקסימיליה</u>
ניתן ביום כ"ז תשרי, תשס"ח (9 אוקטובר, 2007) בלשכה.

השופט יהודה זפט - סגן נשיא

