UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ART-OPTIC, LTD.,                                :        08 CV 0327 (MGC)

                Plaintiff,                    :

SAMUEL TOMASHOVER, MERYL         :
TOMASHOVER and NEWLIGHT
EYEWEAR, LLC.,                                  :

                Defendants.                 :
-------------------------------------------------------X

## DEFENDANTS' PROPOSED FINDINGS OF FACT

Defendants Samuel Tomashover, Meryl Tomashover and Newlight Eyewear, LLC., through their counsel, hereby submit defendants Proposed Findings of Fact in opposition to plaintiff's motion for preliminary relief.

### Plaintiff

1. Plaintiff Art-Optic, Ltd. ("plaintiff") is a small Israeli company, founded in 2002 by Mr. Ehud Bibring. (Bibring Aff. ¶2)

2. Plaintiff sells hand painted eyeglasses and eyeglass cases under the brand RONIT FURST. (Bibring Aff. ¶3)

### Plaintiff's Copyrights

3. Plaintiff claims copyright in the designs painted on its frames, which it alleges are the original works of Ronit Furst. Plaintiff alleges that such designs were created for plaintiff as a "work-for-hire." (Copyright registrations attached as Exhibit 2 to Bibring Affidavit).

1

4. On December 14, 2007, plaintiff submitted three (3) applications for registration to the U.S. Copyright Office. Certificates of Registration were subsequently granted with an effective date of December 14, 2007. (Copyright registrations attached as Exhibit 2 to Bibring Affidavit).

5. The alleged date of first publication, as noted on each of the applications and certificates, is January 1, 2002. Since such date is more than five (5) years prior to the effective dates of registrations, plaintiff's certificates <u>do not</u> constitute prima facie evidence of the copyright and the facts stated in the certificate. (17 U.S.C. § 410).

Plaintiff's Trademark

6. Plaintiff alleges use of the RONIT FURST trademark in the United States since 2002. (¶46 of Plaintiff's Complaint).

7. Plaintiff has not applied for, nor has it received, a United States Trademark Registration.

Defendants

8. Defendants Samuel and Meryl Tomashover are a married couple, and the owners of defendant Newlight Eyewear LLC (the Tomashovers and Newlight are collectively referred to herein as "defendants"). (Tomashover Aff. ¶ 2.)

9. Defendants distribute eyeglasses on a wholesale basis. ( Tomashover Aff. ¶3)

10. Defendants do not manufacture glasses, and have not entered into agreements with others to manufacture glasses. All of the glasses that defendants sell are manufactured and supplied by others. (Tomashover Aff. ¶3)

11. All of the glasses that are the subject of this case were supplied to defendants by the plaintiff. (Tomashover Aff. ¶ 19)

The Agreement

12. In 2004, the Tomashovers and plaintiff negotiated and signed a "Sales and Distribution Agreement" for the marketing and sale of RONIT FURST glasses in the United States (hereinafter "the Agreement"). (Bibring Aff. ¶ ¶8 and 9) (Tomashover Aff. ¶ 4).

13. A copy of the Agreement is attached as Exhibit F to the Tomashover Aff. The Agreement identified the plaintiff as "the producer," the Tomashover's as "the buyer," and the subject eyeglass frames as "the Product."

14. The Agreement includes six (6) terms that are critical to the Court's consideration of this motion. They are as follows:

The Grant of Exclusivity

"2. In exchange of the commitments undertaken by the buyer, as set out hereinafter, the producer agrees to grant him sole distribution rights for the USA subject to the terms and conditions laid out in this agreement, for so long as the agreement will stay in force, the

3

producer will not sell the product in the U.S.A. except through the buyer."


### The Term of the Agreement

"3. The agreement shall commence on December 1, 2004 and will stay in force till December 31, 2005, provided that the buyer has fulfilled its minimum purchase orders in accordance with section 4 below, and all of he's other commitments and obligations as set forth in the agreement."


### Plaintiff's Obligation to Purchase Defendants' Inventory Upon Termination

"5. The 2 sides to this agreement hereby proclaim that the basic intention is to continue their business connection for the satisfactory of both sides, further to 2005, by binding of a long term contract that shall be made and signed towards the end of 2005.

However, should the producer, for reasons that the Buyer has no control over, wish to appoint a different distributor for the U.S.A. for the period after 1. January 2006, **he will have to purchase back all the (first quality) frames that the Buyer still has in his stock – prior to the termination of this agreement, at ex-works cost price-not including freight cost.**

Furthermore, it is hereby agreed that the Buyer will have first refusal rights, prior to any distribution contract – between the Producer and a different distributor for the Product in the U.S.A."

