UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
ART-OPTIC, LTD.,                                      :        08 CV 0327 (MGC)

                    Plaintiff,                        :

SAMUEL TOMASHOVER, MERYL                              :
TOMASHOVER and NEWLIGHT
EYEWEAR, LLC.,                                        :

                    Defendants.                       :
------------------------------------------------------X

## DECLARATION OF RICHARD S. SCHURIN

Richard S. Schurin, declares and states as follows:

1.      I am counsel for the defendants in the above captioned action, and

submit this declaration in opposition to plaintiff's motion for preliminary relief.

2.      Attached hereto as Exhibit A is a true and correct copy of the

STATEMENT OF CLAIM filed by plaintiff in the Israeli District Court in Tel-Aviv,

Israel on or about April 30, 2007.

3.      Attached hereto as Exhibit B is a true and correct copy of the

REQUEST IN WRITING FOR ISSUING A TEMPORARY INJUNCTION AT THE

PRESECE OF ONE PARTY filed by Plaintiff in the Israeli District Court in Tel-

Aviv, Israel on or about April 30, 2007.

4.      Attached hereto as Exhibit C is a true and correct copy of the

REQUEST TO PERMIT EX PARTE PERMIT (OUTSIDE JURIDICTION) filed by

Plaintiff in the Israeli District Court in Tel-Aviv, Israel on or about April 30, 2007.

5.    Attached hereto as Exhibit D is a true and correct copy of the

AFFIDAVIT OF EHUD BIBRING filed by Plaintiff in the Israeli District Court in

Tel-Aviv, Israel on or about April 30, 2007.

6.    Attached hereto as Exhibit E is a true and correct copy of the

WRITTEN CLOSING ARGUMENTS OF RESPONDENTS filed by defendants in

the Israeli District Court in Tel-Aviv, Israel.

7.    Attached hereto as Exhibit E is a true and correct copy of the

DECISION of the Israeli District Court in Tel-Aviv, Israel dated October 10, 2007.

Richard S. Schurin (RS 0199)

Dated: New York, New York
       February 7, 2008

# EXHIBIT A

At the District Court
<u>In Tel-Aviv Jaffa</u>

Tel-Aviv Jaffa District Court
A 1661/07
Art Optic Ltd. Vs. Samuel Tomashover
Date started: 30/04/07 legal procedure: standard
New case number: TA 47373-04/07

In the matter:        **Art-Optic Ltd.**
                Legally registered company in Israel (private company 513191148)
                Of Hazamir St. 61, Kiryat Ono 55507
                By its representatives Adv. Uriel Ganiher and/or Yael Amir Lev-Ari
                And/or Yaron Raz and/or Nechami Mayzelish
                Of David Hamelech Blvd. 12 Tel-Aviv 64953
                Tel: 03-6968965  Fax: 03-6969781

                                            **The Plaintiff**

                        - Versus -

                1. **Mr. Samuel Tomashover**
                2. **Mrs. Meryl Tomashover**

                Sales agents whose address is –
                444 East 75th Street, Suite 17C,
                New York 10021, New York, USA

                                            **The Defendants**

The essence of the Claim:        Claim for Declarative Verdict and for an Injunction.

Amount of Claim:        Can not be estimated in money.


# STATEMENT OF CLAIM


## The Parties

1.  The plaintiff is a private company registered in Israel, which among other
    manufactures and distributes plastic eyeglasses' frames that are hand
    painted. The plaintiff is a family company owned by Mrs. Lea Bibring that

2

exclusively manufactures the brand "Ronit Furst" frames. Ronit Furst herself is the designer of the frames. The plaintiff manages her business affairs in Israel but exports her products to different countries in Europe as well as to the USA. The plaintiff holds the rights to use the brand "Ronit Furst" and has the copyrights to the designs, samples and drawings designed by Mrs. Ronit Furst.

2.    Defendants 1 and 2 (the "Defendants") are sales agents and distributors. In 2004 they were unemployed and through a relative of theirs they contacted the plaintiff with an offer to distribute her products in the USA.

## The Product

3.    The product produced by the plaintiff (the "Product") is unique. The plaintiff purchases, through a special order, transparent plastic frames that are produced according to the specifications of the plaintiff. Mrs. Ronit Furst designs patterns, drawings and decorations that are painted on the frames according to her choice. It should be emphasized that the designs are originals, created by Mrs. Furst. Artists that are working for the plaintiff make precision copies, and under the supervision of Mrs. Furst, those samples and drawings are painted on all the frames.

The frames are delivered to a factory where they undergo a coating process that affixes the painting on the frame. Each frame bears the brand name "Ronit Furst" as well as an index number which likewise is written by hand on the inside of the right hand temple of the frame. Picture of the index and in it the number of frames taken out of all the products of the plaintiff is attached to the Statement of Claim and marked as **appendix A'**

4.    The eyeglass brand "Ronit Furst" exists commercially since 2002, the year when the plaintiff was established. During this time it gained reputation

3

for the originality of the models, their beauty and quality, where the frames bearing the brand are sold at selected optical shops.

## The Association

5.  In 2004, when the products of the plaintiff were already sold in a number of shops in the USA, the plaintiff was approached by one of the products' distributors in Israel, Mr. David Goldwasser, who told that his relatives, the defendants, are experienced marketing people but unemployed, and proposed to the plaintiff that the defendants, together with himself, shall receive the distribution rights for the product in the USA. The plaintiff agreed and a distribution contract was signed between the parties. A correct copy of the distribution contract is attached to the Statement of Claim as a part of it thereof and marked as **appendix B'**. Shortly afterward Mr. Goldwasser withdrew, with the consent of the parties, from his share in the deal, and the defendants remain the distributors of the product in the USA according to the contract.

## The Contract

6.  The contract, appendix A', was signed for a period of 13 months starting December 1st, 2005. The plaintiff shall rely on appendix A' in full. However, for the convenience of the Court 2 paragraphs shall be introduced hereof, which are needed in order to understand the matter. Paragraphs 7, 8, of the contract establish the following (translated from English for convenience only, the prevailing version is the source, the term "the buyer" refers to the defendants, the term "the producer" refers to the plaintiff).

4

## ·⌐ 7. Non-Competition

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing· hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

⌐ 8.1 It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

·⌐ 8.2 The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART".

"ART OPTIC", "RONIT FURST".

8.3 It is stressed and agreed, that unless otherwise determined by the Producer in writing, the Product will be sold and distributed in the U.S.A only under the trade name – "RONIT FURST".

. –

## The conduct of the parties and termination of the contract

7.  During the duration of the contract the defendants have breached it and were in arrears for paying for the products that were supplied to them. Since the contract was valid for one year only, the plaintiff took no action against the defendants. Yet, the plaintiff demanded that the infringements be rectified, and also made it clear to the defendants that the contract with them will not be renewed. Indeed, on December 30th, 2005 the period covered by the contract has expired. To be sure, from that date onward the plaintiff continued to supply products to the defendants, however, the contract between the parties was changed in such that the defendants are no longer entitled to exclusivity in marketing the products in the USA. The aforesaid agreement was expressed in exchanged messages via electronic mail (e-mail).

8.  The defendants continued their infringements also after working under the current framework, hence the plaintiff was forced to inform the defendants that the contract is definitely terminated.

5

9. Relevant copies of the electronic correspondence are attached to the Statement of Claim as a part of it thereof and marked as **appendix C'**.

10. As it appears from the contents of the plaintiff's representative's letter, the association between the parties came to a final and absolute end on 12/05/06.

   Copy of the letter is hereby attached and marked as **appendix D'**.

## The prejudice: contravention of contract, forgery, fraud, copyrights infringement, commercial prejudices.

11. The defendants, on account of their attitude and due to the fact that the association period of the contract has expired, could no longer continue and sell the plaintiff's frames but wanted to enjoy the reputation which is the fruit of her labor, decided to employ fraud and deceit to benefit on the plaintiff's account. About two weeks before the time of the Claim the plaintiff found out that the defendants found a supplier, probably a South American country, which produces a precise copy of the defendant's frames, including the caption "Ronit Furst" which is on each frame. Those frames, in which the plaintiff has no part in their production, are marketed by the defendants by falsely claiming that the plaintiff is the producer and they the defendants are her agents.

   It should be pointed out that finding a supplier, learning the design and manufacturing process and preparing a stock of frames, is a prolonged process which clearly establishes that the defendants made preparations for the forgery and copying deeds long time in coming, and only waited for the moment they could start the illicit deeds.

12. The defendants Approached different optician shops in the USA, from California to New York, they presented them with the fake frames,

6

claimed that they are produced by the plaintiff, received orders and even supplied the product.

Among others, the defendants and/or either one of them, solicited the following business owners:

12.1.  Mrs. Cathy Shue, owner of optical goods in Monterey, California. The defendants came to her with a proposal to make in her shop a special sale of the plaintiff's frames to the shop's selected clientele. On 03/10/07 they have indeed appeared at the shop, equipped with the plaintiff's samples and publicity material, and presented themselves as the plaintiff's agents. The shop's clients ordered frames, and after the defendants were given the list of orders they supplied the shop with the frames. The frames look exactly like the frames that are produced by the plaintiff, and only an expert's eye can discern the minute differences. Attached to this Statement of Claim is a photo of some of the fake frames that were given to Mrs. Shue, marked as **appendix E'**. The frame itself is kept at the undersigned advocate's office where it shall be presented to the Court.

12.2.  "Braham Powell", optical goods in Alexandria, Virginia. On 03/20/07 a family member of Mrs. Ronit Furst took a stroll in this city and observed many "Ronit Furst" frames displayed for sale in the shop. He entered the shop, which had the plaintiff's publicity material including a photo of Mrs. Ronit Furst, he was told that the frames are selling very well, at a price of $225 each. He was told that the defendants came to the shop and presented themselves as Ronit Furst agents, they told that Ronit Furst has transferred the production from Israel. This made the man suspicious and he asked

> to examine the frames supplied by the defendants. Upon his examination he discovered that the frames are identical to the original frames, including the brand name "Ronit Furst" that appears at the side of the frame. Only after meticulous examination, and by being an engineer involved in the production process, he discovered that the frames are a fake. That same person also said that he saw "Ronit Furst" frames sold in another shop at that city. Those too were not produced by the plaintiff.

13. In addition to that, at the end of March 2007 an important and one of the largest exhibitions in the USA for optical goods took place in New York. In this exhibition the defendants made a stand laden with plaintiff's publicity material (which included, wall posters, wallpapers and colorful shelves by the design of the plaintiff and even brochures of the plaintiff that he received from the plaintiff for previous exhibitions) that feigns to be a stand of the plaintiff, yet in effect they are fake and the plaintiff had never produced them. Photo of the stand is attached hereof and marked as **appendix F'**. Furthermore, the defendants published at the official website of the exhibition that they are marketing "Ronit Furst" hand painted frames.

14. The defendants made known to optical shop owners in the USA that they intend to present "Ronit Furst" frames in trade fairs, including the optical fair MIDO in Milan at the beginning of May 2007. This is the largest well-known international fair in the optical industry as well as in a fair that is to take place in Chicago in May 2007. This points to the intention of the defendants to market the imitations worldwide.

8

## The reasons for the Statement of Claim

15. The abovementioned behavior of the defendants constitutes the infringement of paragraph 7 of the Distribution Contract, appendix B'. Furthermore, it constitutes copyrights violation of the plaintiff in the design of the frames, and it constitutes violation of paragraphs 1, 2, 3, and 6 of the Commercial Prejudice Law 1999.

## Supports and safeguarding

16. For the abovementioned prejudices the plaintiff is entitled to a support of an injunction and a declarative verdict which will be requested presently. Of course, the abovementioned behavior of the defendants caused the plaintiff, and may continue to cause her, severe financial loss and the plaintiff reserve the right to bring a claim for those damages when they shall come about.

## Jurisdiction

17. The honorable Court has practical jurisdiction to deliberate the Claim due to the predicate of the claim, and local jurisdiction to deliberate it by the power of the parties' agreement in paragraph 10 of the contract, and by the virtue that all the prejudices ascribed to the defendants are an inseparable part of the infringements covered by the contract which, according to the abovementioned paragraph 10, is subject to the laws of the State of Israel, hence also the Israeli jurisdiction.

    **Therefore**, the honorable Court is requested to summon the defendants to trial, to declare that the defendants are obligated in terms of paragraph 7 of the contract, appendix A' to desist for a period of two years beginning on 09/30/06 (last month of supply) from taking the following action: to produce, to sell, to market, or distribute eyeglasses' frames that are similar or in competition with the frames produced by the plaintiff. The Court is

9

further requested to issue a permanent injunction that will prohibit the defendants, directly or indirectly, to do one or more of the following actions: to sell, to produce or to present for commercial purposes anywhere in the world frames that bear the name "Ronit Furst", "Op-Art" or "Art Optic", or those that feign to be frames produced by the plaintiff and/or designed by Ronit Furst, to present themselves as agents or distributors or representatives or delegates of the plaintiff, to make use of designs, samples, drawings, or decorations that were designed by the plaintiff or for the plaintiff by Mrs. Ronit Furst, or in any other way to make any commercial use which constitutes infringements of the plaintiff's copyrights, or to make use of the plaintiff's production process, as well as to pay the plaintiff's trial costs and lawyers' fees.

