UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

ART-OPTIC, LTD., : 08 CV 0327 (MGC)

Plaintiff, :

SAMUEL TOMASHOVER, MERYL TOMASHOVER and NEWLIGHT EYEWEAR, LLC., : :

Defendants. :

-----------------------------------------------------X

AFFIDAVIT OF SAMUEL TOMASHOVER

SAMUEL TOMASHOVER makes the following statements under penalty of perjury:

1. I offer this affidavit in opposition to plaintiff's motion for a preliminary injunction and other expedited relief.

2. I am married to Meryl Tomashover, who is also a defendant in this case. I own a business named Newlight Eyewear, LLC ("Newlight"). Newlight has only two employees, myself and my wife.

3. Newlight distributes eyeglasses on a wholesale basis. We do not manufacture, and have never manufactured eyeglasses. We have never entered into a contract or other agreement with a manufacturer to manufacture eyeglasses for us. All of the glasses that we sell are manufactured and supplied by others.

4. We began selling RONIT FURST glasses in December of 2004 after signing a Sales and Distribution Agreement with the plaintiff. A copy of Agreement that we signed is attached hereto as Exhibit F.

5. Many of the customers to whom we have sold plaintiff's glasses have complained to us of the quality of plaintiff's frames. For example, in October of 2006 we contacted plaintiff and told them customers were complaining of "peeling issues." Copies of some of the e-mails that I exchanged with plaintiff on this subject are attached hereto as Exhibit G.

6. The Agreement that we had with plaintiff expired on December 31, 2005. However, it was always our intent to either renew the agreement or enter into a new agreement with plaintiff. This intent is expressed in paragraph 5 of the Agreement, where we say "the 2 sides to this agreement hereby proclaim that their basic intention is to continue the business connection for the satisfactory of both side, further to 2005, by binding of a long term contract that shall be made and signed towards the end of 2005." I would never have entered the Agreement, if I thought plaintiff was not also interested in a long term agreement.

6 After the agreement expired in December of 2005, we intended to sign a long term agreement and therefore continued our business relationship with the plaintiff. That is, we continued to try to sell plaintiff's products in the United States, and they continued to sell product to us.

7. During this time, we also tried to negotiate a new exclusive agreement with plaintiff.

8. Although we had many typical business disputes with plaintiff during this time, we always felt that they could be worked out, and continued to work to negotiate a new agreement. We continued to work together during 2006.

9. For example, in January of 2006, I discovered that another company by the name of Hilco, Inc. was selling glasses that were identical to the plaintiff's RONIT FURST glasses. I advised plaintiff of this fact, and gave him the name of an attorney to contact.

10. Shortly thereafter, plaintiff retained an attorney to send Hilco a cease and desist letter. I was provided a copy of that letter without the exhibits attached. A true copy of what I received is attached hereto as Exhibit H.

11. Thereafter, I was also provided with a copy of the response from Hilco. In their letter they admitted that they were offering "direct copies" of plaintiff's designs, but said that they would stop. A true copy of this letter is attached hereto as Exhibit I.

12. At this point, I was satisfied that the matter had been resolved. Although, I now think that it is possible that Hilco has started distributing direct copies of plaintiff's designs again, and that plaintiff may be attributing those sales to me. I believe that this is a possibility because plaintiff has said that the marketplace is "flooded" with knock-offs (although I have not noticed this myself) and my sales of RONIT FURST glasses have been extremely modest.

13. In December of 2006, plaintiff finally announced to me that he was no longer interested in doing business with me and would not sell me any more

glasses. A copy of the letter from his attorney that I received is attached hereto as Exhibit J.

14. Up until December 2006. plaintiff not only permitted me to attend trade shows, but encouraged me to do so and supplied me with advertising and other materials for such shows. Moreover, I considered it an unwritten obligation to attend trade shows, and do what I could to promote sales of plaintiff's products.

15. After I received notice that plaintiff was going to enter into an agreement with another distributor, I asked plaintiff to purchase my entire unsold inventory in accordance with the agreement.

