UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

ART-OPTIC, LTD.,                              :
                                              :
                           Plaintiff,         :
                                              :          08 CV 0327 (MGC) (KNF)
            v.                                :
                                              :
SAMUEL TOMASHOVER,                            :
MERYL TOMASHOVER, and                         :
NEWLIGHT EYEWEAR, L.L.C.,                     :
                                              :
                           Defendants.        :

-----------------------------------------------------------------X

# PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Shira Y. Rosenfeld (SR 5392)
SHIBOLETH, YISRAELI, TROBERTS & ZISMAN, LLP
One Penn Plaza, Suite 2527
New York, New York 1019
Tel: 212-244-4111
Fax: 212-563-7108

*Attorneys for Plaintiff*

*February 7, 2008*

## TABLE OF CONTENTS

INTRODUCTION…………..………………………………………………..…………1

    I.     The Ronit Furst Brand Eyewear and Art-Optic...…………………………….....2

    II.    Prior Business History.…………………………………………………………3

    III.   Defendants Manufacture, Market and Sell Counterfeit Ronit Furst Eyewear
          and Cases.………………………………………………………………………5

    IV.   S. Tomashover Improperly Applies to Trademark the "Ronit Furst" Name…..…8

    V.    Art-Optic Obtains an Injunction in Israel Against the Tomashovers in
          October 2007.……………………………………………………………………9

    VI.   Defendants Continue to Manufacture, Market and Sell Counterfeit Ronit Furst
          Eyewear and Cases.……………………………………………………………....9

    VII.  Defendants are Threatening Art-Optic's Current Distributor
          and Representatives …………………………………………………..10

    VIII.  The Court Rejects Defendants' Contentions.………………………………….11

CONCLUSIONS OF LAW.………………………………………………………….....12

    I.     GOVERNING LAW.…………………………………………………………..12

    II.    GROUNDS FOR A PRELIMINARY INJUNCTION
          HAVE BEEN ESTABLISHED.…………………………………………13

    III.   PLAINTIFF HAS ESTABLISHED THAT IT WILL SUFFER IRREPARABLE
          HARM WITHOUT A PRELIMINARY INJUNCTION.....……………14

    IV.   PLAINTIFF HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON
          EACH OF ITS CAUSES OF ACTION.…………………………...…………..15

          A.    Plaintiff's First Cause of Action – Copyright Infringement…………….15

                1. Art-Optic Owns Valid Copyrights………..…………………….....…15

                2. Defendants' Actions Constitute Copying.…………………………..16

                    a. Actual Copying.……………………………………………..16

                 3. Improper Appropriation.…………………………………………….17

B.    Plaintiff's Second Cause of Action - Trademark Infringement............17

        1.    Art-Optic's "Ronit Furst" Trademark is Entitled to Protection....19

        2.    Defendants' Use of Art-Optic's 'RONIT FURST' Mark is Likely
              to Cause Confusion as to the Origin or Sponsorship of
              Defendants' Goods...............................................21

                a.    The Strength of the Plaintiff's Trademark.................20

                b.    The Similarity Between the Two Trademarks..............22

                c.    The Proximity of the Products in the Marketplace.........22

                d.    Likelihood of "Bridging the Gap"...........................23

                e.    Actual Confusion..............................................23

                f.    Defendants' Bad Faith.........................................24

                g.    Quality of Defendants' Product..............................25

                h.    Sophistication of the Relevant Consumer Group...........25

C.    Plaintiff's Third Cause of Action - Common Law
      Trademark Infringement...................................................26

D.    Plaintiff's Fourth Cause of Action - Trade Dress Infringement............26

        1.    Plaintiff's Eyewear Trade Dress is Inherently Distinctive
              and Nonfunctional or Has Acquired
              Secondary Meaning..............................................27

        2.    Defendants' Use of Art-Optic's Trade Dress is Likely to
              Cause Confusion as to the Origin or Sponsorship of
              Defendants' Goods...............................................28

                a.    The Strength of the Plaintiff's Trade Dress.................28

                b.    The Similarity Between the Two Trade Dresses...........28

                c.    The Proximity of the Products in the Marketplace.........29

                d.    Likelihood of "Bridging the Gap"...........................29

                e.    Actual Confusion..............................................29

     f.  Defendants' Bad Faith…………………………………...29

     g.  Quality of Defendants' Product…………………………29

     h.  Sophistication of the Relevant Consumer Group………...29

   E.  Plaintiff's Fifth Cause of Action - Common Law Trade Dress
     Infringement….............................................................................30

   F.  Plaintiff's Sixth Cause of Action – False Advertising…………….....30

   G.  Plaintiff's Seventh Cause of Action - New York False Advertising……31

   H.  Plaintiff's Eighth Cause of Action - Unfair Competition
     by Misappropriation……………………………………………..32

   I.  Plaintiff's Ninth Cause of Action – Tortious Interference with
     Prospective Economic Advantage ………………………………33

V.  PLAINTIFF HAS PRESENTED SUFFICIENTLY SERIOUS QUESTIONS
   GOING TO THE MERITS TO MAKE THEM A FAIR GROUND FOR
   LITIGATION AND A BALANCE OF HARDSHIPS TIPPING DECIDEDLY IN
   PLAINTIFF'S FAVOR…………………………………………………….34

VI.  DEFENDANTS' INFRINGING COPIES AND REPRODUCTION EQUIPMENT
   MUST BE SEIZED, IMPOUNDED AND DESTROYED……………………...35

VII. PLAINTIFF IS ENTITLED TO AN ASSET RESTRAINING ORDER
   AND EXPEDITED DISCOVERY ORDER ……………………………………36

  A.  Asset Restraining Order………………………………………………37

  B.  Expedited Discovery Order……………………………………………37

VIII. REMEDIES………………………………………………………………………38

**TABLE OF AUTHORITIES**

Cases:

*Abercrombie & Fitch Co. v. Hunting World, Inc.,*
    537 F.2d 4 (2d Cir.1976) ......................................................................................27

*Cartier, a Div. of Richemont North America, Inc. v. Samo's Sons, Inc.,*
    2005 WL 2560382 (S.D.N.Y., Oct. 11, 2005)........................................................24

*Cartier Intern. B.V. v. Ben-Menachem,*
    2008 WL 64005 (S.D.N.Y., Jan. 3, 2008) .............................................................36

*Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,*
    150 F.3d 132 (2d Cir. 1998) ..................................................................................16

*Centaur Communications, Ltd. v. A/S/M Communications, Inc.,*
    652 F. Supp. 1105 (S.D.N.Y. 1987). ......................................................................20

*Century Home Entertainment, Inc. v. Laser Beat, Inc.*
    859 F. Supp. 636 (E.D.N.Y. 1994) ........................................................................35

*Courtenay Communications Corp. v. Hall,*
    334 F.3d 210 (2d Cir. 2003) ..................................................................................18

*Edward B. Beharry & Co., Ltd. v. Bedessee Imports Inc.,*
    2006 WL 3095827 (E.D.N.Y., Oct. 31, 2006) .......................................................36

*Eliya, Inc. v. Kohl's Dept. Stores,*
    2006 WL 2645196 (S.D.N.Y., Sept. 13, 2006) ......................................................28

*Fonar Corp. v. Domenick,*
    105 F.3d 99 (2d Cir. 1997) ....................................................................................15

*Freedom Calls Foundation v. Bukstel,*
    2006 WL 845509 (E.D.N.Y., Mar. 3, 2006)...........................................................23

*Fruit-Ices Corp. v. Coolbrands Intern., Inc.,*
    335 F. Supp. 2d 412 (S.D.N.Y. 2004) .............................................................14, 25

*Fun-Damental Too, Ltd. v. Gemmy Industries Corp.,*
    111 F.3d 993 (2d Cir. 1997) ...........................................................................26-28

*Gaste v. Kaiserman,*
    863 F.2d 1061 (2d Cir. 1988) ................................................................................16

*Ideal Toy Corp. v. Chinese Arts & Crafts Inc.*,
   530 F.Supp. 375 (S.D.N.Y. 1981) ......................................................................30

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
   348 F.Supp.2d 165 (S.D.N.Y. 2004) ....................................................................31

*Merit Diamond Corp.*,
   376 F. Supp. 2d 517 (S.D.N.Y. 2005) ...................................................................17

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
   312 F.3d 94 (2d Cir. 2002) ..................................................................................13

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
   818 F.2d 254 (2d Cir. 1987) ................................................................................21

*Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*,
   182 F.3d 133 (2d Cir. 1999) ................................................................................25

*Neutrik AG v. Switchcraft, Inc.*,
   2001 WL 286722 (S.D.N.Y. Mar. 23, 2001) *aff'd*,
   31 Fed. Appx. 718 (Fed. Cir. 2002)......................................................................30

*Norbrook Laboratories Ltd. v. G.C. Hanford Mfg. Co.*,
   297 F. Supp. 2d 463 (N.D.N.Y. 2003)...................................................................14

*North Face Apparel Corp. v. TC Fashions, Inc.*,
   2006 WL 838993 (S.D.N.Y. Mar. 30, 2006)......................................................36-37

*Novo Nordisk A/S,*
   997 F.Supp. 470 (S.D.N.Y.,1998) ........................................................................32

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,*
   317 F.3d 209 (2d Cir. 2003) ................................................................................19

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*,
   2004 WL 896952 (E.D.N.Y., Mar. 26, 2004)..........................................................26

*Polaroid Corp. v. Polarad Elecs. Corp.*,
   287 F.2d 492 (2d Cir. 1961) ................................................................................21

*Price v. Fox Entertainment Group, Inc.*,
   2007 WL 241389 (S.D.N.Y. Jan. 27, 2007) ...........................................................15

*Princeton Graphics Operating, L.P. v. NEC Home Elecs. (U.S.A.), Inc.*,
   732 F.Supp. 1258 (S.D.N.Y.1990) ........................................................................32

*Purgess v. Sharrock,*
   33 F.3d 134 (2d Cir. 1994) ...........................................................................................33

*Qualitex Co. v. Jacobson Products Co., Inc.,*
   514 U.S. 159, 115 S.Ct. 1300 (1995) ..........................................................................27

*Ringgold v. Black Entertainment Television, Inc.,*
   126 F.3d 70 (2d Cir. 1997) ...........................................................................................16

*Roy Export Co. Establishment v. Columbia Broad. Sys.,*
   672 F.2d 1095 (2d Cir. 1982) .......................................................................................32

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
   497 F.3d 144, 162 (2d Cir. 2007) .................................................................................14

