UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ART-OPTIC, LTD.,                                         :
                                                        :
                              Plaintiff,                :          08 CV 0327 (MGC)(KNF)
                                                        :
              v.                                        :          **DECLARATION OF**
                                                        :          **SHIRA Y. ROSENFELD**
SAMUEL TOMASHOVER and                                   :
MERYL TOMASHOVER,                                       :
                                                        :
                              Defendants.               :
-----------------------------------------------------------------X

COUNTY OF NEW YORK  )
                    )        ss.:
STATE OF NEW YORK   )

        SHIRA Y. ROSENFELD declares and says under penalty of perjury:

        1.      I am an attorney admitted to practice in the State of New York and in the United

States District Court Southern District of New York.  I am counsel to plaintiff Art-Optic, Ltd.

("Art-Optic") and make this reply declaration in support of its memorandum of law in opposition

to defendants' Order to Show Cause to Compel Arbitration and for a Stay.  I make this

declaration based on my personal knowledge and review of the relevant documents.

        2.      Art-Optic commenced an action against the Tomashovers in the Tel Aviv-Jaffa

District Court in April 2007. (The translation of Plaintiff's Statement of Claim is annexed hereto

as Exhibit 1.)

        3.      In ten months, the Tomashovers never have requested arbitration. In fact, the

subject of arbitration was first raised, not by Defendants, but by the Court at a conference on

January 22, 2008.  It was not until February 4, 2008 that Defendants wrote to the Court

requesting a conference to discuss their proposed motion to compel arbitration.  Fearing the

evidentiary hearing in conjunction with Plaintiff's Order to Show Cause for a preliminary

injunction, seizure order, asset restraining order and expedited discovery order, which the Court

1

scheduled for February 20, 2008, Defendants served Plaintiff with their Order to Show Cause to Compel Arbitration and for a Stay on the evening of February 14, 2008. (Defendants letter to the Court dated February 4, 2008 is annexed hereto as Exhibit 2.)

4.      Since Plaintiff commenced its action against the Tomashovers in Tel Aviv-Jaffa District Court in April 2007, a substantial amount of litigation has taken place in the Israeli and United States Courts, including several affirmative actions taken by Defendants.

5.      After Plaintiff filed its claim and requested an ex parte temporary injunction in April 2007, the Tomashovers, who are New York residents, consented to submit to the jurisdiction of the Tel Aviv-Jaffa District Court by the Tomashovers' counsel submission of a Statement of Defense on July 22, 2007. (Defendants' Statement of Defense is annexed hereto as Exhibit 3.) (The English translation for Exhibit 3 will be provided shortly.)

6.      The Tomashovers actively defended themselves against Plaintiff's motion for a temporary injunction.  Specifically, Samuel Tomashover testified at the temporary injunction hearing on September 20, 2007. After the hearing, the Tomashovers' counsel, submitted a Defendants' Summary, arguing that the court should postpone issuing a temporary injunction and requesting attorneys' fees. (Defendants' Summary is annexed hereto as Exhibit 4.) ( The English translation for Exhibit 4 will be provided shortly.)

7.      On October 9, 2007, the Israeli Court issued a decision granting the temporary injunction. (The Israeli Court Decision is  annexed hereto as Exhibit 5.)

8.      Six days later, on October 18, 2007, the Tomashovers submitted a permissive counterclaim in the Israeli Court and specifically requesting that pursuant to paragraph 5 of the Distribution Agreement, Art-Optic purchase its remaining Ronit Furst inventory. (Defendants' Counterclaim is annexed hereto as Exhibit 6) (The English translation for Exhibit 6 will be provided shortly.)

2

9.    The complaint in this action, 20 pages in length and alleging nine causes of action, was filed on January 14, 2008.

10.    On January 18, 2008, plaintiff filed its Order to Show Cause for a Temporary Restraining Order, Preliminary Injunction and Related Relief, which consisted of a 36-page memorandum of law, two affidavits, one declaration and a total of 15 exhibits.

11.    The Court subsequently scheduled a conference on the matter on January 22, 2008. In response, defendants' counsel submitted a letter to this Court on January 21, 2008 in anticipation of the conference, where they maintained that there is litigation already in progress in the Israeli courts. (Defendants' letter to the Court dated January 21, 2008 is attached hereto as Ex. 7)

12.    Defendants' counsel did not mention arbitration once in their letter.  At the January 22, 2008 conference, defendants' counsel once again did not raise arbitration.

13.    On February 1, 2008, plaintiff sent defendants its First Request for Production of Documents. On February 4, 2008, plaintiff filed an amended complaint.

14.    Between January 31, 2008 and February 7, 2008, each party drafted three detailed letters to the Court concerning the amendment of the complaint, discovery and defendants' proposed motion to compel arbitration and a stay.

15.    On February 7, 2008, plaintiff filed its 46-page Proposed Findings of Fact and Conclusion of Law, and defendants filed their Proposed Findings of Fact, Proposed Conclusion of Law, Affidavit of Samuel Tomashover and Declaration of Richard S. Schurin.

16.    On February 14, 2008, defendants served plaintiffs with the Order to Show Cause to Compel Arbitration. On February 19, 2008, plaintiff filed the Reply Declaration of Shira Y. Rosenfeld consisting of seven exhibits to be used at the hearing.

17.     On February 20, 2008 and February 21, 2008, the Court commenced the evidentiary hearing, where: (1) the Court accepted plaintiff's submission of the Affidavit of Cathy Shue, after defendants contended that her affidavit accompanying plaintiff's motion was "stale"; (2) Ronit Furst testified on direct examination and was cross-examined by defendants' counsel; (3) Ehud Bibring testified on direct examination and was cross-examined by defendants' counsel.

18.     At the end of the hearing on February 21, 2008, the Court ordered that defendants produce their inventory of "Ronit Furst" eyewear and their financial books and records for inspection and that plaintiff produce its communications with the Tomashovers.

19.     This exchange of discovery is expected to be completed at the end of this week or the beginning of next week.

20.     On February 25, 2008, Defendants, despite their motion to compel arbitration, sent an extensive request for document production to Plaintiff. (Defendants' counsel's e-mail to Plaintiff's counsel is attached hereto as Exhibit 8.)

21.     Wherefore, I respectfully request that Defendants' Order to Show Cause to Compel Arbitration and For a Stay be Denied.

Dated:  New York, New York
        February 28, 2008

SHIRA Y. ROSENFELD

4

**Exhibit 1**

At the District Court
In Tel-Aviv Jaffa

Tel-Aviv Jaffa District Court
A 1661/07
Art Optic Ltd. Vs. Samuel Tomashover
Date started: 30/04/07 legal procedure: standard
New case number: TA 47373-04/07

In the matter:    **Art-Optic Ltd.**
            Legally registered company in Israel  (private company 513191148)
            Of Hazamir St. 61, Kiryat Ono 55507
            By its representatives Adv. Uriel Ganiher and/or Yael Amir Lev-Ari
            And/or Yaron Raz and/or Nechami Mayzelish
            Of David Hamelech Blvd. 12 Tel-Aviv 64953
            Tel: 03-6968965  Fax: 03-6969781

                                            **The Plaintiff**

                        - Versus -

            1. **Mr. Samuel Tomashover**
            2. **Mrs. Meryl Tomashover**

            Sales agents whose address is –
            444 East 75th Street, Suite 17C,
            New York 10021, New York, USA

                                            **The Defendants**

The essence of the Claim:    Claim for Declarative Verdict and for an Injunction.

Amount of Claim:            Can not be estimated in money.


## STATEMENT OF CLAIM


The Parties

1.    The plaintiff is a private company registered in Israel, which among other
      manufactures and distributes plastic eyeglasses' frames that are hand
      painted. The plaintiff is a family company owned by Mrs. Lea Bibring that

exclusively manufactures the brand "Ronit Furst" frames. Ronit Furst herself is the designer of the frames. The plaintiff manages her business affairs in Israel but exports her products to different countries in Europe as well as to the USA. The plaintiff holds the rights to use the brand "Ronit Furst" and has the copyrights to the designs, samples and drawings designed by Mrs. Ronit Furst.

2.   Defendants 1 and 2 (the "Defendants") are sales agents and distributors. In 2004 they were unemployed and through a relative of theirs they contacted the plaintiff with an offer to distribute her products in the USA.

**The Product**

3.   The product produced by the plaintiff (the "Product") is unique. The plaintiff purchases, through a special order, transparent plastic frames that are produced according to the specifications of the plaintiff. Mrs. Ronit Furst designs patterns, drawings and decorations that are painted on the frames according to her choice. It should be emphasized that the designs are originals, created by Mrs. Furst. Artists that are working for the plaintiff make precision copies, and under the supervision of Mrs. Furst, those samples and drawings are painted on all the frames.

The frames are delivered to a factory where they undergo a coating process that affixes the painting on the frame. Each frame bears the brand name "Ronit Furst" as well as an index number which likewise is written by hand on the inside of the right hand temple of the frame. Picture of the index and in it the number of frames taken out of all the products of the plaintiff is attached to the Statement of Claim and marked as **appendix A'**

4.   The eyeglass brand "Ronit Furst" exists commercially since 2002, the year when the plaintiff was established. During this time it gained reputation

for the originality of the models, their beauty and quality, where the frames bearing the brand are sold at selected optical shops.

## The Association

5. In 2004, when the products of the plaintiff were already sold in a number of shops in the USA, the plaintiff was approached by one of the products' distributors in Israel, Mr. David Goldwasser, who told that his relatives, the defendants, are experienced marketing people but unemployed, and proposed to the plaintiff that the defendants, together with himself, shall receive the distribution rights for the product in the USA. The plaintiff agreed and a distribution contract was signed between the parties. A correct copy of the distribution contract is attached to the Statement of Claim as a part of it thereof and marked as **appendix B'**. Shortly afterward Mr. Goldwasser withdrew, with the consent of the parties, from his share in the deal, and the defendants remain the distributors of the product in the USA according to the contract.

## The Contract

6. The contract, appendix A', was signed for a period of 13 months starting December 1st, 2005. The plaintiff shall rely on appendix A' in full. However, for the convenience of the Court 2 paragraphs shall be introduced hereof, which are needed in order to understand the matter. Paragraphs 7, 8, of the contract establish the following (translated from English for convenience only, the prevailing version is the source, the term "the buyer" refers to the defendants, the term "the producer" refers to the plaintiff).

**7. Non-Competition**

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

8.1 It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

8.2 The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",

"ART OPTIC", "RONIT FURST".

8.3 It is stressed and agreed, that unless otherwise determined by the Producer in writing, the Product will be sold and distributed in the U.S.A only under the trade name – "RONIT FURST".

## The conduct of the parties and termination of the contract

7.   During the duration of the contract the defendants have breached it and were in arrears for paying for the products that were supplied to them. Since the contract was valid for one year only, the plaintiff took no action against the defendants. Yet, the plaintiff demanded that the infringements be rectified, and also made it clear to the defendants that the contract with them will not be renewed. Indeed, on December 30th, 2005 the period covered by the contract has expired. To be sure, from that date onward the plaintiff continued to supply products to the defendants, however, the contract between the parties was changed in such that the defendants are no longer entitled to exclusivity in marketing the products in the USA. The aforesaid agreement was expressed in exchanged messages via electronic mail (e-mail).

8.   The defendants continued their infringements also after working under the current framework, hence the plaintiff was forced to inform the defendants that the contract is definitely terminated.

9.    Relevant copies of the electronic correspondence are attached to the Statement of Claim as a part of it thereof and marked as **appendix C'**.

10.    As it appears from the contents of the plaintiff's representative's letter, the association between the parties came to a final and absolute end on 12/05/06.
Copy of the letter is hereby attached and marked as **appendix D'**.

## The prejudice: contravention of contract, forgery, fraud, copyrights infringement, commercial prejudices.

11.    The defendants, on account of their attitude and due to the fact that the association period of the contract has expired, could no longer continue and sell the plaintiff's frames but wanted to enjoy the reputation which is the fruit of her labor, decided to employ fraud and deceit to benefit on the plaintiff's account. About two weeks before the time of the Claim the plaintiff found out that the defendants found a supplier, probably a South American country, which produces a precise copy of the defendant's frames, including the caption "Ronit Furst" which is on each frame. Those frames, in which the plaintiff has no part in their production, are marketed by the defendants by falsely claiming that the plaintiff is the producer and they the defendants are her agents.
It should be pointed out that finding a supplier, learning the design and manufacturing process and preparing a stock of frames, is a prolonged process which clearly establishes that the defendants made preparations for the forgery and copying deeds long time in coming, and only waited for the moment they could start the illicit deeds.

12.    The defendants Approached different optician shops in the USA, from California to New York, they presented them with the fake frames,

claimed that they are produced by the plaintiff, received orders and even supplied the product.

Among others, the defendants and/or either one of them, solicited the following business owners:

12.1.   Mrs. Cathy Shue, owner of optical goods in Monterey, California. The defendants came to her with a proposal to make in her shop a special sale of the plaintiff's frames to the shop's selected clientele. On 03/10/07 they have indeed appeared at the shop, equipped with the plaintiff's samples and publicity material, and presented themselves as the plaintiff's agents. The shop's clients ordered frames, and after the defendants were given the list of orders they supplied the shop with the frames. The frames look exactly like the frames that are produced by the plaintiff, and only an expert's eye can discern the minute differences. Attached to this Statement of Claim is a photo of some of the fake frames that were given to Mrs. Shue, marked as **appendix E'**. The frame itself is kept at the undersigned advocate's office where it shall be presented to the Court.

12.2.   "Braham Powell", optical goods in Alexandria, Virginia. On 03/20/07 a family member of Mrs. Ronit Furst took a stroll in this city and observed many "Ronit Furst" frames displayed for sale in the shop. He entered the shop, which had the plaintiff's publicity material including a photo of Mrs. Ronit Furst, he was told that the frames are selling very well, at a price of $225 each. He was told that the defendants came to the shop and presented themselves as Ronit Furst agents, they told that Ronit Furst has transferred the production from Israel. This made the man suspicious and he asked

to examine the frames supplied by the defendants. Upon his examination he discovered that the frames are identical to the original frames, including the brand name "Ronit Furst" that appears at the side of the frame. Only after meticulous examination, and by being an engineer involved in the production process, he discovered that the frames are a fake. That same person also said that he saw "Ronit Furst" frames sold in another shop at that city. Those too were not produced by the plaintiff.

13. In addition to that, at the end of March 2007 an important and one of the largest exhibitions in the USA for optical goods took place in New York. In this exhibition the defendants made a stand laden with plaintiff's publicity material (which included, wall posters, wallpapers and colorful shelves by the design of the plaintiff and even brochures of the plaintiff that he received from the plaintiff for previous exhibitions) that feigns to be a stand of the plaintiff, yet in effect they are fake and the plaintiff had never produced them. Photo of the stand is attached hereof and marked as **appendix F'**. Furthermore, the defendants published at the official website of the exhibition that they are marketing "Ronit Furst" hand painted frames.

14. The defendants made known to optical shop owners in the USA that they intend to present "Ronit Furst" frames in trade fairs, including the optical fair MIDO in Milan at the beginning of May 2007. This is the largest well-known international fair in the optical industry as well as in a fair that is to take place in Chicago in May 2007. This points to the intention of the defendants to market the imitations worldwide.

### The reasons for the Statement of Claim

15. The abovementioned behavior of the defendants constitutes the infringement of paragraph 7 of the Distribution Contract, appendix B'. Furthermore, it constitutes copyrights violation of the plaintiff in the design of the frames, and it constitutes violation of paragraphs 1, 2, 3, and 6 of the Commercial Prejudice Law 1999.

### Supports and safeguarding

16. For the abovementioned prejudices the plaintiff is entitled to a support of an injunction and a declarative verdict which will be requested presently. Of course, the abovementioned behavior of the defendants caused the plaintiff, and may continue to cause her, severe financial loss and the plaintiff reserve the right to bring a claim for those damages when they shall come about.

### Jurisdiction

17. The honorable Court has practical jurisdiction to deliberate the Claim due to the predicate of the claim, and local jurisdiction to deliberate it by the power of the parties' agreement in paragraph 10 of the contract, and by the virtue that all the prejudices ascribed to the defendants are an inseparable part of the infringements covered by the contract which, according to the abovementioned paragraph 10, is subject to the laws of the State of Israel, hence also the Israeli jurisdiction.

**Therefore,** the honorable Court is requested to summon the defendants to trial, to declare that the defendants are obligated in terms of paragraph 7 of the contract, appendix A' to desist for a period of two years beginning on 09/30/06 (last month of supply) from taking the following action: to produce, to sell, to market, or distribute eyeglasses' frames that are similar or in competition with the frames produced by the plaintiff. The Court is

further requested to issue a permanent injunction that will prohibit the defendants, directly or indirectly, to do one or more of the following actions: to sell, to produce or to present for commercial purposes anywhere in the world frames that bear the name "Ronit Furst", "Op-Art" or "Art Optic", or those that feign to be frames produced by the plaintiff and/or designed by Ronit Furst, to present themselves as agents or distributors or representatives or delegates of the plaintiff, to make use of designs, samples, drawings, or decorations that were designed by the plaintiff or for the plaintiff by Mrs. Ronit Furst, or in any other way to make any commercial use which constitutes infringements of the plaintiff's copyrights, or to make use of the plaintiff's production process, as well as to pay the plaintiff's trial costs and lawyers' fees.

Adv. Uriel Ganihar

For the plaintiff

(-)

**Exhibit 2**

# GOTTLIEB, RACKMAN & REISMAN, P.C.

COUNSELORS AT LAW

PATENTS · TRADEMARKS · COPYRIGHTS · INTELLECTUAL PROPERTY

270 MADISON AVENUE

NEW YORK, N.Y. 10016-0601

PHONE: (212) 684-3900 · FACSIMILE: (212) 684-3999

WEB: http://www.grr.com · E-MAIL: info@grr.com

JAMES REISMAN
MICHAEL I. RACKMAN
GEORGE GOTTLIEB
BARRY A. COOPER
DAVID S. KASHMAN
ALLEN I. RUBENSTEIN
JEFFREY M. KADEN
AMY B. GOLDSMITH
TIBERIU WEISZ
MARIA A. SAVIO
RICHARD S. SCHURIN

OF COUNSEL
DIANA MULLER*

* MEMBER OF THE BAR
OF ARGENTINA ONLY

DONNA MIRMAN BROOME
BARBARA H. LOEWENTHAL
MARC P. MISTHAL
FRANK D. DECOLVENAERE
STEVEN STERN
YUVAL H. MARCUS

PATENT AGENT
ZOYA V. CHERNINA

February 4, 2008

**By Hand**

Hon. Miriam G. Cedarbaum
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 1330
New York, N.Y. 10007

> Re:   Art-Optic, Ltd. v. Samuel Tomashover et. al.
>        08 CV 0327 (MGC) (KNF)

Dear Judge Cedarbaum:

This firm represents the defendants in the above referenced matter. We write pursuant to ¶3 A. of Your Honor's Individual Practices to request a pre-motion conference. Defendants request a pre-motion conference for the purpose of discussing defendants' proposed motion to compel arbitration.

As the Court is aware, the Sales and Distribution Agreement attached as Exhibit 3 to the Bibring Affidavit in plaintiff's Order to Show Cause contains an arbitration provision. Specifically, the Agreement provides in relevant part:

> "Any and all disputes arising between the parties out of or in connection of this agreement, its interpretation, performance or breach, shall be referred to a binding arbitration before a single arbitrator to be appointed by mutual agreement between the parties and, in the absence of such agreement, within fourteen (14) days from any of the parties first demand, and the arbitrator will be appointed at the request of either party by the chairman of the Israeli bar. The arbitration shall be conducted in accordance with the provisions of the Israeli Arbitration Law, 1968, the arbitrator shall not be bound by any rules of evidence or procedure, but shall be bound by substantive Israeli law. Any award of decision rendered shall be made by means of a written opinion explaining the arbitrator's reasons for the award or decision, shall be final and binding upon the parties hereto, and shall be given in 60 days from the appointment of the arbitrator."

See, Exhibit 3, ¶10 to Bibring Affidavit included in plaintiff's Order to Show Cause.

Hon. Miriam G. Cedarbaum
February 4, 2008
Page 2

     In this case, defendants' position is that all of the alleged infringing glasses were sold to it by plaintiff under the Agreement, and that defendants have the absolute right to re-sell such glasses. Defendants' further maintain that this dispute has arisen only because plaintiff has refused to purchase defendants' unsold inventory in accordance with the terms of the Agreement. (See Exhibit Exhibit 3, ¶5 to Bibring Affidavit.)  Accordingly, since interpretation of the terms of the Agreement will be necessary to resolve the current dispute, and the Agreement provides for arbitration for such disputes, the instant action should be dismissed in favor of arbitration in Israel.  See also, *United States Fire Ins. Co. v. National Gypsum Co.*, 101 F.3d 813, 816 (2$^d$ Cir. 1996)  (Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability.)

                           Respectfully submitted,
                           GOTTLEIB, RACKMAN & REISMAN

                           Richard S. Schurin

cc:    Shira Rosenfeld, Esq.

**Exhibit 3**

בבית המשפט המחוזי

<u>בתל-אביב-יפו</u>

בש"א 9267/07

ת.א. 1661/07

ב ע נ י ן :



1. מר סמואל טומשובר

2. גב' מריל טומשובר

שכתובתם היא :

444 East 75th Street, Suite 17C,

New York 10021, New York, USA

ע"יי באי כוחה עוה"ד אריה להב-לוי

ו/או דורון שמעוני ו/או זהבית מרקס

מרחוב אחד העם 9, תל אביב

טל: 7979992 -03   פקס : 7979997- 03

<u>המשיבים</u>

- נ ג ד -

ארט-אופטיק בע"מ

חברה רשומה בישראל כחוק (ח.פ. 513191148)

מרח' הזמיר 61, קרית אונו 55507

ע"יי באי כוחה עוה"ד אוריאל גניהר

ו/או יעל אמיר לב-ארי ו/או

ירון רז ו/או נחמי מייזליש

משד' דוד המלך 12 תל אביב 64953

טל' 6968965 -03 פקס : 6969781 -03

<u>המבקשת</u>

## <u>תגובת המשיבים</u>

המשיבים, באמצעות ב"כ, מתכבדים להגיש לבית משפט הנכבד, תגובה לבקשת המבקשת

לצו מניעה זמני, כדלקמן :

**טענות סף-**

**איסור בדבר קיומה של זהות בין הסעד הזמני לבין הסעד העיקרי:**

1. כבר בפתח תגובתם המשיבים יטענו, כי דינה של בקשת המבקשת למתן צו מניעה זמני, כמו גם תביעתה העיקרית, להידחות על הסף, הכל כפי שינומק משפטית להלן.

2. המשיבים יטענו, כי כלל בסיסי הוא בדיני הסעדים הזמניים, שלא ניתן לבקש במסגרת עתירה למתן סעדים זמניים את הסעד המבוקש במסגרת התביעה העיקרית. כלומר, אסור שתהיה זהות בין הסעד הזמני המבוקש לסעד הקבוע המבוקש במסגרת התביעה העיקרית.

3. במקרה דנן, המבקשת עוברת על כלל זה, ובענייננו קיימת זהות בין הסעד הזמני המבוקש על ידה בבקשה זו לבין תביעתה העיקרית למתן צו מניעה קבוע. המבקשת עותרת למתן צו מניעה זמני שימנע מהמשיבים **"לא להיות מעורב בכל דרך שהיא בייצור, שיווק, קידום מכירות, הפצה ומכירה של מסגרות למשקפיים צבועות בעבודת יד".** בסעיף 17 לכתב התביעה העיקרית, פסקה שניה, עותרת המבקשת לקבלת סעד קבוע הזהה לסעד הזמני המבוקש. ראה והשווה- הפתיח בבקשה לצו מניעה זמני.

4. לפיכך, רק מטעם זה יש לדחות הבקשה.

## הבקשה לא נתמכת בתצהיר מטעם בעל דין: ✗

5. אף לא אחד מן המצהירים הינו בעל דין, או מוסמך מטעמו של בעל דין ליתן תצהיר, ועל כן דינה של הבקשה להידחות והואיל ובבקשה למתן סעד זמני על בעל דין ליתן תצהיר תמיכה לבקשה. תקנה 365.ג. לתקסד"א קובעת כי: **"בתצהיר המצורף לבקשה יפרט המבקש את כל העובדות הנוגעות לבקשה".** תחת מתן תצהיר מטעם בעלי ומנהלי החברה, בחרה המבקשת להטיל את משא הבקשה על כתפיו של מר אהוד ביברינג, המשמש, לטענתנו, כמנהל הייצוא והשיווק של המבקשת.

6. זאת ועוד, המשיבים יוסיפו ויטענו כי במקרה דנן, בו המבקשת טוענת טענות זיוף ומרמה כנגד המשיבים היה עליה להעמיד בחזית מצהיריה בעל דין או מצהירים רלבנטיים, לרבות עדים מומחים ואולם זו לא עשתה כן.

7. לפיכך, יש לדחות את הבקשה.

## התנהגות המבקשת – חוסר ניקיון כפיים: ✗

8. המבקשת אינה מעמידה תשתית ראייתית ראויה כלל וכלל על מנת שדלתו של בית משפט תיפתח בפניה. אפילו במונחי הראיות הנדרשות במסגרת עתירה למתן סעד

זמני- עת ניתן לתמוך את הבקשה בראיות אשר אינן קבילות על פי דיני הראיות כגון עדויות שמיעה, סברה וכיוצ"ב- לא עמדה המבקשת.

9. במקרה דנן, ראיות המבקשת שהובאו בתמיכה לבקשתה אינן מספיקות, ולו לכאורה, זאת מחמת כלליותן והיעדר קשר בינן למטריה הנדונה. האמירות בתצהירי המצהירים הינן אמירות כלליות וסתמיות, והחשוב מכל, לא ניתן לקשר בין המתואר בתצהירי עדי המבקשת לבין המשיבים עצמם.

10. כך למשל, תצהירו של מר איתמר פירסט, לוקה בחסר משמעותי שכן על-פי סעיף 9 לתצהירו: **"המוכרת אף אמרה כי המשקפיים נמכרת לה על ידי שני בני זוג אשר הודיעו לה שהם מפסיקים לייצר את המשקפיים בישראל ומתחילים לייצר אותם במקום אחר".** [ההדגשה אינה במקור].

11. דברים ברוח זו ובאותה טרמינולוגיה- *בני זוג*- נאמרו גם בסעיף 10 לתצהירו הנ"ל.

12. מן המקובץ עולה כי "בני הזוג" האמורים יכולים להיות כל בני זוג שהם ואין הכרח כי מדובר במשיבים עצמם ועל כן, תצהירו של מר פירסט לא יצלח אפילו לבקשה לסעד זמני.

13. כך גם נפלו פגמים מהותיים במסמכים הנחזים להיות "תצהירים" אשר צורפו לבקשה ואשר ניתנו, לכאורה, על ידי קולגות עסקיות של המבקשת.