(Emphasis added)

### The Agreed Price

"6.1 The agreed price for each frame (including an Optical case) is 25.00 US$. This is an EX-WORKS price and does not include Shipping, export documentation and insurance costs."

### The Non-Compete Clause

"7. <u>Non-Competition</u> During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, whether directly or indirectly, whether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing hand

4

painted frames for glasses of any kind (made of Plastic or metal) Worldwide that resemble and /or compete with the Product."

### The Arbitration Provision

"10. <u>Governing Law</u>  This agreement shall be governed and interpreted solely in accordance with the laws of Israel.  **Any and all disputes arising between the parties out of or in connection with this agreement, its interpretation, performance or breach, shall be referred to a binding arbitration** before a single arbitrator to be appointed by mutual agreement between the parties and, in the absence of such agreement, within fourteen (14) days from any of the parties first demand, and the arbitrator will be appointed at the request of either party by the chairman of the Israeli bar.  The arbitration shall be conducted in accordance with the provisions of the Israeli Arbitration Law, 1968, the arbitrator shall not be bound by any rules of evidence or procedure, but shall be bound by substantive Israeli law. Any award of decision rendered shall be made by means of a written opinion explaining the arbitrator's reasons for the award or decision, shall be final and binding upon the parties hereto, and shall be given in 60 days from the appointment of the arbitrator."
(Emphasis added)

(Exhibit G to Tomashover Aff. and Exhibit 8 to Bibring Aff.)

### Complaints re: Quality of Plaintiff's Products

15. Many of the customers to whom defendants sold plaintiff's glasses complained of the quality of plaintiff's products.  For example, in or about October 2006 defendants contacted plaintiff and told them that they were "experiencing numerous peeling issues" with the plaintiff's glasses. (Tomashover Aff. ¶ 5 and Exhibit H).

5

### Negotiations Break Down

16. After the expiration of the contract in December 2005, in accordance with the parties' "basic intent to continue their business connection" as expressed in paragraph 5 of the Agreement, plaintiff and defendants made efforts to negotiate a new agreement. (Tomashover Aff. ¶ 8)

17. During this time, plaintiff continued to sell glasses to defendants for one more full year, and did not finally stop selling glasses to defendants until December 2006. (Bibring Aff. ¶16).

18. Plaintiff has alleged that during this time, the Agreement between the parties "was changed in such that the defendants are no longer entitled to exclusivity in marketing the products in the U.S.A." (Paragraph 7 of Plaintiff's Statement of Claim in Israeli action attached as Exhibit A to Schurin Decl.)

19. In December of 2006, a year after the Agreement expired, plaintiff finally announced to defendants that it would no longer sell them any glasses, and the parties stopped doing business. (Bibring Aff. ¶16, Tomashover ¶13 and letter attached as Exhibit K to Tomashover Aff.)

### Plaintiff's Refusal to Purchase Defendants' Unsold Inventory

20. When plaintiff informed defendants that it would be entering into an agreement with a new distributor to sell RONIT FURST glasses in the United States, in accordance with paragraph 5 of the Agreement,

6

        defendants requested that plaintiff purchase their remaining inventory of unsold glasses. (Tomashover Aff. ¶15)

21.    Plaintiff refused to purchase any of defendants unsold inventory, thereby breaching the express provisions of the Agreement. (Tomashover Aff. ¶16)

### Notice of Third Party Infringement

22.    In or about January 2006, defendants learned that another manufacturer and distributor of glasses, by the name of Hilco, Inc., was selling products that were identical to plaintiff's hand painted frames. Defendants notified plaintiff of this fact. (Tomashover Aff. ¶9)

23.    Shortly thereafter, plaintiff retained an attorney in New York to send Hilco a cease and desist letter. (Tomashover Aff. ¶10)

24.    On February 8, 2006, plaintiff's counsel, Michael Cornman, Esq., of the firm of Schweitzer, Cornman, Gross & Bondell LLP of New York, New York sent a cease and desist letter on behalf of plaintiff to Mr. Paul Janell, the Vice President of Hilco. (Tomashover Aff. ¶10 and Exhibit I to Tomashover Aff.)

25.    In the cease and desist letter plaintiff's counsel states:

> "It has come to our client's attention that pp. 72, 73 of your 2006 catalog illustrate three "hand painted" frames NOs. NF201, NF 202 and NF 203, which are **direct copies** of our client's proprietary design Nos. 01: 10; and 17 (photographs by certified mail.)
>
> (February 8, 2006 letter attached as Exhibit I to Tomashover Aff.)
> (Emphasis supplied)

26. On February 14, 2006, Mr. Janell responded to the cease and desist letter stating in relevant part:

" Upon reviewing your communication and accompanying photogtaphs with our attorney, we have concluded that the hand painted readers pictured in the Hilco 2006 catalog pages 72 and 73 **are direct copies of your client's design.**

Hilco will not engage in selling any of these 'hand painted' readers styles NF 201, NF 202, NF 203. The "hand painted reader collection was a new product line extension for Hilco for 2006, and no orders had been filled prior to your notice.