Adv. Uriel Ganihar

For the plaintiff

(-)

# EXHIBIT B

At the District Court
In Tel-Aviv Jaffa

Tel-Aviv Jaffa District Court
A 1661/07 (BSA 9266/07)
Art Optic Ltd. Vs. Samuel Tomashover
(in the case of Art Optic Ltd. vs. Sam…
Date started: 30/04/07 legal procedure: standard
New case number: TA 47373-04/07

In the matter:      **Art-Optic Ltd.**
                    Legally registered company in Israel (private company 513191148)
                    Of Hazamir St. 61, Kiryat Ono 55507
                    By its representatives Adv. Uriel Ganiher and/or Yael Amir Lev-Ari
                    And/or Yaron Raz and/or Nechami Mayzelish
                    Of David Hamelech Blvd. 12 Tel-Aviv 64953
                    Tel: 03-6968965  Fax: 03-6969781

                                                        **The Petitioner**

                        - Versus -

                    1. **Mr. Samuel Tomashover**
                    2. **Mrs. Meryl Tomashover**

                    Sales agents whose address is –
                    444 East 75th Street, Suite 17C,
                    New York 10021, New York, USA

                                                        **The Respondents**


# REQUEST IN WRITING FOR ISSUING A TEMPORARY INJUNCTION AT THE
# PRESENCE OF ONE PARTY

Request is hereby submitted to the honorable Court to issue a temporary injunction
which will prohibit the respondents or either of them, directly, indirectly, or through
those who act on their behalf, to do each one or more of the following deeds

Not to be involved in any way in the production, marketing, sales promotion,
distribution and sale of hand painted frames for eyeglasses, as well as to prohibit the
respondents to sell, produce, or to present anywhere in the world eyeglasses' frames

that bear the name "Ronit Furst", "Op-Art", or "Art Optic" or frames that feigned to be produced or designed by the petitioner. This shall be so until final verdict is issued in the proceedings submitted to the Court simultaneously with this petition.

This petition is submitted together with the attached request for ex parte permit outside jurisdiction, according to paragraph 500 to the civil procedure regulations.

**Reasons for the request:**

1.     The petitioner is a private company registered in Israel, which among other, manufactures and distributes plastic eyeglasses' frames that are hand painted. The petitioner is a family company owned by Mrs. Lea Bibring that exclusively manufactures the brand "Ronit Furst" frames. Ronit Furst herself is the designer of the frames. The petitioner manages her business affairs in Israel but exports her products to different countries in Europe as well as to the USA. The petitioner owns the rights to use the brand "Ronit Furst" and has the copyrights to the designs, samples and drawings designed by Mrs. Ronit Furst.

2.     Respondents 1 and 2 (the "respondents") are sales agents and distributors. In 2004 they were unemployed and through a relative of theirs they contacted the petitioner with an offer to distribute her products in the USA

**The Product**

3.     The product produced by the petitioner (the "Product") is unique. The petitioner purchases, through a special order, transparent plastic frames that are produced according to the specifications of the petitioner Mrs. Ronit Furst designs patterns, drawings and decorations that are painted on the frames according to her choice. It should be emphasized that the designs are originals, created by Mrs. Furst.

3

Artists that are working for the petitioner make precision copies, and under the supervision of Mrs. Furst, those samples and drawings are painted on all the frames. The frames are delivered to a factory where they undergo a coating process that affixes the painting on the surface of the frame. Each frame bears the brand name "Ronit Furst" as well as the index number which likewise is **written by hand on the inside of the right hand temple** of the frame. Picture of the index and in it the number of frames taken out of all the products of the plaintiff is attached to the Statement of Claim and marked as **appendix A'**

4.      The eyeglass brand "Ronit Furst" exists commercially since 2002, the year when the petitioner was established. During this time it gained reputation for the originality of the models, their beauty and quality, where the frames bearing the brand are sold at selected optical shops.

**The Association**

5.      In 2004, when the products of the petitioner were already sold in a number of shops in the USA, the petitioner was approached by one of the products' distributors in Israel, Mr. David Goldwasser, who told that his relatives, the respondents, are experienced marketing people but unemployed, and proposed to the petitioner that the respondents, together with himself, shall receive the distribution rights for the product in the USA. The petitioner agreed and a distribution contract was signed between the parties. A correct copy of the distribution contract is attached to the Claim as a part of it thereof and marked as **appendix B'**. Shortly afterward Mr. Goldwasser withdrew, with the consent of the parties, from his share in the deal, and the respondents remain the distributors of the product in the USA according to the contract.

6.      The contract, appendix B', was signed for a period of 13 months starting December 1st, 2005. The petitioner shall rely on appendix B' in full. However, for the convenience of the Court 2 paragraphs shall be introduced hereof, which are needed

4

in order to understand the matter. Paragraphs 7, 8, of the contract establish the following (translated from English for convenience only, the prevailing version is the source, the term "the buyer" refers to the respondents, the term "the producer" refers to the petitioner).

**7. Non-Competition**

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing· hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

**8.1** It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

**8.2** The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",

"ART OPTIC", "RONIT FURST".

## The conduct of the parties and termination of the contract

7.     During the course of the contract the respondents have breached it and were in arrears for paying for the products that were supplied to them. Since the contract was valid for one year only, the petitioner took no action against the respondents. Yet, the petitioner demanded that the infringements be rectified, and also made it clear to the respondents that the contract with them will not be renewed. Indeed, on December 30th, 2005 the period covered by the contract has ended. To be sure, from that date onward the petitioner continued to supply products to the respondents, however, the contract between the parties was changed in such that the respondents are no longer entitled to exclusivity in marketing the products in the USA. The aforesaid agreement was expressed in exchanged messages via electronic mail (e-mail).

5

8.    The respondents continued their infringements also after working under the current framework, hence the petitioner was forced to inform the respondents that the contract is definitely terminated.

9.    The respondents, on account of their attitude and due to the fact that the association period of the contract has expired, could no longer continue and sell the petitioner's frames but wanted to enjoy the reputation which is the fruit of her labor, decided to employ fraud and deceit to benefit on the petitioner's account. About a month  before the time of the Claim the petitioner found out that the respondents found a supplier, probably in a South American country, which produces a precise copy of the petitioner's frames, including the caption "Ronit Furst" which is on each frame. Those frames, in which the petitioner has no part in their production, are marketed by the respondents by falsely claiming that the petitioner is the producer and they the respondents are her agents.

It should be pointed out that finding a supplier, learning the designs and manufacturing process and preparing a stock of frames, is a prolonged process which clearly establishes that the respondents made preparations for the forgery and copying deeds long time in coming, and only waited for the moment they could start the illicit deeds.

10.    The defendants approached different optician shops in the USA, from California to New York, they presented them with the fake frames, claiming that they are produced by the petitioner, received orders and even supplied the product.

Among others, the respondents and/or either one of them, solicited the following business owners:

10.1. Mrs. Cathy Shue, owner of optical goods in Monterey, California. The respondents came to her with a proposal to make in her shop a special sale of the petitioner's frames to the shop's selected clientele. On 03/10/07 they have indeed

6

appeared at the shop, equipped with the plaintiff's samples and publicity material, and presented themselves as the petitioner's agents. The shop's clients ordered frames, and after the respondents were given the list of orders they supplied the shop with the frames. The frames look exactly like the frames that are produced by the petitioner, and only an expert's eye can discern the minute differences. Attached to this Claim is a photo of part of the fake frames that were sold to Mrs. Shue, marked as **appendix C'**. Also attached is Mrs.Shue's affidavit which confirms the above said , marked as **appendix C'.1**.

The frames themselves are at the undersigned advocate's office and they shall be presented to the Court.

10.2. "Braham Powell", optical goods in Alexandria, Virginia. On 03/20/07 Mr.Itamar Furst, a family member of Mrs. Ronit Furst took a stroll in this city and observed many "Ronit Furst" frames displayed for sale in the shop. He entered the shop, which had the petitioner's publicity material including a photo of Mrs. Ronit Furst, he was told that the frames are selling very well, at a price of $225 each. He was told that the respondents came to the shop and presented themselves as Ronit Furst agents, they told that Ronit Furst has transferred the production from Israel. This made the man suspicious and he asked to examine the frames supplied by the respondents. Upon his examination he discovered that the frames are identical to the original frames, including the brand name "Ronit Furst" that appears at the side of the frame. Only after meticulous examination, and by being an engineer involved in the production process, he discovered that the frames are fake. That same person also said that he saw "Ronit Furst" frames sold in another shop at that city. Those too were not produced by the petitioner

Mr Itamar Furst affidavit is attached to the request, marked as **appendix D'**

11.    In addition to that, at the end of March 2007 an important and one of the largest exhibitions in the USA for optical goods took place in New York. In this exhibition the respondents made a stand laden with petitioner's publicity material which included, wall posters, wallpapers and colorful shelves by the design of the petitioner

7

and even brochures of the petitioner that he received from the petitioner for previous exhibitions) that feigns to be a stand of the petitioner, in which the respondents offered for sale eyeglasses frames that feigns to be of the petitioner, yet in effect they are fake and the petitioner had never produced them. Mrs.Ruth Domber who was present in the abovementioned exhibition, confirms in her affidavit the above said. Her affidavit and 2 photos of the stand, which were taken by Mrs.Domber, are attached hereof and marked as **appendix E', E'1.**

Furthermore, the respondents published at the official website of the exhibition that they market "Ronit Furst" hand painted frames.

12.    The respondents made known to optical shop owners in the USA that they intend to present "Ronit Furst" frames in trade fairs, including the optical fair MIDO in Milan at the beginning of May 2007. This is the largest well-known international fair in the optical industry as well as in a fair that is to take place in Chicago in May 2007. This points to the intention of the respondents to market the imitations worldwide.

13.    The abovementioned behavior of the respondents constitutes infringement of paragraph 7 of the Distribution Contract, appendix B'. Furthermore, it constitutes copyrights violation of the petitioner in the design of the frames, and it constitutes violation of paragraphs 1, 2, 3, and 6 of the Commercial Prejudice Law 1999.

14.    For the abovementioned prejudices and for the fear of irreversible damage that will be caused to the petitioner if continuation of the abovementioned prejudices is not stopped without further delay, the petitioner is entitled to this temporary injunction until the petition submitted by the petitioner is heard. Should this injunction not be granted immediately and be enforced in the State of New York and as may be necessary also in Italy and other countries, all the rights of the petitioner squandered, as well as wasting the creativity and talent that were invested in the design of the product, and the reputation gained by the petitioner, whereas the respondents will benefit on her account. Furthermore, should the respondents be given the time for prolonged deliberation before

8

the injunction is issued, the objective of the injunction will be in vain as the respondents will be able to transfer large quantities of counterfeit products to clients throughout the USA and Europe.

15. After consultation with an attorney who specializes in intellectual property in New York, I have been informed that an order granted by this honourable court may be enforced in the state of New York.

16. It is legitimate and just to accede to the petition.

Adv. Uriel Ganihar
For the plaintiff
(-)

# EXHIBIT C

At the District Court
<u>In Tel-Aviv Jaffa</u>

Tel-Aviv Jaffa District Court
A 1661/07 (BSA 9266/07)
Art Optic Ltd. Vs. Samuel Tomashover
Date started: 30/04/07 legal procedure: standard
New case number: TA 47373-04/07

In the matter:          **Art-Optic Ltd.**
                        Legally registered company in Israel (private company 513191148)
                        Of Hazamir St. 61, Kiryat Ono 55507
                        By its representatives Adv. Uriel Ganihar and/or Yael Amir Lev-Ari
                        And/or Yaron Raz and/or Nechami Mayzelish
                        Of David Hamelech Blvd. 12 Tel-Aviv 64953
                        Tel: 03-6968965 Fax: 03-6969781

                                                    **The Petitioner**

                              - **Versus** -

                        1. **Mr. Samuel Tomashover**
                        2. **Mrs. Meryl Tomashover**

                        Sales agents whose address is –
                        444 East 75th Street, Suite 17C,
                        New York 10021, New York, USA

                                                    **The Respondents**


## REQUEST FOR EX PARTE PERMIT (OUTSIDE JURISDICTION)


Request is hereby submitted to the honorable Court to permit the presentation of
the proceedings and the request that is submitted simultaneously with this
submission, to the hands of the respondents in the following address:
444 East 75th Street, Suite 17C, New York 10021, New York, USA

2

## Reasons for the request:

### Preamble

1.  This petition is intended to permit the petitioner to start proceedings to rectify prejudices caused to her by the respondents. The respondents are United States of America residents and their address is the one mentioned above, however they have associated with the petitioner in a contract that was made in Israel and which is subjected to Israeli laws, and where its jurisdiction is in Israel, where it all stems from the power of an explicit agreement by the parties as stated in the contract. This petition will unfold before the honorable Court the summary of the relevant facts and the reasons for issuing the requested permit.

2.  The petitioner is a private company registered in Israel, which among other, produces and distributes plastic eyeglasses' frames that are hand painted. The petitioner is a family company owned by Mrs. Lea Bibring that exclusively manufactures the brand "Ronit Furst" frames. Ronit Furst herself is the designer of the frames. The petitioner manages her business affairs in Israel but exports her products to different countries in Europe as well as to the USA. The petitioner owns the rights to use the brand "Ronit Furst" and has the copyrights to the designs, samples and drawings designed by Mrs. Ronit Furst.

3.  Respondents 1 and 2 (the "respondents") are sales agents and distributors. In 2004 they were unemployed and through a relative of theirs they contacted the petitioner with an offer to distribute her products in the USA.

3

## The Product

4.    The product that is produced by the petitioner (the "Product") is unique.
      The petitioner purchases, through a special order, transparent plastic
      frames that are produced according to the specifications of the petitioner
      Mrs. Ronit Furst designs patterns, drawings and decorations that are
      painted on the frames according to her choice. It should be emphasized
      that the designs are originals, created by Mrs. Furst. Artists that are
      working for the petitioner make precision copies, and under the
      supervision of Mrs. Furst, those samples and drawings are placed on all
      the frames.