16. Plaintiff refused to purchase my inventory in violation of the agreement.

17. I first learned that plaintiff was trying to enter into a distributorship agreement with Ms. Cathy Shue when I read the papers that were filed in the Israeli action. Prior to that time, I always just considered Ms. Shue to be a customer.

18. In February of 2007, I sold 13 genuine RONIT FURST glasses to Cathy Shue. At that time, I did not represent myself as an "agent of plaintiff," although it is very possible that Ms. Shue believed that since I had previously sold her RONIT FURST glasses while the distributorship agreement was in effect. In addition, I never said anything about a distributor in South America. These allegations are entirely false.

19. All of the RONIT FURST glasses that I sold to customers, including *Davante* and *Bella Vista Optics*, were genuine products that had been purchased from plaintiff. Any claim to the contrary is untrue.

20. After plaintiff announced to me that he would no longer do business with me, and would not purchase my existing inventory, I became nervous about my ability to sell my existing inventory. I believed, at that time, that for me to sell my inventory, I would need to have a trademark registration. I did not consult an attorney with respect to this issue.

21. Therefore, I filed an application to register the trademark RONIT FURST in the United States. This application was refused, and I never contested the refusal.

22. I have since learned that it was not necessary for me to have a trademark in order to re-sell product that I had purchased from plaintiff, and more importantly, that I should not have filed a trademark application for RONIT FURST in my own name.

23. After I learned that in fact my application was still pending notwithstanding the fact that I never responded to the Trademark Office's refusal of the application, I expressly abandoned my application. I do not claim to have any rights in any RONIT FURST trademark

24. I have not attempted to prevent Mr. Beeri's representatives form selling RONIT FURST frames in the United States, nor have I verbally harassed anyone. The plaintiff's claims that I have done so are completely false and harmful to my reputation.

25. Similarly, Plaintiff's claim that I am manufacturing and selling counterfeit RONIT FURST eyewear is completely false, and is also hurting my reputation in the industry. I have never threatened or intimidated any customer or distributor of plaintiff. Plaintiff and Mr. Beeri claims that I have are slanderous and hurt my business.

26. Finally, I have been litigating this case with plaintiff in Israel since April of 2007. I have spent a considerable amount of time and money defending myself and prosecuting various counterclaims that I have asserted in that case. Since I have been litigating with plaintiff in Israel for the last 10 months, there is obviously no urgent need for the relief that plaintiff requests.

27. Moreover, my Agreement with the plaintiff provides for arbitration in Israel. Since I am already in Israel litigating the first case, it is my desire to arbitrate this case in Israel in accordance with the terms of my Agreement.

Dated: New York, New York
February 7, 2008

Samuel Tomashover

# EXHIBIT G

7 מסמך

**SALES AND DISTRIBUTION AGREEMENT**

This sales and distribution agreement is made and entered into as of the 1st day of October 2004,

By and between **Mrs Lea Bibring and/or Art Optic Ltd**- a company registered in Israel,business No.513191148, It's address:61 Hazamir Street, Kiryat-Ono 55507, Israel (henceforth:**The Producer**)

And: Mr.David Goldwasser, Mr & Mrs Samuel & Meryl Tomashover -In person and/or as company (when and if such a company will be established in future), It's address: Mr.Goldwasser-

8 Haoranim Street,Kfar Maas,Israel., Mr.&Mrs.Tomashover- 444 east 75th Street,suite#17C,NY,New York 10021, U.S.A (henceforth: **The Buyer**)

WHEREAS, The producer produces hand painted frames for glasses of any kind and adjoining cases for those frames, under the trade name RONIT FURST (henceforth : The **Product**),

WHEREAS, The producer wishes to export the product and sell it in the U.S.A, and for that purpose is prepared to grant sole distribution rights for the U.S.A only,

WHEREAS, The Buyer wishes to buy the product and has the will as the ability and the means to cause such distribution, and wishes to undertake the distribution of the product in the U.S.A,