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.,*
   749 F. Supp. 473 (S.D.N.Y. 1990) ...............................................................................37

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
   505 U.S. 763, 112 S. Ct. 2753 (1992) ..........................................................18-20, 26-27

*U2 Home Entertainment, Inc. v. Bowery Music City, Inc.,*
   2003 WL 22889738 (S.D.N.Y. Dec. 8, 2003) ..............................................................35

*Virgin Enterprises Ltd. v. Nawab,*
   335 F.3d 141 (2d Cir. 2003) ...................................................................................14, 18

Statutes:
15 U.S.C. § 1052(c) .............................................................................................................19

15 U.S.C. §§ 1116(a) .....................................................................................................13, 43

15 U.S.C. § 1125 ...........................................................................................................17, 20

15 U.S.C. §1125(a)(1)(A) ...................................................................................................17

15 U.S.C. §1125(a) ...............................................................................................13, 18, 37

15 U.S.C. § 1125(a)(1)(B) ..................................................................................................30

17 U.S.C. § 101 ..................................................................................................................13

17 U.S.C. § 410(c) ..............................................................................................................15

17 U.S.C. § 502 ..........................................................................................................13, 43

17 U.S.C. § 503 ..................................................................................................................35, 38

17 U.S.C. § 503(a)...................................................................................................................43

Fed. R. Civ. P. 65................................................................................................13, 36, 42, 43

Fed. R. Civ. P. 65(f)..................................................................................................................36

N.Y. Gen. Bus. Law § 350 ...................................................................................................31, 32

TMEP § 813.................................................................................................................................19

TMEP § 1206................................................................................................................................19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ART-OPTIC, LTD.,                              :
                                              :
                          Plaintiff,          :
                                              :
              v.                              :        08 CV 327 (MGC)
                                              :
SAMUEL TOMASHOVER,                            :
MERYL TOMASHOVER, and                         :
NEWLIGHT EYEWEAR, L.L.C.,                     :
                                              :
                          Defendants.         :
-------------------------------------------------------------X

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

### INTRODUCTION

        Plaintiff Art-Optic, Ltd. ("Art-Optic"), a manufacturer and seller of the "Ronit Furst"

brand of unique hand-painted eyewear and accompanying eyeglass cases, brought this action in

the United States District Court Southern District of New York against Samuel and Meryl

Tomashover (the "Tomashovers") and their company Newlight Eyewear, L.L.C. ("Newlight")

(collectively "Defendants"), manufacturers, marketers and distributors of counterfeit "Ronit

Furst" eyewear and cases. On January 22, 2008, the Court heard argument concerning Plaintiff's

Order to Show Cause for a Temporary Restraining Order, Preliminary Injunction, Seizure Order,

Asset Restraining Order and Expedited Discovery Order. A hearing on Plaintiff's Order to Show

Cause was held on February 20, 2008, and the Court now makes the following Findings of Fact

and Conclusions of Law.

1

I.    **The Ronit Furst Brand Eyewear and Art-Optic**

1.    Art-Optic was founded in Israel in 2002 by Ehud Bibring ("Bibring"), who has managed its daily business affairs from its inception, and is owned by his mother Lea Bibring. (Affidavit of Ehud Bibring ("Bibring Aff.") ¶¶ 2, 3.)

2.    Art-Optic exclusively manufactures and sells the "Ronit Furst" brand of unique hand-painted eyewear designed and created by Bibring's wife, the artist Ronit Furst ("Furst"), with a distinctively designed case accompanying each pair of eyeglasses sold. (*Id.* at ¶¶ 2-3, 5.)

3.    Since 2002, Art-Optic, has grown from a small local business to a well-known international eyeglasses company who sell Ronit Furst hand-painted eyewear in optical stores in New York, throughout the United States, Europe, Israel and South Africa. (*Id.* at ¶ 4.)

4.    Because of the high artistic beauty and the unique and distinctive design as well as personal attention given to apply each design on each frame, the "Ronit Furst" brand has earned a reputation as distinctive, high quality eyeglasses through Israel, Europe and the United States. (*Id* at ¶ 7.)

5.    The eyeglasses produced by Art-Optic are unique and distinctive as each frame is designed with hand-painted colorful designs created by Furst, the artist behind each design on the eyewear. (*Id* at ¶ 5.)

6.    Each design is then hand-painted onto clear plastic eyeglass frames by a select small group of artists who train for months to learn the various designs and apply these designs under the direct supervision of Furst. (*Id.*)

7.    Each design has an identifying index number which is handwritten by an artist on the inside of the right temple of each frame. After applying a special coating process that affixes

the paint to the surface of the frame, each frame is then screen printed with Ronit Furst's personal signature on the left temple and left lens of each frame. (*Id.* at ¶ 5.)

8.      Designing, creating, marketing and distributing the eyeglasses took and still takes intensive research, a great deal of labor, and a large capital investment into Art-Optic. (Bibring Aff. at ¶ 6.)

9.      All designs and marketing material are proprietary and owned outright by Art-Optic, including all intellectual property rights. (*Id* at ¶ 6, Ex. 1.)

10.     The designs of three of these frames are registered with the U.S. Copyright Office. (*Id* at ¶ 6, Ex. 2.)

11.     Art-Optic has filed for copyrights on the remaining twenty-three frames. (*Id.*)

## II.     **Prior Business History**

12.     In 2004, Art-Optic, the Tomashovers and David Goldwasser, a relative of the Tomashovers, entered into an exclusive Sales and Distribution Agreement ("Agreement"). (*Id.* at ¶¶ 8-9, Ex. 3.) The term of the Agreement was thirteen months, from December 1, 2004 until December 31, 2005, and contained a non-competition clause which extended to December 31, 2007. (*Id.* at ¶ 9, Ex. 3.)

13.     The Agreement provided that the Tomashovers had the exclusive right to purchase and sell the Ronit Furst Brand of Eyewear in the United States with the exception of two customers, one of which was a small distributor in the Rochester, New York area, and the other being an optical shop in Manhattan. (*Id.* at ¶¶ 8, 9.)

14.     As part of the Agreement, and to assist with the sales of the Ronit Furst brand of eyewear, Art-Optic supplied the Tomashovers with marketing material, including posters, wallpapers, brochures and colorful shelving designed by Art-Optic. (*Id.* at ¶ 3.) With the

approval of all parties, Goldwasser subsequently withdrew from the Agreement in February 2005. (*Id.* at ¶ 9.)

15.    During the term of the Agreement, the Tomashovers repeatedly breached the terms by not ordering the required quantities as per the term of the Agreement, failing to pay for products supplied to them by Art-Optic, and not returning damaged frames after Art-Optic replaced them. (Bibring Aff. ¶¶ 10, 11.)

16.    The Agreement was not renewed after December 31, 2005; however, Art-Optic reluctantly allowed the Tomashovers to continue selling the Ronit Furst brand of eyewear in the United States on a non-exclusive basis as Art-Optic had no other distributor in the Untied States. (*Id.* at ¶ 12.)

17.    In April 2006, the Tomashovers attempted to enter into a new agreement with Art-Optic, however they continually demanded terms which were unfavorable to Art-Optic and failed to remedy their existing breaches of the Agreement. (*Id.* at ¶ 13.) Thus, Art-Optic sought a new distributor. (*Id.* at ¶ 15.)

18.    The Tomashovers could not accept that the relationship was over and shouted obscenities at Bibring and threatened to harm Art-Optic if it sought a new importer. (*Id.* at ¶ 15, 16.)

19.    As a result, Art-Optic, through its counsel in Israel, sent a letter dated December 5, 2006 informing the Tomashovers that they were no longer authorized to sell the Ronit Furst brand of eyewear and they could not hold themselves out to the public as representatives of Art-Optic, Ronit Furst or as promoters and sellers of the Ronit Furst brand of eyewear. (*Id.* at ¶ 16.)

4

III.    **Defendants Manufacture, Market and Sell**
       **Counterfeit Ronit Furst Eyewear and Cases**

20.    In February 2007, Bibring learned from Cathy Shue ("Shue"), an owner of an optical store in Monterey, California, that the Tomashovers sold her frames which they claimed to be original Ronit Furst frames. (*Id.* at ¶¶ 17-20, Ex. 4, Affidavit of Cathy Shue)

21.    On March 16, 2007, Shue sent the frames sold to her by the Tomashovers to Bibring. (*Id.* at ¶ 22, Ex. 5)

22.    The frames were counterfeit and Bibring replaced Shue's frames with originals at no cost. (*Id.*)

23.    On the authentic Ronit Furst eyewear, the color reference is written by hand on the bottom of the right temple of each frame. On the frames sent by Shue, the color reference was screen printed on the upper inside right temple of each frame. (*Id.* at ¶ 22, Ex. 5.)

24.    The Tomashovers, knowing that they would no longer receive goods from Art-Optic due to the termination of the agreement, actively took the time to seek out a supplier to create counterfeit Ronit Furst frames. (Bibring Aff. at ¶ 23.)

25.    They produced exact replicas of Art-Optic's frame shapes, a production process that within the optical industry takes at least 4-5 months. (*Id.*)

26.    They had learned of Art-Optic's technique and method of producing the eyeglasses frames from Bibring who explained the process to S. Tomashover in the regular course of business during the term of the Agreement. (*Id.*)

27.    The Tomashovers used Art-Optic's trade secrets and confidential information to train their manufacturer to mirror Art-Optic's technique, albeit not perfect. (*Id.*)

28.     Their manufacturer continues to produce precise copies of Ronit Furst's frame designs, including printing her name on the left temple of the eyeglasses frames as well as upon the left lens, thereby infringing on Art-Optic's intellectual property.  (*Id.*)

29.     Finally, the Tomashovers marketed and sold their counterfeit frames as original Ronit Furst frames.  (*Id.*)

Innocent customers were duped into purchasing these frames, unaware of the differences between the frames.  (*Id.*)

30.     The Tomashovers' behavior reflects a deliberate attempt to create and build their business on Art-Optic's business, goodwill and reputation.  (*Id.* at ¶ 24.)

31.     Their deliberate use of a separate manufacturer and training their workers how to create the designs and apply them to the frames in the exact same manner as Art-Optic shows that this was a well thought-out scheme plotted by the Tomashovers.  (*Id.*)

32.     In addition, the Tomashovers also began to produce eyeglass cases that were the same unique shape and design as the glasses cases manufactured by Art-Optic to hold the Ronit Furst glasses.  (*Id.* at ¶ 6, Ex. 1.)