14. המדובר בתצהירה של גב' קטי שו ובתצהירה של גב' רות דמבר, אשר המסמכים עליהן חתמו אומתו על ידי "NOTARY PUBLIC" של מדינת ניו יורק- גורם אשר אינו מוכר בדין הישראלי ועל כן האזהרה, כמו גם אימות החתימה- אשר הינם מיסודות התצהיר- אינם תקפים.

15. מכאן גם שהמסמך אותו ערכו ועליו חתמו אינו קביל לשמש כתצהיר.

16. על כן, מתבקש בית המשפט הנכבד להורות על הוצאתם של מסמכים אלו מן הבקשה ולהתעלם מתוכנם.

17. לחילופין ולמען הזהירות בלבד, המשיבים יטענו כי אם וככל שבית משפט נכבד זה יכשיר את המסמכים הנ"ל ויראה בהם כתצהיר, עומדים המשיבים על כך שנותני התצהירים, כמו גם הגורמים שהזהירו ואימתו את חתימותיהם- יתייצבו כולם להיחקר- כל אחד בעניינו.

18. לפיכך, גם מן הטעם הזה יש לדחות את הבקשה.

## תביעה חמדנית:

19. בנסיבות שתוארו וכעולה מהתצהירים ושאר המסמכים שצורפו לבקשת המבקשת מדובר בהליך שעל אף שלמבקשת יש ככל הנראה, את הזכות לרשום מדגם על המסגרות המיוצרות על ידה (ולא זכות יוצרים כנטען בבקשה), הרי שבפועל מנסה היא למנוע את המשיבים לעסוק בכל סוג של עיסוק הקשור למסגרות משקפיים צבועות ביד בכל מקום בעולם (!).

20. ודוק, כל זה כאשר אין למבקשת אפילו מדגם רשום בישראל על מסגרות המשקפיים אותן היא מייצרת.

21. עוד ובנוסף לאמור לעיל, מנסה המבקשת להביא את בית המשפט לאכוף תניית אי תחרות אשר לא רק שהינה בלתי סבירה בעליל ("...כל מסגרות משקפיים צבועות ביד..." (– סעיף 6 לבקשת המבקשת) להבדיל ממסגרות המיוצרות על ידי המבקשת בלבד) אלא שתניית אי התחרות אותה מבקשת המבקשת לאכוף אינה דרה בכפיפה אחת עם הפסיקה הישראלית בנוגע למשך הזמן הנהוג והמותר לאסור בו תחרות.

22. יתירה מכך, תניית אי תחרות כל כך גורפת וכל כך בלתי מאוזנת פוגעת בזכויות היסוד של המשיבים, זכויות יסוד המעוגנות, בין היתר בחקיקת יסוד כגון: חוק יסוד: כבוד האדם וחירותו ו – חוק יסוד: חופש העיסוק.

23. אם לא די בכל זה, מבקשת המבקשת לעצור ולמנוע את המבקשים מביצוע של פעילויות כלכליות – שיווקיות שונות במדינות שונות בכללן במדינת ישראל כאשר אין ולא יכול להיות חולק כי תחולתו של ההסכם שהיה בין הצדדים השתרעה אך ורק לתחומי ארה"ב.

24. משמע, גם במקרה זה מנסה המבקשת לתפוס כפי יכולתה וזאת ללא כל הצדקה ובהיעדר תשתית ובסיס לכך.

25. לסיכום, המבקשת באמצעות בקשתה ותביעתה מנסה להשיג לעצמה הרבה למעלה מהמגיע לה תוך קיפוח זכויות יסוד של המשיבים עצמם - כאשר בהקשר זה מודגש כי אין ללמוד מהמילים: "המגיע למבקשת" לעיל, משום הודאה של המשיבים בהפרת זכות כלשהיא של המבקשת.

26. לפיכך, גם מטעם זה מתבקש בית המשפט נכבד לדחות הבקשה לאלתר.

## צו שאינו אכיף- חלקית:

27. סמכותו של בית משפט בישראל משתרעת רק על תחום מדינת ישראל. בית משפט בישראל אינו מוסמך ליתן צווים אשר יחולו על מדינות אחרות.

28. על כן מטעם זה בלבד מתבקש בית המשפט הנכבד שלא ליתות לבקשה למתן צו "בכל מקום בעולם" כמבוקש בבקשה.

## העובדות שביסוד תגובת המשיבים-

29. בסוף שנת 2004, המשיבים התקשרו עם המבקשת, בהסכם הפצה בלעדי לשיווק של מסגרות משקפיים מפלסטיק המיוצרות על ידי המבקשת- בארה"ב.

30. יצוין ויודגש, כי עיסוקם היחיד של המשיבים היה בהפצת מסגרות המבקשת בארה"ב.

31. המשיבים עסקו אך רק בקידום מכירות של מסגרות המבקשת. המשיבים לא ייצגו יצרנים נוספים לבד המבקשת.

32. מיד לאחר חתימת הסכם ההפצה, המשיבים החלו בשיווק המסגרות תוך השקעת סכומי עתק מצידם בהחדרת המוצר לשוק, בין היתר, על ידי השתתפות בתערוכות וקיום מכירות ותצוגות בכל רחבי ארצות הברית.

33. המשיבים עבדו ועמלו, מבוקר עד ליל, 7 ימים בשבוע, על מנת לפתח את השוק המקומי בארה"ב וליצור ביקוש למסגרות המבקשת, בין היתר, באמצעות התקשרות עם מפיצי משנה מקומיים ברחבי ארה"ב. המשיבים פעלו ללא לאות לקדם את מכירות המסגרות ללקוחות חדשים ולקבלת הזמנות חוזרות מלקוחות קיימים.

34. בסוף שנת 2005 הגיע המועד החוזי של הסכם ההפצה לקיצו, ובין הצדדים לא נחתם הסכם הפצה חדש- זאת בניגוד למוסכם בהסכם ההפצה.

35. חרף זאת המשיכו הצדדים לקיים את התנייה העיקרית של הסכם ההפצה- המשיבים היו המפיצים הבלעדיים של מסגרות המבקשת בארה"ב.

36. בכל שנת 2006, המשיכו המשיבים לייצג את המבקשת כנציג הבלעדי של המבקשת בארה"ב. המבקשת מצידה המשיכה לנהוג במשיבים כמפיץ בלעדי. המשיבים המשיכו לרכוש, באופן סדיר, מסגרות מהמבקשת. המשיבים- בידיעה, בהסכמת ובעידוד המבקשת- המשיכו בפיתוח והרחבת השוק המקומי בארה"ב, בין היתר, על ידי השתתפות בלעדית בתערוכות וקיום מכירות מיוחדות ותצוגות בכל רחבי ארה"ב.

37. במאמר מוסגר יצוין, כי במספר רב של מסגרות נתגלו פגמים בעיקר בהתקלפות הציפוי של המסגרות. הדבר הערים על המשיבים קשיים סובייקטיביים במכירת המסגרות וכן גרם למשיבים להתעסקות בלתי פוסקת במתן שירות חוזר לתיקונים וחלקים ללקוחות המשיבים. בעיות מסוג זה (ותולדות בעיות אלו) היו בין הגורמים שהעכירו את יחסי הצדדים.

38. בסוף שנת 2006 התגלע בין הצדדים סכסוך שמקורו בהודעה מפתיעה מצד המבקשת לפיה- בכוונתה להתקשר עם מפיץ אחר בהסכם הפצה בלעדי לשיווק המסגרות בארה"ב- במקומם של המשיבים. למשיבים ברור כי מהלך זה לא היה ספונטני אלא תוכנן בקפידה. מהלך זה התנהל במשך חודשים מאחורי גבם, בזמן שהמשיבים ממשיכים במרץ רב בעבודתם- שיווק מוצרי המבקשת.

39. המשיבים לא הפסיקו ואינם מפסיקים למחות על ההתנהלות וההתנהגות המבקשת וניסו בכל מאודם, להתנגד לכוונות המבקשת, ולהמשיך את הפעילות העיסקית במתכונת הקיימת. [כאלף מונים יעיד כתב התביעה שכנגד אשר בכוונת המשיבים להגיש בתובענה העיקרית].

40. המבקשת הוסיפה והערימה קשיים בירוקראטיים על פעילות המשיבים, ואף שינתה לרעה את התנאים המסחריים שנהגו בינה לבין המשיבים. המבקשת העמידה תנאים דרקוניים להמשך פעילותם העסקית של המשיבים- בהם המשיבים לא יכלו לעמוד.

הדבר גרם למשיבים לבעיות פיננסיות בלתי צפויות, ואף הוביל את המשיבים להכרה והבנה כי הפעילות המשותפת בין הצדדים באה לקיצה.

41. המשיבים נותרו בפני שוקת שבורה. המבקשת הפרה את ההסכם עימם הפרות יסודיות תוך ניצול ציני של משאבי ומאמצי המשיבים. ויודגש, המשיבים היו המפיץ הבלעדי בשוק חדש ועבודתם הניחה את היסודות להכרת מוצרי המבקשת בארה"ב, כמו גם את צינורות השיווק, את הלקוחות, ואת הביקוש למסגרות המבקשת.

42. המבקשת לא הותירה בפני המשיבים ברירה, ובכדי למזער את נזקיהם נאלצו המשיבים- **ועודם נאלצים**- לנסות ולמכור את מלאי המסגרות העצום שנותר בידם, בין היתר, על ידי השתתפות בתערוכות, בהם ניתן לקבל הזמנות למלאים גדולים, ועל ידי כך לצמצם את מלאי המסגרות שנותר בידם.

43. על מנת לטשטש את הפרת ההסכם על ידי המבקשת, הוסיפה המבקשת וטענה כנגד המשיבים טענות שווא בגין זיוף מוצריה. בעניין זה חשוב לציין כי ההיפך הוא הנכון, עת המשיבים היו אלה אשר פעלו באופן תקיף ונמרץ כנגד זייפנים בשוק המקומי בארה"ב אשר זייפו ומכרו את מסגרות המבקשת.

## תגובת המשיבים לגופה של הבקשה-

44. יצוין על אתר, כי עניינה של הבקשה לסעד זמני כמו גם התביעה העיקרית, בניסיון "להקדמת תרופה למכה" אותו נוקטת המבקשת כנגד המשיבים. המבקשת נהגה שלא בתום לב עם המשיבים בתקופת ההתקשרות בין הצדדים, בסיומה ואף לאחר סיומה.

45. המבקשת ידעה כי בכוונת המשיבים להגיש תביעה כנגדה, אשר מתעכבת אך בשל הריחוק הגיאוגרפי של המשיבים המתגוררים בארה"ב ואיסוף ראיות ממדינות אחרות. המבקשת מיהרה לנקוט בהליכים כנגד המשיבים טרם ינקטו האחרונים בהליכים נגדה, הכל כפי שיפורט לקמן בתגובת המשיבים ובתצהיר התמיכה הנלווה. בקשתה של המבקשת נסמכת על טענות כלליות, הצו המבוקש גורף ובלתי מבוסס, כפי שיפורט לקמן.

46. המבקשת אף הרחיקה לכת בניסיונותיה למנוע מן המשיבים לממש את זכויותיהם על פי הסכם ההפצה ובכדי לחסום את המשיבים מלהתחרות עימה, זאת על ידי טענות מרמה וזיוף שיקריות ובלתי מבוססות כנגד המשיבים. הדבר נועד להכפיש את שמם הטוב לפגוע במוניטין שצברו המשיבים בשוק המקומי בארה"ב.

המשיבים עודכנו על ידי קולגות עסקיות כי המבקשת מפיצה על המשיבים טענות זיוף ומרמה ושקרים אחרים.

47. המבקשת לא טרחה להגן על זכויותיה, או למצער למזער את נזקיה, המוכחשים כשלעצמם. המבקשת לא טענה לרישום מדגם או פטנט וגם זכויות היוצרים לה היא טוענת אינם רלבנטיים למוצריה. המבקשת לא טרחה לעדכן את כלל הלקוחות אודות השינוי שערכה וסיום ההתקשרות עם המשיבים. למבקשת קיימת רשלנות עצמית ברמה גבוהה ועל כן אין לה אלא להלין על עצמה.

## חוסר תום לב של המבקשת -

### ההתקשרות בין הצדדים: הסכם הפצה בלעדי -

48. המשיבים התקשרו עם המבקשת בהסכם הפצה בלעדי למכירה ושיווק בארה"ב של מסגרות משקפיים מתוצרת המבקשת. הסכם ההפצה נחתם ביום 1 אוקטובר בשנת 2004. (להלן- "**ההסכם**" ; "**הסכם הפצה**").

- מצורף הסכם ההפצה, מסומן נספח א' לתגובה.

49. בסעיף 3 להסכם ההפצה נקבע כי תקופת ההסכם הינה לשנה, בין התאריכים 1/12/04 ועד ליום 31/12/05. (להלן- "**תקופת הסכם ההפצה**").

50. **עוד הצהירו הצדדים, בסעיף 5 להסכם ההפצה, כי כוונתם הבסיסית היא להמשיך את ההתקשרות העיסקית ביניהם, לשביעות רצון כל הצדדים, אף לאחר שנת 2005, באמצעות חוזה לטווח ארוך שייחתם בין הצדדים לקראת סוף שנת 2005.**

51. כוונת הצדדים, ובעיקר כוונת המשיבים הייתה <u>התקשרות ארוכת טווח</u> כשהמשיבים משמשים כסוכן מכירות <u>ומפיץ בלעדי</u> של מסגרות המבקשת בטריטוריה של ארה"ב. המשיבים הסתמכו על הצהרת כוונות זו שעמדה בבסיס ההתקשרות בין הצדדים והשקיעו את מרצם והונם בקידום מכירות, הפצה, שיווק, פיתוח שווקים חדשים, איתור מפיצי משנה מקומיים, השתתפות בתערוכות וקיום מסעי מכירות מיוחדות ותצוגות בכל רחבי ארה"ב. פועלם של המשיבים נקטע באיבו כאשר רשת השיווק שלהם צפצילה מספר מפיצי משנה ומוכרת ל- 150 חנויות בכל רחבי ארה"ב.

52. עוד קבעו הצדדים בסעיף 5 להסכם ההפצה את התנאים להפסקת הפצה ביוזמת היצרן (המבקשת), לפיהם על המבקשת/המפיץ החלופי לרכוש את מלא המסגרות שבידי המשיבים במקרה בו תבקש להחליף את המשיבים כמפיץ בלעדי. **לית מאן דפליג שהמבקשת אפילו אינה טוענת כי הציעה למשיבים, עובר להפסקת ההתקשרות, את רכישת המלאי שנותר ברשות המשיבים.**

53. זאת ועוד, בסעיף 5 להסכם ההפצה נקבעה זכות הסירוב של (המפיץ) המשיבים במקרה בו המבקשת חפצה בהחלפת המשיבים כמפיץ בארה"ב. זכות זו חוללה

והושמה לאל, בעיתוי ההחלפה, בנסיבות ההחלפה ובהרעת התנאים המסחריים
שהיו נהוגים בין הצדדים.

## <u>התנהגות המבקשת בתקופת ההסכם:</u>

54. המשיבים לא היו שבעים מהתנהלות המבקשת בתקופת הסכם ההפצה כפי שיפורט
לקמן. המבקשת לא עמדה במועדי האספקה כפי שהתחייבה בהסכם ההפצה
ופעילותה של המשיבים הואטה בשל כך. המבקשת לא טרחה לפרט את הליקויים
הרבים והקלקולים התכופים של מוצריה שהיו מנת חלקם של המשיבים כל העת
ואשר העמידו את המשיבים במצבים לא נעימים, כמו גם טורח רב בטיפול ובמתן
השירות הרב שנדרש בשל כך.

55. המשיבים התלוננו בפני המבקשת פעמים רבות הקלקולים, הליקויים והפגמים וכן
על בעיות באספקת המוצרים ו/או חלקי החילוף של המסגרות עבור שירות
התיקונים של המשיבים ללקוחותיהם בארה"ב.


## <u>ביטול הסכם ההפצה על ידי המבקשת:</u>

56. לטענת המשיבים, הסכם ההפצה עימם לא חודש שלא כדין, בניגוד לציפיות שלהם
ובעיקר נוכח חוסר תום הלב של המבקשת אשר עשתה מאמצים רבים להביא את
ההסכם לסיומו ולהשתלט על תשתית השיווק שבנו המשיבים בשוק המקומי
בארה"ב.

57. ויודגש, הטריטוריה נשוא הסכם ההפצה היא ארצות הברית. כמפיץ בלעדי של
מוצר חדש היה זה עמלם של המשיבים בלבד אשר יצר את השיווק והעלה את
המכירות ואת הביקוש בשוק המקומי למוצר. לצורך כך, לא חסכו המשיבים
במאמצים ובאמצעי מימון ושיווק מסיבי אשר בוצעו על ידי המשיבים מחוף לחוף,
מעיר לעיר וממדינה למדינה.

58. המשיבים השקיעו סכומי כסף ניכרים בהקמת תשתית שיווק בארה"ב עבור מוצרי
המבקשת מתוך הסתמכות על הצהרות הצדדים בהסכם ההפצה וצפייה לגיטימית
בנסיבות העניין להתקשרות ארוכת טווח כמובטח וכמצופה.

59. המבקשת מנסה לעשות עושר ולא במשפט, עת היא מבקשת לאסור על המשיבים
למכור את מלאי המסגרות שבידם, ובאותה נשימה מבקשת את רשימת הלקוחות
של המשיבים לצורך ביצוע מכירה ישירה שלא באמצעות המשיבים וללא מתן
תגמול כלשהו.


## <u>התנהגות המבקשת בתקופה שלאחר ביטול ההסכם:</u>

60. המשיבים טוענו כי המבקשת העלתה את מחירי המסגרות בצורה דרסטית ואף
שינתה לרעה את תנאי התשלום של המשיבים, הכל בכוונת תחילה, מתוך ידיעה כי

התנאים החדשים/הנוספים לא יהיו מקובלים על המשיבים ויובילו לסיום היחסים העסקיים שבין הצדדים.

61. המבקשת נוקטת בדרך של אכילת העוגה כ<u>ולה</u> – ויחד עם זאת- השארתה שלמה. מחד, בסיום שנת 2005, המבקשת לא חתמה עם המשיבים על הסכם הפצה חדש ומפורט לטווח ארוך, כמוסכם על פי סעיף 5 להסכם, ומאידך, היא מבקשת לאכוף על המשיבים את תניית אי התחרות לתקופה של שנתיים החל מסוף שנת 2006- <u>לאחר</u> פקיעת תוקפו של הסכם ההפצה הישן.

<u>תניית היעדר תחרות</u>:

62. כאמור, המבקשת, שלא בתום לב, מנסה לאכוף על המשיבים את תניית אי- תחרות שבהסכם ההפצה אשר הופר על ידה הפרות יסודיות ומהותיות.

63. המבקשת מפנה את בית המשפט הנכבד לתניית אי תחרות בסעיף 7 להסכם ההפצה, לפיה, התחייבו המשיבים שלא להתחרות במשיבה בתקופת הסכם ההפצה ותקופה נוספת של שנתיים מיום סיום ההסכם.

64. ודוק, תניית אי התחרות אותה מנסה המבקשת לאכוף אינה באה להגן על סודות מסחריים של המבקשת או על אינטרס לגיטימי אחר שלה כי אם בהגבלת התחרות מטעמים של הגבלת עיסוק ותחרות חופשית סתם, הגבלה האסורה על פי רוח ופרשנות חוקי היסוד כפי שקיבלו ביטוי בפסיקה.

65. לא זו אף זו, בפסיקה הענייפה שהושרשה בבתי המשפט בישראל, נקבע כי תניית אי תחרות ככלל עומדת בניגוד לעקרונות חופש העיסוק בהתאם לחוק יסוד : חופש העיסוק, ועל כן יש לראותה כבטלה או לצמצמה באופן משמעותי. בוודאי שאין אח ורע בפסיקה לתניית אי תחרות סתם למשך זמן כה ארוך.

66. במקרה דנן, ובהתחשב במכלול הנסיבות, יש לראות בתניית אי התחרות כבתניה מוגבלת לזמן קצר וסביר אשר <u>תוקפה פג</u>.

67. בנסיבות העניין דנן, בו הסכם ההפצה הבלעדי- לא חודש עם המשיבים- בסיום שנתו הראשונה במתכונתו המקורית- הרי שאין בסיס לדרוש מן המשיבים "תקופת צינון" בכלל, ותקופה כפולה (!) מתקופת ההתקשרות, בפרט.

68. למעלה מן הצריך, יוסיפו המשיבים ויטענו התנהלותה של המבקשת והתנהגותה שלא בתום לב כלפי המשיבים מאיינים את התחייבות המשיבים שניתנה מתוך הסתמכות המשיבים על הצהרת הצדדים בדבר כוונתם להתקשרות לטווח ארוך.

<u>ייצור</u>:

69. בעת מתן התגובה, המשיבים אינם קשורים במישרין או בעקיפין בייצור מסגרות משקפיים מכל מין וסוג. יחד עם זאת המשיבים אינם מעוניינים לוותר על זכותם לייצור מסגרות משקפיים ועל כן התנגדותם לבקשה לצו המניעה של המבקשת

כוללת גם התנגדות לאיסור עליהם ייצור, ככל שהייצור נעשה בכפוף לשמירה על זכויות הקניין הרוחני בכלל ושל המבקשת בפרט.

70. המשיבים יפנו את בית המשפט הנכבד לאמור בסעיפים 62-68 לעיל, בכל הקשור לתוקפה של תניית אי התחרות. כאמור, הסכם ההפצה עם המשיבים הסתיים ביום 31/12/05 ועל כן, תקופת אי התחרות, האמורה בתנאי ההסכם, מסתיימת לכל המאוחר ביום 31/12/07. לא יכולה להיות מחלוקת על היותו של מועד זה המועד המאוחר ביותר לתחילת תוקפה של תניית אי התחרות עליה הסכימו המשיבים.

**טענת הזיוף-**

71. למעלה מן הצריך, יטענו המשיבים כי טענות המבקשת נטענות בצורה כללית, באופן גורף ומגמתי, כך ש-"ירב הנסתר על הגלוי". המבקשת נוקטת לשון עמומה בבקשתה עת מתארת המבקשת את טענת הזיוף שבוצע על ידי המשיבים. המבקשת אינה מפרטת כיצד נודע לה, כטענתה, כי למשיבים ספק באחת ממדינות דרום אמריקה, אשר לטענת המבקשת מייצר עבור המשיבים מסגרות שהן העתק מדויק של מסגרות המבקשת. המבקשת לא ציינה את פרטי הספק ולא הביאה כל ראשית ראיה הקשורה את המשיבים לטענות החמורות שהמבקשת טוענת כלפיהם. בנוסף, טענת הזיוף והמרמה שטענה המבקשת אינה נתמכת בתצהיר כנדרש. לא ברור מיהו הגורם התומך טענות אלו בתצהיר ובו פירוט העובדות הרלבנטיות העומדות בבסיס טענות קשות אלו.

המבקשת אינה מפרטת את הסממנים הייחודיים המאפיינים את מסגרותיה אלא מסתפקת באמירות כלליות וסתמיות. יתירה מכך, אין כל השוואה בין מוצרי המבקשת שנמכרו למשיבים לבין המסגרות, המזויפות, לכאורה, שמקורם במשיבים, לכאורה.

72. אין צורך להכביר מילים על כך שטענת זיוף ומרמה אינה דבר של מה בכך. בפסיקה ענפה שהושרשה, נקבע לא אחת כי כאשר נטענת טענה שכזו, רמת ההוכחה הנדרשת הנה גבוהה ביותר ובעלת חשיבות רבה. כך למשל-

נקבע בתא (ת"א) 76131/00 **B.G Assistance LTD** נ' סגל אשר אוסקר :

> "אין די בטענות הנתבעים באשר לחוסר תום לבה של המשיבה,
> כמו גם בטענותיהם באשר לעושק, רמייה והטעיה, קל וחומר,
> מקום שהוכח שהונחה תשתית להוכחת קשר הסכמי שכובד
> במשך שנים רבות.
>
> טענות כאלה, דורשות הוכחה ע"י ראיה של ממש או בעלת משקל
> וכזאת לא הוגשה. על מנת לסבר את אוזנם של הנתבעים, אוסיף
> כי גם אם היו מעידים לא היה בכך די, שכן עפ"י הדין וההלכה,
> טענות כאלה מטילות על הטוען אותם נטל ראייתי מוגבר.

לעניין זה   ראה דברי כב' השופט מ' חשין בע"א 5663/90 –
<u>אספקה חברה מרכזית לחקלאים בע"מ נ' משה גרוס, פד"י מח'</u>
(3) עמ' 877-876:

"אוסיף שמצד ההלכה למדנו כי במקום שבו טוען בעל דין כלפי
חברו טענה של הטעיה (והיא לשון נקיה לרמיה), <u>מוטל עליו
לעמוד בנטל שהוא כבד מנטל המוטל ברגיל על מתדיין במשפט
אזרחי".</u>

73.   וכן דברי כב' השופט מ' חשין, <u>בע"א 2275/90 לימה חברה ישראלית
לתעשיות נ' פרץ רוזנברג,</u> פד"י מז (2), 605, עמי 615-616:

"לא נתעלמה מאיתנו ההלכה כי לעניין טענת רמיה מוטל על בעל
הדין המטיל דופי בחברו נטל מיוחד באשר למשקל הראיות
שעליו לערום לפני בית המשפט (וזאת, בין אם מדברים אנו בנטל
מיוחד לעצמו – בצד הנטל המוטל על צד במשפט אזרחי והנטל
המוטל על התביעה במשפט פלילי – ובין אם מדברים אנו בנטל
הראיות במשפט אזרחי, ובגדריו – במישקל ראיות כבד במיוחד);
ראה: ע"פ 232/55 <u>היועץ המשפטי לממשלה נ' גרינוולד,</u> פד"י
יב' (2060), 2017 (3 ואילך; ע"א 475/81 <u>זיקרי נ' "כללי חברה
לביטוח בע"מ,</u> פד"י מ (594, 589 (1 ואילך; ע"א 670/79, 78,
82/80 <u>הוצאת עתון "הארץ"  בע"מ ואח' נ' מזרחי,</u> פד"י מא (169
187-186 (2, ראה עוד: י' קדמי, על הראיות (דיונון, 1991), בעמ'
873-876"".

74.   <u>הרנון בספרו דיני ראיות, חלק ראשון, עמי 216 מסביר כי:</u>

"לצידן של שתי מידות ההוכחה הידועות, האזרחית והפלילית,
התפתחה בארצות הברית מידת-הוכחה שלישית במשפטים
אזרחיים, שהיא מעין רמת ביניים: יותר מ"עודף הסתברות" אך
פחות מאשר "מעבר לכל ספק סביר". זו היא דרישה ל- cler,
cogent and convincing proof. מידת השכנוע צריכה להגיע
לדרגה של הסתברות גבוהה (highly probble). למידה שלישית
זו נזקקו בעיקר כאשר, בהקשרים שונים, היה צורך להוכיח
מרמה או השפעה בלתי הוגנת וכן כאשר ביקשו להוכיח את
תנאיה של צוואה שאבדה ועניינים מיוחדים אחרים כיוצא בהם.
היו שפסקו, כי המידה השלישית חלה בכל הליך אזרחי בו צריך
להוכיח ביצוע עבירה פלילית".