We still believe that these 'hand painted' readers fit very well with the reader product line that Hilco carries. We would like to express our interest in potentially purchasing these readers direct from Ronit Furst at Art Optic Ltd. If there was any interest by your client to have Hilco distribute his collection, we would be happy to speak with him."

(Emphasis supplied) (Exhibit J to Tomashover Aff.)

### The Israeli Action

27. On April 30, 2007, plaintiff commenced an action against defendants in the Israeli District Court. ("Statement of Claim" to Israeli Court, attached as Exhibit A to Schurin Decl.)

28  Plaintiff consulted with an attorney in New York prior to commencing the Israeli action. ( ¶5 of Request for TRO. attached as Exhibit B to Schurin Decl.)

29. In its Statement of Claim to the Israeli Court, plaintiff specifically stated that the Israeli Court has jurisdiction over the case. Specifically, plaintiff states in relevant part that "the honorable Court has practical jurisdiction to deliberate the Claim due to the predicate of the claim, and local jurisdiction to deliberate it by the power of the parties'

agreement in paragraph 10 of the contract, **and by the virtue that all the prejudices ascribed to the defendants are an inseparable part of the infringements covered by the contract which, according to the abovementioned paragraph 10, is subject to the laws of the State of Israel**." (¶17 of "Statement of Claim," attached as Exhibit A to Schurin Decl.) (Emphasis added)

30. The "prejudices ascribed to the defendants," in other words the allegations supporting plaintiff's Israeli claims, are much the same as the allegations supporting plaintiff's claims in this case. For example, in paragraph 12.1 of the Statement of Claim, plaintiff offers the same April 2007 affidavit of Cathy Shue. (See ¶¶ 18 to 22 of the Bibring Affidavit offered in this case.)

31. Plaintiff also specifically acknowledges that its claims are subject to the Agreement's arbitration clause. In this regard, plaintiff's counsel's "Request for Ex-Parte Permit" notes the arbitration provision and states: "[S]hould the respondents be willing to implement the arbitration agreement in terms of the abovementioned and in accordance with the provisions of the law, the petitioner hereby declares that on her part she will endeavor to do all that it takes in order you have the arbitration in Israel." (¶ 16 of Request for Ex Parte Permit (Outside Jurisdiction) attached as Exhibit C to Schurn Decl.)

32. Plaintiff was aware that an action could have been brought in New York, and instead chose to pursue its remedies in Israel. In paragraph

9

20 of his affidavit, Mr. Bibring states "To the best of my knowledge and belief, my legal advisers were informed by consultation with lawyers in New York, than an injunction which may be given as requested by an Israeli Court can be enforced in the State of New York." (¶ 20 of Bibring Aff. filed in Israeli action attached as Exhibit D to Schurin Decl.)

33. In paragraph 18 of the same affidavit of plaintiff's counsel acknowledges the obligation to arbitrate this dispute. (¶ 18 of Bibring Aff. filed in Israeli action attached as Exhibit D to Schurin Decl.)

34. Plaintiff's TRO sought an injunction prohibiting defendants:

(a) from selling hand painted frames, including frames bearing the RONIT FURST, OP-ART or ART OPTIC marks; or

(b) from selling frames that "feigned to be produced or designed by the petitioner."

(TRO Request attached as Exhibit B to Schurin Decl.)

The Decision of the Israeli Court

35. On October 9, 2007, the Israeli court issued its decision on plaintiff's motion for temporary relief. (Exhibit F to Schurin Decl.)

36. The Court issued two specific rulings:

(a) First, on page 3, the Court denied plaintiff's request for a temporary injunction banning the respondents from competing with plaintiff for an indefinite period. The Court held:

10

"The petitioner is applying for a temporary injunction banning the respondents from competing with it for an indefinite period whereas it was entitled at most to prevent the respondents from marketing competing glasses with decorated frames till December 31, 2007. Therefore, I see no justification for accepting this request, which was intended to prevent the respondents from competing with the petitioner."

(b) Second on pages 4-5, the Court granted plaintiff's request for a temporary injunction banning defendants from distributing **forged frames**. The Court held:

The respondents agreed in their reply to obtain a temporary injunction banning them from distributing forged frames (clause 90 of the respondents' reply of July 22, 2007), and on these grounds I think it would be justified to hand down a temporary injunction banning the respondents from further marketing of frames that constitute a forgery of the decorated ones."