      The frames are delivered to a factory where they undergo a coating
      process that affixes the painting on the surface of the frame. Each frame
      bears the brand name "Ronit Furst" as well as the index number which
      likewise is written by hand on the inside of the right hand temple of the
      frame. Picture of the index and in it the number of frames taken out of all
      the products of the plaintiff is attached to the Statement of Claim and
      marked as **appendix A'**

5.    The eyeglass brand "Ronit Furst" exists commercially since 2002, the
      year when the petitioner was established. During this time it gained
      reputation for the originality of the models, their beauty and quality,
      where the frames bearing the brand are sold at selected optical shops.

## The Association

6.    In 2004, when the products of the petitioner were already sold in a
      number of shops in the USA, the petitioner was approached by one of the
      products' distributors in Israel, Mr. David Goldwasser, who told that his
      relatives, the respondents, are experienced marketing people but
      unemployed, and proposed to the petitioner that the respondents, together
      with himself, shall receive the distribution rights for the product in the

4

USA. The petitioner agreed and a distribution contract was signed between the parties. A correct copy of the distribution contract is attached to the Claim as a part of it thereof and marked as **appendix B'**. Shortly afterward Mr. Goldwasser withdrew, with the consent of the parties, from his share in the deal, and the respondents remain the distributors of the product in the USA according to the contract.

7.   The contract, appendix B', was signed for a period of 13 months starting December 1st, 2005. The petitioner shall rely on appendix B' in full. However, for the convenience of the Court 2 paragraphs shall be introduced hereof, which are needed in order to understand the matter. Paragraphs 7, 8, of the contract establish the following (translated from English for convenience only, the prevailing version is the source, the term "the buyer" refers to the respondents, the term "the producer" refers to the petitioner).

7. Non-Competition

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing- hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

8.1 It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

8.2 The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",

"ART OPTIC", "RONIT FURST".

## The conduct of the parties and termination of the contract

5

8.    During the course of the contract the respondents have breached it and were in arrears for paying for the products that were supplied to them. Since the contract was valid for one year only, the petitioner took no action against the respondents. Yet, the petitioner demanded that the infringements be rectified, and also made it clear to the respondents that the contract with them will not be renewed. Indeed, on December 30th, 2005 the period covered by the contract has ended. To be sure, from that date onward the petitioner continued to supply products to the respondents, however, the contract between the parties was changed in such that the respondents were no longer entitled to exclusivity in marketing the products in the USA. The aforesaid agreement was expressed in exchanged messages via electronic mail (e-mail).

9.    The respondents continued their infringements also after working under the current framework, hence the petitioner was forced to inform the respondents that the contract is definitely terminated.

10.    The respondents, on account of their attitude and due to the fact that the association period of the contract has expired, could no longer continue and sell the petitioner's frames but wanted to enjoy the reputation which is the fruit of her labor, decided to employ fraud and deceit to benefit on the petitioner's account. About two weeks before the time of the Claim the petitioner found out that the respondents found a supplier, probably in a South American country, which produces a precise copy of the petitioner's frames, including the caption "Ronit Furst" which is on each frame. Those frames, in which the petitioner has no part in their production, are marketed by the respondents by falsely claiming that the petitioner is the producer and they the respondents are her agents.
       It should be pointed out that finding a supplier, learning the design and manufacturing process and preparing a stock of frames, is a prolonged

6

process which clearly establishes that the respondents made preparations for the forgery and copying deeds long time in coming, and only waited for the moment they could start the illicit deeds.

11.  The defendants approached different optician shops in the USA, from California to New York, they presented them with the fake frames, claiming that they are produced by the petitioner, received orders and even supplied the product.

Among others, the respondents and/or either one of them, solicited the following business owners:

11.1.  Mrs. Cathy Shue, owner of optical goods in Monterey, California. The respondents came to her with a proposal to make in her shop a special sale of the petitioner's frames to the shop's selected clientele. On 10/03/07 they have indeed appeared at the shop, equipped with the plaintiff's samples and publicity material, and presented themselves as the petitioner's agents. The shop's clients ordered frames, and after the respondents were given the list of orders they supplied the shop with the frames. The frames look exactly like the frames that are produced by the petitioner, and only an expert's eye can discern the minute differences. Attached to this Claim is a photo of part of the fake frames that were given to Mrs. Shue, marked as **appendix C'**. The frames themselves are kept at the undersigned advocate's office where they shall be presented to the Court.

11.2.  "Braham Powell", optical goods in Alexandria, Virginia. On 20/3/07 a family member of Mrs. Ronit Furst took a stroll in this city and observed many "Ronit Furst" frames displayed for sale in the shop.

7

He entered the shop, which had the petitioner's publicity material including a photo of Mrs. Ronit Furst, he was told that the frames are selling very well, at a price of $225 each. He was told that the respondents came to the shop and presented themselves as Ronit Furst agents, they told that Ronit Furst has transferred the production from Israel. This made the man suspicious and he asked to examine the frames supplied by the respondents. Upon his examination he discovered that the frames are identical to the original frames, including the brand name "Ronit Furst" that appears at the side of the frame. Only after meticulous examination, and by being an engineer involved in the production process, he discovered that the frames are fake. That same person also said that he saw "Ronit Furst" frames sold in another shop at that city. Those too were not produced by the petitioner.

12. In addition to that, at the end of March 2007 an important and one of the largest exhibitions in the USA for optical goods took place in New York. In this exhibition the respondents made a stand laden with petitioner's publicity material (which included, wall posters, wallpapers and colorful shelves by the design of the petitioner and even brochures of the petitioner that he received from the petitioner for previous exhibitions) that feigns to be a stand of the petitioner, yet in effect they are fake and the petitioner had never produced them. Photo of the stand is attached hereof and marked as **appendix D'**. Furthermore, the respondents published at the official website of the exhibition that they market "Ronit Furst" hand painted frames.

13. The respondents made known to optical shop owners in the USA that they intend to present "Ronit Furst" frames in trade fairs, including the optical fair MIDO in Milan at the beginning of May 2007. This is the

8

largest well-known international fair in the optical industry as well as in a fair that is to take place in Chicago in May 2007. This points to the intention of the respondents to market the imitations worldwide.

14.  The abovementioned behavior of the respondents constitutes infringement of paragraph 7 of the Distribution Contract, appendix B'. Furthermore, it constitutes copyrights violation of the petitioner in the design of the frames, and it constitutes violation of paragraphs 1, 2, 3, and 6 of the Commercial Prejudice Law 1999.

15.  For the abovementioned prejudices and for the fear of irreversible damage that will be caused to the petitioner if continuation of the abovementioned prejudices is not be stopped on the spot, the petitioner is entitled for an ex parte injunction until the petition submitted by the petitioner is heard. Should this injunction not be granted immediately and be enforced in the State of New York and as may be necessary also in Italy and other countries, all the rights of the petitioner will be squandered, as well as wasting the creativity and talent that were invested in the design of the product, and the reputation gained by the petitioner, whereas the respondents will benefit on her account. Furthermore, should the respondents be given the time for prolonged deliberation before the injunction is issued, the objective of the injunction will be in vain as the respondents will be able to transfer large quantities of counterfeit products to clients throughout the USA and Europe.

16.  Paragraph 10 of the contracts sets out:

9

## 10. Governing Law

This agreement shall be governed and interpreted solely in accordance with the **laws of Israel.** Any and all disputes arising between the parties out of or in connection of this agreement, it's interpretation, performance or **breach,** shall be referred to a binding arbitration before a single arbitrator to be appointed by mutual agreement between the parties and, in the absence of such agreement, within fourteen (14) days from any of the parties first demand, and the arbitrator will be appointed at the request of either party by the chairman of the Israeli bar. **The arbitration will be held in Tel-Aviv, Israel.** The arbitration shall be conducted in accordance with the provisions of the Israeli arbitration Law, 1968. The arbitrator shall not be bound by any rules of evidence or procedure, but shall be bound by the **substantive of Israeli law.** Any award or decision rendered shall be made by means of written opinion explaining by arbitrator's reasons for the award or decision, shall be final and binding upon the parties hereto, and shall be given in 60 days from the appointment of the arbitrator.

Should the respondents be willing to implement the arbitration agreement in terms of the abovementioned and in accordance with the provisions of the law, the petitioner hereby declares that on her part she will endeavor to do all that it takes in order to have the arbitration in Israel. However, at the present stage the petitioner urgently requires the temporary injunction, according to the petition, to issue such an injunction that is submitted simultaneously with this petition, for the support to which she is entitled in accordance with the law and the contract.

17.    It is legitimate and just to accede to the petition.

Adv. Uriel Ganihar

For the plaintiff

(-)

# EXHIBIT D

# **AFFIDAVIT**

I, the undersigned Ehud Bibring bearer of I.D. document number 056716574 of Hazamir Street 61, Kiryat Ono, who after being warned that I have to state the truth, otherwise I may be subjected to penalties prescribed by the law, hereby state the following in writing:

1.  My name and address are those that are mentioned above.

2.  In this affidavit: "the petitioner": "Art Optic" company Ltd.; "the respondents" Mr. Samuel Tomashover and Mrs. Meryl Tomashover.

3.  I serve in the capacity of Marketing and Export Manager of the company "Art Optic" Ltd. ("the petitioner"). I attended on behalf of the petitioner to the association between her and between Messrs. Samuel and Meryl Tomashover ("the respondents") and the facts which are detailed in this affidavit are known to me personally, except for the facts that are known to me to the best of my belief and knowledge, for which I have herein conveyed the source of the knowledge and/or have attached documents, as the case may be.

**The parties**

4.  The petitioner is a private company registered in Israel, which among other produces and distributes plastic eyeglasses' frames that are hand painted. The petitioner is a family company owned by Mrs. Lea Bibring which exclusively manufactures the brand "Ronit Furst" frames. Ronit Furst herself is the designer of the frames. The petitioner manages her business affairs in Israel but exports her products to different countries in Europe as well as to the USA. The petitioner holds the rights to use the brand "Ronit

2

Furst" and owns the copyrights to the designs, samples and drawings designed by Mrs. Ronit Furst.

5. Respondents 1 and 2 (the "respondents") are sales agents and distributors. In 2004 they were unemployed and through a relative of theirs they contacted the petitioner with an offer to distribute her products in the USA.

## The Product

6. The product produced by the petitioner (the "Product") is unique. The petitioner purchases, through a special order, transparent plastic frames that are produced according to the specifications of the petitioner. Mrs. Ronit Furst designs patterns, drawings and decorations on the frames according to her choice. It should be emphasized that the designs are originals, created by Mrs. Furst. Artists that are working for the petitioner make precision copies, and under the supervision of Mrs. Furst, those samples and drawings are painted on all the frames.

The frames are delivered to a factory where they undergo a coating process that affixes the painting on the surface of the frame. Each frame bears the brand name "Ronit Furst" as well as the index number which likewise is written by hand on the inside of the right hand temple of the frame. Picture of the index and in it the number of frames taken out of all the products of the petitioner is attached to the Statement of Claim and marked as **appendix A'**

7. The eyeglass brand "Ronit Furst" exists commercially since 2002, the year when the petitioner was established. During this time it gained reputation for the originality of the models, their beauty and quality, where the frames bearing the brand are sold at selected optical shops.

3

## The Association

8.  In 2004, when the products of the petitioner were already sold in a number of shops in the USA, the petitioner was approached by one of the products' distributors in Israel, Mr. David Goldwasser, who told that his relatives, the respondents, are experienced marketing people but unemployed, and proposed to the petitioner that the respondents, together with himself, shall receive the distribution rights for the product in the USA. The petitioner agreed and a distribution contract was signed between the parties. A correct copy of the distribution contract is attached to the Claim as a part of it thereof and marked as **appendix B'**. Shortly afterward Mr. Goldwasser withdrew, with the consent of the parties, from his share in the deal, and the respondents remained the distributors of the product in the USA according to the contract.

## The contract

9.  The contract, appendix B', was signed for a period of 13 months starting December 1st, 2005. The petitioner shall rely on appendix B' in full. However, for the convenience of the Court 2 paragraphs shall be introduced hereof, which are needed in order to understand the matter. Paragraphs 7, 8, of the contract establish the following (translated from English for convenience only, the prevailing version is the source, the term "the buyer" refers to the respondents, the term "the producer" refers to the petitioner).

7. **Non-Competition**

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing- hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

8.1 It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

8.2 The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",

"ART OPTIC", "RONIT FURST".

## The conduct of the parties and termination of the contract.

10. During the duration of the contract the respondents have breached it and were in arrears for paying for the products that were supplied to them. Since the contract was valid for one year only, the petitioner took no action against the respondents. Yet, the petitioner demanded that the infringements be rectified, and also made it clear to the respondents that the contract with them will not be renewed. Indeed, on December 30th, 2005 the period covered by the contract has expired. To be sure, from that date onward the petitioner continued to supply products to the respondents, however, the contract between the parties was changed in such that the respondents were no longer entitled to exclusivity in marketing the products in the USA. The aforesaid agreement was expressed in exchanged messages via electronic mail (e-mail).

11. The respondents continued their infringements also after working under the current framework, hence the petitioner was forced to inform the respondents that the contract is definitely terminated.

5

12. Relevant copies of the electronic correspondence are attached to the Claim as a part hereof and marked as **appendix C'**

13. As it appears from the contents of the letter by the advocate of the petitioner, the association between the parties came to a definite end on December 5th,2006.

14. To the best of my knowledge and belief, and as I understood from the optics shop owners in the USA, Mrs. Cathy Shue and Mrs. Ruth Domber, whose affidavits are attached to the petition for which this affidavit of mine is supporting. Indeed, the respondents, on account of their behavior and due to the fact that the association period of the contract has ended, could no longer continue and sell the petitioner's frames but wanted to enjoy the reputation which is the fruit of her labor, decided to employ fraud and deceit to benefit on the petitioner's account. About a month before the time of the Claim the petitioner found out that the respondents found a supplier, probably in a South American country, which produces a precise copy of the petitioner's frames, including the caption "Ronit Furst" which is marked on each frame. Those frames, in which the petitioner has no part in their production, are marketed by the respondents by falsely claiming that the petitioner is the producer and they the respondents are her agents.