Therefore the parties have jointly decided on the following agreement :

1. The above declarations made by the parties are an integral part of this agreement. S T

2. In exchange of the commitments undertaken by the buyer,as set out hereinafter,the producer agrees to grant him sole distribution rights for the U.S.A Subject to the terms and conditions laid out in this agreement,for as long as the agreement will stay in force,the producer will not sell the product in the U.S.A except through the buyer. S T

Despite the above said, it is herby agreed that the Producer is allowed to sell directly, not through the Buyer, in the U.S.A to 2 customers only:

Mr. Morley of Advance Optical, 37 Goodway Drive, Rochester, NY 14623.
Mrs.Ruth Domber of 10/10 Optics, 168 Fifth Avenue New York,N.Y 10010.

It is herby acknowledged by the parties to this agreement that these two customers are working with the Producer for over 18 months- prior to this agreement.And it is herby understood by the Buyer that customer no.1 is a small distributor in the Rochester NY area, and that customer no.2 is an Optical shop in NY.

S.T

3. The agreement shall commence on December 1-2004 and will stay in force till December 31- 2005, provided that the buyer has fulfilled its minimum purchase orders in accordance with section 4 bellow,and all of he's other commitments and obligations as set forth in this agreement.

S.T

4. The Buyer undertakes to purchase from the producer the minimum sales forecasts as set here forth :

Sales for the period from December 1,2004 till June 30,2005- Minimum **65,000 US$** Ex-Works.

(in words: sixty five thousand US dollars).

I.E in quantity- a minimum of 2600 Frames.

Buyer hereby represents and confirms that it would not have received the state of sole distribution rights had he not agreed to its undertaking in this section 4.

S.T

5. The 2 sides to this agreement hereby proclaim that their basic intention is to continue their business connection for the satisfactory of both sides, further to 2005, by binding of a long term contract that shall be made and signed towards the end of 2005.

However, should the producer, for reasons that the Buyer has no control over, wish to appoint a different distributor for the U.S.A- for the period after 1.January 2006, he will have to purchase back all the (first quality) frames that the Buyer still has in his stock- prior to the termination of this agreement , at ex-works cost price- not including freight costs.

Furthermore, it is herby agreed that the Buyer will have first refusal rights,prior to any distribution contract- between the Producer and a different distributor for the Product in the U.S.A.

S.T

6. **Prices, Terms and Delivery**:

6.1 The agreed **price** for each frame (including an Optical Case) is **25.00 US$**.This is an **EX-WORKS** price and does not include Shipping , export documentation and insurance costs.

6.2 **Terms of payment** : By bank Swift transfer, **30%** at the time of placing the order and the remaining **70%** upon receipt of notice that the order is ready for dispatch.

The Buyer undertakes to Insure the goods shipped to him, and shall pay the Producer in full -

In accordance with the payment terms above specified, including should any damage and /or total-loss occur after the goods have been delivered by the Producer to the shipper.

S.T

5.3 **Delivery**: For orders of up to 1000 (one thousand) Frames - a maximum of up to Three months- from placement of order and payment of 30% advance payment. Larger quantities will be delivered according to specific understanding between the parties.

6. Purchase orders by the Buyer shall be in writing (by e-mail or by Fax messages) and are subject to acceptance by the Producer in writing.

**It is hereby clarified that once the Producer accepts the order, the Buyer is obliged to purchase the ordered frames as listed in the order. Furthermore, the Buyer undertakes not to return and/or** exchange any frame. Without derogating from the above said, the producer agrees to exchange any frame found to be **production Defective**- within a period of **12 months** from it's delivery to the Buyer. The Buyer will return such frames , and these will be exchanged by the Producer at no further cost to the Buyer.

Under no curcumstances will the Buyer deduct payment for frames said to be defective. Those-

As specified above- will be exchanged for new ones.