33.     The Tomashovers also continued to use the Art-Optic marketing materials after the term of the Agreement ended as part of their deliberate scheme to hold themselves out as authorized sellers of the Furst Brand Eyewear to optical stores in New York and throughout the United States.  (Bibring Aff. ¶¶ 20, 21; Affidavit of Avri Beeri ("Beeri Aff.") ¶ 5.)

34.     On June 8, 2007, the Tomashovers incorporated "Newlight Eyewear L.L.C." in New York with their home address as the address of the company.  (Declaration of Shira Y. Rosenfeld ("Rosenfeld Dec.") ¶ 2, Ex. 1.)  Thus, the Tomashovers have established a limited liability company to front their counterfeiting operation.

6

35.    The Tomashovers have flooded the marketplace in the United States with counterfeits of Art-Optic exclusive and uniquely individual products thereby damaging Art-Optic's business, goodwill and reputation in the U.S. marketplace. (Bibring Aff. ¶ 25.)

36.    The Tomashovers' sale of counterfeit eyewear has not been limited to individual stores like Shue's. (*Id.* at ¶¶ 26, 32, Ex. 7, Affidavit of Ruth Domber of 10/10 Optics.)

37.    They have attended conventions in New York, Chicago and Las Vegas where they have claimed to represent Ronit Furst eyewear. (Bibring Aff. ¶ 26, Ex. 7; Beeri Aff. ¶ 9, Ex. 4)

38.    Through these conventions, the Tomashovers sold unknown amounts of counterfeits throughout the world. (*Id.*)

39.    In fact, Bibring learned that they plan to attend a convention in Atlanta in February 2008 in furtherance of their counterfeiting scheme. (Bibring Aff. ¶ 26.)

40.    In October 2007 at the Vision Expo West eyeglasses convention in Las Vegas, Defendants sold identically designed counterfeit Ronit Furst frames in a booth less than 50 feet from Art-Optic's booth which was selling original Ronit Furst frames. (Bibring Aff. ¶ 27; Beeri Aff. ¶¶ 5, 6; Ex. 2.)

41.    This convention appearance caused Art-Optic and Avri Beeri ("Beeri") of Brintech, Art-Optic's official distributor as of May 2007, significant damage to the outstanding reputation of the Ronit Furst brand of eyewear, a great deal of embarrassment and thousands of dollars in lost sales because customers avoided Art-Optic's booth when they saw identical frames being sold several feet away. (Bibring Aff. ¶¶ 27, 32; Beeri Aff. ¶ 6, Ex. 2)

42.    Because of this, Art-Optic was not able to sell many frames at the convention. (*Id.*)

7

43.    While in Las Vegas, Bibring and Beeri saw 30 counterfeit frames advertised with a photograph of Ronit Furst at Davante, a prestigious boutique optical store in The Forum Shops located at the Caesar's Palace Hotel. (Bibring Aff. ¶ 28, Ex. 6; Beeri Aff. ¶ 8, Ex. 3.)

44.    In October 2007, Bibring also traveled to New York and visited Bella Vista Optics, located at 1291 Lexington Avenue, New York, New York, and A.R. Trapp Opticians, located at 488 Madison Avenue, New York, New York, where he saw over 40 different pieces of counterfeit Ronit Furst eyewear supplied by Defendants. (Bibring Aff. at ¶ 29.)

45.    Bibring purchased a counterfeit version of frame number 1174 color 9 from A.R. Trapp Opticians and noticed that Defendants realized their error in creating their counterfeit frames. (*Id.*)

46.    In an effort to conceal their error and have their frames look more like original Ronit Furst frames, Defendants have since scratched out the color reference which was printed on the frame and replaced it with a hand-painted color reference utilizing a color similar to Art-Optic's. (*Id.*)

**IV.    S. Tomashover Improperly Applies to Trademark the "Ronit Furst" Name**

47.    On or about April 30, 2007, S. Tomashover applied for a trademark registration for the mark RONIT FURST (Serial No. 77169467). (Bibring Aff. ¶ 30; Rosenfeld Dec. ¶ 3, Ex. 2.)

48.    According to the application posted on the United States Patent and Trademark Office website, S. Tomashover listed himself as the owner. (*Id.*)

49.    Neither Ronit Furst, Art-Optic or Bibring gave S. Tomashover the right to use the mark RONIT FURST. (Bibring Aff. ¶ 30.)

50.    S. Tomashover also falsely claimed that his first use in commerce occurred "at least as early as 11/01/2004," prior to his entry into the Agreement with Art-Optic, who first used the mark in commerce since January 2002. (Bibring Aff. ¶¶ 4, 30; Rosenfeld Dec. Ex. 2.) This is false because Art-Optic has been manufacturing and marketing Ronit Furst frames since 2002. (*Id.*)

51.    Furthermore, S. Tomashover's application to trademark of Furst's name was also in direct violation of  paragraph 8.1 of the Agreement: "It is hereby specifically acknowledged by the buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product." (Bibring Aff. ¶ 30.)

## V.    Art-Optic Obtains an Injunction in Israel Against the Tomashovers in October 2007

52.    In April 2007, Art-Optic sued the Tomashovers in Tel Aviv District Court in the State of Israel (Civil File 1661/07). (Bibring Aff. at ¶ 32, Exs. 4, 7.)

53.    On October 9, 2007, the District Court issued a temporary injunction barring the defendants from "making and/or marketing and/or selling spectacle frames that constitute an imitation of the decorated frames made by the [plaintiff] with the inscription Ronit First [sic]  . . ." (*Id.* at ¶ 32, Ex. 8.)

54.    In addition, a judgment was entered against the Tomashovers in the amount of 20,000 NIS (New Israeli Shekels) for attorney's fees. (*Id.*)

## VI.    Defendants Continue to Manufacture, Market and Sell Counterfeit Ronit Furst Eyewear and Cases

55.    Despite the temporary injunction and judgment, Defendants continue to: (1) manufacture eyewear that is deliberately produced to look exactly like Art-Optic's Ronit Furst eyewear and cases; (2) hold themselves out as authentic Ronit Furst eyewear dealers; and (3)

palm off their counterfeit eyewear and cases as Ronit Furst eyewear and cases to the public. (Bibring Aff. ¶ 32; Beeri Aff. ¶¶ 5-8, Ex. 3.)

56.    Defendants' blatant and deliberate scheme to infringe Art-Optic's unique Ronit Furst line of hand-painted eyewear and cases has caused serious business losses.  (Bibring Aff. ¶¶ 25, 31, 33; Beeri Aff. ¶¶ 9,10, 12-14.)

**VII.    Defendants are Threatening Art-Optic's Current Distributor and Representatives**

57.    Defendants have also engaged in a campaign to identify Brintech's representatives in New York and throughout the United States.  (Beeri Aff. ¶ 11.)

58.    Once identified, S. Tomashover has verbally threatened and intimidated Brintech and its representatives in the United States and in New York that he will sue and bankrupt them. (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.)

59.    The representatives are frightened and most have decided no longer to distribute Ronit Furst Frames because they do not want to deal with Defendants' threatening and abusive behavior.  (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.)

60.    Moreover, the Defendants spread false rumors about Art-Optic's business practices thereby further damaging Art-Optic's reputation.  (Bibring Aff. ¶ 25; Beeri Aff. ¶ 11.)

61.    Art-Optic's agreement with Brintech has called for Brintech to order an additional 2,000 eyeglasses by January 31, 2008.  (Bibring Aff. ¶ 31; Beeri Aff. ¶ 14.)

62.    As of November 2007, Beeri has already informed Bibring that he will not be able to purchase this amount because he is finding it extremely difficult to find representatives to sell the frames because of Defendants' reprehensible behavior.  (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.)

63.    The Defendants' blatant and deliberate scheme to infringe Art-Optic's unique Furst Brand Eyewear is defrauding the public and is undoubtedly damaging Art-Optic's business and sales.  The Defendants are clearly embarking on a program to expand their counterfeiting business, divert business away from Art-Optic and earn money off of the hard-earned reputation built up over years by Ronit Furst and Art-Optic.  (Bibring Aff. ¶ 33.)

64.    By threatening and intimidating Beeri's representatives in the United States, Defendants have ensured that no one wants to work with Art-Optic and it is losing sales of the glasses while Defendants enjoy the sale of their counterfeit products.  (Bibring Aff. ¶ 33.)

VII.    **The Court Rejects Defendants' Contentions**

65.    The Tomashovers received the following frames:

| Date | Number of Frames | Number of Cases | Price |
|---|---|---|---|
| 2/14/2005 | 290 | | $  7,250.00 |
| 2/15/2005 | 734 | 1000 | $ 18,350.00 |
| 3/1/2005 | 310 | | $  7,750.00 |
| 4/6/2005 | 459 | | $ 10,842.00 |
| 5/15/2005 | 451 | 400 | $ 11,850.00 |
| 7/19/2005 | 427 | 400 | $  7,975.00 |
| 9/4/2005 | 245 | 200 | $  6,125.00 |
| 10/30/2005 | 610 | | $ 15,250.00 |
| 11/6/2005 | 40 | 600 | $  1,000.00 |
| 12/11/2005 | 393 | | $  9,025.00 |
| 2/2/2006 | 385 | 440 | $  9,625.00 |
| 3/7/2006 | 93 | | $  2,325.00 |
| 3/23/2006 | 467 | | $ 11,675.00 |
| 3/27/2006 | 112 | | $  2,200.00 |
| 4/11/2006 | 71 | | $    900.00 |
| 5/14/2006 | 117 | 83 | $  2,925.00 |
| 7/27/2006 | 482 | 100 | $ 13,832.00 |
| 10/3/2006 | 514 | 600 | $ 13,364.00 |
| | | | |
| **Total** | 6200 | 3823 | $152,263.00 |

66.    It is highly improbable that Defendants are still in possession of 3,300 pieces of authentic Ronit Furst eyewear as defendants' counsel represented to the Court on January 22, 2007.

67.    The small quantities purchased at many different times throughout a year demonstrate that the Tomashovers purchased frames only when they need to replenish their inventory or because they pre-sold them.  Accepting defendants' contention would mean that they purchased 245 frames on September 4, 2005.

68.    Despite not being able to sell 16 frames, they continued to place an additional **ten** orders for almost a year on November 6, 2005, December 11, 2005, February 2, 2006, March 7, 2006, March 23, 2006, March 27, 2006, April 11, 2006, May 14, 2006, July 27, 2006 and October 3, 2006, resulting in a stockpile of 3,284 frames.  There is no logical reason why defendants would keep ordering frames if they could not sell them.  Furthermore, the Tomashovers during that time period were under no obligation to purchase any frames from Art-Optic.  (Bibring Aff., Ex. 3, ¶ 4.)