75. <u>נטל ההוכחה בטענת תרמית במשפט אזרחי</u> :

<u>"בע"א. 400/86 עזבון המנוח בן-ציון קריגר נגד ד"ר סבינה שטנה</u>
<u>פ"ד מ"ד(4) 500, 504 צוטט ע.א. 292/64 פ"ד יט(1) 414,416</u> שם
נפסק כי : "טענת תרמית או מעילה היא טענה רצינית בעלת גוון
הפוגע בשמו הטוב של האדם שנגדו היא מכוונת.

לפיכך, טבעי הדבר, שבית-המשפט הנתקל בטענה כזאת ידרוש
מידת הוכחה יותר גדולה וודאית מאשר בסוגי משפטים אחרים
בעלי אופי פחות חמור... את התרמית יש להוכיח על כל חלקיה
ופרטיה, על כל תגיה ודקדוקיה, ובדרגת שכנוע לגבי כל ענין ועניין
לגבי כל סכום וסכום".

76. <u>בע"א 260/82 סולומון נ. אמונה פ"ד לח (4) 253, 256</u> נאמר כי –

"אך טבעי הוא, שבית-משפט, היושב לדין בהליך אזרחי, ידרוש
הוכחה יותר קרובה לוודאות מן המבחן הרגיל, אם מיוחסת לבעל דין
מירמה". (וכן ע"א 365 359/79, פ"ד לה (1) 711, 701) .

77. <u>אשר לרמת הראיות שיש להביא נגד המואשם במרמה</u> נפסק-
<u>בע"א 475/81 זיקרי נ. כלל פ"ד מג (1) 600-599, 589</u> כי –

"שהצד שעליו רובץ הנטל להוכיח עובדות המטילות על יריבו
סטיגמה של ביצוע עבירה פלילית, חייב לעשות זאת באמצעות ראיות
בעלות משקל רב ונכבד יותר ממה שדרוש במשפטים אזרחיים
רגילים".

78. וכן ראה גם, <u>ע.א. 51/89 האפוטרופוס הכללי נ. צאלח אסעד פ"ד מו(1) 491,</u>
<u>500</u> שם נפסק כי עול ההוכחה לעניין טענות המרמה הינו "כבד למדי".

## <u>שיווק, מכירה, הצגה, קידום מכירות והפצה:</u>

79. המבקשת עותרת לקבלת סעד האוסר גורף על המשיבים, בין היתר, לשווק,
למכור, לקדם מכירות או להפיץ כל מסגרות שהן למשקיים צבועות בעבודת יד. כן
עותרת המבקשת לאסור על המשיבים, בין היתר, לשווק, למכור, לקדם מכירות או
להפיץ מסגרות שיוצרו על ידי המבקשת ואשר נרכשו ממנה- בכסף מלא- על ידי
המשיבים.

80. המשיבים יטענו כי מלאי המסגרות המצוי בידם נרכש מן המבקשת. המשיבים
יוסיפו ויטענו כי המבקשת קיבלה תשלום מלא עבור מלאי המסגרות המצוי בידי

המשיבים. לפיכך, המשיבים זכאים לממש את זכותם למכירת מלאי המסגרות שבידם תוך הפקת רווח.

המשיבים עומדים על זכותם למימוש הרווח הגלום ממכירת המסגרות, וזאת כחלק מן המאמץ שנקטו על מנת למזער את נזקיהם הרבים כתוצאה ממעשי, מחדלי והתנהגות המבקשת.

81.    למען הזהירות בלבד, יוסיפו המשיבים ויטענו כי על-פי סעיף 5 להסכם ההפצה, התחייבה המבקשת לרכוש את מלאי המסגרות שבידי המשיבים אם ברצונה של המבקשת להשתמש במפיצים אחרים / נוספים תוך הפסקת פעילות השיווק של המשיבים.

## <u>נזק בלתי הפיך, הכבדה ומאזן הנוחות:</u>

82.    נוכח כל אשר נאמר ופורט לעיל בבקשה זו, דומה כי ברור שאין כל שחר לטענות המבקשת בדבר גרימת נזק בלתי הפיך, ונטיה של מאזן הנוחות לטובתה. המשיבים יטענו כי ההיפך הגמור הוא הנכון.

83.    המשיבים יטענו כי נוכח כל האמור לעיל, ברי הוא כי סיכוייה של הבקשה שהגישו המבקשים אינם גבוהים, בין היתר בהתחשב בכל מעשי ומחדלי המבקשת בכלל זה עובדת התכנון הקפדני של ההשתלטות על צינורות השיווק והקשרים העיסקיים שהמשיבים בנו וטוו בעמל רב ובהשקעה ממונית ממשית ונכבדת.

84.    המשיבים יטענו כי המבקשת מגיעה לפתחו של בית המשפט כשידיה שלה אינן נקיות מכל רבב בכך שהיא זו אשר יצרה מצג ברור כלפי המשיבים בדבר מוכנות לכינון קשר עיסקי ארוך טווח, ובכך גרמה למשיבים להסתמך על המצג ולהשקיע ממון, זמן ומשאבים לפיתוח קשרים, צינורות שיווק וצבר לקוחות והזמנות מתוך הבנה כי פני המבקשת לכינון יחסים ארוכי טווח, בעוד שבפועל המבקשת מיהרה להתנער מהמצגים וההתחייבויות החוזיות הברורים שנטלה על עצמה כלפי המשיבים בכללן ובראשן ההתחייבות ליתן למשיבים זכות סירוב ראשונה לגבי כל הסכם הפצה עתידי שיהיה לאחר פקיעת או סיום תקופת תוקפו של ההסכם נשוא הבקשה.

85.    כתוצאה ממעשי המבקשת כאמור והתנערותה מהתחייבויותיה ומצגיה, נותרו המשיבים בסיטואציה בעייתית בה לא רק שהשקיעו כספים רבים אשר לגביהם קיים יותר מחשש כי ירדו לטימיון, לא רק ששמם הטוב בענף נפגע בו הם והמבקשת פועלים תוך הפצת בדיות על ידי המבקשת על מעורבותם, לכאורה, של המשיבים בזיופים של מסגרות וכיו"ב דבר היכול לחסל את פעילותם בענף לצמיתות, אלא שהמשיבים נותרו עם מלאי משמעותי של מסגרות משקפיים אותן רכשו מהמבקשת בזמנו, וכעת נוכח ההליכים הננקטים נגדם, אין בידם לעשות שום דבר עם המלאי והנזק הכלכלי הנובע מכך.

86. על כן ולאור כל האמור לעיל, ברי הוא כי למבקשת לא ייגרם כל נזק בלתי הפיך, וממילא גם לא הובהרה בבקשת המבקשת מהו הנזק הבלתי הפיך, לטענתה, שעלול להיגרם לה ובאיזה אופן. אם כבר, הנזק הבלתי הפיך ייגרם (אם לא נגרם כבר) למשיבים, שכן הכפשת שמם הטוב בענף משמעותה כריתת מטה לחמם באופן סופי ומוחלט, שהרי איש בענף לא ירצה לעבוד עם מי שנטען לגביו כי הוא מפיץ שמזייף את הסחורה של הגורם אותו הוא מפיץ, זאת אפילו אם בסופו של יום יימצא שאין כל שחר לנטען אלא שדי יהיה בהפצת השמועות או במתן צו ולו זמני כדי שהנזק למשיבים ייגרם.

87. יתירה מכך, אם אכן המשיבים הם זייפנים כנטען נגדם (דבר המוכחש מכל וכל), הרי שיש די אפשרויות בידי המבקשת על מנת למנוע או למזער התופעה והמעשה הפסול, למשל, בין היתר, על ידי מתן הודעות מתאימות ללקוחות ולציבור, תוך שימת לב ודגש לחוקי וכללי לשון הרע.

88. באשר להכבדה ומאזן הנוחות, דומה כי נוכח כל האמור לעיל אלה נוטים בבירור לטובת המשיבים.

89. ברור כי הותרת המשיבים עם מלאי מסגרות מקוריות בשווי של עשרות אלפי דולרים ומניעת הרווח שהיה צפוי למשיבים כתוצאה ממכירתן מבלי לשפותם על הפסדיהם או לאפשר להם למזער נזקיהם אינו דבר שיכול לבוא בחשבון בפרט מקום בו בית המשפט עורך איזון אינטרסים בין אינטרסי הצדדים.

90. המשיבים מוכנים לכך שיוצא צו מניעה זמני כנגדם המונע מהם להפיץ מסגרות מזוייפות כאשר במקביל יותנה הצו בחיוב המבקשת לרכוש מהמשיבים את המסגרות המקוריות שבידי המשיבים לרבות פיצויים בגין אובדן רווחיהם.

91. דומה כי בכך יישמר האיזון הראוי בין אינטרסי הצדדים. מחד שמוצרי המבקשת לא יזוייפו וימכרו בשוק תוך פגיעה כלכלית בה, ומאידך שהמשיבים לא ייפגעו כלכלית בגין כך שמילאו אחר הוראות הסכם ההפצה שבין הצדדים, וכעת בשל גחמה או בשל כך שסר חינם בעייני המבקשת, יהפכו הם לקורבן כלכלי וסכומי הכסף המשמעותיים שהשקיעו לרכישת המסגרות, כמו גם הציפייה הלגיטימית שלהם להרוויח ממכירתן של מסגרות אלה- תאבד ותרד לטמיון.

92. עוד ובנוסף, יטענו המשיבים כי הטלת איסור למכור את מלאי המסגרות שברשותם, אפילו, לתקופה קצובה יגרום להם לנזק כיוון שמדובר במוצר אופנתי אשר עלול עקב חלוף הזמן הכרוך בהתדיינות המשפטית להפוך את מלאי הדגמים שבידי המשיבים לבלתי רלוונטי, קרי לסחורה שלא ניתן לעשות בה דבר מבחינה מסחרית - כלכלית. כלומר, אם ינתן צו זמני כמבוקש על ידי המבקשת מבלי לשקול את אינטרסי המשיבים, הרי שעם הסרתו או ביטולו של זה עלולים המשיבים למצוא עצמם בסיטואציה בה לא יוכלו למכור את מלאי המסגרות שבידם כיוון שקו האופנה התחלף. המשמעות המעשית של הטלת צו מניעה המורה למשיבים להימנע ממכירת המלאי שברשותם- אפילו באופן זמני- ואפילו לתקופה

קצרה, הוא אובדן עלות המסגרות ואובדן הרווח הצפוי להתקבל ממכירתם. אומנם, אין כל ערבות שהיא כי המשיבים יצליחו למכור את מלאי המסגרות שברשותם ואולם- אין ולא יכולה להיות מחלוקת כי למשיבים ייגרם נזק ממוני נכבד אם ייאסר עליהם למכור את מלאי המסגרות שהמצוי בידם.

93. יוצא אם כן כי מאזן הנוחות נוטה בבירור ובאופן משמעותי לטובת המשיבים.

94. לאור האמור לעיל, מתבקש בית משפט הנכבד, לדחות את בקשת המבקשת ולהשית על המבקשת הוצאות משפט ושכר טרחת עורך דין בתוספת מע"מ כחוק.

95. לחילופין, מתבקש בית המשפט הנכבד ליתן צו מניעה זמני כנגד המשיבים אך ורק בנוגע להפצה של מסגרות מזוייפות להבדיל מהמסגרות המקוריות המוחזקות על ידי המשיבים ושנרכשו בזמנו מהמבקשת, שבהן יוכל המשיב לסחור ולמכור.

96. לחילופי חילופין, מתבקש בית המשפט הנכבד ליתן צו מניעה כמבוקש ואולם להתנותו בערובות להנחת דעתו בסכומים אשר יכסו הן את הנזק שייגרם למשיבים אם יימצא כי אין בסיס וشחר לבקשה זו, כפי שמסתמן מכל האמור לעיל, והן לכיסוי כל הנזקים המיידים שייגרמו למשיבים עקב זה שאולצו בזמנו לרכוש מהמבקשת מסגרות מקוריות אשר גם בהן מתבקש בית המשפט, על ידי המבקשת, למנוע מהמשיבים לעשות כל פעולה.


דורון שמעוני, עו"ד                    אריה להב-לוי, עו"ד
ב"כ המשיבים                          ב"כ המשיבים



אני ___ **AVIVA YOCHLIS** קונסול ישראל בניו יורק מאשר כי היום ניצב/ה בפני
**VICE CONSUL**

מר/ת ___ TOMASHOVER MERYL ___

שזהותו/ה הוכחה לי עפ"י רישיון נהיגה אמריקאי ניו יורק

ובו מספר ___ 601306852 ___

וחתם/ה מרצונו/ה החופשי על המסמך המצורף המסומן באות א 1-2 ולראיה הריני

מאמת את חתימתו/ה בחתימת ידי ובחותמי.

היום ___ 2.7.07

**AVIVA YOCHLIS**
**VICE CONSUL**
תואר וחתימה ___

רישום פעולות נוטריוניות

| שנה | מסי סידורי בדף | בסי חדף | מסי דף/ספר |
|---|---|---|---|
| 07 | 5 | 98 | 66 |

800 SECOND AVENUE, NEW YORK, NY 10017 • TEL. (212) 499-5000



יפה כוח

רשות מהאר, ניו יורק - _____
601 306852

אני ח – חיים **מריל טומשובר - ID NO. 562 301 504** ממנה בזה את עו"ד דורון שמעוני ו/או
עו"ד אריה להב-לוי ו/או עו"ד זהבית מרקס, מרח' אחד העם 9 ת"א (כולם יחד וכל אחד מהם לחוד) להיות באי כח במשפט
של: ארט אופטיק בע"מ נגד שמואל ומריל טומשובר בעניין **ת.א. 07/1661; 07/9267 בבית המשפט המחוזי בת"א.**

מבלי לפגוע בכלליות המינוי הנ"ל בא כוחי רשאי לעשות ולפעול בשמי ובמקומי בכל הפעולות, הבאות, כולן ומקצתן הכל בקשר
לעניין הנ"ל והנובע ממנו כדקלמן:

לחתום על ולהגיש כל תביעה או תביעה שכנגד, ו/או כל בקשה, הגנה התנגדות, בקשה למתן רשות ערער, ערעור, הודעה, טענה, תובענה, הליכי
הוצל"פ או כל הליך אחר הנוגע או הנובע מהליך הנ"ל ללא יוצא מן הכלל. ובכלל לפעוע ואמרו גם להודות ו/או לכפור בשמי במשפטים
פליליים.

2.   לחתום על ו/או לשלוח התראות נוטריוניות או אחרות, לדרוש הכרת פשיטת רגל, או פירוק גוף משפט ולעשות את כל הפעולות הקשורות
והנובעות מהעניין הנ"ל.

3.   לבקש ולקבל חוות דעת רפואית מכל רופא או מוסד שבדק אותי או חוות דעת אחרת הנוגעת לעניין הנ"ל.

4.   להופיע בקשר לכל אחת מהפעולות הנ"ל בפני כל בתי המשפט, בתי דין למיניהם או מוסדות אחרים הן ממשלתיים הן אחרים עד לדרגה אחרונה.

5.   למסור כל עניין הנוגע מהעניין האמור לעיל לבוררות ולחתום על שטר בוררין כפי שבא כוחי ימצא לנכון ולמועיל.

6.   להתפשר בכל עניין הנוגע או הנובע מהעניינים האמורים לעיל לפי שיקול דעתו של בא כוחי ולחתום על פשרה זו בביהמ"ש או מחוצה לו.

7.   לגבות את סכום התביעה או כל סכום אחר בכל עניין מהעניינים הנ"ל לרבות הוצאות ביהמ"ש ושכר טרחת עו"ד, לקבל בשמי כל מסמך והפץ ולתת
קבלת השחרורים כפי שבא כוחי ימצא לנכון למתאים.

8.   להוציא לפועל כל פס"ד או החלטה או צו לדרוש צווי מכירה או פקודות מאסר, לעשות כל הפעולות המותרות עפ"י חוק ההוצאה לפועל.

לנקוט בכל הפעולות ולחתום על כל מסמך או כתב בכל יוצא מן הכלל אשר בא כוחי ימצא לנכון בכל עניין הנובע מהעניין הנ"ל.

להופיע בשמי וליצגני בפני רושם רושם הקרקעות בלשכת רישום המקרקעין, לחתום בשמי ובמקומי על כל בקשה הצהרה ומסמכים אחרים למיניהם
ולבצע בשמי כל עסקה (דיספוזיציה)  המכורך ע"י החוק ולתת הצהרות, קבלות ואישורים ולקבל כל מסמך שאני רשאי לקבל עפ"י דין.

ליצגני ולהופיע בשמי בפני רושם רושם החברות, רושם השותפויות ורושם אגדות שתופיות, לחתום בשמי ובמקומי כל בקשה או מסמך אחר בקשר לרישום בכל גוף
משפטי,  לטפל ברישומו או מחיקתו של כל גוף משפטי ולטפל בכל דבר הנוגע לו ולבצע כל פעולה בקשר לאותו גוף משפטי.

12.  לטפל בשמי בכל הקשור לרישום פטנט, סימני מסחר וכן בכל זכויות אחרות המוכרות ע"י החוק.

13.  להעביר יפוי כח זה על כל הסמכויות שבו או חלק מהן לעו"ד אחר עם זכות העברה לאחרים, לפטרם ולמנות אחרים במקומם ולנהל ולנהל עניני הנ"ל לפי
ראות עיניו ובכלל לעשות את כל הצעדים שימצא שימצא לנכון ומועיל בקשר עם המשפט וענייני הנ"ל כאשר את מעשיו או מעשי ממלא המקום בתוקף יפוי
כוח זה מראש.

המילים הבאות ביחיד תכלולנה את הרבים ולהיפך.

ולראיה באתי על החתום, היום יום __02__ לחודש __07__ בשנת 2007

*Meryl Tomashover*

חתימה

רישום פעולות נוטריוניות

| שנה | מס' סידורי בדף | מס' הדף | מס' הספר |
|---|---|---|---|
| 07 | 5 | 98 | 66 |

הנני מאשר את חתימת הנ"ל.

קונסול



הקונסוליה הכללית של
ישראל בניו יורק

AVIVA YOCHLIS
VICE CONSUL

אביבה יוחליס
סגן קונסול

אני _____ קונסול ישראל בניו יורק מאשר כי היום ניצב/ה בפני

מר/ת _____ יונתן שמעון _____

_____

שזיהותו/ה הוכחה לי עפ"י _____ רשיון נהיגה מספר 8 1196911

_____ ודרכון מספר 05175135-2

וחתם/ה מרצונו/ה החופשי על המסמך המצורף המסומן באות א 2-1 ולראיה הריני

מאמת את חתימתו/ה בחתימת ידי ובחותמי.

היום _____ 2.7.07



AVIVA YOCHLIS
VICE CONSUL

אביבה יוחליס
סגן קונסול

תואר וחתימה _____

רישום פעולות נוטריוניות

| 66 | 98 | 4 | 07 |
|---|---|---|---|
| מס׳ הספר | מס׳ הדף | מס׳ סידורי בדף | שנה |

800 SECOND AVENUE, NEW YORK, NY 10017 • TEL. (212) 499-5000

אני ה – ח"מ שמואל טומשובר ת.ז. 05175135 ממנה בזה את עו"ד דורון שמעוני ו/או עו"ד אריה להב-לוי ו/או עו"ד זהבית
מרקס , מרח' אחד העם 9 ת"א (כולם יחד וכל אחד מהם לחוד) להיות באי כוח במשפט של: ארט אופטיק בע"מ נגד שמואל
ומריל טומשובר בענייני ת.א. 1661/07; 9267/07 בבית המשפט המחוזי בת"א.

מבלי לפגוע בכלליות המינוי הנ"ל בא כוחי רשאי לעשות לפעול בשמי ובמקומי בכל הפעולות, הבאות, כולן ומקצתן הכל בקשר
לעניין הנ"ל והנובע ממנו כדקלמן:

לחתום על ולהגיש כל תביעה או תביעה שכנגד, ו/או כל בקשה, הגנה התנגדות, בקשה למתן רשות ערער, ערעור, הודעה, טענה, תובענה, הליכי
הוצל"פ או כל הליך אחר הנוגע או הנובע מהתהליך הנ"ל ללא יוצא מן הכלל. ומבלי לפגוע באמור גם להתדיין ו/או לכפור בשמי במשפטים
פליליים.

2.    לחתום על ו/או לשלוח התראות נוטריוניות או אחרות, לדרוש הכרזת פשיטת רגל, או פירוק גוף משפטי ולעשות את כל הפעולות הקשורות
והנובעות מהעניין הנ"ל.

3.    לבקש ולקבל חוות דעת רפואית מכל רופא או מוסד שבדק אותי או חוות דעת אחרת או הוויה אחרת בנוגע בעניין הנ"ל.

4.    להופיע בקשר לכל אחת מהפעולות הנ"ל בפני כל בתי המשפט, בתי דין למיניהם כם מוסדות אחרים הן ממשלתיים והן אחרים עד לדרגה אחרונה.

5.    למסור כל עניין הנוגע מהעניין האמור לעיל לבוררות ולחתום על שטר בוררין כפי שבא כוחי ימצא לנכון ולמועיל.

6.    להתפשר בכל עניין הנוגע או הנובע מהעניינים האמורים לעיל לפי שיקול דעתו של בא כוחי ולחתום על פשרה כזו בביהמ"ש או מחוצה לו.

7.    לגבות את סכום התביעה או כל סכום אחר בכל עניין מהעניינים הנ"ל לרבות הוצאות בימ"ש ושכר טרחת עו"ד, לקבל בשמי כל מסמך החפץ ולתת
קבלות ושחרורים כפי שבא כוחי ימצא לנכון ולמתאים.

8.    להוציא לפועל כל פס"ד או החלטה או צו לדרוש צווי מכירה או פקודות מאסר, לעשות כל הפעולות המותרות עפ"י חוק ההוצאה לפועל.

לנקוט בכל הפעולות ולחתום על כל מסמך או כתב בלי יוצא מן הכלל אשר בא כוחי ימצא לנכון בכל עניין הנוגע מהעניין הנ"ל.

להופיע בשמי ולייצגני בפני רושם הקרקעות בלשכת רישום המקרקעין, לחתום בשמי ובמקומי על כל בקשה הצהרה ומסמכים אחרים למיניהם
ולבצע בשמי כל עסקה (דיספוזיציה)  המוכרת ע"י החוק ולתת הצהרות, קבלות ואישורים ולקבל כל מסמך שאני רשאי לקבל עפ"י דין.

לייצבי ולהופיע בשמי בפני רשם החברות, רשם השותפיות ורשם אגודות שתופיות, לחתום בשמי ובמקומי כל בקשה או מסמך או בקשר לרשום גוף
משפטי, לטפל ברישומו או מחיקתו של גוף משפטי ולטפל בכל דבר הנוגע או לבצע כל פעולה בקשר לאותו גוף משפטי.

12.    לטפל בשמי בכל הקשור לרישום לרישום פטנט, סימני מסחר וכן בכל זכויות אחרות המוכרות ע"י החוק.

13.    להעביר יפוי כח על כל הסמכויות שבו או חלק מהן ל עו"ד אחר עם זכות העברה לאחרים, לפסרם ולמנות אחרים במקומם ולבהל עניני הנ"ל לפי
ראות עיני ובכל דעת עצמאות לעשות את כל הצעדים שימצא לנכון ומהרצל בקשר עם המשפט או עם עניני הנ"ל לאשר את מעשיו או מעשה ממלא מקומם בתוקף יפוי
כח זה מראש.

המילים הבאות ביחיד תכללנה את הרבים ולהיפך.

ולראיה באתי על החתום, היום יום ____ לחודש _____ בשנת 2007

ולראיה באתי על החתום, היום יום 2 לחודש 07 בשנת 2007

*[signature]*

חתימה

הנני מאשר את חתימת הנ"ל.

*[signature]*

קונסול

רישום פעולות נוטריוניות

| מס׳ הספר | מס׳ הדף | מס׳ סידורי בדף | שנה |
|---|---|---|---|
| 66 | 98 | 4 | 07 |

## תצהיר

אני הח"מ, שמואל טומשובר הנושא ת.ז. 05175135, לאחר שהוזהרתי לומר אמת וכי אהיה צפוי לעונשים הקבועים בחוק אם לא אעשה כן, מצהיר בזה בכתב כדלקמן :

1. הנני עושה תצהיר זה מטעמי טמטעמה של אשתי בתמיכה לתגובתנו, שלי ושל אשתי, הגב׳ מריל טומשובר, לבקשת המבקשת, ארט אופטיק בע"מ, למתן צו מניעה נגדנו כמפורט בבקשה.

2. כל האמור להלן בתצהירי זה הינו מידיעתי האישית ו/או מכח משרתי ותפקידי ו/או ממה שנמסר לי על ידי יועציי המשפטיים להם אני מאמין, הכל לפי הקשר הדברים הנכון והדבקם.

3. על פי עיצה משפטית שקיבלתי, עומדות לנו מס׳ טענות סף שאותן אפרט להלן.

4. דינה של בקשת המבקשת למתן צו מניעה זמני, כמו גם תביעתה העיקרית, להידחות על הסף.

5. כלל בסיסי הוא בדיני הסעדים הזמניים, שלא ניתן לבקש במסגרת עתירה למתן סעדים זמניים את הסעד המבוקש במסגרת התביעה העיקרית. כלומר, אסור שתהיה זהות בין הסעד הזמני המבוקש לסעד הקבוע המבוקש במסגרת התביעה העיקרית.

6. במקרה דנן, המבקשת עוברת על כלל זה, ובענייננו קיימת זהות בין הסעד הזמני המבוקש על ידה בבקשה זו לבין תביעתה העיקרית למתן צו מניעה קבוע. המבקשת עותרת למתן צו מניעה זמני שימנע מהמשיבים **"לא להיות מעורב בכל דרך שהיא בייצור, שיווק, קידום מכירות, הפצה ומכירה של מסגרות למשקפיים צבועות בעבודת יד"**. בסעיף 17 לכתב התביעה העיקרית, פסקה שניה, עותרת המבקשת לקבלת סעד קבוע הזהה לסעד הזמני המבוקש. ראה והשווה- הפתיח בבקשה לצו מניעה זמני.

7. לפיכך, רק מטעם זה יש לדחות הבקשה.