(Exhibit F to Schurin Decl)

Plaintiff's First Notice of Allegedly Infringing Acts

37. Plaintiff first learned of the defendants' alleged infringing acts in February 2007. (Bibring Aff. ¶ 17 and page 2 of plaintiff's memorandum)

11

### Allegations of Infringement – Affidavit of Ehud Bebring

38. In 2006, while plaintiff and the defendants were trying to negotiate a new exclusive Sales and Distribution Agreement, plaintiff was negotiating a potential distribution agreement with Ms. Cathy Shue. (Bibring Aff. ¶ 18)

39. Plaintiff's efforts to negotiate a distribution agreement with Ms. Shue was unknown to the Defendants at the time, and violated paragraph 5 of the Agreement. (¶5 of Agreement and ¶ 17 of Tomashover Aff.)

40. In February of 2007, plaintiff had revived its efforts to negotiate a distribution agreement with Ms. Shue. This fact was unknown to the defendants. (Bibring Aff. ¶ 18) (Shue Aff. ¶ 4)

41. At that time, defendants sold 13 genuine RONIT FURST glasses to Cathy Shue. Such glasses had been previously purchased from plaintiff, and were part of defendants' existing inventory.

42. Defendants did not represent themselves as agents of RONIT FURST eyewear, nor did defendants state that they were associated with a distributor in South America. (Tomashover Aff. ¶ 18)

43. Plaintiff's allegation that defendants have "flooded the marketplace in the United States with counterfeits" is entirely unsupported and false. (Bibring Aff. ¶ 25) (Tomashover Aff. ¶ 25)

44. Until December of 2006, plaintiff not only permitted, but encouraged defendants to represent themselves as representatives of RONIT FURST eyewear in the United States when attending trade shows. (Tomsahover Aff. ¶ 14) (Bibring Aff. ¶ 27)

45. The Israeli District Court denied plaintiff's request to enforce the non-compete provision of the Agreement. (Page 3 of Exhibit 8.) Since plaintiff had refused to purchase defendants existing inventory of genuine RONIT FURST glasses in accordance with the terms of the Agreement, defendants had the right to attempt to re-sell such inventory of glasses that it had at shows in Las Vegas in October 2007.

46. The glasses that defendants sold to the store *Davante*, located in the Forum Shops at Caesar's Palace Hotel in Las Vegas NV are genuine RONIT FURST glasses. (Tomshaover Aff. ¶ 19)

47. All of the glasses sold by defendants to the store *Bella Vista Optics* were genuine RONIT FURST glasses. (Tomshaover Aff. ¶ 19)

48. Defendants applied to register the trademark RONIT FURST in the United States without the advice of counsel. Defendants' application was rejected, and after consultation with counsel, defendants have since expressly abandoned said application. Defendants claim no rights in the RONIT FURST mark. (Tomshaover Aff. ¶¶ 20-23)

49. Defendants have not attempted to prevent Berri's representatives from selling RONIT FURST frames in the United States. Defendants have not verbally harassed, threatened or attempted to intimidate any individual, and all of plaintiff claims to the contrary are unsupported and false. (Tomshaover Aff. ¶ 24)

Allegations made in the Affidavit of Avri Beeri

50. The allegations made by Mr. Beeri in paragraph 7 of his Affidavit, that defendants are manufacturing counterfeit Ronit Furst eyewear and distributing same throughout the United States are false and completely unsupported by any evidence.

51. Defendants have not sold counterfeit frames to any stores in Las Vegas and Mr. Beeri's allegations to the contrary are false and completely unsupported by any evidence. (Tomshaover Aff. ¶¶ 24-25)

52. Mr. Beeri's charge that defendants have "threatened and intimidated distributors" is false and completely unsupported by any evidence.

53. Mr. Beeri's allegation that defendants have "flooded the marketplace with counterfeit goods" is false and completely unsupported by any evidence. (Tomshaover Aff. ¶¶ 24 -25)

54. Mr. Beeri's charge that defendants have verbally harassed and threatened distributors with litigation is false and completely unsupported by any evidence. (Tomshaover Aff. ¶ 24)

55. Mr. Beeri's representations of what third parties have allegedly said to him about the defendants is rank hearsay, and has no documentary support whatsoever.

The Instant Case

56. Plaintiff filed the instant case against defendant on January 14, 2008, which is at least 11 months after plaintiff first learned of the allegedly infringing acts of defendant.

Respectfully submitted,<br>
GOTTLIEB, RACKMAN & REISMAN<br>
<br>
Richard S. Schurin<br>
Counsel for Defendants

New York, N-ew York
February 7, 2008

15