It should be pointed out that finding a supplier, learning the design and manufacturing process and preparing a stock of frames, is a prolonged process which clearly establishes that the respondents made preparations for the forgery and copying deeds long time in coming, and only waited for the moment they could start the illicit deeds.

15. The respondents approached different optical shops in the USA, from California to New York, they presented them with the fake frames, claiming

6

that they are produced by the petitioner, received orders and even supplied the product.

Among others, the respondents and/or either one of them, solicited the following business owners:

15.1. Mrs. Cathy Shue, owner of optical goods shop in Monterey, California. The respondents came to her with a proposal to make in her shop a special sale of the petitioner's frames to the shop's selected clientele. On 10/03/07 they have indeed appeared at the shop, equipped with the petitioner's samples and publicity material, and presented themselves as the petitioner's agents. The shop's clients ordered frames, and after the respondents were given the list of orders they supplied the shop with the frames. The frames look exactly like the frames that are produced by the petitioner, and only an expert's eye can discern the minute differences. Attached to this Claim is a photo of some of the fake frames that were given to Mrs. Shaw, marked as **appendix D'**. The frames themselves are kept at the undersigned advocate's office and they shall be presented to the Court.

15.2. "Braham Powell", optical goods shop in Alexandria, Virginia. On 03/20/07 a family member of Mrs. Ronit Furst took a stroll in this city and observed many "Ronit Furst" frames displayed for sale in the shop. He entered the shop, which had the petitioner's publicity material including a photo of Mrs. Ronit Furst, he was told that the frames are selling very well, at a price of $225 each. He was told that the respondents came to the shop and presented themselves as Ronit Furst agents, they told that Ronit Furst has transferred the production from Israel. This made the man suspicious and he asked to examine the frames supplied by the respondents. Upon his examination he

7

discovered that the frames are identical to the original frames, including the brand name "Ronit Furst" that appears at the side of the frame. Only after meticulous examination, and by being an engineer involved in the production process, he discovered that the frames are fake. That same person also said that he saw "Ronit Furst" frames sold in another shop at that city. Those too were not produced by the petitioner.

16. In addition to that, at the end of March 2007 an important and one of the largest exhibitions in the USA for optical goods took place in New York. In this exhibition the respondents made a stand laden with petitioner's publicity material (which included, wall posters, wallpapers and colorful shelves by the design of the petitioner and even brochures of the petitioner that he received from the petitioner for previous exhibitions) that feigns to be a stand of the petitioner, in which eyeglasses frames that feigns to be that of the petitioner, were offered for sale, yet in effect they are fake and the petitioner had never produced them. Photo of the stand is attached hereof and marked as **appendix E'**. Furthermore, the respondents published at the official website of the exhibition that they are marketing "Ronit Furst" hand painted frames.

17. The respondents made known to optical shop owners in the USA that they intend to present "Ronit Furst" frames in trade fairs, including the optical fair MIDO in Milan at the beginning of May 2007. This is the largest well-known international fair in the optical industry, as well as in a fair that is to take place in Chicago in May 2007. This points to the intention of the respondents to market the imitations worldwide.

## Reasons for the petition

8

18. To the best of my knowledge and belief, and as was explained to me by my legal advisor, the abovementioned behavior of the respondents constitutes the infringement of paragraph 7 of the Distribution Contract, appendix B'. Furthermore, it constitutes copyrights violation of the petitioner in the design of the frames, and it constitutes violation of paragraphs 1, 2, 3, and 6 of the Commercial Prejudice Law 1999.

**The importance of the required support and applying it to the website**

19. To the best of my knowledge and belief and as was explained to me by my legal adviser, indeed because of the abovementioned prejudices and for the fear of irreversible damage that will be caused to the petitioner if continuation of the abovementioned prejudices is not stopped on the spot, the petitioner is entitled for an ex parte injunction in the presence of one party until the petition submitted by the petitioner is heard. Should this injunction not be granted immediately and be enforced in the State of New York and as may be necessary also in Italy and other countries, all the rights of the petitioner will be squandered, as well as wasting the creativity and talent that were invested in the design of the product, and the reputation gained by the petitioner, whereas the respondents will benefit on her account. Furthermore, should the respondents be given the time for prolonged deliberation before the injunction is issued, the objective of the injunction will be in vain as the respondents will be able to transfer large quantities of counterfeit products to clients throughout the USA and Europe.

**Enforcement**

20. To the best of my knowledge and belief, my legal advisers were informed by consultation with lawyers in the relevant domain from the State of New York, that an injunction which may be given as requested by an Israeli Court can be enforced in the State of New York.

9

21. I present this affidavit in support of the petitioner's petition to issue a temporary injunction against the respondents, and I state that this is my name, this is my signature, and the contents of my affidavit are true.

22. This is my name, this is my signature and the contents of my affidavit - true.

Ehud Bibring

(-)

## CONFIRMATION

I hereby confirm that on 26/4/06 appeared before Advocate Nechami Mayzlish at my office in David Hamelech Blvd. 12, Tel-Aviv, Mr. Ehud Bibring who is known to me personally, and after warning him that he have to state only the truth, otherwise he may be subjected to penalties prescribed by the law should he not do so, has confirmed the truthfulness of his above affidavit by his signature.

(Seal and signature):

Nechami Mayzlish, Adv. License No. 33283
David Hamelech Blvd. 12, Tel-Aviv,
Tel: 03-6969781, 03-6968965

At the District Court
In Tel-Aviv Jaffa

Tel-Aviv Jaffa District Court
A 1661/07
Art Optic Ltd. Vs. Samuel Tomashover
Date started: 30/04/07 legal procedure: standard
New case number: TA 47373-04/07

In the matter:       **Art-Optic Ltd.**
                     Legally registered company in Israel  (private company 513191148)
                     Of Hazamir St. 61, Kiryat Ono 55507
                     By its representatives Adv. Uriel Ganiher and/or Yael Amir Lev-Ari
                     And/or Yaron Raz and/or Nechami Mayzelish
                     Of David Hamelech Blvd. 12 Tel-Aviv 64953
                      Tel: 03-6968965  Fax: 03-6969781

                                                          **The Plaintiff**

                               **- Versus -**

                     1. **Mr. Samuel Tomashover**
                     2. **Mrs. Meryl Tomashover**

                     Sales agents whose address is –
                     444 East 75th Street, Suite 17C,
                     New York 10021, New York, USA

                                                          **The Defendants**

The essence of the Claim:     Claim for Declarative Verdict and for an injunction.

Amount of Claim:              Can not be estimated in money

# **STATEMENT OF CLAIM**

### The Parties

!       The plaintiff is a private company registered in Israel, which among other
        manufactures and distributes plastic eyeglasses' frames that are hand
        painted. The plaintiff is a family company owned by Mrs. Lea Bibring that

2

exclusively manufactures the brand "Ronit Furst" frames. Ronit Furst herself is the designer of the frames. The plaintiff manages her business affairs in Israel but exports her products to different countries in Europe as well as to the USA. The plaintiff holds the rights to use the brand "Ronit Furst" and has the copyrights to the designs, samples and drawings designed by Mrs. Ronit Furst.

2. Defendants 1 and 2 (the "Defendants") are sales agents and distributors. In 2004 they were unemployed and through a relative of theirs they contacted the plaintiff with an offer to distribute her products in the USA.

### The Product

3. The product produced by the plaintiff (the "Product") is unique. The plaintiff purchases, through a special order, transparent plastic frames that are produced according to the specifications of the plaintiff. Mrs. Ronit Furst designs patterns, drawings and decorations that are painted on the frames according to her choice. It should be emphasized that the designs are originals, created by Mrs. Furst. Artists that are working for the plaintiff make precision copies, and under the supervision of Mrs. Furst, those samples and drawings are painted on all the frames.

The frames are delivered to a factory where they undergo a coating process that affixes the painting on the frame. Each frame bears the brand name "Ronit Furst" as well as an index number which likewise is written by hand on the inside of the right hand temple of the frame. Picture of the index and in it the number of frames taken out of all the products of the plaintiff is attached to the Statement of Claim and marked as **appendix A'**

4. The eyeglass brand "Ronit Furst" exists commercially since 2002, the year when the plaintiff was established. During this time it gained reputation

3

for the originality of the models, their beauty and quality, where the frames bearing the brand are sold at selected optical shops.

## The Association

5.  In 2004, when the products of the plaintiff were already sold in a number of shops in the USA, the plaintiff was approached by one of the products' distributors in Israel, Mr. David Goldwasser, who told that his relatives, the defendants, are experienced marketing people but unemployed, and proposed to the plaintiff that the defendants, together with himself, shall receive the distribution rights for the product in the USA. The plaintiff agreed and a distribution contract was signed between the parties. A correct copy of the distribution contract is attached to the Statement of Claim as a part of it thereof and marked as **appendix B'**. Shortly afterward Mr. Goldwasser withdrew, with the consent of the parties, from his share in the deal, and the defendants remain the distributors of the product in the USA according to the contract.

## The Contract

6.  The contract, appendix A', was signed for a period of 13 months starting December 1st, 2005. The plaintiff shall rely on appendix A' in full. However, for the convenience of the Court 2 paragraphs shall be introduced hereof, which are needed in order to understand the matter. Paragraphs 7, 8, of the contract establish the following (translated from English for convenience only, the prevailing version is the source, the term "the buyer" refers to the defendants, the term "the producer" refers to the plaintiff).

4

**7. Non-Competition**

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing- hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

8.1 It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

8.2 The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",

"ART OPTIC", "RONIT FURST".

8.3 It is stressed and agreed, that unless otherwise determined by the Producer in writing, the Product will be sold and distributed in the U.S.A only under the trade name – "RONIT FURST".

## The conduct of the parties and termination of the contract

7.  During the duration of the contract the defendants have breached it and were in arrears for paying for the products that were supplied to them. Since the contract was valid for one year only, the plaintiff took no action against the defendants. Yet, the plaintiff demanded that the infringements be rectified, and also made it clear to the defendants that the contract with them will not be renewed. Indeed, on December 30th, 2005 the period covered by the contract has expired. To be sure, from that date onward the plaintiff continued to supply products to the defendants, however, the contract between the parties was changed in such that the defendants are no longer entitled to exclusivity in marketing the products in the USA. The aforesaid agreement was expressed in exchanged messages via electronic mail (e-mail).

8.  The defendants continued their infringements also after working under the current framework, hence the plaintiff was forced to inform the defendants that the contract is definitely terminated.

5

9.   Relevant copies of the electronic correspondence are attached to the Statement of Claim as a part of it thereof and marked as **appendix C'**.

10.  As it appears from the contents of the plaintiff's representative's letter, the association between the parties came to a final and absolute end on 12/05/06.

Copy of the letter is hereby attached and marked as **appendix D'**.

## The prejudice: contravention of contract, forgery, fraud, copyrights infringement, commercial prejudices.

11.  The defendants, on account of their attitude and due to the fact that the association period of the contract has expired, could no longer continue and sell the plaintiff's frames but wanted to enjoy the reputation which is the fruit of her labor, decided to employ fraud and deceit to benefit on the plaintiff's account. About two weeks before the time of the Claim the plaintiff found out that the defendants found a supplier, probably a South American country, which produces a precise copy of the defendant's frames, including the caption "Ronit Furst" which is on each frame. Those frames, in which the plaintiff has no part in their production, are marketed by the defendants by falsely claiming that the plaintiff is the producer and they the defendants are her agents.

It should be pointed out that finding a supplier, learning the design and manufacturing process and preparing a stock of frames, is a prolonged process which clearly establishes that the defendants made preparations for the forgery and copying deeds long time in coming, and only waited for the moment they could start the illicit deeds.

12.  The defendants Approached different optician shops in the USA, from California to New York, they presented them with the fake frames,

6

claimed that they are produced by the plaintiff, received orders and even supplied the product.

Among others, the defendants and/or either one of them, solicited the following business owners:

12.1.  Mrs. Cathy Shue, owner of optical goods in Monterey, California. The defendants came to her with a proposal to make in her shop a special sale of the plaintiff's frames to the shop's selected clientele. On 03/10/07 they have indeed appeared at the shop, equipped with the plaintiff's samples and publicity material, and presented themselves as the plaintiff's agents. The shop's clients ordered frames, and after the defendants were given the list of orders they supplied the shop with the frames. The frames look exactly like the frames that are produced by the plaintiff, and only an expert's eye can discern the minute differences. Attached to this Statement of Claim is a photo of some of the fake frames that were given to Mrs. Shue, marked as **appendix E'**. The frame itself is kept at the undersigned advocate's office where it shall be presented to the Court.

12.2.  "Braham Powell", optical goods in Alexandria, Virginia. On 03/20/07 a family member of Mrs. Ronit Furst took a stroll in this city and observed many "Ronit Furst" frames displayed for sale in the shop. He entered the shop, which had the plaintiff's publicity material including a photo of Mrs. Ronit Furst, he was told that the frames are selling very well, at a price of $225 each. He was told that the defendants came to the shop and presented themselves as Ronit Furst agents, they told that Ronit Furst has transferred the production from Israel. This made the man suspicious and he asked

7

to examine the frames supplied by the defendants. Upon his examination he discovered that the frames are identical to the original frames, including the brand name "Ronit Furst" that appears at the side of the frame. Only after meticulous examination, and by being an engineer involved in the production process, he discovered that the frames are a fake. That same person also said that he saw "Ronit Furst" frames sold in another shop at that city. Those too were not produced by the plaintiff.