S.T 7. **Non-Competition**

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing- hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

S.T 8.1 It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

S.T 8.2 **The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other** indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",

"ART OPTIC", "RONIT FURST".

8.3 It is stressed and agreed, that unless otherwise determined by the Producer in writing, the Product will be soled and **distributed in the U.S.A only under the trade name – "RONIT FURST".**

S.T 9. **Notices**

Any notice provided pursuant to this agreement shall be in writing and sent by registered mail, curier, facsimile or e-mail. All notices and other communications shall be deemed to have been one business day after the date personally delivered, by hand, facsimile or e-mail, or 10 business days after mailing by registered mail (return receipt requested).

Said regestered mail are to be sent to the address set forth in the headings of this agreement.

S.T 10. **Governing Law**

This agreement shall be governed and interpreted solely in accordance with the laws of Israel.

Any and all disputes arising between the parties out of or in connection of this agreement, its

interpretation, performance or breach, shall be referred to a binding arbitration before a single

arbitrator to be appointed by mutual agreement between the parties and , in the absence of such agreement, within fourteen (14) days from any of the parties first demand, and the arbitrator will be appointed at the request of either party by the chairman of the Israeli bar. The arbitration will be held in Tel-Aviv, Israel. The arbitration shall be conducted in accordance with the provisions of the Israeli Arbitration Law, 1968. the arbitrator shall not be bound by any rules of evidence or procedure, but shall be bound by the substantive of Israeli law. Any award or decision rendered shall be made by means of written opinion explaining the arbitrator's reasons for the award or decision, shall be final and binding upon the parties hereto, and shall be given in 60 days from the appointment of the arbitrator.

IN WITNESS WHEREOF, the parties have excecuted this agreement as of the date first herein written and each party acknowledges having received one counterpart.

Art Optic Ltd.
61 Hazamir St.
Kiryat Ono ISRAEL

**PRODUCER:** **BUYER:**

Lea Bibring and/or Art Optic Ltd David Goldwasser, Samuel Tomashover, Meryl Tomashover.

# EXHIBIT H

**Richard Schurin**

---

**From:** sammy thomas [greeneyes_76@hotmail.com]

**Sent:** Thursday, January 31, 2008 3:21 PM

**To:** Richard Schurin; Marc Misthal

**Subject:** FW: balance of last order

---

> From: greeneyes_76@hotmail.com
> To: ehud@op-art.co.il
> Subject: RE: balance of last order
> Date: Tue, 17 Oct 2006 19:52:08 +0000
>
>
> Hi Ehud
>
> We are experiencing numerous peeling issues with the new frames most often in the purple you sent us 1763-t19s I noticed you sent us the old fronts not the solid fronts and they are all peeling this is the third customer call I have had in 1 day complaining about the same frame I just sold them.
>
> At $26.00 a frame I cannot afford to keep supplying from my inventory. Are you sending me old frames with the new temples? Why are the fronts old and the temples are in the new T's something doesn't make sense. Please respond ASAP. We need replacement for these 3 frames immediately with the fronts that match the T temples not the old fronts .We will not keep paying $26.00 for defective frames.
>
> If its a T temple why does the front have the blue dot unless its an old front, unacceptable
> Now do you understand why I am out of colors??????????????????????????????????????????
>
> If there is a new peeling issue let us know now
>
> Meryl
>
>
>
>
>
>
>

---

Play free games, earn tickets, get cool prizes! Join Live Search Club. Join Live Search Club!

---

Helping your favorite cause is as easy as instant messaging. You IM, we give. Learn more.