## CONCLUSIONS OF LAW

The Court, having found that the Tomashovers and Newlight are liable for the above-mentioned causes of action and having determined that Art-Optic incurred damages as set forth above, now makes its Conclusions of Law.

## I.    GOVERNING LAW

1.    As set forth in the Plaintiff's memo of law, Federal law and New York law governs this case. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C.A. § 1331 (federal question), 28 U.S.C.A. § 1338 (jurisdiction to adjudicate

claims of federal trademark and copyright infringement and accompanying claim of unfair competition), and 15 U.S.C.A. § 1121 (original jurisdiction over Lanham Act claims).

2.    Furthermore, pursuant to 28 U.S.C.A. § 1332(a), this Court has diversity jurisdiction over this action as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a Plaintiff, a company incorporated in the State of Israel, and Defendants, citizens of New York within the meaning of the statute.

3.    Under 28 U.S.C.A. § 1367(a), this Court also has supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## II.    GROUNDS FOR A PRELIMINARY INJUNCTION HAVE BEEN ESTABLISHED

4.    A preliminary injunction is proper where a plaintiff establishes " (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002).

5.    Preliminary injunctions are specifically authorized by Fed. R. Civ. P. 65, 17 U.S.C. § 502, which applies to Plaintiff's first claim, copyright infringement pursuant to Copyright Act of 1976; 17 U.S.C. § 101, et seq., and 15 U.S.C. §§ 1116(a), which applies to Plaintiff's second, fourth and sixth claims based on trademark infringement, trade dress infringement and false advertising pursuant to False Designations of Origin, False Representations and False Advertising, Section 43 of the Lanham Act; 15 U.S.C. § 1125(a) and

(b). The Court finds that based on the analysis herein, the grounds for a preliminary injunction have been established.

## III.    PLAINTIFF HAS ESTABLISHED THAT IT WILL SUFFER IRREPARABLE HARM WITHOUT A  PRELIMINARY INJUNCTION.

6.    In copyright infringement cases, irreparable harm is presumed where a plaintiff makes out a *prima facie* case of copyright infringement.    *Id.*    In actions for trademark infringement and trade dress infringement, a likelihood of confusion is generally sufficient to demonstrate irreparable harm.    *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (trademark infringement); *Fruit-Ices Corp. v. Coolbrands Intern., Inc.*, 335 F. Supp. 2d 412, 418 (S.D.N.Y. 2005) (trade dress infringement).    With respect to a claim for false advertising, irreparable harm is presumed when plaintiff is an obvious competitor with respect to the misrepresented product.    *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 162 (2d Cir. 2007).    Irreparable harm is shown in an unfair competition claim if there is a "potential loss of an industry leader's present market and loss of the advantage of being the pioneer in the field and the market leader."    *Norbrook Laboratories Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 492-93 (N.D.N.Y. 2003).

7.    Art-Optic clearly meets these presumptions of irreparable harm as demonstrated in Point IV, *infra.*    There is no question that Art-Optic has demonstrated that it will continue to suffering irreparable harm in the absence of a preliminary injunction because every day that Defendants produce, market and sell their counterfeit eyewear, represent themselves as authentic distributors of Ronit Furst eyewear and threaten Art-Optic's distributor and representatives, it damages Art-Optic's business, reputation and goodwill.

14

8.      Furthermore, Defendants' actions blatantly violate the temporary injunction obtained by Art-Optic in Israel in September 2007, which expressly enjoined the Tomashovers from manufacturing and selling counterfeit Ronit Furst frames. (Bibring Aff. ¶ 32, Ex. 8.)

9.      Moreover, Defendants plan to attend an eyewear convention in Atlanta, Georgia in February 2008 in furtherance of their counterfeiting scheme (*Id.* at ¶ 26.)

## IV.    PLAINTIFF HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON EACH OF ITS CAUSES OF ACTION

10.     It is clear that Art-Optic has established that it is likely to succeed on each of its causes of action against the Defendant and will raise sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in favor of Art-Optic.

## A.    Plaintiff's First Cause of Action – Copyright Infringement

11.     To prevail on a claim of copyright infringement, a plaintiff must prove two elements: "ownership of a valid copyright and the copying of constituent elements of the work that are original. *Fonar Corp. v. Domenick,* 105 F.3d 99, 103 (2d Cir. 1997)

### 1.      Art-Optic Owns Valid Copyrights.

12.     A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright. 17 U.S.C. § 410(c); *Price v. Fox Entertainment Group, Inc.*, 2007 WL 241389, *5 (S.D.N.Y. Jan. 27, 2007)

13.     Art-Optic has obtained certificates of registration for three of its eyewear designs and one of its cases. (Bibring Aff. ¶ 6, Ex. 2.) The Court finds that Art-Optic has provided prima facie evidence of its ownership of those copyrighted materials. Furthermore, Art-Optic has applied to register its remaining 23 frames. (Bibring Aff. ¶ 6.)

## 2. **Defendants' Actions Constitute Copying.**

14.    The second element, copying, is comprised of two requirements: actual copying and improper or unlawful appropriation. *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)

### a. **Actual Copying**

15.    Actual copying may be established either by direct evidence of copying or by indirect evidence, including "access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Id.*  The Second Circuit has stated that "[a]ccess means that an alleged infringer had a 'reasonable possibility' - not simply a 'bare possibility' - of hearing [or seeing] the prior work." *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988).  Furthermore, a finding of probative similarity "requires only the fact that the infringing work copies something from the copyrighted work." *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997).

16.    Here, Defendants' counterfeiting of Ronit Furst eyewear clearly satisfies "actual copying" under a direct evidence analysis. Defendants willfully created counterfeit frames and cases that are identical to Art-Optic's Ronit Furst eyewear. (Bibring Aff. ¶¶ 22-24, Ex. 5; Beeri Aff. ¶ 7.) Defendants made an active effort to replicate every detail of Ronit Furst eyewear, by creating identically shaped clear plastic eyeglasses frames, copying the designs and color schemes and printing Ronit Furst's personal signature on the left temple and left lens of each frame. (*Id.*) Defendants also copied the unique shape and design of the cases. (*Id.*) Thus, even using indirect evidence and a probative similarity analysis, the "actual copying" prong is satisfied as well, because the authentic and counterfeit frames and cases are identical.

16

17.    It is also indisputable that the Tomashovers, as the previous exclusive distributor of authentic Ronit Furst eyewear, were given the copyrighted eyewear and cases to sell and thus had direct access prior to producing their counterfeit eyewear and case. (Bibring Aff. ¶ 23.) The Court finds that Art-Optic has clearly established actual copying.

### 3.    Improper Appropriation

18.    Once actual copying has been established, as is the case here, the next step must focus on the second element of copying, the "improper appropriation" requirement. Improper appropriation is established by demonstrating "substantial similarity" between the protected elements of the copyrighted work and the alleged infringing copy. *Merit Diamond Corp.*, 376 F. Supp. 2d at 525.

19.    Applying the 'substantial similarity' analysis to the context of the matter at hand, Defendants' counterfeit eyewear and case is not merely substantially similar to the Ronit Furst eyewear and case, but are virtually exact copies, clearly giving rise to improper appropriation on the part of the Defendants. (Bibring Aff. ¶ 22-24, Ex. 5; Beeri Aff. ¶ 7.)

### B.    Plaintiff's Second Cause of Action - Trademark Infringement

20.    15 U.S.C. §1125(a)(1)(A), Section 43(a)(1)(A) of the Lanham Act provides, in relevant part:

**§ 1125. False designations of origin, false descriptions, and dilution forbidden**

(a) Civil action

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to

the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

21.    The United States Supreme Court in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68, 112 S. Ct. 2753, 2757 (1992), stated that unregistered marks are entitled to protection under Lanham Act, Section 43(a):

> The Lanham Act was intended to make "actionable the deceptive and misleading use of marks" and "to protect persons engaged in ... commerce against unfair competition." § 45, 15 U.S.C. § 1127. Section 43(a) "prohibits a broader range of practices than does § 32," which applies to registered marks, *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 858, 102 S.Ct. 2182, 2190-2191, 72 L.Ed.2d 606 (1982), but it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a). See *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 299, n. 9 (CA3 1986); *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 215-216 (CA2 1985).

(footnote omitted); *see also Courtenay Communications Corp. v. Hall*, 334 F.3d 210, 214 (2d Cir. 2003) ("Although CCC has not registered its mark, an unregistered mark is entitled to Lanham Act protection if it would qualify for registration.")

22.    In *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003), the Second Circuit set forth the test to assert a claim for trademark infringement under 15 U.S.C. 1125(a). In *Virgin Enterprises Ltd. v. Nawab*, the Second Circuit stated:

> a claim of trademark infringement, whether brought under 15 U.S.C. § 1114(1) (for infringement of a registered mark) or 15 U.S.C. § 1125(a) (for infringement of rights in a mark acquired by use), is analyzed under the familiar two-prong test described in *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072 (2d Cir.1993). *See Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir.1999) (noting that *Gruner* test is applicable to claims brought under § 1114(1) and § 1125(a)). The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods. *Gruner*, 991 F.2d at 1074.

18

1.    **Art-Optic's "Ronit Furst" Trademark is Entitled to Protection.**

23.    To determine a mark's eligibility, it is first necessary to classify it as either (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Two Pesos, Inc.*, 505 U.S. at 768-69 (1992). While an individual's proper name is inherently considered descriptive in the Second Circuit, it can qualify for trademark protection if the name has attained "secondary meaning." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 217 (2d Cir. 2003). Furthermore, a personal name rendered in a distinctive lettering style may be considered strong even without a showing of secondary meaning. *Id.* (citation omitted).

24.    As of the date of this action, Art-Optic has not yet registered the trademark "RONIT FURST" and is, in fact, unable to do so because S. Tomashover has improperly applied for trademark protection of the mark RONIT FURST claiming himself as owner of the mark. (Bibring Aff. ¶ 30; Rosenfeld Dec. ¶ 3, Ex. 2).

25.    S. Tomashover's application for trademark protection of Furst's name is a violation of Trademark Act Section 2(c), 15 U.S.C. § 1052(c); TMEP §§ 813 and 1206 because S. Tomashover did not receive signed, written consent from Furst to apply to trademark her name. (Rosenfeld Aff. ¶ 3, Ex. 2)

26.    Furthermore, S. Tomashover falsely claimed that his first use in commerce occurred "at least as early as 11/01/2004," prior to his entry into the Agreement with Art-Optic, who first used the mark in commerce since January 2002. (Bibring Aff. ¶¶ 4, 30.)