8. טענת הסף הבאה היא שאף לא אחד מן המצהירים הינו בעל דין, או מוסמך מטעמו של בעל דין ליתן תצהיר, ועל כן דינה של הבקשה להידחות הואיל ובבקשה למתן סעד זמני על בעל דין ליתן תצהיר תמיכה לבקשה. תקנה 365ג. לתקסד"א קובעת כי: **"בתצהיר המצורף לבקשה יפרט המבקש את כל העובדות הנוגעות לבקשה"**. תחת מתן תצהיר מטעם בעלי ומנהלי החברה, בחרה המבקשת להטיל את משא הבקשה על כתפיו של מר אהוד ביברינג, המשמש, לטענתנו, כמנהל הייצוא והשיווק של המבקשת.

9. במקרה דנן, בו המבקשת טוענת טענות זיוף ומרמה כנגד המשיבים היה עליה להעמיד בחזית מצהיריה בעל דין או מצהירים רלבנטיים, לרבות עדים מומחים ואולם זו לא עשתה כן.

10. לפיכך, יש לדחות את הבקשה.

11. הטענה הבאה הינה שהמבקשת אינה מעמידה תשתית ראייתית ראויה כלל וכלל על מנת שדלתו של בית משפט תיפתח בפניה. אפילו במונחי הראיות הנדרשות במסגרת עתירה למתן סעד זמני- עת ניתן לתמוך את הבקשה בראיות אשר אינן קבילות על פי דיני הראיות כגון עדויות שמיעה, סברה וכיוצ"ב- לא עמדה המבקשת.

12. במקרה דנן, ראיות המבקשת שהובאו בתמיכה לבקשתה אינן מספיקות, ולו לכאורה, זאת מחמת כלליותן והיעדר קשר בינן למטריה הנדונה. האמירות בתצהירי המצהירים הינן אמירות כלליות וסתמיות, והחשוב מכל, לא ניתן לקשור בין המתואר בתצהירי עדי המבקשת לבינינו.

13. כך למשל, תצהירו של מר איתמר פירסט, לוקה בחסר משמעותי שכן על-פי סעיף 9 לתצהירו: "המוכרת אף אמרה כי המשקפיים נמכרה לה על ידי _שני בני זוג_ אשר הודיעו לה שהם מפסיקים לייצר את המשקפיים בישראל ומתחילים לייצר אותם במקום אחר".

14. דברים ברוח זו ובאותה טרמינולוגיה- _בני זוג_- נאמרו גם בסעיף 10 לתצהירו הנ"ל.

15. מן המקובץ עולה כי "בני הזוג" האמורים יכולים להיות כל בני זוג שהם ואין הכרח כי מדובר בנו ועל כן, תצהירו של מר פירסט לא יצלח אפילו לבקשה לסעד זמני.

16. כך גם נפלו פגמים מהותיים במסמכים הנחזים להיות "תצהירים" אשר צורפו לבקשה ואשר ניתנו, לכאורה, על ידי קולגות עסקיות של המבקשת.

17. המדובר בתצהירה של גב' קטי שו ובתצהירה של גב' רות דמבר, אשר המסמכים עליהן חתמו אומתו על ידי "NOTARY PUBLIC" של מדינת ניו יורק- גורם אשר אינו מוכר בדין הישראלי ועל כן האזהרה, כמו גם אימות החתימה- אשר הינם מיסודות התצהיר- אינם תקפים.

18. מכאן גם שהמסמך אותו ערכו ועליו חתמו אינו קביל לשמש כתצהיר.

19. על כן, מתבקש בית המשפט הנכבד להורות על הוצאתם של מסמכים אלו מן הבקשה ולהתעלם מתוכנם.

20. לחילופין ולמען הזהירות בלבד, אם וככל שבית משפט נכבד זה יכשיר את המסמכים הנ"ל ויראה בהם כתצהיר, אזי אנו עומדים על כך שנותני התצהירים, כמו גם הגורמים שהזהירו ואימתו את חתימותיהם- יתייצבו כולם להיחקר- כל אחד בענייננו.

21. לפיכך, גם מן הטעם הזה יש לדחות את הבקשה.

22. טענת הסף הבאה הינה שבנסיבות שתוארו וכעולה מהתצהירים ושאר המסמכים שצורפו לבקשת המבקשת מדובר בהליך שעל אף שלמבקשת יש ככל הנראה, את הזכות לרשום מדגם על המסגרות המיוצרות על ידה (ולא זכות יוצרים כנטען בבקשה), הרי שבפועל מנסה היא למנוע אותנו לעסוק בכל סוג של עיסוק הקשור למסגרות משקפיים צבעוניות ביד בכל מקום בעולם (!).

23. ודוק, כל זה כאשר אין למבקשת אפילו מדגם רשום בישראל על מסגרות המשקפיים אותן היא מייצרת.

24. עוד ובנוסף לאמור לעיל, מנסה המבקשת להביא את בית המשפט לאכוף תניית אי תחרות אשר לא רק שהינה בלתי סבירה בעליל ("...כל מסגרות משקפיים צבעוניות ביד..." (– סעיף 6 לבקשת המבקשת) להבדיל ממסגרות המיוצרות על ידי המבקשת בלבד) אלא שתניית אי התחרות אותה מבקשת המבקשת לאכוף אינה דרה בכפיפה אחת עם הפסיקה הישראלית בנוגע למשך הזמן הנהוג והמותר לאסור בו תחרות.

25. יתירה מכך, תניית אי תחרות כל כך גורפת וכל כך בלתי מאוזנת פוגעת בזכויות היסוד שלנו, זכויות יסוד המעוגנות, בין היתר בחקיקת יסוד כגון: חוק יסוד: כבוד האדם וחירותו ו – חוק יסוד: חופש העיסוק.

26. אם לא די בכל זה, מבקשת המבקשת לעצור ולמנוע אותנו מביצוע של פעילויות כלכליות – שיווקיות שונות במדינות שונות בכלל במדינת ישראל כאשר אין ולא יכול להיות חולק כי תחולתו של ההסכם שהיה בין הצדדים השתרעה אך ורק לתחומי ארה"ב.

27. משמע, גם במקרה זה מנסה המבקשת לתפוס כפי יכולתה וזאת ללא כל הצדקה ובהיעדר תשתית ובסיס לכך.

28. לסיכום, המבקשת באמצעות בקשתה ותביעתה מנסה להשיג לעצמה הרבה למעלה מהמגיע לה תוך קיפוח זכויות יסוד שלנו - כאשר בהקשר זה מודגש כי אין ללמוד מהמילים: "המגיע למבקשת" לעיל, משום הודאה שלנו בהפרת זכות כלשהיא של המבקשת.

29. לפיכך, גם מטעם זה מתבקש בית המשפט נכבד לדחות הבקשה לאלתר.

30. טענת הסף הבאה שלנו עניינה סמכותו של בית משפט בישראל המשתרעת אך ורק על תחום מדינת ישראל. בית משפט בישראל אינו מוסמך ליתן צווים אשר יחולו על מדינות אחרות.

31. על כן מטעם זה בלבד מתבקש בית המשפט הנכבד שלא ליטות לבקשה למתן "בכל מקום בעולם" כמבוקש בבקשה.

32. עד כאן טענות הסף, ברשות בית המשפט אפרט הטיעון לגופו.

33. בסוף שנת 2004. התקשרנו עם המבקשת, בהסכם הפצה בלעדי לשיווק של מסגרות משקפיים מפלסטיק המיוצרות על ידי המבקשת- בארה"ב.

34. יצוין ויודגש, כי עיסוקנו היחיד היה בהפצת מסגרות המבקשת בארה"ב.

35. עסקנו אך רק בקידום מכירות של מסגרות המבקשת. לא ייצגנו יצרנים נוספים לבד מהמבקשת.

36. מיד לאחר חתימת הסכם ההפצה, התחלנו בשיווק  המסגרות תוך השקעת סכומי עתק מצידנו בהחדרת המוצר לשוק, בין היתר, על ידי השתתפות בתערוכות וקיום מכירות ותצוגות בכל רחבי ארצות הברית.

37. עבדנו ועמלנו, מבוקר עד ליל, 7 ימים בשבוע, על מנת לפתח את השוק המקומי בארה"ב וליצור ביקוש למסגרות המבקשת, בין היתר, באמצעות התקשרות עם מפיצי משנה מקומיים ברחבי ארה"ב. פעלנו ללא לאות לקדם את מכירות המסגרות ללקוחות חדשים ולקבלת הזמנות חוזרות מלקוחות קיימים.

38. בסוף שנת 2005 הגיע המועד החוזי של הסכם ההפצה לקיצו, ובין הצדדים לא נחתם הסכם הפצה חדש- זאת בניגוד למוסכם בהסכם ההפצה.

39. חרף זאת המשיכו הצדדים לקיים את התניה העיקרית של הסכם ההפצה ואנו הינו המפיצים הבלעדיים של מסגרות המבקשת בארה"ב.

40. בכל שנת 2006, המשכנו לייצג את המבקשת כנציגה הבלעדי של המבקשת בארה"ב. המבקשת מצידה המשיכה לנהוג בנו כמפיץ בלעדי.

41. כך גם המשכנו לרכוש, באופן סדיר, מסגרות מהמבקשת.

42. אנו - בידיעת, בהסכמת ובעידוד המבקשת - המשכנו בפיתוח והרחבת השוק המקומי בארה"ב, בין היתר, על ידי השתתפות בלעדית בתערוכות וקיום מכירות מיוחדות ותצוגות בכל רחבי ארה"ב.

43. כמאמר מוסגר יצוין, כי במספר רב של מסגרות נתגלו פגמים בעיקר בהתקלפות הציפוי של המסגרות. הדבר הערים על המשיבים קשיים סובייקטיביים במכירת המסגרות וכן גרם לנו להתעסקות בלתי פוסקת במתן שירות חוזר לתיקונים וחלקים ללקוחותינו. בעיות מסוג זה (ותולדות בעיות אלו) היו בין הגורמים שהעכירו את יחסי הצדדים.

44. בסוף שנת 2006 התגלע בין הצדדים סכסוך שמקורו בהודעה מפתיעה מצד המבקשת לפיה- בכוונתה להתקשר עם מפיץ אחר בהסכם הפצה בלעדי לשיווק המסגרות בארה"ב- במקומנו.

45. לנו ברור כי מהלך זה לא היה ספונטני אלא תוכנן בקפידה. מהלך זה התנהל במשך חודשים מאחורי גבנו, בזמן שאנו ממשיכים במרץ רב בעבודתנו - שיווק מוצרי המבקשת.

46. לא הפסקנו למחות על התנהלות והתנהגות המבקשת וניסינו בכל מאודנו, להתנגד לכוונת המבקשת, ולהמשיך את הפעילות העיסקית במתכונת הקיימת. [כאלף מונים יעיד כתב התביעה שכנגד אשר בכוונת המשיבים להגיש בתובענה העיקרית].

העתק תכתובת בדוא"ל המדברת בעד עצמה מצ"ב **כנספח א'** לתצהירי זה.

47. המבקשת הוסיפה והערימה קשיים בירוקראטיים על פעילותנו, ואף שינתה לרעה את התנאים המסחריים שנהגו בינינו. המבקשת העמידה תנאים דרקוניים להמשך פעילותנו העסקית- תנאים בהם לא יכולנו לעמוד.

48. הדבר גרם לנו לבעיות פיננסיות בלתי צפויות, ואף הוביל אותנו להכרה והבנה כי הפעילות המשותפת בין הצדדים באה לקיצה.

49. נותרנו בפני שוקת שבורה. המבקשת הפרה את ההסכם עימנו הפרות יסודיות תוך ניצול ציני של משאבינו ומאמצינו. וידוע, אנו היינו המפיץ הבלעדי בשוק חדש ועבודתנו היא שהניחה את היסודות להכרת מוצרי המבקשת בארה"ב, כמו גם את צינורות השיווק, את הלקוחות, ואת הביקוש למסגרות המבקשת.

50. המבקשת לא הותירה לנו ברירה, ובכדי למזער את נזקיהם נאלצנו - **ועודם נאלצים**- לנסות ולמכור את מלאי המסגרות המקוריות העצום שנותר בידנו, בין היתר, על ידי השתתפות בתערוכות, בהם ניתן לקבל הזמנות למלאים גדולים, ועל ידי כך לצמצם את מלאי המסגרות שנותר בידנו.

51. על מנת לטשטש את הפרות ההסכם על ידי המבקשת, הוסיפה המבקשת וטענה כנגדנו טענות שווא בגין זיוף מוצריה. בעניין זה חשוב לציין כי ההיפך הוא הנכון. אנו הינו אלה אשר פעלו באופן תקיף ונמרץ כנגד זייפנים בשוק המקומי בארה"ב אשר זייף ומכרו את מסגרות המבקשת.

העתק הודעות דוא"ל המדברות בעד עצמן וכן המכתב שנשלח לזייפנים מצ"ב **כנספח ב'** לתצהירי זה.

52. יצוין על אתר, כי עניינה של הבקשה לסעד זמני כמו גם התביעה העיקרית, בניסיון "להקדמת תרופה למכה" אותו נוקטת המבקשת כנגדנו. המבקשת נהגה שלא בתום לב עמנו בתקופת ההתקשרות בין הצדדים, בסיומה ואף לאחר סיומה.

53. המבקשת ידעה כי בכוונתנו להגיש תביעה כנגדה, אשר מתעכבת אך בשל הריחוק הגיאוגרפי שלנו כמי שממתגוררים בארה"ב ואיסוף ראיות ממדינות אחרות, ולכן המבקשת מיהרה לנקוט בהליכים כנגדנו טרם ינקטו האחרונים בהליכים נגדה.

54. המבקשת אף הרחיקה לכת בניסיונותיה למנוע מאיתנו לממש את זכויותינו על פי הסכם ההפצה ובכדי לחסום אותנו מלהתחרות בה, זאת על ידי טענות מרמה וזיוף שיקריות ובלתי מבוססות כנגדנו. הדבר נועד להכפיש את שמנו הטוב לפגוע

במוניטין שצברנו בשוק המקומי בארה"ב. עודכנו על ידי קולגות עסקיות כי המבקשת מפיצה עלינו טענות זיוף ומרמה ושקרים אחרים.

55. המבקשת לא טרחה להגן על זכויותיה, או למצער למזער את נזקיה, המוכחשים כשלעצמם. המבקשת לא טענה לרישום מדגם או פטנט וגם זכויות היוצרים לה היא טוענת אינם רלבנטיים למוצרינו. המבקשת לא טרחה לעדכן את כלל הלקוחות אודות השינוי שערכה וסיום ההתקשרות עימנו. למבקשת קיימת רשלנות עצמית ברמה גבוהה ועל כן אין לה אלא להלין על עצמה.

56. התקשרנו עם המבקשת בהסכם הפצה בלעדי למכירה ושיווק בארה"ב של מסגרות משקפיים מתוצרת המבקשת. הסכם ההפצה נחתם ביום 1 אוקטובר בשנת 2004. (להלן- **"ההסכם"** ; **"הסכם הפצה"**).

העתק הסכם ההפצה מצ"ב **כנספח ג'** לתצהירי זה.

57. בסעיף 3 להסכם ההפצה נקבע כי תקופת ההסכם הינה לשנה, בין התאריכים 1/12/04 ועד ליום 31/12/05. (להלן- **"תקופת הסכם ההפצה"**).

58. **עוד הצהירו הצדדים, בסעיף 5 להסכם ההפצה, כי כוונתם הבסיסית היא להמשיך את ההתקשרות העיסקית ביניהם, לשביעות רצון כל הצדדים, אף לאחר שנת 2005, באמצעות חוזה לטווח ארוך שייחתם בין הצדדים לקראת סוף שנת 2005.**

59. כוונת הצדדים, ובעיקר כוונתנו הייתה <u>התקשרות ארוכת טווח</u> כשאנו משמשים ונשמש כסוכן מכירות <u>ומפיץ בלעדי</u> של מסגרות המבקשת בטריטוריה של ארה"ב.

60. אנו הסתמכנו על הצהרת כוונות זו שעמדה בבסיס ההתקשרות בין הצדדים והשקענו את מרצנו והוננו בקידום מכירות, הפצה, שיווק, פיתוח שווקים חדשים, איתור מפיצי משנה מקומיים, השתתפות בתערוכות וקיום מסעי מכירות מיוחדות ותצוגות בכל רחבי ארה"ב. פועלנו זה נקטע כאשר כאביו כאשר רשת השיווק שלנו מפעילה מספר מפיצי משנה ומוכרת ל- 150 חנויות בכל רחבי ארה"ב.

61. עוד קבעו הצדדים בסעיף 5 להסכם ההפצה את התנאים להפסקת ההפצה ביוזמת היצרן (המבקשת), לפיהם על המבקשת/המפיץ החלופי לרכוש את מלאי המסגרות שבידנו במקרה בו תבקש להחליף אותנו כמפיץ בלעדי.

62. **המבקשת אפילו אינה טוענת כי הציעה לנו, עובר להפסקת ההתקשרות, את רכישת המלאי שנותר ברשותנו.**

63. זאת ועוד, בסעיף 5 להסכם ההפצה נקבעה זכות הסירוב שלנו (המפיץ)במקרה בו המבקשת חפצה בהחלפתנו כמפיץ בארה"ב. זכות זו חוללה והושמה לאל, בעיתוי ההחלפה, בנסיבות ההחלפה ובהרעת התנאים המסחריים שהיו נהוגים בין הצדדים.

**64.** לא שבענו רצון מהתנהלות המבקשת בתקופת הסכם ההפצה כפי שיפורט להלן.

**65.** המבקשת לא עמדה במועדי האספקה כפי שהתחייבה בהסכם ההפצה ופעילותנו הואטה בשל כך.

**66.** המבקשת לא טרחה לפרט את הליקויים הרבים והקלקולים התכופים של מוצריה שהיו מנת חלקנו כל העת ואשר העמידו אותנו במצבים לא נעימים, כמו גם גרמה לנו לטורח רב בטיפול ובמתן השירות הרב שנדרש בשל כך.

**67.** התלוננו בפני המבקשת פעמים רבות על הקלקולים, הליקויים והפגמים וכן על בעיות באספקת המוצרים ו/או חלקי החילוף של המסגרות עבור שירות התיקונים שלנו ללקוחותינו בארה"ב.

**68.** הסכם ההפצה עימנו לא חודש שלא כדין, בניגוד לציפיות שלנו ובעיקר נוכח חוסר תום הלב של המבקשת אשר עשתה מאמצים רבים להביא את ההסכם לסיומו ולהשתלט על תשתית השיווק שבנינו בשוק המקומי בארה"ב.

**69.** וידגש, הטריטוריה נשוא הסכם ההפצה היא ארצות הברית. כמפיץ בלעדי של מוצר חדש היה זה עמלנו בלבד אשר יצר את השיווק והעלה את המכירות ואת הביקוש בשוק המקומי למוצר. לצורך כך, לא חסכנו מאמצים ואמצעי מימון ושיווק מסיבי אשר בוצעו על ידינו מחוף לחוף, מעיר לעיר וממדינה למדינה.

**70.** השקענו סכומי כסף ניכרים בהקמת תשתית שיווק בארה"ב עבור מוצרי המבקשת מתוך הסתמכות על הצהרות הצדדים בהסכם ההפצה וצפייה לגיטימית בנסיבות העניין להתקשרות ארוכת טווח כמובטח וכמצופה.

**71.** המבקשת מנסה לעשות עושר ולא במשפט, עת היא מבקשת לאסור עלינו למכור את מלאי המסגרות שבידינו, ובאותה נשימה מבקשת את רשימת הלקוחות שלנו לצורך ביצוע מכירה ישירה שלא באמצעותנו וללא מתן תגמול כלשהו.

**72.** המבקשת העלתה את מחירי המסגרות בצורה דרסטית ואף שינתה לרעה את תנאי התשלום לנו, הכל בכוונת תחילה, מתוך ידיעה כי התנאים החדשים/הנוספים לא יהיו מקובלים עלינו ויובילו לסיום היחסים העסקיים שבין הצדדים.

**73.** המבקשת נוקטת בדרך של אכילת העוגה כולה – ויחד עם זאת- השארתה שלמה. מחד, בסיום שנת 2005, המבקשת לא חתמה עימנו על הסכם הפצה חדש ומפורט לטווח ארוך, כמוסכם על פי סעיף 5 להסכם, ומאידך, היא מבקשת לאכוף עלינו את תניית אי התחרות לתקופה של שנתיים החל מסוף שנת 2006- שנה לאחר פקיעת תוקפו של הסכם ההפצה הישן.

**74.** כאמור, המבקשת, שלא בתום לב, מנסה לאכוף עלינו את תניית אי- תחרות שבהסכם ההפצה אשר הופר על ידה הפרות יסודיות ומהותיות.

**75.** המבקשת מפנה את בית המשפט הנכבד לתניית אי תחרות בסעיף 7 להסכם ההפצה, לפיה, התחייבנו שלא להתחרות במבקשת בתקופת הסכם ההפצה ותקופה נוספת של שנתיים מיום סיום ההסכם.

76. ודוק, תניית אי התחרות אותה מנסה המבקשת לאכוף אינה באה להגן על סודות
מסחריים של המבקשת או על אינטרס לגיטימי אחר שלה כי אם בהגבלת התחרות
מטעמים של הגבלת עיסוק ותחרות חופשית סתם, הגבלה האסורה על פי רוח
ופרשנות חוקי היסוד כפי שקיבלו ביטוי בפסיקה.

77. לא זו אף זו, בפסיקה הענפה שהושרשה בבתי המשפט בישראל, נקבע כי תניית אי
תחרות ככלל עומדת בניגוד לעקרונות חופש העיסוק בהתאם לחוק יסוד: חופש
העיסוק, ועל כן יש לראותה כבטלה או לצמצמה באופן משמעותי. בודאי שאין אח
ורע בפסיקה לתניית אי תחרות סתם למשך זמן כה ארוך.

78. במקרה דנן, ובהתחשב במכלול הנסיבות, יש לראות בתניית אי התחרות כבתניה
מוגבלת לזמן קצר וסביר אשר **תוקפה פג.**

79. בנסיבות העניין דנן, בו הסכם ההפצה הבלעדי לא חודש עימנו בסיום שנתו
הראשונה במתכונתו המקורית הרי שאין בסיס לדרוש מאיתנו "תקופת צינון"
בכלל, ותקופה כפולה (!) מתקופת ההתקשרות, בפרט.

80. למעלה מן הצריך, אוסיף כי התנהלותה של המבקשת והתנהגותה שלא בתום לב
כלפינו מאיינים את התחייבותנו שניתנה מתוך הסתמכות שלנו על הצהרת
הצדדים בדבר כוונתם להתקשרות לטווח ארוך.

81. בעת מתן התגובה, אנו איננו קשורים במישרין או בעקיפין בייצור מסגרות
משקפיים מכל מין וסוג. יחד עם זאת איננו מעוניינים לוותר על זכותנו לייצר
מסגרות משקפיים ועל כן התנגדותנו לבקשה לצו המניעה של המבקשת כוללת גם
התנגדות לאיסור עלינו ייצור, ככל שהייצור נעשה בכפוף לשמירה על זכויות הקניין
הרוחני בכלל ושל המבקשת בפרט.

82. הנני להפנות את בית המשפט הנכבד לאמור בסעיפים 62-68 לעיל, בכל הקשור
לתוקפה של תניית אי התחרות. כאמור, הסכם ההפצה עימנו הסתיים ביום
31/12/05 ועל כן, תקופת אי התחרות, האמורה בתנאי ההסכם, מסתיימת לכל
המאוחר ביום 31/12/07. לא יכולה להיות מחלוקת על היותו של מועד זה המועד
המאוחר ביותר לתחולת תוקפה של תניית אי התחרות עליה הסכמנו.

83. למעלה מן הצריך, נטען כי טענות המבקשת נטענו בצורה כללית, באופן גורף
ומגמתי, כך ש-"רב הנסתר על הגלוי". המבקשת נוקטת לשון עמומה בבקשתה את
מתארת המבקשת את טענות הזיוף לכאורה שבוצעו על ידנו.

84. המבקשת אינה מפרטת כיצד נודע לה, כטענתה, כי יש לנו ספק באחת ממדינות
דרום אמריקה, אשר לטענת המבקשת מייצר עבורנו מסגרות שהן העתק מדויק
של מסגרות המבקשת. המבקשת לא ציינה את פרטי הספק ולא הביאה כל ראשית
ראיה הקושרת אותנו לטענות החמורות שהמבקשת טוענת כלפינו.

85. בנוסף, טענת הזיוף והמרמה שטוענת המבקשת אינה נתמכת בתצהיר כנדרש. לא ברור מיהו הגורם התומך טענות אלו בתצהיר ובו פירוט העובדות הרלבנטיות העומדות בבסיס טענות קשות אלו.

86. המבקשת אינה מפרטת את הסממנים הייחודיים המאפיינים את מסגרותיה אלא מסתפקת באמירות כלליות וסתמיות. יתירה מכך, אין כל השוואה בין מוצרי המבקשת שנמכרו לנו לבין המסגרות, המזויפות, לכאורה, שמקורן בנו, לכאורה.

87. אין צורך להכביר מילים על כך שטענת זיוף ומרמה אינה דבר של מה בכך. בפסיקה ענפה שהושרשה, נקבע לא אחת כי כאשר נטענת טענה שכזו, רמת ההוכחה הנדרשת הנה גבוהה ביותר ובעלת חשיבות רבה. כך למשל-
נקבע בבתא (ת"א) 76131/00 B.G Assistance LTD נ' סגל אשר אוסקר:

> "אין די בטענות הנתבעים באשר לחוסר תום לבה של המשיבה, כמו גם בטענותיהם באשר לעושק, רמייה והטעיה, קל וחומר, מקום שהוכח שההנחה תשתית להוכחת קשר הסכמי שכובד במשך שנים רבות.
>
> טענות כאלה, דורשות הוכחה ע"י ראיה של ממש או בעלת משקל וכזאת לא הוגשה. על מנת לסבר את אוזנם של הנתבעים, אוסיף כי גם אם היו מעידים לא היה בכך די, שכן עפ"י הדין וההלכה, טענות כאלה מטילות על הטוען אותם נטל ראייתי מוגבר.
>
> לעניין זה ראה דברי כב' השופט מ' חשין בע"א 5663/90 - הספקה חברה מרכזית לחקלאים בע"מ נ' משה גרוס, פד"י מח' (3) עמ' 876-877:
>
> "אוסיף שמצד ההלכה למדנו כי במקום שבו טוען בעל דין כלפי חברו טענה של הטעיה (והיא לשון נקיה לרמיה), מוטל עליו לעמוד בנטל שהוא כבד מנטל המוטל ברגיל על מתדיין במשפט אזרחי".
>
> וכן דברי כב' השופט מ' חשין, בע"א 2275/90 לימה חברה ישראלית לתעשיות נ' פרץ רוזנברג, פד"י מז (2), 605, עמ' 615-616:
>
> "לא נתעלמה מאיתנו ההלכה כי לעניין טענת רמיה מוטל על בעל הדין המטיל דופי בחברו נטל מיוחד באשר למשקל הראיות שעליו לערום לפני בית המשפט (וזאת, בין אם מדברים אנו בנטל מיוחד לעצמו - בצד הנטל המוטל על צד במשפט אזרחי והנטל המוטל על התביעה במשפט פלילי - ובין אם מדברים אנו בנטל

הראיות במשפט אזרחי, ובגדריו - במישקל ראיות כבד במיוחד);
ראה: ע"פ 232/55 **היועץ המשפטי לממשלה נ' גרינוולד**, פד"י
יב' (2060, 2017 3 ואילך; ע"א 475/81 **זיקרי נ' "כלל" חברה
לביטוח בע"מ**, פד"י מ (594, 589 1 ואילך; ע"א 670/79, 78,
82/80 **הוצאת עתון "הארץ":   בע"מ ואח' נ' מזרחי**, פד"י מא (169
2), 186-187 ראה עוד:  י' קדמי, על הראיות (דיונון, 1991), בעמ'
.873-876"""

<u>הרנון בספרו דיני ראיות, חלק ראשון, עמ' 216 מסביר כי</u>:

"לצידן של שתי מידות ההוכחה הידועות, האזרחית והפלילית,
התפתחה בארצות הברית מידת-הוכחה שלישית במשפטים
אזרחיים, שהיא מעין רמת ביניים: יותר מ"עודף הסתברות" אך
פחות מאשר "מעבר לכל ספק סביר". זו היא דרישה ל- ,cler
cogent and convincing proof. מידת השכנוע צריכה להגיע
לדרגה של הסתברות גבוהה (highly probble). למידה שלישית
זו נזקקו בעיקר כאשר, בהקשרים שונים, היה צורך להוכיח
מרמה או השפעה בלתי הוגנת וכן כאשר ביקשו להוכיח את
תנאיה של צוואה שאבדה ועניינים מיוחדים אחרים כיוצא בהם.
היו שפסקו, כי המידה השלישית חלה בכל הליך אזרחי בו צריך
להוכיח ביצוע עבירה פלילית".