13.    In addition to that, at the end of March 2007 an important and one of the largest exhibitions in the USA for optical goods took place in New York. In this exhibition the defendants made a stand laden with plaintiff's publicity material (which included, wall posters, wallpapers and colorful shelves by the design of the plaintiff and even brochures of the plaintiff that he received from the plaintiff for previous exhibitions) that feigns to be a stand of the plaintiff, yet in effect they are fake and the plaintiff had never produced them. Photo of the stand is attached hereof and marked as **appendix F'**. Furthermore, the defendants published at the official website of the exhibition that they are marketing "Ronit Furst" hand painted frames.

14.    The defendants made known to optical shop owners in the USA that they intend to present "Ronit Furst" frames in trade fairs, including the optical fair MIDO in Milan at the beginning of May 2007. This is the largest well-known international fair in the optical industry as well as in a fair that is to take place in Chicago in May 2007. This points to the intention of the defendants to market the imitations worldwide.

8

## The reasons for the Statement of Claim

15.   The abovementioned behavior of the defendants constitutes the infringement of paragraph 7 of the Distribution Contract, appendix B'. Furthermore, it constitutes copyrights violation of the plaintiff in the design of the frames, and it constitutes violation of paragraphs 1, 2, 3, and 6 of the Commercial Prejudice Law 1999.

## Supports and safeguarding

16.   For the abovementioned prejudices the plaintiff is entitled to a support of an injunction and a declarative verdict which will be requested presently. Of course, the abovementioned behavior of the defendants caused the plaintiff, and may continue to cause her, severe financial loss and the plaintiff reserve the right to bring a claim for those damages when they shall come about.

## Jurisdiction

17.   The honorable Court has practical jurisdiction to deliberate the Claim due to the predicate of the claim, and local jurisdiction to deliberate it by the power of the parties' agreement in paragraph 10 of the contract, and by the virtue that all the prejudices ascribed to the defendants are an inseparable part of the infringements covered by the contract which, according to the abovementioned paragraph 10, is subject to the laws of the State of Israel, hence also the Israeli jurisdiction.

**Therefore**, the honorable Court is requested to summon the defendants to trial, to declare that the defendants are obligated in terms of paragraph 7 of the contract, appendix A' to desist for a period of two years beginning on 09/30/06 (last month of supply) from taking the following action: to produce, to sell, to market, or distribute eyeglasses' frames that are similar or in competition with the frames produced by the plaintiff. The Court is

9

further requested to issue a permanent injunction that will prohibit the defendants, directly or indirectly, to do one or more of the following actions: to sell, to produce or to present for commercial purposes anywhere in the world frames that bear the name "Ronit Furst", "Op-Art" or "Art Optic", or those that feign to be frames produced by the plaintiff and/or designed by Ronit Furst, to present themselves as agents or distributors or representatives or delegates of the plaintiff, to make use of designs, samples, drawings, or decorations that were designed by the plaintiff or for the plaintiff by Mrs. Ronit Furst, or in any other way to make any commercial use which constitutes infringements of the plaintiff's copyrights, or to make use of the plaintiff's production process, as well as to pay the plaintiff's trial costs and lawyers' fees.

Adv. Uriel Ganihar
For the plaintiff

(-)



### SALES AND DISTRIBUTION AGREEMENT

This sales and distribution agreement is made and entered into as of the 1st day of October 2004.

By and between Mrs Lea Bibring and/or Art Optic Ltd- a company registered in Israel,business No.513191148, It's address:61 Hazamir Street, Kiryat-Ono 55507, Israel (henceforth:The Producer)

And: Mr.David Goldwasser, Mr & Mrs Samuel & Meryl Tomashover -in person and/or as company (when and if such a company will be established in future), It's address: Mr.Goldwasser-

8 Haoranim Street,Kfar Maas,Israel., Mr.&Mrs.Tomashover- 444 east 75th Street,suite#17C,NY,New York 10021, U.S.A (henceforth: The Buyer)

WHEREAS, The producer produces hand painted frames for glasses of any kind and adjoining cases for those frames, under the trade name RONIT FURST (henceforth : The Product).

WHEREAS, The producer wishes to export the product and sell it in the U.S.A. and for that purpose is prepared to grant sole distribution rights for the U.S.A only.

WHEREAS, The Buyer wishes to buy the product and has the will as the ability and the means to cause such distribution, and wishes to undertake the distribution of the product in the U.S.A

Therefore the parties have jointly decided on the following agreement

1. The above declarations made by the parties are an integral part of this agreement.

2. In exchange of the commitments undertaken by the buyer as set out here, and of the payments set out below, the distribution rights for the product will be the property and sale of this agreement. As long as this agreement stay in force, the product will be sold in the U.S.A. in the agreement through the buyer.

Despite the above said, the producer will be able to sell the product directly to the Buyer, in the U.S.A. in the agreement.

Mr. Morris of Advance Ltd, and his company Lower Rochester, NY, and Mrs Ruth Dumber of the company, 123 East Avenue, New York, U.S.A.

It is hereby acknowledged by the parties of this agreement that these two customers are existing customers of the Producer. If any such existing customer of this agreement A.. and the same which the Buyer that customer that the producer's right as a source of income by the Buyer that optical shop in NY.

3 The agreement shall commence on December 1, 2004 and will stay in force till December 31, 2005, provided that the Buyer has fulfilled its minimum purchase orders in accordance with section 4 below and all of the further commitments and obligations as set forth in this agreement.

4 The Buyer undertakes to purchase from the producer the minimum sales for which as set here forth:

Sales for the period from December 1, 2004 till June 30, 2005. Minimum: 65,000 USS a year and

in words: sixty five thousand U.S.d. dollars

I.i. in quantity- a minimum of 2000 frames

Buyer hereby represents and confirms that it would not have received the state of sole distribution rights had he not agreed to its undertaking in this section 4.

5 The 2 sides to this agreement hereby proclaim that their basic intention is to continue their business connection for the satisfactory of both sides, further to 2005, by binding of a long term contract that shall be made and signed towards the end of 2005.

However, should the producer, for reasons that the Buyer has no control over, wish to appoint a different distributor for the U.S.A- for the period after 1 January 2006, he will have to purchase back all the (first quality) frames that the Buyer still has in his stock- prior to the termination of this agreement, at ex-works cost price, not including freight costs

Furthermore, it is herby agreed that the Buyer will have a first refusal rights prior to any sales of a contract between the Producer and a different distributor for the Product in the U.S.A.

6. Prices, Terms and Delivery

6.1 The agreed price for each ... 25.00 USS ... (ex-works) ... include shipping, export documents ...

6.2 Terms of payment: He shall ... dates of his calculation ... of notice that the order is ready to ...

... to be delivered ...

In accordance with the prices ... prices based of the order ... and ... ... after the goods ...

6.3 Delivery ... ... ... ... the actual amount of a ...

6. Purchase orders by the Buyer shall be in writing (by e-mail or by fax messages) and are subject to acceptance by the Producer in writing.

It is hereby clarified that once the Producer accepts the order, the Buyer is obliged to purchase the ordered frames as listed in the order. Furthermore, the Buyer undertakes not to return and/or exchange any frame. Without derogating from the above said, the producer agrees to exchange any frame found to be production Defective- within a period of 12 months from it's delivery to the Buyer. The Buyer will return such frames , and these will be exchanged by the Producer at no further cost to the Buyer.

Under no circumstances will the Buyer deduct payment for frames said to be defective. Those

As specified above will be exchanged for new ones.

## 7. Non-Competition

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing- hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

8.1 It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

8.2 The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin, as may be determined by the Producer from time to time, currently, the Producer's trade marks and/or trade names consist of ...........

"ART OPTIC", "RONIT FURST"

8.3 It is stressed and agreed, that unless otherwise determined by the Producer, the product will be distributed in the U.S.A only under the trade name: "RONIT FURST"

## 9. Notices

Any notice provided pursuant to this agreement shall be in writing, and sent by registered mail, courier, facsimile or e-mail. All notices and other communications shall be deemed to be given on the business day after the first personally delivered by hand, facsimile or e-mail, or ....... days after mailing by registered mail (return receipt requested)

hand registered mail ..........................................................................

## 10. Governing Law

This agreement shall be ...............................................................................

Any and all disputes arising between the parties on account of or in connection with this agreement ....

interpretation, performance or breach, shall be referred to a binding arbitration before a single

arbitrator to be appointed by mutual agreement between the parties and, in the absence of such agreement, within fourteen (14) days from any of the parties first demand, and the arbitrator will be appointed at the request of either party, by the chairman of the Israeli bar. The arbitration will be held in Tel-Aviv, Israel. The arbitration shall be conducted in accordance with the provisions of the Israeli Arbitration Law, 1968, the arbitrator shall not be bound by any rules of evidence or procedure, but shall be bound by the substantive of Israeli law. Any award or decision rendered shall be made by means of written opinion explaining the arbitrator's reasons for the award or decision, shall be final and binding upon the parties hereto, and shall be given in 60 days from the appointment of the arbitrator.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date first herein written and each party acknowledges having received one counterpart.

Art Optic Ltd
61 Hazait n St.
Kiryat Ono - 19.R.A.

PRODUCER                                    BUYER

___ Bearing and of ___ ___ ___            ___ ___ ___ ___ ___ ___ ___

# כספ ה

### ehud

| | |
|---|---|
| **מאת:** | "sammy toma" <sammy_toma@yahoo.com> |
| **אל:** | "ehud" <ehud@oo-art.co.il> |
| **נשלח:** | יום חמישי 27 אפריל 2006 13:51 |
| **נושא:** | Re: Fw: Inventory needed for Chicago |

What I am offering you Is a better deal?
You are asking for $1270 in 3 payments for the old item

I OFFERED A $3500 IN 4 OR 5 DAYS FROM NOW
I would probably be able to send you more money right after the chicago show ..
probably the amount of the shipment for frames you will send me for the chicago show
So if you do the calculation, it is a better money arrangement for you.
within 3 weeks from now you will have receive more money from today than what you are trying to offer me

WHAT DONT YOU UNDERSTAND?

I WILL ONLY AGREE TO C.O.D ON THE DAY THAT YOU WILL KEEP ALL THE INVENTORY IN THE
WORLD THAT I NEED WHEN I NEED IT
Seems like that day is very far away from us

in the meantime.

If you were able to ship me exactly what I needed every time I order frames from you, then I would order smaller and
more frequent deliveries. I would Probably have delivery every few weeks. But you never seem even Inventory on your
model across the entire line that WE need so desperately. That creates a huge inventory need and under situation like
where we need constant shipments from you in many instances, like this situation we order frames we would not order
normally, because they were not our first priority. I would have the constant running out of many styles and never buy
the most popular

If I were to sign a new agreement with you, I will not sign it unless I have less chances from you that you committed to
keep constant inventory where I get what I need anytime I need It
But the agreement expired and I have built some experience where you are not delivering our needs and not a guaranty
our inventory needs.

So? If you are demanding C.O.D payments because you are trying to build trust then you are wrong about trust. If you
wrong ...you cannot demand C.O.D trust from me that is about a few, you must always trust me to carry and take a
huge amount of frames in one store and often times situation happens like this situation you are running out. So always
will always need more frames because constantly our inventory is always more than what normally you order in a store
C.O.D.

All you voice in your emails are selling units
You cannot expect me to satisfy the needs of my voice if our operation is not there for me. If our operation
operation is not met and I am not getting everything I need to sell more I am not making units and different amount of
my annual sales is lacking and so on so.
I informed you 6 months ago that we are ...
and counting in 3 shows the more ...
it is not about how many above ...
it is about feeling seeing that we ...
me time and selling them in big units ...
Right now we are selling what you have to sell ...
and so we simplethe out of the...
So not include the most popular ...

I no need to give him what I ...
we are asking for models that ...
production for our forecast of sales.
Maybe if you ask about a COD I am not able to ...
if I have what I always get $250 and I am not going to ...
know that I always seem to get my margin and ...
depending if it is a new item I am ...
normal so
I have not need items in every ...
as selling and I go forward and make my profit. ...
I see what I am running out of ...

half, and all the frequent payments I have been making to you,
your contract with us expired, we are working with a hand shake trust between us for a long time now.

Please address our needs for the first 15% A.G.D snow and some term including productions for the future and everything will work out fine

these are the 2 burning issues...

We are working very hard to sell more frames all the time, so money will never be the issue, that is the only guarantee I can give you

SAM

*ehud <ehud@op-art.co.il>* wrote

Sammy,
Why do you call my payment terms- BLACKMAIL ?
You sighned an agreement stating the terms are 30% with
the forwarding of your order and the 70% balance is C O D
I am willing to improve these terms for you to 100% C.O.D-
Why are you accusing me of BLACKMAIL are you out of your mind ?

If you had not agreed to my payment terms in the contract you would not
have been our distributor !
You signed an agreement to pay under certain terms and you are
not standing up to it !
I agreed to help you in the first year (and over ) I made it very clear
that that this help is temporary until your business can stand on its
own 2 legs, i.e. to pay c.o.d
I agree now that you will pay your current debt in 6 payments until
the end of the year- 8 months from now- and you call me a blackmailer "
This is completely crazy !