# EXHIBIT I

SCHWEITZER CORNMAN GROSS & BONDELL LLP
ATTORNEYS AT LAW
PATENT TRADEMARK AND COPYRIGHT MATTERS
292 MADISON AVENUE
NEW YORK NY 10017

TELEPHONE (646) 424-0770
TELEFAX (646) 424-0880

February 8, 2006

CERTIFIED MAIL RRR

ADVANCE BY EMAIL: pjanell@hilco-usa.com

Mr. Paul Janell, Vice President
Hilco
33 West Bacon Street
Plainville MA 02762

Re: Hand Painted Eyeglass Frames
Our Ref. 3056-000

Dear Mr. Janell:

Our firm represents the well-known Israeli artist Ronit Fürst and the company Art Optic Ltd., founded in 2002, the creator and proprietor of myriad unique painted designs on eyeglass frames. A representative collection of these original designs are the subject of trade dress protection and of copyright protection and may be viewed at www.ronitfurst.com.

It has come to our client's attention that pp. 72, 73 of your 2006 catalog illustrate three "hand painted" frames, Nos. NF201, NF202, and NF203, which are direct copies of our client's proprietary design Nos. 01; 10; and 17 (photographs by Certified Mail).

This copying is an egregious violation of our client's rights in its original designs. Accordingly, demand is made that Hilco cease and desist from selling and/or delivering frames Nos. NF201, NF202, and NF203; that any inventory of the infringing frames be destroyed; that any other copies of our client's designs which Hilco may possess be destroyed; and that Hilco identify to us its source of the accused frames.

Our client acknowledges Hilco's right to create its own original hand-painted designs (as may be the case for item NF200); however, the copying of Ronit Fürst's original designs will not be tolerated.

Please promptly acknowledge, in writing, within five days of receipt of this notice, that you will refrain from copying our client's designs and will comply fully with our client's demands. This will surely avoid litigation and lead quickly to a reasonable resolution of this matter.

Very truly yours,

Michael A. Cornman

MAC:mlc/Enclosures

# EXHIBIT J



Mr. [illegible]
[illegible]
Attorneys At Law
[illegible]
[illegible] Madison Avenue
New York, NY [illegible]

[illegible]

[illegible]

[illegible] the [illegible] and [illegible]
[illegible]
[illegible]

[illegible]

[illegible]

[illegible] would be happy to speak [illegible]

Sincerely

[illegible]
Chief [illegible]

Smart Optical Solutions

[illegible]

# EXHIBIT K

URIEL GANIHAR & Co., ADVOCATES

URIEL GANIHAR (M.JUR.) · YAEL AMIR LEV-ARI (LL.B.) · YARON RAZ (B.A., LL.B, M.A.) · NEHAMI SHILISH (B.A., LL.B.)

December 5, 2[illegible]

Mr. & Mrs. Samuel Tomashover
444 East 75th Street,
Suite 17C
New-York N.Y. 10021
U.S.A.

Dear M. & Mrs. Tomashover,

My client, Art-Optic Ltd. Of Kiryat-Ono, Israel, has instructed me to bring the following to your attention.

1. As you are aware, the Distribution Agreement between my client and yourselfs ("the Contract") is now terminated. In view of that, you are kindly requested as follows:

   a. to comply with all contractual terms and conditions applicable to such situation, and without detracting from the generality of the above, not to make any representation to any third parties as to your being a distributor of Art-Optic Ltd.

   b. to comply in the strictest manner with the stipulations [illegible] paragraph [illegible] of the Contract regarding non-competition, for the required period of 2 years from the date of termination of the Contract.

URIEL GANIHAR & CO., ADVOCATES

e. to refrain from interfering in any manner whatsoever with attempts by my client to distribute their products in the U.S.A.

2. You are also required inform all retailers and customers of my client's Israel address, and let them know that they may now approach them directly with any post-sales and service problems.

3. Kindly note that non-compliance of the above will result in legal action by my client.

4. My client informs you hereby, that there is an outstanding debt of $3810 which you are requested to remit to my client within 7 days from receipt of this letter. If such remittance will not be forthcoming, kindly regard this letter as a request for appointing an arbitrator as per paragraph 10 of the Contract. My client will provide a list of suggested arbitrators, if and when it will be required.

5. This letter is without prejudice to my client, and does not constitute any waiver of any right to which my client is legally or contractually entitled.

Yours very truly,

Uriel Ganihar