27.    S. Tomashover's application to trademark Furst's name was also in direct violation of paragraph 8.1 of the Agreement: "It is hereby specifically acknowledged by the buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product." (*Id.*)

19

28.    Thus, the application must be rejected or withdrawn, which is one type of relief that Art-Optic is requesting in its Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, before Art-Optic can apply for a trademark. Nevertheless, Art-Optic is entitled to trademark protection for their use of the mark under 15 U.S.C. § 1125.

29.    Attaining "secondary meaning" means that despite its merely descriptive nature, a mark becomes distinctive of the goods in the minds of consumers. *Two Pesos*, 505 U.S. at 768-69. These factors include (1) advertising expenditures, (2) consumer studies linking the name to a source, (3) sales success, (4) unsolicited media coverage of the product, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 652 F. Supp. 1105, 1108 (S.D.N.Y. 1987).    In *Centaur Communications, Ltd.*, the Court stated, "[i]n assessing the existence of secondary meaning no 'single factor is determinative,' and every element need not be proved. Each case, therefore, must be resolved by reference to the relevant factual calculus." *Id., citation omitted.*

30.    Art-Optic has continuously been using the name "RONIT FURST," the artist's personal name, on each pair of its eyeglasses designs sold in New York and throughout the United States, and in Europe, Israel and South Africa, as well as on all of its marketing materials, since 2002. (Bibring Aff. ¶ 4.)  Art-Optic has spent considerable funds advertising Ronit Furst eyewear and the public has come to identify the brand with the original designs created by the artist Ronit Furst. (Bibring Aff. ¶ 7.)  Such advertising efforts and public association have been significant in generating significant sales of Ronit Furst eyewear.    (Bibring Aff. ¶ 7.) Furthermore, Defendants have blatantly plagiarized the "Ronit Furst" trademark by emblazoning it on the left temple and left lens of all of its counterfeit eyewear. (Bibring Aff. ¶¶ 22-24, Ex. 5.) Ms. Furst's name – "RONIT FURST" has acquired secondary meaning and is inextricably

associated in the minds of consumers with the unique hand-painted eyewear produced by Ronit Furst. (Bibring Aff. ¶ 7.)

**2.    Defendants' Use of Art-Optic's 'RONIT FURST' Mark is Likely to Cause Confusion as to the Origin or Sponsorship of Defendants' Goods**

31.    The Second Circuit applies the test established in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) to evaluate whether there is a likelihood of confusion. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256 (2d Cir. 1987).  A nonexhaustive list of eight factors, articulated by Judge Friendly in *Polaroid, supra,* 287 F.2d at 495, helps guide this inquiry: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will "bridge the gap" between the two markets; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the purchasers.  *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 256 (2d Cir. 1987)

**a.    The Strength of the Plaintiff's Trademark**

32.    Each frame produced by Art-Optic is screen printed with Ronit Furst's personal signature in block letters "RONIT FURST" on the left temple and left lens of each frame (Bibring Aff.  ¶ 5, Ex. 1.) Furthermore, all of the marketing materials used by Art-Optic to sell the Ronit Furst brand of eyewear prominently contain the "Ronit Furst" mark. (Bibring Aff. ¶ 6; Beeri Aff. ¶ 2, Ex. 1)  Thus, eyewear bearing the Ronit Furst name written distinctively in her personal handwriting is highly recognized and respected as a symbol of the unique hand-painted designs on eyewear created by her. (Bibring Aff. ¶ 7.)  Therefore, the Ronit Furst Trademark has undoubtedly acquired the requisite strength to satisfy this particular "*Polaroid*" factor.

**b.**    **The Similarity Between the Two Trademarks**

33.    When comparing the RONIT FURST mark on the authentic eyewear and Defendants' counterfeit eyewear, it is obvious that Defendants deliberately copied the RONIT FURST mark by replicating Furst's handwritten signature and placing it on the left temple and lens of each frame.  (Bibring Aff. ¶¶ 5, 22-23, Exs. 1, 5.)

**c.**    **The Proximity of the Products in the Marketplace**

34.    Both Art-Optic and Defendants operate within the same industry – design, production and sale of eyeglasses frames – and their respective products, Ronit Furst authentic eyewear and the counterfeit eyewear, are designed to appeal to the same consumer base, in fact the same exact customers seeking to purchase Ronit Furst frames.  (Bibring Aff. ¶¶ 3-7, 17-23, 27-30; Exs. 1, 3-5, 7; Beeri Aff. ¶¶ 4-12, Exs. 1-3.)

35.    For instance, Defendants sold their counterfeit Ronit Furst frames using Ronit Furst publicity materials to Cathy Shue, an owner of an optical store in Monterey, California. (Bibring Aff. ¶¶ 17-22, Exs. 4-5.)  Art-Optic's representatives have also attended conventions in New York, Chicago and Las Vegas where they have claimed to represent Ronit Furst eyewear. (Bibring Aff. ¶¶ 26-27; Beeri Aff. ¶¶ 4-5, Ex. 2.)  Specifically, in October 2007, Defendants had a booth at the Vision Expo West eyeglasses convention in Las Vegas, where they sold identically designed counterfeit Ronit Furst frames in a booth less than 50 feet from Art-Optic's booth which was selling original frames.  (Bibring Aff. ¶ 27; Beeri Aff. ¶ 5, Ex. 2.)  At the same time, Bibring and Beeri saw 30 counterfeit frames advertised with a photograph of Ronit Furst at Davante, a prestigious optical store in Las Vegas (Bibring Aff. ¶ 28; Ex. 6; Beeri Aff. ¶ 8, Ex. 3.) The proximity of the products in the marketplace is not only close, but in fact overlapping.

### d.    Likelihood of "Bridging the Gap"

36.    For the purposes of "*Polaroid*" test analysis, "bridging the gap" refers to whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, "bridge the gap." *Freedom Calls Foundation v. Bukstel*, 2006 WL 845509, *10 (E.D.N.Y., Mar. 3, 2006)  However, there is no bridge to gap when the parties are competing in the same market, making this factor irrelevant in the likelihood of confusion analysis.  *Id.*  ("More broadly, it is clear that Plaintiff is not just likely to enter Defendant's 'business'-it is a foregone conclusion because this is the exact same space that Plaintiff occupied before Defendant created his infringing website.")

37.    There is no bridge to gap in the case at bar and it is thus a foregone conclusion that Defendants are trying to occupy exactly the same position in the market by trying to palm off their counterfeit eyewear as Ronit Furst eyewear.

### e.    Actual Confusion

38.    The very nature of the infringing counterfeit eyewear – that they are exact replicas of the Ronit Furst brand of eyewear – means that consumers cannot tell the difference between one or the other and are duped into purchasing the counterfeit frames, unaware of the differences. (Bibring Aff. ¶ 23.)  At the Vision Expo West in Las Vegas in December 2007, where both Art-Optic and Defendants had booths less than 50 feet away from each other, numerous distributors and optical stores approached Beeri and asked why Art-Optic and Defendants were both selling the same frames. (Bibring Aff. ¶ 27; Beeri Aff. ¶ 6.)

f.    **Defendants' Bad Faith**

39.    In *Cartier, a Div. of Richemont North America, Inc. v. Samo's Sons, Inc.*, 2005 WL 2560382, *9 (S.D.N.Y., Oct. 11, 2005), the Court set forth the standard in determining bad faith:

> The question is whether Defendants "adopted the marks with the intention of capitalizing on Cartier's reputation and goodwill, as well as any customer confusion as to the source of the products." *Four Star,* 348 F.Supp.2d at 248; *see also Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 482-83 (2d Cir.1996). Defendants' Watch appears similar to the Tank Francaise, and Defendants, as jewelry sellers, must (should) have "had knowledge of plaintiffs' design and did not innocently choose a confusingly similar design." *Four Star,* 348 F.Supp.2d at 248.

40.    Defendants' bad faith is intrinsic in every action they have taken.  Defendants actively took time to seek out a supplier to create counterfeit frames.  (Bibring Aff. ¶¶ 23, 24.) They also made exact replicas of Art-Optic's frame shapes, a production process that within the optical industry takes at least 4-5 months, based on Art-Optic's technique and method.  (*Id.*) They also used Art-Optic's trade secrets and their knowledge of confidential information to train their manufacturer to mirror Art-Optic's technique.    (Bibring Aff. ¶¶ 23, 24.)    Their manufacturer continues to produce precise copies of Ronit Furst's frame designs, including printing her name, the RONIT FURST mark, on the left temple of the eyeglass frames as well as upon the left lens, thereby infringing on Art-Optic's intellectual property.  (*Id.*, Ex. 5)  Finally, Defendants marketed and sold their counterfeit frames as original Ronit Furst frames, by selling to stores and attending conventions.  (Bibring Aff. ¶¶ 17-20, 22, 26-29, Exs. 4, 6-7; Beeri Aff. ¶¶ 5-9, Ex. 3.)

41.    Moreover, S. Tomashover applied to register the RONIT FURST mark, falsifying the date of first use in commerce to a date before the Agreement, and in violation of the Agreement not to use the RONIT FURST mark.  (Bibring Aff. ¶ 30.)

42.    Finally, despite an injunction entered against the Tomashovers in Israel prohibiting them from manufacturing and marketing the counterfeit frames, they continue to do so. (Bibring Aff. ¶ 32.) It is clear that Defendants infringed the RONIT FURST mark in bad faith.

### g.    Quality of Defendants' Product

43.    This "*Polaroid*" factor is met where there is little difference between the quality of the parties' product because products of equal quality may tend to create confusion as to source because of that very similarity of quality. *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999). Here, Defendants' counterfeit eyewear is close enough in quality to Art-Optic's authentic eyewear, because both frames are hand painted with Ronit Furst designs on clear plastic frames using the same process, thereby adequately satisfying this factor. (Bibring Aff. ¶¶ 6, 22-24, Exs. 1, 5)

### h.    Sophistication of the Relevant Consumer Group

44.    When analyzing likelihood of confusion, "[t]he sophistication of purchasers, as measured by the care likely used by consumers when purchasing a particular product, is a factor to be taken into account." *Fruit-Ices Corp.*, 335 F. Supp. 2d at 428.