<u>נטל ההוכחה בטענת תרמית במשפט אזרחי</u>:

"**בע.א. 400/86 עזבון המנוח בן-ציון קריגר נגד ד"ר סבינה שטנה**
פ"ד מ"ב(4) 500, 504 צוטט ע.א. 292/64 פ"ד יט(1) 414,416 שם
נפסק כי : "טענת תרמית או מעילה היא טענה רצינית בעלת גוון
הפוגע בשמו הטוב של האדם שנגדו היא מכוונת.

לפיכך, טבעי הדבר, שבית-המשפט הנתקל בטענה כזאת ידרוש
מידת הוכחה יותר גדולה וודאית מאשר בסוגי משפטים אחרים
בעלי אופי פחות חמור... את התרמית יש להוכיח על כל חלקיה
ופרטיה, על תגיה ודקדוקיה, ובדרגת שכנוע לגבי כל עניין ועניין
לגבי כל סכום וסכום".

בע"א 260/82 סולומון נ. אמונה פ"ד לח (4) 253, 256 נאמר כי –

"אך טבעי הוא, שבית-משפט, היושב לדין בהליך אזרחי, ידרוש
הוכחה יותר קרובה לודאות מן המבחן הרגיל, אם מיוחסת לבעל דין
מירמה". (וכן ע"א 359/79, 365 פ"ד לה (1) 711, 701) .

אשר לרמת הראיות שיש להביא נגד המואשם במרמה נפסק-
בע"א 475/81 זיקרי נ. כלל פ"ד מג (1) 600-599, 589 כי –

"שהצד שעליו רובץ הנטל להוכיח עובדות המטילות על יריבו
סטיגמה של ביצוע עבירה פלילית, חייב לעשות זאת באמצעות ראיות
בעלות משקל רב ונכבד יותר ממה שדרוש במשפטים אזרחיים
רגילים".

וכן ראה גם, ע.א. 51/89 האפוטרופוס הכללי נ. צאלח אסעד פ"ד מו(1) 491,
500 שם נפסק כי עול ההוכחה לעניין טענות המרמה הינו "כבד למדי".

88.   המבקשת עותרת לקבלת סעד האוסר באופן גורף עלינו, בין היתר, לשווק, למכור,
      לקדם מכירות או להפיץ כל מסגרות שהן למשקפיים צבועות בעבודת יד. כן עותרת
      המבקשת לאסור עלינו, בין היתר, לשווק, למכור, לקדם מכירות או להפיץ מסגרות
      שיוצרו על ידי המבקשת ואשר נרכשו ממנה- בכסף מלא- על ידינו.

89.   מלאי המסגרות המצוי בידינו נרכש מן המבקשת. המבקשת קיבלה תשלום מלא
      עבור מלאי המסגרות המצוי בידינו. לפיכך, אנו זכאים לממש את זכותנו למכירת
      מלאי המסגרות שבידינו תוך הפקת רווח.

90.   אנו עומדים על זכותנו לממש הרווח ממכירת המסגרות, וזאת כחלק מן
      המאמץ שנקטנו על מנת למזער את נזקינו הרבים כתוצאה ממעשי, מחדלי
      והתנהגות המבקשת.

91.   למען הזהירות בלבד, נטען כי על-פי סעיף 5 להסכם ההפצה, התחייבה המבקשת
      לרכוש את מלאי המסגרות שבידינו אם ברצונה של המבקשת להשתמש במפיצים
      אחרים / נוספים תוך הפסקת פעילות השיווק שלנו.

92.   נוכח כל אשר נאמר ופורט לעיל בבקשה זו, דומה כי ברור שאין כל שחר לטענות
      המבקשת בדבר גרימת נזק בלתי הפיך, ונטיה של מאזן הנוחות לטובתה. לשיטתנו
      ההיפך הגמור הוא הנכון.

93.   נוכח כל האמור לעיל, ברי הוא כי סיכוייה של הבקשה שהגישה המבקשת אינם
      גבוהים, בין היתר בהתחשב בכל מעשי ומחדלי המבקשת בכלל זה עובדת התכננון

הקפדני של ההשתלטות על צינורות השיווק והקשרים העיסקיים שבנינו וטווינו בעמל רב ובהשקעה ממונית ממשית ונכבדת.

94. המבקשת מגיעה לפתחו של בית המשפט כשידיה שלה אינן נקיות מכל רב בכך שהיא זו אשר יצרה מצג ברור כלפינו בדבר מוכנות לכינון קשר עיסקי ארוך טווח, ובכך גרמה לנו להסתמך על המצג ולהשקיע ממון, זמן ומשאבים לפיתוח קשרים, צינורות שיווק וצבר לקוחות והזמנות מתוך הבנה כי פני המבקשת לכינון יחסים ארוכי טווח, בעוד שבפועל המבקשת מיהרה להתנער מהמצגים מההתחייבויות החוזיות הברורות שנטלה על עצמה כלפינו בכללן ובראשן ההתחייבות ליתן לנו זכות סירוב ראשונה לגבי כל הסכם הפצה עתידי שיהיה לאחר פקיעת או סיום תקופת תוקפו של ההסכם נשוא הבקשה.

95. כתוצאה ממעשי המבקשת כאמור והתנערותה מהתחייבויותיה ומצגיה, נותרנו בסיטואציה בעייתית בה לא רק שהשקענו כספים רבים אשר לגביהם קיים יותר מחשש כי ירדו לטימיון, לא רק ששמנו הטוב בענף בו המבקשת ואנו פועלים תוך הפצת בדיות על ידי המבקשת על מעורבותנו, לכאורה, בזיופים של מסגרות וכיו"ב דבר היכול לחסל את פעילותנו בענף לצמיתות, אלא שגם נותרנו עם מלאי משמעותי של מסגרות משקפיים אותן רכשנו מהמבקשת בזמנו, וכעת נוכח ההליכים הננקטים נגדנו, אין בידנו לעשות שום דבר עם המלאי והנזק הכלכלי הנובע מכך.

96. על כן ולאור כל האמור לעיל, ברי הוא כי למבקשת לא ייגרם כל נזק בלתי הפיך, וממילא גם לא הובהר בבקשת המבקשת מהו הנזק הבלתי הפיך, לטענתה, שעלול להיגרם לה ובאיזה אופן. אם כבר, הנזק הבלתי הפיך ייגרם (אם לא נגרם כבר) לנו שכן הכפשת שמנו הטוב בענף, משמעותה כריתת מטה לחמנו באופן סופי ומוחלט, שהרי איש בענף לא ירצה לעבוד עם מי שנטען לגביו כי הוא מפיץ שמזייף את הסחורה של הגורם אותו הוא מפיץ, זאת אפילו אם בסופו של יום יימצא שאין כל שחר לנטען אלא שדי יהיה בהפצת השמועות או במתן צו ולו זמני כדי שייגרם לנו נזק.

97. יתירה מכך, אם אכן אנו זייפנים כנטען נגדנו (דבר המוכחש מכל וכל), הרי שיש די אפשרויות בידי המבקשת על מנת למנוע או למזער התופעה והמעשה הפסול, למשל, בין היתר, על ידי מתן הודעות מתאימות ללקוחות ולציבור, תוך שימת לב ודגש לחוקי וכללי לשון הרע.

98. באשר להכבדה ומאזן הנוחות, דומה כי נוכח כל האמור לעיל אלה נוטים בבירור לטובתנו.

99. ברור כי הותרתנו עם מלאי מסגרות מקוריות בשווי של עשרות אלפי דולרים ומניעת הרווח שהיה צפוי לנו כתוצאה ממכירתן מבלי לשפותנו על הפסדינו או לאפשר לנו למזער נזקינו, אינו דבר שיכול לבוא בחשבון בפרט מקום בו בית המשפט עורך איזון אינטרסים בין אינטרסי הצדדים.

100. אנו מוכנים לכך שיוצא צו מניעה זמני כנגדנו המונע מאיתנו להפיץ מסגרות מזוייפות כאשר במקביל יותנה הצו בחיוב המבקשת לרכוש מאיתנו את המסגרות המקוריות שבידנו לרבות פיצויינו בגין אובדן רווחינו.

101. דומה כי בכך יישמר האיזון הראוי בין אינטרסי הצדדים. מחד שמוצרי המבקשת לא יזוייפו וימכרו בשוק תוך פגיעה כלכלית בה, ומאידך שאנו לא ניפגע כלכלית בגין כך שמילאנו אחר הוראות הסכם ההפצה שבין הצדדים, וכעת בשל גחמה או בשל כך שסר חיננו בעייני המבקשת, נהפוך לקורבן כלכלי, וסכומי הכסף המשמעותיים שהשקענו לרכישת המסגרות, כמו גם הציפייה הלגיטימית שלנו להרוויח ממכירתן של מסגרות אלה- תאבד ותרד לטמיון.

102. עוד ובנוסף, נטען כי הטלת איסור למכור את מלאי המסגרות שברשותנו, אפילו, לתקופה קצובה יגרום לנו לנזק ודאי כיוון שמדובר במוצר אופנתי אשר עלול עקב חלוף הזמן הכרוך בהתדיינות המשפטית להפוך את מלאי הדגמים שבידנו לבלתי רלוונטי, קרי לסחורה שלא ניתן לעשות בה דבר מבחינה מסחרית - כלכלית. כלומר, אם ינתן צו זמני כמבוקש על ידי המבקשת מבלי לשקול את אינטרסינו, הרי שעם הסרתו או ביטולו של זה אנו עלולים למצוא עצמנו בסיטואציה בה לא נוכל למכור את מלאי המסגרות שבידנו כיוון שקו האופנה התחלף. המשמעות המעשית של הטלת צו מניעה המורה לנו להימנע ממכירת המלאי שברשותנו - אפילו באופן זמני- ואפילו לתקופה קצרה, הוא אובדן עלות המסגרות ואובדן הרווח הצפוי להתקבל ממכירתם. אומנם, אין כל ערבות שהיא כי נצליח למכור את מלאי המסגרות שברשותנו ואולם- אין ולא יכולה להיות מחלוקת כי ייגרם לנו נזק ממוני נכבד אם ייאסר עלינו למכור את מלאי המסגרות שהמצוי בידנו.

103. יוצא אם כן כי מאזן הנוחות נוטה בבירור ובאופן משמעותי לטובתנו.

104. זו שמי, זו חתימתי ותוכן תצהירי אמת.

_____
**שמואל טומשובר**


## אישור

אני החי"מ, _____, מאשר בזה כי ביום _____ התייצב בפני מר שמואל טומשובר הנושא ת.ז. מס' 05175135 ולאחר שהזהרתיו כי עליו להצהיר אמת וכי יהיה צפוי לעונשים הקבועים בחוק אם לא יעשה כן, חתם על תצהירו דלעיל בפניי

_____
קונסול

## SALES AND DISTRIBUTION AGREEMENT

This sales and distribution agreement is made and entered into as of the 1ˢᵗ day of October 2004,

By and between Mrs Lea Bibring and/or Art Optic Ltd- a company registered in Israel,business No.513191148, It's address:61 Hazamir Street, Kiryat-Ono 55507, Israel (henceforth:The Producer)

And: Mr.David Goldwasser, Mr & Mrs Samuel & Meryl Tomashover -In person and/or as company (when and if such a company will be established in future), It's address: Mr.Goldwasser-

8 Haoranim Street,Kfar Maas,Israel., Mr.&Mrs.Tomashover- 444 east 75ᵗʰ Street,suite#17C,NY,New York 10021, U.S.A (henceforth: The Buyer)

WHEREAS, The producer produces hand painted frames for glasses of any kind and adjoining cases for those frames, under the trade name RONIT FURST (henceforth : The Product),

WHEREAS, The producer wishes to export the product and sell it in the U.S.A, and for that purpose is prepared to grant sole distribution rights for the U.S.A only,

WHEREAS, The Buyer wishes to buy the product and has the will as the ability and the means to cause such distribution, and wishes to undertake the distribution of the product in the U.S.A,

Therefore the parties have jointly decided on the following agreement :

1. The above declarations made by the parties are an integral part of this agreement.      S.T

2. In exchange of the commitments undertaken by the buyer,as set out hereinafter,the producer agrees to grant him sole distribution rights for the U.S.A Subject to the terms and conditions laid out in this agreement,for as long as the agreement will stay in force,the producer will not sell the product in the U.S.A except through the buyer.

Despite the above said, it is herby agreed that the Producer is allowed to sell directly, not through the Buyer, in the U.S.A to 2 customers only:

Mr. Morley of Advance Optical, 37 Goodway Drive, Rochester, NY 14623.
Mrs.Ruth Domber of 10/10 Optics, 168 Fifth Avenue New York,N.Y 10010.

It is herby acknowledged by the parties to this agreement that these two customers are working with the Producer for over 18 months- prior to this agreement.And it is herby understood by the Buyer that customer no.1 is a small distributor in the Rochester NY area, and that customer no.2 is an Optical shop in NY.

**3.** The agreement shall commence on December 1-2004 and will stay in force till December 31- 2005, provided that the buyer as fulfilled its minimum purchase orders in accordance with section 4 below,and all of he's other commitments and obligations as set forth in this agreement.

S. T

**4.** The Buyer undertakes to purchase from the producer the minimum sales forecasts as set here forth :

Sales for the period from December 1,2004 till June 30,2005- Minimum **65,000 US$** Ex-Works.

(in words: sixty five thousand US dollars).

I.E in quantity- a minimum of 2600 Frames.

Buyer hereby represents and confirms that it would not have received the state of sole distribution rights had he not agreed to its undertaking in this section 4.

S. T

**5.** The 2 sides to this agreement hereby proclaim that their basic intention is to continue their business connection for the satisfactory of both sides, further to 2005, by binding of a long term contract that shall be made and signed towards the end of 2005.

However, should the producer, for reasons that the Buyer has no control over, wish to appoint a different distributor for the U.S.A- for the period after 1.January 2006, he will have to purchase back all the (first quality) frames that the Buyer still has in his stock- prior to the termination of this agreement , at ex-works cost price- not including freight costs.

Furthermore, it is herby agreed that the Buyer will have first refusal rights,prior to any distribution contract- between the Producer and a different distributor for the Product in the U.S.A.

S. T

**6. Prices, Terms and Delivery:**

**6.1** The agreed **price** for each frame (including an Optical Case) is **25.00 US$**.This is an **EX-WORKS** price and does not include Shipping , export documentation and insurance costs.

**6.2 Terms of payment** : By bank Swift transfer, **30%** at the time of placing the order and the remaining **70%** upon receipt of notice that the order is ready for dispatch.

The Buyer undertakes to Insure the goods shipped to him, and shall pay the Producer in full –

In accordance with the payment terms above specified, including should any damage and /or total-loss occur after the goods have been delivered by the Producer to the shipper.

S. T

**5.3 Delivery:** For orders of up to 1000 (one thousand) Frames – a maximum of up to Three months- from placement of order and payment of 30% advance payment. Larger quantities will be delivered according to specific understanding between the parties.

6. Purchase orders by the Buyer shall be in writing (by e-mail or by Fax messages) and are subject to acceptance by the Producer in writing.

It is hereby clarified that once the Producer accepts the order, the Buyer is obliged to purchase the ordered frames as listed in the order. Furthermore, the Buyer undertakes not to return and/or exchange any frame. Without derogating from the above said, the producer agrees to exchange a frame found to be **production Defective**- within a period of **12 months** from it's delivery to the Buyer. The Buyer will return such frames , and these will be exchanged by the Producer at no further cost to the Buyer.

Under no curcumstances will the Buyer deduct payment for frames said to be defective. Those-

As specified above- will be exchanged for new ones.

### 7. Non-Competition

During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing- hand painted frames for glasses of any kind (made of Plastic or Metal) Worldwide that resemble and/or compete with the Product.

**8.1** It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.

**8.2** The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",

"ART OPTIC", "RONIT FURST".

**8.3** It is stressed and agreed, that unless otherwise determined by the Producer in writing, the Product will be soled and distributed in the U.S.A only under the trade name – "RONIT FURST".

### 9. Notices

Any notice provided pursuant to this agreement shall be in writing and sent by registered mail, curier, facsimile or e-mail. All notices and other communications shall be deemed to have been one business day after the date personally delivered, by hand, facsimile or e-mail, or 10 business days after mailing by registered mail (return receipt requested).

Said regestered mail are to be sent to the address set forth in the headings of this agreement.

### 10. Governing Law

This agreement shall be governed and interpreted solely in accordance with the laws of Israel.

Any and all disputes arising between the parties out of or in connection of this agreement, its

interpretation, performance or breach, shall be referred to a binding arbitration before a single

arbitrator to be appointed by mutual agreement between the parties and , in the absence of such agreement, within fourteen (14) days from any of the parties first demand, and the arbitrator will be appointed at the request of either party by the chairman of the Israeli bar. The arbitration will be held in Tel-Aviv, Israel. The arbitration shall be conducted in accordance with the provisions of the Israeli Arbitration Law, 1968. the arbitrator shall not be bound by any rules of evidence or procedure, but shall be bound by the substantive of Israeli law. Any award or decision rendered shall be made by means of written opinion explaining the arbitrator's reasons for the award or decision, shall be final and binding upon the parties hereto, and shall be given in 60 days from the appointment of the arbitrator.

IN WITNESS WHEREOF, the parties have excecuted this agreement as of the date first herein written and each party acknowledges having received one counterpart.

PRODUCER:

Lea Bibring and/or Art Optic Ltd

Tomashover.

BUYER:

David Goldwasser, Samuel Tomashover,

Meryl

**Exhibit 4**

<div dir="rtl">

ת.א. 1661/07
בש"א 9267/07
קבוע לסיכומים בפני כב' השופט י. זפט

בבית המשפט המחוזי
בתל אביב – יפו

ארט אופטיק בע"מ
ח.פ. 51-319114-8

ע"י ב"כ עוה"ד גניהר ואח'
משד' דוד המלך 12, תל אביב 64953

טל: 6968965-03 פקס: 6969781-03

המבקשת
(התובעת)

- נ ג ד -

1. סמואל טומשובר
2. מריל טומשובר

ע"י ב"כ עוה"ד אריה להב-לוי ו/או דורון שמעוני
מרחוב אחד העם 9, ת.ד. 29557, תל אביב 61294

טל: 7979993-03 פקס: 7979997-03

המשיבים
(הנתבעים)

## סיכומים בכתב מטעם המשיבים

בהתאם להחלטתו של בית המשפט הנכבד מיום 20.9.07, מתכבדים בזה המשיבים, באמצעות ב"כ, להגיש את סיכומיהם בכתב בבקשה למתן צו מניעה זמני, שהמבקשת הגישה בבש"א שבכותרת, כדלקמן:

</div>

גניהר ושות'
עורכי דין
0 8 -10- 2007

1. נוכח מגבלת המכסה שנקבעה על ידי בית המשפט לסיכומים אלה, המשיבים לא ישחיתו מקום כתיבה יקר על מנת להתייחס לבוטות ולנסות הלשוניות וההתנהגותית שישימשה את המבקשת ובאי כוחה בסיכומיהם כמו גם בעת הדיון בבית המשפט. לעומת זאת באשר לטעניות המשפטיות, (אם נקרא להם כך מטעמי נימוס), אשר נפלו בסיכומי וטיעוני המבקשת- בהחלט יעמידו המשיבים, בסיכומים אלה, דברים על דיוקם.

2. למבקשת שתי טענות בגין, מבקשת היא לקבל צו מניעה זמני אשר יאסור על המשיבים למכור מסגרות משוכפים מתוצרתה: טענה חוזית הנסמכת על סעיף 7 להסכם ההפצה שבין הצדדים, וטענת נוספת מן הדין, לפיה מיוחסים למשיבים מעשי זיוף ומרמה.

3. על מנת שאדם יוכל לזכות לסעד זמני מהסוג המבוקש על ידי המבקשת עליו לקיים מספר דרישות חוקיות מקדמיות שחלקן בא לידי ביטוי ברור ומפורש בתקנות בתקנות סדר הדין האזרחי (להלן: **"התקנות"**), חלקן נלמד מדיני היושר הישר החלים על סוג זה של סעדים וחלקן מהפסיקה הישראלית.

4. על פי תקנה 362 לתקנות על מנת שיינתן סעד זמני, על המבקש להציג לבית המשפט בסיס ראייתי מהימן, לכאורה, לקיומה של עילת תביעה, ויתר התנאים הייחודיים הנדרשים לסוג הסעד הזמני המבוקש, שאז בית המשפט ישקול את מתן הסעד המבוקש, בין היתר, בהתחשב במאזן הנוחות של הצדדים, ובהתחשב במידת תום ליבו של המבקש, וכן האם מתן הסעד המבוקש צודק וראוי בנסיבות העניין.

5. במקרה דנן נראה שמלאכתו של בית המשפט קלה ביותר הואיל והמבקשת לא הניחה ולו שמץ תשתית ראייתית מהימנה, לכאורה, לקיומה של עילת תביעה כנגד המשיבים, לא כל שכן יכולה המבקשת להתהדר בטענת תום לב, אם בכך שמתן הסעד המבוקש צודק וראוי בנסיבות העניין.

6. **באשר לטעניות החוזית** – לשיטת המבקשת בבקשתה המקורית למתן צו מניעה זמני, הסכם הסוכנות הבלעדית עם המשיבים הסתיים **בסוף 2005** (ראה : סעיף 6 לבקשה).

7. בהתאם לכך, תוקפה של תנייה אי תחרות- לתקופה של שנתיים- מסתיימימת לכל המאוחר בעוד 2 חודשים- בחודש דצמבר 2007. המשיבים יטענו, כי מבלי לגרוע מהאמור לעיל, המבקשת הרחיבה חזית בסיכומיה, עת אימצה לחיקה את טענת המשיבים בדבר מועד סיום תקופת התקשרות. בסיכומיה ניסתה המבקשת לעשות בהרחבת החזית הבלתי לגיטימית שלה- קרדום לחפור בו- על מנת לטעון כי תוקפה של תנייה אי תחרות מסתיימת רק בסוף שנת 2008. **בהקשר זה המשיבים מביעים את התנגדותם הנחרצת ומבקשים את בית המשפט להתעלם מהרחבת החזית האסורה.**

8. בנוסף, המבקשת לא פצלה לאכיפתה של תנייה אי תחרות במועד סיום ההסכם בסוף שנת 2005, אלא נזכרה בקיומה של תנייה אי תחרות רק **בסוף הרבעון הראשון של 2007**, עת נפתחו ההליכים בתיק זה.

9. גם אז לא אצה למבקשת הדרך, **ובית המשפט לא מצא בסיס להעניק למבקשת צו מניעה במעמד צד אחד**. כך שבסופו של דבר העניין נדון רק **בשלהי ספטמבר 2007**.

10. **בנסיבות דנן, ניתן בהחלט לראות במבקשת כמי שהשתהתה, כמי שישנה על זכויותיה וכך ויתרה, בהתנהגותה, על אכיפתה של התניה. מטעם זה בלבד אין לאכוף עתה את תניית אי התחרות על המשיבים.**

11. כיום- כל מטרתה של המבקשת של בצו המבקש נועד להוסיף ולפגוע בשמם הטוב של המשיבים כפי שהיא עושה מזה חודשים רבים- כאשר תנית אי התחרות מסתיימת, לכל המאוחר, עוד חודשים.

1

12. בנוסף, המשיבים יטענו, כי אין כל מקום לאכיפתה של תניית אי תחרות כאשר אכיפתה, תלויה בביצוע מוקדם של פעולות ומעשים מצד המבקשת, להבדיל מהטענה הריקה של המבקשת בסעיף 11 לסיכומיה כאילו המדובר בתנאי שלובה. הכוונה לביצוע של כל האמור בסעיף 5 להסכם ההתקשרות בין הצדדים, ובכלל זה, מתן זכות סירוב ראשונה למשיבים בטרם החלפתם במפיץ או סוכן אחר (כאשר כיום למבקשת מפיץ בשם בארי), וכן רכישת כל מלאי המסכרות שבידי המשיבים.

13. המבקשת לא עמדה בקיום סעיף 5 להסכם ההפצה. המבקשת אף מוסיפה חטא על פשע בעצם התמוממותה בתואנה כי המשיבים לא פנו אליה בדרישה בנושאים אלה- דבר אשר לא רק שאינו נכון עובדתית, שכן המשיבים פנו ודרשו את זכות הסירוב הראשונה- אלא שהדברים נעדרי כל בסיס משפטי בהתחשב באמור בהסכם המטיל חובה אקטיבית על המבקשת THE PRODUCER...WILL HAVE TO PURCHASE... ובהמשך נאמר גם: **"PRIOR TO TERMINATION OF THIS CONTRACT"**. כמו כן, נוכח חובת תום הלב המוטלת על צד להסכם, בהתאם לסעיף 39 לחוק החוזים (חלק כללי), תשל"ג – 1973, משמע כי לא רק שהחובה האקטיבית להציע לרכוש את המלאי כמו גם להעניק זכות סירוב ראשונה הוטלו על המבקשת באופן בלעדי, אלא שהדברים אף דרים בכפיפה אחת עם הוראותיו של חוק החוזים המחיל והקובע חובת תום לב בעת ביצועו של הסכם -- החובה לקיים את התחייבויות המבקשת טרם עמידה על זכויותיה שלה לפי סעיף 7 להסכם. גם מטעם זה אין לאכוף אי תחרות.