You must understand one thing: I am not making enough money from
the sales I do with you, to justify the credit you demand
A along the way, I have shown that I'm doing everything in my power
to help you build up your business
And it's me when I tell you that I can not continue to keep on
manufacturing the stock you need without the c.o.d payment terms
IT'S NOT A MATTER OF WANTING TO MAKE MORE PROFHIT

If I have 30,000$ extended in credit to your customers use this
money to pay for the inventory you need

Sammy, you have a business in hand, and this is how to repay high status
as customers
If you can't afford to participate in as I was always and forever as part
for the names you need then know in business it is just this
Nothing bad will happen to us in this way

Please accept my generous offer in my way to join you and
and let's continue to try to build a relationship on trust and a push
for both of us

Let's stop arguing all the time
You must accept the fact that
perceived C.O.D
it's a personal it's not anything
it's the simple economics

What more can I say to sum up

Best regards
Ehud

P.S. I don't give and never had the ability to hold the organization of any
price to structure. Not because of anything but just the

3A00..., 77

Page 3 Ques 9

----- Original Message -----
**From:** sammy toma
**To:** ahuy
**Sent:** Wednesday, April 28, 2006 10:32 PM
**Subject:** Re: Fw: Inventory needed for Chicago

You need to consider our need for the time in THIT YOU and set aside the financial disbursements between us until we come to an understanding.
your conduct demonstrates that you are denying me a this business relationship owing to Blackman and force C.O.D terms on us when the other I did not see as a bearing.
I will not agree to C.O.D terms ever

I have over $30,000 extended in credit to me and much more in accounts

you are a direct beneficiary of our issue and personal for a team that I have won the business.
The fact that you also extend the services on a new STORE and AMOUNT sales and the WHOLESALE and does not benefit the wholesaler.
that I have more money invested in many transactions of the fact that I am the only
beneficiary of my investment for the file.

You will find that I do not respect the laws and our relations from the less
the contracts it will only provide
even that you finalize writing the agreement of the some other agreement that
in the show
DON'T SELL ME THIS

It is Pretty clear that you are not in the sale in my lawyer to have away for money in
to reach a particular agreement with me

SAM

chud tehnutaop arten

I still the debt is 10 1000
The offer to finance the product in our future on our and stand in
only if you agree to my offer of a payment in the time out of advise up.

As no your request to hold in an agreement and will profit Optic in a beginning
claims that Art Optic is a bank in community and will only the question man financial
I was willing to try to hold in company anyway to
but in order to do that we in on the message in the agreement is not set

Your unrealistic demands for open credit account with no deadline for payments, lead me to the conclusion that you don't want to work with us anymore. That is your right please but why not say it in simple words ?

I expect to receive the 10,'1955 as a d first payment being as Merv promised in the first week of May

Best regards,
Ehud

----- Original Message -----
From: Sammy toma
To: ehud
Sent: Wednesday, April 26, 2006 12:40 AM
Subject: Re: Fw: Inventory needed for Chicago

your offer in this email has nothing much more different than the previous one end

you offer to stretch the current debt til december
and you committed to pay for future post card and show paper materials

THAT IS IT

I do not need your one time help with stretching the $10,000 debt that I owe as a one time gesture !

Actually the debt is now $9600 since you are paying for the posters that now owe you

What I need from you as far as inventory and financing is the following

A long term help in receiving the frames when I need them, namely consignment and inventory in general

2. I need a Revolving credit of up to $30,000 in inventory that I receive from you that I can instantly use to supply customers that I receive from terms for stock frames and that I will pay at my discretion, but will not go over the $30,000

In general, I will not pay a third of my inventory in advance to stock up in store and sometimes sending me frames I can not at all
I need a partner that is a long term asset and not to bribe someone to weigh out the profits while I buy frames for my inventory at full price and also always having them in stock on time

SAM

ehud <chuda.op-art.co.il>

Hi Sammy

First, I would like to point out that I see your claims that I did not live up to our not making enough frames for you and or no delivery, some times that you can't say that and point it also was a agreement some terms when we shared a delivery on a very specific event.

The first 2 shipments were based on our original agreement
After Dudi left the partnership me and Merv had to continue to work with you, and together with Merv together me and Nery, Merv and we all putting all your efforts and ideas into the business, I decided to join in on the incorporation with you.
Even when I realised it that the one of us and I found that the one way to credit something which I always pay for all and in my business as a companies

עמוד 5 מתוך 9

makes it very difficult to prodce the stock I need to hold for you and my other customers abroad and in israel

I decided to continue to supply you with frames- in the belief and hope that I am helping you to build up your business in the first year if you remember, in the begining of 2005 I asked you for your estimation of the yearly turn over and you estimated it to be 8000-10.000 frames that would have proven to be true, I'm sure you could pay for the frames as per your commitment in the contract between us with out difficulty

however, in actual fact you purchased about 4.500 frames in 2005- which in my opinion is not a bad figure for the first year, Although in comparesant to your estimation it's somewhat dissaponting

Anyway, the fact remains that at the price of 25-26$ I japordize my business if I don't collect the money on delivery

After giving it a lot of thought, here is my final offer

From now on the terms (in actual fact and not only on paper) are full payment of Invoice on delivery (c.o.d)

Reg the debt of **10,165$** I understand that it's difficult for you to pay it in 3 payments and at the same time to pay for the new frames I will let you pay it in 8 payments of 1,270$ each- with the payment for the 3 next deliveries of frames to you  but the debt must be fully paid until December 31  2006

Furthermore, Ronit and I decided that for the shows in future we will cover the costs for all the posters  stickers etc  which are used in the booth

This offer is more than fair-in the last year you owe me in average over 3.000$ at all time, and for the current debt I give you a further credit of an average of 4 months- and I hope a practical one

I's think about it and let me know your decision

Regards
Ehud

From: sammy toma
To: ehud
Sent: Tuesday, April
Subject: Re: Fw: Inventory needed for Chicago

I AM NOT MAKING
THE TERMS YOU AGREE
THAT IS MY ANSWER
YOU WILL RECEIVE
BOUGHT IN THE PAST
IF YOU WANT
FOR RENEGOTIATE

SAM

ehud <ehud.a.op-art.co...

Hi Meryl
But the bottom pays
but mate I have all
I have to wait til

Re the money side
I expect to be paid
The 3.500$ you



# AFFIDAVIT

I, the undersigned, Cathy Sima, having been duly warned that I must state the truth, or else be subject to penalties under the law, make the following statement in writing:

1.  I am the owner and manager of the store "INSIGHT EYEWEAR" at 187 El Dorado St., Monterey, CA 93940.

2.  In recent years I have purchased hand painted eyeglass frames, designed by and branded Ronit Furst, from Sammy and Meryl Lomashover of Newlight eyewear from New York ("The Lomashover").

3.  Sometime during September 2006 I contacted the company Art-Optic Ltd. in Israel which I knew manufactured the Ronit Furst frames ("the company") by E-mail in order to clarify several matters in connection with the frames it produces. In reply to my inquiry, I received a reply from Mr.Ehud Bibring who introduced himself as sales manager of the company ("Ehud").

   Since a contact was established, we stayed in contact by E-mail and by telephone.

4.  [illegible] Ronit Furst frames [illegible] informed [illegible] Meryl [illegible]

they planned on putting the frames on view at the forthcoming Exhibition
in New-York.

5.    Ehud Expressed great surprise and concern at this news and said that the
Tomashovers are no longer his official representatives in the US, and that
to the best of his knowledge they did not have enough frames to justify a
"special sale" nor to take part in the exhibition in New-York.
Therefore, Ehud asked me to "keep an eye" on what they were up to and to
see what sort of frames the Tomashovers would put out on exhibition.

6.    On 03/10/07 a special sale did indeed take place in my store. The
Tomashovers arrived at the store with a selection of frames which looked
exactly like the Ronit Furst colorful hand painted frames, including the
Ronit Furst stamped signature on the outside left temple of each frame.
However, I did notice something significant about the frames they
presented: in contrast to the Ronit Furst manufactured stock up until that
time where the color code number was located on the left inside temple
at the bottom of the inside right temple. In the frame they presented in the
"special sale" the color code number was 0000 at the upper inside right temple.

7.    Furthermore, the ............... ...............
are in connection ...... ... ...... ... ... ... ...... ...
manufactured the ...... ... ... ............... ... ... ......
... ... ... ... ... ...... ... ... ...
Stock Numbers ... ... ... ... ...... ...... ...... ... ...
... ... ... ... ...... ...
Frame ...... ...... ...... ...... ... ... ... ...... ...
... ...... ... ...... ...
with possibly ...... ...

To clarify this I ordered a few frames from the Tomashovers.
On March 13th I wrote to Farida. I had not ordered any of the above

8.  On March the 16th, just 6 days after the "special sale" I received the frames
    I ordered. They were counterfeits of the Romi Furst frames but I could see
    that the color code number was PRINTED and not HAND PAINTED, like
    in the original frames
    All of the frames had the Romi Furst signature stamped on the outside left
    temple-exactly like in the original frames
    Attached is a copy of the invoice with the list of frames I ordered during the
    sale and supplied by the Tomashovers. (attachment Y)

9.  As per Farida's request, I sent to Israel the frames supplied to me by the
    Tomashovers. A photo of the frames I sent is attached. (attachment
    R)

10.  I declare this to be my name and signature, and my above statement to be
    the truth.

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Monterey_

On _7/9/07_ before me, _NANCY L. SILVA_

personally appeared _CATHY SHUE_


NANCY L. SILVA
Commission # 1543771
Notary Public · California
Monterey County
My Comm. Expires Jan 17, 2009

☐ personally known to me

☑ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

OPTIONAL

## Description of Attached Document

## Capacity(ies) Claimed by Signer(s)



NEWLIGHT EYEWEAR

444 EAST 75TH STREET
SUITE 17C
NY, NY 10021
917-859-5212/212-288-5827

# invoice

| Date | Invoice # |
|------|-----------|
| 5/12/2007 | 1014 |

**Bill To**

INSIGHT EYEWEAR
CATHY SHUE
187 EL DORADO STREET
MONTEREY, CA 93940

**Ship To**

INSIGHT EYEWEAR
CATHY SHUE
187 EL DORADO STREET
MONTEREY, CA 93940

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| | | | 5/12/2007 | PRIORITY | | |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| 1 | 1546-09 | CATS EYE SEMI-RIMLESS GET DIANE | | |
| 1 | 1546 | CATS EYE SEMI-RIMLESS YELLOW | | |
| 1 | 2321-47 | LARGE PLUS RIMLESS SUN | | |
| 1 | 2147-15 | PROGRESSIVE SUN | | |
| 1 | 1556-015 | SEMI-RIMLESS | | |
| 1 | 2321-24 | large frame progressive | | |
| 1 | 2147-19 | PROGRESSIVE SUN GLASS | | |
| 1 | 31-S73 | FUNKY SEMIRIMLESS | | |
| 1 | 215-015A | FUNKY HALF EYE | | |
| 1 | 2321-14 | LARGE PROGRESSIVE SUN | | |
| 1 | 2123-17 | LARGE PROGRESSIVE | | |
| 1 | 2321-21 | LARGE FRAME PROGRESSIVE SUN | | |
| 1 | 4174-13 | GROUND | | |
| 1 | 2746-05 | HALF EYE | | |
| 1 | 2746-13 | FULL RIM ROUND | | |
| | shipping/handling | | | |

| | | | Total | |

נספח ב'



כס פה ה

## AFFIDAVIT

I, the undersigned, Ruth H. Domber, having been duly sworn, deposes and says under the penalties for perjury as follows:

1.  I am one of the owners of the optical store DBA **10/10 Optics** at 168 Fifth Avenue at 22nd street, New York, N.Y 10010. (We are relocating this business to 50 Madison Avenue as this time), and have been so for the last 12 years.

2.  Since 2003 I have been purchasing from the firm **Art Optic Ltd** (the Company) hand painted eyeglass frames designed by RONIT FURST. My contact with the above company is handled through Mr. Ehud Bibring ("Ehud").

3.  I had been introduced to SAMMY TOMASHOVER and his wife MERYL as the United States representative of The Company. I am also aware that the relationship between The Company and The Tomashover's had been terminated.

4.  On 3/22/07 Ehud contacted me and told me that he suspects that the Tomashover's are imitating the frames his company produces and he further suspects that the Tomashover's sell these imitation frames to various stores in the [ ]. Ehud added that according to his information the Tomashover's are participating in the then forthcoming (iSTO?) by an optical firm [ ] [ ] that [ ] suggested that Tomashover's stand and check out the situation.

5.  I complied [ ] [ ] [ ] Santa Monica [ ] [ ] exhibition

6.  I attended [ ] [ ] [ ] [ ] [ ] booth of the [ ] [ ] [ ] [ ]

by the the outstanding colorful posters and background paperwork well known to me from the Ronit Furst stand a year ago- in the Vision Expo 2006. I also saw the red Ronit Furst brochures, which I received about a year ago from Ehud and Ronit Furst business cards which were being distributed at the booth. To my amazement, I noticed on display hundreds of eyeglasses frames which appeared to be an exact replica of the Ronit Furst frames, including the Ronit Furst signature stamped on the outside left temple of each frame. This surprised me since I was aware that the Tomashover's were no longer authorized to represent the brand.