45.    Here, there are two main types of consumers — optical shop distributors and owners and their customers. Although optical shop distributors and owners may personally examine the quality of the frames closely, the counterfeits are so well done that even those who have previously sold the original products could be fooled into believing that the counterfeits are original. (Bibring Aff. ¶¶ 6, 22-24, 27, Exs. 1-5; Beeri Aff. ¶ 6.) In fact, at the trade show in Las Vegas, Art-Optic was approached by distributors and consumers and asked why they were selling the same product as Defendants whose booth was 50 feet away. (Bibring Aff. ¶ 27; Beeri

Aff. ¶ 6.)  If optical shop distributors and owners, who are the most sophisticated consumer group here, are confused then consumers, who do not have their knowledge of eyewear and purchase frames less often, are obviously confused as well.

46.    It is clear that all of the *Polaroid* factors weigh in favor of Art-Optic.  Thus, Art-Optic has demonstrated that there is not only a likelihood of confusion, but actual confusion between its eyewear and Defendants' counterfeit eyewear.

**C.    Plaintiff's Third Cause of Action - Common Law Trademark Infringement**

47.    The same analysis is used for common law trademark infringement as is used under federal law. *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 WL 896952, *7 (E.D.N.Y., Mar. 26, 2004).  As set forth in Section IV. B,  Art-Optic established its likelihood of success on the merits of its trademark infringement claim under the Lanham Act, *supra,* and thus has established its likelihood of success on the merits on its common law trademark infringement cause of action.

**D.    Plaintiff's Fourth Cause of Action - Trade Dress Infringement**

48.    Trade dress of a product is the total image and overall appearance of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques. *Two Pesos, Inc.,* 505 U.S. at 765, 112 S. Ct. at 2755 (1992). To establish a claim of trade dress infringement under Section § 43(a), "plaintiff must first demonstrate that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning." *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 999 (2d Cir. 1997) (citing *Two Pesos,* 505 U.S. at 769, 112 S. Ct. at 2757-58).  If a trade dress is inherently distinctive, then it must be nonfunctional. *Fun-Damental Too,*

*Ltd.*, 111 F.3d at 999. Second, plaintiff must demonstrate that there is a likelihood of confusion between defendant's and plaintiff's trade dress. *Id.*

### 1.    Plaintiff's Eyewear Trade Dress is Inherently Distinctive and Nonfunctional or Has Acquired Secondary Meaning.

49.    An inherently distinctive trade dress is one whose "intrinsic nature serves to identify a particular source of a product," although it may not yet have widespread identification among consumers. *Fun-Damental Too, Ltd.*, 111 F.3d at 999 (*citing Two Pesos, Inc.*, 505 U.S. at 769, 771, 112 S.Ct. at 2757-59). The inherent distinctiveness of trade dress is evaluated by applying the trademark classifications set forth by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). *Fun-Damental Too, Ltd.*, 111 F.3d at 999-1000. Within this framework, trade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful. *Id.* at 1000. Suggestive and arbitrary or fanciful trade dress is deemed to be inherently distinctive and thus always satisfies the first prong of the test for protection. *Two Pesos,* 505 U.S. at 768, 112 S. Ct. at 2757.

50.    The designs, including the shapes, color, color combinations and graphics on Ronit Furst eyewear and case, as well as the cases they come in, are inherently distinctive and original and are known as designs created by the artist Ronit Furst. (Bibring Aff. ¶¶ 3-6, Ex. 1.)

51.    The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 164, 115 S. Ct. 1300, 1304 (1995).

52.    The designs, i.e. trade dress, of Ronit Furst eyewear and cases are nonfunctional because they are purely a decorative element of the eyewear and case.

27

53.    The overall design of a product has acquired secondary meaning if the general public associates the product's design with a particular source of origin. *Eliya, Inc. v. Kohl's Dept. Stores*, 2006 WL 2645196, *2 (S.D.N.Y., Sept. 13, 2006)

54.    Ronit Furst's eyewear and cases have nonetheless obtained secondary meaning because the public links the fanciful and unique design of Ronit Furst eyewear with Art-Optic's Ronit Furst brand of eyewear, thereby satisfying the test for trade dress infringement. (Bibring Aff. ¶¶ 3-6, Ex. 1.)

### 2.    Defendants' Use of Art-Optic's Trade Dress is Likely to Cause Confusion as to the Origin or Sponsorship of Defendants' Goods

55.    As in trademark infringement actions, a court evaluates the issue of likelihood of confusion relating to trade dress by analyzing the eight *Polaroid* factors. *Fun-Damental Too, Ltd.*, 111 F.3d at 1002-1003.

### a.    The Strength of the Plaintiff's Trade Dress

56.    Consumers identify Ronit Furst frames through the unique colorful designs she designed and hand-painted on the eyeglasses frames as well as the uniquely designed case that accompany each frame. (Bibring Aff. ¶¶ 3-6, Ex. 1.)  Therefore, Art-Optic's trade dress has undoubtedly acquired the requisite strength to satisfy this *Polaroid* factor.

### b.    The Similarity Between the Two Trade Dresses

57.    Defendants' counterfeit eyewear and cases are not only similar to Art-Optic's authentic Ronit Furst brand of eyewear and cases; they are virtually exact copies. (Bibring Aff. ¶¶ 6, 22-24, Exs. 1, 5)

### c.     The Proximity of the Products in the Marketplace

58.     As stated in Section IV 2. c., *supra*, both Art-Optic and Defendants operate within the same industry – design, production and sale of eyewear – and their respective products are designed to appeal to the same consumer base.

### d.     Likelihood of "Bridging the Gap"

59.     As stated in Section IV 2. d., *supra*, there is no bridging the gap because Defendants' counterfeit eyewear obviously occupies the same market as Art-Optic's genuine eyewear.

### e.     Actual Confusion

60.     As stated in Section IV 2. e., *supra*, the counterfeit eyewear are exact replicas of the Ronit Furst brand of eyewear, which means that consumers cannot tell the difference between one or the other.  Thus, there is actual confusion between the Ronit Furst brand of eyewear and the counterfeit eyewear.

### f.     Defendants' Bad Faith

61.     Art-Optic has demonstrated Defendants' bad faith as stated in Section IV 2. f, *supra*.

### g.     Quality of Defendants' Product

62.     As stated in Section IV 2. g., *supra*,, Defendants' counterfeit eyewear is similar enough in quality to the Furst Brand Eyewear, to create confusion among these purchasing eyeglasses, thereby adequately satisfying this factor.

### h.     Sophistication of the Relevant Consumer Group

63.     This factor, Sophistication of the Relevant Consumer Group, weighs in favor of Art-Optic as shown in Section IV 2. h, *supra*.

### E.    Plaintiff's Fifth Cause of Action - Common Law Trade Dress Infringement

64.    The standard for proving a trade dress infringement claim under New York common law is similar to the standard for proving a Lanham Act trade dress claim. *Neutrik AG v. Switchcraft, Inc.*, 2001 WL 286722 *1 n. 2 (S.D.N.Y., Mar. 23, 2001), *aff'd*, 31 Fed. Appx. 718 (Fed. Cir. 2002). The only difference is that, under New York common law, there is no requirement to show "secondary meaning" for distinctive designs. *Id.*; *Ideal Toy Corp. v. Chinese Arts & Crafts Inc.*, 530 F. Supp. 375, 377 (S.D.N.Y. 1981) ("Under New York law . . . an injunction may issue against a confusingly similar trade dress, even if no secondary meaning is shown.")

65.    As set forth in Section IV. C., *supra*, Art-Optic established its likelihood of success on the merits of its trade dress infringement claim under the Lanham Act, *supra,* and thus has established its likelihood of success on the merits on its common law trade dress infringement cause of action.

### F.    Plaintiff's Sixth Cause of Action – False Advertising

66.    Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C.A. § 1125(a)(1)(B) provides, in relevant part as follows:

**§ 1125. False designations of origin, false descriptions, and dilution forbidden**

(a) Civil action

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-- . . .

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

67.    To establish a false advertising claim under Section 43(a) of the Lanham Act, a plaintiff must prove the following elements: (1) the defendant has made a false or misleading statement; (2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; (3) the deception is material in that is it likely to influence purchasing decisions; (4) there is a likelihood of injury to plaintiff, such as declining sales or loss of good will; and (5) the goods traveled in interstate commerce." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F. Supp. 2d 165, 178 (S.D.N.Y. 2004).

68.    Defendants' representations of themselves to optical store owners and at conventions as authentic Ronit Furst eyewear representatives using Ronit Furst marketing materials and selling authentic Ronit Furst eyewear constitute false and misleading statements. (Bibring Aff. ¶¶ 17-20, 22, 26-29, Exs. 4, 6-7; Beeri Aff. ¶¶ 5-9, Ex. 3.) Defendants' false and misleading statements have actually deceived consumers into thinking that they were purchasing authentic Ronit Furst eyewear, when they were actually not, and undoubtedly have the capacity to deceive a substantial portion of consumers into thinking the same. (Bibring Aff. ¶¶ 6, 22-24, 27, Exs. 1-5; Beeri Aff. ¶ 6.) The deception is material and likely to influence purchasing decisions because optical store owners and consumers are duped into thinking that they are purchasing authentic Ronit Furst eyewear when they are not. (*Id.*) Defendants' false and misleading statements have injured Art-Optic and will definitely continue to do so. (Bibring Aff. ¶¶ 6, 22-25, 27, 31-33, Exs. 1-5; Beeri Aff. ¶¶ 6, 9-10, 12-14.)

G.    **Plaintiff's Seventh Cause of Action - New York False Advertising**

69.    Section 350 of the New York State General Business Law expressly prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 350. The Court's analysis under the New York General

Business Law is the same as under the Lanham Act. *Novo Nordisk A/S,* 997 F. Supp. 470,

472 (S.D.N.Y., 1998); *Princeton Graphics Operating, L.P. v. NEC Home Elecs. (U.S.A.), Inc.,*

732 F. Supp. 1258, 1267 (S.D.N.Y.1990) ("the standards for a violation under Section 350-d [of

the New York General Business Law] are substantially the same as under section 43(a) [of the

Lanham Act]"). Thus, because Art-Optic has established a likelihood of success on the merits of

its Lanham Act false advertising claim in Section IV. F., *supra*, it has also established a

likelihood of success on the merits of its New York false advertising claim.