14. גם בחינה של התניה עצמה אינה עושה חסד עם המבקשת שכן לא ברור מהי תכליתה האמיתית של התניה ועל מה באה זו להגן למעט "הערך" של אי תחרות ככזה.

15. על פי ההלכה הנוהגת, לצורך אכיפתה של תניית אי תחרות יש לבחון את התניה והתכלית שזו באה לשרת. השיקולים להכיר בתניית אי תחרות הינם: הצורך לקיים הסכמים ככאלה, והצורך להגן על מבקש התניה מפני תחרות של זה שנדרש לאי תחרות, משום שלמשל המבקש בתנית אי תחרות השקיע בהכשרה. יצר את צבר הלקוחות וחשף את מי שמבקשים לאכוף את התניה כלפיו לסודותיו המסחריים. נבהיר כבר כאן, כי אף אחד מהשיקולים הללו אינו מתקיים במקרה זה. ביחס לקיום הסכם, המבקשת אינה יכולה לבקש אכיפת הסכם אותו היא הפירה בעצמה (אי ביצוע הוראות סעיף 5), לא נטען כי המבקשת השקיעה בהכשרת המשיבים, לא נטען כי המבקשת נתנה או חשפה למשיבים את לקוחותיה (ההיפך היא החריגה מסי לקוחות מהההסכם – ראה ההסכם סעיף 2) וגם לא נטען כי המשיבים שותפו בסודות המסחריים של המבקשת.

16. מאידך, השיקולים שלא לאכוף תניית אי תחרות הם: הגבלה יתירה ובלתי חוקתית של חופש העיסוק (זכות יסוד הנתונה משום מה בעיני אי כוחה של המבקשת כ"נכס חלוד" -- ראה סעיף 13 לתשובת המבקשת לתגובת המשיבים), השיקול של הגברת חופש התחרות על מנת להביא לשיפור ושכלול השוק, והשיקול האחרון הגנה על מי שמבקשים לאכוף את התניה נגדו, וזאת מתוך הנחה כי מנסח החוזה, כבמקרה דנן, הוא הצד החזק או בעל היתרון להכתיב תניות מהסוג דנן.

17. בעבר נקבע כי ככלל, תנייה אי תחרות הינה סבירה ותקיפה אם היא הוגנת כלפי שני הצדדים. עם השתנותה של המציאות המשפטית, הבחינה היא כעת דו שלבית: ראשית יינבחנו מהם האינטרסים המוגנים של מבקש האכיפה. אם ימצאו כאלה תעשה הבחינה השנייה והיא האם היקף ההגבלה הוא כדין. אם כבר בבחינה הראשונה יימצא כי אין כל אינטרס מוגן של מבקש האכיפה, אזי תתבטל התניה מחמת היותה נוגדת תקנת ציבור. **התחייבות "ערומה" לאי תחרות שאינה מגינה על אינטרסים של מבקש האכיפה מעבר לאינטרס אי התחרות כשלעצמו (כגון אינטרס השמירה על סודות מסחריים ורשימת לקוחות) אינה מעצבת אינטרס לגיטימי ודינה להיפסל.**

2

ראה: ע"א 6601/96 **AES SYSTEMS INC** נ. **סער** פ"ד נד (3) 850, 860.

ראה: ע"א 164/99 **פרומר נ. צ'ק פוינט** רדגאדרד בע"מ פד"יע לד 264, 312.

18. אם הבחינה הראשונה תעלה כי קיים אינטרס לגיטימי של מבקש האכיפה שיש להגן עליו, אזי תיבחן מידתיות התניה באספקט של משך התניה, המקום בו חלה התניה וסוג הפעילות אותה יש להגביל.

19. **מן הכלל אל הפרט** – במקרה דנן אין חולק כי אין כל מקום לאכיפת התניה מהטעם שהמבקשת אינה מסוגלת לצלוח אפילו את המבחן הראשון מבין השניים דלעיל. המבקשת לא הניחה בפני בית המשפט כל ביטוי לאינטרס לגיטימי שלה שיש להגן עליו באמצעותה של תנית אי התחרות. כך, לא נטען על ידי המבקשת דבר בנושא קיומם של סודות מסחריים שמסרה למשיבים ועליהם באה התניה להגן כעת, כך גם לא נטען כי המבקשת חשפה בפני המשיבים את לקוחות שלה, אם כבר ההיפך הוא הנכון המשיבים נשכרו מלכתחילה על מנת להרחיב את חוג לקוחות והלקוחות והם שיצרו את מאגר הלקוחות, אין גם כל טענה כי המבקשת הכשירה או מימנה הכשרתם של המשיבים. מהמקובץ עולה אם כן, כי תניית אי התחרות לא באה על מנת להגן על אינטרסים לגיטימיים ברי הגנה של המבקשת, ולמעשה מדובר בהתחייבות "ערומה" לאי תחרות שאין לה כל תכלית **זולת אי תחרות לשמה.**

20. במצב דברים זה ניתן בהחלט להפסיק את הבדיקה, שכן לאור הפסיקה דלעיל מדובר בתניית אי תחרות הנוגדת את תקנת הציבור ועל כן רק מטעם זה דינה להתבטל. למען הזהירות, ניישם אף את המבחן השני. משך התניה מוגזם בכל קנה מידה, שכן משך התניה אינו דר בכפיפה אחת עם המציאות המשפטית דהיום אשר אוכפת, אם אוכפת, תניות אי תחרות למשך תקופות קצרות מאד, חודשים ספורים בלבד. במקרה דנן יש לבחון את משך אי התחרות וסבירותה גם לאור משך ההתקשרות כולה, אשר לשיטת המבקשת היתה משך שנה אחת. לכן, לאכוף תניית אי תחרות למשך זמן כפול מכל ההתקשרות כולה הינה חוסר סבירות קיצוני. משנה תוקף מקבלים הדברים עת בחינת הסכם הפצה מסוג **אחר** של המבקשת מעלה תנית אי תחרות לתקופה דומה (שנתיים) אלא שתקופת ההסכם ההפצה הינה ל-7 שנים (!) ולא לשנה אחת כמו במקרה דנן. מצ"ב הסכם הפצה קונדה.

21. גם בחינת המקום בו מבקשים לאכוף את התניה -- "כל העולם" -- מחדד את חוסר הסבירות ודרקוניות התניה, כמו גם יש בכך להצביע כי הצו המבוקש הינו גורף וכוללני. גם מטעם זה אין להיענות לבקשה.

22. לשיא שלילי מיוחד מגיעה התניה המנוסחת באופן גורף וכוללני הקובע כי אסור יהיה למשיבים לעסוק בכל עיסוק הקשור למסגרות צבעוניות ביד. ודוק, לא מדובר במסגרות של המבקשת המוגנות על ידי דיני זכויות יוצרים, זכויות שאין למשיבים כל מחלוקת לגביהן בכפוף לקיום האמור בסעיף 5 להסכם, אלא בכל עיסוק במסגרות צבעוניות ביד (!) ללא קשר אם התחשבות בשאלה אם המסגרות האחרות הצבעוניות ביד אינן יצירות מוגנות של אמן או גורם אחר. על מנת שתתקום למבקשת זכות כזו היא צריכה להיות בעלת הזכויות של כל המסגרות הצבעוניות ביד בכל מקום בעולם על ידי כי יצרן, ונדמה כי לא רק שאין לכך שום בסיס, אלא שאפילו המבקשת אינה טוענת לכך. אם כן, מדוע יש להגביל את המשיבים באופן כה קיצוני? התשובה פשוטה בתכלית -- המבקשת ומטעמה, החליטה לחסל את המשיבים מבחינה עיסקית, להשתלט על לקוחותיהם, על צינורות השיווק שלהם, על טרחן עמלו והשקיעו המשיבים על מנת להגדיל את נתח נתח והיקף שוק הזעיר של המבקשת של המבקשת בתחום מסגרות המשקפיים.

23. בניגוד לתדמית שהמבקשת מנסה ליצור לעצמה כחברה מולטי לאומית המגלגלת מחזורי עתק בכל העולם, מדובר בגוף על גבול הקיקיוניות אשר רוכש מסגרות סטנדרטיות מיצרן עלום-שם בסין, אלה נצבעות על ידי 3-4 "אמניות" העובדות כאן במעין סדנא בישראל, ואחר מכן משוווקות לחנויות בכמויות קטנות, כאשר חלקים גדולים מהסחורה מוחזרים למבקשת עקב ריבוי שברים של המסגרות, ובעיקר עקב קילופים ניכרים של הצבע בו נצבעו. זו כל "תהילתה" של המבקשת.

3

24. מהמקובץ עולה אם כן, גם מבחינת משך התניה, מידותיה וסבירותה, אין כל מקום לאכיפת תניית אי התחרות מן הבחינה החוזית ועל כן יש לדחות הטענה בפן זה.

25. **באשר לטענת הזיוף** – אם נמצא כי אין שום מקום או בסיס לאכיפתה של התניה מן הבחינה החוזית, הרי שמלאכתם של המשיבים להדיפת טענות הזיוף נגדם, טענות תלושות ונטולות ביסוס, קלה שבעתיים הואיל **והמבקשת לא הניחה כל ראיה ממשית או למצער ראיה לכאורה להוכחת טענותיה כי המשיבים הינם "זייפנים"**. כל שיש בידי המבקשת הוא תצהירו של אחד, אהוד ביברינג, אדם אשר ספק אם ניתן לראות בו כאדם מהימן ואת נוכח התנהלותו הכספית הבעייתית אשר יצרה לו חובות עתק בגינם מצוי הוא כיום בהליכי פשיטת רגל (כנ"ר פ"ר 7719 תיק ביהמ"ש 9126/03). גם מעדותו, לא ניתן ללמוד דבר וחצי דבר הקשור את המשיבים לזיוף מסגרות המוגנות בזכות היוצרים של המבקשת, אשר אפילו בחקירתו בבית המשפט בשאלה ישירה השיב כי כל מה שנושא זה נושא עדות ולהיחקר, לכן אם נוסיף לכך את העובדה שדבריהם של אלה, נמשכו בכלל כראיית מתיק בית המשפט, הרי שבסופו של יום נותרה המבקשת עם עדותו הסתמית של אותו 'ביברינג'.

26. המשיבים ערים לכך כי במסגרתם של הליכי ביניים ניתן להעיד גם מפי השמועה ובלבד שיצוין מקור הדברים, ואולם ברור כי בית המשפט לא יסתפק, מבחינת התשתית הראייתית בהבל פיו של עד יחיד ועל פיו יחרוץ דין, בפרט מקום בו מדובר בעד מעוניין ובלתי אובייקטיבי מסוגו של ביברינג. במקרה כזה, שומה על בית המשפט לתור ולחפש תוספת ראייתית לביסוס ולחיזוק עדותו של העד, ובאין ראיה כאמור, לדחות את הבקשה. הלכה מושרשת ונטועה בפסיקה היא כי הימנעותו של בעל דין להביא עד שיש בעדותו כדי לתמוך בגרסתו פועלת לחובתו של בעל הדין.

27. במקרה דנן פ לאחר שהפכנו היטב בכל החומר, לא מצאנו ולו דבר קלוש או קרוב לביסוס הנטען על ידי ביברינג והמיוחס למשיבים. ראשית וכפי שכבר נאמר, המעט שהיה בכד מבקשת בידי תצהיר של פירסט ושני מסמכים נוספים הנחזים להיות תצהירים נמשכו בפתח הדיון; המבקשת טענה כי דוכן של המשיבים צולם בעת תערוכה שהתקיימה עת אלה מכרו שם מסגרות מזויפות, ואולם מעיון בתמונות שצורפו כנספח ו' לכתב התביעה **לא עולה** כי האובייקטים המצולמים הם המשיבים או מי מהם, או כי זה הדוכן שלהם או כי זה בו מסגרות מזוייפות או כי יש לו כל קשר למבקשת או למשיבים. או כי זה צולם בתערוכה הנטענת. אם כך על סמך מה נטען מה שנטען ? למבקשת הפתרונים.

28. גם הנסיון להשליך את היהב על תצהירו של פירסט (אשר כזכור נמשך) אף הוא לא רציני, שכן הכיצד ניתן להסתמך על ראיה אשר אינה קיימת כלל בתיק ? יתירה מזה, גם לו היתה קיימת ראיה הרי לא הוצגו משקפיים כלשהם מחונה זו. כל שנאמר בתצהיר פירסט הוא כי מדובר **בבני זוג** שמכרו משקפיים מזוייפים- ללא כל קשר כלשהו למשיבים. ביברינג אשר עומת עמו בנושא זה בחקירתו, התחמק ממתן תשובה עניינית ורצינית בנושא ושב על המנטרה השחוקה על נושא זה (ראה : פרוטוקול עמ' 2, למטה).

29. בנסיבות דנן נשאלת גם השאלה אם אכן מדובר ב"זייפנים", מדוע לא הוגשה עד עצם היום הזה כל תלונה במשטרה נגד המשיבים, כאן או בארה"ב ?

30. מהמקובץ עולה אם כן, כי אין ביד המבקשת כל ראיה, לא כל שכן "ראיות מהימנות לכאורה" לביסוס טענותיה ועל מנת שתקום לה הזכות לקבלת צו מניעה כנגד המשיבים. בה בעת שבמקרה בו מדובר בטעננת של זיוף או מרמה, חלה על הטוען חובת ראיה מוגברת. מיותר לומר כי המבקשת לא עמדה בנטל זה, ואף לא קרוב לכך.

4

31. לא רק שאין למבקשת כל ראיה לביסוס טענותיה, אלא שגם את המעט שהביאה מצאה היא למשוך **ללא**
**הסבר כלשהו** בפתיחת הדיון, דבר אשר יש לו משמעות ראייתית לחובתה. כלומר הדלות הראייתית
מלכתחילה, שבאה לידי ביטוי בין היתר בהפרחת דברים תלושים ללא אי העדת בעלי הדין
הרלוונטיים עצמם, כמו גם ההימנעות מהבאת ראיות ועדים בהמשך בעת הדיון ולגופם של דברים,
מבססים את החזקה הראייתית לפיה: **מעמידים בעל דין בחזקתו שלא ימנע מבית משפט ראיה שהיא**
**לטובתו, ואם נמנע מהבאת ראיה שהיא בהישג ידו ואין לכך כל הסבר סביר, ניתן להסיק כי אילו**
**הובאה הראיה היתה פועלת נגדו**

ראה : ע"א 2275/90 לימה חברה ישראלית לתעשיות כימיות בע"מ נ' פרץ רוזנברג ואח' פ"ד מו (2) 605.

ראה י. קדמי, **על הראיות (חלק שלישי)** הדין בראי הפסיקה מהדורה משולבת ומעודכנת 2003, עמ' 1648 ואילך.

32. מהמקובץ עולה אם כן, כי המבקשת כשלה לא רק בעצם אי הבאתן של ראיות להוכחת וביסוס טענותיה,
אלא שגם את המעט שהביאה משכה, ובכך המיטה על עצמה בעייתי ביותר מן הבחינה המשפטית
והראייתית. על כן, גם מכל הנימוקים שפורטו כאן, אין כל מקום להידרש לטענות הזיוף, לא כל שכן
ליתן צו המתבסס על "עילה" זו.

33. בטרם סיום המשיבים יתייחסו קצרות לאמור בסיכומי המבקשת כדלקמן : באשר לטענה כי המשיב 1
"הודה" במכירת מסגרות בוירג'יניה, אין בכך כדי להוות ראיה לדבר זולת מאמץ המשיבים להיפטר
ממלאי המסגרות **המקוריות** שבידיהם, הואיל והמבקשת לא קיימה חובתה לרכוש אותן מהם, תרו הם
את כל הנקודות בהן מכרו סחורה, בכלל זה בוירג'יניה. אולם, רחוקה הדרך מעצם הודאה במכירה
למסגרות מזויפות. בכלל מיהו הסוחר שירכוש מסגרות מזויפות ביודעו כי הן כאלה כשסימני
ההיכר כה בולטים ?

34. דבר ההבל הגדול ביותר שנשמע במסגרת טיעוני המבקשת הוא הטענה כי הואיל ומה שמבדיל מסגרת
מקורית ממזוייפת הוא דרך סימון פרטי הדגם על ידית/מוט המשקפיים, הרי שכל ידית משקפיים עליה
אין כיתוב ידני היא היתה מזוייפת. הואיל והמסגרת שהוצגה מזוייפת, אזי "הזייפנים" הם המשיבים. אם
אכן כך הם פני הדברים, הרי שהמשיבים צריכים להיות שוטים גמורים כדי לא לייצר מסגרות
"מזוייפות" אשר אינן מחוקים את הסממן הנ"ל. אם כבר, עצם קיומן של המסגרות שהוצגו, מעידה
כאלף עדים כי יד של המשיבים לא היתה במעל, שכן המשיבים- כסכום בלעדי- ידעו על הסממן, ולכן
רק מי שאינו שותף לידיעה על הסממן יכול לזייף את המסגרת באופן כה שלומיאלי. חזקה על
המשיבים כי לו היו הם הזייפנים, היו מקפידים בנושא זה.

35. מפאת קוצר היריעה, המשיבים שבים בזה על כל האמור בתגובתם לבקשת המבקשת למתן צו מניעה,
על מנת שלא ייחזה כאילו נטשו טענות אלה, ואולם דומה כי נוכח ליבו של העניין במחלוקת ראוי ונכון
היה למקד הדיון והטיעון בניתוח המצב המשפטי הנוגע ישירות לבקשת המבקשת.

36. לאור כל האמור לעיל מתבקש בזה בית המשפט לדחות את בקשת המבקשת ליתן צו מניעה זמני כנגד
המשיבים, ולחייב המבקשת בהוצאות משפט ובשכ"ט עו"ד בצירוף מע"מ כחוק בגינו בקשה זו.

דורון שמעוני, עו"ד
ב"כ   המשיבים

אריה להב-לוי, עו"ד
ב"כ   המשיבים

5



Register Now    Search Exhibitors    Contact Us    Industry Supporters    Photo/Video Gallery

Home

Register Now

Search Exhibitors

Exhibits Only
Information

Continuing
Education
Information

What's New This
Year

Show Specials &
Networking Events

Discounted Hotel
& Travel

Press & News

International
Vision Expo East

Exhibitor
Information

Search

[Go]
Advanced search

## Vision Expo 2007 Exhibitor List

Vision Expo hosts over 550 exhibitors from all over the world showcasing the latest in ophthalmic products and eyewear trends. Explore the largest and most comprehensive exhibit hall of ophthalmic products and services for the entire ophthalmic community.

Moving Forward at International Vision Expo West
Register today to attend this world-renowned trade show and continuing education meeting.

**Brintech Eyewear**                                              Charlotte, NC 28211
**Ronit Furst**                                                   www.brintech-usa.com
booth : G22036

Exhibitor Details   |   Press Releases

**Company Description**                          Categories

Brintech is the exclusive distributor in the USA for  Ronit Furst       Frames
hand painted eyewear. Ronit Furst is an Israeli artist and           Reading Glasses
designer who for the past 20 years created a variety of              Sunglasses
magnificent works of art. In 2002, Ronit Furst turned her
talents to painting optical frames. Each high quality frame is
individually hand painted with exceptional patterns and colors,
opening up the possibilities for a unique and joyful eyewear
experience that will surly set your customers apart from the
crowd.

**Additional Information**

Names of People in Attendance: Avri Beeri, Donna Beeri, Linda Beeri, Ronit Furst, Eyal Bllima

Designer Frames: Ronit Furst

Site Map | Privacy Policy | Copyright | Reed Com | Reed Corporate | Reed Eyewear

    



**Homepage**

**Gallery**

**About the Artist**

**Events**

**Reviews**

**Contact Us**

## Contact Us

Here at ronitfurst-usa.com, we love to hear from you. Please feel free to call, fax, and/or email us your requests, comments, thoughts and ideas. For your convenience, we have listed a variety of options to best serve your needs. We look forward to hearing from you soon!

Phone: 828-835-4765 or 704-365-5499
Fax: 866-960-0002 or 704-365-1871
Address: 1101 Court Drive, Charlotte, NC 28211 USA

Marc Brunovich marks@ronitfurst-usa.com
Avri Brein avri@ronitfurst-usa.com
Clark Morris clarkm@ronitfurst-usa.com

info@ronitfurst-usa.com



*Name or Store Name:

*Address:

*City:

*State, Zip

*Email:

*Phone:

Comments:







SALES AND DISTRIBUTION AGREEMENT

dubuc opticiens

From:     ehud [ehud@op-art.co.il]
Sent:     20 janvier, 2004 19:30
To:       dubuc opticiens
Subject:  SALES AND DISTRIBUTION AGREEMENT

## SALES AND DISTRIBUTION AGREEMENT

This sales and distribution agreement is made and entered into as of the 1st day of January 2004,
By and between **Mrs Lea Bibring and/or Art Optic Ltd** a company registered in Israel
(henceforth : The Producer), It's address : 61 Hazamir Street, Kiryat-Ono 55507, Israel. And Mr.
**Alain Dubuc and/or Lynx Optique** a company organized and existing under the laws of Quebec,
Canada (henceforth : The Buyer) It's address: 46 Carlisle, Pointe-Claire, Quebec H9R 5S9, Canada.

WHEREAS, The producer produces hand painted frames for glasses of any kind and adjoining cases for
those frames, under the trade name RONIT FURST (henceforth : The Product),

WHEREAS, The producer wishes to export the product and sell it in Canada and for that purpose is
prepared to grant sole distribution rights for Canada only,

WHEREAS, The Buyer wishes to buy the product and has the will as the ability and the means to cause
such distribution, and wishes to undertake the distribution of the product in Canada,

Therefore the parties have jointly decided on the following agreement :

1. The above declarations made by the parties are an integral part of this agreement.

2. In exchange of the commitments undertaken by the buyer,as set out hereinafter,the producer agrees to
grant him sole distribution rights for Canada.Subject to the terms and conditions laid out in this
agreement,for as long as the agreement will stay in force,the producer will not sell the product in Canada
except through the buyer.

3. The agreement shall commence on January 1,2004 and will stay in force for 7 (seven) years, provided
that the buyer has fulfilled its minimum purchase orders in accordance with section 4 bellow,and all of
he's other commitments and obligations as set forth in this agreement.

4. The Buyer undertakes to purchase from the producer the minimum sales forecasts as set here forth :
Sales during the year 2004- Minimum **25,000 US$**
Sales during the year 2005- Minimum **50,000 US$**
Sales during the year 2006- Minimum **80,000 US$**
Sales during the year 2007- Minimum **100,000 US$**
Sales during the year 2008- Minimum **120,000 US$**
Sales during the year 2009- Minimum **126,000 US$**
Sales during the year 2010- Minimum **132,000 US$**

Buyer hereby represents and confirms that it would not have received the status of sole distribution
rights had he not agreed to its undertaking in this section 4.

05-03-04

8.1 It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have
any proprietary rights, trade rights or copyrights with respect to the Product.
8.2 The Buyer will promote the product only under the Producer's registered trademarks, trade names,
logos, labels and other indications of source or origin as may be determined by the Producer from time
to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",
"ART OPTIC", "RONIT FURST".
8.3 It is stressed and agreed, that unless otherwise determined by the Producer in writing, the Product
will be soled and distributed in Canada only under the trade name – "RONIT FURST".

9. **Notices**
Any notice provided provided pursuant to this agreement shall be in writing and sent by registered mail,
currier, facsimile or e-mail. All notices and other communications shall be deemed to have been one
business day after the date personally delivered, by hand, facsimile or e-mail, or 10 business days after
mailing by registered mail (return receipt requested).

SALES AND DISTRIBUTION AGREEMENT

**5. Prices, Terms and Delivery:**
5.1 The agreed **price** for each frame is **19.00 US$** plus **2.00 US$** for the case. This is an EX-WORKS price and does not include Shipping , export documentation and insurance costs.
The price for each frame will increase each year by 1.00 US$ or by 5%- the higher of the two.
5.2 **Terms of payment** : For the first year only (2004)- **25%** of the value of the total order shall be paid at the time of placing the order, a further 25% upon receipt of notice that the order is ready for dispatch, and the balance **50%** shall be paid up to 60 days after the day of dispatch.
Despite of the above said regarding the payment terms for the first year, it is agreed that **full payment** must be made by the Buyer per order before the shipping of a following order.
For the following years (2005-2010) the payment terms are : **30%** at the time of placing the order and the remaining **70%** upon receipt of notice that the order is ready for dispatch.
To avoid any misunderstanding, the date on which the Producer delivers the frames to the Shipper (be it U.P.S or any other shipper) is the dispatch date- as ment by this section.
The Buyer undertakes to **Insure the goods** shipped to him, and shall pay the Producer in full —
In accordance with the payment terms above specified, including should any damage and /or total-loss occur **after** the goods have been delivered by the Producer to the shipper.
5.3 **Delivery**: For orders of up to 700 (seven hundred) Frames – a maximum of up to Three months from placement of order and payment of 25% or 30% advance payment. Larger quantities will be delivered according to specific understanding between the parties.

6. Purchase orders by the Buyer shall be in writing (by e-mail or by Fax messages) and are subject to acceptance by the Producer in writing.
It is hereby clarified that once the Producer accepts the order, the Buyer is obliged to purchase the ordered frames as listed in the order. Furthermore, the Buyer undertakes not to return and/or exchange any frame. Without derogating from the above said, the producer agrees to exchange any frame found to be **production Defective**- within a period of **6 months** from it's delivery to the Buyer. The Buyer will return such frames , and these will be exchanged by the Producer at no further cost to the Buyer.
Under no circumstances will the Buyer deduct payment for frames said to be defective. Those-
As specified above- will be exchanged for new ones.

7. **Non-Competition**
During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, wether directly or indirectly, wether for consideration or not, in manufacturing, marketing, selling, promoting, or distributing- hand painted frames for glasses of any kind (made of Plastic or Matal) Worldwide that resemble and/or compete with the Product.

8.1 It is hereby specifically acknowledged by the Buyer that it does not have, nor will it claim to have any proprietary rights, trade rights or copyrights with respect to the Product.
8.2 The Buyer will promote the product only under the Producer's registered trademarks, trade names, logos, labels and other indications of source or origin as may be determined by the Producer from time to time. Currently, the Producer's trademarks and/or trade names consist of : "OPART",
"ART OPTIC", "RONIT FURST".
8.3 It is stressed and agreed, that unless otherwise determined by the Producer in writing, the Product will be soled and distributed in Canada only under the trade name – "RONIT FURST".

9. **Notices**
Any notice provided provided pursuant to this agreement shall be in writing and sent by registered mail, currier, facsimile or e-mail. All notices and other communications shall be deemed to have been one business day after the date personally delivered, by hand, facsimile or e-mail, or 10 business days after mailing by registered mail (return receipt requested).
Said regestered mail are to be sent to the address set forth in the headings of this agreement.