7.    Upon my arrival to the stand I noticed that Meryl Tomashover recognized me-she signaled hastily to her husband to come quickly. I tried to enter into conversation with Mr. Tomashover, but he raised his voice at me and asked me to leave the stand. I left the stand and took pictures of the stand from a distance (they are attached as part of this affidavit)

8.    I went on my way looking at various exhibitor stands when after a few minutes I was surprisingly approached by Mr. Tomashover, who told me that we can do business together and that he can supply me with Ronit Furst frames directly provided I refrain from telling Ehud what I saw

..    When I refused the offer Tomashover turned to being aggressive, he threatened me, badmouthed Ehud, and shouted at me in front of passers by that I was going to ... a ... a ... plan and told them ... bad ... of ... of the booth

Sworn before me this

Vivene Dixon
Notary Public, State of New York
No. 01DI6146902
Qualified in Queens County
Commission Expires May 30, 2011







**EXHIBIT E**

- 1 -

**District Court**　　　　　　　　　**Civil File No. 1661/07**
**Tel Aviv Jaffa**　　　　　　　　　　**MCA 9267/07**
　　　　　　　　　　　　　　　　　　**Set for Closing Arguments**
　　　　　　　　　　　　　　　　　　**Before the Honorable Judge Y. Zapt**


**Art Optic Ltd.**
**Private Co. Reg. No. 51-319114-8**

By its attorneys, Advocates Ganihar et al
12 David Hamelech Blvd., Tel Aviv 64953

Tel.: 03-6968965; Fax: 03-6969781

　　　　　　　　　　　　　　　　　　　　**Applicant**
　　　　　　　　　　　　　　　　　　　　(Plaintiff)


**Vs**.


1. **Samuel Tomshucher**
2. **Meryl Tomshucher**

By their attorneys, Advocates Arie Lahav-Levy and/or
Doron Shimoni
9, Achad Ha'am Street, P.O.B. 29557,Tel Aviv 61294

Tel.: 03-7979993; Fax: 03-7979997

　　　　　　　　　　　　　　　　　　　　**Respondents:**
　　　　　　　　　　　　　　　　　　　　(Defendants)


# Written Closing Arguments on behalf of the Respondents

Pursuant to the decision of the Honorable Court dated September 20, 2007, the Respondents respectfully submit, via their attorneys, their written closing arguments within the motion for an interim injunction which the Applicant submitted in the MCA at the outset, as follows:

1.　　In view of the quota limitation determined by the Court in respect of these closing arguments, the Respondents will not waste precious writing space with a view to referring to the bluntness and coarse language used by the Applicant and its attorneys in their closing arguments, just as at the court hearing. On the

other hand, in these closing arguments the Respondents will most definitely rectify the legal errors (so termed out of courtesy alone), which occurred in the Applicant's closing arguments and claims.

2.    The Applicant has two claims in respect of which, it seeks an interim injunction barring the Respondents from selling glasses frames manufactured by it: A contractual claim relying on clause 7 of the distribution agreement between the parties and another claim, under law, to the effect that acts of counterfeiting and fraud are attributed to the Respondents.

3.    For a person to be granted an interim relief of the type sought by the Applicant he must satisfy several preliminary statutory requirements, some of which are clearly and expressly reflected in the Civil Procedure Regulations (hereinafter: the "**Regulations**"), some drawn from the law of equity governing this type of remedies, and some from Israeli case law.

4.    Pursuant to Regulation 362 of the Regulations, to obtain an interim relief, the Applicant has to present to the court a reliable evidentiary foundation, showing, *prima facie*, the existence of a cause of action, and the other unique conditions required for the type of the interim relief sought, at which time the court will consider granting the relief sought, *inter alia*, taking account of the parties' balance of convenience, considering the extent of the Applicant's good faith, and whether the grant of the relief sought is just and appropriate under the circumstances.

5.    In the present case, it appears that the Court's work is particularly easy, since the Applicant has failed to show even a shred of *prima facie* reliable evidentiary foundation as to the existence of a cause of action against the Respondents. Moreover, the Applicant certainly cannot boast with claims of good faith or that the grant of the relief sought is just and appropriate under the particular circumstances.

6.    **Concerning the contractual claim** – The Applicant claims in its original motion for an interim injunction, that the exclusive agency agreement with the Respondents was terminated **at the end of 2005** (See: section 6 of the motion).

7.    Accordingly, the force of a non-competition stipulation – for a period of two years – expires at the latest, in another two months – in December 2007. The Respondents claim that in its closing arguments, without limitation to the

- 3 -

foregoing, the Applicant extended its legal claims, when it embraced the Respondents' claim as to the date of termination of the contractual term. In its closing arguments the Applicant attempted, without legitimacy, to turn the illegitimate addition of new legal claims on its part into an axe to grind – with a view to claiming that the non-competition stipulation terminates only at the end of 2008. **In this context the Respondents express their determined objection and request the Court to ignore this illicit extension of legal claims.**

8. Furthermore, the Applicant failed to act to enforce the non-competition stipulation on the date of the termination of the agreement, at the end of 2005. Rather, the Applicant "remembered" the existence of the non-competition stipulation only **at the end of the first quarter of 2007**, when the proceedings in this case were instituted.

9. Even then, the Applicant was in no hurry, **and the Court found no ground for granting to the Applicant an injunction *ex parte*,** so that the case was finally heard only **at the end of September 2007.**

10. **In these circumstances the Applicant can most certainly be deemed to be in delay, to have failed to safeguard its rights, thereby waiving, by its conduct, the enforcement of the stipulation. On this ground alone the non-competition stipulation cannot be enforced on the Respondents at present.**

11. The Respondents further claim that there is no reason to enforce a non-competition stipulation where the enforcement thereof is dependent on prior performance of acts and procedures on the part of the Applicant, as opposed to the Applicant's baseless claim in section 11 of its closing arguments, as though the subject is a concurrent stipulation. This means performance of everything stated in clause 5 of the contractual agreement between the parties, including the grant of a right of first refusal to the Respondents prior to their replacement by another distributor or agent (while today the Applicant has a distributor by the name of Barry), as well as the purchase of the entire inventory of frames in the Respondents' possession.

12. The Applicants failed to uphold the provisions of clause 5 of the distribution agreement. The Applicant goes even farther with its feigned innocence, claiming that the Respondents never applied to it in this context, which is not

only factually inaccurate, since the Respondents did apply to it, demanding the right of first refusal, but it also lacks any legal basis, in view of the contents of the agreement which imposes an active duty on the Applicant (The producer... will have to purchase). Subsequently it is also stated as follows: **"PRIOR TO TERMINATION OF THIS CONTRACT"** .Furthermore, in view of the obligation of good faith imposed on a party to a contract pursuant to section 39 of the Contracts Law (General Part), 5733 – 1973; that is to say that not only was the active duty to offer to purchase the inventory and to grant the right of first refusal imposed on the Applicant exclusively, but this also falls in line with the provisions of the Contracts Law, imposing and determining a duty of good faith also in the course of the performance of a contract – the duty to uphold the Applicant's obligations before insisting on its own rights under clause 7 of the agreement. On this ground too non-competition should not be enforced.

13.    Neither does examination of the stipulation itself shed positive light on the Applicant, since the true purpose of the stipulation is unclear. It is also unclear what this stipulation strives to protect, apart from the "value" of non-competition as such.

14.    Pursuant to the prevalent rule, to enforce a non-competition stipulation, the stipulation and the purpose it strives to serve should be examined. The considerations for accepting a non-competition stipulation are as follows: The requirement to uphold agreements as such, and the need to protect the party seeking the stipulation from competition on the part of the party required not to compete, since, for instance, the party seeking non-competition has invested in training, created the pool of customers and exposed the party in respect of whom it is sought to enforce the stipulation, to its trade secrets. It should be clarified even at this stage, that none of these considerations is satisfied in the present case. Concerning the upholding of an agreement, the Applicant is barred from seeking to enforce an agreement which it itself breached (failure to uphold the provisions of clause 5); it has not been argued that the Applicant invested in training the Respondents; it has not been argued that the Applicant gave or exposed its customers to the Respondents (the opposite is true – it excluded several customers form the agreement – see clause 2 of the agreement); nor has it been argued that the Applicant shared with the Respondents its trade secrets.

- 5 -

15.  On the other hand, the considerations for not enforcing a non-competition stipulation are as follows: Excessive and unconstitutional restriction of the freedom of occupation (a basic right which, for some reason, appears to be regarded by the Applicant's attorneys as a "rusty weapon" – see section 13 of the Applicant's response to the Respondents' response), the consideration of enhancing the freedom of occupation with a view to improving and perfecting the market, and the last consideration is protection of the party against whom it is sought to enforce the stipulation, assuming that the author of the agreement, as in the present case, is the strong party or the party having the power to dictate stipulations of this type.

16.  In the past it has been established that, as a rule, a non-competition stipulation is reasonable and valid where it is fair to both parties. With the variability of legal reality, the test at present is two-phased: First the protected interests of the party seeking the enforcement will be examined. If such interests are found, the second examination will be conducted, which is whether the extent of the limitation is lawful. If it is already found in the first test that there is no protected interest for the party seeking the enforcement, then the stipulation will be nullified due to its being in contravention of the public policy. **A "bare" non-competition undertaking which does not protect the interests of the party seeking the enforcement beyond the non-competition interest in itself (such as the interest of protecting trade secrets and list of customers) does not form a legitimate interest and should be nullified.**

See: Civil Appeal 6601/96 **Aes Systems Inc. vs. Saar** *P.D.* **54 (3) 850, 860.**

See: Civil Appeal 164/99 **Frumer vs. Check Point Redguard Ltd.** *PDA* 34 264, 312.

17.  If the first test shows that there is a legitimate interest that should be protected for the party seeking the enforcement, then the proportionality of the stipulation will be examined against the duration of the stipulation, the place where it applies and the type of activity to be limited.

18.  **And from the general to the specific** – In the present case there is no dispute that there is no reason to enforce the stipulation on the ground that the Applicant is not capable of even passing the first of the two tests referred to above. The Applicant failed to present to the Court any sign of its legitimate interest to be protected by means of the non-competition stipulation. Thus, no

- 6 -

claims were made by the Applicant concerning the existence of trade secrets which it disclosed to the Respondents and which the stipulation strives to protect at present; likewise, it was not claimed that the Applicant exposed its customers to the Respondents; if anything, the opposite is true. The Respondents were hired from the outset to expand and enhance its clientele and it was them that created the pool of customers; there is also no claim that the Applicant trained or financed the training of the Respondents. It hence follows from all the foregoing that the purpose of the non-competition stipulation is not to protect the Applicant's legitimate defensible interests and that in fact this is a "bare" non-competition undertaking having no other purpose **but non-competition** *per se*.

19.    Under these circumstances, the test can certainly be discontinued, since, in view of the above case law, this non-competition stipulation is in contravention of public policy and, accordingly, on this ground alone, should be nullified. For the sake of prudence, we also apply the second test. The duration of the stipulation is excessive on any scale, since the duration of the stipulation does not fall in line with the current legal reality which enforces non-competition stipulations, where it does, for very short periods, of a few months only. In the present case the duration and reasonableness of the non-competition should also be examined in respect of the duration of the entire contractual engagement, which, according to the Applicant, was one year. Hence, to enforce a non-competition stipulation for a period of time which is double the entire engagement is extremely unreasonable. This is further intensified where the examination of <u>another</u> distribution agreement of the Applicant shows a non-competition stipulation for a similar period (two years) but where the term of the distribution agreement is for 7 years (!) and not one year as in the present case. A distribution agreement for Canada is attached hereto.

20.    Examination of the place where it is sought to enforce the stipulation – "worldwide" – sharpens the unreasonableness and the Draconian nature of this stipulation. This also shows that the order sought is sweeping and general. For this reason as well, the motion should not be accepted.

21.    The stipulation, which is written in a sweeping and general manner, reaches a particularly negative peak when stating that the Respondents are barred from engaging in any activity relating to hand-painted frames. And it should be

clarified that these are not the Applicant's frames which are protected by copyright laws, respecting which rights the Respondents have no dispute subject to fulfillment of the provisions of clause 5 of the agreement, but any activity relating to hand-painted frames (!) irrespective and without considering the question of whether or not the other hand-painted frames are protected works of an artist or any other entity. To be entitled to such a right, the Applicant has to be the owner of the rights in all hand-painted frames anywhere in the world, by any manufacturer. Apparently, not only that there is no basis for this, but also the Applicant itself does not make such a claim. Why then, should the Respondents be limited so drastically? The answer is fairly simple – the Applicant, for its own reasons, decided to terminate the Respondents in business terms, to take over their customers and their marketing channels, over which the Respondents have labored and in which they have invested with a view to enhancing the Applicant's tiny market share and scope in the field of glasses frames.

22. In contrast to the image which the Applicant attempts to create for itself as a multinational company, with enormous turnover all over the world, it is actually an entity on the verge of transience, which purchases standard frames from an unknown manufacturer in China, which in turn are painted by 3-4 "artists" working in a *quasi* workshop in Israel, and are then marketed to stores in Israel in small quantities, while large parts of the merchandise are returned to the Applicant due to the multiple breaks in the frames, and especially due to significant peeling of the paint. This sums up the Applicant's "glory".

23. It accordingly transpires from the foregoing, also in terms of the duration of the stipulation, its proportionality and its reasonableness, that there is no reason to enforce the non-competition stipulation from the contractual aspect and hence the claim should be denied in this context.

24. **Concerning the claim of counterfeit** – Where it is found that there is no reason or basis for the enforcement of the stipulation from the contractual perspective, then the Respondents' task in warding off the counterfeit claims against them, which claims are groundless and have no basis, is all the more easier since **the Applicant has presented no real evidence or even *prima facie* evidence to prove its claims that the Respondents are "counterfeiters"**. All that the Applicant has in its possession is an affidavit by

one, Ehud Bibring, a person who can hardly be regarded as a reliable person, in view of his problematic financial conduct which resulted in enormous debts, due to which he is currently in the midst of bankruptcy proceedings (Bankruptcy 7719 9126/03) From his testimony, nothing can be drawn which connects the Respondents with counterfeiting of the Applicant's frames which are protected under copyright. Even in his examination at the court, in answer to a direct question, he responded that all that he has in this context had been disclosed to him by entities in the United States, who did not take the trouble to come to the Court in order to give testimony and be examined. Hence, should we add to this, the fact that if the statements of the above were completely removed from the evidence in the court file, then at the end of the day, all that the Applicant is left with is casual testimony of one "Bibring".

25.    The Respondents are aware that within the framework of interim proceedings hearsay testimony can also be heard, provided that the source of the testimony is indicated. However, obviously, the court would not be satisfied, in terms of the evidentiary foundation, to take the word of a solitary witness and the court will not decide the matter solely on the basis of such testimony, particularly where this involves an interested and non-objective witness of the type of Bibring. In such event, the Court should search for and seek additional evidence, to substantiate and strengthen the witness' testimony, and in the absence of such evidence, it should deny the motion. An established, well rooted rule in case law, is that a litigant's refraining from bringing a witness whose testimony can support his version, acts against the litigant.