**H.    Plaintiff's Eighth Cause of Action - Unfair Competition by Misappropriation**

70.    An unfair competition claim involving misappropriation concerns the taking and

use of the plaintiff's property to compete against the plaintiff's own use of the same property. *Roy*

*Export Co. Establishment v. Columbia Broad. Sys.*, 672 F.2d 1095, 1105 (2d Cir.1982)

71,    Here, the Defendants utilized the existing intellectual property of Art-Optic which

they had direct access to when the Agreement between the parties was signed in 2004. (Bibring

Aff. ¶ 23.) The Defendants created exact replicas of the Ronit Furst designs by copying the

hand-painted designs created by Ronit Furst, applying the designs on identically shaped

eyeglasses, applying the trademark RONIT FURST, which is Ronit Furst's personal name, on

the left lens and left temple of every pair of counterfeit eyewear they manufactured, and copying

the unique shape and design of the cases. (Bibring Aff. ¶¶ 22-24, Ex. 5; Beeri Aff. ¶ 7.) They

then sold their counterfeit eyewear claiming that they were authentic Ronit Furst representatives

selling authentic Ronit Furst eyewear. (Bibring Aff. ¶¶ 17-20, 22, 26-29, Exs. 4, 6-7; Beeri Aff.

¶¶ 5-9, Exs. 3-4.) Art-Optic has certainly proven that they are likely to succeed on their cause of

action  unfair competition by appropriation.

I.    **Plaintiff's Ninth Cause of Action –**
      **Tortious Interference with Prospective Economic Advantage**

72.    In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

73.    Defendants' conduct encompasses these elements and therefore a valid claim exists.    After learning of Art-Optic's new distributorship relationship with Brintech, S. Tomashover has engaged in a campaign to identify Brintech's representatives in New York and throughout the United States. (Beeri Aff. ¶ 11.)  S. Tomashover has then proceeded to verbally harass plaintiff's representatives, including threatening to sue and bankrupt Brintech and its representatives if they continued to sell Ronit Furst eyewear.  (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.)  Defendants' actions themselves demonstrate that they have acted with the sole purpose of harming Art-Optic and used dishonest, unfair or improper means.

74.    Art-Optic has undoubtedly been harmed by Defendants' behavior.  As a result, Brintech's distributors do not want to sell the original frames as a result of S. Tomashover's threats.  (Bibring Aff. ¶ 31; Beeri Aff. ¶¶ 10-14.)  Moreover, the Defendants spread false rumors about Art-Optic's business practices thereby further damaging Art-Optic's reputation.  (Bibring Aff. ¶ 25; Beeri Aff. ¶ 11.)  Moreover, Art-Optic's agreement calls for Brintech to order 2,000 eyeglass frames by January 31, 2008. (Bibring Aff. ¶ 31; Beeri Aff. ¶ 14.)  However, as of the end of November 2007, Beeri already informed Bibring that he will not be able to purchase that amount because he is finding it extremely difficult to find representatives to sell the frames because of Defendants' belligerent behavior toward representatives.  (Bibring Aff. ¶ 31; Beeri

Aff. ¶¶ 10-14.) Defendants' conduct has therefore severely limited Art-Optic's ability to do business in the United States thereby causing enormous economic damages.

## V. PLAINTIFF HAS PRESENTED SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS TO MAKE THEM A FAIR GROUND FOR LITIGATION AND A BALANCE OF HARDSHIPS TIPPING DECIDEDLY IN PLAINTIFF'S FAVOR.

75,    Art-Optic has presented sufficiently serious questions going to the merits to make them a fair ground for litigation, with the balance of the hardships tipping decidedly in favor of Art-Optic.

76.    The counterfeit eyewear and case are virtually identical copies of the Ronit Furst eyewear and cases. (Bibring Aff. ¶¶ 5, 22-23, Exs. 1, 5.)

77.    Defendants' are representing to optical store business owners and distributors that they are authentic Ronit Furst eyewear representatives using Ronit Furst marketing materials. (Bibring Aff. ¶¶ 17-20, 22, 26-29, Exs. 4, 6-7; Beeri Aff. ¶¶ 5-9, Ex. 3.)

78.    They are undoubtedly confusing the authentic and counterfeit eyewear. (Bibring Aff. ¶¶ 6, 22-24, 27, Exs. 1-5; Beeri Aff. ¶ 6.)

79.    Art-Optic is losing sales by this confusion and S. Tomashover is threatening Brintech representatives to the point that Art-Optic is incurring serious business losses. (Bibring Aff. ¶¶ 6, 22-25, 27, 31-33, Exs. 1-5; Beeri Aff. ¶¶ 6, 9-10, 12-14.)

80.    Having its intellectual property misappropriated and wrongfully passed off as belonging to another entity has caused, and will continue to cause, great hardship to Art-Optic.

81.    The balance of hardships unquestionably tips in Art-Optic's favor.

82.    Not a scintilla of hardship should be accorded to counterfeiters who are engaged in a campaign to run Art-Optic out of business by continuing to produced fake eyewear,

threatening Art-Optic's representatives and applying to trademark the RONIT FURST mark,

notwithstanding a preliminary injunction issued against them in Israel.

## VI.  DEFENDANTS' INFRINGING COPIES AND REPRODUCTION EQUIPMENT MUST BE SEIZED, IMPOUNDED AND DESTROYED

83.    17 U.S.C. § 503 provides:

### § 503. Remedies for infringement: Impounding and disposition of infringing articles

(a) At any time while an action under this title is pending, the court may order the impounding, on such terms as it may deem reasonable, of all copies or phonorecords claimed to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced.

(b) As part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies or phonorecords found to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced.

84.    Impoundment of items that allegedly infringe plaintiff's rights under the

Copyright Act is warranted if plaintiff establishes a *prima facie* case of copyright infringement,

and therefore demonstrates a likelihood of success on the merits. *U2 Home Entertainment, Inc.*

*v. Bowery Music City, Inc.*, 2003 WL 22889738, *1 (S.D.N.Y., Dec. 8, 2003).

85.    In *Century Home Entertainment, Inc. v. Laser Beat, Inc.*, 859 F.Supp. 636, 638-

639 (E.D.N.Y. 1994), the court in granting an order of seizure explained as follows:

Furthermore, Plaintiff need not show that a particular Defendant would not adhere to a TRO but rather only that someone like the Defendant would be likely to hide or destroy the evidence of his infringing activity. *In re Vuitton et Fils S.A.,* 606 F.2d 1 (2d Cir.1979); *First Technology Safety Systems, Inc. v. Depinet,* 29 USPQ 2d 1269, 11 F.3d 641 (6th Cir.1993) (holding that an applicant for an order of seizure bears the burden of "showing that the adverse party has a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history").

Procedurally, Fed. R. Civ. P. Rule 65, which provides for preliminary injunctions and temporary restraining orders, expressly states that this section also applies to copyright impoundment proceedings. Fed. R. Civ. P. Rule 65(f).

86.    As shown in Section IV A., B., *supra*, Art-Optic has established a *prima facie* case for infringement and a likelihood of success on the merits. Seizure, impoundment and destruction of Defendants' infringing copies and manufacturing equipment to make those infringing copies is desperately needed to stop Defendants from manufacturing and selling Ronit Furst counterfeit eyewear, which is irrefutably damaging Art-Optic's business, goodwill and reputation. Moreover, these measures will stop Defendants who have blatantly disregarded the temporary injunction in Israel in September 2007, which enjoined them from making and marketing counterfeit Ronit Furst frames. (Bibring Aff. ¶ 32.)

87.    Furthermore, seizure orders are par for the course in counterfeiting cases. *Cartier Intern. B.V. v. Ben-Menachem*, 2008 WL 64005, *1 (S.D.N.Y., Jan. 3, 2008) ("The Plaintiffs commenced this action on May 23, 2006, and on that date, a temporary restraining order, seizure order, and order for expedited discovery, asset restraint and to show cause for a preliminary injunction was issued and was executed on May 24, 2006.")

## VII.    PLAINTIFF IS ENTITLED TO AN ASSET RESTRAINING ORDER AND EXPEDITED  DISCOVERY ORDER

88.    In counterfeiting cases, asset restraining orders and expedited discovery orders are routinely granted as part of the relief sought with the temporary restraining order. *Cartier Intern. B.V.*, 2008 WL 64005 at *1; *Edward B. Beharry & Co., Ltd. v. Bedessee Imports Inc.*, 2006 WL 3095827, *1 (E.D.N.Y., Oct. 31, 2006); *North Face Apparel Corp. v. TC Fashions, Inc.*, 2006 WL 838993, *1 (S.D.N.Y., Mar. 30, 2006). Furthermore, these orders are kept in place after the Court issues a preliminary injunction. *Id.*

A.    **Asset Restraining Order**

89.    In *North Face Apparel Corp.*, the Court set forth the standard to impose an asset

restraining order in a counterfeiting case:

> District courts have the "authority to freeze those assets which could [be] used to
> satisfy an equitable award of profits." *Levi Strauss & Co. v. Sunrise Int'l Trading
> Inc.*, 51 F.3d 982, 987 (11th Cir.1995) (citing *Reebok Int'l, Ltd. v. Marnatech
> Enters., Inc.*, 970 F.2d 552, 558-59 (9th Cir.1992)); *see also* 15 U.S.C. § 1117(a)
> (as remedy for violation of 15 U.S.C. § 1125(a) (false designation of origin) "the
> plaintiff shall be entitled, ... subject to the principles of equity, to recover [among
> other things] defendant's profits"); McCarthy on Trademarks and Unfair
> Competition § 30:40 (4th ed.) (*purpose of freezing assets is to preserve "security
> for plaintiff's future recovery on an accounting of the counterfeiter's profits."*).

*North Face Apparel Corp.*, 2006 WL 838993 at *3 (*emphasis added.*)

90.    It is clear that Defendants' assets must be frozen to preserve security for Art-

Optic's future recovery on an accounting of the "counterfeiter's profits."

B.    **Expedited Discovery Order**

91.    In *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473,

475 (S.D.N.Y. 1990), this Court has set forth the following requirements for granting expedited

discovery in a counterfeiting case:

> (1) irreparable injury, (2) some probability of success on the merits, (3) some
> connection between expedited discovery and the avoidance of the irreparable
> injury, and (4) some evidence that the injury that will result without expedited
> discovery looms greater than the injury that the defendant will suffer if the
> expedited relief is granted.

92.    Points III and IV demonstrate that Art-Optic has more than satisfied the first two

factors requiring a showing of irreparable injury and some probability of success on the merits.

As for the third factor, immediate discovery of Defendants' records of manufacture and sale of

their counterfeit products, including the name of the manufacturers, suppliers and purchasers,

and the opportunity to take the Tomashovers' depositions, will allow Art-Optic to discover the

totality of the counterfeiting operation and shut it down to stop the daily bleeding of business

forever lost and damage to goodwill and reputation. As for the fourth factor, without expedited discovery, if Art-Optic does not discover who is supplying the materials, manufacturing the counterfeit products and purchasing them, it will not be long before counterfeit frames and cases are produced again. Thus, Art-Optic meets all four factors, and expedited discovery should be granted.