05-03-04

SALES AND DISTRIBUTION AGREEMENT

**10. Governing Law**

This agreement shall be governed and interpreted solely in accordance with the laws of Israel. Any and all disputes arising between the parties out of or in connection of this agreement, its interpretation, performance or breach, shall be referred to a binding arbitration before a single arbitrator to be appointed by mutual agreement between the parties and , in the absence of such agreement, within fourteen (14) days from any of the parties first demand, and the arbitrator will be appointed at the request of either party by the chairman of the Israeli bar. The arbitration will be held in New York City, NY. The arbitration shall be conducted in English, in accordance with the provisions of the Israeli Arbitration Law, 1968. the arbitrator shall not be bound by any rules of evidence or procedure, but shall be bound by the substantive of Israeli law. Any award or decision rendered shall be made by means of written opinion explaining the arbitrator's reasons for the award or decision, shall be final and binding upon the parties hereto, and shall be given in 60 days from the appointment of the arbitrator.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date first herein written and each party acknowledges having received one counterpart.

_____

Lea Bibring and/or ART OPTIC LTD

_____

ALAIN DUBUC and/or LYNX OPTIQUE

05-03-04

**Exhibit 5**

1

בתי המשפט

בש"א 009267/07  בבית המשפט המחוזי בתל אביב-יפו
בתיק עיקרי: א 001661/07

בפני:  כבוד השופט יהודה זפט – סגן נשיא

בעניין:  ארט-אופטיק בע"מ
ע"י ב א כח עוה"ד    אוריאל גניהר    **המבקשת**
נ ג ד
1. סמואל טומשובר
2. מריל טומשובר  **המשיבים**
ע"י ב א כח עוה"ד    אריה לתב-לוי

## החלטה

### רקע

ביום 1.10.04 התקשרה המבקשת המייצרת ומשווקת מסגרות משקפיים מפלסטיק מצויירות
בעבודת יד (להלן: "המסגרות המצויירות"), עם המשיבים בהסכם הפצה, לפיו ישמשו המשיבים
כמפיצים בלעדיים של המסגרות המצויירות בארה"ב מיום 1.12.04 ועד 31.12.05 (להלן: "הסכם
ההפצה").

בין המבקשת למשיבים התגלע סכסוך בקשר להפצת המסגרות המצויירות ובשנת 2006 חדלה
המבקשת לספק למשיבים מסגרות מצוירות.

לטענת המבקשת, המשיבים משווקים בארה"ב מסגרות משקפיים המהוות חיקוי של המסגרות
המצויירות.

בת.א 1661/07 תבעה המבקשת להצהיר כי המשיבים מנועים מלייצר או לשווק מסגרות משקפ"ם
חדומות או מתחרות במסגרות המצויירות במשך תקופה של שנתיים החל מיום 30.9.06 הוא
המועד האחרון בו סיפקה המבקשת למשיבים מסגרות משקפיים מצויירות. כן תבעה המבקשת לאסור על
המשיבים לייצר ו/או למכור מסגרות תחת השם "רונית פירסט", "אופ-ארק" או "ארט
אופטיק" או חמתחזות להיות מסגרות המיוצרות על ידי המבקשת ו/או מעוצבות על ידי רונית
פירסט ו/או להציג עצמם כמפיצים ו/או נציגים של המבקשת.

2



בתי המשפט

בבית המשפט המחוזי בתל אביב-יפו    בשא  009267/07
בתיק עיקרי: א  001661/07

בפני:   כבוד השופט יהודה זפט - סגן נשיא

בבקשה שלפני עותרת המבקשת לצו מניעה זמני שיאסור על המשיבים לייצר ו/או לשווק ו/או
להפיץ ו/או למכור מסגרות משקפיים צבועות בעבודת יד, וכן לאסור על המשיבים לייצר ו/או
למכור ו/או להציג בכל מקום בעולם מסגרות משקפיים הנושאות את השם "רוניית פירסטי", "אופ-
ארטי", או "ארט אופטיקי" או מסגרות המתחזות להיות מיוצרות או מעוצבות ע"י המבקשת.

דיון

א.  המבקשת מבססת את זכותה לסעד הנתבע על הוראות סעיף 7 להסכם ההפצה לפיו נאסר
על המשיבים לחיות מעורבים בייצור ו/או שיווק של מסגרות משקפיים צבועות ביד
הדומות למסגרות המצויירות ו/או מתחרות בהן במהלך תוקפו של ההסכם ולתקופה של
שנתיים לאחר מכן.

סעיף 7 להסכם ההפצה (נספח ב), קובע:

"During the term of this agreement and for a period of 2 years
thereafter, the Buyer shall not be involved in any way, wether
directly or indirectly, wether for consideration or not, in
manufacturing, marketing, selling, promoting, or distributing-
hand painted frames for glasses of any kind (made of Plastic
or metal) Worldwide that resemble and/or compete with the
product."

לטענת המבקשת, יש למנות את תקופת הגבלת התחרות מיום 31.12.06 משום שעל פי
גרסת המשיבים עד לאותו המועד המשיכו המשיבים לשמש כנציגים בלעדיים של
המבקשת.

3



בתי המשפט

בבית המשפט המחוזי בתל אביב-יפו           בשא 009267/07

בתיק עיקרי: א 001661/07

בפני:    כבוד השופט יהודה זפט - סגן נשיא

אפשר שנוכח מתן זכות ההפצה הבלעדית בארה"ב למשיבים אין בהגבלת העיסוק של
המשיבים למשך שנתיים משום פגיעה לא מידתית בחופש העיסוק של המשיבים. ברם
אפילו כך אין להוסיף על תקופת ההגבלה שנקבעה בהסכם במפורש. משנקבע כי ונוקפו
של חסכם ההפצה יהיה עד ליום 31.12.05 (סעיף 3 להסכם) יש למנות את תקופת ההגבלה
לשנתיים החל ממועד זה.

לכך יש להוסיף כי אספקת המסגרות המצויירות למשיבים בתקופה שלאחר ה – 31.12.05
הייתה בתנאים שונים מאלה שנקבעו בהסכם ההפצה ובתקופה זו אף נשללה מהמשיבים
בלעדיות ההפצה בארה"ב (סעיף 10 לתצהירו של אהוד ביברינג מיום 26.4.07).

ב.  המבקשת עותרת לצו מניעה זמני שיאסור על המשיבים להתחרות בה לתקופה בלתי
מוגבלת מקום שלכל היותר זכאית היא למנוע מהמשיבים לשווק מסגרות משקפיים
המתחרות במסגרות המצויירות עד ליום 31.12.07. לפיכך, איני רואה לנכון להיעתר
לבקשה שנועדה למנוע מהמשיבים להתחרות במבקשת.

ג.  מתצהירו של אהוד ביברינג עולה כי ביום 10.3.07 הציגו המשיבים בחנות מוצרי אופטיקה
במונטריי מסגרות משקפיים הדומות למסגרות המצויירות (סעיף 10.1 לתצהיר).
הצהרה זו ניתנה תוך הסתמכות על גרסתה של קטי שו בעלת החנות במונטריי אשר אף
העבירה למבקשת מסגרות משקפיים שרכשה מהמשיבים.

בחקירתו העיד  סמואל טומשובר (ע' 3 לפרוטוקול מיום 20.9.07):

    "ש. כאשר להתצחירה של קטי שו – האם הופעת אצלה ומכרת לת
    מסגרות!
    ת. כן."

עדותו של סמואל טומשובר תומכת בגרסתה של קטי שו אשר נמסרה לאהוד ביברינג.

4



בתי המשפט

בבית המשפט המחוזי בתל אביב-יפו          בשא 009267/07

בתיק עיקרי: א 001661/07

בפני:    כבוד השופט יהודה זפט - סגן נשיא

מהשוואה בין מסגרות המשקפיים שנמכרו לקטי שו על ידי המשיבים לבין המסגרות
המצויירות (מוצג 2), נמצא כי מסגרות המשקפיים שנמכרו על ידי המשיבים לקטי שו
כוללות רכיבי קישוט וסימני דגם זהים לאלה הקיימים במסגרות המצויירות ובין חיוגו
כוללים הם את הסימן "ronit furst" המאפיין את המסגרות המצויירות. לפיכך, נראה
לכאורה שקיים דמיון מטעה בין מסגרות המשקפיים שנמכרו על ידי המשיבים לקטי שו
לבין המסגרות המצויירות.

ד.   בתשובתם הסכימו המשיבים שיינתן נגדם צו מניעה זמני שיאסור עליהם להפיץ מסגרות
מזוייפות (סעיף 90 לתשובת המשיבים מיום 22.7.07), ומשכך אני סבור שנכון יהיה ליתן
צו מניעה זמני שימנע מהמשיבים להמשיך ולשווק מסגרות המהוות חיקוי למסגרות
המצויירות

                                סוף דבר

ניתן בזה צו מניעה זמני האוסר על המשיבים ו/או מי מהם ו/או מי מטעמם לייצר ו/או לשווק
ו/או למכור מסגרות למשקפיים המהווות חיקוי של מסגרות המשקפיים המצויירות של
המבקשת הנושאות את השם "רוניט פירסט", "אופ-ארט" או "ארט אופטיק" כמופיע בנספח
א לבקשה.

תוקף הצו הזמני מותנה בהפקדת התחייבות עצמית לפי הוראות תקנה 365 (ב) לתקנות סדר
הדין האזרחי, התשמ"ד – 1984.

נוכח הסכמת המשיבים לצו האמור איני רואה צורך להתנות את תוקף הצו הזמני בהפקדת
ערבות.

5



בתי המשפט

בבית המשפט המחוזי בתל אביב-יפו          בשא 009267/07

בתיק עיקרי: א  001661/07

בפני:    כבוד השופט יהודה זפט - סגן נשיא

המשיבים ביחד ולחוד ישלמו למבקשת את הוצאות הבקשה, ושכ"ט עו"ד בסך 20,000 ₪.

מזכירות בית המשפט תמציא עותק מהחלטה זו לבאי כח הצדדים בפקסימיליה

ניתן ביום כ"ז תשרי, תשס"ח (9 אוקטובר, 2007) בלשכה.

_____
השופט יהודה זפט - סגן נשיא

State of Israel

The Courts of Law

At the Tel-Aviv – Jaffa District Court                    Case 009267/07

Principal Case    A  001661/07

Before His Honor Judge Yehuda Zepet  - Vice President

In the matter of        ART – Optic Ltd.

Represented by Counsel  Uriel Ganiar        The Petitioner

V e r s u s

1.    Samuel Tomshover

2.    Merill Tomshover

Represented by Counsel Arie Lahav-Levy        The Respondents

## Ruling

### Background

On October 1, 2004 the Petitioner, engaged in the production and marketing of spectacle frames made of plastic, decorated by handwork ("the decorated frames") made a distribution agreement with the respondents whereby the respondents were to serve as sole distributors of the decorated frames in the USA in the period between December 1, 2004 and December 31, 2005 ((hereinafter: the distribution agreement).

A dispute about the distribution of the decorated framers erupted between the petitioner and the respondents and from 2006 onward the petitioner ceased to provide the respondents with decorated frames.

According to the petitioner, the respondents are engaged in the USA in the marketing of spectacle frames that constitute an imitation of the decorated frames.

2

In civil file 1661/07 the petitioner sought a declaratory ruling banning the respondents from producing or marketing frames that are similar to or competing with the decorated frames over a period of two years from September 30, 2006 – the final date on which the petitioner supplied the respondents aith decorated spectacles. The petitioner also applied for a ruling banning the respondents from making and/or selling frames bearing the name Ronit First, Op-Art, or Art Optic, or purporting to be frames manufactured by the petitioner and/or designed by Ronit First and/or being passed off as distributors and/or representatives of the petitioner.

In the petition before me, the petitioner requests a temporary injunction banning the respondents from manufacturing and/or marketing and/or distributing and/or selling spectacle frames painted by hand, and also from making and/or selling and/or displaying anywhere in the world spectacle frames bearing the name Ronit First, Op-Art, or Art Optic or frames purporting to be made or designed by the petitioner.

### Discussion

A.  The petitioner bases its right to the sought relief on the provisions of clause 7 of the distribution agreement, which bans the respondents from engaging in production and/or marketing of hand-painted spectacle frames resembling the decorated frames and/or competing with them during the currency of the agreement for a period of two years thereafter. Clause 7 of the distribution agreement (Appendix B) stipulates:

*During the term of this agreement and for a period of 2 years thereafter, the Buyer shall not be involved in any way, whether directly or indirectly, whether for consideration or not, in manufacturing, marketing, selling, promoting or distributing hand painted frames for*

3

*glasses of any kind (made of plastic or metal) worldwide that resemble and/or compete with the product".*

According to the petitioner, the period of restricted competition is to be counted from December 31, 2006 because according to the respondents' version they served till then as sole agents of the petitioner.

Owing to the grant of sole distribution rights in the USA to the respondents it is possible that their restriction of business constitutes no disproportionate impairment of their right of conducting business. Even in this case, however, the restriction period expressly established in the agreement should not be extended. Since it is established that the distribution agreement is to be valid till December 31, 2005 (clause 3 of the agreement), the restriction period is to be counted for two years starting on that date.

Moreover, the delivery of decorated frames to the respondents in the period after December 31, 2005 took place in conditions different from those established in the distribution agreement and during that period the respondents were denied the exclusivity of distribution in the USA (article 10 of the affidavit by Ehud Bibering of April 26, 2007).

B.   The petitioner is applying for a temporary injunction banning the respondents from competing with it for an indefinite period whereas it was entitled at most to prevent the respondents from marketing competing glasses with decorated frames till December 31, 2007. Therefore, I see no justification for accepting this request, which was intended to prevent the respondents from competing with the petitioner.

4

C.    It follows from the affidavit by Ehud Bibering that on March 10, 2007 the
respondents displayed in the optical store in Monterey spectacle frames
similar to the decorated frames (article 10.1 of the affidavit). This statement
was given on the basis of the version of Kathy show, owner of the Monterey
store, who even handed over to the petitioner frames purchased by her from
the respondents.

Samuel Tomshover testified as follows (p. 3 of the protocol of
September 20, 2007:

*Q.    About the deposition by Kathy Show, did you appear in her place
and sell her frames?*

*A.    Yes.*

The testimony of Samuel Tomshover supports the version of Kathy Shaw, as given
to Ehud. Bibering.

Comparison between the frames sold to Kathy Shaw by the respondents and the
decorated frames (Exhibit 2) reveals that the frames sold by the respondents to
Kathy Shaw comprise decorative elements and model signs identical to those
existing in the decorated frames, among other things they contained the *ronit first*
sign, which characterizes the decorated frames. Therefore it appears prima facie
that there is a misleading similareity between the frames sold by the respondents to
Kathy Shaw and the decorated frames.

D.    The respondents agreed in their reply to obtain a temporary injunction
banning them from distributing   forged frames (clause 90 of the
respondents' reply of July 22, 2007), and on these grounds I think it
would be justified to hand down a temporary injunction banning the

5

respondents from further marketing of frames that constitute a forgery of the decorated ones.

## Conclusion

A temporary injunction is hereby handed down, banning the respondents and/or any person on their behalf from making and/or marketing and/or selling spectacle frames that constitute a forgery of the decorated frames made by the petitioner with the inscription Ronit First, Op-Art, or Art Optica as shown in Appendix A of the Petition.

The validity of this temporary injunction is conditional upon the deposition of a personal undertaking pursuant to Regulation 365(B) of the Civil Court Procedure, 1984.

In view of the respondents' consent to the said order I see no need for making the temporary injunction conditional upon the deposition of a guarantee.

The respondents shall jointly and severally pay the petitioner the costs of the petition and attorney fee in the sum of NIS 20,000.

The court secretariat shall issue a copy of this ruling to the counsels of the parties by fax.
*Issued on October 9, 2007, in the chambers.*

*( - )*
*Judge Yehuda Shefet, Vice President*

**Exhibit 6**

<div dir="rtl">

בית משפט מחוזי תל אביב-יפו
א 1661.1/07 {תביע.שכנגד}
סמואל טומשובר נ. ארט אופטיק בע
(בתיק ארט אופטיק בע"מ נ. סמ.)
ת.פתיחה:18/10/07 סדר דין: רגיל

בבית המשפט המחוזי
בתל אביב – יפו

1. סמואל טומשובר

2. מריל טומשובר

שניהם ע"י ב"כ עוה"ד אריה להב-לוי
ו/או דורון שמעוני ו/או זהבית מרקס
מרחוב אחד העם 9, ת.ד. 29557, ת"א 61294
טל: 7979993-03 פקס: 7979997-03

התובעים שכנגד
(הנתבעים)

- נ ג ד -

1. ארט אופטיק בע"מ ח.פ. 8-319114-51

ע"י ב"כ עוה"ד נחמי מייזליש ואח'
מרחוב דוד המלך 12, תל אביב 64953
טל: 6968965-03 פקס: 6969781-03

(התובעת)

2. לאה יוסקובי ביברינג ת.ז. 008097677
3. אהוד ביברינג ת.ז. 05676574

שניהם מרחוב הזמיר 61, קרית אונו

הנתבעים שכנגד

מהות התביעה: כספית, חוזית-נזיקית

סכום התביעה: 1,058,390 ₪

## כתב תביעה שכנגד

הצדדים:

1. הנתבעים [והתובעים-שכנגד] (להלן: "התובעים") הינם בני זוג, יהודים, תושבי העיר ניו יורק שבארה"ב (התובע שכנגד 1 הינו בעל אזרחות ישראלית), אשר בכל הזמנים הרלוונטיים לתביעה שכנגד זו, עסקו בשיווק מסגרות למשקפיים ומוצרי אופטיקה בארה"ב. ומי ששימש משווקים (בתחילה בלעדיים ובהמשך יחד עם אחרים) של מסגרות משקפיים בעיצובה של הנתבעת שכנגד 1.

2. הנתבעת שכנגד 1 (להלן: "הנתבעת 1") הינה חברה בע"מ, הנחזית להיות רשומה כדין בישראל, העוסקת, לטענתה, בייצור מסגרות משקפיים (המיוצרות באופן סטנדרטי בסין) ועיצובן בדרך של צביעתן ביד.

</div>

1

3. הנתבעת שכנגד 2 (להלן:"**הנתבעת 2**") הינה בעלת המניות ובעלת השליטה, כמשמעו, בנתבעת 1, ומי שחתמה, יחד ולחוד, עם הנתבעת 1 מול התובעים על הסכם מכירות והפצה בלעדי של מוצרי הנתבעת 1 בארה"ב.

4. הנתבע שכנגד 3 (להלן : "**הנתבע 3**"; "**אהוד**"), משמש, לדבריו, מנהל השיווק של הנתבעת 1, עד לאחרונה פושט רגל, אשר בכל הזמנים הרלוונטיים לתביעה זו היה הרוח החיה, המוציא והמביא מטעמה של הנתבעת 1 ומי שאחראי, יחד ולחוד עם הנתבעות 2-1 לביצועו, כמו גם להפרתו הבוטה, היסודית והנמשכת של הסכם ההתקשרות שהיה בין התובעים לנתבעים 2-1.

## העובדות שביסוד התביעה-שכנגד :

5. בסמוך לסוף שנת 2004, פנו התובעים לנתבעים, באמצעות (ויחד עם) מר דוד גולדווסר, שהינו גיסם של התובעים, ואשר שימש אז אחד ממפיצי מוצריה של הנתבעת 1 בישראל, על מנת לקבל, יחדיו, מהנתבעת 1 את זכויות ההפצה הבלעדיות של מוצרי הנתבעת 1 בארה"ב.

6. לאחר מו"מ קצר שניהלו הצדדים, נערך ונחתם ביום 1.10.04 הסכם בין התובעים ומר גולדווסר מצד אחד, לבין הנתבעות 2-1 מצד שני, אשר הוכתר במילים (באנגלית) : "**הסכם מכירות והפצה**", כאשר בסעיף 3 בו נקבע כי ההסכם ייכנס לתוקפו החל ביום 1.12.04 ויהיה בתוקף במשך 13 חודשים עד ליום 31.12.05. (להלן- "**הסכם ההפצה**").

- העתק הסכם ההפצה מצ"ב כ**נספח א'** לכתב תביעה שכנגד זה.

7. כאן המקום לציין, כי , בהסכמת הצדדים, לאחר תקופה קצרה- בסמוך לאחר חתימת הסכם ההפצה- מר דוד גולדווסר פרש מחלקו בהסכם וחדל משיווק מוצרי הנתבעת 1 בארה"ב, כך שהסכם ההפצה שנחתם בין הצדדים נשאר בתוקפו בין הנתבעות 2-1 לבין התובעים בלבד.

8. ייאמר מיד כי על אף תוקפו המוגבל ותקופתו הקצרה של הסכם ההפצה, הוצהר הן בכתב (ברישא לסעיף 5 להסכם ההפצה) והן בע"פ על ידי הנתבע 3- במהלך ביצועו של ההסכם, כי כוונת הצדדים היא לכונן התקשרות ארוכת טווח ביניהם, אשר תיערך ותיחתם פורמלית לקראת סיום תקופת תוקפו של הסכם ההפצה - קרי בסמוך לתחילת שנת 2006.

9. לתובעים לא הייתה כל סיבה לחשוד במצגים אלה שכן ממה שידוע להם ומשיחות עם מפיצים אחרים שעבדו בשירותן של הנתבעות 2-1 באוסטרליה ובקנדה למשל, תקופת ההתקשרות של אלה עם הנתבעות הינה למשך 7 שנים.

- העתק הסכם הפצה בלעדי של מוצרי הנתבעת 1 בקנדה, מצ"ב כ**נספח ב'** לכתב תביעה שכנגד זה.

2

10. בהסתמך על מצגי הנתבעות 2-1 כאמור, החלו התובעים בביצוע מעשי של ההסכם הפצה שנחתם עימם. כך, החלו התובעים לתור את כל המדינות המרכזיות בארה"ב, לכונן קשרים עיסקיים עם חנויות העוסקות בממכר משקפיים ומוצרי אופטיקה, ולהציע את מרכולתה של הנתבעת 1 לאותם גורמים.

11. בתחילה שווקו המסגרות בשיטת 'דלת לדלת' מחנות לחנות, בהמשך החלו התובעים לארגן כנסי מכירות ולהשתתף בתערוכות וירידים מקצועיים ספציפיים בתחום האופטיקה. וכך 'עקב בצד אגודל' כוננו התובעים רשת של מפיצי משנה במדינות ארה"ב השונות שבאמצעותם שווקה והופצה מרכולתה של הנתבעת 1 ברחבי ארה"ב, עד כי כוננו התובעים למעלה מ- 150 נקודות מכירה בכל רחבי ארה"ב. ויודגש- המדובר בכל רחבי ארה"ב מחוף לחוף.

12. למעלה מן הצורך יצוין, כי בניגוד לגישה הלעגנית והמזלזלת של הנתבעים או מטעמם בכתבי טענותיהם השונים, רשת שיווק והפצה כזו לא יכולה לקום ללא השקעת עבודה קדחתנית והשקעה כספית משמעותית וניכרת.

13. די בניסיון החיים הכללי והשכל הישר על מנת להגיע למסקנה שכינונה של רשת שיווק והפצה כה רחבה כרוכה לא רק ב"עבודת רגליים" אינטנסיבית מהנץ החמה ועד שקיעתה, כי אם לא פחות מכך, בהשקעה ממונית רבה, הנובעת בין היתר, מהנסיעות התכופות לנקודות השיווק וההפצה או לנקודות חדשות, - רחוקות כקרובות- על האש"ל הכרוך בכך, האירוח והמתנת ללקוחות הפוטנציאליים, עלות ההשתתפות בכנסים ובתערוכות, הפירסום ומוצרי הפירסום, וכיוצא באלה אמצעי שיווק, שהנתבעות 2-1 נמנעו מקידום מכירות של מוצרי הנתבעת 1. יצוין כי הנתבעת 1 נמנעה מהשתתפות בכל העלויות הללו, למעט אולי במקרים נדירים יוצאים מן הכלל , וגם אז בעניינים ובסכומים זניחים ושוליים.

14. התובעים מעריכים את היקף השקעתם הכספי הכולל, להבדיל מעבודתם האישית והפיזית, בפיתוחה של רשת השיווק וההפצה של מוצרי הנתבעות 2-1, בכל מהלך הזמנים הרלוונטי לתביעה שכנגד זו, בסכום של עשרות אלפי דולרים.

15. ברי הוא, כי אף בר בר דעת לא היה נכנס להרפתקה כספית מסוג ובהיקף כזה אילולא האמין והסתמך על מצגי והצהרות הנתבעות, ואהוד מנהלם. הן בכתב והן בע"פ. הן קודם לכריתת ההסכם והן במהלך ביצועו, לפניהם פני הצדדים לכינונה של התקשרות ארוכת טווח, כאשר כאמור, היקף ההתקשרות שנהג אצל הנתבעות 2-1 עם מפיצים אחרים, עמד על משך של 7 שנים, לפחות.

16. זה המקום לציין, כי בכל זה לא סגי, שכן מעבר לקשיים האובייקטיביים שהיו מנת חלקם של התובעים בנסיון לכונן את רשת השיווק וההפצה, נאלצו הם להתמודד עם החזרות והחלפות רבות של סחורה בשל פגמים בה.

17. הפגם השכיח ביותר היה התקלפות של אותה צביעה ביד אשר לטענת הנתבעים, זהו ייחודן של המסגרות שלהם. כאן המקום לציין את ההתעלמות של הנתבעים והנתבע 3 בפרט, מצורכי הלקוחות, הטרחה הנוספת הכרוכה בכך ומן הפידבק השלילי בשטח כתוצאה מכך.

18. חוסר התאמה, פגמים ושברים, במסגרות עצמן אף הם היו מהתקלות המביכות אשר אירעו ונפלו במוצרי הנתבעות 1-2 בתדירות גבוהה. חמורים הדברים שבעתיים, עת מישקפי הנתבעת 1 הוצגו ושווקו על ידי התובעים כמשקפיים יוקרתיים הנמכרות לצרכן במחיר של מאות דולרים למסגרת אחת.

19. במקום לקבל את הגיבוי של מטה החברה ובמקום שלחברה יהיה מערך המטפל באורח מהיר ויעיל בהחלפת הסחורה הפגומה. כך שהלקוחות הזועמים (ובצדק) אשר שילמו סכומי עתק עבור "העיצוב האומנותי המיוחד" של המסגרות לא ירגישו מרומים, נאלצו התובעים להתמודד עם הבעיות ומול הלקוחות, שכן הנתבע 3 פשוט בחר לנהוג מנהג בת יענה, לטמון ראשו בחול ולהתעלם. במעט המקרים בהם שעה שעה כבר הנתבע 3 לפניות התובעים, המענה שניתן על ידו ועל ידי הנתבעות 1-2 היה מעט מידי ומאוחר מידי.