26.    In the present case, even after we have thoroughly reviewed all the material, we have found nothing, not even a shred of anything, in substantiation of Bibring's claims which are attributable to the Respondents. First and foremost, as already stated, the little that the Applicant had, in the form of First's affidavit and two other documents appearing to be affidavits, were removed at the outset of the hearing; the Applicant claimed that the Respondent's stand was photographed during the exhibition that was held when they sold counterfeited frames; however, a review of the photographs attached as Appendix F to the statement of claim **does not show** that the photographed objects are the Respondents or any of them, or that this is indeed their stand or that there are counterfeited frames there or that it has any connection with either the Applicant or the Respondents, or that it was

photographed at the alleged exhibition. If so, on what basis was the allegation made? The answer to this question rests with the Applicant.

27.    The attempt to rely on First's affidavit (which, as may be recalled, was withdrawn) is also not serious. After all, how can evidence which does not exist at all in the file be relied on? Moreover, even had there been any evidence, no glasses from this store were presented. All that is stated in First's affidavit is that the subject is **a couple** who sold counterfeited glasses – without any connection whatsoever with the Respondents. Bibring, who was confronted with this issue in his examination, failed to give a pertinent or serious answer to this question and reiterated the worn out and familiar mantra (See: Transcript, p. 2 at the bottom).

28.    In these circumstances, the question to be asked is this: if indeed we are dealing with "counterfeiters", why is it that, to this very day, no charges were pressed with the police against the Respondents, either in Israel or in the United States?

29.    Accordingly, it transpires from the foregoing that the Applicant has no evidence, not to mention "*prima facie* reliable evidence" in substantiation of its claims and for it to be entitled to receive an injunction against the Respondents. When a case deals with claims of counterfeiting or fraud, the party making such claims is subject to an enhanced duty of proof. Needless to say, the Applicant failed to meet this burden, and was not even close to doing so.

30.    Not only does the Applicant have no evidence to substantiate its claims, but it also decided to withdraw the little that it did present **without any explanation** at the outset of the hearing, which carries evidentiary significance against it. Namely, the meager evidence from the outset, which is reflected, *inter alia*, in the casual statements that have no basis, as well as the failure to bring to the stand the relevant litigants themselves, just as the refraining from bringing the evidence and witnesses subsequently during he hearing on the merit, strengthens the evidentiary presumption, to the effect that: **A litigant is presumed not to fail to present to the court any evidence which is in his favor, and where he refrains from presenting evidence in his possession without any plausible explanation, it can be deducted that had the evidence been presented it would have acted against him.**

See: Civil Appeal 2275/90 **Lima Israel Chemical Industries Company Ltd. vs. Peretz Rosenberg et al**, *PD* 47 (2) 605.

See: Y. Kedmi, **On Evidence (Third Part) Law As Reflected in Case Law**, combined and up-to-date version 2003, p. 1648 onward.

31.    Accordingly, it transpires from all the foregoing that the Applicant failed not only in actually failing to present evidence to prove and substantiate its claims, but also, the little that it did bring was withdrawn by it, thus putting itself in a particularly problematic situation from the legal and evidentiary points of view. Therefore, also on all the grounds specified above, there is no reason to hear the claims of counterfeiting and certainly not to issue an order on the basis of this "cause of action".

32.    Before concluding, the Respondents wish to refer briefly to the contents of the Applicant's closing arguments, as follows: As to the claim that Respondent 1 "admitted" the sale of frames in Virginia, this is not sufficient to serve as evidence for anything but the Respondents' efforts to dispose of the inventory of the **original** frames in their possession; since the Applicant failed to uphold its duty to purchase such frames from them, they explored all the points where the merchandise was sold, including Virginia. However, this is a long way off from actually admitting to a sale for the purpose of selling counterfeit frames. Besides, what merchant would purchase counterfeit frames knowing that they are counterfeit where the distinctive marks are so conspicuous?

33.    The biggest nonsense heard within the framework of the Applicant's arguments is the claim that since what distinguishes an original frame from a counterfeit one is the manner of marking the details of the model on the glasses frame/handle, then any handle of glass with no handwritten text is counterfeit. Since the frame that was presented is counterfeit, then the "counterfeiters" are the Respondents. If this is indeed so, then the Respondents would be complete idiots not to manufacture "counterfeit" frames which do not imitate the above feature. If anything, the very existence of the frames that were presented, testifies as a thousand witnesses, that the Respondents did not commit any wrong, since the Respondents, as an exclusive agent, were aware of the feature, and hence only those who do not share the knowledge of the feature can counterfeit the frames so clumsily. Had

the Respondents been the counterfeiters, they would have surely attended to this matter.

34. In view of the restricted nature of these closing arguments, the Respondents reiterate everything stated in their response to the Applicant's motion for injunction, so that they will not appear to have abandoned these claims; however, it appears that in view of the core of the matter in dispute it would be just and appropriate to focus the hearing and the arguments on the analysis of the legal situation directly relating to the Applicant's motion.

35. In view of all the foregoing, the Court is hereby requested to deny the Applicant's motion for an interim injunction against the Respondents, and to charge the Applicant with court costs and lawyer's fee plus applicable VAT in connection with this motion.

_____          _____
**Arie Lahav-Levy, Advocate**              **Doron Shimoni, Advocate**
**Attorneys for Respondents**

**EXHIBIT F**



Form No. 312/2007

מס' רץ 312/2007

## CERTIFICATION OF TRANSLATION

I the undersigned Advocate
**Reuven Ben-Ari**
Notary at 14, Massaryk blvd. Tel-Aviv
Israel hereby declare that I am well
acquainted with the Hebrew and English
languages and that the document attached to
this certification and marked "**A**" is a
correct translation into   English of the
original document drawn up in the Hebrew
language, which has been produced to me,
and a copy of which is also attached
herewith and marked "**B**".

In witness whereof I certify the correctness
of the said translation by my signature and
seal.

This **10th** October  2007
Notary's fee 1,698.- NIS. including V.A.T

------------------------------
Notary's Seal and Signature



## אישור תרגום

אני החו"מ עו"ד **ראובן בן-ארי**

נוטריון ב- שד' מסריק 14, תל-אביב מצהיר
בזה, כי אני שולט היטב בשפות העברית
והאנגלית וכי המסמך המצורף לאישור זה
והמסומן "**A**" הוא תרגום מדוייק לאנגלית של
המסמך מקורי הערוך בשפה העברית שהוצג
לפני ואשר העתק צילומי שלו  מצורף גם הוא
לאישורי זה ומסומן "**B**"

ולראיה אני מאשר את דיוק התרגום האמור
בחתימת ידי ובחותמי.

היום 10.10.07
שכרי בסך .- 1698 ש"ח כולל מ.ע.מ. נדרש.



------------------------------
חותם הק...



APOSTILLE
(Convention de la Haye du 5 October 1961)

1. **STATE OF ISRAEL**
   This public document

2. Has been signed by Reuven Ben-Ari
   Advocate ..........................................

3. acting in capacity of Notary.

4. bears the seal/stamp of the above Notary

**Certified**

5. at the Magistrates' Court, Tel-Aviv-Yafo

6. Date ..........................................

7. By an official appointed by Minister of Justice under the Notaries Law, 1976.

8. Serial number ... 2 S 9062

9. Seal/Stamp ..........................................

10. Signature ..........................................

1. מדינת ישראל
   מסמך ציבורי זה

2. נחתם בידי ראובן בן-ארי
   עו"ד.

3. המכהן בתור נוטריון.

4. נושא את החותם/החותמת של הנוטריון הנ"ל

אושר

5. בבית המשפט השלום תל-אביב-יפו

6. ביום .......................

7. על ידי מי שמונה בידי שר המשפטים לפי חוק הנוטריונים, התשל"ו-1976.

8. מס' סידורי .......................

9. החותם/החותמת .......................

10. חתימה .......................

**A** **A**

## State of Israel
## The Courts of Law

At the Tel-Aviv – Jaffa District Court          Civil motion        009267/07

                                                Principal Case   A  001661/07

Before His Honor Judge Yehuda Zaft  - Vice President

In the matter of        ART – Optic Ltd.

Represented by Counsel, advocate  Uriel Ganiar       <u>The Petitioner</u>

              V e r s u s

1.      Samuel Tomshover

2.      Merill Tomshover

Represented by Counsel, advocate Arie Lahav-Levy      <u>The Respondents</u>

## <u>Ruling</u>

### <u>Background</u>

On October 1, 2004 the Petitioner, engaged in the production and marketing of spectacle frames made of plastic, decorated by handwork ("the decorated frames") made a distribution agreement with the respondents whereby the respondents were to serve as sole distributors of the decorated frames in the USA in the period between December 1, 2004 and December 31, 2005 ((hereinafter: the distribution agreement).

A dispute about the distribution of the decorated framers erupted between the petitioner and the respondents and from 2006 onward the petitioner ceased to provide the respondents with decorated frames.

According to the petitioner, the respondents are engaged in the USA in the marketing of spectacle frames that constitute an imitation of the decorated frames.



In civil file 1661/07 the petitioner sought a declaratory ruling banning the respondents from producing or marketing frames that are similar to or competing with the decorated frames over a period of two years from September 30, 2006 – the final date on which the petitioner supplied the respondents with decorated spectacles. The petitioner also applied for a ruling banning the respondents from making and/or selling frames bearing the name "Ronit Furst", "Op-Art", or "Art Optic", or purporting to be frames manufactured by the petitioner and/or designed by Ronit Furst and/or being passed off as distributors and/or representatives of the petitioner.

In the petition before me, the petitioner requests a temporary injunction banning the respondents from manufacturing and/or marketing and/or distributing and/or selling spectacle frames painted by hand, and also from making and/or selling and/or displaying anywhere in the world spectacle frames bearing the name "Ronit Furst", "Op-Art", or "Art Optic" or frames purporting to be made or designed by the petitioner.

### Discussion

A.     The petitioner bases its right to the sought relief on the provisions of clause 7 of the distribution agreement, which bans the respondents from engaging in production and/or marketing of hand-painted spectacle frames resembling the decorated frames and/or competing with them during the currency of the agreement for a period of two years thereafter. Clause 7 of the distribution agreement (Appendix B) stipulates:

*During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, whether directly or indirectly, whether for consideration or not, in manufacturing,*

3

*marketing, selling, promoting or distributing hand painted frames for glasses of any kind (made of plastic or metal) worldwide that resemble and/or compete with the product".*

According to the petitioner, the period of restricted competition is to be counted from December 31, 2006 because according to the respondents' version they served till then as sole agents of the petitioner.

Owing to the grant of a two years sole distribution rights in the USA to the respondents it is possible that their restriction of business constitutes no disproportionate impairment of their right of conducting business. Even in this case, however, the restriction period expressly established in the agreement should not be extended. Since it is established that the distribution agreement is to be valid till December 31, 2005 (clause 3 of the agreement), the restriction period is to be counted for two years starting on that date.

Moreover, the delivery of decorated frames to the respondents in the period after December 31, 2005 took place in conditions different from those established in the distribution agreement and during that period the respondents were denied the exclusivity of distribution in the USA (article 10 of the affidavit by Ehud Bibering of April 26, 2007).

B. The petitioner is applying for a temporary injunction banning the respondents from competing with it for an indefinite period whereas it was entitled at most to prevent the respondents from marketing competing glasses with decorated frames till December 31, 2007. Therefore, I see no justification for accepting this request, which was intended to prevent the respondents from competing with the petitioner.



C.    It follows from the affidavit by Ehud Bibering that on March 10, 2007 the respondents displayed in the optical store in Monterey spectacle frames similar to the decorated frames (article 10.1 of the affidavit). This statement was given on the basis of the version of Kathy Show, owner of the Monterey store, who even handed over to the petitioner frames purchased by her from the respondents.

Samuel Tomshover testified as follows (p. 3 of the protocol of September 20, 2007:

*Q.  About the deposition by Kathy Show, did you appear in her place and sell her frames?*

*A. Yes.*

The testimony of Samuel Tomshover supports the version of Kathy Shaw, as given to Ehud. Bibering.

Comparison between the frames sold to Kathy Shaw by the respondents and the decorated frames (Exhibit 2) reveals that the frames sold by the respondents to Kathy Shaw comprise decorative elements and model signs identical to those existing in the decorated frames, among other things they contained the *Ronit Furst* sign, which characterizes the decorated frames. Therefore it appears prima facie that there is a misleading similareity between the frames sold by the respondents to Kathy Shaw and the decorated frames.

D.    The respondents agreed in their reply to obtain a temporary injunction banning them from distributing forged frames (clause 90 of the respondents' reply of July 22, 2007), and on these grounds I think it



would be justified to hand down a temporary injunction banning the respondents from further marketing of frames that constitute a forgery of the decorated ones.

## Conclusion

A temporary injunction is hereby granted, banning the respondents and/or any person on their behalf from making and/or marketing and/or selling spectacle frames that constitute an immitation of the decorated frames made by the petitioner with the inscription "Ronit Furst", "Op-Art", or "Art Optic" as shown in Appendix A of the Petition.

The validity of this temporary injunction is conditional upon the deposition of a personal undertaking pursuant to Regulation 365(B) of the Civil Procedure Regulations, 5744-1984.

In view of the respondents' consent to the said order I see no need for making the temporary injunction conditional upon the deposition of a guarantee.

The respondents shall jointly and severally pay the petitioner the costs of the petition and attorney fee in the sum of NIS 20,000.



The court secretariat shall issue a copy of this ruling to the counsel of the parties by fax.

*Issued on October 9, 2007, in Chambers.*

*( - )*
*Judge Yehuda Zafi. Vice President*