## VIII. **REMEDIES**

93.     Plaintiff is likely to succeed in showing Defendants have used, and are continuing to use, counterfeits or infringements of Plaintiff's Intellectual Property in connection with the manufacture, distribution, offer for sale and/or sale of merchandise, including but not limited to eyewear, cases and marketing and advertising materials (hereinafter "Defendants' Infringing Products");

94.     The manufacturing, distributing, offering for sale and/or selling of Defendants' Infringing Products will result in immediate and irreparable injury to Plaintiffs if seizure of Defendants' Infringing Products and the records pertaining thereto is not ordered;

95.     Defendants, or other persons acting in concert with Defendants, would likely destroy, move, hide, or otherwise make the Defendants' Infringing Products and business records relating thereto inaccessible to the Court, thus frustrating the ultimate relief Plaintiff seeks in this action;

96.     Plaintiff's harm from denial of the requested temporary restraining order, preliminary injunction, *ex parte* seizure, impoundment and destruction of Defendants' Infringing Products and reproduction equipment pursuant to 17 U.S.C. § 503, expedited discovery order and asset restraining order would outweigh the harm to Defendants' legitimate interests from granting such an order;

38

97.    Plaintiff has demonstrated the location(s) at which Defendants are offering for sale and/or selling Defendants' Infringing Products, at which locations Defendants are likely to be holding the business records thereto; and

98.    Entry of an order other than an *ex parte* seizure order would not adequately achieve the purposes of the Copyright Act and the Lanham Act to preserve Plaintiff's remedies for trademark and copyright counterfeiting, including, inter alia, destruction of Defendants' Infringing Products, the acquisition of the business records relating to Defendants' Infringing Products, and an award to Plaintiff of lost profits or damages.

99.    Plaintiff has demonstrated that Defendants may take action to transfer their assets and thus avoid an accounting of Defendants' profits from their unlawful activities.

100.    Plaintiff is granted a preliminary injunction as follows:

(a)    Enjoining and restraining Defendants, their members, officers, agents, attorneys, employees, servants, representatives, manufacturers and partners, assigns, heirs, executors, administrators, and any other persons in active concert or participation with them from:

(i) using Plaintiff's Intellectual Property or any reproduction, counterfeit, copy or colorable imitation of Plaintiff's Intellectual Property in connection with the manufacture, distribution, advertising, offer for sale and/or sale of merchandise not the genuine products of Plaintiff, or any manner likely to cause others to believe that Defendants' products are connected with Plaintiff or Plaintiff's genuine merchandise bearing or containing Plaintiff's Intellectual Property; and

39

      (ii)   passing off, inducing or enabling others to sell any eyewear or cases, or other items which are not Plaintiff's genuine merchandise as and for Plaintiff's genuine merchandise; and

      (iii)  committing any other acts calculated to cause purchasers and/or the general public to believe that the Defendants' products are Plaintiff's genuine merchandise unless they are such; and

      (iv)  shipping, delivering, holding for sale, distributing, returning, transferring or otherwise moving, storing, or disposing of in any manner eyewear, cases or other items falsely bearing Plaintiff's Intellectual Property, or any reproduction, counterfeit, copy or colorable imitation of same.

(b)     Impounding, during the pendency of this action, eyewear, cases and other items, including, without limitation, plates, molds, labels, matrices, patches, printing devices, advertising, packaging and other materials and merchandise seized pursuant to the provisions of this Order.

(c)     Restricting the transfer of Defendants' assets.

(d)     Ordering the United States Marshal for this district or any federal, state, county, or local law enforcement officers, assisted by one or more attorneys or agents of Plaintiff's, is hereby authorized and directed to seize, impound, and deliver to Plaintiff or its representatives (i) any and all unauthorized and unlicensed merchandise bearing or containing Plaintiff's Intellectual Property as described above; (ii) the means for making same; (iii) the books and records relating thereto, including, but not limited to, records and data contained in electronic format on

40

computers, servers, hard drives, zip drives, and/or disks; and (iv) the containers or vehicles in which same are held or transported, which Defendants sell, attempt to sell or hold for sale, at all locations within this District and other Districts where Defendants' Infringing Products are sold, offered for sale, distributed, transported, manufactured, and/or stored including, but not limited to:

> 444 East 75th Street, Suite 17C, New York, New York
>
> and
>
> 40 Newlight Lane, Water Mill, New York

(e)     Ordering that the United States Marshal or other law enforcement officer(s) effecting such seizure shall employ whatever reasonable force is necessary to enter the premises owned, leased, or controlled by Defendants or the location to be searched where Defendants' Infringing Products or business records relating thereto may be found, and to inspect the contents of any computers, rooms, vehicles, closets, cabinets, containers, cases, desks, or documents located on the identified locations or other premises controlled by Defendants.

(f)     Ordering that Plaintiff's agents shall promptly inspect all items seized and, and if any items are found to be authorized products, such items are to be returned to Defendants within twenty (20) business days after the date the Court's Order is executed.

(g)     Ordering that the search and seizure ordered herein may be photographed or videotaped for the purpose of authenticating and assisting in obtaining evidence and preventing any controversy regarding the activities and events occurring during said search and seizure.

(h)     Ordering that any merchandise or means of making such merchandise and other items seized shall be appropriately tagged to permit identification; Defendants shall be given a receipt therefore; such merchandise, records or other items seized shall be impounded in the custody and control of Plaintiff or Plaintiff's agents as substitute custodian pending further order of this Court and shall be made available for inventory or inspection by the party from which it was seized or its counsel during normal business hours; and that any such records seized shall likewise be impounded and shall be subject to a protective order whereby access thereto shall be initially restricted to Plaintiff and Plaintiff's counsel and Defendants and Defendants' attorneys of record, who shall be permitted to inspect and copy such records, and such records shall be copied and the copies returned to Defendants within twenty (20) days of the date this Order is executed. This protective order, restricting access to such documents, shall expire on the date set forth above for the hearing on the Preliminary Injunction whether or not said hearing occurs, unless extended by Court order, so that at such hearing and thereafter the contents of such records may be revealed, unless otherwise ordered by this Court.

(i)     Ordering that Plaintiff shall post, in accordance with Rule 65 of the Federal Rules of Civil Procedure, a corporate surety bond, cash, or a certified or attorney's check in the amount of ten thousand dollars ($10,000) as security, determined adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful seizure, attempted seizure, or restraint hereunder.

(j)     Ordering that sufficient cause having been shown, the above seizure shall take place at Defendants' place of business or residence or where Defendants are selling or holding for sale the items to be seized within ten (10) days from the date of the Court's Order or at such time as may be extended by this Court.

(k)     Ordering that Plaintiff's counsel shall file within ten (10) business days after the seizure is executed an affidavit or declaration stating the date on which the seizure was executed, whether goods and/or other materials were seized and a description thereof, and where the goods and/or other materials are stored.

(l)     Ordering, that in accordance with Rule 65 of the Federal Rules of Civil Procedure, 15 17 U.S.C. §§ 502, 503(a), U.S.C. § 1116(a), and this Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, Defendants, including, but not limited to, SAMUEL TOMASHOVER, MERYL TOMASHOVER and NEWLIGHT EYEWEAR, L.L.C., their members, officers, agents, attorneys, employees, servants, representatives, manufacturers and partners, assigns, heirs, executors, administrators, and any other persons in active concert or participation with them, and any banks, savings and loan associations, or other financial institutions, or agencies which engage in the transfer of real or personal property, who receive actual notice of this Order by personal service or otherwise, are temporarily restrained and enjoined from transferring, disposing of, or secreting any money, stocks, or other assets of Defendants, without prior approval of the Court, except as to a Defendant that files with the Court and serves upon Plaintiff's counsel:

43

(1)    an accounting of any Defendants' assets having value of two thousand dollars ($2,000) or more, and the location and identity thereof; and

(2)    uncontradicted documentary proof accepted by Plaintiff (such acceptance not to be unreasonably withheld) that particular assets are not proceeds of Defendants' counterfeiting activities, in which case those particular assets shall be released to such Defendant.

(m)    Ordering that upon telephonic notice to the Court and Plaintiff's counsel, any Defendant may, upon proper showing, appear and move for the dissolution or modification of the provisions of this Order concerning the restriction upon transfer of Defendants' assets, including the following modifications:

(1)    allowing payments for ordinary living expenses not to exceed two thousand dollars ($2,000) per month, with an accounting of such payments to be filed with the Court and provided to Plaintiffs within ten (10) days following the end of each month;

(2)    allowing Defendant to pay ordinary, legitimate business expenses as follows:

(a)    rent or mortgage in the amount normally paid as required in any lease or loan on any premises by such Defendant or company, upon presentation of said lease or loan document to Plaintiff's counsel and verification thereof;

(b)    ordinary and regular salaries to any bona fide employees, other than any of the Defendants themselves, or any relatives or dependents thereof, to the extent such salaries are not excessive;

44

provided, however, that such salaries shall be paid to persons who were on the payroll of such Defendant as of the date of this Order, and such salaries do not exceed the prior month's level and further provided that Defendant shall first present to Plaintiff's counsel written documentation identifying and verifying all individuals proposed to be paid and particulars of the salaries proposed therefor;

(c)    ordinary and necessary bills for utilities;

(d)    payments of any amounts less than two thousand dollars ($2,000), not to exceed an aggregate of more than five thousand ($5,000) per month, for ordinary business expenses, which transfers shall be documented and this documentation provided to Plaintiff's counsel within ten (10) days following the end of each month;

(3)    Defendants shall provide Plaintiff's counsel with an accounting of all payments of living expenses, business expenses, and any transfers of assets made pursuant to this Order within ten (10) days following the end of each month.

(n)    Ordering that discovery herein may begin immediately and Plaintiff be permitted, immediately after service of the Court's Order, to inspect and copy Defendants' records of the purchase, manufacture, and sale of Defendants' Infringing Products and thereafter, to take depositions of the persons responsible for Defendants' business.

(o)    Ordering the enforcement of the temporary injunction issued by the Israeli District Court of Tel Aviv-Jaffa in Israel on October 9, 2007.

Dated: New York, New York
       February 7, 2008

Respectfully submitted,

SHIBOLETH, YISRAELI, ROBERTS & ZISMAN, L.L.P.

By: _____
       Shira Y. Rosenfeld (SR 5392)
       1 Penn Plaza, Suite 2527
       New York, New York  10119
       Tel: 212-244-4111
       Fax: 212-563-7108

*Attorneys for Plaintiff*