20. למעשה, עד למועד הגשת כתב התביעה-שכנגד, ועל אף שיחסי הצדדים נסתיימו, עדיין יש בידי התובעים מסגרות משקפיים רבות פגומות אשר שוכבות להן כאבן שאין לה הופכין, על כל ההפסד הכלכלי המשתמע והכרוך בכך.

21. עם התקרבותו של המועד לסיומו הפורמלי של ההסכם בין הצדדים, החל התובע 1 לנסות ולברר אצל הנתבעת 1 ובעיקר אצל אהוד מנהלה, מתי ייחתם עם התובעים הסכם מכירות והפצה לתקופה ממושכת, כפי שהוצג והובטח להם.

22. הנתבע 3 התחמק ממתן תשובה והסתפק באמירה לקונית לפיה: "יהיה בסדר".

23. התובעים, האמינו לכך שאכן "יהיה בסדר", והמשיכו לפתח את רשת השיווק וההפצה, כאשר תוך השקעת כספים נוספים. מעת לעת, התובעים ניסו להציל מפיו של אהוד התייחסות עניינית יותר באשר לגורל המשפטי של המשך יחסיהם העסקיים והמקצועיים של הצדדים, ואולם אהוד המשיך להתנהל באופן ובצורה עמומים, כאשר התובעים מוחים ללא העיל כנגד חוסר התנהלותו העיסקית כמקובל וכנגד חוסר הגינותו הבסיסית של אהוד ואולם, רק בדיעבד התברר לתובעים כי הכל היה פרי מהלך מתוכנן ומוקפד עליו שקד הנתבע 3 משך זמן רב, (בידיעת הנתבעות 1-2 והסכמתן).

24. כך נתחוור לתובעים כי בכוונת הנתבעים להשתלט על קווי השיווק של התובעים להחליף את התובעים- כמפיצים ומשווקים בלעדיים של מסגרות הנתבעת 1 בארה"ב - במפיץ אחר.

4

העניין החמור מכל הוא שהמטרה הסופית והאמיתית של כל המהלך המתוכנן הזה היה להשתלט על רשת השיווק וההפצה הענייפה שהתובעים כוננו ברחבי ארה"ב- על מנת ליהנות מן המודעות למוצר שקיים בזכות פעילות התובעים בהחדרת המוצר לשוק המקומי בארה"ב, ואף לנצל את הביקוש למוצר אותו יצרו התובעים, תוך ביצוע מכירה ישירה לחנויות האופטיקה שנמנות עם לקוחות התובעים, ותוך קיפוחם של התובעים ועשיית עושר ולא במשפט על גבם וממונם של התובעים.

25.    כאמור, דברים אלה נודעו לתובעים רק בדיעבד, לאחר שהשקיעו את מיטב זמנם ומרצם ואת מירב ההון ומשאביהם בשיווק והפצת מוצרי הנתבעת 1 בארה"ב.

26.    עם תחילתה של שנת 2006, המשיכו התובעים בפיתוחה של רשת השיווק וההפצה כמשווקים ומפיצים בלעדיים של הנתבעת 1 בארה"ב. כך פעלו התובעים במשך רובה של שנת 2006.

27.    בסמוך לסופה של שנת 2006, הודיע הנתבע 3 לתובעים, כי בכוונת הנתבעים למסור את זכויות ההפצה והשיווק הבלעדי של מסגרות הנתבעת 1 לידי אחר, כאשר נוכח קיומה של תנייה בהסכם (סעיף 5 להסכם) הקובעת זכות סירוב ראשונה לתובעים בטרם החלפתם, הציע הנתבע 3 לתובעים, המשך של ההתקשרות. ואולם, הואיל ולאישיו מן הנתבעת 1 לא הייתה כל כוונה לקיים את התנייה בהסכם ההפצה הקובעת והמעניקה לתובעים זכות סירוב ראשונה, התעלמה הנתבעת 1 מזכות זו. אהוד מסר לתובעים כי יוכלו להמשיך ולשווק- ללא בלעדיות- את מוצרי הנתבעת 1 ואולם בתנאים כלכליים ומסחריים שלמרבה ההפתעה היו שונים מהותית מהתנאים שנהגו בין הצדדים עד אז, משמע תוך הרעה משמעותית וניכרת של התנאים המסחריים והכלכליים של ההתקשרות.

28.    כך לדוגמה, נוסף על איבוד הבלעדיות לשיווק מוצרי הנתבעת 1 בארה"ב (שנמשכה לדידם של התובעים גם במהלך 2006), עתה נדרשו התובעים לשלם 100% מערך הסחורה בעת ביצוע ההזמנה מהנתבעת 1, בעוד שקודם לכן- בעת ביצוע ההזמנה- נדרשו התובעים לשלם רק על 30% בלבד מערך הסחורה.

29.    מעשית, לא רק שמחירי הרכישה של המסגרות עלו, אלא שגם כמות המסגרות שנדרשו התובעים לרכוש מהנתבעת 1 במשך תקופה קצובה השתנה דרמטית, לרעת התובעים כמובן. בנוסף, החל מסוף שנת 2006 סירבה הנתבעת 1 למכור לתובעים מסגרות נוספות.

30.    בנסיבות אלה, התחוור לחרדתם הרבה של התובעים כי נפלו לפח מתוכנן היטב שאהוד הינו אדריכל הפה, והנתבעות 2-1 מחרות מחזיקות אחריו, טמנו להם, ועל כן חדלו את הקשר עם הנתבעים, תוך שהתובעים רואים את כל כספם, מרצם ומשאביהם יורדים לטמיון.

31.   כאן המקום לציין, כי על פי סעיף 5 להסכם, חלה על הנתבעות 2-1 החובה לרכוש
      את כל המלאי המסגרות שבידי התובעים **בטרם** החלפתם במפיץ אחר.

32.   מיותר אולי לומר, אך חיוני שייעשה כן, כי איש מהנתבעת 1, או מי מטעמה, לא
      טרח להציע לתובעים למלא את חלקן של הנתבעות 2-1 בהסכם ביני לתובעים.
      במסגרת חקירתו הנגדית של הנתבע 3 בבית המשפט בדיון שהתקיים בהליך בירור
      הבקשה למתן צו מניעה זמני, ולשאלה ישירה בנושא זה, השיב אהוד כי התובעים
      ...הם אלו אשר לא פנו אליו בעניין זה (!)

33.   מדברים אלה ניכר כי המושגים 'תום לב' ו  'תום לב בביצוע הסכם' הינם מונחים
      זרים לאהוד, או כאלה שאין להם שום משמעות לגביו או לגבי הנתבעות 2-1.
      הנתבעים היו אלה שצריכים לפנות אל התובעים- ולא היפך- ואם כבר רצים
      לדקדק, אזי התובעים כן פנו לנתבעים, וביקשו שתירכש הסחורה מהם וכי הם
      יפוצו, ואולם פניות אלו לא נענו.

34.   מכל מקום, בנסיבות שהנתבעים יצרו, התובעים נכפו ונאלצו לפעול להקטנת
      ולמזעור נזקיהם, תוך מכירת מלאי המסגרות שנותר בידיהם.

35.   הנתבעים הוסיפו חטא על פשע. לא זו בלבד שהנתבעים לא רכשו את מלאי
      המסגרות שנותר בידי התובעים, עובר לסיום ההתקשרות, אלא שהנתבעים, אשר
      ככל הנראה, שמו להם למטרה להביא את התובעים אל עברי פי הפחת הכלכלי.
      (ועל מנת לטשטש את הפרות הסכם ההפצה על ידי הנתבעת 1), החלו להכפיש את
      שמם הטוב של התובעים ולפגוע במוניטין שקנו להם התובעים בענף, על ידי הפצת
      טענות שיקריות כי לפיהן, התובעים מייצרים ומפיצים מסגרות מזוייפות המחקות
      את המסגרות של הנתבעת 1- דבר שהוא נטול כל שחר ויסוד.

36.   הנתבעים לא שקטו על שמריהם, ועל אף היעדרה של כל תשתית ראייתית, **ואפילו**
      **לא לכאורה**. לטענות ההבל הבדויות, עתרו הם לבית המשפט בישראל בבקשה
      ליתן צו מניעה זמני- בעמדו צד אחד- כנגד התובעים, האוסר עליהם לייצר, לשווק
      ולמכור מסגרות צבועות ביד, "בכל העולם", שכן אלה מסגרות מזוייפות.
      הנתבעים אף הגדילו לעשות ולטענו כי נוכח קיומם של תניית אי תחרות בהסכם
      בין הצדדים, יש לאסור על התובעים להתחרות בנתבעת 1 למשך שנתיים ימים,
      ועוד כהנה וכהנה טענות לא רציניות אחרות.

37.   מיותר לומר כי בית המשפט הנכבד הבין על נקלה כי כל טענות הנתבעת 1 לא
      רציניות, שלא לומר מצוצות מן האצבע, ועל כן סירב להיעתר לבקשה למתן צו
      מניעה במעמד צד אחד.

38.   חודשים לאחר מכן, התקיים דיון במעמד הצדדים וגם שם נטחנו עד זרא כל
      הטענות הבלתי רציניות והבלתי מבוססות של הנתבעים, וגם הפעם לא צלחה
      דרכם של הנתבעים, שכן בית המשפט בהחלטתו, קבע כי אין שום בסיס לאכיפתה

6

של תניית אי התחרות החוזית על התובעים. המעט אותו הצליחה הנתבעת 1, בכל
זאת לקבל, הוא צו מניעה זמני- לפיו התובעים לא יזייפו מסגרות של הנתבעת 1-
צו אשר התובעים הסכימו לקבלתו מלכתחילה שכן הם מעולם לא זייפו או היו
קשורים לזיוף של מסגרות בעיצובה של הנתבעת 1.

39.    אכן הישג משפטי (ומסחרי) מן המעלה הראשונה.

40.    יחד עם זה, מעז יצא מתוק- במובן זה שהנתבע 3 הודה בחקירתו הנגדית (בדיון
בעניין צו מניעה זמני), כי הנתבעים ירכשו את מלוא המסגרות המצוי בידי
התובעים.

-    העתק מפרוטוקול הדיון מיום 20.9.07 מצ"ב כנספח ג' לכתב תביעה שכנגד זה.

41.    בנוסף, הליך הביניים חשף את קיומו של מפיץ אחר בארה"ב מטעם הנתבעת 1,
במקומם של התובעים.

-    אסמכתאות מתוך אתר האינטרנט של הנתבעת 1 (רונית פירסט ארה"ב USA), וכן
מרישומי הנתבעת 1 לתערוכה שהתקיימה ממש לפני מספר ימים, בתחילת חודש
אוקטובר 2007 בלאס-וגאס ארה"ב, מצורפים כנספח ד' לכתב תביעה שכנגד זה.

42.    והואיל ולמרות קיומה של התניה החוזית בין הצדדים, ולמרות המצגים שהוצגו
לתובעים על ידי הנתבע 3. בידיעתן והסכמתן של הנתבעות 1-2, ולמרות ההצהרה
הברורה שניתנה מפיו של הנתבע 3 בעת חקירתו- לא טרם איש מהנתבעים לעשות
כל מעשה שיוכיח כי אין מדובר בהמשך הולכתם שולל של התובעים, המשך עשיית
עושר ולא במשפט על ידה של הנתבעת 1 והמשך פיזור דברים מן השפה ולחוץ
בלבד, נאלצים התובעים להביא עניינים לערכאות וכאמור, בד בבד עם הגשת כתב
ההגנה מוגש בזה כתב התביעה-שכנגד.

43.    מכאן מוגשת תביעה-שכנגד זו.

## הטיעון המשפטי והסעד המבוקש:

44.    התובעים יטענו כי הנתבעים הפרו את הסכם ההפצה עמם הפרות יסודיות.
הראשונה שבהם הייתה בכך שלא נחתם עמם הסכם הפצה לתקופה ארוכה
כמוסכם בין הצדדים בסעיף 5 להסכם ההפצה.

45.    זאת ועוד, התובעים יטענו כי הנתבעים הוליכו אותם שולל, הן בשנת 2005 בתקופת
הבלעדיות האמורה בהסכם ההפצה, והן בשנת 2006 בתקופה בה התובעים היו
משווקים בלעדיים מכוח התנהגות הצדדים, אשר המשיכו לנהוג ע"פ הסכמות כפי
שנקבעו ביניהם בהסכם ההפצה. רק בדיעבד התחוור לתובעים כי לא כך נהגו
הנתבעים. על אף תניית הבלעדיות שהוענקה לתובעים הרי, שהן בשנת 2005 והן
בשנת 2006, מכרו הנתבעים ישירות ללקוחות שונים ברחבי ארה"ב, חלקם לקוחות

של התובעים- זאת ללא ידיעת ובודאי ללא הסכמת התובעים. למותר לציין כי הדבר נעשה אף ללא תגמול התובעים עבור מכירה בטריטוריה. התובעים שומרים על זכותם לתבוע את הנתבעים על נזקים בגין אובדן רווחים כאשר אלו יתגבשו.

46.    התובעים יטענו בנוסף, כי בינם לבין הנתבעים שוכלל הסכם הקובע כי בטרם סיומו של זה, בכלל זה מן הטעם של החלפתם של התובעים- כמשווק הבלעדי של מסגרות בעיצובה של הנתבעת 1- היו חייבות הנתבעות 2-1 לתת להם זכות סירוב ראשונה להתקשרות של הנתבעות 2-1 עם מפיץ אחר או נוסף. כמו כן, במקרה של החלפת התובעים במפיץ אחר מטעם הנתבעות 2-1, לאחר תאריך 1/1/06, היו הנתבעות 2-1 מחוייבות לרכוש את מלאי המסגרות שנותר בידי התובעים (סעיף 5 להסכם ההפצה).

47.    התובעים יטענו כי הנתבעות 2-1 לא קיימו התחייבויות אלו, ועל כן ניתן לראותן כמי שעברו על האיסור בדבר קיום הסכם בחוסר תום לב.

48.    התובעים יטענו כי במעשיהם אלה הפרו הנתבעות 2-1 את ההסכם וגרמו לתובעים נזק בסכום השווה לסכום הרכישה של מלאי המסגרות שבידי התובעים, והכל בצירוף הפרשי ריבית והצמדה כחוק מיום סיום תקופת תוקפו של הסכם ועד ליום התשלום בפועל.

49.    התובעים יטענו כי כל הנתבעים, והנתבע 3 בראשם, יצרו סדרה של מצגי שווא כלפי התובעים, לפיהם ההתקשרות עימם תהיה לתקופה ארוכה וממושכת. התובעים הסתמכו על מצגים אלה, רכשו, מעת לעת, מסגרות רבות, ואולם בשל סדרת מעשיהם ומחדליהם של הנתבעים, בראשם הנתבע 3 בניגוד למצגים שהוצגו, שונה מצבם של התובעים לרעה כך שנוסף על אובדן הבלעדיות וההפצה, נגרם להם נזק ממוני רב שבא לידי ביטוי בשני אופנים: האחד, עלות המסגרות (קרן) שרכשו ושנותרו בידם. המדובר ב- 3,000 מסגרות מקוריות כולל, אשר נרכשו בכסף מלא מהנתבעת 1 ; השני, אובדן הרווח שצפויים היו התובעים להניב כתוצאה ממכירתן של מסגרות אלה.

50.    התובעים יטענו, כי נוכח כל האמור לעיל על הנתבעים לפצותם בגין נזקיהם, כפי שיפורט להלן.

51.    כאמור, בידי התובעים נותרו 3,000 מסגרות, כולן מקוריות, אשר נרכשו מנתבעת 1.

52.    עלות רכישתה של כל מסגרת היא 26 S$, בצירוף 1.5$ עלות משלוח, ובסה"כ 27.5$ לכל מסגרת. סה"כ 82,500 S$ - זהו שווי (עלות) מלאי המסגרות בידי התובעים.

53.    כל מסגרת נמכרת ונמכרת על ידי התובעים בטווח המחירים שנע בין 73$-69$. קרי- במחיר ממוצע של 71$ למסגרת.

54.    אם כן, סה"כ שווי המלאי למכירה כולל הרווח הוא 213,000 S$.

8

55. שערו הייצג של הדולר בעת הגשתה של תביעה זו הוא : 4.03 ₪/S.

56. מהמקובץ עולה אם כן, כי על הנתבעים, יחד ולחוד, לשלם לתובעים סך של 858,390 ₪, המהווה את כלל נזקם הכלכלי הישיר של התובעים בגין הפרתו החד צדדית של הסכם ההפצה על ידי הנתבעים, הצגתם של מצגי שווא כלפיה, הסתמכותם של התובעים על מצגים אלו והשינוי לרעה שחל במצבם של התובעים בעקבות כך.

57. בנוסף, על הנתבעים, יחד ולחוד, לפצות את התובעים בגין הפרתה של התנייה בהסכם שעניינה זכות סירוב ראשונה שכאמור מומשה אך למראית עין ובחוסר תום לב, בסכום של 100,000 ₪.

58. בנוסף, על הנתבעים, יחד ולחוד, לפצות את התובעים בגין הפגיעה בשמם הטוב, זאת עקב דברי הבלע וההבדיות שהנתבעים הפיצו עליהם בענף ואצל הקולגות העיסקיות שלהם, בסכום כולל של 100,000 ₪. (50,000 ₪ ללא הוכחת נזק עבור כ"א מהתובעים בהתאם להוראות חוק איסור לשון הרע).

59. לבית המשפט הנכבד סמכות מקומית ועניינית לדון בתביעה זו.

60. אשר על כן, ולאור כל האמור לעיל, מתבקש בזה בית המשפט הנכבד להזמין את הנתבעים לדין ולחייבם, יחד ולחוד, כדלקמן :

א. לשלם לתובעים סך של 858,390 ₪ בגין ההפסד הכלכלי הישיר שנגרם להם ;

ב. לשלם לתובעים סך של 100,000 ₪ בגין אי קיומו של ההסכם בתום לב והפרות התנייה החוזית שעניינה חתימת הסכם הפצה לטווח ארוך בין הצדדים. וכן העניקת זכות סירוב ראשונה לתובעים בטרם החלפתם במפיץ אחר ;

ג. לשלם לתובעים סך של 100,000 ₪ בגין הפגיעה שנגרמה לשמם הטוב בכלל, ובענף האופטיקה בפרט, זאת בשל העלילה שרקמו הנתבעים נגדם ;

ד. לשלם לתובעים הוצאות משפט הולמות וראויות בנסיבות העניין וכן שכ"ט עו"ד בצירוף מע"מ כחוק בגינו ;

ה. כל סעד אחר אשר יישר בעיני בית המשפט הנכבד.

<br>

דורון שמעוני, עו"ד<br>
ב"כ התובעים - שכנגד

אריה להב-לוי, עו"ד<br>
ב"כ התובעים - שכנגד

**Exhibit 7**

# GOTTLIEB, RACKMAN & REISMAN, P.C.

COUNSELORS AT LAW

PATENTS · TRADEMARKS · COPYRIGHTS · INTELLECTUAL PROPERTY

270 MADISON AVENUE
NEW YORK, N.Y. 10016-0601
PHONE: (212) 684-3900 · FACSIMILE: (212) 684-3999
WEB: http://www.grr.com · E-MAIL: info@grr.com

JAMES REISMAN
MICHAEL I. RACKMAN
GEORGE GOTTLIEB
BARRY A. COOPER
DAVID S. KASHMAN
ALLEN I. RUBENSTEIN
JEFFREY M. KADEN
AMY B. GOLDSMITH
TIBERIU WEISZ
MARIA A. SAVIO
RICHARD S. SCHURIN

OF COUNSEL
DIANA MULLER*

* MEMBER OF THE BAR
OF ARGENTINA ONLY

DONNA MIRMAN BROOME
BARBARA H. LOEWENTHAL
MARC P. MISTHAL
FRANK D. DECOLVENAERE
STEVEN STERN
YUVAL H. MARCUS

PATENT AGENT
ZOYA V. CHERNINA

January 21, 2008

**By Hand**

Hon. Miriam G. Cedarbaum
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 1330
New York, N.Y. 10007

> Re:    Art-Optic, Ltd. v. Samuel Tomashover et. al.
>          08 CV 0327 (MGC) (KNF)

Dear Judge Cedarbaum:

This firm represents the defendants in the above referenced matter.

We write in advance of tomorrow's conference on plaintiff's proposed Order to Show Cause to highlight a few relevant points that we observed in reviewing plaintiff's papers, and which we intend to discuss with the Court in further detail.

1.    This Case is Already Being Litigated in Israel and the Parties' Distribution Agreement Requires That All Disputes be Resolved in Accordance with the Laws of Israel.

The plaintiff, an Israeli company, and defendants, New York residents and a New York company, are parties to an exclusive distribution agreement that requires that all disputes between the parties' be resolved in accordance with the laws of Israel. A copy of this Agreement is attached as Exhibit 3 to plaintiff's papers.

In April of 2007, plaintiff commenced an action in Israel against the defendants alleging the exact same claims of infringement, and offered testimony relating to the same alleged facts. Defendants have appeared in that case, which has been actively litigated over the last nine (9) months and is still pending in the Israeli courts. Moreover, plaintiff also filed a motion for preliminary relief in that case.[1]

---

[1] Plaintiff's motion for preliminary relief in Israel was denied in part and granted in part. (See Exhibit 8 to Plaintiff's papers)

Hon. Miriam G. Cedarbaum
January 21, 2008
Page 2

While the familiar "first-filed rule" may not technically apply since the Israeli action is not "within the federal courts," the policies behind the rule still apply.  These policies include the desire to (a) avoid duplication of judicial effort, (b) avoid vexatious litigation in multiple forums, (c) achieve comprehensive disposition of litigation among parties over related issues, and (d) eliminate the risk of inconsistent adjudication.

With respect to avoiding duplicative effort, since the Israeli Court has already heard and decided an identical motion for preliminary relief (see, Exhibit 8), there is no justifiable reason for this Court to now duplicate that effort. Considerations of International comity entitle the prior Israeli proceeding to some deference.

The policy of avoiding vexatious litigation in multiple forums is also an issue herein.  In this case, it appears as if the only reason for this action is to harass the defendants, who are smaller and have less financial resources than does the plaintiff.

Finally, the remaining policies of achieving a comprehensive disposition and eliminating the risk of inconsistent adjudication are also very much a concern in this situation.  This is true especially since the parties' agreement provides that "[T]his agreement shall be governed and interpreted solely in accordance with the laws of Israel."  (See, ¶10 of Exhibit 3.)

The Court has broad discretion when considering a plaintiff's request for the extreme remedy of a temporary restraining order.  In this case, which concerns facts and claims that have already been litigated in an Israeli court for more than nine (9) months, and which requires the interpretation of Israeli law, consideration of a temporary restraining order and/or preliminary injunction would constitute a duplication of judicial effort, interfere with the Israeli case, and pose a real risk of an inconsistent adjudication.  For these same reasons, there is no urgency of plaintiff suffering irrepereable harm, and a TRO and/or Preliminary Injunction motion should not be entertained.

      2.    Since Plaintiff has been Aware of the Alleged Facts and Circumstances Giving Rise to this Action for at least Eleven (11) Months, there is No Presumption of Irrepereable Harm.

It is well established in this Circuit that unreasonable delay in seeking relief renders inoperative any presumption of irreparable harm, and will preclude

Hon. Miriam G. Cedarbaum
January 21, 2008
Page 3

the award of preliminary relief. *Citibank N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

In this case, plaintiff itself alleges that the complained of acts have been occurring "since the beginning of 2007" (see page 2 of plaintiff's memo), and that plaintiff learned of the alleged acts in February of 2007 (see page 5 of plaintiff's memo.)  That plaintiff has known for at least eleven months of the actions that form the basis for its application and has nevertheless failed to seek relief in this Court until now strongly suggests a lack of urgency and irreparable harm. Moreover, the third party affidavits of Ruth Domber and Cathy Shue[2] upon which plaintiff relies are dated April 6, 2007 and April 9, 2007 respectively. (See Exhibits 4 and 7.)  Accordingly, there is no urgency to plaintiff's request.

Although we only began representing this client last Thursday, and have only had a limited opportunity to review the documents and materials associated with this dispute and to interview our client and its Israeli counsel,[3] it is apparent that this is not a case justifying a TRO or preliminary injunction.  Our clients maintain that all of the products that it sells are authentic products sold to it by plaintiff, and have taken that position in the Israeli case.   Given the work that has already been done in the Israeli case, litigating a duplicative action in New York would do nothing more than waste valuable judicial resources.

Respectfully submitted,
GOTTLIEB, RACKMAN & REISMAN

Richard S. Schurin (RS 0199)

cc:    All counsel of record

---

[2]  The Domber and Shue affidavits were offered in the Israeli case, but then, for reasons unknown to us, they were withdrawn from that proceeding

[3]  Plaintiff is represented by the Israeli office of the same law firm that is representing plaintiff in this action.

**Exhibit 8**

Dear Shira,

Further to my email of this afternoon, I have met with my clients and we hope to be able to have documents, emails and inventory available for your inspection on Friday or early next week.

In accordance with Judge Cedarbaum's orders, since your clients represented that their audited financial statements do not provide relevant specifics, please advise when we can expect to review your clients' books and records, including the following:

- o All invoices for sales of Ronit Furst glasses to the Tomashovers for the period January 2005 - October 2006

- o All invoices for sales of Ronit Furst glasses to the two customers in U.S. identified in the parties' agreement for the period January 2005 - October 2006

- o All invoices for sales of Ronit Furst glasses to customers in any country outside of the U.S. for the period January 2005 - October 2006

- o All purchase orders between plaintiff and the Chinese manufacturer for the period January 2005 - October 2006

- o All purchase orders between plaintiff and the Kibbutz for coating services for the period up to and including October 2006

- o Contracts with the Chinese manufacturer and the with the Kibbutz

- o Communications/instructions from plaintiff to the Chinese manufacturer and/or to the Kibbutz

- o Communications, including emails, with Ruth Domber relating to Tomashover

- o Communications, including emails, with Beeri relating to Tomashover

- o Emails from Ehud Bibring and/or Ronit Furst to Tomashover

o   Communications, including emails, with Cathy Shue relating to
Tomashover

   o   Documents identifying cash payments made to plaintiff on behalf of the
     Tomashovers for purchases of Ronit Furst glasses

   o   All shipping documents, including bills of lading, etc. for Ronit Furst
     glasses sent by plaintiff to the U.S.


As for Judge Cedarbaum's request for a status report, we intend to write to the Court
tomorrow and advise that we cannot proceed with the hearing on March 3rd. I have an
arbitration hearing all day on Wednesday and Thursday this week and will be
unavailable much of tomorrow preparing for same. I do not think it is realistic that the
parties will have completed their exchange of documents by early next week.

Please advise of alternate dates when you and your clients are available.

Very truly yours,

Richard S. Schurin, Esq.
Gottlieb, Rackman & Reisman P.C.
270 Madison Avenue, 8th Floor
New York, N.Y. 10016-0601
(212) 684-3900
(212) 684-3999
rschurin@grr.com